# EXHIBIT 8

008457

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |
|---|---|
| In re:<br><br>INFOW, LLC, *et al.*,<br><br>Debtors.[1] | Case No. 22 - 60020<br><br>Chapter 11 (Subchapter V)<br><br>Jointly Administered |

## DEBTORS' OMNIBUS RESPONSE TO MOTIONS TO DISMISS

InfoW, LLC ("InfoW"), IWHealth, LLC ("IWH"), and Prison Planet TV, LLC ("PTV,"

and together with InfoW and IWH, the "Debtors"), the debtors and debtors-in-possession in the

above-captioned jointly administered chapter 11 cases, hereby file this response to (a) *Connecticut*

*Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Designation as*

*Subchapter V Small Business Vendors* (sic) [ECF No. 36] (the "Connecticut Plaintiffs' MTD");

(b) *The Texas Litigation Plaintiffs' Supplemental Motion to Dismiss Petition* [ECF No. 42] (the

"Texas Plaintiffs' MTD"); and (c) *Motion to Dismiss Debtors' Chapter 11 Cases*, [ECF No. 50]

(the "UST MTD") and together with the Connecticut Plaintiffs' MTD and the Texas Plaintiffs'

MTD, the "Motions to Dismiss"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Connecticut Plaintiffs' MTD and Texas Plaintiffs' MTD are moot. The Texas

Plaintiffs' claims against the Debtors were released and the Texas Plaintiffs' MTD was withdrawn

---

[1] The Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

[2] The Debtors have made the business decision to dismiss these chapter 11 cases and have filed the *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [ECF No. 110]. This Response is filed to make sure that the allegations in any of the Motions to Dismiss are not in any way construed by any party as an admission by the Debtors for any purpose and to preserve the Debtors' rights if the Court declines to enter an order approving the stipulation.



EXHIBIT

8

008458

by the Stipulation and Order entered on May 19, 2022 [ECF No. 99] (the "Texas Plaintiffs' Stipulation"). The U.S. Bankruptcy Court for the District of Connecticut entered an order dismissing the Connecticut Plaintiffs claims against the Debtors with prejudice on May 26, 2022, as reflected in the Order attached hereto as Exhibit A (the "Connecticut Plaintiffs' Dismissal Order"). The Connecticut and Texas Plaintiffs are no longer creditors in or affected by these chapter 11 cases.

2.      The U.S. Trustee still seeks dismissal of the cases.[3] Although the Debtors have at least $140,000 of asserted claims against them that could be satisfied through the chapter 11 case, the ability to pay those claims and administrative expenses, and valuable assets that could be liquidated if funds were not otherwise available.[4] The Debtors' former link to Alex Jones is too great a sin in the U.S. Trustee's eyes for the Debtors to overcome—despite the U.S. Trustee's paradoxical objection to the appointment of independent management for the Debtors.[5]

3.      The U.S. Trustee's assertions in the UST MTD cannot be the *actual* reasons that the U.S. Trustee still wants these cases dismissed. The crux of the argument in the UST MTD is that the chapter 11 cases were just a litigation tactic and thus were filed in bad faith. But the litigation that the U.S. Trustee claims was the sole, bad-faith purpose of these cases is no longer affected. Despite the resolution of the litigation vis-à-vis the Debtors, however, the U.S. Trustee still seeks dismissal.

---

[3] References to the "U.S. Trustee" are to the U.S. Trustee in his official capacity and includes his agents. The Debtors adopt the style of reference used in the UST MTD (e.g., referring to the U.S. Trustee as "he") without asserting that the actions or knowledge attributed to the U.S. Trustee are the actions or knowledge of Kevin M. Epstein personally.

[4] Debtor InfoW owns the domain name "infowars.com." Although it licenses that name to Free Speech Systems, LLC ("FSS"), a condition of that license—negotiated by the Debtors' prepetition—was that $715,000 of initial funding under the PSA would be paid to satisfy the administrative expenses of these chapter 11 cases. FSS's failure to deliver the funds would be a breach of the license agreement and allow InfoW to sell or license the domain name.

[5] *See Objection of United States Trustee to Debtors' Emergency Motion for Order Authorizing Appointment of Russell F. Nelms and Richard S. Schmidt as Trustees of the 2022 Litigation Settlement Trust and Granting Related Relief* [ECF No. 18].

008459

4.      The U.S. Trustee's other arguments in the UST MTD are similarly belied by logic or the U.S. Trustee's inconsistent actions in these cases. The chapter 11 cases put *these three Debtors* in a position to pay more to their creditors than would have been possible absent chapter 11—approximately $10.0 million, even before the proposed litigation settlement trustees (the "Proposed Trustees") were in place to give the Debtors an opportunity for further negotiations with the third-party funding contributors. But apparently the U.S. Trustee does not believe that paying creditors more than they would receive in a liquidation is a valid reorganizational purpose. The U.S. Trustee complains that the PSA and LST were negotiated by insiders but objected when the Debtors sought to put in place independent third-party fiduciaries in the form of the Proposed Trustees to enable further negotiations.[6] The U.S. Trustee argues that the lawsuits that precipitated the chapter 11 cases primarily concerned non-debtors even though the Debtors had been *defendants* in those lawsuits for four years and faced death penalty sanctions when they claimed they did not have financial information to produce in discovery. And finally, the U.S. Trustee asserts that the Debtors are attempting to abuse subchapter v of chapter 11 of the Bankruptcy Code despite not directly claiming that the Debtors fail to meet the requirements for such relief under the Bankruptcy Code.

5.      While the above dubious positions could be attributed to overzealousness, the U.S. Trustee's statements regarding the Debtors' goals in chapter 11 come perilously close to outright deception. On April 17, 2022, the Debtors provided Assistant U.S. Trustee Millie Sall a copy of their contemplated plan of reorganization, as reflected in Exhibit B hereto. The U.S. Trustee was

---

[6] As the Court is aware and the U.S. Trustee indicated, further negotiations with respect to the PSA and LST *did* occur even before the U.S. Trustee filed the UST MTD. *See Notice of Amended and Restated Declaration of Trust and Plan Support Agreement* [ECF No. 48]. The U.S. Trustee asserts that the amended and restated PSA and LST "simply attempt to obfuscate what the earlier version make clear—that the Debtors are using these cases to benefit Alex Jones and FSS, not the Sandy Hook Plaintiffs." UST MTD at p.4 n.6. The evidentiary support the U.S. Trustee has for that representation to the Court, as required by Rule 11, will unfortunately likely remain a mystery.

008460

*aware* that the Debtors (a) were not contemplating any third-party releases, (b) did not intend to deprive the plaintiffs of their jury trial rights, and (c) the contemplated estimation would be voluntary with respect to allowance.[7] To propose that contemplated plan, however, the Debtors needed appointment and buy-in from the Proposed Trustees, as the U.S. Trustee was aware. Conveniently, the U.S. Trustee opposed the appointment of the proposed trustees even though the appointment would have resolved several of the issues raised in the UST MTD.

6.      The facts are that these chapter 11 cases were filed in good faith and would still serve a valid bankruptcy purpose. Nonetheless, the Debtors, under the management of their independent CRO, recognize that the dismissal is in the best interests of the Debtors and their estates because the U.S. Trustee continued opposition to the cases. The U.S. Trustee has decided to run up the administrative expense of these cases even though no party with a remaining pecuniary interest has a problem. That clearly does not square with the U.S. Trustees claimed role in the bankruptcy process, but that is neither here nor there.

7.      The duty of the Debtors and their professionals as estate fiduciaries is clear and unwavering. The Debtors have therefore agreed to the dismissal of the chapter 11 cases pursuant to the *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [ECF No. 110] (the "Stipulation of Dismissal"). The dismissal of the Chapter 11 Cases should be according to the Stipulation and not any of the Motions to Dismiss, which should be denied as moot or on the merits.

---

[7] It should not be a surprise that the Debtors were (prior to the dismissal of claims against them with prejudice ) and Jones and FSS still are likely to appeal any significant judgment. The contemplated plan provided that there would be no appeal or other challenge if the plaintiffs *elected* to determine their claims through an estimation-like claims allowance process. The Debtors submit that kind of voluntary give and take is indisputably appropriate.

4

## ARGUMENT

### A. The Motions to Dismiss Are or Will Be Moot Upon Entry of the Stipulation of Dismissal.

8.      "A pleading is moot when a court's decision on a pending motion will be 'hypothetical or academic' or 'without any practical significance.'" *Halton v. Triplett (In re Triplett)*, Nos. 19-42570, 20-04059, 2022 Bankr. LEXIS 64, at *5 (Bankr. E.D. Tex. Jan. 10, 2022) (quoting *Scarborough-St. James Corp. v. 67500 S. Main St., Richmond, LLC (In re Scarborough-St. James Corp.)*, 554 B.R. 714, 720 (D. Del. 2016)) (internal quotation marks omitted).

9.      Each of the Motions to Dismiss are already moot or will be moot upon approval of the Stipulation of Dismissal. The Texas Plaintiffs' MTD was withdrawn pursuant to the Texas Plaintiffs' Stipulation. But if not, it would be moot because the movants are no longer creditors and have stated they want no further involvement in these chapter 11 cases. The movants with respect to the Connecticut Plaintiffs' MTD are also no longer creditors of the Debtors pursuant to the Connecticut Plaintiffs' Dismissal Order and have told this Court that they want nothing more to do with these chapter 11 cases. The UST Motion either is or will be moot pursuant to the Stipulation of Dismissal.

### B. The Debtors Filed their Bankruptcy Petitions in Good Faith.

10.      To the extent that the Court finds that the Motions to Dismiss are not moot, they should be denied on the merits. The Debtors filed their petitions in good faith and these chapter 11 cases have a valid reorganizational purpose.

#### i.      *Standard for dismissal for bad faith dismissal.*

11.      Bankruptcy relief requires good faith in the commencement, prosecution, and confirmation of bankruptcy proceedings. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986). The Fifth Circuit has instructed that courts should look to a debtor's financial condition,

008462

motives, and local financial realities. *Id.* at 1072. The "traditional" bankruptcy case is where a debtor is facing financial difficulties that pose an existential threat. *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 280–81 (Bankr. N.D. Tex. 2021); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) ("Courts . . . have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11."). "Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *In re Little Creek Dev. Co.*, 779 F.2d at 1072.

12.    To amount to "bad faith" that precludes bankruptcy relief, the facts must "rise to the level of egregiousness necessary to conclude that the reorganization process is being perverted . . . ." *In re Little Creek Dev. Co.*, 779 F.2d. at 1073; *accord In re StatePark Bldg. Grp., Ltd.*, 316 B.R. 466, 476 (Bankr. N.D. Tex. 2004) ("To find bad faith, the court must find that the facts surrounding the filing of the petition are particularly egregious."); *see also In re Greene Ave. Restoration II Corp.*, 597 B.R. 202, 217 (Bankr. E.D.N.Y. 2019) ("Dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances."); *In re MBM Ent., LLC*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015) "[A] bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution."). The question is not whether bankruptcy could have been avoided with the benefit of hindsight, but rather whether the Debtor's management could properly conclude that chapter 11 was an appropriate way to address existing or potential difficulties. *See In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *8 (Bankr. N.D. Tex. Jan. 26, 2005). The purpose of the analysis is to "prevent[] abuse of the bankruptcy process by debtors whose overriding motive is to delay

008463

creditors without benefitting them in any way or to achieve reprehensible purposes." *In re Little Creek Dev. Co.*, 779 F.2d. at 1072.

> ii.   *The chapter 11 cases have valid reorganizational purposes.*

13.     The Debtors were not a financially healthy companies with no need to reorganize. Each of the plaintiffs brought and continued lawsuits against one or more of the Debtors. Those plaintiffs had obtained judgments with respect to liability. Absent restructuring, the Debtors did not have the ability to pay any significant judgment or even the already-imposed sanctions.[8] Chapter 11 relief was necessary for these three Debtors.

14.     The plaintiffs eventually decided that a jury verdict against Alex Jones and FSS was more important to them than maximizing their recovery. That is, of course, their prerogative but it is entirely irrelevant to bad faith. If creditor protestations were indicative of bad faith, virtually every chapter 11 case filed would be subject to dismissal. The Debtors did not try to prevent the plaintiffs from dismissing the cases with prejudice and indeed attempted to *expedite* the process.

15.     The U.S. Trustee's apparent problem is that Alex Jones and FSS would have also received a benefit under the Debtors' contemplated restructuring. Not for nothing, but that is why those parties were willing to pay into a trust to be distributed according to a plan (a) $725,000 initial funding plus any additional costs of the reorganization, (b) $2.0 million in cash on the effective date of a plan of reorganization, and (c) $250,000 per quarter for 60 quarters. If the bankruptcy was just to delay, the money did not need to be on the table.[9] Rather, those funds going to creditors for their claims against the Debtors was the *entire point* of these chapter 11 cases.

---

[8] Sanctions were assessed against InfoW for the failure of *FSS* to present a corporate representative who was properly prepared to testify on the designated topics.

[9] The Debtors had to *negotiate* for these funds prepetition with an eye to using the appointment of the litigation settlement trustees to get even more consideration. That appears to be a foreign concept to the U.S. Trustee.

008464

16.     Reading between the lines, the U.S. Trustee seems to imply that it would have been preferable for the Debtors to have filed for chapter 11 without the $7.7+ million commitment from Jones and FSS. That is completely unreasonable, to put it charitably.

17.     There is no evidence that the funds that the Debtors negotiated for their former creditors was insufficient—it would have adduced in an estimation proceeding for feasibility if it existed—much less that it was so little that it amounts to a "perversion" of the bankruptcy process or egregious conduct. Courts have held under more problematic facts that the concept the Debtors proposed could potentially result in a confirmable plan of reorganization that made dismissal for bad faith appropriate. *See In re LTL Mgmt., LLC*, 637 B.R. 396, 407-09 (Bankr. D.N.J. 2022).[10]

18.     Paying joint claims of FSS and Alex Jones in a chapter 11 plan would have also served the bankruptcy purpose of maximizing the value of the Debtors' assets. The key intellectual property owned by the Debtors is the domain name "infowars.com." That domain name is most valuable while FSS is operating and Alex Jones is on the air. Additionally, the funds from Youngevity received by IWH are related to FSS's operations. While the Plaintiffs—and perhaps the U.S. Trustee—would prefer Alex Jones to not have a platform, that is irrelevant to these chapter 11 cases. Bankruptcy is about putting dollars in the pockets of creditors.

    *iii.*    *The U.S. Trustee's arguments about the PSA and LST are meritless, disingenuous, or inapposite.*

19.     The U.S. Trustee's arguments about the PSA and LST (paragraphs 37-42) were and remain baseless.  The U.S. Trustee's complaints are essentially as follows:

---

[10] In LTL, a Johnson & Johnson ("J&J") subsidiary was organized in Texas, another J&J subsidiary with tort liabilities merged into that Texas entity, the newly merged entity conducted a divisive merger in which all of the tort liabilities were put into a new non-operating entity, J&J entered into a funding agreement with the liable entity, and the entity was moved to a different district where it filed bankruptcy. The Debtors here have been defendants in the litigation for years and filed for bankruptcy in the district in which they were domiciled. Also, there are no allegations that the Debtors' actions killed anyone or caused them to develop cancer.

008465

a. The PSA and LST provided that financial information of Jones and FSS relevant to the contemplated restructuring are (i) subject to confidentiality provisions by the proposed trustees and the Debtors' professionals and may be provided to other parties only with a protective order and (ii) related to estimated claims rather than actual claims;

b. The PSA requires an estimation procedure;

c. The "handwriting is on the wall" that the Debtors are going to seek extension of the automatic stay to Jones and involuntary non-consensual releases; and

d. The creditors did not participate in the negotiation of the PSA or LST before the Debtors filed their petitions.

The U.S. Trustee wants the Court to rule that those "facts" are evidence that the Debtors' bankruptcy cases are an attempt to "pervert" the bankruptcy process. Despite the U.S. Trustee's presumably faux outrage, they show nothing of the sort.

20.     Companies and individuals typically require confidentiality provisions before providing non-public financial information and would want a protective order before that information is shared. And even if Alex Jones and FSS were Debtors, the only financial information that would be *public* would be their schedules, statements, and monthly operating reports. Any other non-public financial could only be compelled by a Rule 2004 examination or other discovery and would almost certainly be subject to a protective order if requested. The U.S. Trustee's argument on this point has absolutely no merit.

21.     The U.S. Trustee's arguments with respect to the estimation procedures and non-consensual third-party releases gets close to being disingenuous. As reflected in Exhibit B hereto, the Debtors provided the U.S. Trustee's office a copy of the Debtor's contemplated plan of reorganization on April 17, 2022. The U.S. Trustee was or should have been aware that the estimation procedures contemplated by the Debtors were only (a) for purposes of feasibility or (b) upon election by litigation claimholders. Rather than using the information the U.S. Trustee had

008466

available, however, the UST MTD decided to engage in flights of fancy because it better suited his position.

22.      Whether "handwriting was on the wall" as to the extension of the stay to FSS and Jones is a matter of opinion. In any event, it certainly did not happen. The Debtors sought central adjudication of the claims against them but that is hardly tantamount to an extension of the automatic stay.[11]

23.      Finally, that the Debtors did not engage the plaintiffs in the formation of the PSA or LST is inapposite. The U.S. Trustee cannot seriously contend that failure to have a prepackaged chapter 11 case is an indication of bad faith. That is especially true here where the Debtors negotiated a mechanism expressly for the purpose of further negotiations in the appointment of the Proposed Trustees. The entire point of the Proposed Trustees was to give creditors someone unquestionably neutral with whom to negotiate.

> iv.      *One or more of the Debtors were defendants in each of the Sandy Hook Lawsuits and liability had already been established prior to resolution during these chapter 11 cases.*

24.      The U.S. Trustee makes noise about the fact that Sandy Hook Lawsuits "do not arise from the Debtors' conduct" but rather "from the allegedly tortious, intentional conduct of Alex Jones and FSS (through its employees) . . . ." UST MTD ¶ 44. The Debtors agree with the U.S. Trustee that the Debtors were entitled to judgment as a matter of law based on the pleadings in the Sandy Hook Litigation. But the relevant state courts—whose opinions actually matter— decided differently. These two state courts even entered judgment against the Debtors.

25.      Ironically, the U.S. Trustee's argument directly cuts against the assertion that the Debtors are not "honest but unfortunate debtors." According to the U.S. Trustee, the Debtors did

---

[11] Moreover, centralized adjudication of claims is one of the central features of the U.S. bankruptcy process.

008467

nothing to cause liability but were still found liable. The *plaintiffs* made the decision to sue these Debtors, pursue litigation against them, and obtain judgments even though there was no basis for liability. The Debtors' use of bankruptcy to resolve those claims—by attempting to paying them in full—was appropriate. When the plaintiffs agreed to have their claims against the Debtors resolved through dismissals with prejudice, the Debtors were more than happy to oblige and worked with the plaintiffs to expedite that process.

     *v.*   *The Debtors qualify for subchapter v of chapter 11*

26.    The U.S. Trustee never asserts that the Debtors do not qualify for subchapter v. Rightly so. It is hard to imagine *how* the Debtors could have possibly incurred any liability except through engaging in business activities. They did not run up their credit cards on trips to Cabo.

27.    Instead, the U.S. Trustee takes issue with Bankruptcy Code § 1182 not including unliquidated liabilities in the calculation of maximum debt to qualify as a subchapter v debtor. The U.S. Trustee wants this Court to unabashedly and directly modify the language that Congress enacted in the Small Business Restructuring Act of 2019 because the U.S. Trustee thinks it should be different.[12] The U.S. Trustee may very well know better than Congress, but obviously that is inappropriate.

     *vi.*   *The chapter 11 cases were not merely a litigation tactic*

28.    As indicated above, the Debtors had valid reorganizational purposes that they sought to accomplish through these chapter 11 cases. The Debtors were prepared with a plan that would have provided as much as $10.0 million for the resolution and payment of claims in a way

---

[12] The U.S. Trustee asserts that "[l]ittle doubt exists that the total damage award against the Debtors, Alex Jones, FSS, and other non-debtor solvent entities of the Alex Jones Enterprise would exceed the debt limit currently in place for subchapter V." UST MTD ¶ 48. There are 21 plaintiffs and the debt limit for subchapter v is $3,024,725. The Debtors severely doubt the U.S. Trustee has a factual basis to assert that the damages of *any* of the plaintiffs exceeds $144,035.71 other than sheer speculation.

008468

that had the potential to shortcut months of successive jury trials and years of appeals. And again, the U.S. Trustee was in possession of that contemplated plan when he filed the UST MTD.

29.     The U.S. Trustee also points to the statements of Alex Jones's personal lawyer that the goal of the bankruptcy was to force estimation.[13] But Jones has no control over the Debtors. And, if anything, it shows *why* the Debtors locked Jones and FSS in under the PSA and LST. At the end of the day, the desires of Alex Jones matter even less to the Debtors than the U.S. Trustee's desire to re-write Bankruptcy Code § 1182.

30.     The Debtors' conduct during the chapter 11 cases confirms that the point of the bankruptcy cases was to resolve the claims against the Debtors. Although the Debtors opposed the plaintiffs' dubious dismissals *without* prejudice, their position was consistently that they would gladly resolve the claims against them through dismissal *with* prejudice rather than money from Jones and FSS.[14] After the issues were resolved, the Debtors took actions to expedite the process.

### C. The Debtors Agree That Dismissal is in the Best Interests of Creditors in Light of the U.S. Trustee's Unreasonable Position.

31.     The U.S. Trustee has made it clear that he will continue to oppose the Debtor's efforts to pay its remaining creditors through these chapter 11 cases even though there is no remaining creditor opposition.

32.     Under these circumstances, the Debtors' CRO has determined that dismissal would be in the best interests of the Debtors and their creditors. While the U.S. Trustee is free to ignore the proclaimed mission of the U.S. Trustee Program "to promote the integrity and efficiency of

---

[13] Perhaps the U.S. Trustee believes that Jones should have been willing to contribute $7.7+ million for nothing, but that is not the way the world works outside of government.

[14] The problem with dismissal *without* prejudice would have been that the plaintiffs could have arguably filed proofs of claim, thereby continuing to assert claims while removing the Debtors' ability to pay them in full. Although the statute of limitations would have run absent bankruptcy, the effect of the automatic stay and the claims bar date may have tolled the applicable limitations period.

12

008469

the bankruptcy system for the benefit of all stakeholders[,]" the Debtors and their professionals are bound by their fiduciary duties. The Debtors have therefore entered into Stipulation of Dismissal, under which the Debtors seek dismissal of these chapter 11 cases.

**<u>CONCLUSION</u>**

33.     Based on the foregoing, the Debtors do not oppose dismissal of these chapter 11 cases, but such dismissal not under any of the grounds set forth in the Motions to Dismiss. Instead, the Court should enter the Stipulation of Dismissal agreed to by the Debtors, the U.S. Trustee, and the Subchapter V Trustee.

[*Remainder of Page Intentionally Left Blank*]

008470

Dated: June 2, 2022

**KYUNG S. LEE PLLC**

/s/ Kyung S. Lee
Kyung S. Lee
TX Bar No. 12128400
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: klee@kslpllc.com
Phone: 713-301-4751

*Proposed Counsel to the Debtors*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing document was served at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service.

/s/Kyung S. Lee
Kyung S. Lee

008471

# EXHIBIT 9

008472

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3    Avi Moshenberg,               )  CASE NO:  22-60043
                                    )  ADVERSARY
 4               Plaintiffs,        )
                                    )  Houston, Texas
 5        Vs.                       )
                                    )  Wednesday, August 3, 2022
 6    Free Speech Systems LLC,      )                        )
                                    )  10:02 a.m. - 5:05 p.m.
 7               Defendants.        )
      ----------------------------)

 8

 9                               TRIAL

10        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE

11

12    APPEARANCES:

13    For Plaintiffs:          MARCEL FONTAINE
                               McDowell Hetherington LLP
14                             1001 Fannin Suite 2700
                               Houston, Texas 77002
15
      For Defendant:           RAY BATTAGLIA
16                             Law Offices of Ray Battaglia, PLLC
                               66 Granburg Circle
17                             San Antonio, Texas 78218

18    Court Reporter:

19    Courtroom Deputy:        Zilde Martinez

20    Transcribed by:          Veritext Legal Solutions
                               330 Old Country Road, Suite 300
21                             Mineola, NY 11501
                               Tel: 800-727-6396
22

23

24    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
25
```

EXHIBIT
9
008473

1                              INDEX

2   PLAINTIFFS' WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3

4

5   DEBTOR'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

6   W. Marc Schwartz       52        101,     228

7                                    159,

8                                    177,

9                                    223

10  PLAINTIFFS' EXHIBITS                           RECEIVED

11

12  DEBTOR'S EXHIBITS                              RECEIVED

13  Exhibit 1      CV of W. Marc Schwartz          52

14  Exhibit 3      Plan Support Agreement          59

15  Exhibit 2      Engagement letter between

16                 W. Marc Schwartz and FSS        60

17  Exhibit 8      Forbearance agreement           70

18  Exhibit 4      8/13/20 promissory note         74

19  Exhibit 5      8/2020 security agreement       75

20  Exhibit 6      11/10/2021 promissory note      76

21  Exhibit 7      UCC 1 Financing Statement       77

22  Exhibit 11     Critical Vendor List            89

23

24

25

```
 1        HOUSTON, TEXAS; WEDNESDAY, AUGUST 3, 2022; 10:02 A.M.

 2                          (Call to Order)

 3        THE COURT:  Good morning, everyone.  This is Judge

 4   Lopez.  Today is August 3rd.  I'm going to call the Free

 5   Speech Systems case here on first days.  I've completely

 6   muted to the phone line so I'm going to take appearances in

 7   the courtroom then I'm going to take appearances for anyone

 8   on the phone.  If you wish to be recognized, you just need

 9   to hit five star, give me a second and I will unmute your

10   line.

11        I'll just remind everyone who may be appearing, by

12   video that appearing by video is just the same as appearing

13   live in Court.  So, I would just ask that everyone please

14   observe the decorum that you would use if you were live in

15   the courtroom, that you would exercise that same judgment if

16   you were appearing by video.

17        So, with that said, let me go ahead and take

18   appearances.  And I will begin in the courtroom.

19        MR. BATTAGLIA:  Good morning, Your Honor.  I

20   assume this microphone is working.  Your technology is --

21        THE COURT:  We're good today.

22        MR. BATTAGLIA:  Okay, good.  Ray Battaglia on

23   behalf of Free Speech Systems.  Appearing with me today are

24   Hyung Lee and RJ Shannon.  Also present in the courtroom is

25   Marc Schwartz, the Chief Restructuring Officer for my
```

```
1    client.  And on the telephone, Norm Pattis, the Counsel for
2    the Debtor in the Connecticut State Court litigation.
3              THE COURT:  Okay, thank you.  And if -- I can --
4    good to see you in person, Mr. Battaglia.
5              MR. BATTAGLIA:  Good to see you, Judge.
6              THE COURT:  Good morning.
7              MR. MOSHENBERG:  Good morning, Your Honor.  How
8    are you?
9              THE COURT:  Good.  Good morning.
10             MR. MOSHENBERG:  I'm here on behalf of the Texas
11   Plaintiffs, Avi Moshenberg.  And also, as we had hoped, we
12   have secured Jarrod Martin and Marty Brimmage as our
13   bankruptcy counsel on behalf of the Texas Plaintiffs, Your
14   Honor.
15             THE COURT:  Okay, good morning.
16             MR. CHAPPLE:  Good morning, Your Honor.
17             THE COURT:  Good morning.
18             MR. CHAPPLE:  Nice to see you again.  Ryan Chapple
19   on behalf of the Connecticut Plaintiffs.  I have my
20   colleague, Eleanor Sterling here in the courtroom.
21             THE COURT:  Good to see you.
22             MR. CHAPPLE:  And Mr. Chris Mattei on the line as
23   well.
24             THE COURT:  Okay, good morning.
25             MR. NGUYEN:  Good morning, Your Honor, Ha Nguyen
```

1    appearing on behalf of the United States Trustee.  Also with

2    me in the courtroom is Assistant U.S. Trustee Millie Sall.

3         THE COURT:  Oh, pleasure.  Seen the name, a

4    pleasure.  Nice to see you.

5         MR. LEMMON:  Your Honor, Steve Lemmon.  I

6    represent PQPR Holdings Limited.

7         THE COURT:  Oh, good morning.

8         MS. HASELDEN:  Good morning, Your Honor.  Melissa

9    Haselden, the Chapter 5 Trustee.

10        THE COURT:  Good morning, Ms. Haselden.  Anyone

11   else in the courtroom wish to make an appearance?

12        MR. CHAPPLE:  Your Honor, my apologies.  I

13   neglected to make clear and introduce Mr. Brimmage as

14   counsel for the Connecticut Plaintiffs as well.

15        THE COURT:  Oh, okay, good morning.  Okay.  I

16   think we've taken all the appearances in the courtroom.  If

17   anyone wishes to make an appearance who's on the line, why

18   don't you hit five star and I will unmute your line.  Okay.

19   I've got a 361 area code.

20        MR. JORDAN:  Judge, Shelby Jordan.  I represent

21   Alex Jones.

22        THE COURT:  Okay, good morning.  Mr. Jordan, I'm

23   going to mute --

24        MR. JORDAN:  Good morning, Judge.

25        THE COURT:  -- I'm going to leave the other line

```
1    unmuted.  If you could just keep your phone on mute during

2    the time, but if you wish to make a statement, obviously,

3    I'll keep your line unmuted.  You don't need to hit five

4    star again.

5         MR. JORDAN:  All right, thanks.  Thank you.

6         THE COURT:  Anyone else wish to make an

7    appearance?  Okay, I've got an area code 203.

8         MR. PATTIS:  Judge, this is Norm Pattis.  I don't

9    have an appearance in the file, but I was asked to make

10   myself available today, so I am here.

11        THE COURT:  Okay.  Thank you.  Mr. Pattis, just

12   for clarification, you represent just FSS in the Connecticut

13   --

14        MR. PATTIS:  I'm sorry, sir?

15        THE COURT:  Just want --

16        MR. PATTIS:  No sir.  I represent --

17        THE COURT:  Go ahead.

18        MR. PATTIS:  I apologize, sir.  I represent Free

19   Speech Systems and Alex Jones in the Connecticut Litigation.

20        THE COURT:  Okay, thank you.  Now, I'll keep your

21   line unmuted as well.  And just keep your phone on mute,

22   sir.  Thank you.

23        MR. PATTIS:  Yes, sir.

24        THE COURT:  Would anyone else wish to make an

25   appearance?  Okay, now that we've taken all the appearances,
```

1    Mr. Battaglia, I'll turn it over to you.

2         MR. BATTAGLIA:  Thank you, Your Honor.  Ray

3    Battaglia for Free Speech Systems.  The matters before the

4    Court today are Docket Number 6, the cash collateral motion.

5    And with that motion, Your Honor, we have an issue that

6    lingers with the -- I'll call them the Plaintiffs' Group --

7         THE COURT:  Mm hmm.

8         MR. BATTAGLIA:  -- that I'll come back to and

9    discuss in a moment, and we can decide how to proceed.

10        THE COURT:  Mm hmm.

11        MR. BATTAGLIA:  With respect to the motion to

12   provide adequate assurance for payment of utilities, Docket

13   Number 7, the Court had suggested that a two-week segregated

14   escrow be established.  I'm wise enough to -- and have

15   inserted that in the proposed form of order.  And unless the

16   Court requires more, there's no opposition to that motion

17   with that change.

18        THE COURT:  Okay.

19        MR. BATTAGLIA:  Generally, the motion provides

20   pretty standard procedures for a utility to come in and

21   request additional adequate assurance if they think -- and

22   then a protocol for how that proceeds.  But generally,

23   between the two-week escrow and the ability to generate cash

24   flow, we've offered that as adequate assurance at this

25   juncture.

```
 1              THE COURT:  Okay.  Let me hear from Mr. Nguyen.

 2    Mr. Nguyen, have you had an opportunity to --

 3              MR. NGUYEN:  Yes, Your Honor.  I've also spoke

 4    with Mr. Battaglia.  We have no objection to the utilities

 5    motion.

 6              THE COURT:  Okay.  Is there a revised proposed

 7    form of order that I can --

 8              MR. BATTAGLIA:  I will upload an order this

 9    evening, Your Honor.

10              THE COURT:  Okay.  Let me just hear this -- I

11    spoke to the utilities motion, which is at Docket Number 7.

12    Anyone wish to be heard in connection with that particular

13    emergency motion?  Okay, anyone on the line?  Let me just

14    check.  And if you do, you need to hit five star.

15              Okay.  I would just note then for the record that

16    at Docket Number 7, it was an emergency motion seeking entry

17    of an order approving the Debtor's proposed form of adequate

18    assurance of payment for future utility services and

19    approving adequate assurance procedures.

20              A very common first day motion to provide adequate

21    assurance to utility providers without adequate assurance,

22    Section 366 of the Bankruptcy Code would allow utility

23    providers to not -- essentially not provide services if they

24    so wish to.  So, upon the furnishing of adequate protection

25    -- actually, adequate assurance and the related procedures,
```

008480

1    I'm going to ask the Debtor to ease into the Chapter 11

2    process and still maintain all of its utilities on an

3    ongoing basis.

4            So, I have proposed at the last hearing, and Mr.

5    Battaglia has kindly agreed, to take the Court's

6    consideration of a two-week deposit at -- in a segregated

7    account that would serve as adequate assurance.  Any utility

8    can come in and ask for additional assurance, but I am

9    comfortable with a two-week in a segregated account.

10           And Mr. Battaglia, it can be placed -- I've got a

11   question about the bank accounts, just so I understand the

12   cash management system.  But theoretically, I'm comfortable

13   with just it segregated with -- still held by the Debtors.

14           MR. BATTAGLIA:  Separate account, Your Honor, or

15   just accounting segregated?

16           THE COURT:  Just accounting segregation for my

17   purposes is fine.  Just something that utilities cand feel

18   comfortable, that they could look to that's accounted for on

19   the books.

20           MR. BATTAGLIA:  We are in the process of opening

21   DIP accounts with Access Bank.

22           THE COURT:  Okay.

23           MR. BATTAGLIA:  And moving the Debtor's accounts

24   to that bank.

25           THE COURT:  Okay.  It just makes it easier.  And

1    at the end of the case, then if -- depending on where we end

2    up, one can provide an order and a plan or something that,

3    you know, the deposit would then go back at the end of the

4    case.  It just makes it a little bit easier.

5            So, with the proposed change, I'll grant the

6    emergency motion at Docket Number 7.  I would just ask that

7    you run the proposed order by Mr. Nguyen before you get it

8    on file.  Make sure the Trustee's okay with it, and then

9    file it on the Docket and I'll take a look at it.  If it

10   looks good, I'll sign it, okay?

11           MR. BATTAGLIA:  Depending upon how late we go

12   today, I'll leave the -- well, Mr. Nguyen, by tomorrow,

13   Judge.

14           THE COURT:  Okay, and if any other party asks to

15   see it, just -- can I just make sure that everyone takes a

16   look at it before you upload it?  But I find this to be

17   fairly routine.  So --

18           MR. BATTAGLIA:  Your Honor, Docket Number 8 is the

19   Debtor's emergency motion for authority to pay critical

20   vendors.

21           THE COURT:  Why don't we take up 9 first and then

22   we can kind of take up 6 and 8 together?  Because I think

23   they relate.

24           MR. BATTAGLIA:  That's fine, Judge.  The Docket

25   Number 9 is the Debtor's emergency motion to extend time to

Case 4:23-cv-00463   Document 6-25   Filed on 03/23/23 in TXSD   Page 27 of 480
Case 22-60043   Document 165-15   Filed in TXSB on 09/16/22   Page 11 of 257

Page 11

1    file schedules and statements of affairs.  There's no

2    opposition to the relief requested in that motion.

3        THE COURT:  Okay.  Does anyone wish to be heard in

4    connection with the motion to file -- I should say to extend

5    the time to file schedules and statements?  Just checking

6    online.  Okay.  This is another what I consider to be

7    procedural ordinary course, it's just providing for

8    essentially a two-week extension of the time.  I want the

9    Debtor to get the schedules right and to take the time to

10   get it right so there's no filing of amendments if that's --

11   it has the right to do that, but I'd rather you come out

12   with what you feel is right.  So --

13       MR. BATTAGLIA:  And Your Honor, the proposed

14   order, the 15th day falls on a Sunday, so I've put a date

15   certain of the following Monday.

16       THE COURT:  Okay.

17       MR. BATTAGLIA:  The Code authorizes only a 15-day

18   extension for a Sub B case without further cause.

19       THE COURT:  No, it's fine.  The 29th is fine.  I

20   want you to -- if that's the date you'll feel you can get it

21   right by, then let's do that.  Let me just -- I'm signing

22   that order right now and I'm going to send it off to

23   Docketing.

24       Mr. Nguyen, can you just talk to me, just

25   generally at the 10,000-foot level?  I just want to

008483

Case 4:23-cv-20463 Document 6-25 Filed on 03/23/23 in TXSD Page 28 of 480
Case 22-60043 Document 165-15 Filed in TXSB on 09/16/22 Page 12 of 257
Page 12

1    understand the Debtor's cash management -- current cash
2    management system. Where does it hold bank accounts and
3    what's going on there?
4         MR. BATTAGLIA: The current bank account is at
5    Security Bank in Crawford, and it'll be moved to Access Bank
6    as a DIP account. Security, not a DIP approved account.
7         THE COURT: Okay. Is Access?
8         MR. BATTAGLIA: Yes.
9         THE COURT: Okay. And Mr. Nguyen, I'm sure you'll
10   -- I'm just going to -- you'll be working with them on the -
11   -
12        MR. NGUYEN: Yes, Your Honor.
13        THE COURT: Okay.
14        MR. NGUYEN: We'll check the bank account to make
15   sure it's properly collateralized and approved -- on the
16   approved list. I believe it is, but (indiscernible) I
17   imagine it is. I haven't seen the list.
18        THE COURT: Okay, I'll -- but if any issues come
19   up, then you'll just let me know, but I'm going to assume
20   that, if I grant debt relief related, that there's no issues
21   with the cash management system now, and we'll be -- you all
22   continue to work on that, so there's no issue for me to take
23   up on that.
24        MR. BATTAGLIA: Yes, sir.
25        THE COURT: Okay. (Indiscernible) how many

1       employees (indiscernible) right now?

2           MR. BATTAGLIA: There are 58 employees. They're

3   employed through a PEO with ADP. And we're current on

4   payroll. We paid the payroll through the filing date to

5   avoid having any disruption with employees.

6           THE COURT: Okay. So, it's just a related

7   question, so I want to look at the budget for employee

8   payroll, that's not including any pre-petition amount?

9           MR. BATTAGLIA: It will not.

10          THE COURT: Okay. How much cash on hand does the

11  Debtor have from the petition date?

12          MR. BATTAGLIA: Your Honor, it's --

13          THE COURT: Just roughly.

14          MR. BATTAGLIA: -- I'll let (indiscernible) give

15  the current --

16          THE COURT: Just on the back of the envelope. I

17  won't hold you to the number. I'm just trying to understand

18  just generally.

19          MR. BATTAGLIA: As of filing date, approximately

20  $1.3 million, of which about $800,000 was not cash

21  collateral.

22          THE COURT: About $800,000?

23          MR. BATTAGLIA: One of the -- yeah, the Debtors

24  you will learn, receives large donations on occasion.

25          THE COURT: Mm hmm. Okay.

1      MR. BATTAGLIA:  And obviously there's great
2   variability in that in the sense --
3      THE COURT:  So that half a million of just what
4   you would consider cash collateral, about $1.3 million and
5   about $800,000 we would call restricted for now, and then
6   another half a million --
7      MR. BATTAGLIA:  My estimate, yes, sir.
8      THE COURT:  Okay.
9      MR. BATTAGLIA:  Now, that's the full accounting.
10     THE COURT:  So, and we'll get into this, and I
11  kind of just want to understand before we get into the cash
12  collateral motion, just when I looked at the budget, it's
13  your 13-week cash flow using -- it's just simply going week-
14  by-week.  I don't -- I didn't see kind of a beginning cash,
15  ending cash analysis there.  And that's why I was asking.
16  So, are you comfortable --
17     MR. BATTAGLIA:  It was not in the -- because as of
18  the time we filed the motion, we didn't know what the
19  beginning cash balance would be.
20     THE COURT:  Okay.
21     MR. BATTAGLIA:  But we obviously can provide that.
22     THE COURT:  Okay.
23     MR. BATTAGLIA:  It's now, as we understand it,
24  about $1.3 million.  And you know, in-flows, Judge, the
25  nature of the cash generation aspects of this business,

Case 4:23-cv-00463   Document 6-25   Filed on 03/23/23 in TXSD   Page 31 of 480
Case 22-60043   Document 165-15   Filed in TXSB on 09/16/22   Page 15 of 257
Page 15

1   obviously the broadcast generally in and of itself doesn't

2   produce revenue except by advertising, and also by

3   generating product sales.  And product sales are dependent

4   on a number of things.  One of them is Alex Jones being the

5   broadcaster.

6            THE COURT:  Mm hmm.

7       MR. BATTAGLIA:  And another one is the

8   availability of inventory, which has been an issue in the

9   first quarter of this year, and one that we are rapidly

10   solving for.

11            THE COURT:  Okay.  And I'm going to let you turn

12   to your presentation.  I apologize for -- I just had a

13   couple of questions to understand.

14       MR. BATTAGLIA:  I'm here to answer the Court's

15   questions, Judge.

16            THE COURT:  So, I understand that the -- just from

17   the -- my knowledge from the prior cases, there were cases

18   pending in Austin and in Connecticut.  There was one of the

19   litigation claims as continuing out of assigned, an order

20   lifting a stay.  We still had the fraudulent transfer action

21   in Austin.  So, those are the two Austin actions that I was

22   aware of.  And there was, what we call the Sandy Hook

23   litigation in and -- pending in Connecticut.

24       MR. BATTAGLIA:  There's one other lawsuit in

25   Austin.  It's the Fontaine lawsuit, which is not

1    consolidated with Austin (indiscernible) lawsuit --

2              THE COURT:  Oh, that's right.

3              MR. BATTAGLIA:  -- and is not currently in trial.

4              THE COURT:  Got it, okay.  That was the --

5              MR. MOSHENBERG:  There's also -- yeah, thank you.

6    There's the Posner case, also, Your Honor.  It's another

7    Sandy Hook litigation.

8              THE COURT:  Right, yeah, no, no.  That's exactly

9    right.  But they're all kind of related.

10             MR. MOSHENBERG:  Yes sir.

11             THE COURT:  They're -- those were the ones that

12   were released on a case -- I get it there were several cases

13   on it, but this -- I'm thinking just in buckets.  In the

14   Connecticut litigation, I do remember that there were

15   potentially several lawsuits pending, but they were overall

16   related.  The same kind of set of Plaintiffs there.  Are

17   there -- is there any additional litigation with respect to

18   this Debtor that's different than the --

19             MR. BATTAGLIA:  Your Honor, I think --

20             THE COURT:  I guess what I'm looking at --

21             MR. BATTAGLIA:  Sandy Hook related?

22             THE COURT:  Well, I'm thinking -- I remember the

23   three Debtors were all actually Defendants in the -- in all

24   of these litigation, in one way or the other, whether the

25   InfoW, IW Health, and Prison Planet.  Is FSS asserting any

1   claims against -- any cross-claims, any counter-claims

2   against any other parties related to this litigation?  Are

3   they being sued separately by any party in any parts of this

4   litigation?  I'm just trying to understand.

5        I understood the last Debtors I had.  I just --

6   I'm just trying to get up to speed so if folks start

7   mentioning litigation claims, then I'm up to speed.  Is

8   there any other litigation that I should be aware of that

9   relates to Mr. Jones, any of his entities, as it relates to

10  FSS that's different or in addition to the ones that I

11  mentioned?

12        MR. BATTAGLIA:  Yes, sir.  With respect to the

13  Sandy Hook litigation, the extent the -- and I'll call it

14  the IW Defendants --

15        THE COURT:  Mm hmm.

16        MR. BATTAGLIA:  -- have been dismissed with

17  prejudice.  There are no cross-claims or counter-claims

18  between those parties.

19        There is I think one piece of litigation that does

20  join both IW and FSS, and that was a lawsuit filed in

21  Florida that the Debtor and its affiliates were successful

22  and won at trial.  And it's up on appeal.  It was a -- no

23  damages, shall we say acquittal judgment entered in the

24  Florida case.  That case has been pending for a while with

25  no action ongoing.

Case 4:23-cv-00463  Document 6-25  Filed on 03/23/23 in TXSD  Page 34 of 480
Case 22-60043  Document 165-15  Filed in TXSB on 09/16/22  Page 18 of 257

Page 18

1          THE COURT:  Okay.

2          MR. BATTAGLIA:  In terms of other litigation, I'm

3    aware of, and there could be a few more, but these are the

4    ones I'm aware of, I know that FSS was sued for intellectual

5    property improper use, copyright infringement, a lawsuit

6    which is not extraordinary for this business.

7          And that is probably a couple of months past

8    answer date.  And there is a lawyer representing the Debtor.

9    And then I am aware of another lawsuit filed in New York, I

10   think Federal Court -- don't hold me to that -- that alleged

11   that an ADA violation for not making its website accessible

12   or its purchasing website accessible to, I think it was

13   visually impaired individuals.  And that -- it was filed at

14   or about the same time as the copyright infringement case.

15         THE COURT:  Okay.

16         MR. BATTAGLIA:  Those are the ones I'm aware of.

17         THE COURT:  Thank you.

18         MR. LEE:  Your Honor, Kyung Lee for the record.  I

19   just want to supplement that -- what Mr. Battaglia said.

20         THE COURT:  If you can just get closer to the mic.

21   I want to make sure everybody can hear you.  I appreciate

22   it.

23         MR. LEE:  I'll just tell Mr. Battaglia --

24         THE COURT:  And just considering these are

25   preliminary questions, I just want to make sure that I

1    understand the lay of the land before we --

2            MR. LEE:  For purposes of complete transparency,

3    Your Honor, there was an indemnity claim that Mr. Jones

4    filed against FSS in the Connecticut litigation last week,

5    which has been stricken by the Connecticut Judge, Honorable

6    Bellis yesterday.

7            So, I just want you to know that there was an

8    indemnity claim made by Alex Jones against FSS.  So, that's

9    another claim that existed.  And I think Mr. Jones is also

10   going to assert a proof of claim in the FSS bankruptcy case.

11           THE COURT:  Okay.

12           MR. LEE:  I just wanted to let you know that.

13           THE COURT:  So, but you said that litigation, that

14   cause of action is it -- doesn't seem like it's live

15   anymore, is that --

16           MR. BATTAGLIA:  There is an update, obviously, of

17   developments from yesterday.  And I am going to give the

18   straight version without any color on either side.

19           THE COURT:  Okay.

20           MR. BATTAGLIA:  It is that the judge preceded with

21   hearings yesterday in Connecticut and did strike the cross-

22   claim.  And then apparently, suggested that the litigation

23   should go forward and pick a jury, although FSS was still a

24   party to that litigation and had not been settled.  As a

25   consequence, FSS filed a notice of removal of that

1    litigation.

2            THE COURT:  Okay.

3            MR. BATTAGLIA:  We didn't feel it was appropriate

4    with --

5            THE COURT:  Where is it pending now, in front of a

6    bankruptcy court, like an adversary proceeding in front of

7    bankruptcy court or something?

8            MR. BATTAGLIA:  It will be pending in front of a

9    Bankruptcy Court.  Is it Bridgeport?

10           MR. LEE:  Yes.

11           MR. BATTAGLIA:  It's in Bridgeport.

12           THE COURT:  Okay, okay.

13           MR. BATTAGLIA:  So, that's the status of it.  And

14   I know the parties are having some conversation about what

15   that means for Friday, the emergency motion to lift stay.

16   Nothing further to report on it.

17           THE COURT:  Okay.  No, no, no, I just -- I

18   appreciate it.  I know that there's a lot of moving pieces

19   and I just want to just understand that before we got into

20   the motion, just so we're all on the same page.  I think you

21   answered all my basic questions.  I just wanted to

22   understand kind of the employees' insurance.  Any issues

23   with insurance that I should be aware of?

24           MR. BATTAGLIA:  We have insurance coverage.  And I

25   believe part of the payments in the critical vendor include

008492

Case 4:23-cv-00463   Document 6-25   Filed on 03/23/23 in TXSD   Page 37 of 480
Case 22-60043   Document 165-15   Filed in TXSB on 09/16/22   Page 21 of 257
Page 21

1   payment of the policy.

2           THE COURT:  Okay.  All righty.  I will stay quiet

3   and let you --

4           MR. BATTAGLIA:  No, you won't, Judge.

5           THE COURT:  -- turn it back over to you.

6           MR. BATTAGLIA:  This is your courtroom.

7           So, the remaining two matters, Your Honor, are the

8   cash collateral motion and the critical vendor motion.  And

9   where we stand on those, Mr. Martin and I have had several

10  conversations on the cash collateral motion.  There's

11  certain accommodations being made, and I'll -- the biggest

12  one relates to a $250,000 payment to PQPR that is shown in

13  the budget.  That is a -- the way the Debtor operates with

14  PQPR in inventory, if PQPR purchase inventory, pays for it,

15  sells it through our sales channel, the Debtor gets 20

16  percent of the net.  PQPR gets 80 percent of the net.  If

17  it's FSS's inventory, and obviously, FSS is Free Speech

18  Systems, 90 percent goes to the Debtor and 10 percent goes

19  to PQPR for its involvement in the purchasing and

20  involvement in the -- as I understand it, supplements have

21  to have, and don't hold me to this word -- be sold under

22  some certification, and Dr. Jones individually, PQPR holds

23  that certification.  That's my very basic understanding.

24          And so, there is inventory that we have agreed to

25  purchase from PQPR.  It has not been delivered yet, that

008493

1    it's pre-paid $750,000 for.  We would like to move that

2    inventory into the FSS inventory category and sell it and

3    receive 90 percent of the net.  The profit margin on

4    supplements can be anywhere from 3X to 5X, so we think it's

5    a good investment for this estate.  And the accommodation

6    that the Plaintiffs have requested is that they have a 30-

7    day look claw back window look -- to file something, if they

8    think the payment is inappropriate.  And we're amenable to

9    that.

10           There are some other changes we've agreed to,

11   particularly strengthening the reservation and the no waiver

12   provisions that aren't intended.  We have proposed a

13   replacement lien to the equivalent validity and priority of

14   the existing PQPR pre-petition liens.  Obviously, if there's

15   no pre-petition lien, there's no replacement lien.  And the

16   -- I think the remaining -- there was also a request that we

17   limit any insider payments to not more than $20,000,

18   exclusive of that $250,000 payment I just mentioned.  And

19   we're amenable to that.  We'll put that in an order.

20           So, the hang-up here that we have, and we can

21   discuss it in a little more detail later, is that they've

22   requested that they be given challenge rights with respect

23   to the PQPR liens, like, basically, Louisiana World

24   Exposition rights.  And the Debtor is not amenable to that.

25           We have two options as far as proceeding.  One of

Case 4:23-cv-00463   Document 6-25   Filed on 03/23/23 in TXSD   Page 39 of 480
Case 22-60043   Document 165-15   Filed in TXSB on 09/16/22   Page 23 of 257

Page 23

1    course, is just to go forward with the full-blown hearing.

2    And the other is for, I guess Mr. Martin and I, and I'm not

3    sure who else, to stand up and say why we think the creation

4    of the Tort Committee is a good idea or a bad idea at this

5    point in time, and let the Court give us some direction on

6    that.  I'm amenable to whatever the Court would like to do.

7    But other than that, there's no opposition to the use of

8    cash collateral.

9              THE COURT:  Okay.  And with respect to the

10   critical vendor motion, where do things stand?

11             MR. BATTAGLIA:  The only comment I received was

12   from Mr. Nguyen, who asked that I make a proffer of the

13   critical nature of the vendors.  Otherwise, there's no

14   opposition of the critical vendors.

15             THE COURT:  Okay.  And the critical vendors, when

16   is it generally?  And we haven't taken any evidence, but I

17   just want to understand it.  When are those payments due?

18   When do you need them?  When does the Debtor need to make

19   those payments?

20             MR. BATTAGLIA:  I think they do come in.  They're

21   probably staggered, but some of them are very important.

22   You know, obviously, you're in the broadcast business in the

23   modern world.  Access to the internet and satellite and

24   other things is vital.  And if you go dark, it's extremely

25   costly.

Page 24

```
 1              So, I don't know specifically.  And Mr. Schwartz

 2    may or may not know precisely when those payments are due.

 3    But certainly, I would say within the next two weeks, we

 4    have to make -- we have to commence making payments.

 5              THE COURT:  Okay.

 6              MR. BATTAGLIA:  I think they're not broken out as

 7    critical vendor payments in the budget.  They're included

 8    within the expense items.

 9              THE COURT:  Okay, thank you.

10              MR. BATTAGLIA:  So --

11              THE COURT:  Let me hear from -- go ahead.

12              MR. BATTAGLIA:  And then as far as the remaining

13    things, you had asked at the last hearing to have Mr.

14    Schwartz address the relationship with IW.  I'm prepared to

15    do that however the Court would like.  And you know, I have

16    to make one comment.  I kept hitting five star the other day

17    because I kept hearing about $62 million going to Alex Jones

18    in the last two years -- and I think it's in the objection.

19    $62 million has been drawn on account of Alex Jones over 15

20    years, over $30 million of which was to pay income taxes,

21    which this is a flowthrough entity, and the LLC has an

22    obligation to pay the tax obligations.

23              I understand those payments were directly from FSS

24    to the IRS.  So, I just -- I'm not going to go any further

25    than that to say I can't leave that -- the misinformation
```

1    going out across the globe without offering some

2    explanation, because it's highly prejudicial.  But I'm

3    prepared to proceed however the Court would direct me.

4              THE COURT:  Okay.

5              MR. BATTAGLIA:  You want me to turn the podium

6    over?

7              THE COURT:  Yeah, let me just hear if anyone --

8    what other parties may have to say at this time.

9              MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple

10   again, on behalf of the Connecticut Plaintiffs.  And I --

11   just a little logistics today.  And I'm sure you know

12   because you read the pleadings.  The Connecticut Plaintiffs

13   and the Texas Plaintiffs filed a joint objection.

14             THE COURT:  Mm hmm.

15             MR. CHAPPLE:  So, today, I believe Mr. Moshenberg,

16   Mr. Brimmage, and myself, collectively refer to the group as

17   the Sandy Hook Plaintiffs.

18             THE COURT:  Okay.

19             MR. CHAPPLE:  A few comments about what Mr.

20   Battaglia said with regard to just the narrow issue of cash

21   collateral.  I think it was an accurate recitation of where

22   we are in the back and forth between the parties.  But I

23   want to add a little color to one issue, and then I want to

24   raise one issue that Mr. Battaglia didn't mention.

25             The issue that he didn't mention, that has been

 1    part of the discussion is discovery, the opportunity for the

 2    Sandy Hook Plaintiffs, between now and a final hearing on

 3    cash collateral, to depose Mr. Schwartz and a representative

 4    of PQPR and to obtain written discovery from both of those

 5    parties relating to the underlying debt that is really at

 6    the key of all of this cash collateral discussion.  So, I

 7    believe we're on the same page there, but I just wanted to

 8    raise that and let the Court know that issue.

 9         THE COURT:  Yeah, yeah --

10         MR. BATTAGLIA:  Ray Battaglia for FSS.  We have

11    agreed to reasonable discovery.  We're not going to oppose

12    that.  There may be some timing issues.  Apparently, this is

13    vacation time of the world and I'm happy to say that I never

14    take a vacation, so it's not my --

15         THE COURT:  I was going to say, when did people

16    start doing that?  Just kidding, everyone.  I'm glad

17    everyone takes vacation.  Go ahead.

18         MR. CHAPPLE:  So, Your Honor, that's just --

19    that's issue one that I wanted to raise, that he didn't

20    speak about earlier.  The other issue, and the issue -- he's

21    right.  The impasse that we've reached, the issue that is

22    crucial to the Sandy Hook Plaintiffs is the lien issue and

23    the ability to challenge this lien.

24         THE COURT:  So, tell me, your clients -- well,

25    from the Sandy Hook Plaintiffs' side's perspective, what

008498

```
 1    should a cash collateral order look like, if you had your
 2    way today?  What should an interim order look like today?
 3             MR. CHAPPLE:  Today, the interim order should --
 4             THE COURT:  What do you want in it?  What do you
 5    want out of it?
 6             MR. CHAPPLE:  We are agreeable, and I think it'll
 7    be a short back and forth between the Debtor and the
 8    Connecticut, or excuse me, the Sandy Hook Plaintiffs, going
 9    line by line in the 14-day budget that they have.  We've
10    made some modifications.  The original 14-day budget I
11    believe had payments of $54,000 to Mr. Jones.  We've reduced
12    that amount.  So, we've kind of gone back and forth on all
13    of those issues.  I think the sticking point --
14             THE COURT:  So, there's an agreed form of -- well,
15    let's just call it interim -- a proposed form of interim
16    budget, where there -- the line items is -- there may be
17    agreement on buckets for line items for the next couple of
18    weeks.
19             MR. CHAPPLE:  Yes.
20             THE COURT:  Okay.
21             MR. CHAPPLE:  Yes, Your Honor.
22             THE COURT:  Okay.
23             MR. CHAPPLE:  The sticking point is whether or not
24    the Sandy Hook Plaintiffs or any party in this litigation,
25    any party in interest, has standing to challenge the
```

1    purported lien that PQPR has over the cash that's in the

2    hand of Free Speech Systems.  And so -- go ahead.

3              THE COURT:  No, no, so your objection asks for

4    some language basically saying that I'm not making any

5    findings about whether there's a lien -- a valid lien or

6    not.  If that language is included, what else do you need

7    for purposes now?  Do you want me to grant you standing on

8    an interim basis, do you?  Is that what you're asking?

9              MR. CHAPPLE:  If we --

10             THE COURT:  I'm just trying to understand.

11             MR. CHAPPLE:  Sure, sure, sure.  No, and I

12   appreciate that.  If we have the language that we put in the

13   proposed objection that basically makes the finding that you

14   just --

15             THE COURT:  Mm hmm.

16             MR. CHAPPLE:  -- that you just recited, then I

17   would want just a few minutes to confer with my co-counsel,

18   but I believe we are okay there.

19             The other thing, Your Honor, that we were talking

20   about in the hall right before this, that Mr. Battaglia

21   mentioned, is the Court's ability to appoint a Plaintiffs --

22   a Tort Plaintiffs Committee similar to what Judge Isgur did

23   in the Watson Grinding case, that gives that oversight and

24   power to a committee to challenge those liens and to

25   investigate the validity of those liens.

1          THE COURT:  Right.  So, I will -- I'll tell you,
2     Mr. Battaglia's going to have to tell me, and how he feels
3     about that language.  I'm not telling you to agree to it or
4     not.  I just need to understand what your position is, if
5     that language is included for purposes of an interim order,
6     then I'm -- the Court isn't making any findings as to
7     whether there's a lien or not.  You'll have to let me know
8     about that.
9          MR. BATTAGLIA:  Your Honor, I'll do that after the
10    other side is complete -- whoever is going to present --
11         THE COURT:  Okay.  You know, I agreed 1102(a)(3) -
12    -
13         MR. CHAPPLE:  Your Honor, may I go grab my --
14         THE COURT:  Oh absolutely.  And I'm not saying
15    this is what you're asking for --
16         MR. CHAPPLE:  Mm hmm.
17         THE COURT:  -- I'm just noting 1102(a)(3) says
18    that unless the Court for cause orders otherwise of
19    committee creditors may it not be appointed in a small
20    business case or a case under Sub Chapter 5.
21         So, I'm of -- I don't believe I have authority to
22    do anything today, but I do think if someone filed a motion,
23    and we take it up as -- and then we'd find whether there
24    would be cause, unless someone can show me cause today.
25         So, if -- I'm not comfortable agreeing me just

Case 4:23-cv-00463   Document 6-25   Filed on 03/23/23 in TXSD   Page 46 of 480
Case 22-60043   Document 165-15   Filed in TXSB on 09/16/22   Page 30 of 257

Page 30

1    ordering it over the objection of a party.  Someone's going

2    to have to show cause, and if there's cause then you win.

3    But someone's going to have to tee the issue up as to

4    whether there's cause to appoint a committee.  And if there

5    is -- and maybe that's what you're asking for, is to say

6    that if you're asking for a committee like the Watson

7    Grinding Committee, and that was, I believe, and Trustee

8    will have to tell me, it felt like an official committee.

9    What maybe was a -- someone will have to tell me.  But I

10   think Sub Chapter 5 is a little different.

11            MR. CHAPPLE:  Mm hmm.

12            THE COURT:  So, I don't -- the answer may not --

13   the answer just may be no today, but maybe at some point,

14   maybe you do get it at a final, if you can prove cause or

15   not.  But someone will have to show me where I would have

16   authority to do it today and based on what.  And maybe that

17   evidence comes out today.  But those'll be the questions

18   that I've got.

19            MR. CHAPPLE:  I understand, and I appreciate that

20   clarification, Your Honor.  I think what we do now is take a

21   short recess, let me confer with my colleagues on kind of

22   the question you had about the language that's in the

23   objection, and if that gets us there in the interim.  And

24   then also, I know we were absolutely interested in moving

25   for the creation of a committee for cause.  And we can also

1    talk about that dynamic, and whether or not we feel like if

2    we move forward today in -- while we're objecting to the

3    motion for interim use of cash collateral, we can also prove

4    up the cause needed to form the committee.  So, if the Court

5    will give me that latitude, we can visit for just a few

6    minutes and come back.

7         THE COURT:  You're asking for time to meet, yeah.

8    Mr. Battaglia, I just would need to know, and I'm not

9    telling you one way or the other what you should do.

10   Obviously, I'm already suggesting it one way or the other.

11   I just need to understand that was some requested language

12   in an objection that I read, and I just need to understand

13   whether you'd be comfortable with that.  Because again, I'm

14   just trying to understand.  We haven't taken any evidence or

15   anything.  I just need to understand.

16        But I would need to hear as well -- Mr. Lemmon,

17   you have to tell me one way or the other whether there's a

18   lot of proposed changes to an order, and PQPR would have to

19   let me know whether they'd be amenable to that as well.  And

20   I'll give them the latitude to say yes or no.

21        MR. BATTAGLIA:  Your Honor, I think the changes

22   that Mr. Martin and I exchanged by email last night that are

23   agreed to are a cap on insider distributions of $20,000,

24   individual insiders.

25        THE COURT:  Mm hmm.

```
 1              MR. BATTAGLIA:  The $250,000 inventory purchase

 2    payment with the claw back provision.  The -- there's

 3    nothing in my proposed order that has this Court validating

 4    any liens or debts of anybody.  It simply says that there is

 5    a replacement lien of equal stature.  That's it.  But

 6    they've requested some reservation sand non-waiver language,

 7    and -- at least what I saw last night, and I don't know that

 8    I recall whether it's the same in the objection, we've

 9    agreed to insert that language.  We've agreed to reasonable

10    discovery.

11              And Your Honor, the problem I have with a Tort

12    Committee at this juncture, aside from the fact that there's

13    no motion, aside from the fact that we've agreed to a level

14    of discovery so they can at least take a look behind the

15    curtain, is that creation of a Tort Committee on behalf of

16    creditors who at this point have no -- they have a claim,

17    but they have an unliquidated claim, we don't know whether

18    that claim is going to swamp this Debtor or whether it's

19    going to be manageable and can be paid from operations of

20    the estate, which renders pursuit of, you know, fraudulent

21    conveyance claims as kind of a tomorrow issue.

22              But there's no limitations running on any of these

23    questions.  We just don't see it as a today issue.  If you

24    appoint a Tort Committee with the Debtor's sort of start-up

25    growth back into revenue with product deliveries, the costs
```

Case 4:23-cv-00463   Document 6-25   Filed on 03/23/23 in TXSD   Page 49 of 480
Case 22-60043   Document 165-15   Filed in TXSB on 09/16/22   Page 33 of 257
Page 33

1    of that committee are going to swamp this case.  They just

2    are.  They're going to hire a lawyer and they're going to

3    charge it to the estate and they're going to swamp this

4    case.  We think that let them take a look and we can come

5    back and revisit the issue when it's before the Court.

6    That's our position on appointment of a committee at this

7    point.

8            THE COURT:  Okay.  So, you're okay with inserting

9    -- and I want you to confirm that -- the only language that

10   I've read obviously is the language that was in the

11   objection.  Maybe during the break, you can take a look at -

12   -

13           MR. BATTAGLIA:  I will, I will.

14           THE COURT:  -- that language, or maybe Mr. Martin

15   can confirm what that -- you know, I still want to -- and

16   again, and I know there -- still have to put up some

17   evidence.  I still need an evidentiary basis.  And maybe Mr.

18   Schwartz's declaration does the trick or whatever to support

19   critical vendor and cash collateral.

20           MR. BATTAGLIA:  Absolutely.

21           THE COURT:  And I know that.  And again, and at

22   the same time there, maybe I can -- at that time, you can

23   provide the -- I don't know, the clarity that I was looking

24   for with respect to Mr. Schwartz's relationship now with

25   these Debtors as opposed to the last cases.

1          MR. BATTAGLIA:  And if the Court's okay with a

2     proffer at that point, I'm happy to do it.  If not, I'll

3     call Mr. Schwartz (indiscernible).

4          THE COURT:  Okay, I'll let you all figure it out

5     and we'll see if we got a contested hearing or not and

6     whether the declaration's going to work or not.  So --

7          MR. CHAPPLE:  Yes, sir.

8          THE COURT:  It is 10:42.  How much time do you

9     think you all need?  Okay, I'll come back at 10:52, more or

10    less.

11         MR. LEE:  Your Honor?

12         THE COURT:  Yes?

13         MR. LEE:  I have one housekeeping administrative

14    matter.

15         THE COURT:  Okay.

16         MR. LEE:  I just wanted to alert this Court to.

17    Since we're all here today -- Kyung Lee for the record --

18    you know that we have ECF Number 15, the emergency motion

19    for relief from automatic stay scheduled for Friday --

20         THE COURT:  Mm hmm.

21         MR. LEE:  -- at 10 a.m.  And based upon some of

22    the activities that have taken place in Connecticut --

23         THE COURT:  Mm hmm.

24         MR. LEE:  -- especially the removal of the

25    litigation that took place yesterday, I've consulted, or

008506

```
 1    I've asked the counsel for the Connecticut Plaintiffs,

 2    whether or not the hearing on Friday is moot because there

 3    is no -- going to be a jury selection, as I understand it,

 4    which was the basis for the emergency motion, whether there

 5    is going to be any jury selection on Monday, next Monday.

 6          So, I just wanted to raise that issue because I'd

 7    rather have Mr. Schwartz go up to Austin and work on other

 8    stuff rather than be here in the courtroom this week.  So,

 9    just wanted to raise that.

10          THE COURT:  I'll let the Connecticut Plaintiffs

11    tell me what you want to do.

12          MR. LEE:  Right.

13          THE COURT:  You asked for an emergency hearing,

14    I'll grant you one.  And if you want to come back another

15    day, you can do that.  If you want to go forward on Friday

16    with the Southern District of Texas, you'll get your day, if

17    you want it.  And you just tell me what you want to do.

18          If you want to take some time and talk about it,

19    I'll come back in 10 minutes, and we can talk about

20    everything.

21          MR. CHAPPLE:  Thank you, Your Honor.

22          THE COURT:  Okay.

23          MR. CHAPPLE:  As of now, we still want to go

24    forward on Friday.  We're still discussing it.  And one

25    other thing, I -- it always takes a little bit longer than I
```

1    want it to.  Could we do the top of the hour?  Could we do

2    11:00 instead of 10:42?

3          THE COURT:  Well, I was going to tell you that --

4    that was going to get tricky for me then.

5          MR. CHAPPLE:  Oh wait -- I don't want it to be

6    tricky.

7          THE COURT:  No, I'd rather -- what I was going to

8    say, I would rather just round up, so if someone would come

9    back and ask me for more time.  So, it's 10:43.  I'm going

10   to come back at 11:00, and then I'll check in.  If the

11   parties want more time, you let me know, okay?

12         MR. CHAPPLE:  Thank you, Your Honor.

13         THE COURT:  For the folks who are on the line, I'm

14   going to mute the audio.  But -- I'm going to mute the line.

15   I'm going to let the parties in here have the ability to

16   talk freely.  If there's someone you need to talk to, then

17   call them by the cell, but I'm going to mute the line

18   because I'm stepping off and I'll come back on.

19       (Recess)

20         CLERK:  All rise.

21         THE COURT:  Okay.  I'm back in on the record in

22   Free Speech Systems.  Mr. Battaglia, why don't you tell me

23   where we are?

24         MR. BATTAGLIA:  As far as the language that was

25   suggested, the -- I added one word, moreover nothing herein

008508

```
1    shall grant or prejudice the rights of -- it goes on to talk
2    about the rights to challenge the liens and challenge the
3    debt.  We don't dispute any creditor and party in interest
4    that has a right to contest the debt of PQPR and the liens.
5           At this point, I just don't want it to infer going
6    further that there's any additional rights that are
7    conferred by this order.
8           THE COURT:  Okay.  Kind of status quo.  Okay.  And
9    --
10          MR. BATTAGLIA:  They stand as far as the --
11          THE COURT:  Yeah.
12          MR. BATTAGLIA:  -- Tort Committee issue.
13          THE COURT:  So --
14          MR. CHAPPLE:  Thank you, Your Honor.  Ryan
15   Chapple, thank you for the time.  Appreciate it.  We've had
16   discussions between the Connecticut Plaintiffs and Texas
17   Plaintiffs.  And our position is that cause exists today to
18   appoint a committee.  And the reason that cause exists is
19   even if we have protective language in an interim order,
20   there's still no party that has standing in this case to
21   challenge the validity of those liens.
22          And we believe that the lack of standing for any
23   party to challenge the validity of a lien is cause to
24   appoint a plaintiffs committee today.  And we think it's
25   consistent with the thoughts that the U.S. Trustee has
```

 1   espoused on Monday, and I believe it will espouse again

 2   today about the need for oversight here.

 3          And really, this underlying debt and this lien is

 4   a fundamental issue in this bankruptcy case.  And we feel

 5   like we have to have a mechanism and the most logical

 6   mechanism is a plaintiffs committee that would have the

 7   oversight and the ability to challenge those liens.

 8          I know that Mr. Brimmage wants to make some --

 9   make a few remarks as well, but I wanted to reiterate that,

10   and I believe Mr. Ha would like to make a few remarks as

11   well.

12          THE COURT:  Okay, thank you.

13          MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14   the U.S. Trustee.  I just want to touch base with some of

15   the first day motion.  The first thing is the critical

16   vendor motion.  Mr. Battaglia and I, we worked out some

17   language.

18          THE COURT:  Okay.

19          MR. NGUYEN:  He's going to put on some evidence to

20   show the necessity of the payments.  Every time there's a

21   payment outside the statutory scheme, you know, we need

22   (indiscernible) any (indiscernible) --

23          THE COURT:  No, no, no, I agree.  I'm looking for

24   it.

25          MR. NGUYEN:  And then, in addition to that, in the

008510

 1    proposed order, there's going to be a redline for the

 2    critical vendor, there's going to be a mechanism that allows

 3    people to know which critical vendor gets paid.  And then

 4    there's a billing objection period that we put in the order

 5    to allow other creditors who object.  And then there's

 6    potential claw back from the critical vendor.  And that --

 7    you're going to see it once we submit the proposed --

 8              THE COURT:  The claw back, if someone doesn't

 9    provide ordinary --

10              MR. NGUYEN:  Correct, Your Honor.  Or they can

11    challenge the critical nature of that particular vendor.

12              THE COURT:  Yeah.

13              MR. NGUYEN:  It's going to be in a proposed order

14    that Mr. Battaglia's going to file.  And as to the cash

15    collateral, I just wanted to make sure the Court understands

16    that we -- the U.S. Trustee, we do have concerns with the

17    underlying transaction.  I said it on Monday.

18              THE COURT:  Mm hmm.

19              MR. NGUYEN:  It is an affiliate insider debt.

20    When you look at the breakdown of the company, you know, 20

21    percent essentially is owned by Dr. Jones and Alex Jones'

22    wife.  The other 80 percent is indirectly owned by another

23    company that Alex Jones has a majority stake in, someone --

24    there is dealing between parties who are -- you know,

25    there's an insider here.  They're dealing with family

1    members.  We pay particular important attention to it.

2          And I think it's particularly important for

3    someone to be able to take a look at this lien and be able

4    to tell the Court whether we have a legitimate debt or not.

5    And I think that's one of the burden that Debtor needs to

6    prove.  It's that before you can actually approve the use of

7    cash collateral, you've got to prove that there's an

8    underlying debt and it needs to be a valid debt.

9          There's a lot of discussion about Tort Committee.

10   On Monday, I mentioned that, you know, this is not your

11   typical Sub Chapter 5 case.  You usually don't have a $60

12   million loan in a Sub Chapter 5 case.  You don't have $62

13   million in (indiscernible) draws in a Sub Chapter 5 case.

14         And I've always urged the Court to slow the

15   process down, and also consider whether additional

16   protections are needed in this case.  And one of the things

17   I point to is maybe there is a need for a Tort Committee to

18   actually take a look at this loan.  Because usually in any

19   cash collateral case -- in any case where there's a cash

20   collateral, one of the first things I do is I always go in

21   and I preserve the challenge period for the lien for any

22   committee.  That's ordinary.  That's routine.  And any case

23   before you, where I think there's going to be a formation of

24   a committee, we preserve that challenge period.  There's no

25   challenge period here.  Quite frankly, because you know,

1    there's no one who has that standing to bring that challenge

2    to the cash collateral.

3            I'm not advocating one way or the other for the

4    Tort Committee, but I let the Court know, you know, once the

5    Court orders the forming of the committee, my office stands

6    ready, and we will get on it and we will move, and we will

7    have an appointment as quickly as possible.

8            That's all I have to say, Your Honor, and thank

9    you very much.

10            THE COURT:  Thank you.  Mr. Brimmage, good to see

11    you.

12            MR. BRIMMAGE:  Good morning, Your Honor.  It's

13    good to be before the Court.  Marty Brimmage with Akin Gump

14    Strauss Hauer & Feld here on behalf of the Texas Defendant

15    or Texas Plaintiffs as well as the Connecticut Plaintiffs.

16            It's always funny to me when the judge on the

17    bench starts citing a code and starts looking at it and

18    everybody starts scrambling to find their code and remind

19    themselves what it said.

20            But I'm glad you did that because 1102(a)(3) says

21    exactly what you said it did.  Unless the Court for cause

22    orders otherwise --

23            THE COURT:  Mm hmm.

24            MR. BRIMMAGE:  Meaning, the Court can order for

25    cause.

1          THE COURT:  Mm hmm.

2          MR. BRIMMAGE:  And I think that's exactly what you

3    have right here, right now.  It doesn't say upon an

4    evidentiary hearing and findings, and you know, dah, dah,

5    dah, in a contested matter where there's whatever the Court

6    finds cause.

7          It says, the Court for cause.  And I think you

8    have for cause, for the reasons articulated by the U.S.

9    Trustee and the reasons articulated in the cash collateral

10   order that you're being asked to consider right now.  There

11   is nobody -- if there -- typically, there's a challenge

12   period at some point, right?  30, 60, 90 days come in and

13   challenge.  There is nobody that could come in and seek

14   standing to challenge that lien right now.  Maybe by design,

15   maybe not.  That is your cause, Your Honor.  You're going to

16   enter a cash collateral order where nobody can challenge the

17   underlying lien.

18         And now, I'm not asking you to prejudge standing.

19   That's a whole different gig and we'll deal with that in due

20   time.  But right here right now, I think you have cause

21   because without it, you need to have a body that can come

22   and seek standing and attempt to prove that they should have

23   standing and go and check out these liens.  As the U.S.

24   Trustee articulated, that doesn't exist right now.

25         So, Your Honor, for all the reasons that have been

 1    articulated to you right now, I think cause exists, and I

 2    think under 1102(a)(3), the Court for cause can order a Tort

 3    Committee.

 4         You have heard about the litigation that's

 5    surrounding and involved in this case.  It's predominantly,

 6    overwhelmingly, 99.9 percent related to the Sandy Hook

 7    Plaintiffs, whether it's a TUFTA action or it's the

 8    Connecticut Plaintiffs or it's the Texas Plaintiffs.  And I

 9    don't want to say they're all exactly the same, but they all

10    derive from the same facts and circumstances and the same

11    issues.

12         THE COURT:  Mm hmm.

13         MR. BRIMMAGE:  That is who the Tort Committee I

14    think should be comprised of.  We'll leave it to the U.S.

15    Trustee, who said that he can act quickly.  The U.S.

16    Trustee's Office stands ready to act quickly, so that -- and

17    that's what I think we need, Your Honor, and I think that's

18    what you need.  You need that acted quickly so that this

19    case can be adjudicated on the merits, and that we can

20    determine the validity of that lien once and for all from a

21    body that has the authority to seek standing.

22         And with that, Your Honor, I'd answer any

23    questions the Court may have.

24         THE COURT:  Yeah.  I'm going to sit here and

25    listen to a little evidence now and see where things go.

```
1              MR. BRIMMAGE:  Thank you, Your Honor.

2              THE COURT:  Thank you.

3              MR. LEMMON:  Your Honor, if I may, Steve Lemmon on

4   behalf of the secured creditor, PQPR.

5              THE COURT:  Mm hmm.

6              MR. LEMMON:  I just want to make a couple of

7   observations, Judge.

8              THE COURT:  Mm hmm.

9              MR. LEMMON:  First of all, I started with a 20-

10  page cash collateral order, and -- that had a number of

11  findings, had a number of protections for my client, had all

12  the things that we use.  And I determined that in this

13  particular case, with the level of suspicion that's out

14  there in the world, not evidence right now, but suspicion

15  that's out there in the world, that it'd be inappropriate

16  perhaps to do that, just so we could avoid this kind of

17  problem.

18             I believe that the current cash collateral order

19  is really nothing more than a recitation of what the law is.

20  If my client has a lien and if the cash collateral is being

21  used, then I get a replacement lien to the extent that I

22  have a valid lien.  Nothing in it is a finding that

23  prohibits anybody, any party in interest from challenging

24  the lien.

25             Now, Judge, my observation right now is that right
```

```
 1    now the evidentiary record is nil.  And in this case, I

 2    mean, I -- we heard the U.S. Trustee say that they want to

 3    perhaps slow things down.  I don't see anything going really

 4    fast right now from my perspective in this case.  I'm one of

 5    the people with a vacation that is going to bollocks up

 6    formal discovery in the next couple of weeks.  And I know

 7    that there are other vacations.

 8              But I've offered informal discovery, Judge, just

 9    so people can assuage some of their fears, some of their

10    concerns so that they can find out what's going on.  And I'm

11    not asking anybody to give up any of their rights right now

12    in connection with this cash collateral order.  It is the

13    most bland cash collateral order I have ever seen in my

14    career.

15              And so, I -- you know, I tried to avoid this fight

16    by giving up all the things I normally would negotiate for,

17    and -- in thinking that we would just address that later in

18    a final order.  This is an interim order.  We're willing to

19    consent to it in order to let this Debtor try its business

20    plan.

21              And that's all I have to say.

22              THE COURT:  Thank you.  Mr. Battaglia, you know,

23    there's one question.  It's related, but not entirely on

24    point.  But I want to make sure I ask you the question.  And

25    it's the question that every judge asks at the beginning of
```

1   every case.  What does the Debtor hope to accomplish through

2   this Chapter 11 process?

3            MR. BATTAGLIA:  Well, Your Honor, the impetus for

4   filing with the Debtor's just inability to be in two places

5   and fund two trials at one time.  And you know, ultimately,

6   we don't know what the number's going to be in terms of the

7   potential exposure in Connecticut and in Texas.  Eventually,

8   some tribunal is going to give us a number.  Will it be

9   appealed?  I think there's a virtual certainty it's going to

10   be appealed, probably from either side at the end of the

11   day.

12            But this Debtor entity, which has the capacity to

13   generate significant revenue has been harmed by the manner

14   in which it operates.  And by that, let me just -- what I

15   probably said, and my co-counsel's probably getting tired of

16   hearing me.  This is kind of like the garage band that

17   became the boy band overnight, and had his girlfriend

18   running the books, and the head roadie being the business

19   manager.

20            The entity has never -- it's been run like a

21   family business.  It's never had appropriate management and

22   accounting controls.  It's an inverted T as far as

23   management, where a lot of fiefdoms exist and they go to

24   Alex, who wants to run a show.  He's not a business manager.

25            And so, implementing Mr. Schwartz and Jeff Schultz

```
 1   into the process has really changed things considerably in a

 2   very short period of time.  There have been a lot of changes

 3   in a matter of months, both in the sense of getting the

 4   accounting up to date, changing the manner in which product

 5   is purchased and sold to increase the revenues, increasing

 6   advertising revenue on the program, you know, changing the

 7   cost structure in the way that fulfillment is handled of

 8   product sales to reduce the overall overhead to the estate,

 9   producing the headcount to the estate.  So, a lot of changes

10   have been made that we expect will generate revenue.

11           And if the goal of this bankruptcy at the end of

12   the day is to have FSS be able to pay its creditors, then

13   that effort is worthwhile to everybody in this room.  And

14   so, if you're asking me, what does the plan look like today?

15   I can't tell you.  It's premature.

16           THE COURT:  It's fine.  I wish -- what the -- the

17   estate --

18           MR. BATTAGLIA:  There are so many options that are

19   available out there in this world today, and in terms of

20   raising funds or monetizing this asset that could be

21   explored, depending again on what the numbers turn out to

22   be.

23           THE COURT:  Okay.

24           MR. BATTAGLIA:  So, that's kind of a broad brush,

25   Judge, but --
```

```
1                THE COURT:  Okay.

2                MR. BATTAGLIA:  I do want to say, I'm not clear.

3      I understand that standing to file an avoidance action is

4      limited, but I don't understand that these parties don't

5      already have the right to contest the debt.  Any party can

6      file an objection to a claim and any party can take 2004,

7      you know, examinations and, you know, we'll agree to --

8      we've already agreed to discovery.

9                So, I'm not sure that as it stands today, in terms

10     of making an initial evaluation of this claim, that they

11     don't already have the standing to do that.  They don't need

12     anything more.  They don't need a Louisiana World Exposition

13     case at this juncture.  And honestly, I mean, the cynical me

14     says I want to get a committee appointed so that the estate

15     can pay for it.  And we can't.  We'll never be able to.

16     We'll kill this case, and all of the promise that Mr.

17     Schwartz is generating through changes and operations that

18     he's made will be for naught.

19               It won't stop Alex Jones from broadcasting.

20     There'll be -- somewhere, a platform for him to continue.

21     So, if the goal here is to silence him, that's simply never

22     going to happen.  It may just kill FSS.

23               THE COURT:  Okay.  And I really want to be clear

24     about this.  We're going to run a case and focusing on the

25     Debtor that's in front of me.  And I understand that there
```

```
 1    are a lot of moving pieces and a lot of folks involved and a

 2    lot of emotions on both sides.  We're going to run a case

 3    and I'm going to leave it there.

 4            MR. BATTAGLIA:  Yes, sir.

 5            THE COURT:  And we'll see where we go.  Why don't

 6    you call -- what evidence do you have to support either

 7    position?  How do you wish to proceed?

 8            MR. BATTAGLIA:  Your Honor, if I can, I'll just

 9    proffer Mr. Schwartz, and he's available and he's in the

10    courtroom.

11            THE COURT:  Oh.  Let me just ask.  Is there any

12    objection to the proffer of the witness?

13            MR. BRIMMAGE:  Your Honor, yes, we --

14            THE COURT:  Okay.  Mr. Schwartz, come on and take

15    the stand.  Let me just -- I'm going to swear the witness

16    in.  Are you -- do you swear to tell the truth, the whole

17    truth, and nothing but the truth?

18            THE WITNESS:  Yes, I do.

19            THE COURT:  Okay.  You may have a seat, sir.

20            Mr. Battaglia, how do you wish to proceed with

21    respect to any exhibits, if you wish to --

22            MR. BATTAGLIA:  I have emailed exhibits to all of

23    the parties last night, and I have a bound version to hand

24    to the witness.

25            THE COURT:  Okay.
```

```
 1              MR. BATTAGLIA:  And they're filed on the record.
 2              THE COURT:  So, I want to make sure folks can
 3    follow online, so if you can -- are they -- is there any --
 4    let me ask you this.  Is there any -- let me ask the
 5    Connecticut side or the U.S. Trustees.  Is there any
 6    agreement on any of the exhibits, or how are we doing this?
 7              MR. BATTAGLIA:  May I approach the witness, Your
 8    Honor?
 9              THE COURT:  Yeah.  Just a second.  I just want to
10    know, what's -- are you providing the exhibits that are
11    filed at Docket Number 26?
12              MR. BATTAGLIA:  Yes, Your Honor.
13              THE COURT:  Okay.  And Connecticut, tell me what
14    they want to do.  On 1 through 26, was there any agreement
15    on any of this?
16              MR. BRIMMAGE:  Your Honor, the Tort Plaintiffs can
17    agree to the admissibility of Exhibits -- Debtor Exhibits 1,
18    2, 9, and 10.
19              THE COURT:  1, 2, 9, and 10?
20              MR. BRIMMAGE:  Yes, Your Honor.
21              THE COURT:  Okay.  That's what there's agreement
22    on.  Mr. Nguyen?
23              MR. NGUYEN:  Yeah.  Your Honor, Ha Nguyen for the
24    U.S. Trustee.  I don't have any objection to Exhibit 1, 2,
25    3, 9, 10, 11, 12.  The rest needs to be -- foundation needs
```

1    to be laid.

2              THE COURT:  You said -- can you repeat those

3    numbers?

4              MR. NGUYEN:  1, 2, 3, 9, 10, 11, and 12.  No

5    objection from the U.S. Trustee for those exhibits.

6              THE COURT:  Okay.  All right.  It looks like there

7    is agreement on 1, 2, 9, and 10.  Everything else, you're

8    going to have to prove up.

9              MR. BATTAGLIA:  Yes, sir.  And 12 does not need to

10   be offered at this point.  It related to a motion the Court

11   has granted.

12             THE COURT:  That's correct.

13             MR. BATTAGLIA:  May I approach the witness, Your

14   Honor?

15             THE COURT:  Yes.  Just for anyone following online

16   on the Docket, you look at the Court's Docket, exhibits that

17   are -- will be shown to the witness -- Mr. Schwartz, I'm

18   going to ask that you let the examination direct you to

19   where you're going in the exhibit list.  You know, some of

20   those exhibits have not been admitted into evidence, and I

21   want to make sure that you just answer the questions that

22   are asked of you.  If there is any objection, I ask that you

23   give me an opportunity to resolve the objection, and then

24   I'll let you know if you can answer the question or not,

25   okay?

Page 52

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  Okay.  All righty.  Mr. Battaglia, you
 3    may proceed.
 4              MR. BATTAGLIA:  Has the witness been sworn, Your
 5    Honor?
 6              THE COURT:  Yes.
 7              MR. BATTAGLIA:  I'm sorry, I didn't hear that.
 8              DIRECT EXAMINATION OF W. MARC SCHWARTZ
 9    BY MR. BATTAGLIA:
10    Q    Good morning, Mr. Schwartz.  Would you state your name
11    for the record?
12    A    Marc Schwartz.
13    Q    Would you turn to Exhibit Number 1?  Is that your CV?
14         (Exhibit 1 received into evidence)
15    BY MR. BATTAGLIA:
16    A    Yes, it is.
17    Q    Is it true, correct, and accurate?
18    A    True, correct, and I believe it is still accurate.
19    Q    Mr. Schwartz, without going into excruciating detail,
20    can you tell the Court who you are and what you do?
21    A    I'm a CPA.  I'm accredited in financial -- certified in
22    financial forensics by the American Institute of CPAs.  I'm
23    a certified fraud examiner from the Association of Certified
24    Fraud Examiners, and I'm a licensed private investigator in
25    the State of Texas.  I have practiced as a CPA since
```

1    approximately 1974, I think.

2         Became involved in working in the bankruptcy world in

3    the 80s with the collapse of the energy and real estate and

4    banking industry in Texas.  And worked in that field, along

5    with my -- I was an auditor in public accounting.  Up until

6    that point, continued as a financial statement auditor --

7    following that, but also worked extensively with litigation

8    and in restructuring and bankruptcy, primarily working for

9    Chapter 7 Trustees.

10        '93 I left my -- the firm I was associated with,

11   started my own practice, and began working as a Chapter 11

12   Trustee for the Southern District and the Western Districts

13   of Texas.  And here with that work, working also as a

14   examiner -- examiner with expanded powers.  And doing civil

15   litigation, financial economic expert witness work.

16        And the -- sometime in the back -- in the dim back --

17   dim past, I was asked to serve as a Federal Court Receiver

18   in a Federal -- in a Federal Trade Commission matter where I

19   was a receiver over two groups of companies that were

20   involved in defending themselves from a FTC matter in

21   Federal Court, and then became involved in and asked to

22   serve as a State Court Receiver.

23        So, today our practice involves Financial Restructuring

24   involving in and out of bankruptcy expert witness work in

25   the civil courts, civil litigation primarily, and as a

```
 1    receiver in Federal and State Court matters.

 2    Q     Thank you, sir.  The Judge had asked some questions at

 3    the last hearing about the -- your relationship with the

 4    InfoW and affiliated bankruptcy cases filed in this Court,

 5    so I want to discuss that for a moment.  What was your role

 6    in the InfoW cases, and by that I'm referring to all three

 7    related entities?

 8    A     I was engaged to be the CRO of those companies prior to

 9    their filing.

10    Q     And is that case pending today?

11    A     Oh, the bankruptcy is not pending.

12    Q     And why was the case dismissed from your perspective?

13    A     Well, from my perspective the goal of the case was to

14    bring the Texas -- let's refer to the Texas and the

15    Connecticut litigation into a resolution process where we

16    could get the -- liquidation of the damages and develop a

17    plan for that.  The parties -- the Plaintiffs entered into

18    an agreement with us to dismiss their claims against the

19    Debtors with prejudice, ultimately, and as a result of that,

20    they were no longer involved in litigation.  We had two or

21    three minor creditors, which we had handled outside of

22    litigation.  So, if -- that determined to be a lot cheaper

23    to resolve that case by dismissing it, which the U.S.

24    Trustee agreed with, and let us resolve these things outside

25    of the bankruptcy process.
```

Page 55

```
1    Q     And do you recall approximately when the Plaintiffs,

2    Texas and Connecticut, agreed to dismiss their claims of

3    prejudice?

4    A     I'm -- in terms of the approximate date, I don't

5    recall.  I believe the motion to dismiss, at least one of

6    them was granted on -- I think it was May 19th, that was on

7    the Texas Plaintiffs.  I don't -- I'm not recalling the

8    Connecticut Plaintiffs' date.

9    Q     Who, at the time the cases were filed, the IW cases

10   were filed, owned the interest in IW?

11   A     Concerning -- (indiscernible) the three companies?

12   Q     Yes, sir.

13   A     It was owned by a trust that had been set up prior to

14   the filing of bankruptcy, which was to be the vehicle for

15   funding, any resolution that could be -- if that had

16   occurred.

17   Q     So, what claims does, or do any of the IW affiliates

18   have against Free Speech Systems as we stand here today?

19   A     None that I'm aware of.

20   Q     What claims does Free Speech Systems have against any

21   of the IW affiliates?

22   A     None that I'm aware of.

23   Q     And how was the Plan to be funded in the IW cases?

24   A     Initially with funds submitted -- injected by Mr. Jones

25   from personal assets of his.  As I recall, it was also to be
```

008527

1   funded, I think once it went effective, with the -- with

2   revenues provided -- not revenues, with income from --

3   earned by FSS, which would fund it over a five-year period.

4   Q    And what was the operative document by which those

5   revenue contributions were to be made?

6   A    It was called a Plan -- it was named a Plan Support

7   Agreement.

8   Q    Could you turn to Exhibit 3 in your binder, please?

9   Take a moment and look through it, and when you're done let

10  me know if that's a true and correct copy of the Plan

11  Support Agreement.

12  A    Yes, sir, it appears to be.

13           MR. BATTAGLIA:  Your Honor, I would offer Exhibit

14  3.

15           THE COURT:  Any objection?

16           MR. BRIMMAGE:  (Indiscernible).

17           THE COURT:  All right, a little bit more

18  foundation, Mr. Battaglia.

19           MR. BATTAGLIA:  Yes, sir.

20  BY MR. BATTAGLIA:

21  Q        You're familiar with the books and records of the

22  InfoW entity?

23  A    Entities?  Yes.  Yes.

24  Q    And did InfoWars enter into this agreement -- into a

25  Plan Funding Agreement?

```
 1              MR. BRIMMAGE:  Your Honor, (indiscernible).

 2              MR. BATTAGLIA:  Your Honor --

 3              MR. BRIMMAGE:  (Indiscernible).

 4              THE COURT:  Mr. Battaglia?

 5              MR. BATTAGLIA:  Your Honor, the witness was the

 6    CRO for these entities, and this is a business record, and

 7    that's where we're headed.

 8              THE COURT:  Okay, just ask him that question.

 9              MR. BATTAGLIA:  Sure.

10              THE COURT:  And I'll sustain the objection.

11              MR. BATTAGLIA:  Sure.

12    BY MR. BATTAGLIA:

13    Q        Is this a record that was maintained within the

14    files of the InfoW entities?

15    A    Yes.

16    Q    And were you the custodian of those records?

17    A    Yes, I guess so.

18    Q    And --

19              MR. BRIMMAGE:  Your Honor, (indiscernible) --

20              THE COURT:  Yeah, I -- why don't you just ask a

21    few more questions.  I'm going to sustain the objection, why

22    don't you ask a few more foundational questions.  I think

23    you'll get there.

24    BY MR. BATTAGLIA:

25    Q    So, with respect to the business records of InfoW, you
```

1    were in physical possession of some of those records, were

2    you not?

3    A    Yes, I am.

4    Q    And is the Plan Support Agreement one of the records

5    that you maintained physical possession of?

6    A    Yes, it is.

7    Q    And you're familiar with the manner and means in which

8    those business records were maintained within your auspices

9    as a CRO?

10   A    Yes.

11   Q    And is Exhibit 3 a document that was within your

12   control and held as a business record of IW, and the

13   affiliated entities?

14   A    Yes, it is.

15   Q    And do you recognize Exhibit 3?

16   A    Yes, I do.

17   Q    Is it a true and correct copy of the business record

18   that was the Plan Support Agreement?

19   A    Yes.

20              MR. BATTAGLIA:  I would offer Exhibit 3.

21              MR. BRIMMAGE:  (Indiscernible).

22              THE COURT:  I'm going to overrule the objection.

23   I'm going to admit 3 for what it is.  It's a Plan Support

24   Agreement, and it's a public document as well.  It's been

25   filed on the Docket in the prior case in which it was the

1    CRO, so, Mr. Brimmage, you can ask -- you can cross-examine

2    about all that stuff.

3         (Exhibit 3 received into evidence)

4    BY MR. BATTAGLIA:

5    Q    Would you turn to section eight of Exhibit 3?

6         THE COURT:  I do want to make one clarification,

7    and this could be a very hyper-technical point, but the

8    version that's on the Docket is highlighted, and the version

9    that I'm admitting, for the record, that I want a clean copy

10   of it, the version that I'm seeing on Docket 26 has certain

11   language highlighted, and that's not what I'm admitting.  If

12   you're asking me for a publicly filed version of you know,

13   22-6002063, Document 63 without highlights --

14        MR. BATTAGLIA:  Yes, sir.

15        THE COURT:  I'm okay with that.  But if you're

16   asking to admit what you've -- well, the Docket Number 26,

17   that I won't admit, but I'm -- a clean version can be

18   admitted into the record.

19        MR. BATTAGLIA:  Shall I supplement, Your Honor?

20        THE COURT:  Yeah.  Yes, please.

21   BY MR. BATTAGLIA:

22   Q    When you look at the -- Section Eight, what does it

23   provide for?

24   A    It's the termination provision of the agreement.

25   Q    Under the terms under Section Eight, what is your

1    understanding about whether this agreement remains in

2    effect?

3    A    My understanding is the agreement was terminated.

4    Q    And is it true that the bankruptcy cases for the IW

5    entities were dismissed?

6    A    Yes, it is.

7    Q    Is it true that there was no order approving the

8    Litigation Settlement Trustees by April 30, 2022?

9    A    That is correct.

10   Q    And that there was no Plan on file by April 30, 2022?

11   A    That is correct.

12   Q    What is your involvement on behalf of FSS, the Debtor?

13   A    I was hired to be its Chief Restructuring Officer.

14   Q    And, can you turn to Exhibit 2, please?  And this has

15   been admitted into evidence, is that your engagement

16   agreement with Free Speech Systems?

17        (Exhibit 2 received into evidence)

18   A    Yes, it is.

19   Q    And when was that dated?

20   A    It was dated May 19th, 2022.

21   Q    When was it executed?

22   A    I believe it was June 7th.

23   Q    Of 2022?

24   A    2022.  Yes, June 6th, excuse me, of 2022.

25   Q    Can you describe what level of authority over the

1    Debtor and its operations you were afforded under this

2    agreement?

3    A    Really, it's absolute authority over the operations.   I

4    agreed to consult with Mr. Jones on major decisions.

5    Q    So, who has control over the bank accounts?

6    A    I do.

7    Q    Who has control over payroll?

8    A    I do.

9    Q    Who has control over hiring and firing of employees?

10   A    I do.

11   Q    Who has control over the records of the Debtor?

12   A    I do.

13   Q    And is it within your unilateral power to hire and fire

14   employees?

15   A    Yes.

16   Q    To open and close bank accounts?

17   A    Yes.

18   Q    Who will be the signatory on the Access DIP account?

19   A    I will be.

20   Q    Anybody else?

21   A    No.

22   Q    Do you have authority to make operational changes

23   within the Debtor's operations?

24   A    Yes.

25   Q    Have you in fact made such changes?

```
 1   A     Yes.

 2   Q     What role does Alex Jones play in any of the areas

 3   we've just discussed?

 4   A     Because of his experience, obviously, with the company,

 5   and his knowledge of the customers -- and customers -- of

 6   the vendors, and the personnel, when he's available to me to

 7   consult with to get more guidance information on, if I had a

 8   -- several changes I've implementing -- am implementing, I

 9   went and said, this is what I'm going to do, do you have a

10   problem with it?  If it is, tell me what that problem is.

11   Q     At the time you were installed as the Chief

12   Restructuring Officer, what was the management structure of

13   Free Speech Systems?

14   A     Someone in the process of this case referred it to --

15   referred to it as an inverted T, and I think that's a good

16   description.  There is Alex, and then there's everybody

17   else.

18   Q     And is that -- in your experience, the way a successful

19   business is, or should be managed?

20   A     No.

21   Q     What was the status of the accounting controls on the

22   date that you became CRO?

23   A     As far as I can tell they were non-existent.

24   Q     Who performed the accounting on behalf of Free Speech

25   Systems?
```

```
 1    A     At what time?

 2    Q     Prior to you becoming a CRO.

 3    A     Oh, the 17 months or so prior to my becoming CRO, it

 4    appeared to me nobody did.

 5    Q     Was there anybody with an accounting degree or

 6    background that provided accounting services?

 7    A     There was a consultant who had been hired, Mr. Roe,

 8    who's a CPA, who provided some advisory consulting services.

 9    He was not involved and was not permitted to be involved in

10    the actual accounting process.  The people responsible for

11    maintaining the books and records did not have accounting

12    degrees.

13    Q     What was the state of the company's accounting books

14    when you became CRO?

15    A     2021, I had -- this was on June 6th date.  2021 had not

16    been closed, which means the books were not completed, and

17    year-end closed.  There had been no recording of any entries

18    in 2022 other than automatic downloads from the bank

19    transactions.  So, they were -- 20 -- 2021 was at -- was

20    incomplete and had not -- was not able to produce any

21    financial statements of meaning, and 2022 was untouched.

22    Q     Were you able to find typical accounting reports on

23    your entry in as CRO?

24    A     No.

25    Q     So, balance sheets, income statements, there were no
```

Case 4:23-cv-00463   Document 6-25   Filed on 03/23/23 in TXSD   Page 80 of 480
Case 22-60043   Document 165-15   Filed in TXSB on 09/16/22   Page 64 of 257
Page 64

1    current --

2    A    There were no financial reports that I could -- there

3    were no financial reports at all, that had ever been

4    produced in at least the last 18 months.

5    Q    What, at the time that you became CRO, what was the

6    Debtor's business relationship with PQPR Holdings, Limited?

7    And I'll just call it PQPR.

8    A    At the time I became CRO, PQPR was facilitating the

9    purchase of inventory by FSS.  In addition, PQPR was

10    purchasing and selling its own inventory and FSS was selling

11    PQPR inventory as well.

12    Q    And who to your knowledge owns PQPR?

13    A    Carol and David Jones, who are Mr. Alex Jones' parents.

14    And in -- through an intermediary entity, Mr. Alex Jones

15    himself owns.  So, about -- the -- turns out about 80 -- 72

16    percent of the interest is indirectly owned by Mr. Alex

17    Jones, and the 18 percent balance -- if that's right -- 28

18    percent balance, is owned by Carol and David Jones.

19            MR. BRIMMAGE:   (Indiscernible).

20            THE COURT:  I'm just going to -- I'm going to

21    allow it just as his understanding, and not for the truth of

22    the matter asserted.  All right.  It's a -- just testifying

23    as his understanding of the corporate structure, and I'll

24    allow him to do it.

25    BY MR. BATTAGLIA:

```
1    Q    So, prior to your joining FSS, what -- how were

2    proceeds of inventory sales allocated?

3    A    I've identified at least two methods.  For a period of

4    years, it appears PQPR purchased --

5         MR. BRIMMAGE:  Your Honor, I hate to interrupt.

6    (Indiscernible).

7         THE COURT:  Yeah, I think you -- yeah, I'm going

8    to sustain that objection.  Well, maybe you can ask a few

9    more background questions there.

10   BY MR. BATTAGLIA:

11   Q    Sure.  Have you reviewed the historical operations

12   between the Debtor and PQPR?

13   A    Yes.

14   Q    And what is your understanding of the allocation of

15   proceeds between PQPR and FSS from inventory sales?

16   A    Up to some date in 2021, which I don't recall the exact

17   date, I think it was in November, PQPR purchased inventory

18   at the request of FSS.  It then marked up that inventory and

19   sold it to FSS, which then marked up the inventory for sale

20   to the public.

21        MR. BRIMMAGE:  (Indiscernible).

22        THE COURT:  I'm going to let you -- I'm going to

23   just allow it just as his understanding of what it is, I'm

24   going to let you explore though -- the door's open.  I'm

25   going to let you explore, sir, where he gained that
```

1    information.

2    BY MR. BATTAGLIA:

3    Q     And based on your review of the books, and your

4    discussions with -- well, your review of the books and

5    records and contracts that you've seen, how did that

6    relationship change?  You said that up until November of

7    2021 --

8    A     Yeah, it changed on -- I believe it was November 2021,

9    to where the -- as opposed to marking up and selling

10   inventory to FSS, they entered into -- the arrangement

11   changed to where FSS would sell the unmarked inventory and

12   receive 20 percent of the proceeds, and 80 percent of the

13   proceeds would be paid to PQPR.

14   Q     How does the Debtor -- or how, I guess, how does the

15   Debtor effectuate sales transactions?

16   A     It's almost all over the internet.

17   Q     So --

18   A     Credit card charges by the -- through the internet.

19   Q     And, what did the Debtor pay for credit card

20   processing, prior to your involvement?

21   A     Prior to my involvement, it was paying in total about

22   14.5 to 14.9 percent.  Four point -- well, there was 10

23   percent going to a facilitator, if you will, and the balance

24   of that 14.9, 14.8, whatever it was, goes to the actual

25   credit card processor.

008538

1    Q      Why was the Debtor paying such a high rate?

2    A      Because it needed to -- they had been de-platformed and

3    had lost its credit card processor, so the facilitator was

4    brought in as an intermediary to receive the proceeds from

5    the credit card processor, and to be in fact the face that

6    the Fed credit card processor saw, and it then distributes

7    the money, the funds, to PQPR and FSS.

8    Q      How were sales fulfilled, and what do you understand

9    when I use the word fulfilled?

10   A      Yeah, what do I understand, you mean?

11   Q      Yes, yes.

12   A      Yes, well, fulfillment was and to me is once the

13   customer places an order, that someone has to go pull

14   merchandise out of the warehouse, package it, box it, put

15   postage or whatever you'd use, whether it's UPS, the UPS

16   stamp on it, there's -- put a sticker on it, and ship it to

17   the customer.  So, fulfillment's that process of -- but also

18   includes here, warehousing, managing the warehouse with

19   product in it, and that -- that is -- from when it's

20   received to the warehouse to when it's shipped to the

21   customers is fulfillment.

22   Q      And who employed the individuals that were doing

23   fulfillment prior to you becoming CRO?

24   A      FSS employed -- well, FSS employed them for a period of

25   time, and then they were transferred -- excuse me.  FSS uses

```
 1    ADP for its payroll.  These employees were on that payroll.

 2    Subsequently, they're then charging the fulfillment payroll

 3    to PQPR, although they stayed -- still stayed on -- on the

 4    FSS ADP payroll account.

 5    Q    Let's turn and talk about what's happened since you

 6    became the CRO.  Can you tell the Court where the Debtors

 7    stands in its accounting records currently?

 8    A    Well, we've closed through May 2022, those were

 9    included -- those financials were included in the material

10    we filed in connection with the bankruptcy.  The -- June,

11    we've gotten all the transactions in, we have to go back and

12    do closing review and make sure that we've -- well, one

13    thing we did and critical, we got the bank accounts

14    reconciled.  I forgot to mention, there'd never been a bank

15    -- there hadn't been a bank account reconciliation we could

16    find, so we reconciled the bank accounts through May.  I

17    believe July's are done also.

18         So, we're current, we've produced financial statements,

19    we have not yet started working on we've -- going down and

20    digging up, producing managing accounting statements, but

21    we've got the primary financials done.

22    Q    Okay.  And who is responsible, primarily responsible

23    for maintenance of the accounting records for FSS?

24    A    Right now it's -- you mentioned Mr. Schultz, as I hired

25    Mr. -- we hired -- FSS hired Mr. Schultz to come in and take
```

1    over as business manager.  But the actual

2    bookkeeping/accounting work is being taken over by -- so, of

3    my low -- my personnel, my bookkeeping personnel, until we

4    get a bookkeeping service in place there.  So, the

5    accounting was handled by, essentially us through -- as FA's

6    and by the business manager.

7    Q    And are you familiar with Mr. Schultz's accounting

8    qualifications?

9    A    Yes.

10   Q    And what are they?

11   A    He has a bachelor's degree in accounting from

12   University of Houston.  He served as a CFO -- I mean, not

13   immediately, but through a period of years, and most

14   recently, CFO, and then CEO of companies, so he's very

15   knowledgeable of that -- accounting and financial reporting

16   aspects.

17   Q    Earlier you talked about prior relationship with PQPR,

18   has it changed?

19   A    Yes.  The entered -- FSS and PQPR entered a new

20   agreement under which sharing ratios changed, where FSS

21   inventory -- FSS gets 90 percent of the proceeds from the

22   sale of it, PQPR gets 10 percent, and inventory that is

23   acquired by PQPR for its own account, they -- and if it's

24   sold, it's 80 percent of that goes to PQPR, and 20 percent

25   goes to FSS.

1   Q    And in the process of changing that relationship, what

2   was done regarding the credit card processing costs?

3   A    I -- one of my -- I insisted that that be reduced, and

4   it was negotiated down to four percent.

5   Q    So four plus the 4.9 charged --

6   A    Correct.

7   Q    -- by the banks.

8   A    Yeah, this is for the intermediary, four percent, and

9   then the 4.9, is their regular bank processing charge.  And

10   that, by the way, varies by the type of credit cards used.

11   Q    Turn to Exhibit 8, please.  Tell the Court what that

12   is.

13   A    This is the Forbearance Agreement entered into on July

14   10th of 2022.

15   Q    And were you involved in negotiation and drafting of

16   this document?

17   A    Negotiating the document and reviewing the draft, yes.

18   Q    And is this a true and correct copy of the Forbearance

19   Agreement entered into between the parties?

20   A    Yes, it is.

21        MR. BATTAGLIA:  Your Honor, I would offer Exhibit

22   8 into evidence.

23        THE COURT:  Any objection?  It's admitted.  26-8

24   is admitted.

25        (Exhibit 8 received into evidence)

```
 1              MR. BATTAGLIA:  Thank you, Your Honor.
 2      BY MR. BATTAGLIA:
 3      Q    Have there been any changes in the manner in which
 4      fulfillment of product sales is handled?
 5      A    Yes.
 6      Q    What are those changes?
 7      A    A significant one was prior to filing bankruptcy, we
 8      engaged a third-party fulfillment service to take over
 9      fulfillment for FSS's and PQPR's products, and FSS's
10      products.
11      Q    Who employs the individuals who actually pull product
12      and ship it?
13      A    The fulfillment service we hired.
14      Q    And how do you pay fulfillment?  Is it a flat rate per
15      month, or what's the term?
16      A    It's a flat rate per shipment.
17      Q    And overall, shifting to this vehicle, what's the
18      effect on the Debtor's expenses?
19      A    It -- based on my analysis, it should be a push in the
20      sense that there should not be much of a net increase, if
21      any, and cost -- of the actual cost, the fulfillment should
22      be -- improve our efficiency though, because that would be
23      not something that we have to manage and worry about.
24      Q    And would that answer change if volumes increased
25      significantly?
```

008543

```
 1   A    No, it should not.

 2   Q    Let's talk about --

 3   A    Let me stop.  It may actually it probably -- if volumes

 4   increase, our cost of fulfillment per dollar may actually go

 5   down, could go down.

 6   Q    I want to talk about the PQPR debt now.  As the Chief

 7   Restructuring Officer, do you control the business records

 8   of FSS?

 9   A    Yes.

10   Q    And are you familiar with the business records of FSS?

11   A    Yes.

12   Q    And the manner in which they're maintained?

13   A    Yes.

14   Q    Do you recognize Exhibit 4?

15   A    Yes.

16   Q    What is it?

17   A    The promissory note dated August 13th, 2020 between

18   Free Speech Systems, LLC and PQPR Holdings Limited, LLC.

19   Q    Is this a true and correct copy of the promissory note

20   that is within the business records of the Debtor?

21        MR. BRIMMAGE:  Your Honor, (indiscernible).

22   Hearsay.  (Indiscernible) prove this up.  (Indiscernible)

23   and any further testimony (indiscernible).

24        MR. BATTAGLIA:  Your Honor, if I may respond?

25        THE COURT:  Yes, please.
```

```
 1            MR. BATTAGLIA:  It's an absurd suggestion that a

 2    custodian is ineligible to testify to the authenticity of a

 3    business record, and that what one must do is find someone

 4    who is employed by the Debtor as the custodian back at the

 5    time the document was originated.  There is no requirement

 6    that a party -- that a custodian be a signatory to every

 7    document, that's equally an absurd evidentiary requirement.

 8    There's no way business records would ever come in if those

 9    requirements were required.

10            MR. BRIMMAGE:  (Indiscernible).

11            MR. BATTAGLIA:  He can authenticate a business

12    record, which is what he's done.  And legal documents are

13    business records, just as accounting records are, and any

14    other document within the control of an entity of a party.

15            MR. BRIMMAGE:  (Indiscernible).

16            THE COURT:  I'm going to admit it as a business

17    record.  I think custodian doesn't need -- just that the

18    reports that are -- it just has to be a circumstantial

19    guarantee of trustworthiness of the document, and it can be

20    brought in by someone who was just a custodian, and he's the

21    CRO.  The question that I have for you, Mr. Schwartz, is

22    when did you first view this -- have you ever viewed this

23    document before today?

24            THE WITNESS:  Oh yes, I have.

25            THE COURT:  When did you view this document for
```

```
 1    the first time?  Do you recall what month?
 2              THE WITNESS:   I would have -- June of this year.
 3              THE COURT:  Okay.
 4              THE WITNESS:  I would say early June.  I'd have to
 5    look back at my time record so you can tell (indiscernible).
 6              THE COURT:  No, it's one and the same.  I'll admit
 7    it.  It's --
 8         (Exhibit 4 received into evidence)
 9              MR. BRIMMAGE:  Your Honor, (indiscernible).
10              THE COURT:  I'll let you take him up on cross.
11    I'm going to let you take him up on cross.
12    BY MR. BATTAGLIA:
13    Q    Can you turn to Exhibit 5, please?  Can you tell the
14    Court what that is?
15    A    This is a security agreement entered into between PKR
16    Holdings and FSS, dated August 2020.
17    Q    That's your --
18    A    Yes, I'm sorry.
19    Q    Sorry.  And have you seen this document before?
20    A    Yes.
21    Q    Would it be true you saw it at or about the same time
22    you saw the prior exhibit?
23    A    Yes.
24    Q    Does this appear to be a true and correct copy of the
25    document that is maintained within the business records of
```

1    Free Speech Systems?

2    A    Yes.

3              MR. BATTAGLIA:  Your Honor, I would offer Exhibit

4    5.

5              MR. BRIMMAGE:  Objection.

6              THE COURT:  Yeah, I understand.  I'm going to

7    admit it as a business record, but -- and I know you're

8    going to have questions for -- and I'm going to let you ask

9    those questions about the scope of his knowledge of it, this

10   document, and questions about it.  It's in evidence, so you

11   get to ask questions about it, and it's relevant to the cash

12   collateral motion and critical vendors.  So, you may

13   proceed, counsel.

14        (Exhibit 5 received into evidence)

15             MR. BATTAGLIA:  Thank you, Your Honor.

16   BY MR. BATTAGLIA:

17   Q    Could you turn to Exhibit 6, please?

18   A    Yes, sir.

19   Q    And can you tell the Court what that is?

20   A    This is another promissory note that's been dated

21   November 10th, 2021 between Free Speech Systems and PQPR

22   Holdings in the amount of 25,300,000.

23   Q    And does that -- have you seen this document on or

24   about the same time as you responded to the preceding

25   documents?

```
 1    A    Yes.

 2    Q    And does this appear to be a true and correct copy of

 3    that promissory note that is within the business records of

 4    the Debtor?

 5    A    Yes, it is.

 6               MR. BATTAGLIA:  Offer Exhibit 6.

 7               MR. BRIMMAGE:  (Indiscernible).

 8               THE COURT:  Understood, overruled.  It's admitted.

 9         (Exhibit 6 received into evidence)

10    BY MR. BATTAGLIA:

11    Q    Can you turn to Exhibit 7, please?  Can you tell the

12    Court what that is?

13    A    This is a copy of UCC financing statement, November

14    18th of 2020 for --

15    Q    And was this -- did you see this document for the first

16    time about the same time as the preceding documents?

17    A    Yes.

18    Q    And is this document maintained as a business record in

19    the Debtor's files and records?

20    A    Yes.

21    Q    Does this appear to be a true and correct copy of the

22    UCC 1 financing statement?

23    A    Yes.

24    Q    Does it bear a filing number with the Secretary of

25    State's office?
```

```
 1   A    Yes, it does.

 2              MR. BATTAGLIA:  Offer Exhibit 7.

 3              THE COURT:  Any objection?  It's admitted.

 4        (Exhibit 7 received into evidence)

 5   BY MR. BATTAGLIA:

 6   Q    If you would turn to Exhibit 9 and keep your finger on

 7   Exhibit 10.

 8   A    Yes, sir.

 9   Q    Okay, do you recognize Exhibit 9?

10   A    Yes.

11   Q    What is it?

12   A    This is a copy of the 13-week cash flow forecast that I

13   had prepared for Free Speech Systems.

14   Q    Now, we're here today on an interim motion, can you

15   turn to Exhibit 10 please, and keep your finger on 9?

16   A    Yes, sir.

17   Q    What is that?

18   A    Exhibit 10 is a blow up of the first three weeks of the

19   cash flow forecast on Exhibit 9.

20   Q    They're identical in terms of the numbers displayed for

21   the three-week period, yes?  Go back to 9.  Would you tell

22   the Court generally what authority you're seeking today, to

23   use cash collateral today?  What do you want to pay?

24   A    The bills.

25   Q    A little more detail.
```

1    A    The bills and the cost of operating the Debtor.

2    Q    Payroll?

3    A    Payroll, lights, electricity, a lot of

4    telecommunications or internet-related vendors who provide

5    the backbone for the telemarketing and the production or --

6    of the show, if you will.

7    Q    What about product cost?

8    A    There's some product cost in here.

9    Q    There's one entry in here of a $250,000 proposed

10   payment to PQPR.  Can you tell the Court what that's for?

11   A    Yes, PQPR advanced $750,000 towards the purchase of

12   inventory --

13   Q    Advanced to who?

14   A    Advanced to FSS towards the purchase of merchandise

15   inventory.

16   Q    Did they advance to FSS or to the supplier?

17   A    The money was paid to a supplier as part of a million-

18   and-a-half-dollar prepayment that was made to -- in order --

19   to order inventory from that supplier.

20   Q    Why is it advantageous to pay to acquire -- and there's

21   two installments to pay for inventory, are there not?

22   A    Well, there are --

23   Q    PQPR inventory, I'm sorry.

24   A    Now, I'm confused.

25   Q    Okay.  So, there's a $250,000 payment --

```
 1    A      Oh, yes.  There's --

 2    Q      -- included in the budget.

 3    A      There's $250,000, and there's subsequently a $500,000

 4    payment in the budget to repay PQPR for that $750,000.

 5    Q      Why is it advantageous for FSS to acquire that

 6    inventory that PQPR is purchasing?

 7    A      Because PQPR essentially was out of -- not PQPR.  FSS

 8    was out of inventory essentially, of any -- of that was

 9    high-value and had a high marketability to it.  And that had

10    to be replaced in order to make this plan work and make the

11    company work.  So.

12    Q      What does the Debtor get if its PQPR products sold

13    through the Debtor's sales channel?

14    A      Well, this is -- this -- well, I mean, it depends on

15    what -- which way you look at this.

16    Q      If you didn't buy it.

17    A      If we didn't buy it, that PQ -- wait a minute.

18    Q      If FSS did not pay this $250,000, what would this --

19    how would the sales proceeds be allocated?

20    A      80 percent PQPR, 20 percent Debtor.

21    Q      How are they allocated if you're allowed to purchase

22    the inventory from PQPR?

23    A      10 percent PQPR, 90 percent Debtor.

24    Q      And what's the markup on products of the type that are

25    being purchased?
```

1    A    300 to 400 percent.

2    Q    In your business judgment, is it better to pay the 250

3    or not pay the 250 to PQPR?

4    A    It's better to pay the 250.

5    Q    So, in coming up with these projections, can you

6    describe for the Court a little bit what your basic

7    assumptions are?

8    A    The inventories that we -- that were acquired, and that

9    are being rolled into the sales, they're being shipped in at

10   intervals as they're produced.  We had a one shipment about

11   two weeks before filing, three weeks before filing.  We had

12   a second shipment within a -- the week before filing.  As

13   those products come into the warehouse, Alex Jones starts

14   pushing them on the shelf, and we can see a marked increase

15   in daily sales, we get daily sales reports.

16        And so, what we did in watch -- and I did in watching

17   these, and one of the things I asked for was give me time to

18   see the impact of these sales.  We were able to see a

19   various -- an increase, definitely an increase, significant

20   increase in daily sales.  So, prior to filing, just prior to

21   filing, let's just look at the last five business days of

22   sales, and that's what we use as our base.  As we're -- have

23   more product coming in, we're seeing they -- these are

24   increasing sales, and they're being attracted to the market.

25        And I said, okay, well take that times 125 percent and

```
 1    that will be our weekly sales budget, and we should be able
 2    to accommodate that.
 3    Q    Do you -- would you tell the Court; do you perceive
 4    that as aggressive or a conservative income budgeting?
 5    A    I see it as conservative.  We had -- this was two of
 6    the six products, which we're still operating with these two
 7    products.  The next one's coming in next week.  So, we've
 8    got a layering effect coming, but -- on this, but it's not
 9    at all what I consider aggressive.  If you ask Mr. Jones,
10    his -- he -- and he has the experience, he believes he'll be
11    substantially -- these are substantial understatements.
12              MR. BRIMMAGE:  (Indiscernible).
13              THE COURT:  Sustained.
14    BY MR. BATTAGLIA:
15    Q    Can you tell the Court, is there a correlation between
16    sales and Mr. Jones' broadcasting, or someone else, or a
17    repeat broadcast?
18              MR. BRIMMAGE:  (Indiscernible).
19              THE COURT:  We'll see what he -- let's hear his
20    answer.
21    BY MR. BATTAGLIA:
22    Q    Have you examined that to determine whether there's a
23    correlation?
24    A    Have I examined it?  I have -- I've had -- there are
25    people at FSS that keep track of that information.  So --
```

```
 1    Q    And have you looked at that information to --

 2    A    Yes.

 3    Q    -- make a determination?

 4         THE COURT:  And I don't think you answered the

 5    question.  Why don't you ask the question again.  I don't

 6    think you actually answered the question.

 7         MR. BATTAGLIA:  I'm not sure I remember precisely

 8    what the question was, Judge, I'm sorry.

 9         THE WITNESS:  Is there a correlation?

10         THE COURT:  Yeah, is -- well, is there a

11    correlation, and --

12    BY MR. BATTAGLIA:

13    Q    Have you reviewed books and records to see if there's a

14    correlation between sales when Mr. Jones' on air or not?

15    A    Well, I've asked, what is the correlation; and I've

16    been told what it is.

17         THE COURT:  That's -- you're not answering the

18    question.  The question is, have you reviewed documents to

19    determine whether there's a correlation?  It's --

20         THE WITNESS:  I have not received a document at

21    this time.

22    BY MR. BATTAGLIA:

23    Q    You have an understanding of whether there's a

24    correlation between when Mr. Jones is on the air or not?

25    A    Yes.
```

1    Q      What is that understanding?

2           MR. BRIMMAGE:  (Indiscernible) I've been told.

3           THE COURT:  Yeah.  I'm going to -- I guess the

4    question that would then follow is what is your

5    understanding based on?  And that's going to then inform

6    what your answer will be.  You said you had -- you developed

7    an understanding of it.  You haven't reviewed a document,

8    but you've developed an understanding.  What is that

9    understanding based on?

10          THE WITNESS:  The person in charge of e-commerce

11   which track -- and he -- one of the things he does is he

12   tracks daily sales of product and tracks hours of all people

13   on the air, but particularly, he'll actually focus on Alex

14   Jones.  And when Alex Jones is not on the air, we see a 30 -

15   - we could see a 30 percent drop in sales.

16          THE COURT:  Yeah, but what --

17          THE WITNESS:  That's what he's --

18          THE COURT:  You're saying we.

19          THE WITNESS:  (Indiscernible), sorry, Your Honor.

20          THE COURT:  No, no, no, I mean we as in -- you

21   said you haven't reviewed a document, so what's that based

22   on?  That 30 percent?  Is that based on something someone

23   told you?

24          THE WITNESS:  Correct, that's based on Mr. Roddy's

25   data that he maintains.

```
 1              THE COURT:  Have you reviewed that data?

 2              THE WITNESS:  I -- no, I've actually been tied up

 3    getting ready for this hearing.

 4              THE COURT:  Okay.  I'm going to sustain the

 5    objection.

 6    BY MR. BATTAGLIA:

 7    Q    If you are not authorized to use cash collateral today,

 8    what's the -- going to be the effect on the Debtor's

 9    business?

10    A    As I think I mentioned earlier, we have about 800,000

11    of cash that is not cash collateral, so we can pay our bills

12    this first week it looks -- I believe.  We could pay a --

13    most of our bills this first week, not all of them.

14    Q    And if you don't pay your bills, what's going to happen

15    to the Debtor?

16    A    It depends on which ones we don't pay, but it's going

17    to be a -- if we can't pay critical -- the critical vendors,

18    then we will be shut down.

19    Q    Well, let's turn and talk about critical vendors.

20              MR. BRIMMAGE:  Your Honor, (indiscernible).

21              THE COURT:  That's just this -- I'm going to --

22    I'm just going to (indiscernible) it -- that wasn't based on

23    any evidence, I think he's going to have to testify as to

24    why, give me a little bit more as to why.  But he's allowed

25    to say what he thinks.  Why he thinks that I think is
```

008556

1    probably the more relevant question, and I think we'll get

2    there.  I think that's where Mr. Battaglia is going anyway.

3              MR. BATTAGLIA:  Yes, actually I was going to turn

4    to critical vendors, they're very related, but I'll just ask

5    that question now and put it to rest.

6              THE COURT:  Well --

7    BY MR. BATTAGLIA:

8    Q     Why do you think that it would shut the business down?

9    A     Well, if we can't broadcast, we can't sell.  So, if we

10   lose a vendor who's critical to our ability to broadcast, if

11   we can't operate our e-commerce platform, we can't sell,

12   even if we could broadcast.  If we can't fulfill orders,

13   then we're not going to be able to fulfill what we've been

14   paid for, and those revenues have to go back to those --

15   will have to go back to those customers.  So, it's -- and

16   all of these are -- we're, you know, the company's in a

17   situation right now where there's not a lot of breathing

18   room.

19   Q     Let's pick an example, it's one of the critical

20   vendors.  Do you know who Cloudflare Inc. is?

21   A     I have a bit of knowledge about Cloudflare, yes.

22   Q     What do they do?

23   A     They're part of our e-commerce platforming.

24   Q     And they provide security for purchasers, right?

25   A     Right.

008557

1   Q    And for transactions over the internet?

2   A    Right.

3   Q    What happens if Cloudflare does not continue providing

4   services?

5   A    We're out of business.  We're shut down.  We're not out

6   of business, we're shut down until we can find a

7   replacement, if we can find one.

8   Q    There are other vendors who are identified as

9   providing, I'm going to call it internet access, I'm not a

10   troglodyte, but I'm only marginally above that, but let's

11   say contact to content users, you know who I'm talking

12   about, internet providers, satellite providers, and the

13   like.  What happens if the Debtor is unable to pay those?

14   A    The same thing, we're shut off.  We can't -- if you

15   don't have access to the satellite, you can't broadcast.

16   Q    What happens if the Debtor's unable to pay its

17   employees?

18   A    Well, I suspect that would be, it was a big issue with

19   the ability to keep going if we don't have any employees.

20   Q    If you would please turn to Exhibit 11.

21        THE COURT:  Mr. Battaglia, you were talking about

22   critical vendors, and then you talked about employees.

23        MR. BATTAGLIA:  Your Honor, I was just using the

24   critical vendors as an example of some of the uses of cash

25   collateral.  Obviously, they're critical vendors as well,

008558

```
 1     and I'll get to the critical vendors here.

 2               THE COURT:  Okay.  But --

 3               MR. BATTAGLIA:  Separately.

 4               THE COURT:  -- are the employees viewed as

 5     critical vendors?

 6               MR. BATTAGLIA:  No, sir, but they're being paid

 7     under the cash collateral budget.

 8               THE COURT:  Okay.  Okay.

 9               MR. BATTAGLIA:  And that was my point.

10               THE COURT:  I just wanted to make sure that we

11     were clear.

12               MR. BATTAGLIA:  Yes, sir.

13     BY MR. BATTAGLIA:

14     Q     You got Exhibit 11 in front of you?

15     A     Yes, I do.

16     Q     And do you recognize this document?

17     A     Yes, I do.

18               MR. BATTAGLIA:  Your Honor, this is attached to

19     the motion and/or order that were filed requesting the

20     authority to pay critical vendors.

21     BY MR. BATTAGLIA:

22     Q     Is this a true and correct copy of the list of vendors

23     that you proposed to have authority to pay under the

24     critical vendor motion?

25     A     Yes, it is.
```

```
 1              MR. BATTAGLIA:  Your Honor, I would offer Exhibit

 2    11 into evidence.

 3              THE COURT:  Any objection?

 4              MR. BRIMMAGE:  (Indiscernible).

 5              THE COURT:  Okay.  It show for -- what truth of

 6    the matter is asserted, it is a -- I can just admit it -- or

 7    I'll accept it for the purpose of these are the -- that you

 8    seek to pay.  And those are the amounts that you believe

 9    that you need to pay them.

10        (Exhibit 11 received into evidence)

11              MR. BATTAGLIA:  That's fine, Your Honor.

12    BY MR. BATTAGLIA:

13    Q    So, there's a list of, I see 20 vendors here.  I want

14    to talk, first of all, generally about FSS's ability to

15    identify and contract with suppliers of goods and services.

16    Generally, in -- do you have an understanding as to whether

17    or not it's easy for this Debtor to replace vendors?

18    A    Yes.

19    Q    What is that understanding?

20              MR. BRIMMAGE:  (Indiscernible).

21              THE COURT:  I don't know.  Overrule it to the

22    extent of -- I want to hear it, how do you?  You can answer

23    the question.

24    BY MR. BATTAGLIA:

25    A    Yes, I do.
```

1   Q      What is that understanding?

2   A      It can be very difficult.  The -- starting around, I

3   think 2018, but -- today, I'd say today, if we lose a

4   vendor, it can be hard to find a replacement vendor.  Most

5   recent examples I'm aware of are the impact on the bank card

6   processing, where we ended up having to get an intermediary

7   vendor, if you will, to shield the processor from our

8   identity, if you will.  The -- (indiscernible) are unable to

9   find a bank to bank with, going from one of the big

10  international banks to a small rural, Texas State bank.

11         Even an issue of me trying to transfer our banking to

12  Access, which is a major bank on the east coast.  It's

13  actually a savings institution, does a lot of work in the

14  bankruptcy field.  And I wanted to move our banking there

15  prior to filing so that we could easily just transition

16  right into the DIP accounts without changing anything.  And

17  they concluded they would not do it per the bankruptcy

18  without an order from the Bankruptcy Court, and I could not

19  a -- they would not open the banking.  And they require that

20  I be the single signatory, period.

21  Q      Have you had experience attempting to replace the

22  controller position or bookkeeper position?

23  A      Yes, it has been very hard.

24  Q      Why?

25  A      The company's located in Austin, Texas.  And they've

008561

1   had real trouble with finding companies who would be willing

2   to be associated with FSS in Austin, Texas.  And finding

3   somebody (indiscernible) accept having an FSS on their

4   resume.  We just lost one employee, he's coming back as a

5   consultant, contract employee.  He did not want FS -- he

6   wanted to get FSS off his resume.

7   Q    So, understanding that there's -- due to Alex Jones'

8   notoriety, there are limitations on the pool of suppliers of

9   goods and services; is that a fair statement?

10           MR. BRIMMAGE:   (Indiscernible).

11           THE COURT:  Sustained.

12   BY MR. BATTAGLIA:

13   Q    What is your understanding about the effect of Alex

14   Jones' notoriety on the ability to attract alternate

15   suppliers of goods and services?

16   A    It makes it difficult.

17           THE COURT:  Can I tell you on the critical vendor,

18   and for my purposes, Mr. Battaglia, I -- maybe you can focus

19   on -- I'm say, (indiscernible) to go into this question for

20   me, Mr. Battaglia, maybe I can ask the witness, but there

21   are three insurance providers, there's -- right?  There's a

22   -- there are three insurance providers here.  Someone who

23   does trash service, and someone that does the alarm service.

24   But I don't think you need to focus on those.  I mean,

25   unless -- but you tell me the insurance was all paid up, so

008562

1    what is this insurance?

2              MR. BATTAGLIA:   I think they are periodic

3    installments, Your Honor, based on --

4              THE COURT:   Okay.

5              MR. BATTAGLIA:   -- the size of these.

6              THE COURT:   Okay.   All right.

7              MR. BATTAGLIA:   Your Honor, I'll -- and I'll focus

8    on the larger ones, and --

9              THE COURT:   No, I just, to me -- I can --

10   (indiscernible) can object if they want, but I don't think

11   they will.   I suspect they're more focused on the analysis

12   that went into creating this list.   But if you're telling --

13   yeah, the Debtor wants insurance, and maybe that's the

14   better answer for that.   And you've got to maintain

15   insurance.   And you can tell me why you need to maintain the

16   insurance, and that will probably get me over the hump on

17   those.   But maybe you can ask questions.   I think you've

18   already touched on Cloudflare, but maybe you can talk a

19   little bit about what Amazon Web Services does and the

20   security folks.

21             MR. BATTAGLIA:   Yes, sir.

22             THE COURT:   Okay.

23   BY MR. BATTAGLIA:

24   Q    If you'll look at Exhibit 11, and I'll just kind of run

25   down and focus on some of the more substantial -- what does

008563

1    Amazon Web Services provide?

2    A    They do what it says, they provide our web services.

3    Amazon has a huge commercial web service operation they

4    developed for their own internal use for selling a product,

5    and which they now make available to third-parties.

6    Q    Yeah.  How important is that to Debtor's ongoing

7    operation, to maintain that relationship?

8    A    Again, it's critical, it's another component to get to

9    the -- get up -- get to the customers is having access to

10    commercial web services.

11    Q    ATXHD is a satellite uplink why are they critical to

12    the Debtor's business?

13    A    Again, to broadcast across United States is done by

14    satellite.

15    Q    And what happens if they terminate services?

16    A    We won't be broadcasting across the United States until

17    we find an alternative.

18    Q    Austin Security and Investigation is $28,000.  Why is

19    security vital to this Debtor?

20    A    Security's vital because the company and Mr. Jones are

21    extremely in the public eye, and they are extremely

22    controversial.  So, we have -- or FSS has armed security 24

23    hours a day, seven days a week in their facilities.

24             THE COURT:  Is this armed security in the

25    building?

008564

Page 93

```
 1                 THE WITNESS:  Yes, sir.

 2                 THE COURT:  Okay.

 3                 THE WITNESS:  And the buildings, there's no names

 4     on the buildings.

 5                 THE COURT:  Okay.

 6                 THE WITNESS:  When you drive by you don't know

 7     what's in there.

 8     BY MR. BATTAGLIA:

 9     Q    Cloudflare you've touched upon, so let's move to the

10     next largest one.  Getty Images, Inc., you -- tell the Court

11     what that's for?

12     A    Getty Images is a major supplier.  Think about any

13     program, talk show, whatever you've seen on television,

14     they'll bring up pictures of this, that, or the other.  They

15     get it from Getty, so it's for content for the show.  At

16     least, the shows are -- if you haven't watched one, are

17     operated as talk shows.  So, images, clips, et cetera are

18     all a very important part of the production.

19     Q    Hay Vision Network Video.  What do they do?

20     A    This is, again, I've moved a little bit up the

21     technical ladder of streaming bandwidth, which I really

22     didn't know anything about, but I know a little bit more

23     now.  But essentially, having the bandwidth to push out.  If

24     you think about streaming video and it stops and starts and

25     stops and starts, well, the bigger the bandwidth you get,
```

1    the better that experience is.  So, that provides the

2    ability to stream a lot of gigabytes of visuals and sound

3    out to the market.

4    Q    And if the Debtor didn't have that added bandwidth,

5    what effect would it have on the experience?

6    A    It would again, the shows would be absolutely

7    unwatchable.

8    Q    With respect to the smaller dollar items in here, are

9    each of them, to your opinion, vital to the continued

10   operations of the Debtor?

11   A    Yes.

12   Q    With respect to the insurance, can you give the Court a

13   flavor as to why those are one of the relatively minor, but

14   -- let's see towards the bottom, the Hartford, and

15   Travelers, I think there's two.

16   A    Hartford, Travelers, and then there's the Frost.  Just,

17   you know, this capacity of having insurance for the property

18   and casualty insurance on the assets.  There is a tremendous

19   investment in -- there are four studios onsite and the

20   technology in each one of those is quite large and

21   expensive.  There's a lot of dollars there to be insured and

22   protected.  If something happens, a fire in the building,

23   whatever, that's a lot of assets we've got to protect.

24   Q    Now, are you specifically asking the Court to allow you

25   to pay these, or order you to pay these amounts?

1    A    No.

2    Q    What are you asking for?

3    A    I'm asking to be able to pay up to these amounts.

4    Q    So, for example, I see Amazon Web Services at $77,000.

5    It's unusual to have a flat number like that.  What is the

6    basis for that?

7    A    These were -- what we did was go back and look at the

8    last three or four months and developed an average.

9    (Indiscernible), I suspect the average got rounded to

10   77,000.

11             MR. BRIMMAGE:  Objection, testifying, speculating.

12             THE COURT:  I'll sustain that objection.

13   BY MR. BATTAGLIA:

14   Q    Is it fair to assume that perhaps you don't have the

15   invoice yet for pre-petition services from Amazon Web

16   Services?

17             MR. BRIMMAGE:  Objection, leading.

18             THE COURT:  Sustained.

19   BY MR. BATTAGLIA:

20   Q    What information have you received about the pre-

21   petition amounts owed to Amazon Web Services to this date?

22   A    I have not received a bill yet, so I don't know.

23             MR. BATTAGLIA:  Your Honor, may I have a minute

24   consult with my co-counsel?

25             THE COURT:  Absolutely.

```
1              MR. BATTAGLIA:   Thank you.

2    BY MR. BATTAGLIA:

3    Q    What conditions are imposed on the vendors if you pay

4    them under this -- if the Court grants the relief requested?

5    What do they have to do?

6    A    Continue to provide service.

7    Q    On what terms?

8    A    Normal.  Their normal terms we've been operating under

9    pre-bankruptcy.

10   Q    And if they don't?

11   A    If they don't?

12   Q    The order allows you to claw back --

13   A    Yeah, I can claw back but I mean from a business

14   standpoint --

15             MR. BATTAGLIA:   One more moment.  Pass the

16   witness, Your Honor

17             THE COURT:   Okay.

18             MR. BATTAGLIA:   I don't know when it would be

19   appropriate.  I think Mr. Schwartz is drying out there.

20             THE COURT:   Yeah, I was just going to ask folks.

21   I want to be respectful of -- I know folks need to -- may

22   need to eat, and I want to be respectful of that.  Does it

23   make sense to break now, come back, I don't know, 45

24   minutes, and then come back and pick up?  Okay.  Why don't

25   we come back on the record at 1:15.
```

008568

 1          Mr. Schwartz, I would remind you that you're still

 2    under oath so you're not able to talk to anyone about your

 3    testimony.

 4          So, we will continue.  We'll break for lunch and

 5    come back at 1:15.  I am going to keep Go to Meeting open.

 6    I'm going to hang up the line, and then we will come back on

 7    the line -- I think we will open up the line about 10

 8    minutes before we start.  So, it will be sometime between

 9    1:00 and 1:05, but I'll make sure if anyone's dialed in,

10    that you'll be able to hear everything.  But we'll hang up

11    the line and I'll keep Go to Meeting open for now.  Okay?

12    Thank you.

13          MR. BATTAGLIA:  Thank you, Your Honor.

14       (Off the record)

15          CLERK:  All rise.  Please be seated.

16          MR. BATTAGLIA:  Your Honor, is it okay if I have

17    this?

18          THE COURT:  Absolutely.

19          MR. BATTAGLIA:  Thank you.

20          THE COURT:  Okay.  This is Judge Lopez.  The time

21    is 1:22, back on the record in Free Speech.  Let me just --

22    I think we're going to turn to the cross-examination at this

23    time.

24          Mr. Schwartz, I remind you that you're still under

25    oath.  Okay?

008569

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Moshenberg.

3          MR. MOSHENBERG:  Yes, Your Honor.  If it's all

4    right with the Court, I'm going to be cross-examining Mr.

5    Schwartz on behalf of the Texas Plaintiffs and Mr. Brimmage

6    will be cross-examining Mr. Schwartz on behalf of the

7    Connecticut Plaintiffs, Your Honor.

8          THE COURT:  No problem.

9          MR. BATTAGLIA:  Your Honor, I understand Mr.

10   Brimmage represents both of them.  I mean, I don't --

11   there's no sense in having the same party taking multiple

12   shots here.

13         THE COURT:  Well, they're -- they both filed a

14   joint objection.  So, I'm going to give both of them an

15   opportunity for cross.  If I do see overlap, I will -- so.

16   Go for it.

17         MR. MOSHENBERG:  Fair enough, thank you.

18         THE COURT:  They filed a joint objection, but they

19   are different.  They've always been different from the very

20   beginning.

21         MR. BATTAGLIA:  Yes, but Mr. Brimmage represents

22   both.

23         THE COURT:  He does, he does.  He's picking today.

24   Let's just see where it goes.  All your rights are

25   preserved.  If it starts to get a little out of hand, I'll

```
 1    handle it.

 2              MR. MOSHENBERG:  Your Honor, I'm going to Austin

 3    later to attend the trial happening in Austin, so I have

 4    every incentive to get out of here as soon as we can.

 5              THE COURT:  I don't, so take your time.

 6              MR. MOSHENBERG:  Fair enough.  Thank you, Your

 7    Honor.

 8              THE COURT:  Let me ask you this, in terms of

 9    exhibits, how do you intend to show the witness?  Do you

10    have --

11              MR. MOSHENBERG:  We do have an exhibit list, Your

12    Honor.  We're going to pull them up, as --

13              THE COURT:  Well, let me ask it before you begin.

14              MR. MOSHENBERG:  Yes, Your Honor.

15              THE COURT:  Maybe I can then ask the same

16    questions.  Are you looking to -- by pull them up, is

17    someone going to ask me for permission to -- how do you

18    intend on doing this, Mr. Martin?  Okay.  Are you -- do you

19    intend to show exhibits out of 28, from Exhibit 28?  Docket

20    28, I should say.

21              Jarrod Martin, where are you?  There you are.  Mr.

22    Martin, I'm going to make you the presenter.  Let me make

23    you a presenter.  Is there -- just before you show anything.

24    Let's see, you have a number of exhibits at 28.  You just

25    want to go through them or are the parties -- is there
```

```
 1    anything the parties can stipulate to now?  There may be

 2    some overlap, right?

 3            MR. BATTAGLIA:  Your Honor, I'm afraid that this

 4    was filed while I was in my car on my way here, so I

 5    actually haven't had an opportunity to look at them.

 6            THE COURT:  Well, let's look at them now.  I think

 7    a lot of this is public, by the way.  If you want to, Mr.

 8    Battaglia, if you want to take a moment, I'll give you a

 9    moment to just review them.  If not, we can just take them

10    up one by one.

11            I'll give you a few minutes to review.  It's a

12    first-day hearing, so everybody filed witness and exhibit

13    lists late.  So, I'm going to -- I will say for the parties

14    who are online, in the Go to Meeting feature, if you were to

15    hover your mouse around the right side, you'll see a plus

16    and minus.  And so, depending on the way it's shown on the

17    scroll, you'll still be able to zoom in or zoom out to be

18    able to view a particular document that is shown on the

19    screen.

20            MR. MOSHENBERG:  Your Honor, it may make more

21    sense to go one by one as we go because I may not use all

22    these exhibits anyway.  If the Court is more comfortable

23    doing that, I don't mind proceeding that way.

24            THE COURT:  It's your presentation, counsel, I'll

25    let you --
```

```
 1                    MR. MOSHENBERG:  Yeah, my vote is to just start

 2       with the cross and I'll admit what I try to admit and take

 3       them one by one.

 4                    THE COURT:  That works.

 5                    MR. BATTAGLIA:  I have no issues with 1, 2, and 3,

 6       Your Honor.

 7                    MR. MOSHENBERG:  Your Honor, I may not try to

 8       admit those, but it's good to know that there is no

 9       objection to 1, 2, or 3.

10                    THE COURT:  Well, now it just sounds like we ought

11       to just start.

12                    MR. MOSHENBERG:  Okay, fair enough.

13                    CROSS-EXAMINATION OF W. MARC SCHWARTZ

14       BY MR. MOSHENBERG:

15       Q    All right.  Mr. Schwartz, you made some declarations in

16       this case, correct?

17       A    I believe I did one.

18       Q    Okay.  And you understand that the statements you made

19       in that declaration was under oath?

20       A    Yes.

21       Q    And that's the same oath that you're under today,

22       correct?

23       A    Yes.

24       Q    And you understand that it's important to tell the

25       truth in a declaration, correct?
```

```
 1   A    Yes.

 2   Q    You agree that it's important to tell the truth period,

 3   correct?

 4   A    I don't know what you mean by telling the truth period.

 5   It's important to tell the truth.

 6   Q    Okay.  And that's what I'm trying to confirm.  You

 7   agree it's important to tell the truth.

 8   A    I did agree with you.

 9   Q    Okay.  You were hired as the CRO in the InfoW

10   bankruptcy, correct?

11   A    Yes.

12   Q    Do you recall that you spoke at the first day hearing

13   for that bankruptcy?

14   A    I recall I spoke at the first day hearing, yes.

15   Q    Do you recall that at the time you said you hadn't even

16   heard of Alex Jones before being approached to be the CRO?

17   A    Yes.

18   Q    That's still the truth?

19   A    That fact hasn't changed.  I still hadn't heard of him

20   before then.

21   Q    Do you recall telling the Court that you don't really

22   agree with his views and something to the effect of that you

23   put them in the same group as the people who denied the

24   landing on the moon?

25   A    I've missed the first part of it.  I don't agree with
```

1    his views?

2    Q    Sure.

3    A    I don't necessarily agree with his views.

4    Q    That's what I was confirming.  You don't agree with his

5    views, and I think he even said something to the effect of,

6    you know, you put him in the same category as the moon

7    landing deniers?

8    A    Correct.  I think I said that.

9    Q    And the point I'm raising here is that you told the

10   Court that you did not find Jones to be credible; is that

11   right?

12   A    I have to revisit what I said at that time.  I mean it

13   was -- I have to see what I said.

14   Q    Is it your testimony today that you do find Alex Jones

15   to be a credible person?

16   A    Credible, in certain respects, yes.

17   Q    Okay.  The respects relating to this bankruptcy; is

18   that what your testimony is?

19   A    Respect in leading to this bankruptcy?

20   Q    In respect to this bankruptcy is that your testimony?

21         MR. BATTAGLIA:  Objection, Your Honor.  It's

22   overbroad.

23         THE WITNESS:  Yeah, I'm confused by the question.

24         THE COURT:  Hold on a second.  I'm going to

25   sustain that objection.  You can ask a different one.

```
 1              MR. MOSHENBERG:  Okay.

 2    BY MR. MOSHENBERG:

 3    Q    Well, we'll explore that in a minute.  You understand,

 4    though, that in some contexts, Alex Jones does not tell the

 5    truth.  You understand that, correct?

 6    A    I believe that some people believe he does not tell the

 7    truth.  That's obvious from the from the litigation.

 8    Q    Okay.  I also want you to answer my question though.

 9    You understand that in some context, Alex Jones does not

10    tell the truth.

11              MR. BATTAGLIA:  Again, Your Honor, I'm going to

12    object.  This line of questioning is irrelevant

13    (indiscernible) be overbroad.

14              THE COURT:  What's the relevance of the questions?

15              MR. MOSHENBERG:  Your Honor, he's the CRO.  He's

16    relying on the information that the sole owner of the

17    company, Alex Jones, is providing him.

18              THE COURT:  Why don't you ask him if he's relying

19    on it?

20              MR. MOSHENBERG:  Okay.

21    BY MR. MOSHENBERG:

22    Q    Have you relied on any information Alex Jones has

23    provided to you directly or through his attorneys?

24    A    Well, I mean, yes, but it's information I've

25    corroborated.
```

1    Q    Okay.  So, you're relying on information he provided

2    you.  And what I want to know is do you understand that in

3    certain context, Alex Jones does not tell the truth?

4    A    Like all human beings, including yourself, he does not

5    always tell the truth.

6    Q    Okay.  Well, let's talk about an instance where he

7    definitely didn't.  You understand that Jones and Free

8    Speech Systems were determined by two different courts to be

9    liable for intentionally lying, for defamation.  You

10   understand that, correct?

11        MR. BATTAGLIA:  Your Honor, again, I'm going to

12   object.  The entire line of questioning is irrelevant to the

13   issues before the Court today.  This is interim cash

14   collateral hearing.

15        THE COURT:  Why don't you help me with the

16   relevance of where you're going, counsel?

17        MR. MOSHENBERG:  Your Honor, what I want to

18   understand right now in a Subchapter 5 context, Your Honor,

19   where we have the CRO and we have the information that the

20   CRO is given by people who have been already adjudicated by

21   several courts to be liars, not just in underlying causes of

22   action, but also the abuses of the legal process.

23        THE COURT:  Okay.  I just asked you what the

24   relevance is.  I know you're trying to sneak stuff in, but -

25   -

```
 1              MR. MOSHENBERG:  It's going to go to the

 2    credibility.  I'm not trying to sneak anything, Your Honor.

 3    Just to be clear, I'm just going to the credibility of the

 4    of the witness.  That's all I'm trying to get at, Your

 5    Honor.

 6              THE COURT:  The credibility of this witness?

 7              MR. MOSHENBERG:  Yes, Your Honor.

 8              THE COURT:  Okay.  I'll allow a little bit of it

 9    to some extent, but don't go too far.

10              MR. MOSHENBERG:  All right, Your Honor.

11    BY MR. MOSHENBERG:

12    Q    Of course, you're not Alex Jones, and I hope that at

13    least you'd agree with me that it's important in bankruptcy

14    to have transparency, oversight in an investigation.  You'd

15    agree with that?

16    A    I believe in bankruptcy, there should be transparency

17    for certain.  That's why we have oversight.  I mean, I've

18    got the Court, I've got a Sub 5 Trustee.  I'm going to not

19    intentionally obfuscate anything.

20    Q    Now, you've never worked for Free Speech Systems,

21    correct?

22    A    Before this engagement, no.

23    Q    Okay.  And before this engagement, you were never

24    contracted by Free Speech Systems in any way?

25    A    No.
```

1    Q    Okay.

2    A    Not that I'm aware of.

3    Q    Have you ever been contracted by Alex Jones or PQPR

4    before, at all, actually?

5    A    No.  I never knew they existed prior to the first

6    bankruptcy.

7    Q    Now, you -- I want to cover your declaration.  Exhibit

8    3.  (Indiscernible).  Now, Mr. Schwartz, can you see that?

9    A    Yes.

10   Q    Okay.  And that is your declaration, correct?

11   A    It appears to be, at least the second page -- the first

12   page of it.

13   Q    Okay.  And this is your statement under penalty of

14   perjury, correct?

15   A    Correct.

16   Q    I want to turn to Paragraph 4 for a moment.  It says

17   "Except as otherwise indicated, all facts as set forth in

18   this declaration are based upon my personal knowledge, my

19   review of relevant documents, or my opinion based on

20   experience, knowledge and information concerning the Debtor.

21   If called upon to testify, I would testify competently to

22   the facts set forth in this declaration."  Did I read that

23   correctly?

24   A    Yes, you did.

25   Q    What relevant documents did you review when you refer

1   to them in Paragraph 4?

2   A    Thousands of would-be pages if we printed them, out of

3   accounting records.  Of course, the general ledgers, the

4   prior general ledgers, financial statements drawn from those

5   general ledgers, contracts.  I don't have an inventory of

6   those items, but that's generally the types of documents I

7   looked at, would have looked at, and I'm sure there are

8   numerous others.

9   Q    Okay.

10   A    There's some various financial analyses, I remember

11   that.

12   Q    When  you say contracts, what contracts did you review?

13   A    Well, the -- I saw the notes.  I saw --

14   Q    Where those notes something that --

15   A    I think I saw other contracts.  I just don't recall

16   them.  If I can finish my answer.

17   Q    Sure.  I thought you were done.  Those contracts, the

18   promissory notes, were that -- was that just something you

19   found in the file when you started your investigation or

20   were those given to you?

21   A    They're probably given to me.

22   Q    They were given to you by the lawyers?

23   A    No, I don't think so.  I -- they were all recorded in

24   the books of account.  So, I said, okay, I need -- what are

25   these?  Let me see these.  And I believe Mr. Roe gave them

```
 1    to me.

 2    Q    Do you find Mr. Roe to be a credible person?

 3    A    I think.  Yes, I think it's incredible like all of us,

 4    we have our weaknesses.

 5    Q    What sort of steps did you take to determine that Mr.

 6    Roe a credible person?

 7    A    Well, I worked with him for a couple of months in

 8    connection with the first bankruptcy, so I had an

 9    opportunity to see him in action, work with him.  I found he

10    did not try to hide things from me.  And I did test him to

11    see if he would.  He was confident, knows accounting,

12    understood accounting, and understood the problems in the

13    financial records.  So --

14    Q    Is it fair to say beyond your interactions with him

15    over a few weeks, that you didn't do any other vetting of

16    him?

17    A    No, I don't think we did any formal vetting of him.

18    Q    Okay.

19         THE COURT:  Just a second.  Just a second.  I was

20    hearing some background noise and it looks like the line got

21    unmuted.  I'm muting the line again.  If anybody wishes to

22    be heard at some point, you'll need to hit five star.  I

23    apologize.  I just wanted to make sure that you weren't

24    interrupted with background noise.

25         MR. MOSHENBERG:  Thank you, Your Honor.  I
```

1    appreciate it.

2            Can we look at Exhibit 10, please?  Can you scroll

3    down a little bit more?  I want to make sure Mr. Schwartz

4    has a chance to look at it.  I'm going to ask him if he's

5    ever looked at this document before.

6    BY MR. MOSHENBERG:

7    Q    So, Mr. Schwartz, when you're ready, just let me know

8    whether you've ever reviewed it.

9    A    I don't believe I've seen this before.

10   Q    Okay.  Do you have any reason to doubt that this is the

11   default judgment that was entered in the Connecticut

12   Plaintiffs' case in Connecticut?

13           MR. BATTAGLIA:  Objection, Your Honor, asked and

14   answered.  He said he has never seen it.

15           THE COURT:  I'll sustain.

16           MR. MOSHENBERG:  Okay.

17   BY MR. MOSHENBERG:

18   Q    My question is do you have any reason to doubt that

19   this is the default judgment?

20           MR. BATTAGLIA:  Objection, Your Honor, same

21   objection.  How can the witness answer when he said he has

22   never it before?

23           THE COURT:  Yeah.  That was sustained.

24   BY MR. MOSHENBERG:

25   Q    This is a publicly filed document granting the default

1    judgment against Alex Jones.  I'll represent that to you.

2    And what I want to look at is Page 7 --

3         MR. BATTAGLIA:  Your Honor, I'm going to object to

4    him asking questions about a document that's not in

5    evidence.  It's (indiscernible) --

6         MR. MOSHENBERG:  It's a public document, Your

7    Honor.  It's the same standard as --

8         MR. BATTAGLIA:  There's no indicia of reliability

9    here.  It's a certified document and I've never seen it

10   either.

11        THE COURT:  Why don't you -- I don't -- you're

12   asking the question to a witness about a document that's not

13   been admitted into evidence.  Maybe you should move for it

14   to be admitted.

15        MR. MOSHENBERG:  Sure.  Your Honor, I would like

16   to move to admit Exhibit 10 into evidence.

17        MR. BATTAGLIA:  Objection.  No foundation.

18        THE COURT:  What's your response, counsel?

19        MR. MOSHENBERG:  Well, it's part of a publicly

20   filed document in Connecticut, Your Honor, if you go to the

21   top page.  It is a court default judgment in the Connecticut

22   Plaintiffs' case.

23        MR. BATTAGLIA:  It's not a certified copy.  There

24   is no representation that this is valid.  I've never seen it

25   before.  I have no idea what's --

```
 1              MR. MOSHENBERG:  And it's also your --

 2              MR. BATTAGLIA:  Excuse me, counsel.

 3              THE COURT:  You got let him finish the objection

 4    and then you can answer.  Go ahead.

 5              MR. BATTAGLIA:  There's no indicia here that this

 6    in accurate document.  Where it is or not, I have no idea.

 7    no idea.  I've never seen it before, neither has the

 8    witness.

 9              MR. MOSHENBERG:  Your Honor, I'm offering it for

10    impeachment purposes only.   I don't even need to prove it

11    for the truth of the matter asserted.

12              THE COURT:  What is the purpose for the

13    impeachment that you're seeking?  On what point are you

14    seeking to impeach the witness?

15              MR. MOSHENBERG:  The court in the Connecticut case

16    determined that Mr. Roe was not credible, actually did not

17    consider his evidence because he did not find the witness to

18    be credible and that the witness had sanitized records.

19              THE COURT:  Well, what does it have to do with Mr.

20    Schwartz?

21              MR. MOSHENBERG:  He relied on him as part of this

22    bankruptcy.

23              THE COURT:  What is the impeached -- what is the,

24    what is the statement that he made that you're impeaching

25    him on?
```

008584

```
 1              MR. MOSHENBERG:  Well, excuse me.  What I mean is

 2         it's going to his credibility, that he's relying on as the

 3         CRO information done by Mr. Roe, who has been adjudicated by

 4         a judge in Connecticut as not providing reliable

 5         information.

 6              THE COURT:  I'm going to sustain the objection.

 7         You can come up with something that will -- maybe you can

 8         come up with something, but that he hasn't said anything

 9         within the scope of his direct that would warrant an

10         impeachment on that point.  And maybe this is a certified

11         copy, maybe it's not.  Maybe you can come up with something.

12         But I'm also struggling to see the relevance of this in

13         connection with a critical vendor motion and a cash

14         collateral motion.  But maybe you can get me there as well.

15              MR. MOSHENBERG:  All right, Your Honor.  Well, I'm

16         going to focus for a moment on ways to get this in before

17         you in a reliable way.

18              THE COURT:  Okay.

19              MR. MOSHENBERG:  I'm going to move on in the

20         meantime, Your Honor.  And I'll tie that to that.

21              THE COURT:  I'm sure Mr. Brimmage is already

22         thinking of stuff.  But go ahead.

23         BY MR. MOSHENBERG:

24         Q    So I have here accounting records, prior ledgers,

25         financial statements, contracts, inventory, financial
```

1   analyses.  Is there anything else that you relied on in your

2   work so far that you reviewed?

3   A    I'm certain there are.

4   Q    Okay.  Does anything else come to mind?

5   A    Purchase orders, sales orders, invoices.

6   Q    Is that all?

7   A    Give me a chance to think.  I mean you're asking me off

8   the top of my head.

9   Q    Sure.  Did you read any depositions?

10   A    No, not off -- I don't think so.

11   Q    Okay.  All right.  So, aside from the documents you

12   reviewed, what else did you do to make yourself comfortable

13   with the information that you're relying on, and that Free

14   Speech provided you?

15   A    Well, I talked to people, asked them -- pertinent

16   people who had knowledge of those areas.

17   Q    Okay.  Which individuals did you talk to?

18   A    Blake Roddy is one, Bob Roe is another one.  Alex Jones

19   is another one.  David Jones.  Anthony (indiscernible).   I

20   visited some with Melinda Flores.  A gentleman named

21   Zimmerman.

22   Q    Say that again, please.

23   A    A gentleman named Zimmerman.  A gentleman last name

24   Elmo, I don't remember his first name.  I believe it's Elmo.

25   Of course, I talked to counsel.  They were reviewing

008586

1    documents as well.  Patrick -- oh, and you asked me in

2    connection with the declaration, Patrick Riley.  Those are

3    the names I can recall.

4    Q    Okay.  Let's go to Paragraph 11.  And I'm back at

5    Exhibit 3 right now.  This is your declaration we covered

6    earlier.

7              THE COURT:  Just to be clear, this is the

8    declaration that was filed in this case?

9              MR. MOSHENBERG:  Yes, Your Honor.

10             THE COURT:  Okay, thank you.

11   BY MR. MOSHENBERG:

12   Q    Okay.  I want to look at Paragraph 11 please.  It says

13   that Alex Jones, it says born in 1974, Alex Jones or Jones,

14   is the son of Carol Jones, a homemaker, David Jones, a

15   prominent dentist.  Jones moved from Dallas to Austin as a

16   teenager.  Did I read that correctly?

17   A    Yes.

18   Q    That is not based on your personal knowledge; is it?

19   A    No.

20   Q    Okay.  But you testified, you swore in this declaration

21   that that was based on -- that fact is based on your

22   personal knowledge, but you don't know that.

23   A    I said my, my declaration said it was based on

24   documents I reviewed.  I put up the three categories we

25   already talked about.  This was I saw, I read an article

1    that mentioned, I believe, it was an article that stated

2    this.

3    Q    And you just took that to be true?  You read an article

4    and you determined that it was true?

5    A    It was one of the documents I reviewed.  I mean, take

6    any one of the documents, you can say did I take it as true?

7    No, I took a look.  You know, it's a piece of information

8    that may or may not be true.  It appears to be true.  But I

9    said I saw in a couple of places and the press reported it,

10   so, my God, it must be right.

11   Q    So, let me understand this.  You didn't know if

12   something was true.  You saw it.  You thought it was true

13   and that was enough for you to swear it was true in this

14   Court --

15   A    No, I consulted with my attorneys as well, or the

16   attorneys on this case as well.  You know, it's if we go

17   through this, we got to, you know, are we certain this is

18   all right.

19   Q    And so you had no idea.  You just relied on other

20   people, and you swore to that being true?

21   A    Everything I've done in this is based on information

22   provided by others.  I didn't create any of the data I

23   looked at, any of the documents I looked at, or anything.

24   Some, you know, they could all have been fabricated and that

25   -- but I don't believe they were.  So, it's based, all based

1    on someone giving me something.  And I, to some -- some

2    vetted more than others.  And I asked, this is one that I

3    remember talking to counsel about this one.  Are we sure

4    this, we know this, are we comfortable with our references

5    on this?  I saw the article.  Are we comfortable using it?

6    Q    But you don't know if it's true and you swore that it's

7    true to this Court?

8              MR. BATTAGLIA:  Objection, Your Honor.  Asked and

9    answered.  Frankly, it's badgering at this point.

10             THE COURT:  Well, no, see I think -- I think, I

11   think you get to explore a little bit.  Can we go up a

12   little bit.  I'm going to overrule the objection.  Kind of

13   scroll up to the very beginning.  Paragraphs 1 or 2.  Okay.

14             So, tell me where in this declaration it says that

15   the statements that you made are based on conversations with

16   other people?  It says, based on personal knowledge, your

17   review of relevant documents, or your opinion based upon

18   experience, knowledge, and information concerning the

19   Debtor.  And then you --

20             THE WITNESS:  I don't -- it doesn't say based on

21   conversations, but it should be because I talked to a lot of

22   people as I said.

23             THE COURT:  Okay.  You can ask your question.  I'm

24   going to overrule the objection.

25   BY MR. MOSHENBERG:

1    Q    So, you didn't know whether it was true, but you swore

2    that this was true, what Paragraph 11 says.  That's what I

3    wanted to confirm with you today.

4    A    Well, based on my -- it's based on my information,

5    knowledgeable, and belief at the time.  And it may not be

6    true.  Maybe he wasn't born in '74.  That --

7    Q    Not, you could know --

8         THE COURT:  I just want you to let him finish the

9    answer and then --

10        MR. MOSHENBERG:  Yes, Your Honor, I apologize.

11   BY MR. MOSHENBERG:

12   A    Based on the information I had and based on my vetting

13   of that information, I took that piece of information as

14   true.  It is important?  I don't know.

15   Q    I'm fine with you following up, but I do want to answer

16   to my question, which is you didn't know whether this was

17   true, but you swore that it was true.  And I just wanted to

18   confirm that today.  You didn't know if this was true, but

19   you swore to it.

20   A    Well, I believed it was true.  But the knowledge like

21   you knowing about 64 million, you didn't know that was true.

22   But you said it.  It's the same thing.  I didn't, you know,

23   I believed this was true.  I said it.  I believe it's still

24   true.

25   Q    But you don't know whether it's true.

```
 1    A    I did not see him get born.

 2    Q    Okay.  Let's look at Paragraph 12.  Take a moment and

 3    review it.

 4    A    Okay.

 5    Q    Is it fair to say that you don't have any personal

 6    knowledge of whether he was -- about Austin, about in the

 7    early 1990s, Austin was a dirt-cheap home to artists,

 8    musicians, and sign makers.  And according to Shannon Burke,

 9    who's a local talk show radio host said all this

10    information.  Do you know any of these things to be

11    personally true?  Did you have personal knowledge of this?

12    A    No, you -- the -- this was cited.  I actually cited the

13    source for that.

14    Q    Okay.  And you actually reviewed that source.  Is that

15    your sworn testimony?

16    A    I looked at that.  I read it.  Yes.

17         THE COURT:  You read the Buzzfeed article?

18         THE WITNESS:  Yes, I did.  I remember this one,

19    reading it.

20         THE COURT:  Okay.

21    BY MR. MOSHENBERG:

22    Q    Okay.  How about Paragraph 13 then.  Take a moment and

23    read that.

24    A    That's also in the Buzzfeed article.

25    Q    Okay.  So, you don't actually know whether that's true.
```

 1    You're just relying on the Buzzfeed article, correct?

 2    A    Yes.

 3    Q    Okay.  And are you saying you don't know whether this

 4    is true in this, anywhere in here?  Do you ever make that

 5    qualification?  You acknowledge Buzzfeed, but you represent

 6    this as being a true statement.  You're swearing that this

 7    is a true statement, sir, based on something you read on

 8    Buzzfeed.

 9    A    Well, I'm citing Buzzfeed to say this is where I got

10    the information from.

11    Q    Where does it say that?  It says Buzzfeed.  Where does

12    it -- where is that qualification here?

13    A    When I footnoted it -- when we footnoted it with the

14    citation, that tells you the source of it.  And that I can -

15    - you know, I'm relying on Buzzfeed and their reporting, but

16    it doesn't say that I've done anything to verify that

17    Buzzfeed did the job they were supposed to do.

18    Q    Right.  And you swore that this statement is true

19    though.  You acknowledge Buzzfeed, but you don't say I don't

20    know if this is true or not, but this is what Buzzfeed says.

21    You swore in a declaration to its truth.

22    A    That's the truth, that's a true quote from Buzzfeed.

23    Q    That's not what you wrote.  You didn't say according to

24    Buzzfeed, they said this, and I don't know if it's true.

25    You represented this as true.

1   A    I represented this came from Buzzfeed.

2   Q    You don't know if it's true?

3   A    No.

4            MR. BATTAGLIA:  Your Honor, we're just being

5   argumentative.

6            THE COURT:  I think, I think we just got the

7   answer.  I think he just said no.  And I think you're going

8   to ask another question.

9   BY MR. MOSHENBERG:

10   Q    Okay.  I'll speed this along.  Why don't we look, why

11   don't you take a moment and look at Paragraphs 14, 15.  Is

12   it the same issue?  You don't know whether it's true, you're

13   just relying on other sources?

14   A    Yes.  Those are both relying on other sources.

15   Q    Right, because you don't know whether those statements

16   are true, whether those allegations, those factual

17   statements are actually true.  You don't know?

18   A    No.

19   Q    How about Alex Jones was a natural, Number 16?  How did

20   you know that he was a natural in all of this?  Or is it you

21   didn't know?

22   A    That's a quote.  That's not something --

23   Q    I don't see a quotation mark.

24   A    I agree with you.  It's not, and it's cited directly,

25   but that should have been cited.

1    Q    That's something that you're swearing as being true in

2    your declaration.

3    A    Well, based on the evidence I've seen, which is the

4    operating results, at least from 1907 -- 2007 forward, he's

5    obviously, extremely successful at this.

6    Q    But you saw some documents and you decided based on

7    those some documents that was so true that you swore to it

8    being true in a declaration to this Court?

9    A    That Alex Jones is a natural, I don't, I don't think I

10   have a problem with that at all based on what I saw from

11   2007 forward.

12   Q    Right.

13   A    But the evidence I'm used to saying, which is numbers.

14   Q    I thought you said you hadn't heard of him until this

15   engagement.  How did you know he was a natural?

16   A    I just told you; I look at his numbers from 2007

17   forward as well.

18   Q    Okay.

19              THE COURT:  What do you mean by looking at his

20   numbers?  What --

21              THE WITNESS:  Financial results.

22              THE COURT:  From FSS?

23              THE WITNESS:  Yeah, FSS, I think started business

24   in 2007.

25              THE COURT:  I just wanted to clarify what you

1    meant by his financial numbers.  Not -- you mean --

2              THE WITNESS:  FSS's financials.

3              THE COURT:  Okay, thank you.

4    BY MR. MOSHENBERG:

5    Q    I mean, we can speed this along.  Why don't we look at

6    17, 18, 19, those three paragraphs.  Take a moment and

7    review them.  I'll ask my questions when you're ready.

8    A    Okay.

9    Q    Same problem, you're swearing these things are true and

10   you don't know whether they are.  You just looked at some

11   sources and you swore that those things were true?

12   A    I swear, yeah, these are cites from those sources.

13   Q    Right, but you don't at all say this is what these

14   sources reported, but I don't know whether they're true.

15   You swore to them being true.

16   A    Well, I swear that these are proper cites from these

17   sources.

18   Q    Where does it say that?

19   A    Well, because it's based on the information I had,

20   these sources said this.  This si -- I'm telling you this is

21   what these sources said.

22   Q    That that big qualification you just gave, where's that

23   in your declaration?

24   A    I don't think you'll see that that specific wording in

25   the declaration.

```
 1    Q    Right, because in your declaration, you say the
 2    following, I swear under penalty of perjury is true based on
 3    my personal knowledge.  And you don't know whether these
 4    things are true.  You just looked at some sources and swore
 5    they were true.
 6    A    Well, it's -- my declaration says my personal knowledge
 7    is based on the documentation I reviewed as well as the
 8    other two factors like we've already covered in Paragraph 3,
 9    I think.  It's based on that.  See, none of the documents
10    that I reviewed did I create everywhere.  So, you can say
11    the whole thing is not based on my knowledge.
12    Q    I agree.  And I want be very clear that my point is I
13    understand you review things, but lots of people can review
14    stuff and then not decide whether it's true or not.  You
15    reviewed those things and you decided to swear to this Court
16    without knowing whether it actually was that it's true
17    without any of your own personal knowledge.
18    A    I mean, obviously, I do what I do.  I look at other
19    stuff and I interpret it.  In this case this is material,
20    it's -- you know, that people -- other people wrote.  I
21    didn't say it's my source.  I cited to the sources they came
22    from.  But I -- yeah, everything I do is based on
23    information that has existed even before I heard the name
24    Alex Jones.
25    Q    Are you done with your answer, sir?
```

1    A    Yes.

2    Q    Let's look at the first sentence of Paragraph 19.

3    "When Jones started broadcasting on the radio in the late

4    1990s, he closely followed the talk radio playbook.  He

5    built a large, devoted audience of far-right conspiracy

6    believers."  Did I read that correctly?

7    A    Yes.

8    Q    There's no cite there.  Do you agree with that?

9    A    I think that all this paragraph is in SPLC, where it

10   came from.  Excuse me, there's a -- it came out of

11   Intelligencer, is what it says.

12   Q    Where does it say that?

13   A    On the last -- second to the last line.  Right.  I see

14   that sentence has the Intelligencer cited.  I'm talking

15   about the first sentence.  You represented that was true.

16   There's no cite there.  There's no qualification at all.

17   You just said it.

18   A    I think all of that, all of that came from the

19   Intelligencer.  The only thing that didn't was the last

20   sentence about the hundred stations, which came from SPLC.

21   Q    There's no cite there.  You agree with that?

22   A    I don't agree with that at all.

23        THE COURT:  That one has been asked and answered.

24   BY MR. MOSHENBERG:

25   Q    Okay.  All right.  Well, let's go to the next

1    paragraph.  Take a moment and look at that please.  Again,

2    you didn't have any personal knowledge of anything in there,

3    correct?  And take your time reading it.

4    A    Correct.  As I said, none of this is personal, well

5    except for my analysis of numbers, which I don't have

6    personal knowledge of.  But this, excuse me, could you put

7    that paragraph back?

8    Q    Number 20, thank you.

9         THE COURT:  Number 20.

10   BY MR. MOSHENBERG:

11   A    I believe that I did talk about this with Dr. Jones.

12   Q    Okay.  But you didn't know personally whether it was

13   true or not.  You just relied on Dr. Jones.  You didn't know

14   if it was true.

15   A    Right, I don't have personal knowledge of anything.

16   Q    But you swore to it being a fact.

17        MR. BATTAGLIA:  Your Honor, I'm going to object.

18   Counsel keeps saying that he says personal knowledge based

19   on documents, experience, knowledge, and information.

20        THE COURT:  I think the testimony is, is that he's

21   citing to documents, but those documents didn't really form

22   his personal knowledge.  It's just citing stuff.  I think

23   that's what this -- these paragraphs are showing.  Unless

24   Mr. Schwartz wants to tell me that he developed personal

25   knowledge based on -- personal knowledge, I should say,

1    based on news articles and the deposition reference.  It

2    sounds like you're just, in this citing --

3            MR. MOSHENBERG:  It's not a brief, Your Honor.

4    It's a declaration.

5            THE COURT:  No, no, no.  I'm just going -- I think

6    at the core of what you're doing is just citing articles to

7    try to provide background information.  Do I understand that

8    correctly?

9            THE WITNESS:  Yes.  That's correct, Your Honor.

10           THE COURT:  Okay.  I'm just going to caution you.

11   The way your declaration is drafted, and I will be honest

12   with you, it does say you developed personal knowledge based

13   on this.  And as I read this, I knew this line of

14   questioning was coming.  So, that's why I'm allowing it.

15           THE WITNESS:  I apologize, Your Honor.

16           THE COURT:  I'm sure next time you'll cut all this

17   out and get right to the stuff you know.  But today, they

18   get to ask questions about it, and we'll figure out what you

19   know.

20   BY MR. MOSHENBERG:

21   Q    It is fair to say --

22           MR. MOSHENBERG:  Thank you, Your Honor.  I didn't

23   mean to cut you off.

24           THE COURT:  No, no, no.  I didn't mean to

25   interrupt your examination.

008599

```
 1    BY MR. MOSHENBERG:
 2    Q    Is it fair to say sort of based on this exchange --
 3    because earlier I asked if you read any depositions and you
 4    hadn't, correct?
 5    A    Yes.  I don't recall.  I may have -- I don't recall
 6    reading any depositions.  I don't even recall, like, reading
 7    it -- I may have read an excerpt of this deposition, but I
 8    don't recall it.
 9    Q    Yeah.  Well, you agree in Paragraph 20 you cite to a
10    deposition that you haven't read?
11    A    Correct.
12    Q    And it's the same problem, right, on 21, 22, 24, you're
13    citing to this deposition, and you hadn't read it.
14    A    That is correct.
15    Q    And you swore -- based on a deposition you never read;
16    you swore these things were true based on your personal
17    knowledge?
18    A    Correct.
19    Q    Let's take a break from your declaration, sir.  Why
20    don't we go --
21         MR. MOSHENBERG:  Can you pull up Exhibit 1,
22    please?  I think Jarrod quit the case because I asked him to
23    pull up exhibits for me.
24         MR. BRIMMAGE:  We are going to have to take a
25    quick break, Your Honor.  I'm sorry.  I have a Mac.
```

Page 129

```
 1                THE COURT:  No, no worries.  But I think I
 2      probably need to make you a presenter.
 3                MR. BRIMMAGE:  Well, I'm on Jarrod's machine.
 4                THE COURT:  Oh.  Do you want to take a break?
 5                MR. MOSHENBERG:  I think it'll just be one moment,
 6      Your Honor.  We're looking at exhibit one please.
 7                MR. BRIMMAGE:  (Indiscernible).  And I did want
 8      (indiscernible) the issue.  Thanks, Your Honor.
 9                MR. MOSHENBERG:  We're looking at Exhibit 1,
10      please.
11                THE COURT:  What's the exhibit you're going to?
12                MR. MOSHENBERG:  Number 1, Your Honor.
13                THE COURT:  Number 1.
14                MR. MOSHENBERG:  Yes, Your Honor.
15                THE COURT:  Mr. Martin, I believe you're still the
16      presenter.  If anything has changed, if you need me to do
17      anything, you let me know.  I don't see you.  That's what --
18      oh, there you are.  You're still the presenter.
19      BY MR. MOSHENBERG:
20      Q    Can you see the document, sir?
21      A    Are you talking about the petition?  Yes, sir.
22      Q    Yes.
23      A    Yes, sir.
24      Q    I almost called you Your Honor.  Now, the -- you've
25      seen this document before, correct?
```

008601

```
 1    A    Yes.

 2    Q    Okay.  I want to look on this first page.  And Part IV,

 3    it says Debtor's address.  It says principal place of

 4    business.  Do you see that?

 5    A    Yes.

 6    Q    Okay.  It looks like it's in Austin, Texas.

 7    A    Yes, sir.

 8    Q    Okay.  And I think I remember looking in your

 9    declaration too, but it is your understanding that they are

10    based in Austin, correct?

11    A    They being FSS?  Yes.

12    Q    Right.  They've got an office building there.  And I

13    think also a warehouse you mentioned.

14    A    Yes.

15    Q    Okay.  All right.  Let's go to Page 3, please, Section

16    XI.  Do you see Section XI, check all that apply?  Why is

17    this case fall to this District?

18    A    Yes.

19    Q    And can you read the box that's checked please?

20    A    There it said, its domicile place, principal place of

21    business or principal assets in this district for 180 days

22    immediately preceding the date of this petition or for a

23    longer part of such 180 days than in any other district.

24    Q    Okay.  That statement is not correct; is it?

25    A    I believe it --
```

1           MR. BATTAGLIA:  Objection, Your Honor.  I believe

2       that calls for a legal conclusion of what the definition of

3       domicile is.

4           THE COURT:  Yeah, I'm going to sustain that

5       objection.

6       BY MR. MOSHENBERG:

7       Q    What activities are occurring in Houston on behalf of

8       Free Speech Systems?

9       A    In Houston, I don't know.

10      Q    What about in the Southern District?

11      A    Southern District --

12      Q    Yes.

13      A    Well, its business activities are occurring in the

14      state of Texas, and I understand that's the domicile.

15      Q    My understanding is it's all happening in the Austin

16      area, correct?

17      A    Well, I mean all the physical activity is in the Austin

18      area.

19      Q    Right.

20      A    But they sell all over the country.

21      Q    Right.  But you're not aware of anything in particular

22      happening in the Houston area, correct?

23      A    No.

24      Q    Galveston, Victoria, nothing there?

25      A    No.

008603

1    Q    Okay.  So, what was the basis for you checking that

2    box?

3    A    My understanding from counsel is that there's case law

4    out there that a quick Texas entity is domiciled in the

5    state of Texas, and you can pick any district.

6    Q    Okay.  And this is -- of course, if we go to the next

7    page, Page 4, you're swearing under the penalty of perjury

8    that what's in here is correct, correct?

9    A    Correct.

10   Q    So, is it fair to put this in the same bucket of things

11   that you swore as being true even though you didn't really

12   know if it was true or not?

13   A    Well, I'm not a lawyer, so I don't consider my reading

14   of the case law definitive.  But based on the case law I

15   read; this is correct.

16   Q    That their domicile is in this district?

17   A    Yes.

18   Q    Okay.  Even though you're aware of no activities

19   happening in this area?

20            MR. BATTAGLIA:  Objection, Your Honor, asked and

21   answered.

22            THE COURT:  I'm going to sustain that.

23   BY MR. MOSHENBERG:

24   Q    Actually, let's go to Page 13 of that document.  Were

25   you the one that prepared this balance sheet?

1    A    I'm sorry.  What are you referring to?

2    Q    I'm looking on Page 13 of 17.  Excuse me, balance

3    sheet.

4    A    If you look at Page 13 of 17, at the very top, it says

5    "Comparative Profit and Loss Statement."

6    Q    I think that's 12.  Oh, it's the exhibit.  Can you go

7    to the next page, please?  I'm looking at the balance sheet.

8    Were you the one that prepared this?

9    A    No, I think I had one of my staff prepare this.

10   Q    And it's no secret I want to talk to you about the

11   numbers across the bottom.

12   A    Okay.

13   Q    The reports in 2021, 61 million, almost $62 million in

14   member draws; isn't that right?

15   A    Let me clarify your statement for you.  It reports that

16   as of 12/31/21, member draws totaled $61,937,000 -- 938,000.

17   Q    Your testimony is that there were no $61 million in

18   draws in 2021?

19   A    Draws, the total of all draws was $61 million at

20   12/31/21.  That number is correct.

21   Q    And your testimony here is when it says as of

22   12/31/2021, that means as of the date the company was

23   formed?  As of and then to 12/31/2021?

24        MR. BATTAGLIA:  Your Honor, I'm going to object to

25   the form of the question.  I'm not quite sure I understood

```
 1    it.

 2                    THE WITNESS:  I didn't understand it.

 3                    THE COURT:  Well, that makes three of us.

 4    BY MR. MOSHENBERG:

 5    Q    Okay.  My point is where on this document does it say

 6    the beginning date?

 7    A    It doesn't.

 8    Q    Right.  So, there's no -- nothing, here that represents

 9    what you're saying that years earlier there was a $61

10    million in draws.

11    A    What represents that is that member draws was

12    61,937,000 as of 12/31/2021.  That's what that number

13    represents.  That is -- that's a balance sheet.  It's a

14    basic accounting.

15    Q    And you're relying on the financials that were provided

16    to your assistant in order to report that?

17    A    No.

18    Q    What were you relying on relying on?

19    A    We were relying on the general ledgers that were the --

20    QuickBooks system, which is the accounting system.  If you

21    allow me to explain the answer.

22    Q    I'd like to know what you were relying on.

23    A    Okay.  I'm relying on the general ledgers.

24    Q    Okay.  And didn't you say in your beginning testimony

25    earlier today that the financials were all messed up?
```

Page 135

```
1    A    I said that 12/31/21 had not been closed when we were

2    engaged and 12/31/22 had not been posted.

3    Q    Okay.  You said more than that though.  I think you're

4    saying that the financials were a mess, right?

5              MR. BATTAGLIA:  Your Honor, I object to the

6    characterizing the witness's testimony.  He said what he

7    said.

8              THE COURT:  All right.  Well, Mr. Schwartz, do you

9    recall saying that the statements were -- financial

10   statements were a mess?

11             MR. SCHWARTZ:  I said 12/21 and 12/22 were a mess.

12   We didn't do anything to -- have to do anything to 12/20 and

13   prior.

14   BY MR. MOSHENBERG:

15   Q    Well, you said -- all right.

16             THE COURT:  Go ahead.

17   BY MR. MOSHENBERG:

18   A    You said --

19   Q    You said that the people that kept the books beforehand

20   didn't even have accounting degrees, right?

21   A    The people who were -- no.  The people who kept the

22   books when I came on board had no accounting degrees.

23   Q    Mm hmm.

24   A    My predecessor -- I do not know when she was terminated

25   but I've had several people tell me that she was an
```

1    excellent accountant.

2    Q    And it's based on that solely that you determined that

3    those numbers are right, the $62 million in draws.

4    A    No.  I -- okay.  This is what the financial statements

5    reflect.  I did not have to do, and I have not gone back --

6    and for any reason -- I had no reason to go back and audit

7    2020 and prior.  But I had to get 2021 and 2022 up to date

8    and current and posted.  As of 12/31/21, I will clarify for

9    the Court, from 2007 when this company was formed to

10   12/31/21, net draw was -- by Mr. Jones -- was -- to Mr.

11   Jones -- for $62 million, rounded.  From the period of -- if

12   I did that right -- what is that, 14 years, 15 years -- 14

13   years.

14   Q    Okay.  And since the lawsuits were filed, the

15   defamation cases by the Sandy Hook families, how much money

16   in draws did Alex Jones take?

17   A    My -- probably about --

18        THE COURT:  Why don't we put a date on it?  Why

19   don't we just put a date on it just so we're -- we have a

20   clean record --

21        MR. MOSHENBERG:  It was in 2018, Your Honor.

22        THE COURT:  -- because there were multiple

23   lawsuits and I just want to make sure that we're all clear.

24   So, your question if from the beginning, since 2018?

25        MR. MOSHENBERG:  Sure.  Yes, Your Honor.

1        Actually, since April of 2018.

2                THE COURT:  Okay.

3                THE WITNESS:  I can't answer since April of 2018.

4        I've not just gone -- I've got the information.  It's

5        available to me.  I haven't gone back and looked at that.

6        I'm --

7                THE COURT:  Do you know what the draws would have

8        been over the last three years?  Why don't we say it that --

9                THE WITNESS:  For the last -- well, okay.  In 20 -

10       -

11               THE COURT:  I think you can say what the -- yeah.

12       Just (indiscernible) --

13               THE WITNESS:  Did you -- okay.  2022, it was

14       $254,000 through May.  2021, I think it was $2 million.

15       2020, 2019, probably 7 million, maybe.  And this --

16               THE COURT:  Total or each year?

17               THE WITNESS:  Each year, and these are total

18       draws.  The taxes on the income of FSS are also accounted

19       for as draws when they're taken out and paid.  So, for

20       example, the $64 million, we know $30 million of that I

21       think -- what was it -- over the last -- since 2012, was

22       paid to the IRS.

23       BY MR. MOSHENBERG:

24       Q    $30 million?  How much income do you need to have pay

25       $30 million to the IRS?

1    A    You can -- well, divide that by  point four, and that's

2    the taxable income.

3    Q    That was Alex Jones' tax income?

4    A    Well, FFS is a -- this -- disregarded, thank you --

5    entity and so --

6              THE COURT:  Hold on.  So, Mr. Battaglia, I --

7    yeah.

8              THE WITNESS:  I apologize.  I'm at that age where

9    it takes time -- it takes a few minutes to --

10              THE COURT:  No.  Well, I don't --

11              THE WITNESS:  -- pull things out.  A disregarded

12    entity, so all of the income and expenses of FSS appear on

13    Mr. Jones' personal tax return and he has to pay the tax.

14    So, when there's taxable income, FSS has to -- FSS pays the

15    money to the IRS.  It doesn't flow through Mr. Jones'

16    personal accounts.

17    BY MR. MOSHENBERG:

18    Q    Okay.  Are you -- have you seen any sort of document --

19    did you know, I should say, that there was document produced

20    in the Sandy Hook litigation in Texas -- in the Fontaine

21    litigation -- by Free Speech Systems' corporate

22    representative, showing draws between 2018 and 2021 of $18

23    million?  Did you know that?

24    A    No, I'd have to see that.

25    Q    Okay.  Based on your numbers, does that sound right?

Page 139

 1    Between 2018 and 2021, $18 million in draws were taken out

 2    of the company.

 3    A    I mean, I'd have to look at the -- look at it.  I don't

 4    think that ties.  We're looking -- we were looking at total

 5    draws -- 60-something million and -- I do know this, that of

 6    the total draws, less than half occurred after 2018.  There

 7    was actually more in draws before 2018.

 8    Q    Okay.  So --

 9    A    But I'd have to look -- the details of the numbers, I

10    don't have them with me.

11    Q    Okay.  So, when we're talking about 2018 to present, 30

12    million-ish, that's what you were talking about?

13    A    In total draws?

14    Q    Yeah.

15    A    I don't think it's -- that's not -- I mean, we have the

16    exact number.  I don't want to give you a number that's

17    going to be -- you know, you deserve the right number not

18    that one, not something off the top of my head.

19    Q    Those are considerable draws though, you agree?

20    A    It would be to me.

21    Q    Yeah.  And you don't know what Free Speech System

22    received in return for those draws, correct?

23    A    By, you don't -- draws are the equivalent of dividends

24    in a C corp.

25    Q    Right.

Page 140

1    A    Or an S corp.  So, you don't get anything in return for

2    paying -- giving return of the -- of capital or your return

3    of income to your investors.  That's what they're entitled

4    to from -- for investing in you in the first place.

5    Q    Right.  They don't receive any sort of value in return

6    for giving this draw out.

7    A    Same way you don't get -- you know, the question is, do

8    you get any in -- value in return for paying the interest on

9    the debt.

10   Q    You don't.

11   A    Or you -- you know, you receive the debt, you receive

12   the equity.

13   Q    But at the time the draw was made, there was no value

14   given to Free Speech Systems?  Like you were saying, it's

15   like a dividend.  There was no benefit to --

16   A    It's like a dividend.  It's a return of -- it's, you

17   know -- what Free Speech System got was the initial

18   investment and then the buildup of equity over time to use

19   it to invest in the business as long-term capital.

20   Q    That's not what they got when they made a draw.  When

21   they made a draw, they got nothing.  They just lost money.

22            MR. BATTAGLIA:  Objection.  Again, counsel --

23   (indiscernible) asked and answered.

24            THE COURT:  Yeah.  I -- on that one, I'm tending

25   to agree, so I'm going to sustain that objection.

 1     BY MR. MOSHENBERG:

 2     Q     If Alex Jones hadn't taken $62 million out of the

 3     company in that time period or $30 million or $18 million

 4     since 2018, he hadn't taken money out of the company, there

 5     wouldn't have been a bankruptcy, correct?

 6                 MR. BATTAGLIA:  Objection, Your Honor.  Calls for

 7     speculation.

 8                 THE COURT:  Sustained.

 9     BY MR. MOSHENBERG:

10     Q     In your opinion, would it have needed to file

11     bankruptcy if that money had still been in there?

12                 MR. BATTAGLIA:  Objection.  Calls for speculation.

13                 THE COURT:  I did analyze the case and authorized

14     the filing.  You can answer that.

15     BY MR. MOSHENBERG:

16     A     If $30 million had been in the company, depending on

17     the nature of the asset it was invested in, it might or

18     might not have been bankrupt.  If it was sitting there in

19     the bank account, then no, we wouldn't be in bankruptcy.  If

20     he hadn't paid the IRS, we wouldn't -- well, we would have

21     been shut down, so --

22     Q     All right.  You've got a background in investigating

23     fraud is my understanding, correct?

24     A     I have done some of that.

25     Q     Are you familiar with what fraudulent transfers are?

```
 1    A    I have some understanding of that.

 2    Q    Okay.  You understand that Alex Jones and Free Speech

 3    Systems have been accused of making fraudulent transfers to

 4    insiders?

 5    A    I have heard that.  I have not read the complaint.

 6    Q    Okay.  You're not familiar with what the actual lawsuit

 7    alleges?

 8    A    I'm -- well, I understand it alleges a fraudulent

 9    transfer.  A fraudulent transfer is -- that's about the

10    extent of my knowledge.

11    Q    Okay.  You don't know any of the details supporting

12    those allegations?

13    A    Not at this time I don't.

14    Q    Okay.  You understand that Free Speech Systems and

15    Jones were in fact sued for making -- let me skip that

16    question.  Have you investigated at all whether any of the

17    draws were in fact fraudulent transfers?

18    A    No.

19    Q    I want to go back to Exhibit 3, Paragraph 35.  Can you

20    read that statement out loud, please?

21    A    "The CRO's continuing to evaluate where the estate has

22    causes of action to claw back any payments or distributions

23    to Alex Jones."

24    Q    Is it fair to say that at the time this was written

25    that you hadn't evaluated it yet from your prior answer?
```

```
 1    A      Correct.  We had not.

 2    Q      Okay.  So, this isn't true that you're continuing to

 3    evaluate?

 4    A      No, we're -- I mean, we continue to be aware of the

 5    possibility and if we see any evidence of it -- we have not

 6    done any conservative investigation of that.

 7    Q      Okay.  The statement should say --

 8           THE COURT:  Let me get you where you're going.

 9    The question is, are you continuing to evaluate.  Is that

10    statement accurate?

11           THE WITNESS:  Yes.  I have not made a decision

12    either way.  Are there actionable distributions or are there

13    not?  We just have not, you know, we're aware of it's -- of

14    the situation.  It's common in any company bankruptcy and if

15    we see something, we will note it and keep track of it so

16    that at least once we get started on that phase of the

17    engagement, we'll have that knowledge already.

18           MR. MOSHENBERG:  Object as nonresponsive, Your

19    Honor.

20           THE COURT:  Sustained.

21    BY MR. MOSHENBERG:

22    Q      Your testimony is you hadn't even started

23    investigating.  That's what you just me.  You hadn't started

24    yet.  So, you're not continuing, you haven't started.

25    A      Well, I don't read this this way and you're always
```

008615

1    evaluating.  It's just part of the job.  Now, I have not

2    started the actual -- okay, now let's start the formal

3    investigation and start putting together the evidence and

4    focus on that.  That is not just where our focus is right

5    now.

6    Q    Okay.  So, you haven't started, correct?

7    A    Yeah.  So, like I said, our focus -- we have not

8    directed our focus there as of yet.

9    Q    You -- are the draws -- the significant draws that Alex

10   Jones has taken out of the company, do you think those

11   warrant an investigation as to whether those fraudulent

12   transfers?

13   A    I don't think whether I think they're warranted or not,

14   I think I'm obligated to look at that.

15   Q    Okay.  But from what you know right now, do you know --

16   do you think it's warranted to investigate whether those are

17   fraudulent transfers?

18   A    I don't care whether it's warranted or not.  I have to

19   look at it, so I'm going to look at it.

20   Q    I understand but I'd like an answer to my question.

21   A    Well, I don't know what warrant has to do with it.  It

22   just -- I think draws are always warranted in

23   investigations.  So, then in that context, then yes, they

24   warrant investigation because they -- draws should always be

25   investigated in a bankruptcy.

1    Q    Okay.  Now, when you were the CRO of InfoW, you were

2    part of the attempt to secure a release of Alex Jones and

3    Free Speech Systems as part of that bankruptcy plan.

4    Correct?

5    A    Not -- as I recall, that was part of a revision in the

6    Plan Support Agreement that had certain events occurred --

7    certain payments were made -- that they would get a release.

8    Q    Right.  And the goal was to pay $10 million to those

9    claimants, right?

10   A    I note the number on the table it was $10 million.

11   That's what was -- had been committed to at that time, in

12   the beginning.

13   Q    Okay.  And so, we were saying a moment ago, 18 million,

14   30 million, 60 million, the draws are something that need to

15   be investigated, whether they're fraudulent transfers.  But

16   you were trying to secure a release in that bankruptcy of

17   Jones and Free Speech Systems for $10 million while you were

18   the CRO of InfoW --

19        MR. BATTAGLIA:  Your Honor --

20   BY MR. MOSHENBERG:

21   A    -- and you hadn't disclosed --

22   MR. MOSHENBERG:  Let me finish my question, please BY MR.

23   MOSHENBERG:

24   A    -- and you hadn't disclosed that at the time that you

25   were part of that effort, you were the CRO for Free Speech

 1   Systems as well, or that you were at least being engaged to

 2   be.

 3          MR. BATTAGLIA:  Your Honor, I'm going to object on

 4   a couple of grounds.  One, relevance of any of this to a

 5   cash collateral -- interim cash collateral -- hearing,

 6   number one.  Number two, counsel is -- if he wants to talk

 7   about what the Plan Support Agreement says, it's in

 8   evidence.  It doesn't say a release for 10 million.  It says

 9   a release for (indiscernible) over and over and over again.

10   So, he's mischaracterizing the record, the documents in

11   evidence --

12          THE COURT:  I'll sustain the objection on that

13   ground, and I do think he can answer the question about how

14   he was negotiating -- whether he was negotiating the Plan

15   Support Agreement or parties to Plan Support Agreement on

16   behalf of InfoW debtors and was soliciting was to be the CRO

17   of Free Speech at that same time.  And I think that goes to

18   credibility and I think you can --

19          THE WITNESS:  Is that the --

20          THE COURT:  Well, I think you can answer that

21   question.  You know, and I mean, you can ask that question

22   again but if you do want to ask a question about the Plan

23   Support Agreement, I do think it makes more sense to just --

24   it's in evidence.  You can just ask the questions about that

25   and show him a document and that way we can at least have a

1    clean record.

2              THE WITNESS:  Sure.

3    BY MR. MOSHENBERG:

4    Q    So, what's the answer?

5    A    To the Court's question?

6    Q    Yes.

7    A    The Plan Support Agreement had been terminated by April

8    30th because conditions precedent to it had not been met.

9              THE COURT:  Let me take over.  That was never --

10   was that ever told to (indiscernible)?

11             THE WITNESS:  I believe you pointed out in your --

12   at one point from the bench there, you said, this has to be

13   -- if we don't know this by April 30th, this thing's dead,

14   isn't it?

15             THE COURT:  And everybody was assuring me at the

16   time that they were going to extend it and keep working.

17             THE WITNESS:  Well, it never got signed.  Later,

18   we did continue working but by -- in May -- by May 19th for

19   certain, or prior to May 19th, we were negotiating with the

20   Plaintiffs in both cases --

21             THE COURT:  Let me get the question -- I might as

22   well ask it now because it's a good spot.  I can wait until

23   the end, or I can ask it now and don't read too much into

24   it.  I just need to understand it.  On May 19th, there was a

25   hearing before me where on May 18th, there was a request for

008619

1    a continuation on a motion to dismiss.  The hearing on the

2    motion to dismiss -- we held an emergency hearing on the

3    19th where there was a proposed stipulation presented to me

4    to dismiss -- allow the dismissal -- of the -- what I would

5    call the Austin -- one portion of the Austin litigation, and

6    I signed it on that day.

7            And in this case, there is a letter dated by you

8    to Free Speech dated the same day.  I may be reading much

9    into this, but it seems to me that you -- either you wrote

10   the letter that day or you had been in conversation with

11   Free Speech before you wrote that -- before that day you

12   sent the letter.  And I just need to understand -- none of

13   this was ever disclosed to me in connection with the case

14   and the cases were dismissed on June the 10th officially,

15   which tells me that Mr. Jones signed a retention letter.

16   So, you were actively retained before these cases were

17   dismissed -- the last cases were dismissed -- and I just

18   need to understand, one, why that was never disclosed to me,

19   and two, when did you begin to start soliciting or having

20   conversations about representing Free Speech Systems.

21           Why don't -- that's a compound question.  I think

22   that's unfair.  When did you begin to have conversations

23   with anyone from Free Speech Systems about potentially

24   representing them?

25           THE WITNESS:  I had conversations with Mr. Lee, in

008620

```
1    I believe --
2                THE COURT:  Mr. Lee was representing the Debtors
3    too.
4                THE WITNESS:  -- and Mr. Jordan who represented --
5    I think still does represent Mr. Jones.  I don't know when
6    those were, but it was after we had been substantially
7    convinced that we were going to be terminating the InfoWars
8    bankruptcy.
9                THE COURT:  You wrote the letter on May 19th.
10               THE WITNESS:  On May 19th, Mr. Lee asked me to
11   send him an engagement letter for Free Speech -- the Free
12   Speech engagement.
13               THE COURT:  Okay.
14               THE WITNESS:  And to be quite honest with you, I
15   didn't even think about it at that time.
16               THE COURT:  No, I appreciate the honesty.  I
17   appreciate disclosure.  It seeks a retainer.  When did you
18   receive that retainer?
19               THE WITNESS:  Lord --
20               THE COURT:  That month?
21               THE WITNESS:  No, it was --
22               THE COURT:  Let just say if the letter was signed
23   on June -- the letter was officially signed on June 6th --
24               THE WITNESS:  June 6th.
25               THE COURT:  When did you -- did you receive it
```

 1    before or after you were retained, or right about that time?

 2             THE WITNESS:  It was -- no, it was not right

 3    around -- it was after, definitely.

 4             THE COURT:  After.  Okay.

 5             THE WITNESS:  You know, it was several weeks after

 6    at least.

 7             THE COURT:  Okay.  Okay.  Sorry.  That was the

 8    question -- that was the clarification that I had mentioned

 9    I had wanted to understand the day before.  I guess Mr. Lee

10    a few questions as well at some point, but I'll need to

11    understand that as well, but today's not that day.  Today's

12    cash collateral, and so I do want -- and I know I took this

13    off on tangent.  Now, I'm going to bring it back.  I did

14    want to focus on cash collateral, and I want to focus on

15    critical vendor, and I want to understand -- I've given you

16    some leeway.  Maybe that's the better way of saying.  I've

17    given you some leeway to kind of have general conversation

18    about the CRO role and what investigation and he's done to

19    formulate in connection with the budget, but now I'm going

20    to ask you to laser focus on these two motions.

21    BY MR. MOSHENBERG:

22    Q     Okay.  Let's look at that part of Exhibit 3, the ledger

23    (indiscernible).  I want to focus on the part where it

24    provides for a budget for Alex Jones of $54,000 every other

25    week.  Do you see that part?

1   A    Not yet.

2   Q    Can you see it?

3   A    Yes.

4   Q    Okay.  And in total, it ends up being about $379,000.

5   correct?

6   A    I can't tell.  He's -- whatever it says.  I mean, I

7   can't see that.  Would you have your associate or partner

8   reduce the size?  Thank you.

9   Q    Yeah.  (Indiscernible) $379,000 and that's over a 13-

10  week period, correct?

11  A    Correct.

12  Q    Okay.  And if you translate $379,000 over a 13-week

13  period, that translates to about a salary of $1.5 million.

14  Do you understand that?

15  A    Well, I don't believe that's correct.  Mr. Jones --

16  this is a -- Mr. Jones has an appointment agreement for 1.3

17  million.  Some amount of it and I think it's about 8,000 of

18  (indiscernible) Patriot is paid through the payroll system.

19  This should be that difference.  So, you got 26 pay periods

20  in the year so you can do the math.  It will be -- should

21  add up to 1.3, those two components.

22  Q    Well, I did 379 -- 13 weeks is a quarter of a year,

23  right, 52 weeks --

24  A    Yeah, but we can't do -- you've got to do it by --

25  because we pay a biweekly, not semi-monthly.

1    Q    Okay.

2    A    So, that's -- something about the math in that

3    calculation -- you got to multiply that number by 26 to get

4    an annual rate.

5    Q    Okay.  So -- but your point is, $1.3 million salary.

6    A    Total -- his total is 1.3 million.

7    Q    Okay.

8         THE COURT:  I'm just going to tell everyone.

9    Judge -- math and don't claim to be -- (indiscernible) in

10   excel spreadsheet for you, but it's essentially treading a

11   $54,000 bimonthly, you know, but that -- if you take that

12   over 26 periods -- you multiply the 54,000 times -- you get

13   to like a $1.4 million number.

14        THE WITNESS:  That case, well --

15        THE COURT:  If you multiply it times 24, you get

16   to the 1.3.  It's --

17        THE WITNESS:  Oh, shoot.  I apologize, Your Honor.

18        THE COURT:  It's okay.

19        THE WITNESS:  Okay.

20   BY MR. MOSHENBERG:

21   Q    And that's salary separate from the draws that he's

22   taking out of the company, right?

23   A    Correct.

24   Q    Okay.  You understand that in the Free Speech Systems

25   corporate representative, that position, the document that

1    produced showed that he had an annual salary of about

2    $625,000.

3              MR. BATTAGLIA:  Objection, Your Honor.  The

4    question is about a deposition he was not present at and --

5              THE COURT:  Yeah.  I'm going to sustain that.  I

6    want you focused on the questions -- I've given you plenty

7    of room --

8              MR. MOSHENBERG:  Sure.

9              THE COURT:  -- and Mr. Brimmage is going to ask

10   questions too and I want him -- I want you all focused on --

11   you got questions about the budget, ask the budget.

12             MR. MOSHENBERG:  Well, what I'm trying to

13   understand is, if there were documents produced to us by

14   Free Speech showing that his salary was $625,000 a year, why

15   is he receiving a $1.3 million salary under this budget.

16             THE COURT:  Do you have those documents?

17             MR. MOSHENBERG:  Yes, Your Honor.  They were notes

18   provide as part of the deposition --

19             THE COURT:  No, I'm asking you are they on your

20   witness and exhibit list?

21             MR. MOSHENBERG:  They are, Your Honor.

22             THE COURT:  Why don't you show that then?

23             MR. MOSHENBERG:  It's Exhibit 12.

24   BY MR. MOSHENBERG:

25   Q    These were notes that were provided by the corporate

1    representative based on her review in preparing for her

2    30(b)(6) deposition.  They were admitted as part of the

3    deposition.  And if you look, about halfway down, it says,

4    AJ paid a salary of $625,000 a year.

5    A    As of what date?  Do you know?

6    Q    Well, this deposition occurred in -- February 15th of

7    2022, this year.

8    A    I'd have to look back and see the date of the

9    employment agreement that I was -- given to me that I have,

10   which is what the 1.3 is based on.

11   Q    Right.  And that employment agreement was created in

12   April of this year, correct?

13   A    You're probably -- you may be right.  I think you're

14   right.

15   Q    Right.  It was kind of about the same time as all the

16   bankruptcies with the InfoW started happening, right,

17   leading up to the Alex Jones trial that was first set in

18   April, 2022, right?

19   A    I don't know about the first setting of the Alex Jones

20   trial, but I do recall -- I'd have to look back and see when

21   I got involved with the InfoWars bankruptcy, if it was in

22   April or not or prior to -- after that.  I don't know when

23   they actually got started.  It was before I had -- the

24   planning for that started before I ever got involved.

25   Q    Okay.

008626

```
1    A    Sometime before I got involved.

2    Q    But you relied on that $1.3 million based on an

3    agreement that was created in April of 2022, correct?

4    A    Right.  That's the contract I have (indiscernible) --

5    Q    It wasn't based on prior pay that he was receiving?

6    A    No.

7    Q    So, in --

8         THE COURT:  Okay.  Mr. Moshenberg, he's answered

9    the question.  Why don't you ask another question?  He's

10   answered the question.  Why don't you ask another one?

11        MR. MOSHENBERG:  Okay.

12   BY MR. MOSHENBERG:

13   Q    You didn't do any sort of investigation to see if $1.3

14   million was the appropriate amount to give him?  You just

15   went off of that agreement it sounds like.

16        THE COURT:  He's answered that question, Mr.

17   Moshenberg.  Why don't you ask another question?

18   BY MR. MOSHENBERG:

19   Q    Do you have any reason to doubt that he gave himself a

20   -- basically a $600,000 raise?

21   A    No, because I know he hasn't been paid anything on the

22   1.3 and during 2022, he was paid about $8,000 every two

23   weeks, which is not 625 either.  So --

24   Q    And now you're deciding in this motion that he needs to

25   get paid.  He needs to starting getting $54,000 every other
```

1    week.

2    A    I -- no, what I decided was, look, the agreement says

3    1.3 million.  I'm going to put you -- I'm putting into your

4    payroll.  That's what the contract says.  You know, if it

5    gets thrown, it gets thrown out.  Whatever --

6    Q    There's no emergency, right?  There's no emergency to

7    pay him those funds.  Isn't that the reality?  You were

8    saying a moment ago he wasn't even making any money.  Well,

9    what is the emergency in this motion that he receive $54,000

10   every other week?

11   A    I can't say there's an emergency.

12   Q    He doesn't need it.

13   A    I wouldn't -- I don't know.  I mean, I can't there was

14   an emergency.  He didn't --

15   Q    Certainly, from the Debtor's part, there's no

16   emergency.  There's no, we have to pay him this or Alex

17   Jones is going to quit, right?  We're not worried about

18   that.

19   A    I don't believe that's the case.

20   Q    Yeah, I don't think so either.

21        THE COURT:  Mr. Moshenberg, now is the time that

22   you start reading the room.  I want you to focus on

23   questions that relate to the budget for cash collateral or -

24   -

25        MR. MOSHENBERG:  Okay.  Fair enough, Your Honor.

 1      Give me one moment, Your Honor.

 2              THE COURT:  Take your time.

 3              MR. MOSHENBERG:  Your Honor, if it works for you,

 4      what I'll do to save time is, if I could save my line of

 5      questions for recross if needed --

 6              THE COURT:  Sure.

 7              MR. MOSHENBERG:  --  but we'll just do it that way

 8      instead just to speed things along.

 9              THE COURT:  Okay.  But before you go, is -- maybe

10      the parties can help me, and I'm just -- as I think through

11      this -- I know it's not official, but my understanding was

12      that the parties were agreeing -- and to my knowledge, Mr.

13      Jones hasn't objected to it, and if there's somebody let me

14      know -- that the $54,000 number was going to count on the

15      20,000, right?

16              MR. BATTAGLIA:  20,000 for the interim cash

17      collateral period.  Yes, sir.

18              THE COURT:  Okay.  I just wanted to make sure that

19      I understood.

20              MR. BATTAGLIA:  Yes.

21              THE COURT:  Okay.  Okay.  Actually, the reason I'm

22      asking all the questions -- regardless if it's 625 or 1.3

23      for the interim period, it would be some number below even

24      the 625 for purposes of interim, and I want to make sure all

25      of his rights are reserved to come back and prove that at

```
 1    one point who has the right number.  I'm not getting into

 2    that.  I just want to make sure that I understand what's on

 3    the table now.

 4              Mr. Schwartz, let me ask, are you ready to

 5    continue or do you need five minutes to use the restroom or

 6    something?

 7              THE WITNESS:  I think I'm okay, Your Honor.

 8              THE COURT:  Okay.

 9              THE WITNESS:  If I turn yellow, I'll raise my

10    hand, Your Honor.

11              THE COURT:  Okay.

12              MR. BATTAGLIA:  Judge, my rule is I never waste an

13    opportunity to a bathroom (indiscernible) --

14              THE COURT:  No, no, no.  I just -- it's the

15    witness so -- just maybe two minutes?

16              MR. MOSHENBERG:  No, Your Honor.

17              THE COURT:  Okay.

18              MR. MOSHENBERG:  (Indiscernible).

19              THE COURT:  That's fine.  I'm just trying to

20    understand the deal --

21              MR. MOSHENBERG:  Yeah.

22              THE COURT:  -- where things stood --

23              MR. MOSHENBERG:  Well --

24              THE COURT:  -- and maybe they've changed.  That's

25    what I'm trying to get to.
```

```
 1              MR. MOSHENBERG:  Yeah.  (Indiscernible).

 2              MR. BATTAGLIA:  I didn't know that need was a

 3   basis here as entitlement to.  I mean, I don't necessarily

 4   my salary.  I'm not sure whether you need your more --

 5              THE COURT:  I get it.

 6              MR. BRIMMAGE:  By the way, there is no

 7   (indiscernible) --

 8              THE COURT:  The record says what it says, and I'll

 9   let parties make the argument based on what they want.

10              MR. NGUYEN:  Thank you, Your Honor --

11              THE COURT:  So, why don't we -- why don't you ask

12   your question and then we'll take a five-minute break and

13   then we'll continue with the cross-examination.

14              MR. NGUYEN:  Thank you, Your Honor.  I will be --

15              THE COURT:  No, no, no.  I want you to take as

16   much time as you need.  That's not --

17              MR. NGUYEN:  -- as brief as possible.

18              THE COURT:  -- that I'm trying to rush you.

19              MR. NGUYEN:  Understood, Your Honor.

20   BY MR. NGUYEN:

21   Q    I just have a couple of question, Mr. Schwartz, about

22   your engagement with FFS and your prior engagement with

23   InfoW.  The Judge asked you some questions.  I still --

24   there's still a little bit of gaps in the timeline and I

25   just -- if you can help me, just walk me through your
```

```
 1    engagement.  So, Mr. Schwartz, can you just tell me exactly

 2    when your engagement with the InfoW entities began?

 3    A    I don't have -- I don't recall the date of that

 4    engagement letter.

 5    Q    The cases were filed back in, I believe, April --

 6    A    Yeah.  It would have been in April right before the

 7    case was filed.

 8    Q    And presently, are you still the chief restructuring

 9    officer for the InfoW entities?

10    A    Yes, I am.

11    Q    And who at the InfoW entities would have the right to

12    terminate your engagement as the CRO?

13    A    I've asked that question.  I don't know the answer.

14    Q    Well, who hired you as the CRO for the InfoW entities?

15    A    The interim Trustee.

16    Q    And who is that?

17    A    Robert Dew.

18    Q    And did Mr. Dew sign the engagement letter for the

19    InfoW entities or was it, Alex Jones?

20    A    No, it was -- well, I'm pretty sure it was Robert Dew.

21    I may have to look at that.

22    Q    And overall, how much money were you paid for your

23    services as the CRO in the InfoW entities?

24    A    I'm -- I'd have to speculate.  I don't recall.  I know

25    had leftovers from my retainer.
```

```
 1   Q    How much was the retainer?

 2   A    You would ask me that.  It was over $30,000, I know

 3   that.

 4   Q    You said you had leftovers?

 5   A    Yes.

 6   Q    Okay.  And who paid the retainer?

 7   A    That was paid by Mr. Jones, but I -- it was paid by Mr.

 8   Jones' lawyer.  I assume it was Mr. Jones' funds but --

 9   Q    And as the CRO for the InfoW entities, you were the one

10   that had the authority to enter into the stipulation with

11   U.S. Trustee to dismiss those cases?

12   A    Yes, I believe I did.

13   Q    Did you need to get authority from Mr. Jones to enter

14   into that stipulation?

15   A    No.

16   Q    And earlier, you mentioned that there was an engagement

17   letter sent to FFS around -- I believe the conversation was

18   May 19th, but I think the actual engagement letter was May

19   16th; is that correct?

20   A    I believe it was May 19th.  That's -- Mr. Lee asked for

21   it.  I don't know when it got to FSS.

22   Q    And how did you got word that FSS was looking for a

23   chief restructuring officer for you to send in an engagement

24   letter to FSS?

25   A    Mr. Lee called me and asked me to send an engagement
```

1    letter.

2    Q    Did you speak to Mr. Jones about being the CRO for FSS?

3    A    Not until June 6th.

4    Q    Do you -- in the InfoW cases, did you file an

5    application to be employed as the CRO for the InfoW

6    entities?

7    A    I didn't file it, but it was filed.   There was one

8    filed.

9    Q    Did you submit a verified statement with your

10   application?

11   A    Yes, I believe so.

12   Q    And in your verified statement, did you disclose

13   anywhere in there that you were seeking employment from FSS?

14   A    I don't believe so.

15   Q    And you serve as a bankruptcy professional that's been

16   appointed and approved by the court before in other cases?

17   A    Yes.  But on your former question, I have -- I was not

18   talking to FSS about serving as their CRO when I was engaged

19   by InfoW.

20   Q    In your experience as a bankruptcy professional, do you

21   think there's a continuing obligation for professionals that

22   appear before the court to supplement their disclosures and

23   tell the court of any connections that occurred during the

24   case?

25   A    Yeah.   The appointment orders require that.

008634

1    Q    And that didn't happen in InfoW cases, correct?

2    A    Correct.  There was no appointment.

3    Q    But you still had a verified statement that was filed

4    with the Court, and you didn't supplement that verified

5    statement.

6    A    No, I didn't -- I was never appointed, so --

7    Q    And earlier, Mr. Battaglia talked about your authority

8    as the CRO for FSS.  Who do you get your direction from as

9    the CRO?

10   A    Me and the Court.

11   Q    Okay.  So, if Mr. Battaglia files a Chapter 11 Plan in

12   this case, you don't have to seek Alex Jones' approval of

13   that plan before it's submitted to the Court?

14   A    No.  We wouldn't look for his approval.  We'd look for

15   his input.

16   Q    Can Mr. Jones fire you as the CRO?

17   A    No.  Well, I guess he -- he'd have to (indiscernible)

18   here to get permission first.  I think actually the Court

19   would fire me.

20   Q    And earlier, there was a discussion of the PQPR notes,

21   one for about 29 million and the other was about 25 million

22   and some change.

23   A    Yes, sir.

24   Q    Do you recall that conversation?  Have you taken any

25   steps to verify that amount of the debt under the promissory

008635

```
 1    notes to ensure that those amounts are accurate?
 2    A     All I've done so far is I have seen calculation of the
 3    makeup of the amount that was in the first note and some of
 4    the supporting documentation.  And I said I have seen it.
 5    I've done nothing on vetting that.  On the second note, I
 6    don't think I've seen anything.  And quite frankly, that's -
 7    - right now, we're still trying to get this company
 8    operating and fighting fires before we get to looking at --
 9    we're going to have to do that.  We know that.
10    Q     And in your declaration at Paragraph 53 -- Karen, can
11    you blow up the declaration?
12          THE COURT:  I've got to make Mr. Martin a
13    presenter again.
14          MR. NGUYEN:  Thank you, Your Honor.
15          THE COURT:  No, no worries.  I -- it was a
16    document that was up a bit earlier and I just wanted to make
17    sure that it was taken down.  Mr. Martin, if I've done
18    anything wrong -- if I need to do it again, let me know.
19    Okay.
20          MR. NGUYEN:  Paragraph 53, Mr. Martin.
21    BY MR. NGUYEN:
22    Q     Mr. Schwartz, can you see Paragraph 53 in your
23    declaration?
24    A     Yes.
25    Q     And it says, on or about August 13th, 2020, FSS and
```

Page 165

```
 1    PQPR executed a promissory note in the principal amount of

 2    29,588,000 made payable to PQPR which memorialized their

 3    accrued obligations of FSS to PQPR through December 31st,

 4    2018.  Do you see that?

 5    A    Yes.

 6    Q    How do you know to put in your declaration under

 7    penalty of perjury that this amount was memorialized with

 8    the accrued obligations?

 9    A    This is one where I said I saw the detail of the

10    calculation and some of the supporting documents in it.  It

11    identifies the transactions going back -- actually, it

12    should be from 12/31/2018.

13    Q    And you mentioned some supporting documents.  What are

14    some of those supporting documents?

15    A    These were schedules of billings, (indiscernible) PQPR

16    for inventory and credits, i.e., payments, applied to those

17    billings and they were developed out of the general ledger

18    system there, accounting transactions pulled out of the

19    general ledger system.  We didn't go beyond that.

20    Q    You didn't look at any -- have you -- did you seen any

21    invoices?

22    A    No.  We haven't done that.  It's --

23    Q    Have you seen any bank statements that show some

24    payments from PQPR?

25    A    Not in this time period.  We have not gone back that
```

1   far yet.

2   Q    Are there any bank statements?

3   A    Well, that's good question.  Right now, there aren't.

4   I've got to go back and check and make sure when we change

5   banks, we don't lose access to those bank statements.

6   Q    So, when you put in your disclosure this was the amount

7   that was memorialized in accrued obligations, you don't know

8   that for a fact.

9   A    Well, I know for a fact and that they showed me -- I

10   have the calculation for the amount of the 29,588,000 and I

11   see from the source date that it is from invoices and

12   payments records.

13   Q    But you don't --

14   A    To me, as an accountant, that tells me that's what I'm

15   looking at.

16   Q    But you haven't seen the billings or the invoices or

17   the --

18   A    We have not vouched it yet to ensure it's actually

19   properly calculated.

20   Q    And in your declaration, you -- on the cash collateral,

21   you mentioned that there was extensive and difficult

22   negotiation with PQPR over the use of cash collateral.  Do

23   you recall that part of your declaration?

24   A    Yes.

25   Q    Who did you communicate with at the PQPR to extensively

1    negotiate the use of cash collateral?

2    A    It was primarily David Jones and his -- and Steve

3    Lemmon.

4    Q    And did Alex Jones have any input in the use of -- in

5    the negotiations for the use of cash collateral?

6    A    Yes.  He would come in to the negotiating sessions

7    intermittently.

8    Q    And is it your understanding that the 80 percent

9    ownership of PQPR is owned by an entity that Alex Jones

10   owns?

11   A    Yes.

12   Q    And I just want to take a look at the budget.  The

13   Plaintiff went over the salary to Mr. Jones, but there is --

14   there's a line item on the budget for an American Express

15   payment of about $172,000.  I think it was the first week in

16   August.  Can you just tell me what that is?

17   A    That's the amount we -- of American Express.

18   Q    So, it's a pre-petition debt?

19   A    No.  That's -- okay.  Excuse me.  Let me fix that.

20   You're right.  It's not a pre-petition debt.  Based on our

21   spending history, this is the amount that will be -- come

22   due.  Well, maybe, you know -- and that's -- you probably

23   hit it on the head.  That probably is pre-petition.

24   Q    So, why is it necessary to pay American Express for a

25   pre-petition debt in the cash collateral 13-week budget?

```
 1    A     Well, I would have argued we should -- well, it's --
 2    we're probably going to have to just let American Express
 3    shave the wind and see what we can do.  We have some charges
 4    that go through them but they would be on the critical
 5    vendor's list so we can take care of that there.
 6    Q     Have you seen the invoices for the American Express
 7    charges?
 8    A     I have received -- seen some of them.  They're
 9    extensive.  We're spending $300,000 a month on average with
10    American Express, and one of the problems we have is the
11    accounting staff did not distribute those charges.  So, all
12    we have is, if you look at the income statement, there's a
13    line item for American Express, because we can't tell you
14    whether it's for electricity, entertainment, or electronic
15    supplies for the production studio.
16    Q     Does Mr. Jones run any of his personal expenses through
17    this American Express card?
18    A     Yes.
19    Q     What are those expenses?
20    A     I've not done an extensive look at it other than I've
21    looked at the charges being -- those are charges against his
22    distribution account, his draw account.  But there -- his
23    housekeeper has charges on it, you know, cleaning,
24    housekeeping type stuff.  And that's the biggest number of
25    line items I recall seeing is her.
```

1    Q    So, help me understand.  Why is it an emergency for

2    this Court to approve a payment to American Express to pay

3    Mr. Jones' housekeeper?

4    A    Well, like I said, the company has been paying the

5    credit card, but those charges are charged as distributions

6    against him.  I would not -- I'm not intending that going

7    forward by any means, and we've informed him he can't put

8    those on his credit card.

9    Q    And how long have Mr. Jones used the American Express

10   credit card to charge his personal expenses?

11   A    It goes back quite a ways.  I don't -- I didn't -- you

12   know, I looked at some of the history on the account the

13   last 18 months and said, you know, I'm not -- you know, the

14   last 18 months, it's been regular.

15   Q    How about the vehicle leases on the budget, about 14 --

16   I believe it's 14 on every two weeks.  Whose car is that?

17   A    Those are actually vans, I believe, that the production

18   studio uses.

19   Q    Does the company pay for Mr. Jones' car?

20   A    No, not that I -- not that I have seen.  I'm told not,

21   and I haven't seen evidence of it.

22   Q    And earlier, one of the questions that the Judge asked

23   you is, what do you hope to accomplish in this bankruptcy

24   case, and I believe I missed your answer, or I believe Mr.

25   Battaglia answered the question.  But, you know, what is the

008641

1    purpose of this bankruptcy case?

2    A    I think Mr. Battaglia answered that question when asked

3    by the Judge.  It's, quite frankly, the -- we can't go to

4    trial in Connecticut and be -- I mean, we have a trial team

5    stuck here if this needs to go to Connecticut to help try

6    that case.  We don't have the money to pay for that at this

7    point in time.  That's a huge problem right there.  So, it's

8    -- we just can't afford the Connecticut case, the time, or

9    the dollars right now.  Now, it's -- Alex Jones being off

10   the air for two months is not acceptable.  We won't be here.

11   We won't last two weeks in that situation, so we have to

12   work out a way to make all this happen.

13   Q    And as the Chief Restructuring Officer of FSS and Mr.

14   Jones being the sole owner and member of FSS, have you had

15   an opportunity to talk to Mr. Jones about the purpose of

16   this bankruptcy case?

17   A    Yes.

18   Q    And is his purpose aligned with what you just stated to

19   the Court as the purpose of the filing of this bankruptcy?

20   A    Yeah.  He knows we can't go double team.  We cannot do

21   it.  I think he'd like to get it out of the Connecticut

22   court, but I don't -- you know, we told him that ain't going

23   to work.

24   Q    You know, in your declaration, Mr. Schwartz, you

25   describe Mr. Jones as a natural radio personality and the --

1    and I'm assuming you've had some opportunity to observe some

2    of the content aired by InfoWars.

3    A    Is that a question?

4    Q    Yes, Your Honor -- sorry, Mr. Schwartz.

5    A    Then you assume -- I have had tried to look at the

6    program a few times.

7    Q    Are you aware that after the hearing that we had on

8    Monday, Mr. Jones appeared on his radio show, and he

9    expressly told listeners of FSS about the purpose of this

10   bankruptcy filing.  Are you aware of that video?

11   A    No.

12   Q    Okay.  And you said that based on your conversation

13   with Mr. Jones, that it's your understanding that Mr. Jones'

14   purpose here is to make sure you don't fight multiple fronts

15   in terms of litigation.  You want to bring it all here and

16   that's the purpose of the bankruptcy filing, correct?

17   A    That's -- I mean, the discussions I've been involved

18   with him, you know, relating to that is, I mean, that's been

19   an expression what we have to do.  We can't do this.

20   Q    And the purpose of the bankruptcy is not to tie up the

21   damages from the Plaintiff for years and years and years?

22   A    No.  That could be done by appeal.  You don't need to -

23   -

24   Q    Okay.

25            MR. NGUYEN:  Mr. Martin, can blow up the

1    (indiscernible) --

2          THE COURT:  Actually, just two questions on the

3    budget.  And just to -- just so I understand, can you just

4    go back to the budget, Mr. Martin?  Just go to the first

5    page.  It's just two simple questions.  There's a line item

6    for outsourced services and -- for about -- yeah, just on

7    the first page.  There's a line item -- let's see -- it is -

8    - where is it?  It's by the total office and admin expense.

9    Now, where'd you go?  Yeah, there's a line item for

10   outsource --

11         THE WITNESS:  Outsource services?

12         THE COURT:  -- and then consulting services.

13   Those are the only two that I just didn't -- those are the

14   two that popped out to me that I just wanted to get some

15   clarification on.

16         THE WITNESS:  Those are two categories we have got

17   to investigate.

18         THE COURT:  Okay.

19         THE WITNESS:  Because, first off, we have to get -

20   - presumably, these are contractual relationships and I want

21   to see the contracts --

22         THE COURT:  Okay.

23         THE WITNESS:  -- which I have not seen, and I want

24   to know exactly what they're doing and why we need to keep

25   paying them to do it.

```
 1                THE COURT:  Okay.

 2                THE WITNESS:  There's this -- there are quite a

 3     number of -- I'd say, 10 or 12 entities in these two

 4     categories combined that --

 5                THE COURT:  Okay.

 6                THE WITNESS:  I put them in there because we've

 7     been -- they're in their regular expenditure and --

 8                THE COURT:  Can you give me an example of an

 9     outsourced service and a consulting service?

10                THE WITNESS:  Oh, for one, for example is --

11     there's an individual who does -- the Sound Simplistic does

12     web design.  What he does -- he does very sophisticated web

13     design for the company, based on a retainer of 25,000 a

14     month.  That is a little -- seems a little bit --

15                THE COURT:  That's an outsource service or

16     consulting --

17                THE WITNESS:  I believe that is consulting

18     services.

19                THE COURT:  Okay.

20                THE WITNESS:  Now -- yeah, no, that's an outsource

21     service.

22                THE COURT:  Okay.  And then what's an example of a

23     consulting service?

24                THE WITNESS:  Well, consulting services -- I'm

25     drawing a blank on an entity.  Consulting on the marketing.
```

```
 1    You're selling product into this audience group and part of
 2    it is looking at that, I believe, and --
 3              THE COURT:  Okay.
 4              THE WITNESS:  That's what I'm -- it's a marketing
 5    service as a -- what would the market service we need be.
 6    It's got to be something to do with reaching out and how do
 7    we touch those people most effectively.
 8              THE COURT:  Okay.
 9              THE WITNESS:  That's why I said, it's -- that's
10    looking at -- it's what I think I'm going to see.  Now I
11    want to -- show me what it really is.
12              THE COURT:  Okay.
13              THE WITNESS:  Those are very definitely two areas
14    we have got to dig into.
15              THE COURT:  Okay.  Thank you.  Mr. Nguyen, I'm
16    sorry.
17              MR. NGUYEN:  No problem, Your Honor.
18    BY MR. NGUYEN:
19    Q    And before I get to Exhibit 8, I just want to clarify a
20    point.  You mention earlier that the Court was the one that
21    appoints you and the Court was the one that fired you --
22    that can fire you.  Do you remember that testimony?
23    A    Yes.  I guess I would modify that this way, by saying,
24    since I'm not appointed yet, Mr. Jones did hire me.
25    Arguably, I guess he could fire me before I'm appointed.
```

```
 1    Q    So based on corporate formalities, you're an officer of
 2    the company, correct?
 3    A    As CRO, I am an officer of the company.
 4    Q    And the owner of the company is who?
 5    A    Alex Jones.
 6    Q    Okay.
 7              MR. NGUYEN:  Mr. Martin, can you (indiscernible)?
 8    I'm almost done, Your Honor.  I would just like to
 9    (indiscernible) questions (indiscernible) Exhibit
10    (indiscernible) there was a admitted (indiscernible).
11              THE COURT:  I'm sorry, Mr. Martin.  I can't hear
12    you.  Can you just get close to a mic?  I'm going to tell
13    you, why don't you go to another question.  I'm not
14    interested.
15              MR. NGUYEN:  Okay.  Your Honor, I will pass the
16    witness.  Thank you.
17              THE COURT:  Thank you.  Why don't we -- and again,
18    I don't want anyone to read one way or the other.  I'm
19    focused on cash collateral and critical vendor.  And why
20    don't we take a five-minute break.  Mr. Brimmage, can you
21    just -- I don't want to -- I want you to take as much time
22    as you want.  I just -- from a scheduling standpoint, how
23    long do you think you'll go?  Okay.
24              MR. BRIMMAGE:  (Indiscernible) start at 10 after
25    the hour.  (Indiscernible).
```

```
 1              THE COURT:  Okay.  Okay.

 2              MR. BRIMMAGE:  (Indiscernible).

 3              THE COURT:  Okay.  Like, I know how it is.  I'm

 4    just trying to get a sense from scheduling and timing.  Oh,

 5    that's fine.  Okay.  Let's all take a -- I'll come back on

 6    at 3:15.

 7              Mr. Schwartz, you're again under oath

 8    (indiscernible) remind you.  Okay.  I'll come back.

 9         (Recess)

10              CLERK:  All rise.

11              THE COURT:  Anyhow.  Before we start, Mr.

12    Brimmage, in terms of your presentation, are you going to

13    have -- are you going use Mr. Martin to show --

14              MR. BRIMMAGE:  I am, Your Honor.

15              THE COURT:  Okay.

16              MR. BRIMMAGE:  What I'm going to hope to do is

17    minimize the document use and refer to documents he's --

18    we've already looked at --

19              THE COURT:  Okay.

20              MR. BRIMMAGE:  -- and kind of move from there.

21    But if we need to pull it up, we'll put it up and keep it.

22              THE COURT:  Okay.  I just want to make sure that -

23    - Mr. Martin, I'm going to make -- I think you -- oh, you're

24    still the presenter so you'll be able to proceed.  Okay.

25              And Mr. Schwartz, you understand that you're still
```

```
 1   under oath?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Okay.  Mr. Brimmage, you may proceed.

 4   BY MR. BRIMMAGE:

 5   Q    Mr. Schwartz, my name is Marty Brimmage and I'm with

 6   Akin Gump Strauss Hauer & Feld and I'm going to question you

 7   today on behalf of the Connecticut Plaintiffs.  You and I

 8   have never met before that I recall; is that right?

 9   A    I do not recall meeting you either.

10   Q    Okay.

11   A    I know the name.  I don't know why.

12   Q    Okay.  Good.  I'm glad my memory isn't quite that

13   faulty.  What I'm going to attempt to do is what I call

14   quick hits.  I'm going to -- some of the things I'm going to

15   talk about, I'm going to refer to your prior testimony

16   today, but I'm not going to intend to repeat that.  I'm

17   going to try to maybe ask some follow up.  So, I'm going to

18   try to be efficient with your time.  I would appreciate if

19   you would do the same.  Does that sound fair?

20   A    If I can.

21   Q    Okay.  Did you have a chance to confer with your

22   counsel during the break?

23   A    About the case?  No.

24   Q    Okay.  Did you have a chance to talk to your counsel

25   during the break?
```

```
 1    A    Oh, yeah.
 2    Q    Okay.  All right.  Let's pick up on a few things if we
 3    could.  I think you have testified in a variety of ways to
 4    what I'm going to -- I'm going to try to paraphrase -- the
 5    sloppy status of the financial records when you became the
 6    CRO; is that correct?
 7    A    I've talked about it.  I know that.  I don't how many
 8    times I've done it.
 9    Q    Fair enough to say, it's sloppy records, right?
10    A    Well, that's one description.  I would say something
11    not -- they don't come up to sloppy.
12    Q    Okay.  And when you took over, the 2021 general ledger
13    had not been completed and the books had not closed, right?
14    A    Correct.
15    Q    And as a result, no financial statements were produced
16    for FSS for the 18 months preceding your engagement, right?
17    A    Well, the fact is, no financial statements were
18    produced, charity I'm saying, as a result.  Had they been
19    updated; I don't know if they would have been produced
20    financial statements even then.
21    Q    So, is my statement true?
22    A    Well, that's -- I mean, I've made assumption of a
23    result of the books not being -- but I do know they did not
24    produce financial statements.
25    Q    So that's a yes.
```

1   A     Yes, sir.

2   Q     Okay.  And you found no bank reconciliations for 2021

3   or 2022, right?

4   A     Correct.

5   Q     You found that FSS personnel expressed no criticism of

6   not receiving any financial reports to assist them in doing

7   their functional responsibilities, right?

8   A     Correct.

9   Q     They were -- appeared unaware of information that would

10  be available to them to timely prepare their financials,

11  right?

12  A     Timely prepare their financials?

13  Q     Right.

14  A     That statement confuses me.

15  Q     Okay.

16  A     Are you talking about the statement beforehand?

17  Q     Did you find that FSS personnel appeared to be unaware

18  of the management -- that the management information was

19  available to them from -- unaware that -- let me start over.

20  It's easy for me to say, right?

21         Were you aware that FSS personnel appeared to be

22  unaware of the management information that was available to

23  them to prepare timely and detailed financial statements and

24  analysis?

25  A     I was aware that management personnel seemed unaware of

008651

```
 1     the information available to them to do their jobs.  That
 2     would be accounting's responsible to actually prepare
 3     financial statements.  That's what -- that point there Is
 4     what threw me.
 5     Q    Fair enough.  You would agree with me that internal
 6     accounting controls were inadequate, right?
 7     A    Yes.
 8     Q    There was a lack of segregation of duties?
 9     A    Yes.
10     Q    Lack of supervisory review?
11     A    Yes.
12     Q    Including billings to PQPR Holdings, right?
13     A    Correct.
14     Q    When did you come on to FSS?
15     A    June 6th is when I was hired.
16     Q    And so, all these findings that we're talking about are
17     subsequent to June 6th, right?
18     A    Yes.
19     Q    Okay.
20     A    And well, let me step back.  I've been told by Mr. Roe
21     that the general ledgers were not up to speed.  I did not
22     realize the significance of that statement when he told it
23     to me.  That was prior to June 6th.
24     Q    Yeah.  You didn't realize just how bad all the
25     financials and accounting were until you got on the scene,
```

008652

```
 1   right?

 2   A    Correct.

 3   Q    They were a mess, right?

 4   A    They were nonexistent.

 5   Q    That's worse than a mess.

 6   A    Yep.

 7   Q    All right.  You would agree with me that the --

 8   locating accurate financial records is a tedious task at

 9   FSS, right?

10   A    Locating accurate financial records?

11   Q    Is a tedious task at FSS, isn't it?

12   A    In general, yes.

13   Q    And specifically yes, right?

14   A    Well, I mean, some banks can -- you know, are

15   accessible.  But in general, don't expect them to be.

16        MR. BRIMMAGE:  Mr. Martin, can we pull up

17   Defendant's -- I'm sorry -- I think it's Exhibit 3, the

18   declaration of Mr. Schwartz in this case, and go to

19   Paragraph 94, please?

20   BY MR. BRIMMAGE:

21   Q    We'll blow it up for you, Mr. Schwartz.

22   A    Oh, I can probably read it.

23   Q    Okay.  If you'll just read it to yourself.  I'm not

24   going to attempt to impeach you.  I'm just going to ask the

25   question again and see if we can move it quickly.  Does that
```

1    sound fair?

2    A    Yes.

3    Q    Okay.  Tell me when you're done.

4    A    Okay.  I'm done.

5    Q    All right.  Isn't it true that locating financial

6    records is a tedious task at FSS?

7    A    I think when you asked me that a minute ago, I

8    responded with another word than tedious.

9    Q    Mr. Schwartz, is that a yes or a no?

10   A    That is what this says.

11   Q    Is that true or not true?

12   A    That is not true today.

13   Q    Okay.  Do you recall when you signed your declaration?

14   A    Sometime around the time of filing.

15   Q    July 29th?

16   A    Okay.  Would you leave that paragraph up, please, or go

17   back to it?

18   Q    July 29th?

19   A    Yes.  Sounds about right.

20   Q    So it was true on July 29th?

21   A    I believed it to be true on July 29th.

22   Q    Well, hang on.  You believed it to be true, or it was

23   true?  I want the Court to understand.

24   A    No, I mean --

25   Q    You tell us.  You pick.  Was it true, or you believed

1    it to be true?

2    A    I believed it to be true.  Like everything else in

3    here, I believed it to be true.

4    Q    But it may not be true; is that correct?

5    A    True.  And everyone says something's true, it may not

6    be, and in this case, I found out that was not true.

7    Q    I think we are getting a clear picture of what you

8    think the truth is.  Let me ask you the next one.  The

9    recordkeeping for orders, invoices, expense reports,

10   American Express charge reports are not well organized;

11   isn't that correct?

12   A    That's correct.

13   Q    And other records on the computer system also require

14   additional time to retrieve, correct?

15   A    Correct.

16   Q    You testified in your declaration that you have

17   extensive experience serving as a fiduciary in bankruptcy.

18   Do you recall that?

19   A    Yes.

20   Q    What is a fiduciary in bankruptcy?

21   A    It's the same, in my opinion, a fiduciary in any --

22   many other capacities.  It's someone who takes possession of

23   assets belonging to another and owes a duty to the

24   beneficial ownership of those assets that put that -- the

25   interests of the beneficial owner first.

1    Q    Anything else?

2    A    I mean, there are some other components of fiduciary,

3    but that's the primary one that I've always known.

4    Q    Okay.  The assets in the FSS bankruptcy, who's going to

5    be the beneficial owner of those assets?

6    A    Well, the beneficial -- the beneficiary of those assets

7    right now would be the creditors, (indiscernible) first.

8    Q    Creditors.  Anybody else?

9    A    No.  First off is creditors, secured and unsecured.

10   Q    In all your experience as a fiduciary in bankruptcy,

11   who do you see as the creditors in this case?

12   A    The people that the estate owes money to.

13   Q    Who is that?

14   A    In this case we have secured creditors.  You have

15   unsecured creditors.  You have administrative claimants.

16   You have the -- and well -- I mean, yeah.  Government

17   creditors, I think they classify as unsecured, but higher

18   class.

19   Q    Okay.  What analysis or investigation did you do to

20   determine who the creditors or potential creditors are in

21   this bankruptcy?

22   A    Really, we haven't completed -- they haven't even done

23   the schedules yet.

24   Q    Okay.

25   A    We looked at who we owed money to as of the filing date

1    and listed them.  Those are creditors.

2    Q    That's all you did up to the filing date, right?

3    A    Well, I mean, we read the loan agreements and the

4    security instrument, but I can't think of a -- I mean, I

5    don't know what there was to do with the -- we know about

6    the contingent claimants in terms of your clients.  So, I

7    don't think we did any more investigation than that at this

8    time.

9    Q    No more investigation than that before you started

10   seeking the cash collateral order that you're asking the

11   Court to approve, correct?

12   A    Correct.

13   Q    Okay.  You've not done any investigation into what I'm

14   going to call the Plaintiffs -- the Texas and the

15   Connecticut and the TUFTA collective group, Plaintiffs'

16   claims, correct?

17   A    Correct.

18   Q    You don't have an opinion one way or another whether

19   they were wronged or not; is that right?

20   A    The TUFTA claimants and your clients?

21   Q    Yes.

22   A    No.  That's for a tryer.

23   Q    Have you done any analysis or estimation of potential

24   amounts of the claims that could be had?

25   A    No.

008657

```
1    Q    Have you asked for any analysis or estimation of that?

2    A    No.

3    Q    Do you believe it's your job to ask for that or to look

4    into that?

5    A    No.

6    Q    Why is it not your job?

7    A    Well, it's up the courts to decide, liquidate those

8    claims.

9    Q    Okay.

10   A    If he came to me and said what could we settle them

11   for, you know, I may be able to come up with a number that

12   we could provide, but it's not going to be the value of the

13   claim, I suspect.

14   Q    You've testified about Mr. Jones -- I guess Alex --

15   there's multiple Joneses, right?

16   A    There's two I'm aware of.

17   Q    And who are the two?

18   A    Alex Jones and Dr. Jones was who I call them.

19   Q    Who's Dr. Jones?

20   A    Alex Jones' father.

21   Q    What's the first name of Dr. Jones?

22   A    David.

23   Q    So, father/son Alex/David Jones, right?

24   A    Yes.

25   Q    All right.  You testified that Alex Jones puts personal
```

```
1    expenses on the American Express card, right?

2    A    Yes.

3    Q    Do others put personal expenses on the American Express

4    card?

5    A    I don't know that.  I would --

6    Q    (Indiscernible)

7    A    -- not be surprised.

8    Q    -- if you don't know.

9    A    I don't know that yet.

10   Q    Yeah, you don't know.  You haven't looked into that?

11   A    No.

12   Q    Okay.  They could, right?

13   A    They could, yes.

14   Q    And you're asking the Court to use cash collateral to

15   pay American Express?

16   A    Yes.

17   Q    Okay.  But no investigation?

18   A    That hasn't been done yet.

19   Q    You also testified that you intend Alex Jones to not

20   charge the American Express going forward, right?

21   A    No.  He can use the American Express, but not for his

22   personal expenses.

23   Q    All right.  Have you confirmed, as you're testifying

24   today in front of this Court, that Mr. Alex Jones has not

25   used the AMEX for any personal expenses since the
```

1    bankruptcy's been filed?

2    A    No.  I have not had a chance to do that.

3    Q    Have you done anything to cut off Mr. Jones or anybody

4    else from using the AMEX for personal expenses?

5    A    We've started collecting the cards from all the

6    employees.  That is something to be done.

7    Q    Okay.

8    A    Okay?

9    Q    What else?

10   A    We started to collecting the cards.  I have -- as I

11   said, I have not had a chance to look at Alex's charges

12   since the filing.

13   Q    Okay.

14   A    But we'll do that.  And I was in -- I believe -- I

15   don't know if David Jones has a card or not.  We'll find --

16   we'll see what his charges are if they've come against FSS.

17   Q    You don't know if David Jones has a card, right?

18   A    I do not.

19   Q    How many cards are there?

20   A    I don't know.

21   Q    You haven't collected Mr. Alex Jones' card yet, have

22   you?

23   A    No.

24   Q    How many cards have you collected?

25   A    I don't know.  They're doing that today.

```
 1    Q    No idea how many they've collected?

 2    A    As I said, I don't know.  It's being done today.

 3    Q    Before today, is it fair to say no cards were

 4    collected?

 5    A    That's -- not by me.  No, we have not collected cards

 6    before today.

 7    Q    Okay.  And you don't have any personal knowledge that

 8    as you're testifying right now, any cards have actually been

 9    collected, right?

10    A    No.  I've been here all day.

11    Q    So, that's correct.  You have no personal knowledge?

12    A    That's what I said.  I don't know.  I've been here all

13    day.

14    Q    Okay.  When you were asked about Mr. Jones' car, you

15    said you didn't know.  You said, I didn't -- I don't think

16    so, but I don't know.

17    A    I got confused.  I mean, the question was whether the

18    company pays for Mr. Jones' car.

19    Q    Right.

20    A    And I said no.

21    Q    No, and no expenses associated with the car; is that

22    right?

23    A    Not unless they come through on the American Express

24    and they're -- what I saw, they're charged to his draw.  So,

25    to that extent, the company paid -- would pay for them, but
```

 1   they're charged -- they were being charged to his draw.

 2   Q    Okay.  But the company initially pays for them?

 3   A    Yes, because it pays the AMEX bill.

 4   Q    Okay.

 5   A    Now, and we say initially.  It's probably on there --

 6   where he works, that'd be charged to his draw before the

 7   AMEX bill gets paid.  So --

 8   Q    Yeah.

 9   A    You know, he gets charged for them before AMEX gets

10   paid.

11   Q    If there's a large judgment in the Austin lawsuit,

12   how's it going to get paid?

13   A    That I don't know.

14   Q    You testified that there's $800,000 in unencumbered

15   cash right now, right?

16   A    Correct.

17   Q    And where did you say -- what did you say the source of

18   that cash was?

19   A    Donations.

20   Q    Donations.  Have you done an analysis of donations over

21   the past five years?

22   A    What do you mean by an analysis of donations?

23   Q    The analysis of how many -- how much money has come in

24   for donations for FSS in the last five years?

25   A    I have looked at that number.  I -- what do you mean by

1    analysis?  I have looked at the number, the amount of the

2    donations over the last five years, seven years.

3    Q    How much is it annually?

4    A    Could I look at Exhibit -- I think it's B, the income

5    statement that's attached to the --

6    Q    Let me just ask -- we can go there if you need to --

7    can you not answer without looking at a document?

8    A    No.  You're asking me for the number.

9    Q    Can you give us a ballpark?

10   A    It varies.  It's been -- seven figures.

11   Q    Seven figures?

12   A    Yeah.

13   Q    All right.  So, in the next -- well, how much in -- and

14   is it true all the cash donations are unencumbered?

15   A    Yes.  I asked -- I asked that specific question of my

16   lawyers, is that cash collateral also?  And they said no.

17   Q    When you asked your lawyers, who did you ask?

18   A    Mr. Lee and Mr. Battaglia.  I guess they're not my

19   lawyers; they're the Debtor's lawyers.

20   Q    You have your own lawyer though, right?

21   A    No.

22   Q    You don't?

23   A    No.

24   Q    You don't have your own lawyer?

25   A    No.

```
 1    Q    Okay.

 2    A    Should I get one?

 3    Q    I'm going to leave it.  Do you recall your engagement

 4    letter that you talked about, with FSS?

 5    A    It depends on what you're asking me to recall from it.

 6    Q    Well, it was Exhibit 2 that you spoke to about your

 7    lawyers.  It was actually one of the documents that was

 8    admitted by agreement.  The May 19, 2022 --

 9    A    Right.

10    Q    -- engagement letter?

11    A    Right.

12    Q    Do you recall that?

13    A    Yes.

14    Q    Okay.  It says in there that's CRO's counsel.  That

15    ring a bell with you?

16    A    Yeah, I believe there was a provision in there that I

17    would be permitted to engage counsel.  I have not done that.

18    Q    Okay.  It says FFS will fund $20,000 retainer to be

19    paid to SA LLC, so that SA LLC can engage Mike Ridulfo, of

20    Kane Russell Coleman Logan, to serve as legal counsel to the

21    CRO, correct?

22    A    Correct.

23    Q    You have not engaged Mr. Ridulfo?

24    A    No.

25    Q    Did the $20,000 retainer get paid?
```

```
 1    A    No.

 2    Q    So, prior to the commencement of the engagement, that

 3    retainer was not paid?

 4    A    Correct.  No retainer was paid prior to the signing of

 5    that engagement letter.

 6    Q    Even though the engagement letter required it?

 7    A    Yes, sir.

 8    Q    Do you have an opinion one way or another about whether

 9    not the engagement letter is enforceable or not?

10    A    Well, I think --

11    Q    I don't think it's that funny.

12    A    What I -- I'm doing -- I think it's terribly

13    enforceable, but I'm not a lawyer and I haven't, you know --

14    I don't think anyone -- I have not asked a lawyer to look at

15    it from enforceability standpoint.

16    Q    Okay.  And you haven't required the -- all of the

17    requirements in the engagement letter to be met; is that

18    correct?

19    A    Well, I -- no, the retainer was paid.  It just wasn't

20    paid in the terms of the agreement.

21    Q    You just testified that the retainer for Mr. Ridulfo

22    was never paid.

23    A    That retainer has not been paid.

24    Q    So --

25    A    I was asked not to engage Mr. Ridulfo.
```

```
1    Q    Who asked you not to?

2    A    Mr. Battaglia.

3    Q    What did he ask you that?

4    A    Concerned over costs.

5    Q    Concerned over costs.  So let me make sure we're clear,

6    Mr. Schwartz.  You're using Mr. Battaglia as your own

7    personal CRO attorney as well as the FSS attorney, right?

8              MR. BATTAGLIA:  Objection, Your Honor.

9    (Indiscernible) question.  He can ask a question, but he's

10   putting words in the witness' mouth.  If he wants to know if

11   I'm his lawyer individually, ask that.

12             THE COURT:  I think that's what he did.

13             MR. BRIMMAGE:  I did.

14             MR. BATTAGLIA:  (indiscernible) what he asked

15   (indiscernible).

16   BY MR. BRIMMAGE:

17   A    Well, the answer is, Mr. Battaglia is not my lawyer.

18   He asked me for -- you know, very simply.  He said, I'm

19   concerned about the legal cost.  Do you need

20   (indiscernible).  And I said, well, I don't -- it doesn't

21   seem like it right now, so I'll hold off.

22   Q    The engagement letter negotiated the right for you to

23   seek your own attorney, correct?

24   A    It did.

25   Q    In fact, it said FSS will find $20,000 prior to
```

 1   commencing the engagement, right?

 2   A     Correct.

 3   Q     And you took advice from FSS counsel not to engage your

 4   own CRO counsel, correct?

 5   A     I don't --

 6   Q     That's what you just testified to.

 7   A     I don't think I testified that that was advice.  He

 8   asked me not to do it.  He said he's concerned about the

 9   legal costs.

10   Q     Okay.

11   A     And after -- you know, I said, okay, I don't see that

12   I'm going to have to have my own counsel here; $20,000 ain't

13   going to pay for much anyway.

14   Q     As the CRO, the only counsel you consult with are FSS

15   counsel?

16   A     Correct.

17   Q     Now, let's stick with your engagement letter while

18   we're here for a little bit, Exhibit 2.  It's dated May

19   19th, 2022, correct?

20   A     Correct.

21   Q     And -- but it's signed by Mr. Jones on June 6th, 2022,

22   right?

23   A     Correct.

24   Q     Why the discrepancy?

25   A     I believe Mr. Jones was committed to signing it and

008667

1    ready to sign it until June 6th.

2    Q    Why is that?

3    A    Well, you'd have to ask Mr. Jones.  I know we had a

4    meeting with him on June 6th to discuss the terms of the

5    engagement letter.

6    Q    Was he concerned about any particular term?

7    A    Yes.  He was concerned about the amount of authority I

8    had.

9    Q    All right.  Let's talk about amount of authority.  Was

10   he concerned about anything else?

11   A    Not specifically, no.

12   Q    Okay.  Now, I'm confused about your prior testimony,

13   and I just want to clarify.  Isn't it true that Mr. Jones

14   can fire you right here, right now, if he wanted to

15   A    That's -- from my reading of the engagement letter,

16   that's my interpretation.  That he has -- still has the

17   authority to terminate me.

18   Q    Okay.  For whatever reason he wants to, right?

19   A    Yes.  I don't think there's a qualifier in there on

20   termination.

21   Q    Okay.  And along those lines, you testified -- and it's

22   been a while -- that you have full authority over a lot of

23   stuff, except major decisions.  Do you recall that

24   testimony?

25   A    No, I didn't say that.

```
 1   Q    You did.

 2   A    No, I didn't say that.  If I did, it's misunderstood.

 3   I don't -- I had authority over major decisions, but I

 4   agreed I would consult with Mr. Jones before I executed any

 5   of those decisions.  I did not say that I could not execute

 6   any decision I deemed necessary.

 7   Q    What constitutes a major decision that you would

 8   consult with Mr. Jones over?

 9   A    Well, a major decision would be product line changes,

10   for example.  That would be a significant decision.  A major

11   decision would be, there are certain key personnel on the

12   area of marketing in the production area, which I think

13   would be major decisions if I determined I needed to

14   terminate somebody in those categories.  I consulted with

15   him on the termination of the previous accountant because

16   she had been there for a long time and had been a

17   significant role in the company.  Those were decisions that

18   -- and ramifications throughout the organization or in the

19   operation of the business.  And it would be insane of me to

20   have executed some decision like that without talking to Mr.

21   Jones about it.

22   Q    What about the decision to file for bankruptcy?

23   A    I mean, that was --

24   Q    Whose decision was that?

25   A    The final decision?  That's a good question.  Mr. Jones
```

1    agreed that we needed to file bankruptcy.  The selection of

2    the date, he concurred with.  The recommendation of the date

3    came from others.

4    Q   Well, let's be clear, Mr. Schwartz.  You were hired

5    because the decision was made to file for bankruptcy.

6    A   Well --

7    Q   You were hired to be the CRO.  You did not make that

8    decision.  That decision was already made, which is why you

9    came on the scene; isn't that right?

10    A   Well, I mean, yes.  The perception was that they needed

11    to file bankruptcy, needed to file bankruptcy.  The question

12    was, could they?  And that was part of my job was to

13    determine if the company could actually file bankruptcy.

14    Q   Okay.  Whose perception, was it?

15    A   I think it was Mr. Jones' and his counsel.

16    Q   Which counsel was that?

17    A   That would be Mr. Jordan, in addition, Mr. Lee and Mr.

18    Battaglia and Mr. Shannon.

19    Q   Okay.  They all -- FSS counsel and Mr. Alex Jones'

20    counsel all got together on whether or not to file

21    bankruptcy -- put FSS into bankruptcy?

22    A   That was that they decided it was a definite option and

23    I got -- I became involved when it was -- it didn't get

24    finalized --

25    Q   All right.

1   A    -- initially.  It wasn't final when I became -- got

2   involved that we would be filing bankruptcy.

3   Q    And when you say they, that's who you're talking about,

4   those -- that group of counsel, right?

5   A    Yes.

6   Q    For all those different Alex Jones-related entities,

7   right, and Alex Jones himself?

8   A    Well, no, these -- they represented FSS and Alex Jones,

9   that group.

10  Q    Okay.

11  A    What other entities I -- we're not there.

12  Q    Who represented the InfoWars Three Debtors prior, that

13  you were the CRO for them?

14  A    Prior was Mr. Lee, Mr. Shannon, I believe, and Mr.

15  Battaglia was involved in that.

16  Q    The same lawyers --

17  A    I'm not sure if they all represented the three of them.

18  Q    Yeah.  Same lawyers we've got here?

19  A    Yes.

20  Q    Okay.

21       MR. BRIMMAGE:  Yeah.  We're going to let the

22  witness answer.

23       MAN 1:  Sorry about that.

24       MR. BRIMMAGE:  That's okay.

25  BY MR. BRIMMAGE:

1    Q    So, let me just circle back make sure that we're clear.

2         Your testimony earlier that only the Court can fire

3    you, that's not the case right now, right?  That's not true?

4    A    I don't believe so.

5    Q    Okay.  I appreciate that.  Let's circle back, if we

6    could, to this donation topic.  Is it true that FSS has

7    received donations in cryptocurrency?

8    A    Mr. Jones received some donations in cryptocurrency.

9    Q    Were those directly to him personally, or are those to

10   FSS?

11   A    They were to his personal -- whatever accounts you call

12   those things.

13   Q    Okay.  They were not to FSS?

14   A    No.

15   Q    Is your --

16   A    Not directly.

17   Q    You've investigated that, and you're rock-solid

18   positive under oath in front of this Court today that that

19   was not to FSS, right?

20   A    No.  I mean, what I'm telling you right now is those

21   donations were given to Mr. Jones.  The -- I have not -- we

22   have not done an investigation as to should they have been

23   Jones' or FSS's.

24   Q    I'm more confused than when I started.  The donations

25   were made to FSS and FSS gave those cryptocurrency donations

```
 1   to Mr. Jones?

 2   A    No.   FSS did not touch those currencies.   They went to

 3   Mr. Jones.

 4   Q    Directly?

 5   A    Directly.

 6   Q    You haven't investigated whether they should have come

 7   to FSS?

 8   A    We have not.   Although we have looked at -- no, we have

 9   not done that investigation.   We've done -- seen some

10   preliminary information.

11   Q    Okay.   Was -- is the amount this year so far around $8

12   million?

13   A    I'm -- well, I haven't seen a full accounting.   We were

14   told it was $9 million.

15   Q    I'll take $9 million.   And so, the cryptocurrency, $9

16   million were donated to InfoWars, InfoWars.com?

17   A    Not to --

18   Q    Is that right?

19   A    Not to my knowledge.   I don't --

20   Q    Okay.   Well, tell the Court where -- who received those

21   donations from the very beginning, the $9 million in

22   cryptocurrency, what entity, what person received them

23   first?

24        MR. BATTAGLIA:   Objection, Your Honor.   Asked and

25   answered.   He said that it was received by Mr. Jones,
```

008673

```
 1    several times.
 2              THE COURT:  He can clarify.  (Indiscernible).
 3    BY MR. BRIMMAGE:
 4    A    I'm not sure (indiscernible) clarify that.  They went -
 5    - to my -- my understanding is that they went to Mr. Jones.
 6    As I said, we have not investigated that.  But that's what
 7    I've been told; that they went directly to Mr. Jones.
 8    Q    Okay.  Thank you.  Does Mr. Jones have a direct place
 9    where people can make donations directly to him personally?
10    A    Well, on the -- I'm not a cryptocurrency guy.  But
11    these were made, apparently, to his cryptocurrency vault, or
12    whatever they call that thing.  So, to that extent, yes, he
13    has his own bank account, people can make donations to that
14    if they have it.
15    Q    Okay.  So, it can be made directly to him --
16    A    Yes.
17    Q    Okay.  Mr. Schwartz, when I'm flipping pages, I'm
18    saving both of us a lot of time.  So, be patient with me.
19    You talked with your attorney about the Plan Support
20    Agreement, which was Exhibit 3.  Do you recall that?
21    A    Yes.
22    Q    All right.  And that was April 15, 2022 is when it was
23    signed, right?
24    A    The -- was that --
25    Q    I'll represent to you that's what it says.
```

1    A    Okay.  Thank you.

2    Q    That was before your time as CRO, right?

3    A    I'm not sure -- was that before I was CRO there?  I --

4    I'm out at -- and I don't remember when I was hired as CRO.

5    I thought it was prior to that.

6    Q    Hired as CRO for which entity?

7    A    The three -- all three are on the engagement letter.

8    InfoWars, IWHealth, and Prison Planet.

9    Q    What about the FSS engagement?

10   A    That was by FSS, a separate engagement letter.

11   Q    Right.  And that was after April 15th, 2022, right?

12   A    Correct.

13   Q    And you didn't do any investigation or analysis

14   regarding the Plan Support Agreement, correct?

15   A    I'm not sure what you mean.

16   Q    You -- it was given to you, right?

17   A    No.  I was -- a draft was given to me to read and

18   comment on and make recommended changes to it.

19   Q    A draft back -- before it was signed on April 15 --

20   A    Yes.

21   Q    When you were the InfoWars CRO?

22   A    Yes.

23   Q    Okay.  Got it, got it, got it.  Thank you.  Let's go to

24   the two promissory notes that you testified to.  Can we do

25   that?  I'm going to try to do them in one, but if we need to

008675

```
 1    break them up, we can.  Isn't it true that you've done
 2    nothing to date to determine the validity of those notes?
 3    A    I believe I've described to Mr. -- somebody already,
 4    that all I've done is look at an analysis showing the
 5    computation of the note balances and some of the supporting
 6    documentation.
 7    Q    But --
 8    A    That is not nothing, but that is -- that's the limit of
 9    it.
10    Q    For one of the notes?
11    A    For one of the notes, correct?
12    Q    But not for the other note?
13    A    I don't believe I've seen anything on the other note.
14    Q    Okay.  And for the one note that you did see something,
15    you didn't do any investigation about the veracity of the
16    information that you were provided.  You just looked at the
17    information you were provided and accepted it as true for
18    now; is that correct?
19    A    Well, I looked at it.  I did not -- have not gone -- we
20    have not started tracing out the information.  So, I -- I
21    mean, you say I looked at it and took it for true.  I don't
22    take it for anything.  It's not true.  It's not false.  It's
23    not proven.
24    Q    Okay.
25    A    To me.
```

```
 1    Q    All right.  Fair enough.  You don't know, testifying

 2    today, whether the notes are valid and enforceable or not,

 3    correct?

 4    A    Yeah.  That would be more of a legal question for me.

 5    Q    Okay.  Where did you get the notes from?

 6    A    Well, I was at FSS's offices, so --

 7    Q    Have you had discussions with counsel about the notes?

 8    A    Yes.  I was about to say I may have gotten them from

 9    counsel, because they were looking all of the documentation

10    before I ever got involved.

11    Q    Right.  And if you got them from counsel, do you recall

12    which counsel might have given them to you?

13    A    No.

14    Q    Okay.  Fair to say you've had conversations with

15    counsel about the notes?

16    A    Yes.

17    Q    Other than your conversations though, you've done no

18    investigations or analysis regarding the veracity of the

19    notes, correct?

20    A    That's correct.  That's not on the -- that's not come

21    up to the top of the to-do list yet.

22    Q    When does that get to the top of the to-do list?

23    A    When we get this -- get this thing stabilized and

24    operating and we didn't -- and turned it, investigating

25    claims.
```

```
 1    Q    You're asking for use of cash collateral in large part

 2    based on the notes, right?

 3    A    No.  I'm asking to use the cash collateral because

 4    we've got the notes out there showing the collateral right

 5    now, or the -- well, I mean, noteholders do.

 6    Q    Have you investigated whether or not you can forbear

 7    paying on the notes during the pendency of the bankruptcy

 8    for now?

 9    A    Well, we entered into a forbearance agreement prior to

10    filing of the bankruptcy.

11    Q    Now, you've filed for bankruptcy.

12    A    Right.  And then part of that agreement, we can reduce

13    the payments on the notes.  But -- so now we're in

14    bankruptcy.

15    Q    Now, you're in bankruptcy.  Have you investigated what

16    your rights are as a CRO of a debtor with regard to paying

17    the notes or holding off on paying the notes for right now?

18    A    I have not had that conversation with the lawyers.

19    Q    Okay.

20    A    And I would have to talk to them.

21    Q    I get that.  But you haven't looked into that yet,

22    right?

23    A    No.

24    Q    Has anybody told you, you have to make these payments

25    right here, right now, with the cash collateral you're
```

1    seeking from the -- the authority from the Court?  Has

2    anybody told you, you have to do it, you must do it?

3    A    No.  I mean, I don't think I'd be here, because --

4    Q    Okay.  That's fair.  That's fair.  And so, you don't

5    know that you have to do it, right?

6    A    No.  If the Court says no, then we don't have to do it.

7    Q    I kind of like the sound of that.  Let's go to these

8    critical vendors.

9              MR. BATTAGLIA:  Objection to the sidebar.

10             THE COURT:  I'll sustain.

11   BY MR. BRIMMAGE:

12   Q    Let's go to the critical vendors, if we could.  You've

13   already talked a lot about this, so I just want to make

14   sure.  The uniform security, that's a lot of money, right?

15   A    It's a lot of security.  It's 24/7.

16   Q    And is that -- is that -- if Mr. Jones wasn't there,

17   would you still need all that security?

18   A    If he was not in the building that day?

19   Q    Yeah.  Or no, not in the building.

20   A    If he was not in InfoWars at all?

21   Q    Yeah.

22   A    Very probably not.

23   Q    Okay.  All right.  Did you look at that with regard to

24   that -- whether or not that's a personal expense that should

25   be borne by Mr. Jones and paid for with his cryptocurrency

1    money or other money?

2    A    No.  It's an expense.  It's the provided security to

3    the employees working there.

4    Q    Well, but if Mr. Jones wasn't there, you just testified

5    the employees don't need that kind of security.

6    A    Well, they don't need that because there wouldn't be

7    any business.

8    Q    Now, you talked to the Court about the three insurance

9    companies, right?

10   A    Right.

11   Q    And you said, look, there's a lot of important assets

12   here that are vital, right?

13   A    Yes.

14   Q    Can you describe for the Court the difference between

15   the three insurance policies and what they cover?

16   A    Not -- no, I don't -- no.  Just their names.

17   Q    You don't have any --

18   A    Property casualty.  We have general liability and -- I

19   don't know what the third one is.

20   Q    I get that.

21   A    Drawing a blank.

22   Q    Apologize.  I get that.  But you can't describe for the

23   Court the three different policies and what they cover,

24   correct?

25   A    Correct.

008680

```
 1    Q    Has anybody told you that you need all three and you

 2    must pay them right now?

 3    A    Yes.  That was how -- that was the --

 4    Q    Who told you that?

 5    A    Well, no one told me that.  They told the people I put

 6    in charge of preparing this list.  And that was based on

 7    going to the employees and saying, okay, what do you have?

 8    What do you have, what vendors do you use, and tell us how

 9    important they are and what we need -- why we need to have

10    them on this list?

11    Q    You were talking to the Court about this little bit,

12    and you talked about claw back.  Do you recall that?

13    A    On Mr. Jones?  Yes.

14    Q    Well, I'm talking about payments to the critical

15    vendors.  You --

16    A    No.

17    Q    -- this -- you (indiscernible) a little bit?

18    A    Yes.

19    Q    And you started saying it, but you didn't finish.  You

20    said, but if we pay them, we have the right to claw back.

21    But you would agree with me, practically, that's not going

22    to happen, right?

23    A    If they're critical vendors and we want to claw back,

24    we have to assess what's the risk to the business of doing

25    that.  So, there may be a legal right, but it may not be
```

008681

1   something we'd be able to execute on.

2   Q    And even -- that's correct.  And even if you decided

3   you wanted to claw it back and no longer have a relationship

4   with that vendor, the chances are you're not getting that

5   money back, right?

6   A    It'd be a fight.

7            MR. BRIMMAGE:  Your Honor, I'm not going to make

8   my time, but I'm going to keep moving.

9            THE COURT:  Sounds like I need to see the claw

10   back language.

11   BY MR. BRIMMAGE:

12   Q    In your declaration -- I'm going to do some quick hits

13   -- you talked about personal knowledge, relevant documents

14   in your opinion, right?

15   A    Mm hmm.  Yes.

16   Q    You would agree with me that nothing happened -- that

17   happened before your engagement that you have personal

18   knowledge of, right?

19   A    I think I even said that earlier.  But --

20   Q    Okay.  You also said that -- I'm not going to go

21   paragraph by paragraph, but a lot of your testimony is based

22   on conversations with others or stuff you've read but know

23   is true, correct?

24   A    Correct.

25   Q    And at least as we're sitting here today, the Court has

1    no way of knowing when you testify whether or not it's true

2    and you have personal knowledge of it, or whether you're

3    just relying on someone else, and you don't know if it's

4    true; isn't that correct?

5              MR. BATTAGLIA:  Objection, Your Honor.

6    Argumentative.

7              THE COURT:  Yeah.  Mr. Brimmage, can you break

8    that question up a little bit?  I --

9              MR. BRIMMAGE:  I --

10             THE COURT:  -- couldn't follow it myself.

11             MR. BRIMMAGE:  Absolutely.

12   BY MR. BRIMMAGE:

13   Q   We're going back to your testimony and your personal

14   knowledge.

15             MR. BRIMMAGE:  And Your Honor, I think I need to

16   ask the predicate question one more time.  It's a repeat,

17   but it gives me momentum.

18   BY MR. BRIMMAGE:

19   Q   So, you testified that some of the stuff that you've

20   testified to in your declaration and otherwise is based on

21   stuff you've read or been told, right?

22   A   Yes.

23   Q   And some of the stuff you've been -- that you've read,

24   you don't know if it's true or not true, right?

25   A   Some of the stuff I've been told; I don't know if it's

1   true or not true.

2   Q    That was my next question.  Thank you.  So, there's no

3   way for this Court to know when you're testifying in that

4   box whether or not your statements are actually true or not

5   true, correct?

6   A    Nothing that we are looking at in here, including the

7   13-week budget, is based on information that we created.

8   It's information that was -- we compiled from the records of

9   the company we booked.  But everything in there is based on

10  those records.

11           MR. BRIMMAGE:  Let me object as nonresponsive,

12  Your Honor, and let me try it one more time.

13           THE COURT:  I'm going to overrule that.  I think

14  he's trying to answer the question, but I know where you're

15  going.  But you can ask another question.

16           MR. BRIMMAGE:  All right.

17  BY MR. BRIMMAGE:

18  Q    As a fiduciary, do you have an obligation to know what

19  the truth is?  Yes, or no?

20  A    Well, I'm -- you know, sorry, I'm not a philosopher,

21  but I can tell you I can -- I have an obligation to tell the

22  truth as I know it.  But I may not know the truth.

23  Q    And if you don't know the truth, as a fiduciary do you

24  have an obligation to not make a statement unless you know

25  it's true?

```
 1    A    If I believe it's true, then I believe it's true, then

 2    I may -- and I may be wrong.  If I knew it wasn't the truth,

 3    I wouldn't say it.

 4    Q    But you could believe it's true based on something you

 5    read or heard, right?

 6    A    I could believe it's true based on an analysis of a

 7    schedule.

 8    Q    The last paragraph of your declaration says, "I declare

 9    under penalty of perjury that the foregoing is true and

10    correct."  Do you recall that?

11    A    Yes.

12    Q    Okay.  Who drafted your declaration?

13    A    For the most part, Mr. Lee drafted a lot of it, and I

14    drafted a lot of it.

15    Q    When you drafted it and put like a citation of where it

16    came from, so-and-so's deposition, was that you or Mr. Lee,

17    or somebody else?

18    A    That -- well, my understanding that it was Mr. Lee.

19    Q    Okay.  All those citations were not yours, right?

20    A    Correct.

21    Q    Those came from Mr. Lee, right?  And do you recall the

22    deposition that was cited in here?  I'm looking for it for

23    the name and I don't recall it.

24    A    Jacobson.

25    Q    Jacobson.  Did you read Jacobson's deposition?
```

008685

 1   A    I don't recall reading it.

 2   Q    I think that's what you testified to before.  I just

 3   wanted to see if that -- if I heard it right.

 4        Let's go to the bankruptcy filing, in your head.

 5   You've already talked about this, but I had a follow-up.

 6   Paragraph 11 is the one you talked to counsel about already,

 7   about -- in the district for 180 days, right?  Did you rely

 8   on counsel in making that checkmark on that box for this

 9   document?

10   A    Yes.

11   Q    Okay.  I think you said the case law you saw -- did you

12   read cases to help you get comfortable with checking that

13   box?

14   A    I read the -- I read the case; I understand which is

15   the one we're relying on by Judge Hale.

16   Q    But what case is that?

17   A    I knew you were going to ask me that.  Erg, or

18   something like that.  E-R-G, maybe, something like that.

19   Q    Judge Hale?

20   A    Judge Hale of the Western -- up in Fort Worth.

21   Q    Okay.  The Northern District of Texas?

22   A    Yeah.

23   Q    All right.  Who gave you that case?

24   A    I believe Mr. Lee gave it to me.

25   Q    Okay.  And when Mr. Lee gave it to you and when you

008686

1    read that case, did you ask, what does it mean when it says

2    principal assets in this district?  Did you ask that

3    question of any -- Mr. Lee or anybody else?

4    A    I don't recall.  We looked at -- I looked at that case

5    back in the filing of the first bankruptcy.

6    Q    Okay.  Do you know what in this district means?

7    A    Yeah.  I assume it refers to the Federal District.

8    Q    Do you think it means the Southern District of Texas,

9    where this Court is sitting?

10   A    That's the way I always interpreted it.

11   Q    Okay.  But just to summarize, you don't recall -- you

12   testified there are no assets of FSS in the Southern

13   District, right?

14   A    Not that I'm aware of.

15   Q    Okay.  Okay.  All right.  I might get in trouble for

16   going over this because you talked to the Judge about it a

17   little bit.  So, I would like to follow up a little bit.

18   A    Okay.

19   Q    This is the discussion you had regarding when you were

20   the CRO -- you still are -- for what I call the InfoWars

21   Debtors, right, the three?

22   A    Yes.

23   Q    Right?  And your declaration or your statement of

24   disinterestedness, right?

25   A    Yes.

```
1    Q    And the involvement of FSS, that wasn't disclosed to

2    the Court or anybody else, right?

3    A    Correct.  When you say anybody else, I mean the people

4    involved with the InfoWars that were aware of it.

5    Q    Okay.  The public wasn't aware, right?

6    A    I don't believe so.

7    Q    And the Judge wasn't aware, right?

8    A    No.

9    Q    And the Plaintiffs' lawyers from Texas and Connecticut

10   to the best of your knowledge weren't aware or made aware,

11   right?

12   A    To the best of my knowledge.

13   Q    When you say that you were disinterested, what does

14   that mean to you?

15   A    Well, I'm -- in my opinion, it means I have no

16   conflict.  I -- there's no party that I'm involved with is

17   adverse or has an interest in what I'm doing.

18   Q    Did FSS play a role at all in the InfoWar bankruptcy?

19   A    FSS agreed to provide -- was going to provide cash flow

20   to the settlement fund.

21   Q    And who on behalf of FSS was going to authorize that or

22   approve that?

23   A    That would have been Mr. Jones.

24   Q    Mr. Jones.  And you were -- but you were the CRO at the

25   time of the InfoWar entities, right?
```

```
1    A    I was CRO of the InfoWar entities.

2    Q    Right.  So FSS was a counterparty that was going to

3    provide money to fund some of the issues in the InfoWar

4    bankruptcy, right?

5    A    Yes, under the Plan Support Agreement.

6    Q    And FSS had their own counsel, or did they have the

7    same counsel?

8    A    I have no idea who FSS's counsel was in that.

9    Q    Okay.

10   A    I don't know.

11   Q    You don't know?

12   A    Mm mm.

13   Q    When you were the CRO of the InfoWar Debtor entities,

14   did you have fiduciary duties then?

15   A    Through those Debtor entities, yes.

16   Q    Did you have fiduciary duties at that time to FSS?

17   A    Not that I'm aware of.

18   Q    Okay.  Let me ask you just a couple of what I think are

19   follow-up questions.  This goes back to the general ledgers

20   that were a mess when you arrived on the scene.  Do you

21   recall that discussion?

22   A    We had several, I believe so.

23   Q    Okay.  Does Melinda Flores ring a bell to you?

24   A    The name does, yes.

25   Q    Who is that?
```

1   A   She was the -- I think her title was Controller when I

2   came on the scene as CRO of FSS.

3   Q   And do you know what time period she was responsible

4   for preparing the FSS books?

5   A   As I recall, she closed the 2020 books.  So, at least

6   sometime in 2020, if not prior thereto.  She may have been

7   there in 2019.  I just don't -- you know -- I might have

8   heard that.  I don't know.  I know she closed the 2020

9   books.

10   Q   You haven't looked into that at this point, right?

11   A   Yeah.  Unless -- I mean, unless someone shows me

12   there's a need for me to look into --

13   Q   Okay.

14   A   -- her administration.

15   Q   Okay.  All right.  Okay.

16          MR. BRIMMAGE:  Your Honor, if I can just have like

17   60 seconds for a quick --

18          THE COURT:  Absolutely.  Take your time.

19          MR. BRIMMAGE:  -- and continue my -- I'll consult

20   with him, but I'm also going to look at my notes real quick.

21   BY MR. BRIMMAGE:

22   Q   Mr. Schwartz, just a couple more final questions.  And

23   thank you for your patience.  Have you assisted in preparing

24   any of the witnesses that have been deposed in any of these

25   State Court actions?

```
1    A     No.  Oh, wait a minute.  Excuse me.  There was a --

2    yes, I did talk to somebody.

3    Q     Do you recall who the somebody was?

4    A     She was a corporate rep.

5    Q     Corporate rep for who?

6    A     That I don't know.  I assume FSS, but I don't know.

7    Q     Why did you help prepare this witness?

8    A     Because the knowledge we had gained on the accounting

9    and accounting records, I was asked to talk to her and

10   answer specific questions she might have to fill out her

11   knowledge.  Because prior to what we had done, the

12   accounting records were absolutely unreliable for '21 and

13   '22.

14   Q     And you don't know if you talked to her because she was

15   being deposed on behalf of FSS or some other entity,

16   correct?

17   A     She was being deposed.  I remember that.  And --

18             THE COURT:  Do you recall when that was?

19             THE WITNESS:  Might have been early in July, is

20   what I think; mid -- maybe mid-July.  But it seems like by

21   then we were heavy into --

22             THE COURT:  Okay.

23             THE WITNESS:  -- other stuff.  But we were -- it

24   had taken us until then to get enough of the accounting

25   records up to date where they were usable information coming
```

008691

```
 1    out.

 2    BY MR. BRIMMAGE:

 3    Q    Could it have been June 27th that the deposition took

 4    place?

 5    A    Is it -- Brittany is her name?

 6    Q    Brittany Paz?

 7    A    Yeah.  Okay.  If that was the date, then it was a

 8    couple of days prior to that.

 9    Q    It was prior to that, right?

10    A    Yeah.

11    Q    So you had been on the scene --

12    A    Not long.

13    Q    Less than a month?

14    A    Yes.

15    Q    Right?  All right.  With books and records that are a

16    mess, right?

17    A    Yep.

18    Q    Okay.  Have you read any of the Plaintiffs' lawsuit

19    complaints?

20    A    I read the -- was that the Fourth Amended Complaint, I

21    believe by the Connecticut complainants.  I read that

22    recently.

23    Q    Any others?

24    A    I don't -- I probably read some of the Texas complaints

25    at some point in this process.  Seems like I did but then --
```

```
 1    I had to read the Fourth for some --  I guess recently to
 2    prep for, I think, for something -- for some of this stuff
 3    this week.
 4    Q    Are you keeping up with the Austin trial?
 5    A    Very little time to keep up with that then.
 6    Q    You would agree with me that the Austin trial result
 7    could have a significant impact on this bankruptcy, right?
 8    A    I don't know.  I mean, it's going to -- I expect to
 9    have a big judgment, and if we don't have a big judgment,
10    even a little judgement's going to have a -- both would have
11    an effect on the bankruptcy.  We have to recognize that.
12    Q    What is a big judgment?  What effect does --
13    A    I know that I understand that the Plaintiffs' opening
14    statements they asked for $145 million.  That would be a big
15    judgment.
16    Q    And if there's a big judgment, what impact do you
17    foresee on this bankruptcy?
18               MR. BATTAGLIA:  Objection, Your Honor.  Calls for
19    speculation.
20               THE COURT:  Yeah, well, just find out where we're
21    going with this one, Mr. Brimmage?
22               MR. BRIMMAGE:  Yeah.  Where I'm going, Your Honor
23    --
24               THE COURT:  Might have gone out of bounds on it.
25               MR. BRIMMAGE:  Absolutely.  I think what we're
```

008693

 1    hearing is that Mr. Schwartz has done nothing -- well, I'm

 2    going to say this, and then I'm going to try to elicit the

 3    testimony, so here we go -- has done --

 4              THE COURT:  Well, just --

 5              MR. BRIMMAGE:  -- nothing to look after the

 6    Plaintiffs' --

 7              THE COURT:  Well, no, no.  Just elicit the

 8    testimony and then you can make the argument at the end.

 9              MR. BRIMMAGE:  Okay.

10    BY MR. BRIMMAGE:

11    Q    Let me ask you this.  You already -- we've already

12    talked about, and you already testified that you've not done

13    anything to assess or analyze the veracity of the various

14    lawsuits by the Plaintiffs across the country, right?

15    A    Correct.

16    Q    And if you are not looking after those potential or

17    actual unsecured, unliquidated, contingent creditors, whose

18    job in this bankruptcy is it to look after them?

19    A    I'm not sure what you mean by not looking after them in

20    this.  My job, as I understand it, and always understood it,

21    is to -- is to get the estate back onto a reasonable basis

22    and generating income, whether that's going to sufficient to

23    pay the creditors or not.  But I can't do anything more than

24    protect the assets and try to increase the value of the

25    estate.  That is -- I mean, I'm not a tryer of fact, so I

 1   can't do much on the case side.

 2   Q    I appreciate that.  But it's -- you don't believe it's

 3   your job to look after the various Plaintiffs and their

 4   unsecured claims in this case; is that correct?

 5            MR. BATTAGLIA:  Your Honor, I'm going to object.

 6   I think he answered that question --

 7            THE COURT:  Yeah.

 8            MR. BATTAGLIA:  -- in his prior answer.

 9            THE COURT:  I think he's answered the question,

10   Mr. Brimmage.

11            MR. BRIMMAGE:  All right.  I appreciate it, Mr.

12   Schwartz.  Your Honor, what I'm getting at is we need a Tort

13   Committee.  Thank you.

14            THE COURT:  Thank you.  Mr. Lemmon?

15            MR. LEMMON:  Thank you, Your Honor.

16   BY MR. LEMMON:

17   Q    Mr. Schwartz, you and I have known each other

18   professionally for over 30 years, right?

19   A    Since you were a baby lawyer.

20   Q    Yes, sir.

21            MR. BRIMMAGE:  Your Honor, just (indiscernible) --

22            THE COURT:  I was going to --

23            MR. BRIMMAGE:  -- because it seems

24   (indiscernible).

25            MR. LEMMON:  I'm getting to that point with my

```
 1    next question, Your Honor.

 2              THE COURT:  Let's see where this goes.

 3    BY MR. LEMMON:

 4    Q    But in this case, our relationship has been -- we've

 5    got a good relationship, you and I, professionally and we're

 6    friendly, aren't we?

 7    A    Most of the time.

 8    Q    Okay.  In this particular case, our relationship has

 9    been adversarial; is that correct?

10    A    Extremely so.

11    Q    Now, you remember, and you've been asked about the

12    discussions -- the negotiations about the forbearance

13    agreement, right?

14    A    Are you asking me if I remember the negotiations?

15    Q    Right.

16    A    I sure do.

17    Q    And those negotiations were heated, weren't they?

18              MR. BRIMMAGE:  (Indiscernible).

19              THE COURT:  Yeah.

20              MR. LEMMON:  Your Honor --

21              MR. BRIMMAGE:  (Indiscernible).

22              MR. LEMMON:  Your Honor, I'm adverse --

23              MR. BRIMMAGE:  (Indiscernible).

24              THE COURT:  Let me ask this.  How are you adverse

25    to -- at this time?
```

1              MR. LEMMON:  I'm adverse to the Debtor with

2     regards to issues concerning the cash collateral.  I have,

3     on behalf of my client, consented to the form of order that

4     was proposed by the Debtor.  But that was also after

5     negotiations.  So, I am not opposed to the relief that the

6     that the Debtor is seeking on an interim basis today.  But I

7     want to make clear my client's position and our

8     separateness.  And my client's position has been attacked

9     here today.

10             THE COURT:  I think you've done it.  I think you

11    done it.

12    BY MR. LEMMON:

13    Q    Why was the forbearance agreement important from the

14    Debtor's perspective?

15    A    The forbearance agreement, we needed -- needed the

16    reduction in the cost of the processor fee.  We needed to

17    change the ratio of sharing the sales proceeds.  Those two

18    were critical to the survival of the Debtor.

19    Q    And is the Debtor trying to change its business plan;

20    in other words, I mean the way it does business, the way it

21    acquires product and sells product?

22    A    Well, yes and no.  We are trying to be much more

23    selective in the product we acquire.  We are trying very

24    hard to separate so it's clear what's our product and what

25    is not because we think we get higher margins on our

```
 1    product.  I shouldn't say ours -- the FSS's.  From the
 2    standpoint of the overall business operation, it needs
 3    organization.  It needs a lot of training.  Personnel are --
 4    grew up in their jobs, but they don't know what they should
 5    be doing and what they --how they should be making decisions
 6    and on what data they should be making decisions.
 7    Q    Is the Debtor attempting, in part, to transition away
 8    from mostly buying products from my client to buying
 9    products on its own?
10    A    Yes.
11              MR. BRIMMAGE:  Objection.
12              THE COURT:  Yeah, and Mr. Lemmon, I think none of
13    us discussed any of this.  I'm going to, kind of, keep you
14    within the bounds of where things are going.  So, if you've
15    got a couple of questions, I'm --
16              MR. LEMMON:  Thank you, Your Honor.
17    BY MR. LEMMON:
18    Q    Do you have an estimate of the legal expenses that the
19    Debtor has incurred in the Sandy Hook litigation?
20    A    I have a number, which from the accounting records, I
21    do not believe it's accurate.  And the reason is, the
22    recording of entries and legal fees don't -- the description
23    does not always tell you what case or even what firm it
24    relates to.  But best that what we can identify is what we
25    know being related to this -- the Texas case is, it's a --
```

1           MR. BRIMMAGE:  Objection.  (Indiscernible).

2           THE COURT:  Yeah, I'm going to let him finish the

3     answer because I think he's just giving his thoughts.  But

4     again, I'm -- those kinds of questions about cash collateral

5     or the critical and the emotional, I'll let you go there,

6     Mr. Lemmon, but is it really -- I just -- with your client,

7     those are cash collaterals are nothing that you're

8     interested in.

9           MR. LEMMON:  That's true, but I believe that this

10    question has to do, in part, with that.  And so, if the

11    witness could be allowed to finish his question -- his

12    answer.

13          THE COURT:  Okay, well, I'll allow it.

14    BY MR. LEMMON:

15    A    From what I can tell, FSS identified payments of

16    approximately $4.5 million through 2022, from 2018 through

17    2022.

18    Q    You were asked a few questions about cryptocurrency,

19    and whether that cryptocurrency was cash collateral.  Do you

20    recall having discussions with me and with my client where

21    we were trying to establish that it was cash collateral?

22          MR. BRIMMAGE:  Objection.  (Indiscernible).

23          THE COURT:  Sustained.

24    BY MR. LEMMON:

25    Q    Do you recall any discussions with me and my client on

1    that subject?

2    A    Yes.

3    Q    And to your knowledge, do you know whether we did an

4    investigation trying to prove that it was cash collateral?

5              MR. BRIMMAGE:  Objection.  (Indiscernible).

6              THE COURT:  Yeah, I'm going to sustain that.  Mr.

7    Lemmon, if your client has a position on it, then they can

8    file something or make an argument about it.  But whether

9    you've done an analysis or not, I'm sure you'll tell me at

10   some time, at some point.

11             MR. LEMMON:  Thank you, Your Honor.

12             THE COURT:  But all your rights are reserved.  I

13   mean --

14             MR. LEMMON:  Of course.  Thank you.  Thank you,

15   Your Honor.  That's all I have.

16             THE COURT:  Okay.  I'll give you a brief redirect.

17             MR. BATTAGLIA:  Your Honor, I'll be

18   proportionately brief.

19             REDIRECT EXAMINATION OF W. MARC SCHWARTZ

20   BY MR. BATTAGLIA:

21   Q    So, you were asked an awful lot of questions on cross

22   about the things that you haven't done about validating Mr.

23   Jones' draws, about validating or examining the precise

24   amounts that were advanced by PQPR, about valuating the

25   Plaintiffs' litigation claims.  Tell me again when you were

 1    retained.

 2    A    June the 6th of 2022.

 3    Q    And tell me again when this bankruptcy case was filed.

 4    A    July 29th.

 5    Q    Good Lord, Mr. Schwartz, what have you been doing?  Why

 6    haven't you evaluated those matters?

 7    A    We have spent most of that time, substantially all of

 8    the time, getting accounting books up to date so we could

 9    determine what our cash flows looked like and what we --

10    whether we could or could not even file.

11    Q    And what amount of your workday is focused on FSS

12    business?

13    A    Post-petition?  I get about two hours a day, if I'm

14    lucky, on the business side.

15    Q    Okay.  But on the non-business side of FSS, total time

16    delegated to FSS?

17    A    Oh, my total time on FSS is -- honestly speaking, I'm

18    not the only one, but it's easy eight to nine hours a day.

19    Q    And are there -- how many people within the Schwartz

20    and Associates firm are dedicating time to the FSS file?

21    A    Four and a half or so.

22    Q    And you mentioned a Mr. Schultz, Schultz --

23    A    Schultz, it's pronounced Schultz.

24    Q    How much of his time is being dedicated towards FSS?

25    A    He's full-time.

1    Q    And so, all these people dedicating all this time,

2    again, you mentioned getting the books and records, what

3    else have you focused on, aside from getting the books and

4    records in a usable state?

5    A    Trying to figure out why we are constantly being

6    surprised with invoices that we didn't know were sitting out

7    there getting old.

8    Q    What about product orders?

9    A    Product orders.  Yes, definitely product orders and

10   reconciling deposits.  For example, we have one vendor that

11   we -- $1.5 million was sent to, a little over $1.5 million,

12   and $1,350,000 worth of product was actually ordered.  We

13   have a 250-something thousand- dollar credit sitting there,

14   which we were unaware of.  We had to find that, reconcile

15   that, and discuss that with Mr. Jones.  Why is that here?

16   Q    So, your focus has been on normalizing the business of

17   this juncture?

18   A    Yes.

19          MR. BRIMMAGE:  Your Honor, objection.  Leading.

20          THE COURT:  Sustained.

21   BY MR. BATTAGLIA:

22   Q    What has your focus been on this since your engagement?

23   A    I've been trying to get my arms around it and get it

24   into a standard operating mechanism where people go to work,

25   they know what their job is going to be that day, they do

1    it, and we get rid of the last-minute catastrophes that have

2    to be handled.  And that stated, we are literally right now

3    in the -- oh, you've got to pay this bill because, you know,

4    it's way past due and we're going to get cut off.

5    Q    In order of priority, to protect and preserve the value

6    of the estate and generate revenue, what are the most

7    important things to do?

8    A    Get control of the costs and get the revenue coming in

9    the door.

10   Q    Where does evaluating Alex Jones' draw come on that

11   list?

12   A    That comes when you've got all -- got the business

13   running on an even keel, maybe I can start those processes.

14   Q    Where does evaluating the PQPR debt?

15   A    It comes in the same category.

16   Q    Where does evaluating the Plaintiffs' claims fit in

17   that regard?

18   A    Well, right now, with them sitting in the courts, I

19   mean, the Court's going to determine the Plaintiffs' claims.

20   I don't -- it's hard for me to see what I need to do to

21   evaluate -- to quantify the Plaintiffs' claims.  It's not a

22   matter to come to me.

23   Q    What is your role in the litigation, the Plaintiffs'

24   litigation?

25   A    I'm -- obviously, to the extent there's discovery, my

```
 1    role is to cooperate and assist in that, try to make sure --

 2    I have the perception that information was requested that we

 3    didn't have, or at least I've been told that that's not

 4    something we track.  But that clearly was not made known,

 5    and I also have a perception there was a lot of stuff put

 6    out there by people who just didn't know what they were

 7    doing.

 8    Q     Did Debtor have legal representation in both of those

 9    lawsuits?

10    A     Yes.

11    Q     And it's not Mr. Lee or myself?

12    A     Correct.

13    Q     What is your intention regarding investigating the

14    matters that have been discussed here, the Alex Jones draws,

15    the note balance, and ultimately, I guess, the Plaintiffs'

16    claims?

17    A     Well, there are a number of -- they fall in the

18    category of the number of deadlines we have to investigate.

19    And they are, you know, once we get past fire drill and get

20    this thing under control, which hopefully is within sight of

21    happening, we have to do a little bit more hiring.  Then we

22    can turn around and start, you know, get into the more

23    routine -- supporting the bankruptcy, supporting the Chapter

24    5 Trustee, and starting to evaluate and investigate the

25    claims.
```

008704

1   Q    You were asked a series of questions regarding Mr.

2   Jones' draw -- historical draws and salary.  I want to visit

3   that a little bit here.  You've at least reviewed, from the

4   general ledger, what the distributions were to Mr. Jones for

5   the period from 2012, say, to 2022?

6   A    I've seen them, yes.

7   Q    And how -- there were some questions asked about post-

8   April 2018 draws.  Can you tell the Court, comparatively

9   speaking in the three or so years before 2018 or four years

10  -- and the four years following 2018, were they different,

11  the same?  How did they compare?

12  A    No, the draws declined following 2018 from the previous

13  period.

14  Q    The Debtor broadcast, the primary broadcast that FSS

15  transmits is called what?

16  A    The Alex Jones Show.

17  Q    Huh.  Is he important to that show?

18  A    Very much so, yes.

19  Q    In your opinion, is Mr. Jones valuable to FSS in his

20  ability to generate revenue in the future?

21  A    Yes, very much so.

22  Q    Why is that?

23  A    He has -- he's a salesman.  He's a -- his forte is

24  selling, and he's very, very, very good at it, and he can

25  sell to his audience.

1    Q    In your opinion, who at FSS is more valuable than Alex

2    Jones?

3    A    Who is more valuable?

4    Q    Yes.

5    A    Nobody.

6    Q    Do you have an opinion as to whether or not a salary of

7    a $1.3 million is appropriate for Mr. Jones and what he

8    contributes to this venture?

9    A    Well, I don't think it's anywhere near representing the

10   value that he provides.  It's quite appropriate from the

11   standpoint of FSS.  You know, it's good for FSS because I

12   think it's far below, way below what he could achieve and

13   has achieved in the past.

14   Q    You were asked some questions about why did FSS file

15   and I think you said something about because of the state of

16   litigation.  What other purposes were primary in your

17   decision to proceed with filing?

18   A    Well, the other purpose is, as I pointed out, the --

19   this organization, this business needs to be reorganized.

20   It has to become -- it's -- it does not have the internal

21   information loop to identify when it's heading into the

22   ditch and to help it make decisions to avoid that.  It has

23   gotten itself in the position where he has to get fully into

24   the ditch until it realizes it has a survival problem.  That

25   takes a reorganization and rethinking.  That takes managers

008706

1   who begin to monitor the financial information related,

2   their operation and the overall operation.

3   Q    In 2021, now that you've closed the books, to what

4   degree was the Debtor profitable or unprofitable?

5   A    It was unprofitable.  It lost about $10 million in

6   2021.

7   Q    And to date, has that trend changed?

8   A    Well, through May 31st, I think we reported a profit

9   around a million dollars or so, but a significant part of

10  that was donations.  Donations are not operating results, so

11  it's hard to account for them.  So, it's definitely improved

12  from what it was in 2021, but I don't think we're anywhere

13  near a sound basis yet.

14  Q    Lots of questions about accounting issues, which you

15  were asked on direct and cross and everybody wants to call

16  it mess and terrible.  Was the ledger, at least up to 2021,

17  reliable?

18  A    It appears to be, yes.

19  Q    And the problem in 2022 is, that there had been no

20  postings as of --

21  A    Correct.

22  Q    Okay.  So, what information that was necessary to close

23  2021 and to book entries in 2022 was not made available to

24  you?

25           THE COURT:  I think you've covered that road.  I

Page 236

```
 1    think you've covered that road, Mr. Battaglia.

 2    BY MR. BATTAGLIA:

 3    Q    I just want to ask, have you been provided access to

 4    all the information you need to do your job?

 5    A    Yes.

 6              MR. BATTAGLIA:  May I have one minute with my co-

 7    counsel?

 8              THE COURT:  Absolutely.

 9              MR. BATTAGLIA:  I'll pass the witness.  Thank you,

10    Mr. Schwartz.

11              THE COURT:  Okay.  I think I'm ready.  I want to

12    note two technical things and then I'll get into the

13    rulings.  One is -- and I'm going to consider it an

14    oversight, but I want it corrected today.  I looked at the

15    Debtor's petition, voluntary petition, and Mr. Battaglia,

16    you didn't sign it.  I need you to sign it today.  It's --

17    I'm just looking -- I don't -- I see where your name is

18    listed, but I don't see -- I'm going to share my screen.

19    I'm going to consider that just an oversight, but I want it

20    corrected.  It's required on a voluntary petition and that's

21    what I see on the voluntary petition, so I want that

22    corrected.  I want it corrected today, unless there's an

23    amended on file, and if there is, someone let me know.

24              This case was filed in the Victoria Division and

25    in May 19th -- on May 19th, excuse me.
```

1          MR. BATTAGLIA:  (Indiscernible) this case?

2          THE COURT:  No, no, no.  I'm saying -- I'm saying,

3     this case was filed in Victoria and on May 19th --

4          MR. BATTAGLIA:  Okay.

5          THE COURT:  -- Bankruptcy Court entered a General

6     Order 22-3.  It deals with Division of filing locations, and

7     it amends Local Rule 1002-1, and it says, (indiscernible)

8     that cases must be filed in the division of the Debtor's

9     principal location.  Principal location, if the Debtor has

10    none, the principal location is the Houston Division, and

11    that's what would have qualified in this case.

12          I'm going to -- you know, (indiscernible) the

13    Houston Division, based on my experience with the prior

14    cases and the efficiency and the best interests of the

15    estate, I'm going to transfer the case to the Houston

16    Division, and I'm going to transfer it to myself and keep

17    the case and we're going to keep the same case number.  But

18    it should be in Houston.  I want to make sure that we're

19    observing the local rules as done.  Parties have their

20    rights, but I want to make sure that those two technical

21    things, one I'll take care of on the back end, one, Mr.

22    Battaglia, you need to sign a declaration.

23          So, that -- but before the Court are two matters,

24    the utility -- I've signed schedules extension that's on the

25    docket.  Utilities you're going to tweak.  What's left now

1    is cash collateral and the critical vendor motion.

2            And let me just excuse you.  You can have a seat.

3            Here's what I'm going to do.  I'm both -- I'm just

4    going to note that notice of today's hearings was proper,

5    the Court considered the evidence on the record, as well as

6    the testimony of Mr. Schwartz.  I appreciate Mr. Schwartz's

7    candor and his testimony.  Some of it I found very helpful.

8    Some of it I found honestly troubling.  Some of it is not

9    surprising for a Debtor early on in a case.  Management may

10    not be completely able to have its arms around a case so

11    that doesn't surprise me.  But everybody knows why these

12    last cases were filed, or the driving impetus, but driving

13    the last case and this case and that's -- there are some

14    major lawsuits going on in Austin and in Connecticut, and

15    they're very serious lawsuits that make some very serious

16    allegations.

17            It's not for me to comment on the merits of any of

18    them.  Those processed -- the process in Austin will run and

19    I don't want to say anything one way or the other about

20    what's happening in that lawsuit.  I just know that it is a

21    significant action, and I do know, and I don't want to make

22    light of it, that there are some -- they are real people and

23    real faces behind each one of them, they're real Plaintiffs

24    who have experienced real pain.  And I think Mr. Jones is --

25    and these Debtors are entitled to put on their defense and

```
 1      it's not for me to comment one way or the other.  I just

 2      know that there's a lot of seriousness and I take it as

 3      such.

 4            And so, I take each case that is filed before me

 5      with the same degree of focus, preparation as one would hope

 6      that a bankruptcy judge would.  And I've took the last cases

 7      really seriously and prepared really hard and I've done the

 8      same here.

 9            So, there's two motions here, and really the

10      question is, is how you stabilize the company now.  There's

11      also been -- there's been oral request for the appointment

12      of a committee, and that can be done by the Court for cause.

13      I'm not going to grant that today, but I am going to express

14      some real concerns about what I heard, and I'll express what

15      they are.

16            You know, whether you realize it or not, Mr.

17      Schwartz was negotiating on both sides of a deal.  And what

18      was represented to me in the last case was that there was --

19      the parties were going to propose mediation and there was a

20      Plan Support Agreement and asking me to approve  Plan

21      Support Agreement entry into where parties were going to try

22      to -- at least what was stated to me in the last case was

23      that, parties were going to ask for mediation and to try to,

24      you know, ask the Plan, there were milestones, and third-

25      party contributors consisting of Mr. Jones and Free Speech
```

```
 1    were at least offering to put some money on the table to see
 2    if there could be a deal that was worked out and that didn't
 3    happen.  And I'm not saying it should have happened.  Again,
 4    I'm just saying the fact it did not happen, so I'm not
 5    saying there was not a good reason that it shouldn't have
 6    happened.  Again, I'm just pointing to the fact that that
 7    did not occur.
 8              But Mr. Schwartz, you spoke with both third-party
 9    contributors at the time, and at least what you're telling
10    me, Mr. Lee was involved as well at the time, then both
11    parties were representing the InfoW Debtors who were --
12    quite frankly, membership interests had been transferred to
13    a trust.  And so, I haven't fully thought through, but I'm
14    concerned that you still may represent the InfoW Debtors as
15    their CRO and how you're purporting to act as the CRO in
16    this case.  And I don't -- at some point, someone's going to
17    have to make some really hard decisions.  I'm -- quite
18    frankly, I'm a little surprised you hadn't read some of the
19    litigation because at least InfoW was involved in the
20    litigation for every one of these last time.  So -- and that
21    was supposedly the purpose of the litigation.
22              So, I'm a little surprised that the CRO is telling
23    me today that he hasn't read, at least, the -- or has a good
24    working knowledge of the lawsuits, including the fraudulent
25    transfer litigation.  I didn't know whether the fraudulent
```

1  transfer litigation has any merit.  I don't know whether --
2  I've heard today about the potential indemnity that Mr.
3  Jones may have against FSS.  And you may file a proof of
4  claim.  He may file a proof of claim, he may not.  That's
5  not surprising in a case whereas -- but the Debtor is going
6  to have to make some tough decisions at some point.  And
7  it's going to have to really analyze those claims and see
8  whether those claims have any merit and whether there are
9  claims that the estate has that it may bring on its own, and
10  I don't know if there are any.  That's certainly not for me
11  to comment on, but someone's going to have to do the hard
12  work, and I don't know how that hard work gets done from
13  what I'm hearing.
14       And I'm not sure that parties who were introduced
15  in the last case could fill that role either.  But the
16  Debtor needs to hear that from me, and I think debtors are
17  entitled, especially early on in a case, to think about what
18  the judge may have to say.  And these are certainly rare
19  comments, but these are certainly uncommon cases.
20       And I don't want to -- there's a request for the
21  appointment of a Tort Committee and I think it's not wholly
22  unfounded to ask for one.  And I think I owe them a real
23  answer as to why I'm not going to appoint one today.  The
24  fact that a Debtor has got to get its books right, that
25  doesn't surprise -- that's -- I think professionals can get

 1    their hands wrapped around that and can drink from the

 2    firehose from it and stabilize the company.  But I think

 3    there's going to be some hard decisions that have to get

 4    made, and maybe the answer is that there are no claims.

 5    Maybe the answer is that everybody's entitled to what

 6    they're saying they are.  Maybe the answer is that, you

 7    know, the secured creditor is a valid secured creditor, it's

 8    a validity priority to the extent that there's liens that's

 9    valid.  I have no idea, but I know somebody's got to go do

10    that work.

11            Someone has to do the hard work on that, and I

12    don't know who is going to do the work.  I don't know who is

13    going to make the call if there really is something there to

14    do.  And I think the Debtor is going to have to really give

15    some thought about who is truly independent and whether

16    someone can convince me otherwise about that.

17            But for purposes of today, I'm not going to

18    appoint one, but certainly it's without prejudice and maybe

19    I hear something that tips me over.  I'm sure this is not

20    going to be the last time a request is made, but I do read

21    it as my call.  Mr. -- but I do know that if I do appoint

22    something or authorize one, that I will turn it over to the

23    Office of the United States Trustee, who will then do their

24    work.  I won't get involved in that part of it.  But I'm not

25    going to appoint one today.  I think the Debtor has to think

008714

```
 1    about what I'm saying today.
 2              But for purposes of today, I'm going to authorize
 3    the use of cash collateral on a limited basis.  And here's
 4    what I'm going to approve on this, and I've got a, kind of,
 5    an additional request at the end.  I have a line item,
 6    "Outsource Services/Consulting Services", there'll be
 7    repayments on those.  That's about $45,980, $22,670.  I've
 8    heard no evidence that any of that is an emergency and
 9    should be authorized today.  You can come ask for it on a
10    final.  It's without prejudice but will not get paid in the
11    interim.  The American Express bill, no.  It's about
12    $172,000.  That bill will not be -- I'm not authorizing
13    payment on -- any payments on that card.  You can ask for it
14    on a final.  Mr. Jones' employment salary.  I think the
15    parties had initially talked about a reduction to $20,000.
16    I'll authorize the payment of $20,000 for Mr. Jones.  I
17    think the employees -- my understanding is that none of the
18    work that they would be paid for is pre-petition and I want
19    -- the employees do the work, they should get paid.  So, I'm
20    going to authorize the payments up to the amounts.
21              The language that the (indiscernible) Plaintiffs
22    requested in their objection must be put in any order.  I
23    also want in the order, that I am also making no findings --
24    and this order won't be construed in any way in a similar
25    way with respect to any donations that we heard about today,
```

008715

1    restricted, unrestricted, how they can be used.  I'm making

2    no findings about that.  I want to make sure that the order

3    also says that no draws are permitted in my interim order.

4          I'm going to set a final hearing on this on -- I

5    think the parties can do it August 15th I think is when cash

6    collateral runs out anyway.  Come back on August 15th at

7    10:00 a.m., and we'll just go till we're done on that.  It's

8    going to be an interim order.

9          Before the order, Mr. Schwartz, it says that it's

10    in evidence.  Your engagement letter says that you were

11    delegated those managerial duties, either Paragraph 8.01 of

12    the Free Speech Systems Company Agreement.  I don't know

13    what that is, and I want you filing it.  I want -- to the

14    extent if it's -- I don't -- I think it should be a public

15    document.  But if anybody wants to tell me it should be

16    filed under seal, it should be.  But if a CRO is going to --

17    I need to understand what your role is and what those

18    managerial duties are under 8.01.  I want that filed on the

19    Docket so all parties can see and have the ability to ask

20    questions about it.

21          And will tell you, on the -- it sounds like under

22    the budget, some of those are buckets based on historicals,

23    and that's fine.  Mr. Schwartz, you're to use your judgment.

24    I don't want to hear about some insider payments.  I don't

25    want to hear about something -- use your judgment.  If it

1    borders on problematic, the answer is kick it to the final.

2            With respect to the critical vendor motion, I'm

3    going to authorize -- I'm going to grant the critical vendor

4    motion.  But Subchapter 5 Trustee and -- has to be involved

5    and it has to see what -- exactly where these payments are

6    going to go.  It sounds like there are buckets here and I

7    want to know that these payments are being made in the

8    ordinary course of business.  In other words, if there's a

9    payment due at the end of the month, nothing is getting

10   prepaid.  If the bill is due and it's one of those entities

11   and the bill is $20,000, then that's just what they're going

12   to pay before they come to a final.  They can come ask for

13   the remainder at a final.

14           I want to see the order for the claw back.  I will

15   assure, you know, that I want that order to have some teeth.

16   And I'm not asking for anything extra and what is ordinary

17   in a critical vendor motion in the Southern District of

18   Texas.  There are plenty of examples of that.  Mr. Brimmage

19   has seen them a million times.  I'm sure Debtor's counsel

20   has seen them as well, and the Trustee can point to a

21   million examples.  Everybody knows what the standard

22   language looks like.  Put it in there.

23           But if I sign the order, it's going to have some

24   teeth, which is why I'm saying just, you know, I don't think

25   they need to sign anything saying, you know, I don't think

008717

1   they need a critical vendor agreement for the trash person,

2   but they need to understand, and it needs to be explained to

3   them if they don't, if they can -- they don't, and I do

4   intend to enforce that order.  And so, it sounds like you

5   all are going to upload three orders, so we could sit here

6   and hack one out old school.  I'll leave it up to you.  What

7   do you want to do?

8              MR. BATTAGLIA:  Your Honor, let me take a stab

9   because I think most of the terms we've talked about prior

10   to hearing as far as cash collateral and the critical

11   vendor, the U.S. Trustees can tell me if they have any

12   federal language on claw back.  I think there's language in

13   there and I'm -- this will shock the world, but I think I

14   got the form of motion and order from a pleading that Mr.

15   Brimmage is on.  So -- but I'll run it by --

16              THE COURT:  That doesn't mean he didn't object to

17   it when he got to a hearing on it though.

18              MR. BATTAGLIA:  Understood.  And if I could have a

19   central point of contact, if Mr. Martin is the person, I

20   will share drafts of all of these orders as they're revised

21   with --

22              THE COURT:  As soon as they're signed -- I should

23   say or upon uploaded, just let my case manager know, Ms.

24   Saldana.  Have them take a look at it and if it looks okay

25   to me --

```
 1              MR. BATTAGLIA:  Share them with all three and take
 2    comments --
 3              THE COURT:  Yeah.
 4              MR. BATTAGLIA:  -- and criticisms and they'll --
 5    I'll have their agreement before we upload them.
 6              THE COURT:  You know, I'm nervous.  I mean, I get
 7    cash collateral in trial, but utilities should not trail.
 8    That one should get done pretty quickly and you should be
 9    able to add some language in the critical vendor motion, and
10    Ms. Haselden, if there's anything that you are concerned
11    about, then just kick it to a final order.  You can have a
12    hearing within two days, 24 hours on any one-off that you
13    think that you all can't agree on.  I just want -- the
14    bucket is based on historicals, and I want to make sure if
15    it's assurance and trash, I'm -- I don't need to see any of
16    those, but that relates to the business.  You know, if it
17    relates to someone -- to anything personal, don't do it.
18    That's not what I'm authorizing.  I'm only authorizing what
19    is essential for the business.  Everybody's rights are
20    preserved.
21              I think the Debtor needs to look forward to having
22    a more robust conversation with the Debtor on the 15th about
23    the things I've talked about and I'm going to give some
24    thought, as well, to where we are.  Maybe there's a good
25    answer, maybe there's not, but I take it from the
```

```
1     Connecticut Plaintiffs and the Texas Plaintiffs that if you

2     want to file something, file something.  If you want to

3     renew at a final, I don't -- I'm fine either way.  I don't -

4     - the Code doesn't require anything in writing, and so, I'm

5     not going to hold you all to that.  I think you can -- if

6     there's anything you wish to supplement before the final in

7     connection with a final, and I think that's standard, quite

8     frankly, then do so.  If there's some reasonable discovery,

9     then go for it.  I don't need to be involved in that, but if

10    you need me, let me know.  But that's -- I take it there's

11    going to be a lot of work between now and the 15th, but it

12    is what it is.

13            Mr. Lemmon?

14            MR. LEMMON:  The Court may recall the discussion

15    earlier this morning about the vacation schedules.

16            THE COURT:  Yep.

17            MR. LEMMON:  I am out that whole week of the 15th.

18            THE COURT:  Okay.

19            MR. LEMMON:  And I'm leaving this Sunday and out -

20    - well, I get back that Friday of that week.  I would --

21            THE COURT:  The Debtor runs out of leave -- I

22    think it runs through the 15th, so that's why I --

23            MR. LEMMON:  Yes, and so, I think it's highly

24    likely that it'll be important to -- you know, I'm just

25    saying I think it would be highly likely that we'll need to
```

1    have a further interim.  But I don't want to delay the

2    discovery process, and so I'd like to start some informal

3    discovery and I've mentioned that to the Plaintiffs' counsel

4    to, you know, just start, so that -- start getting some

5    information.  But I wanted to let the Court know about that

6    impending problem on the 15th.

7              THE COURT:  Okay.  Mr. Brimmage?

8              MR. BRIMMAGE:  Can I address that impending

9    problem?

10             THE COURT:  Yep.

11             MR. BRIMMAGE:  We have several on our team that

12   that week is very problematic for too.

13             THE COURT:  Okay.

14             MR. BRIMMAGE:  So --

15             THE COURT:  What works best?

16             MR. MARTIN:  We agree on it.

17             THE COURT:  I just don't want the Debtor to run

18   out of cash or have to come back.  So --

19             MR. MARTIN:  Yeah.  Yeah.  Totally in agreement.

20             THE COURT:  So --

21             MR. MARTIN:  Yeah, yeah.  Totally understand.

22             MR. BATTAGLIA:  Your Honor, I asked for 14 days,

23   but the three-week budget is included.  And I don't recall

24   if --

25             THE COURT:  So, what works best?  I'm not going to

```
 1      -- yeah --
 2              MR. MARTIN:  We discussed previously, Your Honor,
 3      about extending the interim to the 23rd or 24th of August.
 4              THE COURT:  All right.
 5              MR. MARTIN:  To accommodate for both my vacation
 6      schedule and Mr. Lemmon's vacation schedule.
 7              THE COURT:  I'm looking.  Okay, I'm looking.
 8              MR. BATTAGLIA:  Or the 24th and the 23rd, if
 9      possible, Your Honor.
10              THE COURT:  Or the 24th?  What do I have?
11              MR. BATTAGLIA:  I have a charitable entity that
12      I'm the Board Chair of that I have a Board meeting that
13      morning, but it would be the second one I've missed in 10
14      years, so, I could miss the 24th.  I'm available the 23rd.
15              THE COURT:  You just ask -- Ms. Saldana, can you
16      take a look on the 24th, I've got something at 4:00 p.m. --
17              MR. MARTIN:  The 24th for half a day, there is a
18      Subchapter 5 Trustee Committee meeting that I've committed
19      to, but I can certainly --
20              THE COURT:  All right.  Well, you're going to take
21      a loss on that one.
22              MR. MARTIN:  I'm happy to do that.  I'll get the
23      play-by-play from Judge Norman later.
24              THE COURT:  On the 24th, Ms. Saldana, I think --
25      can I do the 24th or is there something there?  I know I've
```

 1    got a pre-trial conference at 4:00 p.m.  Do I have anything

 2    earlier?  All right.

 3              MR. LEE:  Your Honor, we have an economic issue in

 4    light of going to the 24th.  In light of some of the carve

 5    outs you made with respect to things that we cannot pay.

 6    So, that's what they're talking about right now, between Mr.

 7    Schwartz and --

 8              THE COURT:  Okay.  And look, if you need a break

 9    to get to the 24th, and -- but if the 24th works, why don't

10    we do 10:00 a.m. on the 244th.  We'll just pencil it in and

11    if anything changes.  Do the parties -- the parties here

12    agree, if the -- what I'll call the Collective Sandy Hook

13    Plaintiff, PQPR, and the Debtor agree on a date and time and

14    some breaks, then I'm not going to stand in the way of that.

15              MR. BATTAGLIA:  So, Your Honor, I can include the

16    budgets for the three-week budget and attach that as the

17    approval on the 14 days?

18              THE COURT:  Yeah, if you all are --

19              MR. BATTAGLIA:  Thank you, Your Honor.

20              THE COURT:  Well, hold on a second.  Let me take a

21    look at that.

22              MR. BATTAGLIA:  Understood if there's --

23              THE COURT:  Because I think -- if you go out that

24    extra wait, doesn't that add a really big payment in there?

25    Another -- let me take a look at week three.  Are we going -

1    - between the 24th, right?  You're going to have to hold off

2    on the half a million dollar -- I'm just telling you now.

3    Just on the 24th.

4              MR. BATTAGLIA:  What day was that to be paid on?

5    Do you know?

6              THE COURT:  Yeah, the (indiscernible) may not be

7    (indiscernible), but I'm not going to feel comfortable with

8    a half a million-dollar payment without a final.

9              MR. BATTAGLIA:  I assumed as much, Your Honor.

10             THE COURT:  Okay.

11             MR. BATTAGLIA:  So, we'll remove that from the

12   budgeting.

13             THE COURT:  And then, I think Mr. Jones' salary

14   comes up again.  I think you can budget for the 20, but it

15   could be 54 at the final.  He has the right to come in and

16   ask on that.

17             MR. BATTAGLIA:  We're just going to do 20 in this

18   order.

19             THE COURT:  Okay.

20             MR. BATTAGLIA:  We're limiting it to 20.  We're

21   not going to change it.

22             THE COURT:  Okay.  Just subject to a final?

23             MR. BATTAGLIA:  Yes, sir.

24             THE COURT:  Okay.  And obviously continuing, no

25   AMEX, no consultant, those payments will continue.  Just --

1    so it's essentially, kind of, it should be in a lot of ways,

2    what I've approved in Week 1.  Week 3 should mirror Week 1

3    minus the $500,000 payment.

4         MR. BATTAGLIA:  Mr. Schwartz does have a concern

5    that some of those consultants may really be vital, and I

6    understand --

7         THE COURT:  Just -- no, I'm saying, just ask for a

8    hearing in two or three days and --

9         MR. BATTAGLIA:  That's what I explained to him.

10   First, we'll try to deal with counsel on the other side if

11   we can --

12        THE COURT:  Okay.  And if the parties already

13   agreed it and you all stick to it and they're necessary and

14   there's no fight about.  If not, you can get a hearing in 24

15   hours.

16        MR. BATTAGLIA:  I'll try to work on it informally

17   and if not --

18        THE COURT:  Okay, Ms. Haselden, I'm going to -- I

19   want you to take a look at that, as well, on those.

20        Mr. Brimmage?

21        MR. BRIMMAGE:  Your Honor, point of clarification

22   with regard to the motion to appoint a Tort Committee.

23        THE COURT:  Mm hmm.

24        MR. BRIMMAGE:  I just want to make sure I'm clear.

25   Are you denying that?  Are you just holding that?  What

008725

1   would you like from us?  I just want to make sure we're

2   clear because we would want this record to be part of

3   whatever that effort is.

4          THE COURT:  No, no, I think it continues.  I

5   think, you know --

6          MR. BRIMMAGE:  Okay.

7          THE COURT:  I think you've raised the issue today.

8   It wasn't -- you haven't filed anything.  You made a formal

9   request today.  But there was a request, and I had the

10  authority.  I waived to do it today and I'm just telling

11  folks I didn't do it, but everything is cumulative.

12         MR. BRIMMAGE:  Okay.

13         THE COURT:  I don't expect, in a full evidentiary

14  record, next I mean --

15         MR. BRIMMAGE:  Okay.  You would like us to file

16  something and tee it up again and we can use today's record

17  with whatever other record we need and take it from there?

18         THE COURT:  If that's what you all want to do,

19  yeah, and we can pick a date, yeah.

20         MR. BRIMMAGE:  Okay.  All right.  Thank you, Your

21  Honor.

22         THE COURT:  Mm hmm.

23         MR. BRIMMAGE:  Do we need to do that -- can we do

24  that on an expedited basis?  Not a two-day notice, but not a

25  21-day notice?

```
 1                    THE COURT:  No, look I --

 2                    MR. BRIMMAGE:  We'll see?

 3                    THE COURT:  I know you'll be back on the 15th, so

 4      I know if you --

 5                    MR. BRIMMAGE:  Or the 24th.  Okay.

 6                    THE COURT:  Oh, and that's not the 15th, the 24th.

 7      Yes, that's exactly right.  So, that would make sense.  If

 8      you've got something --

 9                    MR. BRIMMAGE:  Okay.

10                    THE COURT:  -- on file this week, then just tee up

11      the issue, then maybe we can just take it up on the 24th at

12      that time, yeah.

13                    MR. BRIMMAGE:  Thank you, Your Honor.

14                    THE COURT:  That's what I mean.  That's a -- and

15      now that we're going further out, I think it provides -- I

16      think the Debtor needs time to think about what I said.  But

17      I think the Debtor would need a thorough and fair

18      opportunity to respond to anything, especially if something

19      got filed, and I wouldn't dare do that on short notice.  I

20      think the Debtor is entitled to that, so -- okay.  Anything

21      else we need to take care of today?

22                    MR. BRIMMAGE:  No, sir.

23                    THE COURT:  Okay.  So, you all are going to upload

24      orders and then get them to Ms. Saldana.  I will assure you,

25      24 hours you may get an email from her just to make sure --
```

```
 1                MR. BATTAGLIA:  I'm going to try to turn them

 2      tonight if I can get home quick enough.

 3                THE COURT:  Yeah.

 4                MR. BATTAGLIA:  If not, it'll be in the morning,

 5      and I'll turn them to the parties.

 6                THE COURT:  Good luck.  Thank you.  Take care.

 7      Have a good day.

 8                MR. LEMMON:  Thank you, Your Honor.

 9          (Proceedings adjourned at 5:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 12, 2022
```

# EXHIBIT 10

008730

**Forbearance Agreement**
**Summary of Indicative Terms and Conditions**
**Free Speech Systems, LLC.**
**July 10, 2022**

*Free Speech Systems, LLC ("FSS") has discovered certain problems with its record keeping and inventory. These problems, along with litigation expenses, have created a cash flow difficulty, which FSS believes to be temporary. FSS has requested, and PQPR Holdings Limited, LLC ("PQPR"), a secured creditor and provider of product to FSS, has agreed, to a temporary forbearance of certain terms for a period of 60 days, as follows:*

**Credit Card Processing Fee:**   The "fixed fee" provided for in the Financial Services Agreement between FSS and _____ LLC and the MOU shall be reduced from ten percent (10%) to two percent (2%) of gross sales proceeds, net of credit card processing fees.

4.% ( Four percent) WMS

**Allocation of Net Sales Proceeds:**

**FSS Inventory**   FSS Inventory means inventory which PQPR has ordered from vendors on FSS' behalf and for which FSS has pre-paid (prior to product delivery) all or part of the cost of the product.

FSS shall receive 90% of the Net Sales Proceeds and PQPR shall receive 10% of the Net Sales Proceeds. Such sums will be distributed to FSS and PQPR by

FSS shall pay one third any amount advanced by PQPR for FSS Inventory within 30 days following execution of final documents memorializing this agreement, with the balance of PQPR's advances for FSS Inventory due 15 days thereafter.

**PQPR Inventory**   PQPR Inventory means inventory which PQPR has ordered from vendors on PQPR's behalf and for which PQPR has paid the cost of the product.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through FSS sales channels shall be paid 20% to FSS and 80% to PQPR.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through non FSS sales channels shall be paid 10% to FSS and 90% to PQPR.

All payments will be distributed to FSS and PQPR by

**EXHIBIT**
**10**

**EXHIBIT**
**8**

| | |
|---|---|
| **Warehouse and Fulfillment Related Expenses** | FSS will pay one hundred percent (100%) of the employee, lease and shipping expenses associated with the warehouse and fulfillment operations in connection with the sale of PQPR and FSS Inventory. |
| **PQPR Debt** | FSS owes PQPR as represented by the notes dated August 13, 2020, and November 10, 2021 in the total original amount of $54,888,000. Currently, FSS is paying PQPR $11,000 per business day. As a temporary accommodation to FSS, PQPR agrees to reduce the amount FSS will pay to PQPR to $2,500 per business day to be applied to interest on the PQPR Notes for thirty (30) days following the effective date of this agreement, increasing to $5,500 per business day thereafter through the term of this forbearance agreement. |
| | FSS will acknowledge the validity and priority of the PQPR debt and liens and will agree to a replacement lien of equal scope and priority to PQPR's existing liens. |
| **Term:** | 60 Days |
| **Reservation:** | Subject to revision after implementation based on actual operational results. |

Executed this _12_ day of July 2022.

Free Speech Systems, LLC

By: _____

Marc Schwartz, Its Chief Restructuring Officer

PQPR Holdings Limited, LLC

By: _____

David Jones, Its Manager

LLC

By: _____
Its Manager

# EXHIBIT 11

008734

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

## GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY, AND DISCLAIMER REGARDING DEBTOR'S SCHEDULES AND STATEMENTS

The Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") filed by Free Speech Systems, LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor") are unaudited and were prepared pursuant to section 521 of Title 11 of the United States Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") by the Debtor's chief restructuring officer (the "CRO"). While the CRO has made reasonable efforts to file complete and accurate Schedules and Statements based upon information available at the time of preparation, the Schedules and Statements remain subject to further review and verification by the Debtor. Subsequent information may result in material changes in financial and other data contained in the Schedules and Statements. The Debtor reserves the right to amend its Schedules and Statements from time to time as may be necessary or appropriate. The Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements (the "Global Notes") is incorporated by reference in, and comprises an integral part of, the Schedules and Statements and should be referred to and reviewed in connection with any review of the Schedules and Statements.

1. _Description of the Cases and "As Of" Information Date_. On July 29, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor currently operates its business and possess its property as a debtor-in-possession under section 1184 of the Bankruptcy Code. Unless otherwise noted, all asset and liability information is as of the Petition Date.

2. _Basis of Presentation_. These Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to fully reconcile to any financial statements otherwise prepared and/or distributed by the Debtor.

3. _Causes of Action_. Despite its reasonable efforts, as described above, the Debtor may not have set forth all of its claims, causes of actions and potential recoveries in its Schedules and Statements. The Debtor reserves all rights with respect to any causes of action it may possess, and neither these Global Notes nor the Schedules and Statements shall be deemed a waiver of any such causes of action.

EXHIBIT
11
tabbies
008735

4.      Insiders. The listing or failure to list a person or other entity as an "insider" in the Schedules and Statements is not intended to be nor should it be construed as a binding admission that such person or entity is or is not an insider. The Debtor reserves the right to dispute or challenge the designation of any individual or entity in connection with any other matter arising in the Debtor's chapter 11 case.

5.      Intellectual Property Rights. Any omission of intellectual property from the Schedules and Statements shall not be an admission that such intellectual property rights have been abandoned, have been terminated or otherwise expired by their terms or have been assigned or otherwise transferred pursuant to a sale, acquisition or other transaction. In accordance with the foregoing, the Debtor reserves all of its rights with respect to the legal status of any and all intellectual property rights, regardless of whether such intellectual property rights are or are not listed in the Schedules and Statements.

6.      Summary of Significant Reporting Policies. The Schedules and Statements have been signed by W. Marc Schwartz, the CRO to the Debtor. In reviewing and signing the Schedules and Statements, Mr. Schwartz has necessarily relied upon the efforts, statements, and representations of the Debtor's business records and personnel. Mr. Schwartz has not personally verified the accuracy of each such statement and representation, including, but not limited to, statements and representations concerning amounts owed to creditors. The Debtor made reasonable efforts to accurately report asset, liability, disbursement and other information on its Statements and Schedules, and the Debtor adopted the following conventions in the preparation of the Schedules and Statements.

a.      Fair Market Value; Book Value. Unless otherwise noted, the value of each asset and liability of the Debtor is shown on the basis of the book value of such asset or liability in the Debtor's accounting books and records. As applicable, assets that have been fully depreciated or were expensed for accounting purposes have no net book value. As a result, the value of the Debtor's assets and liabilities set forth on the Schedules and Statements may not always reflect the current market values of such property and/or liabilities. The Debtor reserves its right to amend or adjust the value of each asset or liability set forth herein.

b.      Liabilities. The Debtor reserves the right to dispute any liability indicated in its Schedules notwithstanding the designation in the Schedules and Statements.

c.      Claims. The Debtor's Schedules and Statements list creditors and set forth the Debtor's estimate of the claims of creditors as of the Petition Date. The Bankruptcy Court has authorized the Debtor to, among other things make payments to certain critical vendors and utility providers. As a result, the actual unpaid claims of creditors that ultimately may be allowed in this case may differ from the amounts set forth in the Schedules and Statements. The inclusion of any such amounts in the Schedules and Statements shall not be deemed to obligate the Debtor to pay such amounts in and of themselves.

d.      Disputed, Contingent and/or Unliquidated Claims. Schedules D and E/F permit the Debtor to designate a claim as disputed, contingent and/or unliquidated. A failure

2

to designate a claim on any of these Schedules as disputed, contingent and/or unliquidated does not constitute an admission that such claim is not subject to objection. The Debtor reserves the right to dispute, or assert offsets or defenses to, any claim reflected on these Schedules as to amount, liability, or status. Moreover, the Debtor reserves the right to amend its Schedules and Statements as necessary and appropriate.

7.     General Conventions Relating to the Schedules of Assets and Liabilities. The

Debtor adopted the following conventions in connection with the preparation of the Schedules:

a.     Schedule D. Except as otherwise agreed pursuant to a stipulation or agreed order entered by the Bankruptcy Court, the Debtor reserves the right to dispute or challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any specific asset to a secured creditor listed on Schedule D of the Debtor. Moreover, although the Debtor may have scheduled claims of various creditors as secured claims, the Debtor reserve all rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction or any document or instrument related to such creditor's claim. The descriptions provided on Schedule D are intended only to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens. Nothing in the Global Notes or the Schedules and Statements shall be deemed a modification or interpretation of the terms of such agreements.

b.     Schedule G. While reasonable efforts have been made to ensure the accuracy of the Schedule of Executory Contracts, inadvertent errors or omissions may have occurred. The Debtor hereby reserves all rights to dispute the validity, status or enforceability of any contract, agreement or lease set forth on Schedule G and to amend or supplement such Schedule as necessary. The contracts, agreements and leases listed on Schedule G may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements which may not be listed therein. Certain of the real property leases listed on Schedule G may contain renewal options, guarantees of payments, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties and obligations are not set forth on Schedule G. Certain of the executory agreements may not have been memorialized and could be subject to dispute. Additionally, the Debtor may be parties to various other agreements concerning real property, such as easements, rights of way, subordination, non-disturbance, supplemental agreements, amendments/letter agreements, title documents, consents, site plans, maps and other miscellaneous agreements. Such agreements, if any, are not set forth on Schedule G. Certain of the agreements listed on

3

Schedule G may be in the nature of conditional sales agreements or secured financings. The presence of a contract or agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or unexpired lease. The Debtor reserves all rights, claims and causes of action with respect to the contracts and agreements listed on these Schedules and Statements, including the right to dispute or challenge the characterization or the structure of any transaction, document or instrument.

c.  <u>Schedule H</u>. Codefendants in litigation matters involving the Debtor are not listed in Schedule H unless the trial court has made a ruling that results in an identity of interest between the Debtor and such co-defendant.

*[Remainder of Page Intentionally Left Blank]*

4

008738

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | Free Speech Systems, LLC |
| United States Bankruptcy Court for the: | Southern District of Texas (State) |
| Case number (If known): | 22-60043 |

☐ Check if this is an amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals

**12/15**

---

### Part 1:   Summary of Assets

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B*........................................................................... $ 1,335,971.23

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B*........................................................................ $ 13,327,463.23

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B*.......................................................................... $ 14,663,434.46

---

### Part 2:   Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D*........... $ 53,646,687.84

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*.................................. $ _____

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*................ + $ 995,824.64

4. **Total liabilities**..........................................................................
   Lines 2 + 3a + 3b                                                                              $ 54,642,512.48

---

**Fill in this information to identify the case:**

Debtor name  Free Speech Systems, LLC

United States Bankruptcy Court for the: Southern _____  District of  Texas
                                                                    (State)

Case number (if known):  22-60043

☐ Check if this is an
   amended filing

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property          12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

---

**Part 1:   Cash and cash equivalents**

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

   All cash or cash equivalents owned or controlled by the debtor

   **Current value of debtor's interest**

2. **Cash on hand**                                                       $ 951.31

   Please see attached schedule
   for additional Bank accounts

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1. | Checking | 8 5 6 3 | $ 118,999.04 |
| 3.2. | Checking | 8 5 1 4 | $ 1,163,808.79 |

   *See continuation sheet*

4. **Other cash equivalents** *(Identify all)*

   4.1.  __                                                               $ _____
   4.2. _____                                                            $ _____

5. **Total of Part 1**                                                    $ 1,284,759.14
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

---

**Part 2:   Deposits and prepayments**

6. **Does the debtor have any deposits or prepayments?**

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

   **Current value of debtor's interest**

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit
   7.1. _____ (Credit card processing)                             $ 500,000.00
   7.2. LIT Industrial (Security Deposit)                                 $ 33,360.00

---

Debtor    Free Speech Systems, LLC _____    Case number (if known) 22-60043 _____
           Name

| 8 | Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent | Please see attached schedule for additional prepayments |
|---|---|---|

| | | |
|---|---|---|
| | Description, including name of holder of prepayment | |
| 8.1 | The Travelers Companies (Prepaid Insurance) | $ 1,224.50 |
| 8.2 | The Hartford (Prepaid Insurance) | $ 1,444.31 |
| | * See continuation sheet* | |

9. **Total of Part 2.**
Add lines 7 through 8. Copy the total to line 81.                                    $ 687,969.95

---

**Part 3:    Accounts receivable**

10. **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.
☑ Yes. Fill in the information below.

Current value of debtor's interest

11  Accounts receivable

| | | face amount | | doubtful or uncollectible accounts | | |
|---|---|---|---|---|---|---|
| 11a. | 90 days old or less: | 0.00 | – | 0.00 | = ➜ | $ 0.00 |
| 11b. | Over 90 days old: | 9,788,413.22 | – | 0.00 | = ➜ | $ 9,788,413.22 |

12  **Total of Part 3**
Current value on lines 11a + 11b = line 12. Copy the total to line 82.                $ 9,788,413.22

---

**Part 4:    Investments**

13. **Does the debtor own any investments?**
☑ No. Go to Part 5.
☐ Yes. Fill in the information below.

| | | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**
Name of fund or stock:

| 14.1 | _____ | _____ | $ _____ |
| 14.2 | _____ | _____ | $ _____ |

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

| Name of entity: | % of ownership: | | |
|---|---|---|---|
| 15.1. _____ | ____ % | _____ | $ _____ |
| 15.2. _____ | ____ % | _____ | $ _____ |

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**
Describe:

| 16.1. _____ | _____ | $ _____ |
| 16.2. _____ | _____ | $ _____ |

17. **Total of Part 4**
Add lines 14 through 16. Copy the total to line 83.                                  $ 0.00

---

Debtor   Free Speech Systems, LLC

Name

Case number (if known) 22-60043

---

**Part 5:**   **Inventory, excluding agriculture assets**

18. **Does the debtor own any inventory (excluding agriculture assets)?**

☐ No. Go to Part 6.

☑ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | MM / DD / YYYY | $ | | $ |
| **20. Work in progress** | MM / DD / YYYY | $ | | $ |
| **21. Finished goods, including goods held for resale** Merchandise | 07/29/2022 MM / DD / YYYY | $ 1,327,107.43 | Net Book Value | $ 1,327,107.43 |
| **22. Other inventory or supplies** | MM / DD / YYYY | $ | | $ |

23. **Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$ 1,327,107.43

24. **Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value 89,882.37   Valuation method Net Book Value   Current value 89,882.37

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

**Part 6:**   **Farming and fishing-related assets (other than titled motor vehicles and land)**

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | $ | | $ |
| **29. Farm animals** Examples: Livestock, poultry, farm-raised fish | $ | | $ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | $ | | $ |
| **31. Farm and fishing supplies, chemicals, and feed** | $ | | $ |
| **32. Other farming and fishing-related property not already listed in Part 6** | $ | | $ |

Debtor   Free Speech Systems, LLC
_____   Case number (if known) 22-60043 _____
Name

33. **Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85.                                          $ 0.00

34. **Is the debtor a member of an agricultural cooperative?**

☐ No
☐ Yes. Is any of the debtor's property stored at the cooperative?

☐ No
☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No
☐ Yes. Book value $_____ Valuation method _____ Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No
☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No
☐ Yes

| Part 7: | Office furniture, fixtures, and equipment; and collectibles |
|---|---|

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.
☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | | | |
| Rugs, Chairs, Lamps and other Office Furnitures | $ 3,285.92 | Net Book Value | $ 3,285.92 |
| 40. **Office fixtures** | | | |
| | $ ____ | | $ ____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| Computer Equipments and Software | $ 44,180.49 | Net Book Value | $ 44,180.49 |
| 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 Artwork | $ 73.00 | Net Book Value | $ 73.00 |
| 42.2 _____ | $_____ | _____ | $_____ |
| 42.3 _____ | $_____ | _____ | $_____ |

43. **Total of Part 7.**
Add lines 39 through 42. Copy the total to line 86.                                          $ 47,539.41

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No
☑ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No
☐ Yes

Debtor    Free Speech Systems, LLC
Name

Case number (if known)    22-60043

---

**Part 8:    Machinery, equipment, and vehicles**

46.  Does the debtor own or lease any machinery, equipment, or vehicles?

☐ No. Go to Part 9.
☑ Yes. Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

47.  Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles

| | | | |
|---|---|---|---|
| 47.1  2021 Winnebago Adventurer Model 35F (VIN:1F66F5DN1LOA03038) | $ 0.00 | Net Book Value | $ 0.00 |
| 47.2  2015 Ford F-450 Model F45 (VIN: 1FDUF4HT0FEC06013) | $ 148,890.74 | Net Book Value | $ 148,890.74 |
| 47.3 | $ | | $ |
| 47.4 | $ | | $ |

48.  Watercraft, trailers, motors, and related accessories Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 | $ | | $ |
| 48.2 | $ | | $ |

49.  Aircraft and accessories

| | | | |
|---|---|---|---|
| 49.1 | $ | | $ |
| 49.2 | $ | | $ |

50.  Other machinery, fixtures, and equipment (excluding farm machinery and equipment)

| | | | |
|---|---|---|---|
| Production and Other Equipments | $ 40,262.53 | Net Book Value | $ 40,262.53 |

51.  Total of Part 8.
Add lines 47 through 50. Copy the total to line 87.

$ 189,153.27

52.  Is a depreciation schedule available for any of the property listed in Part 8?
☐ No
☑ Yes

53.  Has any of the property listed in Part 8 been appraised by a professional within the last year?
☑ No
☐ Yes

---

| Debtor | Free Speech Systems, LLC | Case number (if known) | 22-60043 |
|---|---|---|---|
| | Name | | |

## Part 9:   Real property

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 Warehouse Improvement (3019 Alvin Devane Blvd Austin, TX 78741) | Leasehold Improvement | $ 1,335,971.23 | Net Book Value | $ 1,335,971.23 |
| 55.2 _____ | _____ | $_____ | _____ | $_____ |
| 55.3 _____ | _____ | $_____ | _____ | $_____ |
| 55.4 _____ | _____ | $_____ | _____ | $_____ |
| 55.5 _____ | _____ | $_____ | _____ | $_____ |
| 55.6 _____ | _____ | $_____ | _____ | $_____ |

**56. Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$ 1,335,971.23

**57. Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☑ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 10:   Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets** | $_____ | _____ | $_____ |
| **61. Internet domain names and websites**<br>Domain Names, Websites and Website Developments | $ 2,520.81 | Net Book Value | $ 2,520.81 |
| **62. Licenses, franchises, and royalties** | $_____ | _____ | $_____ |
| **63. Customer lists, mailing lists, or other compilations** | $_____ | _____ | $_____ |
| **64. Other intangibles, or intellectual property** | $_____ | _____ | $_____ |
| **65. Goodwill** | $_____ | _____ | $_____ |

**66. Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 2,520.81

Debtor  Free Speech Systems, LLC
_____
Name                                                                    Case number (if known) 22-60043
_____

67. Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?

☑ No
☐ Yes

68. Is there an amortization or other similar schedule available for any of the property listed in Part 10?

☐ No
☑ Yes

69. Has any of the property listed in Part 10 been appraised by a professional within the last year?

☑ No
☐ Yes

### Part 11:   All other assets

70. Does the debtor own any other assets that have not yet been reported on this form?

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☑ No. Go to Part 12.
☐ Yes. Fill in the information below.

Current value of
debtor's interest

71. Notes receivable
Description (include name of obligor)

_____ − _____ = ➔   $ _____
_____   Total face amount   doubtful or uncollectible amount

72. Tax refunds and unused net operating losses (NOLs)

Description (for example, federal, state, local)

_____   Tax year _____   $ _____
_____   Tax year _____   $ _____
_____   Tax year _____   $ _____

73. Interests in insurance policies or annuities

_____   $ _____

74. Causes of action against third parties (whether or not a lawsuit has been filed)

_____   $ _____

Nature of claim         _____

Amount requested     $_____

75. Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims

_____   $ _____

Nature of claim         _____

Amount requested     $__        _____

76. Trusts, equitable or future interests in property

_____   $ _____

77. Other property of any kind not already listed  Examples: Season tickets, country club membership

_____   $ _____
_____   $ _____

78. Total of Part 11.

Add lines 71 through 77. Copy the total to line 90.         $ 0.00

79. Has any of the property listed in Part 11 been appraised by a professional within the last year?

☐ No
☐ Yes

Debtor    Free Speech Systems, LLC
         _____          Case number (if known) 22-60043
         Name

---

**Part 12:    Summary**

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 1,284,759.14 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 687,969.95 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 9,788,413.22 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 1,327,107.43 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 47,539.41 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 189,153.27 | |
| 88. **Real property.** *Copy line 56, Part 9.* ....................➔ | | $ 1,335,971.23 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 2,520.81 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column.......................... 91a. | $ 13,327,463.23 | + 91b. $ 1,335,971.23 |

92. **Total of all property on Schedule A/B.**  Lines 91a + 91b = 92 ...............................................    $ 14,663,434.46

---

Debtor: Free Speech Systems, LLC                                Case Number: 22 - 60043

Part 1.
3. Additional checking, savings, money market, or financial brokerage accounts

| Name of Institution | Account Type | Last 4 digits of Account Number | Current value of debtor's Interest |
|---|---|---|---|
| ████████ | Checking | 8522 | $1,000.00 |
| ████████ | Checking | 8621 | $0.00 |
| ████████ | Checking | 5675 | $0.00 |
| ████████ | Checking | 8746 | $0.00 |

Part 2.
8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent

| Description, including name of holder of prepayment | Current value of debtor's Interest |
|---|---|
| Frost Insurance Agency | $4,899.14 |
| Stratus | $2,124.27 |
| Shannon & Lee LLP | $100,000.00 |
| ATXHD, Inc | $41,342.00 |
| Protection 1 Alarm | $2,559.73 |
| CubeSmart | $1,016.00 |

[To Supplement: Retainer of The Law ●ffices of Ray Battaglia, PLLC on the Petition Date - Est. $77,235.00]

**Fill in this information to identify the case:**

Debtor name __Free Speech Systems, LLC__

United States Bankruptcy Court for the: __Southern__   District of __Texas__
(State)

Case number (If known): __22-60043__

☐ Check if this is an amended filing

## Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property          12/15

Be as complete and accurate as possible.

1. **Do any creditors have claims secured by debtor's property?**
   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   ☐ Yes. Fill in all of the information below.

| **Part 1:** | **List Creditors Who Have Secured Claims** |

2. List in alphabetical order all creditors who have secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|

**2.1**

| **Creditor's name** | **Describe debtor's property that is subject to a lien** | | |
|---|---|---|---|
| PQPR Holdings Limited LLC | Please see attached | $ 53,646,687.84 | $ 14,663,434.46 |
| **Creditor's mailing address** | | | |
| 3005 S Lamar Blvd Ste D109-317 | | | |
| Austin TX 78704-8864 | **Describe the lien** | | |
| | Uniform Commercial Code Lien | | |
| **Creditor's email address, if known** | **Is the creditor an insider or related party?** | | |
| | ☐ No | | |
| | ■ Yes | | |
| **Date debt was incurred** 2020/08/13 | **Is anyone else liable on this claim?** | | |
| **Last 4 digits of account number** ___ ___ ___ ___ | ☐ No | | |
| | ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H). | | |
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:** | | |
| ■ No | Check all that apply. | | |
| ☐ Yes. Specify each creditor, including this creditor, and its relative priority. | ☐ Contingent | | |
| | ☐ Unliquidated | | |
| | ■ Disputed | | |

**2.2**

| **Creditor's name** | **Describe debtor's property that is subject to a lien** | | |
|---|---|---|---|
| | | $ | $ |
| **Creditor's mailing address** | | | |
| | **Describe the lien** | | |
| **Creditor's email address, if known** | **Is the creditor an insider or related party?** | | |
| | ☐ No | | |
| | ☐ Yes | | |
| **Date debt was incurred** | **Is anyone else liable on this claim?** | | |
| **Last 4 digits of account number** ___ ___ ___ ___ | ☐ No | | |
| | ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H). | | |
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:** | | |
| ☐ No | Check all that apply. | | |
| ☐ Yes. Have you already specified the relative priority? | ☐ Contingent | | |
| ☐ No. Specify each creditor, including this creditor, and its relative priority. | ☐ Unliquidated | | |
| | ☐ Disputed | | |
| ☐ Yes. The relative priority of creditors is specified on lines ___ | | | |

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**          $ _____

Debtor    Free Speech Systems, LLC
_____        Case number (if known) 22-60043
          Name

| Part 2: | **List Others to Be Notified for a Debt Already Listed in Part 1** |

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |

Free Speech Systems, LLC

## 2.1    Describe debtor's property that is subject to a lien

(1) All fixtures and personal property of every kind and nature, including all
accounts, goods (including inventory and equipment), documents (including, if
applicable, electronic documents), instruments, promissory notes, chattel paper
(whether tangible or electronic), letters of credit, letter of credit rights (whether
or not the letter of credit is evidenced by a writing), securities and all other
investment property, general intangibles (including all payment intangibles),
intellectual property, domain names, trademarks (including but not limited to
the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise,
Haappease, Gut Fution, Vasobeet, Ultimate Female Force, The Real Red Pill,
Bodease, Incuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA
Force, Survival Shield, and Survivial Shield X-2, and the brand Infowars Life),
trade names, money, deposit accounts, and any other contract rights or rights to
the payment of money; and all gross revenue, receivables and proceeds and
products of each of the foregoing in subparagraph (1), all books and records
relating to the foregoing, all supporting obligations related thereto, and all
accessions to, substitutions and replacements for, and rents, profits and products
of, each of the foregoing, and any and all proceeds of any insurance, indemnity,
warranty or guaranty payable to the Debtor from time to time with repect to any
of the foregoing

| Fill in this information to identify the case: | |
|---|---|
| Debtor | Free Speech Systems LLC |
| United States Bankruptcy Court for the: | Southern    District of    Texas |
| | (State) |
| Case number (If known) | 22-60043 |

☐ Check if this is an
amended filing

## Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims

12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

## Part 1:    List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   ■ No. Go to Part 2.
   ☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1** Priority creditor's name and mailing address | As of the petition filing date, the claim is: $ _____ | | $ _____ |

**2.1** Priority creditor's name and mailing address

_____

_____

_____

As of the petition filing date, the claim is: $ _____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Total claim $ _____    Priority amount $ _____

Date or dates debt was incurred

_____

Basis for the claim:

_____

Last 4 digits of account
number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (_____)

**2.2** Priority creditor's name and mailing address

_____

_____

_____

As of the petition filing date, the claim is: $ _____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Date or dates debt was incurred

_____

Basis for the claim:

_____

Last 4 digits of account
number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (_____)

**2.3** Priority creditor's name and mailing address

_____

_____

_____

As of the petition filing date, the claim is: $ _____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Date or dates debt was incurred

_____

Basis for the claim:

_____

Last 4 digits of account
number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (_____)

008762

| Debtor | Free Speech Systems LLC | Case number (if known) | 22-60043 |
|---|---|---|---|
| | Name | | |

## Part 2: List All Creditors with NONPRIORITY Unsecured Claims

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

| | | | **Amount of claim** |
|---|---|---|---|

**3.1** Nonpriority creditor's name and mailing address
Addshoppers, Inc

15806 Brookway Dr Ste 200
Huntersville, NC 28078

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,989.00

---

**3.2** Nonpriority creditor's name and mailing address
Air Supply of North Texas aka Precision Oxygen

2829 Fort Worth Avenue
Dallas, TX 75211

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 105.48

---

**3.3** Nonpriority creditor's name and mailing address
Airco Mechanical, LTD

PO Box 1598
Round Rock, TX 78680

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 17,268.71

---

**3.4** Nonpriority creditor's name and mailing address
AT&T Mobile

PO Box 5001
Carol Stream, IL 60197-5001

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 5,167.41

---

**3.5** Nonpriority creditor's name and mailing address
Atomial, LLC

1920 E. Riverside Drive Suite A-120 #124
Austin, TX 78741

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 50,400.00

---

**3.6** Nonpriority creditor's name and mailing address
Austin Security & Investigation Solutions

PO Box 2904
Pflugerville, TX 78691

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 5,961.87

---

Official Form 206E/F          Schedule E/F: Creditors Who Have Unsecured Claims          page 2 of 17

008753

Case 22-60043   Document 121   Filed in TXSB on 08/29/22   Page 20 of 37

Debtor    Free Speech Systems LLC                                              Case number (if known)   22-60043
          _____
          Name

| Part 2: | Additional Page |
|---------|-----------------|

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.7** Nonpriority creditor's name and mailing address

Blott, Jacquelyn, Attorney at Law

200 University Boulevard Suite 225 #251

Round Rock, TX 78665

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 58,280.00

---

**3.8** Nonpriority creditor's name and mailing address

City of Austin

PO Box 2267

Austin, TX 78783

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 6,532.68

---

**3.9** Nonpriority creditor's name and mailing address

CTRMA Processing

PO Box 734182

Dallas, TX 75373

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 24.23

---

**3.10** Nonpriority creditor's name and mailing address

eCommerce CDN, LLC

221 E 63rd Street

Savannah, GA 31405

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 27,270.00

---

**3.11** Nonpriority creditor's name and mailing address

Elevated Solutions Group

706 W Ben White Blvd, Bldg B, Ste 188

Austin, TX 78740

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 319,148.16

---

Debtor _____Free Speech Systems LLC_____     Case number _(if known)_____
     Name

| **Part 2:** | **Additional Page** |
|---|---|

<table>
<tr><td colspan="2">Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.</td><td>Amount of claim</td></tr>
</table>

**3.12** Nonpriority creditor's name and mailing address
Getty Images, Inc

PO Box 953604
St. Louis, MO 63195-3604

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 9,201.25

---

**3.13** Nonpriority creditor's name and mailing address
Gibson, Ronald

4012 Pleasant Grove Church Rd
Shelby NC, 28150-2842

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 3,000.00

---

**3.14** Nonpriority creditor's name and mailing address
Gracenote Media Services, LLC

29421 Network Place
Chicago, IL 60673-1294

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 119.98

---

**3.15** Nonpriority creditor's name and mailing address
Greenair, Inc

23569 Center Ridge Road
Westlake, OH 44145

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 12,240.00

---

**3.16** Nonpriority creditor's name and mailing address
Impact Fire Services LLC

PO Box 735063
Dallas, TX 75373-5063

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred    _____
Last 4 digits of account number    __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 165.00

---

| Debtor | Free Speech Systems LLC | Case number (if known) | 22-60043 |
| --- | --- | --- | --- |
| | Name | | |

**Part 2:    Additional Page**

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
| --- | --- |

---

**3.17** Nonpriority creditor's name and mailing address
JCE SEO

6101 Broadway
San Antonio, TX 78209

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred        _____
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 5,000.00

---

**3.18** Nonpriority creditor's name and mailing address
JW JIB Productions, LLC

2921 Carvelle Drive
Riviera Beach, FL 33404

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred        _____
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 7,000.00

---

**3.19** Nonpriority creditor's name and mailing address
Konica Minolta Premier Finance

PO Box 41602
Philadelphia, PA 19101-1602

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred        _____
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 1,847.87

---

**3.20** Nonpriority creditor's name and mailing address
Kount An Equifax Company

PO Box 740253
Atlanta, GA 30374

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred        _____
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 11,172.00

---

**3.21** Nonpriority creditor's name and mailing address
Lumen/Level 3 Communications

PO Box 910182
Denver, CO 80291-0182

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred        _____
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 7,906.43

---

Case 22-60043   Document 121   Filed in TXSB on 08/29/22   Page 23 of 37

Debtor ___Free Speech Systems LLC_____   Case number (if known)_____
       Name

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.22** Nonpriority creditor's name and mailing address
Lyman, Daniel

5832 Elton Road

Venice, FL 34293

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

$ 3,500.00

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.23** Nonpriority creditor's name and mailing address
PQPR Holdings

3005 S Lamar Blvd Ste D109-317

Austin TX 78704-8864

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.24** Nonpriority creditor's name and mailing address
MRJR Holdings, LLC

PO Box 27740

Las Vegas, NV 89426

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.25** Nonpriority creditor's name and mailing address
Sparkletts & Sierra Springs

PO Box 660579

Dallas, TX 75266-0579

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 1,084.14

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.26** Nonpriority creditor's name and mailing address
Texas Gas Service

PO Box 219913

Kansas City, MO 64121

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 1,078.28

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

Debtor  Free Speech Systems LLC _____   Case number *(if known)* _____
        Name

| **Part 2:** | **Additional Page** |
|---|---|

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

3.27 **Nonpriority creditor's name and mailing address**
Willow Grove Productions

1810 Rockcliff Road

Austin, TX 78746

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred          _____
Last 4 digits of account number      __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,700.00

---

3.28 **Nonpriority creditor's name and mailing address**
WMQM-AM 1600

21 Stephen Hill Road

Atoka, TN 38004

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred          _____
Last 4 digits of account number      __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,500.00

---

3.29 **Nonpriority creditor's name and mailing address**
American Express

200 Vesey Street

New York, NY 10285

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred          _____
Last 4 digits of account number      __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 54,279.78

---

3.30 **Nonpriority creditor's name and mailing address**
David Jones

3005 S Lamar Blvd Ste D109-317

Austin TX 78704-8864

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred          _____
Last 4 digits of account number      __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 150,000.00

---

3.31 **Nonpriority creditor's name and mailing address**
Campco

4625 W. Jefferson Blvd

Los Angeles, CA 90016

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred          _____
Last 4 digits of account number      __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

Official Form 206E/F          Schedule E/F: Creditors Who Have Unsecured Claims

Debtor _____
            Free Speech Systems LLC
            Name

Case number (if known) _____

| Part 2: | Additional Page |
|---|---|

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.**

Amount of claim

---

**3.32** Nonpriority creditor's name and mailing address

CustomTattoNow.com

16107 Kensington Dr #172

Sugar Land, TX 77479

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed
- ☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

**3.33** Nonpriority creditor's name and mailing address

David Icke Books Limited

1a Babbington Lane

Derby, England DE11SU

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

**3.34** Nonpriority creditor's name and mailing address

American Media/Reality Zone

PO Box 4646

Thousand Oaks, CA 91359

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

**3.35** Nonpriority creditor's name and mailing address

Justin Lair

1313 Lookout Ave

Klamath Falls, OR 97601

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

**3.36** Nonpriority creditor's name and mailing address

RatsMedical.com

1211 E Bridle Trail Rd

Draper, UT 84020

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

Debtor  Free Speech Systems LLC
        _____          Case number (if known) _____
        Name

| Part 2: | Additional Page |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

**3.37** Nonpriority creditor's name and mailing address

▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

**3.38** Nonpriority creditor's name and mailing address

Skousen, Joel

PO Box 565

Spring City, UT 84662

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

**3.39** Nonpriority creditor's name and mailing address

Wisconsin Dept. of Revenue

PO Box 3028

Milwaukee, WI 53201-3028

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

**3.40** Nonpriority creditor's name and mailing address

Watson, Paul

9 Riverdale Road Ranmoor Sheffield

South Yorkshire, United Kingdom S10 3FA

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

**3.41** Nonpriority creditor's name and mailing address

Verizon Wireless

PO Box 660108

Dallas, TX 75266

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

Case 22-60043   Document 121   Filed in TXSB on 08/29/22   Page 27 of 37

| Debtor | Free Speech Systems LLC | Case number (if known) | 22-60043 |
|---|---|---|---|
| | Name | | |

| **Part 2:** | **Additional Page** |
|---|---|

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.42** Nonpriority creditor's name and mailing address

Miller, Sean

PO Box 763

Wyalusing, PA 18853

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.43** Nonpriority creditor's name and mailing address

Spectrum Enterprise aka Time Warner Cable

PO Box 60074

City of Industry, CA 91716

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.44** Nonpriority creditor's name and mailing address

Ready Alliance Group, Inc

PO Box 1709

Sandpoint, ID 83864

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.45** Nonpriority creditor's name and mailing address

One Party America, LLC

6700 Woodlands Parkway Suite 230-309

The Woodlands, TX 77382

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.46** Nonpriority creditor's name and mailing address

LCJ Pictures LLC

PO Box 19549

Austin, TX 78760

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 89,882.37

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

Debtor _____Free Speech Systems LLC_____   Case number (if known) _____
              Name

| Part 2: | Additional Page |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.47** | Nonpriority creditor's name and mailing address

Brennan Gilmore

c/o Civil Rights Clinic, 600 New Jersey Ave NW

Washington, DC 20001

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: __Litigation Settlement__

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 50,000.00

---

**3.48** | Nonpriority creditor's name and mailing address

Christopher Sadowski

c/o Copy Cat Legal PLLC, 3111 N. University Drive,

Coral Springs, FL 33065

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: __Asserted copyright__

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 90,000.00

---

**3.49** | Nonpriority creditor's name and mailing address

Neil Heslin

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: __Litigation claim__

Date or dates debt was incurred   2018
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.50** | Nonpriority creditor's name and mailing address

Scarlett Lewis

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: __Litigation Claim__

Date or dates debt was incurred   2018
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.51** | Nonpriority creditor's name and mailing address

Leonard Pozner

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: __Litigation Claim__

Date or dates debt was incurred   2018
Last 4 digits of account number   __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

Debtor _____   Free Speech Systems LLC _____   Case number (if known) _____
Name

| Part 2: | Additional Page |
|---------|-----------------|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.52** Nonpriority creditor's name and mailing address
Veronique De La Rosa

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston, TX 77002

Date or dates debt was incurred   **2018**
Last 4 digits of account number   __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim:   Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.53** Nonpriority creditor's name and mailing address
Marcel Fontaine

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston, TX 77002

Date or dates debt was incurred   **2018**
Last 4 digits of account number   __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:   Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.54** Nonpriority creditor's name and mailing address
David Wheeler

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred   **2018**
Last 4 digits of account number   __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:   Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.55** Nonpriority creditor's name and mailing address
Francine Wheeler

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred   **2018**
Last 4 digits of account number   __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:   Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.56** Nonpriority creditor's name and mailing address
Jacqueline Barden

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred   **2018**
Last 4 digits of account number   __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:   Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

Debtor  Free Speech Systems LLC
        _____        Case number (if known) _____
        Name

| Part 2: | Additional Page |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

**3.57** Nonpriority creditor's name and mailing address

Mark Barden

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.58** Nonpriority creditor's name and mailing address

Nicole Hockley

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St. STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.59** Nonpriority creditor's name and mailing address

Ian Hockley

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.60** Nonpriority creditor's name and mailing address

Jennifer Hensel

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.61** Nonpriority creditor's name and mailing address

Donna Soto

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Debtor    Free Speech Systems LLC
                Name                                                                            Case number (if known)

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.                    Amount of claim

**3.62** Nonpriority creditor's name and mailing address
Carlee Soto Parisi

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred    2018
Last 4 digits of account number    _ _ _ _

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim:    Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$    0.00

---

**3.63** Nonpriority creditor's name and mailing address
Carlos M. Soto

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St. STE 2850, Austin, TX 78701

Date or dates debt was incurred    2018
Last 4 digits of account number    _ _ _ _

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim:    Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$    0.00

---

**3.64** Nonpriority creditor's name and mailing address
Jillian Soto-Marino

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred    2018
Last 4 digits of account number    _ _ _ _

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim:    Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$    0.00

---

**3.65** Nonpriority creditor's name and mailing address
William Aldenberg

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred    2018
Last 4 digits of account number    _ _ _ _

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim:    Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$    0.00

---

**3.66** Nonpriority creditor's name and mailing address
William Sherlach

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred    2018
Last 4 digits of account number    _ _ _ _

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim:    Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$    0.00

---

Debtor  Free Speech Systems LLC _____   Case number (if known) _____
        Name

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.67** Nonpriority creditor's name and mailing address

Robert Parker

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred        2018

Last 4 digits of account number        __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim:   Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.68** Nonpriority creditor's name and mailing address

Yan Luis

c/o Noor A. Sabb, 280 North Broadway, STE 300

Jericho, New York 11753

Date or dates debt was incurred        _____

Last 4 digits of account number        __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:   ADA Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.__** Nonpriority creditor's name and mailing address

_____

_____

_____

Date or dates debt was incurred        _____

Last 4 digits of account number        __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.__** Nonpriority creditor's name and mailing address

_____

_____

_____

Date or dates debt was incurred        _____

Last 4 digits of account number        __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.__** Nonpriority creditor's name and mailing address

_____

_____

_____

Date or dates debt was incurred        _____

Last 4 digits of account number        __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

Debtor _____ Case number *(if known)*_____
     Free Speech Systems LLC
         Name

| Part 3: | List Others to Be Notified About Unsecured Claims |

4.  List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

   If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.1. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.2. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.3. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.4. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.1. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.5. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.6. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.7. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.8. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.9. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.10. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |
| 4.11. | Line ____  ☐ Not listed. Explain _____ | ― ― ― ― |

Debtor   Free Speech Systems LLC
     Name
Case number (if known) _____

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---|---|

**5. Add the amounts of priority and nonpriority unsecured claims.**

Total of claim amounts

| | | |
|---|---|---|
| 5a. **Total claims from Part 1** | 5a. | $ 0.00 |
| 5b. **Total claims from Part 2** | 5b. + | $ 995,824.64 |
| 5c. **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c. | $ 995,824.64 |

**Fill in this information to identify the case:**

Debtor name __Free Speech Systems, LLC__

United States Bankruptcy Court for the: __Southern__    District of __Texas__
(State)

Case number (If known): __22-60043__    Chapter __11__

☐ Check if this is an amended filing

## Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases    12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

1. **Does the debtor have any executory contracts or unexpired leases?**

   ☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

   ☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

2. **List all contracts and unexpired leases**

**State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease**

| | | |
|---|---|---|
| **2.1** | State what the contract or lease is for and the nature of the debtor's interest | Financial services Agreement |
| | | For Credit Card Processing and Other Financial Service |
| | State the term remaining | 9 years and 2 months |
| | List the contract number of any government contract | |

PQPR Holdings Limited LLC: PO Box 19549 Austin TX 78760 - 9549

| | | |
|---|---|---|
| **2.2** | State what the contract or lease is for and the nature of the debtor's interest | Employment Agreement |
| | | For Employment of Alex Jones |
| | State the term remaining | "At will" Basis |
| | List the contract number of any government contract | |

Alex Jones: 3019 Alvin Devane Blvd Austin TX 78741

| | | |
|---|---|---|
| **2.3** | State what the contract or lease is for and the nature of the debtor's interest | Lease Agreement |
| | | Studio Lease |
| | State the term remaining | 2 years and 5 Months |
| | List the contract number of any government contract | |

BCC UBC LLC: 901 S. Mopac Expressway Plaza I, Suite 60, Austin, TX 78746

| | | |
|---|---|---|
| **2.4** | State what the contract or lease is for and the nature of the debtor's interest | Service Agreement |
| | | For Back Ground Checks and Investigative Services |
| | State the term remaining | 9 Months, Renews Automatically |
| | List the contract number of any government contract | |

Austin Security and Investigation Solutions LLC: PO Box 2904 Pflugerville, TX 78691

| | | |
|---|---|---|
| **2.5** | State what the contract or lease is for and the nature of the debtor's interest | Building and Land Lease Agreement |
| | | Warehouse Lease |
| | State the term remaining | Renews Monthly |
| | List the contract number of any government contract | |

Expo Glo, LLC: 1717 McKinney Ave, Suite 1900 Dallas, TX 75202-1236

**Fill in this information to identify the case:**

Debtor name  Free Speech Systems, LLC

United States Bankruptcy Court for the: Southern    District of Texas
                                                          (State)

Case number (If known):  22-60043

☐ Check if this is an
   amended filing

## Official Form 206H

## Schedule H: Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

1. **Does the debtor have any codebtors?**

   ☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

   ☑ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G.*** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: Codebtor | | Column 2: Creditor | |
|---|---|---|---|
| **Name** / **Mailing address** | | **Name** | Check all schedules that apply: |
| 2.1  Alex E. Jones | 3019 Alvin Devane Blvd. *Street* <br> Austin  TX  78741 *City / State / ZIP Code* | Niel Heslin | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.2  Alex E. Jones | 3019 Alvin Devane Blvd. *Street* <br> Austin  TX  78741 *City / State / ZIP Code* | Scarlett Lewis | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.3  Alex E. Jones | 3019 Alvin Devane Blvd. *Street* <br> Austin  TX  78741 *City / State / ZIP Code* | Leonard Pozner | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.4  Alex E. Jones | 3019 Alvin Devane Blvd. *Street* <br> Austin  TX  78741 *City / State / ZIP Code* | Veronique De La Rosa | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.5  Alex E. Jones | 3019 Alvin Devane Blvd. *Street* <br> Austin  TX  78741 *City / State / ZIP Code* | Marcel Fontaine | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.6 | *Street* <br> *City / State / ZIP Code* | | ☐ D <br> ☐ E/F <br> ☐ G |

| Fill in this information to identify the case and this filing: |
| --- |
| Debtor Name __Free Speech Systems, LLC__ |
| United States Bankruptcy Court for the: __Southern__   District of __Texas__ (State) |
| Case number (*if known*): __22-60043__ |

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors      12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☒ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☒ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☒ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☒ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☒ *Schedule H: Codebtors* (Official Form 206H)

☒ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

❑ Amended *Schedule ____*

❑ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒ Other document that requires a declaration   Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  __08/29/2022__          ✗ _____
              MM / DD / YYYY                Signature of individual signing on behalf of debtor

                        __W. Marc Schwartz__
                        Printed name

                        __Chief Restructuring Officer__
                        Position or relationship to debtor

# EXHIBIT 12

008772

**R. J. Shannon**

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Tuesday, August 16, 2022 9:56 AM |
| **To:** | Shelby Jordan; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procdurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

   b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors ***are*** met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

1

EXHIBIT
tabbies
12
008773

    c.   It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

    d.   Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3)   The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.


R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

008774

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

008775

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

## Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

## Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

4

008776

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

# EXHIBIT 13

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Tuesday, August 16, 2022 2:06 PM |
| **To:** | Ray Battaglia; Kyung S. Lee |
| **Cc:** | R. J. Shannon |
| **Subject:** | Re: Isn't this our case in Conn |

Ray and Kyung:  Based on RJ's total rejection of all defenses and all matters filed in Conn I do not think a conference to discuss how to protect the ongoing business is a total waste of time.

> "The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate."

So, after 300 words of negative, I leave it to the Debtors to decide how to keep Alex supporting the efforts.   I'm sure RJ has an answer since Alex will be left to fighting these battles on his own.

Shelby

---

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just

1



EXHIBIT
13
008779

uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

   b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

   c. It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

   d. Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3) The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee

2

<klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ: I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

3

008781

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

5

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

008784

# EXHIBIT 14

008785

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Wednesday, August 17, 2022 8:38 AM |
| **To:** | R. J. Shannon; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

RJ - I have been waiting since this email to hear the Debtors Plan when Alex sales go dark because he is in trial in Conn.  If you have one, please forward so I may share with Alex.  In light of your opinions  in your email, this is a critical request.

Shelby

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an

1



EXHIBIT
_14_
008786

example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

b.  I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors **are** met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

c.  It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

d.  Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3)  The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

008787

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

3

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

4

008789

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

5

008791

# EXHIBIT 15

008792

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Monday, August 22, 2022 2:32 PM |
| **To:** | Kyung S. Lee; R. J. Shannon |
| **Cc:** | Marc Schwartz; Ray Battaglia |
| **Subject:** | Re: Engagement Letter in word |

I'm checking with Alex but I suspect with the indemnity his answer is none if FSS has funds. Let me talk to him.

**From:** "Kyung S. Lee" <klee@shannonleellp.com>
**Date:** Friday, August 19, 2022 at 3:28 PM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Shelby Jordan <sjordan@jhwclaw.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Ray Battaglia <rbattaglialaw@outlook.com>
**Subject:** FW: Engagement Letter in word

1. Can you look at your Connecticut Removal file and send me a WORD document with the "captions" of the Sandy Hook Lawsuits? Is there just one, or several? I need this for the Engagement Letter for Norm to make sure it is right.
2. Marc, note Norm's request that the post-petition retainer be increased from $25,000 to $100,000.
3. Shelby, I am sure the Court and creditors are going to want to know what Alex will be funding of Norm's fees and retainers. I wanted to raise it now.
4. I am going to start working on the Application for Pattis & Smith so we don't have any estoppel arguments from the Plaintiffs' counsel.

Kyung S. Lee
Shannon & Lee LLP
Cell: 713-301-4751
klee@shannonleellp.com

**From:** Norm Pattis <NPattis@pattisandsmith.com>
**Date:** Friday, August 19, 2022 at 1:25 PM
**To:** Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: Engagement Letter in word

Kyung

Sharon is out today.

If this covers the CT cases, too, can you make the retainer amount $100,000?

Otherwise, fine.

Norm

**From:** Kyung S. Lee <klee@shannonleellp.com>
**Sent:** Friday, August 19, 2022 2:07 PM

1



EXHIBIT
15
008793

**To:** Sharon Abramson <sabramson@pattisandsmith.com>
**Cc:** Norm Pattis <NPattis@pattisandsmith.com>; Shelby Jordan <sjordan@jhwclaw.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** Re: Engagement Letter in word

Sharon, here is a redline of the original Engagement Letter, marked with my changes. Please review  and let me know if you have any questions. Once you tell me you are good with the changes, I can turn it into a final and circulate to Alex and Marc.

Kyung S. Lee
Shannon & Lee LLP
Cell: 713-301-4751
klee@shannonleellp.com

**From:** Sharon Abramson <sabramson@pattisandsmith.com>
**Date:** Thursday, August 18, 2022 at 3:45 PM
**To:** Kyung S. Lee <klee@shannonleellp.com>
**Cc:** Norm Pattis <NPattis@pattisandsmith.com>
**Subject:** Engagement Letter in word

Good afternoon:

Engagement letter in word is attached.

Kind regards,

Sharon Abramson
Office Manager

Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
T: (203) 393-3017
F: (203) 393-9745
https://www.pattislawfirm.com/

Confidentiality Notice: This email message (including attachments) is from Pattis and Smith LLC and is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sec. 2510-2521. The information contained in this transmittal, including any attachment, is privileged and confidential information and is intended only for the person or entity to which it is addressed. If you are neither the intended recipient nor the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying or distribution or the taking of any action in reliance on the contents of this transmittal is strictly prohibited. If you have received this transmittal in error, please contact the sender immediately and delete this transmittal from any computer or other data bank. Thank you.

008794

# EXHIBIT 16

008795

| | |
|---|---|
| NO. X06-UWY-CV-18-6046436-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| ERICA LAFFERTY, ET AL. | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |
| | ) |
| NO. X06-UWY-CV-18-6046437-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| WILLIAM SHERLACH | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |
| | ) |
| NO. X06-UWY-CV-18-6046438-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| WILLIAM SHERLAC, ET AL. | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |

## AFFADAVIT OF W. MARC SCHWARTZ

I, W. Marc Schwartz, the Chief Restructuring Officer of Free Speech Systems, LLC ("FSS"), aver the following statements under penalty of perjury:

1.      I am the Chief Restructuring Officer for Free Speech Systems, LLC. Attached as Exhibit A hereto is my engagement agreement with FSS (the "Engagement Agreement").

2.      As set out in the Engagement Agreement, I have full managerial authority over FSS as set out in paragraph 8.01 of the Company Agreement of FSS (the "Company Agreement"). A copy of the Company Agreement referred to in the Engagement Agreement is attached hereto as Exhibit B.



EXHIBIT
16

008796

3.      I am also a founder and the chairman of Schwartz Associates, LLC ("SALLC"). SALLC has been retained by FSS as its financial advisor to assist me in my duties as the Chief Restructuring Officer. I have control and supervisory authority over all employees of SALLC.

4.      In my role as Chief Restructuring Officer, I have access to all corporate records of FSS and control over all employees, contractors, and professionals of FSS. I have reviewed and analyzed these records in connection with, among other things, preparing the voluntary petition, schedules of assets and liabilities, and statement of financial affairs in FSS's chapter 11 bankruptcy case pending as case no. 22-60043 (the "Bankruptcy Case") before the United States Bankruptcy Court for the Southern District of Texas.

5.      Employees of SALLC have also reviewed and analyzed the records of FSS in connection with, among other things, preparing the voluntary petition, schedules of assets and liabilities, and statement of financial affairs in the Bankruptcy Case.

6.      In connection with the litigation pending before the Connecticut Superior Court against FSS (the "Connecticut Litigation"), I have searched the records of FSS for any management agreements between PQPR Holdings Limited, LLC ("PQPR") and FSS. My understanding of the term "management agreement" is a contract between the owner of a company and one or more persons responsible for managing the company. I have not found any such records and I am not otherwise aware of any management agreements between PQPR and FSS.

7.      I have also directed employees of FSS, attorneys representing FSS, and employees of SALLC involved in assisting me in my role as Chief Restructuring Officer of FSS to search for records of any management agreements between PQPR and FSS. These parties have informed me that they have not uncovered any such records and that they are not otherwise aware of any management agreements between PQPR and FSS.

008797

8.      I have been informed by FSS's counsel in the Connecticut Litigation that Alex Jones and Lydia Hernandez testified to seeing a management agreement between PQPR and FSS at some point in the past.

9.      Notwithstanding the testimony of Mr. Jones and Ms. Hernandez, I do not believe that there is any such management agreement between PQPR and FSS. As the result of the search and my work with FSS, the only document that I am aware of that that Mr. Jones and Ms. Hernandez may have been referring to is the memorandum of understanding document attached in redacted form as Exhibit C (the "Payment MOA").

10.     I do not consider the Payment MOA to be a "management agreement" based on my understanding of that term. Although FSS and PQPR are parties to the Payment MOA and the term "manager" and "management" is used therein, the Payment MOA does not concern management of either FSS or PQPR but rather payment of the proceeds of product sales.

Executed on: 9/8/22

W. Marc Schwartz

THE STATE OF TEXAS

COUNTY OF HARRIS

BEFORE ME, the affiant authority, this day appeared W. Marc Schwartz, who after being duly sworn, stated upon oath that the foregoing was true and correct. Sworn to before me this 8th day of September, 2022.


TRENA N. HOGGE
My Notary ID # 133264331
Expires August 12, 2025

NOTARY PUBLIC STATE OF TEXAS

3

## EXHIBIT A TO SCHWARTZ AFFIDAVIT

Engagement Agreement



**Schwartz** Associates

May 19, 2022

**VIA EMAIL**

Free Speech Systems, LLC
VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that Alex E. Jones has delegated to W. Marc Schwartz of Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts involving the scope described herein, potentially including a filing under the United States Bankruptcy Code (the "Bankrutpcy Code"). This letter also confirms that FSS shall retain SALLC as its financial advisor ("FA") in connection with the restructuring efforts.

SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of FSS' assets, including negotiations with creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best chance of recoveries on their claims. CRO will work to maximize returns and to assure a fair pro rata distribution to all unsecured creditors.

### I.    Scope of Engagement

CRO will lead FSS' management and personnel through the restructuring process. It is agreed that CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as providing necessary testimony before the Bankruptcy Court on matters within CRO's areas of expertise;
6. Review inventory marketability and provide monetization alternatives as deemed appropriate;

1

**EXHIBIT**

4

tabbies



**Schwartz** Associates

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;
8. Implement cost containment measures;
9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;
10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring.
11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

## II.   Indemnification

FSS agrees to indemnify, defend, and hold harmless CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.

2



**Schwartz** Associates

### III.   Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV.   Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V.   Disclosures

FSS shall not disclose any work or analyses of SALLC or CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of CRO, which shall not be unreasonably withheld. Neither SALLC nor CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

3

008802



**Schwartz** Associates

### VI.    Term & Termination

This agreement shall remain in effect until the earlier of i. The completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fails to make payments when due hereunder.

### VII.    Compensation

For services provided described herein, SALLC shall be compensated for the services of CRO on an hourly fee basis of $690.00 per hour.

If, in CRO's sole judgment, it is determined that additional services are required to assist with the scope of this engagements as outlined by this Agreement, CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under the Bankruptcy Code, and FSS apply for authorization to retain and employ CRO and SALLC, FSS' payment of CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

### A. Retainer

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS. SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.

4

008803



**Schwartz** Associates

**B. Invoicing**

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

**VIII.   CRO's Counsel**

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

**IX.    Authorization**

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to CRO and SALLC are not contingent upon the results of this engagement and neither CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.

5

008804



# **Schwartz** Associates

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

Free Speech Systems, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

6

008805

## EXHIBIT B TO SCHWARTZ AFFIDAVIT

FSS Company Agreement

**COMPANY AGREEMENT OF**
**FREE SPEECH SYSTEMS, LLC**

THIS COMPANY AGREEMENT OF FREE SPEECH SYSTEMS, LLC, a Texas limited liability company (this "Agreement"), is dated effective November 16, 2007 (the "Effective Date"), by the undersigned initial Members (defined herein) and Managers (defined herein) of the Company.

1.    **Formation of the Company.**

   **1.01    Filing of Certificate of Formation.** The Certificate of Formation for the Company was filed with, and a certificate evidencing filing was issued by, the Secretary of State of the State of Texas on the Effective Date.

   **1.02    Initial and Additional Members.** The names and addresses of the initial Members of the Company are as set forth on Schedule A of this Agreement.  At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company. Additional Members of the Company shall be admitted only upon the approval of a Required Interest.

   **1.03    Term of the Company.** The Company shall exist for the duration specified in the Certificate of Formation (which may be perpetual), unless sooner terminated in accordance with this Agreement.  No provision of this Agreement (including, without limitation, the provisions of Section 10) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other member or Manager, for any purposes other than federal and state tax purposes.

2.    **Organization of the Company.**

   **2.01    Name of the Company.** The name of the Company is "Free Speech Systems, LLC."  The Managers may cause the Company to do business under one or more assumed names.

   **2.02    Registered Office.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

   **2.03    Principal Office.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 101.501 of the TBOC.  The Company may have such other offices as the Managers may designate from time to time.

2.04    **Purpose.** The sole purpose of the Company shall be to operate such businesses as the Members choose from time to time and shall have all the specified rights, powers, and duties set forth in the TBOC.

3.    **Definitions.**

3.01    **Certain Defined Terms.** The capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Section 3.01.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"**Agreement**" means this Agreement, including Schedule A, as originally executed and as subsequently amended from time to time.

"**Capital Account**" means the Capital Account maintained for each Member pursuant to Section 4.04 of this Agreement.

"**Capital Contribution**" means, as to any Member, the sum of the following: (i) the Member's Initial Capital Contribution; plus (ii) the Member's Additional Capital Contributions, if any. "Initial Capital Contributions" means, as to any Member, the contributions described in Section 4.01. "Additional Capital Contributions" means, as to any Member, the contributions described in Section 4.02.

"**Certificate of Formation**" means the Certificate of Formation of the Company described in Section 1 of this Agreement, as may be amended from time to time by appropriate filing with the Secretary of State of Texas.

"**Code**" means to the Internal Revenue Code of 1986, as it has been and may be amended.

"**Company**" means Free Speech Systems, LLC, a Texas limited liability company, as such limited liability company may from time to time be constituted.

"**Company Minimum Gain**" shall have the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"**Company Property**" or "**Company Properties**" means all interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

- 2 -

008808

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the most recent prime rate as quoted in the Wall Street Journal, and (ii) the maximum rate permitted by applicable law.

"**Managers**" means, as of any date. the Person or Persons who are then managing the business of the Company in accordance with Section 8 of this Agreement.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Members**" means, as of any date, to the Persons who then own Percentage Interests in the Company. The current Members are listed on Schedule A.

"**Membership Interest**" means, as of any date, a Member's share of the Company's income, gain, loss, deduction and credits and the right to receive distributions from the Company expressed by such Member's Percentage Interest, but does not include (i) the right of the holder thereof to participate in the management of the business or affairs of the Company, (ii) the right of the holder thereof to consent, approve, reject or disapprove any act of the Company, or (iii) the right of the holder thereof to be a Member.

"**Net Cash From Operations**" means the gross cash proceeds from the operations of the Company less the portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers. "Net Cash From Operations" shall not be reduced by depreciation, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Net Cash from Sales or Refinancings."

"**Net Cash from Sales or Refinancings**" means the net cash proceeds of the Company from all sales and other dispositions of Company Property other than in the ordinary course of business (such as the sale or condemnation of all or a portion of the Property, a refinancing of all or a portion of the Property pursuant to a refinancing transaction or the receipt of casualty, litigation proceeds, or accelerated lease payments), less any portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers, and shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with such a capital transaction.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

- 3 -

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"**Percentage Interest**" means the interest of each Member in the Company as set forth opposite the Member's name on the attached Schedule A, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Permitted Transferee**" means any of the following:

(1)   Alex Jones, Kelly Jones, and any of their descendants;

(2)   Any corporation, partnership, limited liability company, or other entity 100% of the beneficial ownership of which is owned by Permitted Transferees;

(3)   Any charitable foundation established by an individual referenced in (1) above; or

(4)   Any trust set up for the primary benefit of one or more of the individuals referenced in (1) above or for the benefit of a charitable foundation referenced in (3) above.

"**Person**" means any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, business trust, real estate investment trust, cooperative, association, trust, estate or other entity or organization.

"**Profits**" and "**Losses**" means the net book income or net book loss, as the case may be, of the Company determined in accordance with the principles for computing "book" income and "book" loss under Section 1.704-1(b)(2)(iv) of the Treasury Regulations; provided, however, that items of income, gain, loss, deduction and credit specially allocated pursuant to the provisions of Section 5.03 shall be excluded from the computation of Profits and Losses.

"**Required Interest**" means Members holding in aggregate fifty-one percent (51.00%) or more of the Percentage Interests then held by all Members.

"**Standard Rate**" means a per annum rate of interest equal to ten percent (10%), compounded annually.

"**Tax Distribution**" with respect to any Member for any taxable year of the Company, means an amount of cash equal to the product of (i) the Profit and items of income and gain (reduced by Losses plus any items of loss and deduction) allocated to such Member for such taxable year pursuant to Section 5 and (ii) the highest marginal effective federal income tax rate applicable to an individual in effect from time to time during such taxable year.

"**TBOC**" means the Texas Business Organizations Code, as it may be amended from time to time.

- 4 -

"**Treasury Regulations**" means those regulations promulgated under the Code.

"**Unrecovered Capital Contribution**" means, as of any day, a Member's Capital Contribution adjusted as follows: (i) increased by the amount of any Company liabilities which, in connection with distributions pursuant to Sections 6.02(b) and 10.04(b), are assumed by such Member or are secured by any Company Property distributed to such Member; and (ii) reduced by the amount of cash and the fair market value (as determined by the Managers) of any Company Property distributed to such Member pursuant to Sections 6.02(b) and 10.04(b) and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company. In the event any Person transfers all or any portion of his Membership Interest, the transferee shall succeed to the Unrecovered Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

3.02    **Other Defined Terms.**  Other capitalized terms not defined in Section 3.01 shall have the meanings specified in the other sections of this Agreement.

4.    **Capital of the Company.**

4.01    **Initial Capital Contributions.** Each Member shall contribute to the capital of the Company the amount set forth as such Member's "Initial Capital Contribution" on Schedule A.

4.02    **Additional Capital Contributions.** The Managers may from time to time call upon the Members to make additional contributions to the capital of the Company pursuant to such terms and conditions as are specified by the Managers. The Members may (but shall not be required to) make Additional Capital Contributions to the Company. All Additional Capital Contributions shall be made within thirty (30) days after the Members have received notice thereof from the Managers. For purposes of this Agreement, "Additional Capital Contribution" means, as to any Member, such Member's pro rata share, based upon such Member's Percentage Interest, of the additional sums determined by the Managers to be required for the operation of the Company.

4.03    **Failure to Make Additional Capital Contributions.** If any Member fails to pay all or any portion of an additional assessment after due notice, then the Managers may recoup any deficiency by arranging for additional advances to be made by those Members that are willing to fund some portion of the deficiency, in such proportions as the Managers and the participating Members agree. In any event, if any funds are advanced hereunder on other than a pro rata basis, all such advances made by any Member hereunder (including each Member's pro rata advance) shall be considered loans to the Company and shall accrue interest at a per annum rate equal to the Standard Rate.

4.04    **Capital Accounts.** A Capital Account shall be established and maintained for each Member. It is the intention of the Members that the Capital Accounts be maintained in accordance with Section 1.704-1(b) of the Regulations. In that regard, each Member's Capital Account shall be:

(a)    Increased by:

- 5 -

(i)    The amount of money contributed by that Member to the Company;

(ii)    The fair market value of property or services contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to within the meaning of Section 752 of the Code); and

(iii)    Allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax, and

(b)    Decreased by:

(i)    The amount of money distributed to that Member by the Company;

(ii)    The fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to within the meaning of Section 752 of the Code);

(iii)    Allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code; and

(iv)    Allocations of Company loss and deduction (or items thereof).

A Member's Capital Account also shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(e) to reflect the distribution of property to a Member, and otherwise adjusted as required by Treas. Reg. § 1.704-1(b)(2)(iv) or 1.704-1(b)(4). On the transfer of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

4.05    __Return of Capital Contributions; Company Property.__ Except as otherwise provided herein or in the TBOC, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts. Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Managers may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

5.    __Allocations.__

5.01    __Allocation of Profits.__ After giving effect to the special allocations set forth in Section 5.03, Profits for each taxable year shall be allocated in the following order and priority:

- 6 -

(a)     First, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.02(a)(ii) for all prior taxable years, over (ii) the cumulative Profits allocated pursuant to this Section 5.01(a) for all prior taxable years; and

(b)     Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

5.02    **Allocation of Losses.** After giving effect to the special allocations set forth in Section 5.03, Losses for any taxable year shall be allocated as set forth in Section 5.02(a), subject to the limitations in Section 5.02(b).

(a)     Losses for any taxable year shall be allocated in the following order and priority;

(i)     First, to the Members in accordance with their respective Percentage Interests in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.01(b) for all prior taxable years, over (B) the cumulative Losses allocated pursuant to this Section 5.02(a)(i) for all prior taxable years; and

(ii)    Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

(b)     The Losses allocated pursuant to Section 5.02(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.02(a), the limitation set forth in this Section 5.02(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.03    **Special Allocations.** The following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each

- 7 -

008813

Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Person's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations.   Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 5.03(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5 have been tentatively made as if this Section 5.03(c) were not in this Agreement.

(d)     Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 5.03(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5 have been tentatively made as if Section 5.03(c) and this Section 5.03(d) were not in this Agreement.

(e)     Nonrecourse Deductions. All Nonrecourse Deductions for any taxable year shall be specially allocated among the Members in proportion to their Percentage Interests.

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)     Section 754 Adjustments To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Membership Interest, the

- 8 -

amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentage Interests in the event that Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event that Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

5.04    **Curative Allocations.** The allocations required by Section 5.03 and this Section 5.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 5.04. Therefore, notwithstanding any other provision of this Section 5 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.01.

5.05    **Section 704(c) Allocations.** In accordance with Section 704(c) of the Code, income, gain, loss and deduction concerning any property contributed to the Company shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the agreed fair market value of such property upon contribution. If the agreed fair market value of any Company asset is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its adjusted fair market value in the same manner as under Section 704(c) of the Code. Allocations under this Section 5.05 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Member's Capital Account.

5.06    **Other Allocation Rules.** In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such taxable year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such taxable year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers. Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, and solely for such purpose, the Member's Percentage Interest is specified to be his applicable Interest. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

5.07    **Allocations on Transfer.** Income, gain, loss, deduction or credit attributable to any Company interest which has been transferred shall be allocated between the assignor and the assignee as follows:

(a)    For the months prior to the transfer, to the assignor;

(b)    For the months subsequent to the transfer, to the assignee; and

008815

(c)     For the month of the transfer, to the assignee if the transfer occurs on or before the 15th day of such month and to the assignor if occurring thereafter.

For purposes of the above allocation, income, gains, losses, deductions and credits shall be allocated equally among the months of the taxable year without regard to Company operations during such months.

6.     **Distributions.**

**6.01     Distributions of Net Cash from Operations.** Except as otherwise provided in Section 10, Net Cash from Operations, if any, shall be distributed to the Members within thirty (30) days after the end of each taxable year, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Operations distributed to a Member under this Section 6.01(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.01(a), and (ii) no such distribution of Net Cash from Operations shall be made pursuant to this Section 6.01(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business; and

(b)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

**6.02     Distributions of Net Cash from Sales or Refinancings.** Except as otherwise provided in Section 10, Net Cash from Sales or Refinancings shall be distributed, within thirty (30) days following the receipt thereof, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Sales or Refinancings distributed to a Member under this Section 6.02(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c)of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.02(a), and (ii) no such distribution of Net Cash from Sales or Refinancings shall be made pursuant to this Section 6.02(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business;

(b)     Then, to the Members in an amount equal to their Unrecovered Capital Contributions, payable in proportion to the unpaid amounts thereof; and

(c)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

**6.03     Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company, the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in

008816

respect of any Member or any Person owning an interest, directly or indirectly. in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Section 6.03 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

7.      **Fiscal Matters; Books and Records.**

**7.01    Bank Accounts; Investments.**  Capital Contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments.   Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

**7.02    Records Required by TBOC; Right of Inspection.**  During the term of the Company and for a period of four (4) years thereafter, the Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2 all records required to be kept pursuant to the TBOC. On written request stating the purpose, a Member or an assignee of a Member's Percentage Interest may examine and copy in person or by such Person's representative, at any reasonable time, for any proper purpose, and at such Person's expense, records required to be maintained under the TBOC.

**7.03    Books and Records of Account.**  The Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting selected by the Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

**7.04    Tax Returns and Information.**  The Members intend for the Company to be treated as a partnership for tax purposes.  The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file.  Within the shorter of:  (a) such period as may be required by applicable law or regulation; or (b) seventy-five (75) days after the end of each calendar year, the Managers shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

**7.05    Tax Elections.**  The Company shall be treated as a partnership for federal income tax purposes and neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law.

**7.06    "Tax Matters Member."**  The Managers designate Alex Jones as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth day after

- 11 -

becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

## 8. Management of the Company.

**8.01 Management.** The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers. The Managers shall have authority to cause the Company to do business in jurisdictions other than the State of Texas. Pursuant to the TBOC, the existence of the Company began upon the effective date of the Certificate of Formation. The initial Manager of the Company shall be Alex Jones, and he shall serve in such capacity until such time as his successor or successors have been duly elected by the approval of a Required Interest.

**8.02 Powers of Managers/Delegation of Authority.** The Managers shall have no power to cause the Company to do any act outside the purpose of the Company as set forth in Section 2.04. Subject to the foregoing limitation and all other limitations in this Agreement, the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.

**8.03 Action by Managers.** Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers. A meeting of the Managers shall be held at the principal office of the Company upon five (5) days' notice. Any action that may be taken at a meeting of the Managers or any committee of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting on the particular action, and such consent shall have the same force and effect as a unanimous vote of the Managers or such committee or designated group of Managers at a meeting duly called and held. No notice shall be required in connection with the use of a written consent pursuant to this Section 8.

## 9. Membership in the Company.

**9.01 Rights, Powers and Obligations of Members.** No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. No Member (including any Member who is a Manager or officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

**9.02 Action by Members.** Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members shall be held on the first Thursday of January at 10:00 a.m., local time. Special meetings of the Members may be called by resolution of a Required Interest upon five (5) days' notice, for the purpose of addressing any matter upon which the Members may vote under this Agreement. A Required Interest shall constitute (i) a quorum for the transaction of business, and (ii) the act of the Members. All meetings of Members shall be held at the principal office of the Company as provided in Section 2. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by

- 12 -

a Required Interest or Members holding in aggregate the Percentage Interests required to approve such action under the TBOC, the Certificate of Formation or this Agreement.

## 10.    Restrictions Upon Membership Interests.

**10.01 Generally.**    The ownership and transferability of Interests in the Company are substantially restricted.  Neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred or encumbered except as otherwise set forth in this Agreement.  Capital is material to the business and investment objectives of the Company and its federal tax status.  An unauthorized transfer of a Member's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure.  These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue its business.  Except as provided in this Agreement, neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred without the prior written approval of a Required Interest.

**10.02 Authorized Transfers at Death.**  An individual Member may transfer all or any part of his Membership Interest at his death to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited testamentary power of appointment may transfer all or any part of its Membership Interest at the death of such individual to a Permitted Transferee without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.02, shall become a Substituted Member without the approval of a Required Interest.

The transfer may be accomplished pursuant to (1) the terms of the properly probated last will and testament of a Member; (2) the exercise of a limited or unlimited testamentary power of appointment; (3) the terms of any trust set up for the primary benefit of one or more Permitted Transferees; or (4) pursuant to an acknowledged assignment instrument, effective as of the date of the Member's death, delivered to and signed by the Manager prior to the death of the Member.

If there has been no pre-arranged transfer as provided above, the executor, administrator, guardian, conservator, or legal representative of a deceased or incompetent Member may exercise all the deceased or incompetent Member's rights and powers necessary to settle the Member's estate or administer the Member's property.  However, the estate of a deceased or incompetent Member shall not have the right to become a Substituted Member without the approval of a Required Interest.

**10.03 Authorized Estate Planning Transfers.**  An individual Member may make transfers of all or any part of his Membership Interest, with or without consideration, to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited right to make a disposition of all or any part of his interest in the trust during his lifetime may transfer all or any part of its Membership Interest to a Permitted Transferee with or without consideration, without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.03, shall become a Substituted Member without the approval of a Required Interest.

- 13 -

**10.04  Nonrecognition of an Unauthorized Transfer.**  The Company will not be required to recognize the interest of any transferee or assignee who has obtained a purported Membership Interest as the result of a transfer or assignment that is not authorized by this Agreement (an "Unauthorized Transfer").   If there is doubt as to who owns a Membership Interest or who is entitled to distributions or to the proceeds upon liquidation of the Company, the Manager may accumulate such distributions or liquidation proceeds until the issue is resolved.

**10.05  Effect of Unauthorized Transfers.**  If a Member makes an Unauthorized Transfer of all or any part of a Membership Interest, the Company will have the unilateral option to acquire the interest of the transferee or assignee, or any fraction or part thereof (referred to in this Section 10.05 as the "Unauthorized Interest"), upon the following terms and conditions.

(a)   The Company will have the option to acquire the Unauthorized Interest by giving written notice to the transferee or assignee of its intent to purchase the Unauthorized Interest within ninety (90) days from the date it is finally determined that the Company is required to recognize the transfer or assignment of the Unauthorized Interest.

(b)   The valuation date for the determination of the purchase price of the Unauthorized Interest will be the first day of the month following the month in which such written notice is delivered.

(c)   Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Unauthorized Interest shall be its fair market value as determined in the manner provided in Schedule B.

(d)   Closing of the sale will occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the fair market value was finally determined in accordance with the provisions of Schedule B.

(e)   In order to reduce the burden upon the resources of the Company, the Company will have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in fifteen (15) equal annual installments (or in annual installments for the remaining term of the Company if less than fifteen (15) years) with interest at the Default Interest Rate.  The first installment of principal, with interest, will be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, will be due and payable on the first day of each succeeding calendar year until the entire amount of the obligation is paid.  The Company will have the right to prepay all or any part of the purchase money obligation at any time without penalty.

(f)   Upon the approval of a Required Interest, other than the Member whose interest is to be acquired, the Manager may assign the Company's option to purchase to one or more of the remaining Members and when done, any rights or obligations imposed upon the Company will instead become, by substitution, the rights and obligations of such Members.

(g)   Neither the transferee or assignee of an Unauthorized Interest or the Member causing the transfer or assignment, will have the right to vote on Company matters during the prescribed option period.

**10.06  Deemed Unauthorized Transfers.**  In the event that any of the following events occur with respect to a Member, such Member will be deemed to have made an

- 14 -

Unauthorized Transfer of his Membership Interest, and the provisions of <u>Section 10.05</u> will apply:

        (a)    the assignment of all or any part of a Member's Membership Interest for the benefit of creditors;

        (b)    the Bankruptcy of a Member;

        (c)    the appointment of a receiver for all or substantially all of the assets of a Member;

        (d)    the levy of an attachment, sequestration, garnishment, or charging order against all or any part of a Member's Membership Interest; or

        (e)    a purported transfer or encumbrance by operation of law or otherwise of all or any part of a Member's Membership Interest, except as expressly permitted under this Agreement.

### 10.07  Admission of Substituted Members.

        (a)    Except as otherwise provided in <u>Sections 10.02</u> and <u>10.03</u> of this Agreement, no assignee of all or any part of a Membership Interest shall have the right to become a Substituted Member except with the approval of a Required Interest, the granting or denying of which consent shall be in the sole discretion of those constituting the approval of a Required Interest, and, if granted, may be granted subject to whatever conditions, if any, those constituting the approval of a Required Interest may require.  Notwithstanding any other provision of this Agreement, in no event may an assignor of all or any part of a Membership Interest make or enter into an agreement, oral or written, with an assignee or potential assignee of such interest under which the assignor agrees to exercise its residual rights in the Company at the discretion or instruction of any assignee of such interest, and any such purported agreement shall be null and void.

        (b)    Notwithstanding any granting of the approval of a Required Interest under paragraph (a) of this <u>Section 10.07</u>, and notwithstanding the provisions of <u>Sections 10.02</u> and <u>10.03</u>, the admission of an assignee as a Substituted Member shall be further conditioned as follows:

        (i)    the assignment instrument and such other instruments as the Managers may deem necessary or desirable to effect the admission of the assignee as a Substituted Member being in form and substance satisfactory to the Managers;

        (ii)    the assignor and assignee executing such other instrument or instruments as the Managers may deem necessary or desirable to effectuate such admission;

        (iii)    the assignee and the assignee's spouse (if any) accepting and adopting in writing all the terms and provisions of this Agreement, as the same may have been amended;

- 15 -

(iv)     the assignee and/or the assignor paying or obligating themselves to pay all reasonable expenses connected with such admission (as determined by the Managers, but which the Managers shall have the right to waive), including, but not limited to, the cost of the preparation, filing, and publishing of any appropriate documents; and

(v)     such other conditions as the Managers may reasonably impose.

(c)     In the event that an assignee seeking to become a Substituted Member under this Section 10.07 is an assignee of all or any part of a Membership Interest of a Manager, then all decisions in this Section 10.07 are to be made by the other Manager(s), if any, or if there is no other Manager, then by a Unanimity of Interest of the Members.

**10.08  Status of a Substituted Member.**  A "Substituted Member" is an assignee of all or any part of a Membership Interest admitted to all the rights and subject to all of the obligations of a Member in the Company. Any such Substituted Member shall be treated as a Member. In the event an assignee becomes a Substituted Member, such Substituted Member shall be deemed to have received its interest in the Company from the Member who assigned such interest, and will have the same rights to receive distributions and to be allocated tax items as the Member with respect to which such assignee is becoming a Substituted Member.

**10.09  Assignee of a Membership Interest.**  Any person or entity who acquires all or any part of a Membership Interest and who has not been admitted as a Substituted Member shall be entitled to receive Company distributions attributable to such Interest, but shall have no voting or managerial rights.

**10.10  Membership Interest Pledge or Encumbrance.**  No Member may grant a security interest in or otherwise pledge, hypothecate, or encumber all or any part of his Membership Interest or such Member's distributions without obtaining the approval of a Required Interest. It is understood that the Members are under no obligation to give consent nor are they subject to liability for withholding consent.

11.     **Dissolution and Winding Up.**

**11.01  Events Causing Dissolution.**  The Company shall be dissolved upon the first of the following events to occur: (a) the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation; (b) the written consent of a Required Interest at any time to dissolve and wind up the affairs of the Company; or (c) the occurrence of any other event that causes the dissolution of a limited liability company under the TBOC.

**11.02  Winding Up.**  If the Company is dissolved pursuant to Section 11.01, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)     Appointment of Liquidator.  The winding up of the Company's affairs shall be supervised by a Liquidator. The Liquidator shall be the Managers or, if the Members prefer, a liquidator or liquidating committee selected by a Required Interest.

(b)     Powers of Liquidator.  In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company: (i)

- 16 -

to prosecute and defend civil, criminal or administrative suits; (ii) to collect Company assets, including obligations owed to the Company; (iii) to settle and close the Company's business; (iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; (v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property; (vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; (vii) to distribute any remaining proceeds from the sale of Company Property to the Members; (viii) to prepare, execute, acknowledge and file articles of dissolution under the TBOC and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and (ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managers under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not the Managers) shall not be liable as a Manager to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation.

**11.03  Compensation of Liquidator.** The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Required Interest.

**11.04  Liquidation.** Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(a)  First, to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves; and

(b)  Then, to the Members, in accordance with, and in the ratio of, the positive balances in their respective Capital Accounts.

The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Percentage Interests of each Member in such group.

**11.05  Final Report.** Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 11.04.

**11.06  Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, and notwithstanding that the deficit, if any, in the Capital Account of any Member results from or is

- 17 -

008823

attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

### 12. Miscellaneous.

**12.01   Notices.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (ii) hand delivered to the intended addressee. Notice so mailed shall be effective upon the expiration of three (3) days after its deposit and notice given by hand delivery shall be effective upon actual receipt by the addressee.  For purposes of notice, the addresses of the Members shall be as set forth under their respective names on the attached Schedule A; provided, however, that each Member shall have the right to change his address for purposes of notice hereunder to any other physical address by the giving of thirty (30) days' notice to the other Members in the manner set forth above.

**12.02   Governing Law.** This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Agreement is intended to comply with the requirements of the TBOC and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the TBOC or any provision of the Certificate of Formation, the TBOC and the Certificate of Formation, in that order of priority, will control.

**12.03   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**12.04   Amendment.** Except as expressly provided herein, this Agreement may be amended only by action of a Required Interest.

**12.05   Construction; Headings.** The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**12.06   Creditors Not Benefited.** Nothing in this Agreement is intended to benefit any creditor of the Company or a Member. No creditor of the Company or a Member will be entitled to require the Managers to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**12.07   Arbitration.** Any controversy, claim or dispute arising out of or relating to this Agreement or any other agreements referred to herein, shall be settled by binding arbitration in Austin, Travis County, Texas. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association

- 18 -

("AAA"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by AAA; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the AAA's rules and regulations) of the proceedings has been given to such party. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief. The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement. The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

**12.08   Entire Agreement.** This Agreement (including the heading on the first page hereof), the schedules and exhibits attached hereto and specifically referenced herein, collectively contain the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

**[Signature Page Follows]**

008825

EXECUTED to be effective as of the Effective Date.

**Members:**

_____
Kelly Jones

_____
Alex Jones

**Managers:**

_____
Alex Jones

SIGNATURE PAGE

008826

## SCHEDULE A

### Names, Addresses, Initial Capital Contributions and Percentage Interests

| Members: | Initial Capital Contributions: | Percentage Interest: |
|---|---|---|
| Kelly Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas 78746 | $51.00 | 51% |
| Alex Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas 78746 | $49.00 | 49% |
| **Totals:** | $100.00 | 100.00% |

008827

## SCHEDULE B

### DETERMINATION OF FAIR MARKET VALUE
### OF MEMBERSHIP INTEREST

In the event a determination of the fair market value of all or any part of a Membership Interest is required pursuant to the terms of this Agreement, the following provisions shall apply.

A.  The fair market value of all or any part of a Membership Interest shall be the price at which the interest would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, including, but not limited to, all facts relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held entity interests which may not be withdrawn before the end of the term of the Company.

B.  Purchaser and Seller shall first attempt to determine the fair market value of the affected Membership Interest or any part thereof (the "Affected Interest") by agreement.  If Seller and Membership are unable to agree on the fair market value of the Affected Interest within fifteen (15) days after Purchaser has notified Seller of its intent to purchase the Affected Interest, each of Seller and Purchaser shall, within the period of an additional fifteen (15) days, name a qualified appraiser and supply the name of such appraiser to the other party.  If either Seller or Purchaser fails to appoint an appraiser, the determination of the fair market value of the Affected Interest shall be made by the sole appraiser appointed.  Within the period of thirty (30) days after the appointment of the second appraiser, the two appraisers shall separately determine the fair market value of the Affected Interest and shall provide copies of their written reports to each of Seller and Purchaser.  If the difference between the two appraisal reports is ten percent (10%) or less (the higher report being less than the lower report multiplied by 1.01) the average of the appraisals shall conclusively determine the fair market value of the Affected Interest.  If the difference between the two appraisal reports is greater than ten percent (10%), the two appraisers shall appoint a third appraiser who shall select between the two appraisal reports as to the fair market value of the Affected Interest, and the opinion of the third appraiser shall be conclusive of the fair market value of the Affected Interest.

C.  For purposes hereof, an appraiser shall be "qualified" if he would be considered an expert for purposes of giving testimony as to the fair market value per Interest in the Company in a judicial or similar proceeding.  The costs and expenses of the appraiser selected by Seller or Purchaser shall be borne by the party selecting the appraiser.  The costs and expenses of a common appraiser shall be borne equally by the Seller and Purchaser.

D.  During the period of time that a determination of the fair market value of the Affected Interest is being conducted pursuant to the procedures set forth in this Schedule B, all time periods for notice or exercise of any rights related to the purchase shall be suspended.  Upon the final determination of fair market value, all time limits shall automatically commence.

008828

# EXHIBIT C TO SCHWARTZ AFFIDAVIT

Payment MOA

# Memorandum of Understanding

This Memorandum of Understanding is between ████████████ as Manager, and Free Speech Systems LLC (FSS) and PQPR Holdings LLC (PQPR).

It is agreed that ████████████ will manage all credit card transactions on behalf of FSS and PQPR. ████████████ will perform daily settlements as follows:

    A. ████████████ will first pay the Merchant Account fees as charged by credit card processors.

    B. After deducting credit card processing, remaining funds will be allocated as follows:

    C. funds will be allocated firstly 10 percent to ████████████ for its Services.

    D. Next, 80 percent of the sales of PQPR products will be allocated to PQPR.

    E. ████████████ will pay the sum of $11,000 per calendar day and remit to PQPR Holdings LLC as payment on its prior outstanding balances.

    F. Any remaining funds will be paid to FSS.

This agreement is effective October 6, 2021

Signed:

_____

Free Speech Systems LLC

_____

PQPR Holdings LLC

_____
████████████

008830

# EXHIBIT 17

008831

| NO. X06-UWY-CV-18-6046436-S | ) | SUPERIOR COURT |
| | ) | COMPLEX LITIGATION |
| ERICA LAFFERTY, ET AL. | ) | AT WATERBURY |
| | ) | |
| v. | ) | |
| | ) | |
| ALEX EMRIC JONES, ET AL. | ) | |
| | ) | |
| NO. X06-UWY-CV-18-6046437-S | ) | SUPERIOR COURT |
| | ) | COMPLEX LITIGATION |
| WILLIAM SHERLACH | ) | AT WATERBURY |
| | ) | |
| v. | ) | |
| | ) | |
| ALEX EMRIC JONES, ET AL. | ) | |
| | ) | |
| NO. X06-UWY-CV-18-6046438-S | ) | SUPERIOR COURT |
| | ) | COMPLEX LITIGATION |
| WILLIAM SHERLAC, ET AL. | ) | AT WATERBURY |
| | ) | |
| v. | ) | |
| | ) | |
| ALEX EMRIC JONES, ET AL. | ) | |
| | ) | |

## AFFADAVIT OF BLAKE RODDY

I, Blake Roddy, aver the following statements under penalty of perjury:

1.     My name is Blake Roddy. I am over the age of 18 years old and am competent to make this affidavit (the "Affidavit").

2.     I am currently employed by Free Speech Systems, LLC ("FSS"). I have been employed by FSS since 2013. I work as an e-commerce manager for FSS.

3.     I had a meeting with Attorney Brittany Paz the first quarter of 2022. I do not remember the exact date of this meeting, but my best recollection was that it was in or about March 2022. It is my understanding that this meeting was in connection with Attorney Paz's preparations to testify as a corporate representative of FSS in a deposition.



EXHIBIT 17

008032

4.      I was asked to create Google Analytics reports prior to my meeting with Attorney Paz. I do not use or maintain Google Analytics reports in the ordinary performance of my employment with FSS. To the best of my knowledge, such Google Analytics reports are not used or maintained by FSS in the ordinary course of its business.

5.      I created the Google Analytics reports as requested prior to my meeting with Attorney Paz. Attorney Paz and I discussed such Google Analytics documents in connection with our meeting.

6.      I did not maintain physical copies of the Google Analytics reports I prepared for my meeting with Attorney Paz. I do not believe that I ever created physical copies of the Google Analytics reports. Although I do not recall the exact details of my meeting with Attorney Paz, I believe the review of such Google Analytics reports with Attorney Paz was conducted on a computer monitor.

7.      At the direction of FSS's Chief Restructuring Officer and at the request of FSS's attorneys in certain litigation, I have conducted a search of my computer files for the Google Analytics reports that I discussed with Attorney Paz. That search uncovered the Google Analytics reports from March 2022 attached to this Affidavit as Exhibit A (the "Attached Google Analytics Reports").

8.      I believe that the Attached Google Analytics Reports are the Google Analytics reports that I reviewed and discussed with Attorney Paz in connection with her preparation to testify as a corporate representative of FSS. I have no reason to believe that I discussed any other Google Analytics reports with Attorney Paz. I am not aware of any reason that the Attached Google Analytics Reports would be reflected in my computer files other than because those are the Google Analytics reports that I discussed with Attorney Paz at our meeting.

2

*[Remainder of Page Intentionally Left Blank]*

Executed on: 09/09/2022

Blake Roddy

THE STATE OF TEXAS

COUNTY OF TRAVIS

BEFORE ME, the affiant authority, this day appeared Marion Michelle Fruge who after being duly sworn, stated upon oath that the foregoing was true and correct. Sworn to before me this 9 day of September, 2022.

NOTARY PUBLIC, STATE OF TEXAS

MARION MICHELLE FRUGE
Notary Public, State of Texas
Comm. Expires 05-28-2023
Notary ID 132028704

3

## EXHIBIT A TO RODDY DECLARATION

Attached Google Analytics Reports

# EXHIBIT 18

008836

Filed in The District Court
of Travis County, Texas

JUN 27 2022  CJ

At____3:20____P.M.

Velva L. Price, District Clerk

### D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

### D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

## ORDER ON DEFENDANTS' MOTIONS TO MODIFY AND/OR CLARIFY

On this day, the Court considered Defendants' May 27, 2022 "Defendants' Partially

Unopposed Motion to Correct/Modify 'Order on Attorney's Fees for Plaintiffs' Motion for

Sanctions Regarding Corporate Deposition'" relating to a Sanctions Order issued on April 15,

2022. After considering the pleadings and evidence, and after holding a hearing on June 24,

2022, the Court makes the following findings:

    1)    The Court finds that Defendants failed to meet their burden to show the

Court's April 15th sanctions have a preclusive effect under *Braden*.

    3)    The Court finds that pursuant to the default judgment, Alex Jones and Free

Speech Systems, LLC are admitted to be alter egos. Even absent the default judgment, the

Court notes that the record supports a finding that Alex Jones and Free Speech Systems, LLC

1


EXHIBIT
18
008837

are alter egos. The Court further finds that both Mr. Jones and Free Speech Systems, LLC are both "a party...whose conduct necessitated the motion" under Rule 215.1(d).

4)      Having considered Plaintiffs' evidence of attorney's fees, and having considered Defendants' April 15th objections to those fees, the Court continues to find that the fees are reasonable and the sanction is appropriate and just.

5)      The Court GRANTS Defendants' Motion with regard to D-1-GN-18-001835 (the *Heslin* matter) as it concerns Owen Shroyer.  Therefore, it is ORDERED that Mr. Shroyer has no obligation to satisfy the sanctions award of April 15, 2022. Defendants' Motions to Correct/Modify are in all other respects DENIED.

6)      Defendants are ordered to pay the sanctions within 20 days of this order.


Dated June 24, 2022.


Hon. Maya Guerra Gamble

2

# EXHIBIT 19

008839

1

DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  AUGUST 2, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES



        BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE



A P P E A R A N C E S :


  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY MATT BLUMENTHAL

  Representing the Defendant (s):
    ATTORNEY NORMAN PATTIS


                          Recorded and Transcribed by:
                          Debbie Ellis
                          Court Recording Monitor
                          400 Grand Street
                          Waterbury, CT  06702



EXHIBIT
19
008840

2

1          THE COURT:  We are on the record in the three

2    related Lafftery versus Jones matters.  Lead docket

3    number Waterbury CV186046436.  I'm going to ask counsel

4    to please identify themselves for the record.

5          ATTY. MATTEI:  Good morning, your Honor.  Chris

6    Mattei on behalf of the plaintiffs.  With me is my

7    colleague Matt Blumenthal.

8          THE COURT:  Good morning.

9          ATTY. PATTIS:  Norm Pattis on behalf of Mr. Jones,

10   Free Speech Systems, Judge.  Good morning.

11         THE COURT:  Good morning.

12         ATTY. WILLIAMS:  Good morning, your Honor.  John

13   Williams with a special appearance on behalf of

14   Mr. Jones.

15         THE COURT:  Good morning.  So I think I may be

16   able to avoid the first issue with respect to the

17   objection for the media request.  Mr. Ferraro, have you

18   seen any members of the media here today?

19         THE CLERK:  There's one but nobody who had

20   requested to record.

21         THE COURT:  Okay.  So in light of the fact that no

22   one is here, I can avoid that issue.

23         THE CLERK:  Your Honor, I apologize.  I do think

24   the Connecticut Public Radio person is on his way.  He

25   called me and asked about the address but I don't see

26   him yet.

27         THE COURT:  All right.  I'm not going to delay the

3

1    proceedings for that, so he will not be able to film

2    today.  Okay.

3         So this may be less than five minutes or we may be

4    here all day depending on how this works.  So my first

5    question and this is really a yes or a no or an I don't

6    know.  That's what I want.  I don't want long

7    explanations.  I'm not looking for argument, just a yes

8    or a no or I don't know.  I'll start with Attorney

9    Mattei and then I will ask Attorney Pattis.

10        So my question is, whether the bankruptcy court

11   granted a motion to extend the bankruptcy stay to Alex

12   Jones who has not filed for bankruptcy?  So Attorney

13   Mattei, yes, no or I don't know?

14        ATTY. MATTEI:  No, your Honor.

15        THE COURT:  Okay.  Attorney Pattis, do you agree

16   or disagree with that, sir?

17        ATTY. PATTIS:  Neither.  I don't know is my

18   answer.

19        THE COURT:  Okay.  I'm happy to pass the matter

20   since your client would know, I assume, since you're

21   representing your client.  Would you like me to pass it

22   for a few minutes and we can make a call?

23        ATTY. PATTIS:  He's testifying today.  I tried to

24   reach him yesterday, a per your order and was

25   unsuccessful.  I don't know if I can reach his trial

26   counsel but I'll try.

27        THE COURT:  I know that you had mentioned, I think

4

1    you had reached out to Mr. Stuckel actually since

2    Mr. Ferraro was getting back from his Italy trip, with

3    respect to having bankruptcy counsel use the link to

4    watch it on Microsoft Teams so, I assume, they're

5    available.

6         ATTY. PATTIS:  I assume so too.

7         THE COURT:  So maybe they would be the ones that

8    you could try to reach.  And I just simply want to know

9    whether the bankruptcy court granted a motion to extend

10   the bankruptcy stay to Alex Jones who, to my knowledge,

11   has not filed bankruptcy.

12        ATTY. PATTIS:  I will find out, Judge.

13        THE COURT:  Okay.  So we'll take a five-minute

14   recess.  Thank you.

15        (Whereupon, there was a recess.)

16        THE COURT:  You could be seated.  That was quick,

17   Attorney Pattis.

18        ATTY. PATTIS:  It still took two phone calls.

19        THE COURT:  And the answer?

20        ATTY. PATTIS:  No such motion was filed,

21   therefore, no such motion is granted.

22        THE COURT:  Thank you.

23        So the automatic stay that is in effect as to Free

24   Speech System, LLC who filed for bankruptcy, I believe,

25   on Friday, does not automatically extend to solvent

26   codefendants even where they are similarly legal or

27   factually, so and I don't see that any motion for stay

5

1    has been filed here.

2         I'm going to next turn to the, I have to say

3    untimely cross claim.  I will give Attorney Williams an

4    opportunity to be heard but I do want to start out by

5    saying that it is, everyone has their responsibilities

6    and obligations in this case.  And one of my

7    responsibilities is to maintain the orderly procedure

8    of the court docket and cases and to prevent any

9    interference with the fair administration of justice.

10        And my concern here, Mr. Williams, and I'll give

11   you as much time as you need to respond, is that the

12   cross claim is untimely, improper, and that it delays

13   the trial.  And so I am considering using my statutory

14   authority and inherent authority in sua sponte

15   dismissing or striking the claim at this time.  So I'm

16   happy to have you be heard.

17        I do want to mention one thing before I forget is

18   that your appearance, you're going to need to correct

19   your appearance because your appearance, you didn't use

20   the right form.  There's a specific form that has to be

21   used for limited appearance and that form has different

22   language on it then the standard appearance form that

23   we're all used to.  So, for example, in the limited

24   appearance form you only agree to accept service on

25   your particular issue.  So I do want to tell you that

26   right now you are in for Mr. Jones full force and that

27   you'll need to correct that probably by way of a motion

6

1    or whatever you think is appropriate.

2         But in any event, let me hear you with respect to

3    your cross claim.

4         ATTY. WILLIAMS:  Your Honor, your Honor has raised

5    as I understand it and I apologize my hearing leaves a

6    lot to be desired but as I understand it, your Honor

7    has raised the question of untimeliness and

8    specifically as I look at the docket, there's no notice

9    of closed pleadings.  The case is proceeding as I

10   understand it as a hearing in damages.  It seems to me

11   that the cross claim is completely collateral to that.

12   There should not in any way have an impact on this

13   trial and in deed is the sort of thing that might well

14   be deferred until the end of the trial.

15        So if I have done something, your Honor used the

16   word improper, if I did something that was improper, I

17   can only tell your Honor it was certainly not my

18   intention and I apologize to the court for any offense

19   that I have given to you or inconvenience to anybody

20   else.  It was in no way my intention.

21        THE COURT:  No offense taken but we just need to

22   follow the rules, that's all.  So I raise the issue of

23   the untimeliness being improper and form and the delay

24   that it would work on the trial.  Is there anything

25   else that you wanted to add?

26        ATTY. WILLIAMS:  Well, your Honor, I didn't

27   believe that it was untimely.  But obviously the Free

7

1      Speech Systems I would have expected would oppose that

2      if they felt that it was untimely.  Your Honor, as

3      again said it's improper, I don't understand in what

4      way it would be improper except that I didn't request

5      your permission, which I didn't understand was required

6      and I didn't believe it would have any impact on the

7      case.

8          I have read the motion to strike.  Counsel there

9      indicates that --

10         THE COURT:  You're ahead of me Mr. Williams

11     because I haven't read it but --

12         ATTY. WILLIAMS:  I didn't hear you, your Honor.

13         THE COURT:  I said you're ahead of me because I

14     didn't read the motion to strike because it would now

15     require us to engage in pleading practice, request

16     to -- motion to strike, answer, special defenses,

17     motions for summary judgment and obviously we're down

18     for jury selection today.

19         ATTY. WILLIAMS:  Well, your Honor, all I can say

20     is that I did not intend any -- to do anything

21     improper.  I thought I was proceeding appropriately.

22     If I wasn't, I can only say that I am humbly apologetic

23     to the court.

24         THE COURT:  So I don't -- when I say untimely, and

25     please be seated if you like or remain standing

26     wherever you're most comfortable.  But when I say

27     untimely, it was filed well beyond the close of

8

1    pleadings deadline and the operative scheduling order.

2    I can't even find the last scheduling order, it's so

3    old.  And the deadline for the close of pleadings has

4    long passed.  It was not listed in the joint trial

5    management report which was ordered to be filed.  It

6    wasn't filed when the Jones defendants filed their

7    denials with their notice of defenses and their special

8    defenses and it's obviously filed on the eve of trial.

9         And when I say improper, I don't mean that you,

10   sir, did anything, you know, improperly to offend the

11   court by any means, so please don't think that.  But

12   what you would need to do with such a pleading is file

13   either a request to file the pleading, you know, beyond

14   the deadlines, file a motion with it, file a motion to

15   amend pleadings, something because otherwise, nothing

16   would prevent you from in the middle of evidence, you

17   or anyone else just dropping a pleading in the file and

18   expecting the parties and the court to adjudicate it.

19   So, we can't just have generally what we say with an

20   answer is an answer in cross claim or an answer in

21   counterclaim, certainly there was no answer here given

22   the default but there was the denial and the notice as

23   the defenses and the special defenses and I would have

24   expected it bare minimum to have it filed then.

25        And, you know, with respect to the delay, it would

26   delay the trial as it was filed five days before jury

27   selection.  So I have to say that Mr. Jones is not in

9

1    compliance with his obligations to plead in accordance

2    with our rules of practice and the scheduling order.

3        So pursuant to Connecticut General Statute 52-97

4    and Connecticut Practice Book Section 10-21, the cause

5    of action set forth in the untimely cross claim cannot

6    conveniently be heard with the main complaint.  And the

7    issues raised on the cross claim, even had the cross

8    claim been timely and properly filed, do not arise out

9    of the transaction which is the subject of the

10   plaintiff's complaint, which is required by Practice

11   Book 10-10.

12       For example, one of the basis for relief is an

13   injunction requiring someone from Free Speech Systems

14   to attend the trial.  So in short, it would be

15   impossible to hear and adjudicate the cross claim given

16   that jury selection starts today as it cannot

17   conveniently be heard with the main complaint.

18       So for these reasons, the court directs that the

19   cross claim be deleted or dismissed from this case and,

20   of course, nothing prevents Mr. Jones from filing a

21   separate action and if that does occur in the normal

22   course of business, the parties will be at notice that

23   the court will exercise jurisdiction over that matter

24   and bring it to this docket.  That is the most

25   efficient way to proceed.  But it will not be part of

26   this present case.

27       ATTY. WILLIAMS:  Thank you, your Honor.

10

1          THE COURT:  You're welcome.

2          So I have a couple of housekeeping matters.  I was

3     happy to see that you could agree on the number of

4     alternates which I understand was four and that you had

5     a total of five challenges, but I wasn't sure how you

6     were breaking it down.  Are you doing four and one or

7     three and two?

8          ATTY. MATTEI:  We agree that they be unrestricted,

9     your Honor.

10          THE COURT:  I will not, that I will not agree too.

11     I stick with the statute.  I like that statute.

12          ATTY. MATTEI:  My proposal then, Judge and I --

13          THE COURT:  Why don't you discuss it off the

14     record and then let me know if you have an agreement on

15     it.  Okay.  Thank you.

16          Mr. Pattis, there was one and I didn't pull it up,

17     but there was going to be one late motion in limine.

18     You had an attorney in your office who was not

19     available to file it due to some health issues.  And

20     I'm not sure if that was a motion in limine on behalf

21     of Mr. Jones and Free Speech Systems or just Free

22     Speech Systems because if it is on behalf of Mr. Jones,

23     it's well past filing, so what would you suggest?

24          ATTY. PATTIS:  It was both, but we're not going to

25     file it now.

26          THE COURT:  Okay.

27          ATTY. PATTIS:  He did not get out of the hospital

11

1      yet.

2              THE COURT:  Sorry to hear that.

3              ATTY. PATTIS:  Yeah, as are we.

4          Given the law of the case and the way things seem

5      to be evolving given the motion practice we can address

6      that interest in the other motions that are to be

7      argued later.

8              THE COURT:  Very good.

9              ATTY. PATTIS:  So there will not be another --

10             THE COURT:  And then I looked last night and I

11     thought yesterday was the deadlines for the replies to

12     the objections to the motions in limine, I saw the

13     plaintiffs' replies, are you not filing replies or are

14     you planning on filing them today because they were due

15     yesterday?

16         And again, I don't know if they're just are

17     directed to Free Speech Systems and of course we're not

18     adjudicating that now.

19             ATTY. PATTIS:  I have been advised by bankruptcy

20     counsel that the stay binds my hands as to Free Speech

21     Systems, and that I cannot act on his behalf it would

22     act as his peril.  They would pertain to both, so I

23     took the position that the stay was applicable as to

24     that.  I understand -- I'm here as to your order and I

25     don't mean to be defiant, but I've been told I act at

26     my peril if I act as to Free Speech Systems.

27             THE COURT:  So you don't want to act on behalf of

12

1    Mr. Jones in filing replies since you do represent

2    Mr. Jones and Mr. Jones is a nondebtor and there's no

3    stay at this point?  Listen, I'm not saying that at any

4    point the bankruptcy counsel can't file a motion in

5    bankruptcy court and have the stay extended to

6    Mr. Jones but right now, you're telling me that's why I

7    asked, that's why I started --

8         ATTY. PATTIS:  No, I understand.

9         THE COURT:  -- but there is no stay that extends

10   to Mr. Jones.

11        ATTY. PATTIS:  But there is as to a party that I

12   represent so I feel like I have a conflict at this

13   point, because I'm told I can't act with respect to one

14   and should act with respect to others and now I'm in a

15   position where I've got to parse what to do with

16   respect to each and that strikes me as that sort of

17   1.73 issue that I would need a little bit more time,

18   not an infinite amount of time to address.

19        And, you know, the issue you raised about whether

20   they should file the stay to extend to Mr. Jones that

21   hadn't occurred to me, I'm not a bankruptcy -- I had

22   altercate hands.

23        THE COURT:  Well, I think the law is clear that

24   when one defendant in a case files for bankruptcy it

25   doesn't automatically extend to all other defendants

26   even if they are similarly factually or legally and you

27   would have to move in bankruptcy court to extend the

13

1      stay.

2          Now last time we had this issue when Info Wars and

3      Prison Planet maybe, when they filed for bankruptcy, we

4      had the exact same situation and I believe I entered a

5      very similar order in response to that and then I think

6      what happened and you correct me if I'm wrong, I think

7      that you removed the remaining case to bankruptcy

8      court.  So that it wasn't so much --

9          ATTY. PATTIS:  I understand that.

10         THE COURT:  So here I didn't see and I checked

11     before I came out on the record, I didn't see any

12     removal to bankruptcy court of the pending claims and I

13     didn't see anything about a stay.

14         ATTY. PATTIS:  I was instructed not to file

15     removal papers by bankruptcy counsel for reasons of

16     their own that I didn't inquire as to.  And so I am

17     left in this awkward position now where if we proceed

18     as to Jones but not as to Free Speech that operates

19     almost constructively as a severance and I believe the

20     law is clear that a severance that adversely affects a

21     debtor is prohibited once the debtor is in bankruptcy.

22         So it's my request that and it's my understanding

23     that, I don't know if it's Houston, I don't recall what

24     city in Texas, in the Texas bankruptcy court there's a

25     hearing Friday morning with respect to the plaintiff's

26     emergency motion for relief from stay.

27         THE COURT:  But that emergency motion is a relief

14

1    from stay as to the debtor, Free Speech Systems --

2         ATTY. PATTIS:  Right.

3         THE COURT:  -- we are all on the same page here.

4    Everyone is on the same page.  They're under federal

5    bankruptcy law which, I believe me, respect.  There is

6    an automatic stay as to the debtor, Free Speech

7    Systems, LLC.  If you told me this is why I started

8    asking this question, if you said to me, yes -- because

9    I tried to look last night and I could not access the

10   through Pacer the records or I would have cancelled

11   this if I saw that it was extended.  As I'm

12   understanding it, clearly there's no doubt that there

13   was no extension of that stay to the solvent remaining

14   defendant Mr. Jones, nor has such a motion been filed,

15   so there is an active claim right now against Alex

16   Jones.  There's causes of action and we're down for

17   jury selection.

18        So, I can't, you know, I can't solve for you what

19   instructions you're getting from your client or

20   bankruptcy counsel but I have a remaining claim, but I

21   understand from what you're telling me it's your

22   position, well you can tell me your position why don't

23   you.

24        ATTY. PATTIS:  I'm asking for a recess until a

25   motion is heard on Friday.  I find myself in a position

26   where I cannot satisfy my obligations to both clients.

27   Mr. Jones expects a defense as does Free Speech.

15

1          I am told Free Speech the action will not proceed

2     as to they may or may not have identical interest in

3     every instance but I don't see how I can proceed as to

4     one client and not the other.

5          THE COURT:  So and then let's just hypothetically

6     say that we either didn't pick until Friday and Friday

7     the motion is heard and the motion it's a motion to --

8          ATTY. PATTIS:  For relief from stay.

9          THE COURT:  Okay, let's say that --

10         ATTY. PATTIS:  That's my understanding of it.  I

11     haven't filed it.

12         THE COURT:  So let's say that's denied and so the

13     stay is in effect as to Free Speech System.

14         ATTY. PATTIS:  At this point, Judge, I would be in

15     touch with bankruptcy counsel saying you left me

16     hanging here without a motion for an application as to

17     Jones or a removal, the trial court takes the position

18     that its capable -- that as a matter of law it would be

19     appropriate to proceed with Mr. Jones and I might have

20     to seek independent ethic's counsel advice because I'm

21     starting to feel a 1.73 (inaudible) because I'm now in

22     a position where I can meet the needs of one client but

23     not the other in a proceeding and I've not been in this

24     position before.

25         THE COURT:  Attorney Mattei.

26         ATTY. MATTEI:  Your Honor, what I see Attorney

27     Pattis be doing is asking for making an oral motion for

16

continuance for jury selection.  We oppose that motion

for continuance.  Mr. Jones is more than adequate

represented in bankruptcy court in Houston.  They are

well aware of this jury selection.  They actually filed

a motion to lift the stay as to the ongoing trial in

Texas.  And so they're well aware of the implications

that --

THE COURT:  So that -- excuse me.  The motion to

lift the stay was as to the debtor?

ATTY. MATTEI:  As to the debtor Free Speech

Systems.  And so they're more than aware of occasions

of not moving the stay with respect to Mr. Jones,

they've not done that knowing that jury selection is

scheduled for today.

The bankruptcy, which was filed on Friday,

Mr. Pattis has had the weekend and now Monday to

investigate the extent to which any conflict prevents

him from proceeding today on behalf of Mr. Jones.  But

the facts of the case establishes that there is no

conflict and there can be no conflict because Mr. Jones

and Free Speech Systems are all egos to one another.

They have been represented by the same counsel

throughout.  There's no suggestion or evidence that any

position taken by Mr. Jones here would be adverse to a

company that he 100 percent controls, Free Speech

Systems.

And so there's just no basis to grant a

17

1    continuance here where Mr. Jones is the one that has

2    manufactured this situation on the eve of jury

3    selection to prevent us from going forward.  So we want

4    to proceed today with jury selection.

5         THE COURT:  So here's what I would say, we are

6    going to proceed but if and when a motion is granted in

7    the bankruptcy court, that extends the stay to

8    Mr. Jones, the court needs to be notified immediately

9    and we will cease activity because that would then stay

10   the claim against Mr. Jones as well.  But short of

11   that, listen I suppose Mr. Jones could file for

12   bankruptcy and that would stay the rest of the case

13   under federal law or the bankruptcy court can extend

14   the stay to Mr. Jones.

15        So if either one of those happens, I'm sure you'll

16   let me know immediately and we will stop our

17   proceedings.

18        All right.  So we're going to start jury selection

19   at 10:00.  Just as a reminder please no snapshots or

20   screen shots or whatever you want to call it of the

21   jury confidential jury questionnaires.  Anyone who --

22   so if your clients are here at any point either during

23   jury selection or trial the trial will be in the

24   courtroom next door.

25        But during jury selection and during trial anyone

26   who's seated at counsel table or in the well of the

27   courtroom would have to wait for a recess to leave or

18

1    you can leave in between jurors if you understand what

2    I'm saying.  I don't want people in the well of the

3    courtroom getting up and leaving in the middle of the

4    voir dire, if they're in the well of the courtroom.

5    Now people in the gallery they can come and go as they

6    please but for trial as well, if we're not in a recess

7    any of your clients or other lawyers that are in the

8    well of the courtroom would have to wait for recess.  I

9    don't want people coming and going.  But if there's any

10   believe me any need for a quick break because someone

11   needs to leave or you have an emergency or whatever,

12   I'm happy to take another recess, so you just let me

13   know and ask for a recess and I'm sure we'll take a

14   recess.  I just don't want any commotion.

15        During the -- I am going to remain on the bench at

16   least for the immediate future.  I don't have any other

17   conflicts right now.  I don't know if that's going to

18   remain the whole time but the juror, potential juror

19   will sit next to me up here.  I don't know if you want,

20   I guess, Mr. Ferraro, maybe we can move the lectern up

21   for the lawyers.

22        THE CLERK:  Wherever counsel wants to.

23        THE COURT:  Why don't you discuss where you want

24   it but I'm telling you now I want you to give the

25   jurors space.  I don't want you leaving that lectern

26   area and clouding the jurors and I'm going to say the

27   same thing for witnesses as well.  So I don't want

19

1    anybody invading their space.

2        So here's what I would say on the replies to the

3    motions in limine by Mr. Jones.  If Mr. Jones wishes,

4    he's not ordered to, he doesn't have to but if he

5    wishes to file replies to the motions in limine, and

6    that was due yesterday, Mr. Jones will have until the

7    end of business tomorrow to file his replies if he

8    wants to.

9        I'm prepared to go on the introduction to the

10   panel.  I have, thank you, I have all the information

11   that you gave us with respect to the parties and the

12   witnesses and so forth.  So I think for the

13   introduction to the panel, you're going to be very

14   brief.  You're just going to simply say who you are and

15   what other lawyers are with you and if you want to

16   mention if you have clients here or not, that's fine.

17   But I don't want to hear anything beyond that, no

18   description of the case.  It's going to be very very

19   brief otherwise I am going to cut you off.  That's not

20   the opportunity to start any further details.

21       All right.  So we will be back right at 10:00 p.m.

22   for jury selection.

23       ATTY. MATTEI:  Your Honor, I'm sorry.  One

24   housekeeping matter.  I sent to Mr. Stuckel this

25   morning a proposed revised description of the case for

26   the court to consider giving to the jury in light of

27   the fact we now only have one defendant for whom we are

20

1       picking.  The initial jointly agreed upon statement

2       referred to both defendants and I sent the revision to

3       Mr. Stuckel.  Attorney Pattis I spoke to him

4       beforehand, he indicated that he objects so I just want

5       to flag the court given that right now we are only

6       picking with respect to Mr. Jones.

7            THE COURT:  Well, I planned on deleting Free

8       Speech Systems in the language as a defendant.  I

9       understand that you're objecting basically, Attorney

10      Pattis, even going forward into the proceeding and such

11      but do you have any suggestions on the proposed

12      language or not?

13           ATTY. PATTIS:  Yes.  I don't believe the court can

14      refer to Free Speech Systems.  I don't think the court

15      can refer to Mr. Jones as acting through Free Speech

16      Systems without adversely affecting Free Speech Systems

17      in violation of the stay, so that's the basis of my

18      disagreement.

19           If the court's going to proceed as to Mr. Jones I

20      think it should delete reference to Free Speech Systems

21      from the proposed joint statement.

22           ATTY. MATTEI:  I just in response regardless of

23      Free Speech Systems status that fact is established as

24      a result of fault not, so there's not any question that

25      that is true to be evidence in the case regardless of

26      whether Free Speech --

27           ATTY. PATTIS:  That will be a litigated issue

21

1    whether he'll be evidence, we think any evidence to

2    that effect would be in violation of the stay because

3    it acts to the detriment of Free Speech Systems while

4    it's --

5         THE COURT:  I think we can be very clear in our

6    preliminary instructions and our jury instructions that

7    this case is proceeding only as to Mr. Jones

8    individually so I'm not concerned that they're going to

9    be confused.  So if you can't come up with your own

10   language I'm more than capable of coming up with my own

11   language.  Okay.

12        ATTY. WILLIAMS:  Your Honor, may I be excused?

13        THE COURT:  Well, Mr. Williams, sure but you're

14   going to have to file --

15        ATTY. WILLIAMS:  A motion to withdraw.

16        THE COURT:  Unless you can somehow assure me as an

17   officer of the court that Mr. Jones retained you solely

18   for the purposes of the cross claim and not for any

19   other reason.  Because I explained to you the issue.

20        ATTY. WILLIAMS:  I understand.

21        THE COURT:  And I don't want to be hasty and make

22   mistakes and informally let you out of the case if in

23   fact that's not true.

24        ATTY. WILLIAMS:  Your Honor, I assure you as an

25   officer of the court that that was the sole purpose

26   that he retained me and I have no other interest in

27   this case whatsoever.

22

```
1          THE COURT:  All right.  Do you agree with that,
2     Attorney Pattis?
3          ATTY. PATTIS:  I reviewed the papers and I agree.
4          THE COURT:  I'm sorry.
5          ATTY. PATTIS:  I've reviewed the engagement
6     letter, I agree that there's no ambiguity with respect
7     to that.
8          THE COURT:  So your client, Mr. Jones, is not
9     going to object if I informally let Mr. Williams out.
10          ATTY. PATTIS:  On behalf of Mr. Jones, I'll make
11     that representation.
12          THE COURT:  And Attorney Mattei, you don't want to
13     be heard on this, correct?
14          ATTY. MATTEI:  No, your Honor.
15          THE COURT:  All right.  So ordered.
16          ATTY. WILLIAMS:  Thank you, your Honor.
17          THE COURT:  We'll take a recess.
18          (Whereupon, there was a recess.)
19          *          *          *          *          *
20
21
22
23
24
25
26
27
```

23

```
 1
     DKT NO:   X06-UWY-CV18046436-S    :   COMPLEX LITIGATION
 2
     ERICA LAFFERTY                    :   JUDICIAL DISTRICT WATERBURY
 3   v.                                :   AT WATERBURY, CONNECTICUT
     ALEX EMRIC JONES                  :   AUGUST 2, 2022
 4

 5   DKT NO:   X06-UWY-CV186046437-S

 6   WILLIAM SHERLACH
     V.
 7   ALEX EMRIC JONES

 8
     DKT NO:   X06-UWY-CV186046438-S
 9
     WILLIAM SHERLACH
10   V.
     ALEX EMRIC JONES
11                        E L E C T R O N I C
12                   C E R T I F I C A T I O N

13        I hereby certify the electronic version is a true and

14   correct transcription of the audio recording of the

15   above-referenced case, heard in Superior Court, G.A. 4 of

16   Waterbury, Connecticut before the Honorable Barbara N. Bellis,

17   Judge, on August 2, 2022.

18

19        Dated this 2nd day of August, 2022 in Waterbury,

20   Connecticut.

21

22

23

24        _____

25                   Debbie A. Ellis
                Court Recording Monitor
26

27
```

008862

# EXHIBIT 20

008863

## R. J. Shannon

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Monday, August 8, 2022 7:09 PM |
| **To:** | Martin, Jarrod B.; rbattaglialaw@outlook.com; Kyung S. Lee |
| **Subject:** | Re: FSS |

Jarrod—

Your clients have alleged that PQPR was an insider in the TUFTA action, but below are the bases for PQPR being an insider that we have identified. There may be others, but I don't think that PQPR disputes that it is an insider so I'm not going to try to parse them.

**Way 1 (Statutory):**

1) Bankruptcy Code § 101(31)(E) includes in the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

2) Bankruptcy Code § 101(2)(B) in the definition of "affiliate" a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, . . . by an entity that directly or indirectly owns controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . .";

3) Alex Jones indirectly owns or controls 20% or more of PQPR and directly owns 20% or more of the Debtor;

4) Therefore, PQPR and the Debtor are affiliates and insiders.

**Way 2 (Statutory):**

1) Bankruptcy Code § 101(31)(E) includes as the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

2) Alex Jones is an affiliate of Free Speech Systems;
   a. Bankruptcy Code § 101(2)(A) provides that an "affiliate" includes an "entity that directly owns, controls with the power to vote, 20 percent or more of the outstanding voting securities by the debtor";
   b. Alex Jones directly owns more that 20% of the outstanding voting securities of the Debtor.

3) PQPR is an insider to Alex Jones.
   a. Bankruptcy Code § 101(2)(B) provides that an "affiliate" also includes a "corporation 20% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote, but the debtor";
   b. Alex Jones indirectly owns or controls 20% or more of the outstanding voting securities in PQPR and is thus an affiliate;

4) Therefore, PQPR is an affiliate and insider of the Debtor.

**Way 3 (Non-Statutory)*:**

1) Bankruptcy Code § 101(31)(E) includes as the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";



EXHIBIT
20
008864

2) Alex Jones is an affiliate of Free Speech Systems;
   a. Bankruptcy Code § 101(2)(A) provides that an "affiliate" includes an "entity that directly owns, controls with the power to vote, 20 percent or more of the outstanding voting securities by the debtor";
   b. Alex Jones directly owns more that 20% of the outstanding voting securities of the Debtor.

3) PQPR is controlled by Dr. David Jones;

4) Dr. David Jones is Alex Jones' father, and thus an insider of Alex Jones if he was a debtor under Bankruptcy Code § 101(31)(A)(i);

5) This is substantially similar to statutory insiders under the Bankruptcy Code and PQPR is therefore a non-statutory insider.

*Bankruptcy Code § 1182(1)(A) does not except only the debt to *statutory* insiders from the cap.

Your clients may just be looking for a way to challenge PQPR's lien on the grounds that it is avoidable (I don't think that gets around the need for permission to use cash collateral prior to that avoidance but good for you if you are successful) but you should think long and hard about where the path leads if you are looking for a ruling that PQPR is *not* an insider. Plaintiffs in the TUFTA action have already quixotically asserted and put on evidence in the Heslin/Lewis trial that FSS was solvent to the tune of at least $135 million, which I'm sure had Steve Lemmon jumping for joy. If you get a finding that establishes that PQPR is not an insider, we lose the extended preference lookback period w/r/t PQPR and make getting its lien avoided more of an up-hill battle. An unavoidable PQPR lien also opens up paths for Alex Jones to terminate his employment with the Debtor, force it into liquidation, credit bid for the assets, and continue on at a different entity to the detriment of the bankruptcy estate and your clients.

Thanks,
R. J.

**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Date:** Monday, August 8, 2022 at 4:41 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: FSS

Following up.

Also, Ray, discovery is about to be sent to FSS and PQPR. I think everyone is aiming for depositions for august 19 and 22. Can we agree that discovery will be produced by August 16? Call me if you want to discuss. 832-580-6261. If I don't hear from you I'll call you tomorrow.

Get Outlook for iOS

---

**From:** Martin, Jarrod B.
**Sent:** Sunday, August 7, 2022 2:15:36 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>; rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>; Kyung S.

008865

Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

RJ, a  follow-up question: Could you explain how PQPR is a statutory insider or affiliate for purposes of the sub v debt limit?

Jarrod B. Martin
Shareholder
Chamberlain Hrdlicka
Direct: 713.356.1280
E-Mail: jarrod.martin@chamberlainlaw.com

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Saturday, August 6, 2022 8:07 PM
**To:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>; rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: FSS

**\*\*EXTERNAL EMAIL\*\***

Jarrod—See attached. Kelly Jones' interest was apparently transferred to Alex Jones in connection with their divorce, but we don't have a copy of the divorce decree.

**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Date:** Saturday, August 6, 2022 at 7:16 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

Thanks. Can you send me the relevant corporate documents for the Debtor (LLC agreement, etc.)?

Jarrod B. Martin
Shareholder
Chamberlain Hrdlicka
Direct: 713.356.1280
E-Mail: jarrod.martin@chamberlainlaw.com

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Friday, August 5, 2022 10:51 AM
**To:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>; rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

**\*\*EXTERNAL EMAIL\*\***

008866

Jarrod,

See the attached employment agreement between the Debtor and Alex Jones.

Thanks,
R. J.

--
**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294
rshannon@shannonleellp.com

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Sent:** Thursday, August 4, 2022 2:29 PM
**To:** rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** FSS

Can you guys send me the April 2022 Jones employment agreement?

Jarrod

Get Outlook for iOS

008867

# EXHIBIT 21

008868

## R. J. Shannon

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Thursday, June 30, 2022 2:57 PM |
| **To:** | Kyung S. Lee; MSchwartz@schwartzassociates.us; rbattaglialaw@outlook.com; jshulse@chartcapitalmgmt.com; sjordan@jhwclaw.com |
| **Subject:** | RE: A few questions |
| **Attachments:** | Rethinking Lawyer Ethics to Allow the Rules of Evidence Rules of.pdf |

My research into the case law and relevant ethical rules is that we are _**not required**_ to delete or destroy the additional documents, which seems to just be the P&L. In light of the pending TUFTA action, I think we _**should not**_ destroy the documents because it would arguably be spoilation of evidence.

(1) The documents were not wrongfully obtained.
   a. Melinda Flores—an FSS employee—provided these documents in response to the request of an FSS consultant. She had access to this information.
   b. This does not appear to be a misappropriation of a trade secret because PQPR did not take any actions to keep the information secret _from FSS_ and it does not have independent value derived from being kept secret. _See_ Tex. Civ. Prac. & Rem. Code § 134A.002(6).
   c. Factors for whether something is a trade secret are according to _In re Union Pac. R.R. Co._, 294 S.W.3d 589, 592 (Tex. 2009):
      i. The extent to which the information is known outside of the business;
      ii. The extent to which it is known by employees involved in the business;
      iii. The extent of measures taking to guard the secrecy of the information;
      iv. The value of the information to the business and to its competitors;
      v. The amount of effort or money in developing the information; and
      vi. The ease or difficulty with which the information could be properly acquired or duplicated by others.
   d. Use of a trade secret requires attempting to use the trade secret for profit from commercial use. _Atl. Richfield Co. v. Misty Prods._, Inc., 820 S.W.2d 414, 422 (Tex. App. 1991)
   e. There is no implied contract re confidentiality under Texas law. _See Sci. Mach. & Welding, Inc. v. Rose_, No. 03-20-00564-CV, 2022 Tex. App. LEXIS 1884, at *14 (Tex. App.—Austin Mar. 23, 2022)

(2) The documents are not privileged vis-à-vis FSS.
   a. I don't see any applicable privilege here. These were not created for litigation or contain attorney-client statements.
   b. Lemmon might argue that they are privileged w/r/t to other parties as a trade secret, but that's an issue for another time addressed in my recommendation below.
      i. Texas Rule of Evidence 507 allows a person to prevent other persons from disclosing trade secrets.
      ii. Lemmon could assert that privilege if FSS was required to disclose the Income Statement to someone else and argue that it is a trade secret. A holder of a trade secret may divulge information to a limited extent without destroying its status as a trade secret. _Schwimmer v. Presidio Indus. LLC_, No. 3:10-CV-2213-P, 2011 U.S. Dist. LEXIS 161754, at *16 (N.D. Tex. Feb. 11, 2011).
      iii. Texas Rule of Evidence 511(b)(2) and Rule of Civil Procedure 193.3(d) would prevent a waiver of privilege if made in discovery.

(3) The applicable ethical rules do not require destruction of the documents.



EXHIBIT
21
008869

    a. Attached law review article details the changes to the ABA model rules that the Texas courts have used as persuasive authority before.

    b. The Texas Disciplinary Rules do not contain anything about this and the Texas Rules of Evidence merely state that inadvertent disclosures maintain their privilege.

(4) The applicable case law does not require destruction of the documents.

    a. There is some caselaw that allows for (but does not require) the disqualification of attorneys where they have and use **_privileged_** information obtained by their client. *See In re Meador*, 968 S.W.2d 346, 351 (Tex. 1998).

        i. The Texas Supreme Court identified the following factors for disqualification for use of privileged documents outside of formal discovery: 1) Whether the attorney knew or should have known the material was privileged; 2) The promptness with which the attorney notices the opposing side that he or she has received the its privileged information; 3) The extent to which the attorney reviews and digests the privileged information; 3) The significance of the privileged information; 4) The extent to which the movant may be at fault for the unauthorized disclosure; 5) The extent to which the non-movant will suffer prejudice from the disqualification.

        ii. Each of these factors other than No. 3 is in our favor even if it is technically privileged for one reason or another.

    b. Further, those cases talk about harm whereas here the document should be discoverable in any dispute where they are relevant.

    c. Texas Rules of Evidence do not apply since the document was not sent inadvertently for was it in response to a discovery request. Melinda must have intended to send these exact documents but apparently just did not listen to what David said.

I would tell Lemmon that our research indicates that we are not required to destroy the additional document and we are concerned that doing so may be spoliation of evidence regarding the TUFTA action but **_(a)_** we are happy to hear from him to reconsider if we are missing something, **_(b)_** we will hold the information confidential subject to obtaining the document in discovery if there is a dispute with PQPR, and **_(c)_** we will inform Lemmon if we are compelled to produce it to a third party so that PQPR can assert any relevant privilege against production by FSS. Splits the baby nicely, and if we are right that it is not privileged as a trade secret, we would be able to obtain in discovery.

What do you all think?

--

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294
rshannon@shannonleellp.com

**From:** Kyung S. Lee <klee@shannonleellp.com>
**Sent:** Thursday, June 30, 2022 12:35 PM
**To:** MSchwartz@schwartzassociates.us; rbattaglialaw@outlook.com; R. J. Shannon <rshannon@shannonleellp.com>; jshulse@chartcapitalmgmt.com; sjordan@jhwclaw.com
**Subject:** Re: A few questions

Let's give everyone a little time to think about the issues. I propose we have a Zoom somewhere between 3-6 depending on folks' schedules.

For right now, I will propose a Zoom at 3PM CST today among us. If anyone has a conflict, please speak up. Marc, can you circulate Zoom Room for 3 now and if people have conflicts we can use that same Zoom Room for a different time that fits everyone's schedule?

008870

**Kyung S. Lee**
Partner
**Shannon & Lee LLP**
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Cell: (713) 301-4751
klee@shannonleellp.com

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Date:** Thursday, June 30, 2022 at 12:32 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, R. J. Shannon (FIRM) <rshannon@shannonleellp.com>, Jeffrey Shulse <jshulse@chartcapitalmgmt.com>, Shelby Jordan <sjordan@jhwclaw.com>
**Subject:** RE: A few questions

Should we Zoom?

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Thursday, June 30, 2022 12:29 PM
**To:** rbattaglialaw@outlook.com; R. J. Shannon (FIRM) <rshannon@shannonleellp.com>; Marc Schwartz <MSchwartz@schwartzassociates.us>; Jeffrey Shulse <jshulse@chartcapitalmgmt.com>; Shelby Jordan <sjordan@jhwclaw.com>
**Subject:** Re: A few questions

Gentlemen: Lemmon is not happy these documents were sent to us. Apparently, David Jones only authorized the balance sheet of PQPR to be sent to us. Here are PQPR's instructions on how to handle these erroneously produced documents. I have not encountered this situation before, so I need guidance or a little research on this point to make sure we are doing what is right for Schwartz and FSS.

**Kyung S. Lee**
**Shannon & Lee LLP**
Cell: 713-301-4751
klee@shannonleellp.com

---

**From:** Stephen Lemmon <lemmon@slollp.com>
**Date:** Thursday, June 30, 2022 at 12:24 PM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Cc:** rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, R. J. Shannon (FIRM)

008871

<rshannon@shannonleellp.com>
**Subject:** Re: A few questions

This is a mistake.  The documents need to be returned and all copies destroyed.

Sent from my iPhone


> On Jun 30, 2022, at 12:14 PM, Kyung S. Lee <klee@kslpllc.com> wrote:

Please review and let's chat.

Kyung S. Lee
Kyung S. Lee PLLC
Partner
Pennzoil Place
700 Milam, Suite 1300
Houston, Texas 77002
Mobile (713) 301-4751
Klee@kslpllc.com
www.kslpllc.com


**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Sent:** Thursday, June 30, 2022 12:05:50 PM
**To:** Kyung S. Lee <klee@kslpllc.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** FW: A few questions


**From:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
**Sent:** Thursday, June 30, 2022 10:47 AM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Subject:** Fwd: A few questions

These don't make any sense to me ... there are some huge numbers on the balance sheet that net against other huge numbers ... I'm digging into it

Sent from my iPhone

Begin forwarded message:

> **From:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
> **Date:** June 30, 2022 at 10:36:42 AM CDT
> **To:** Jeffrey Shulse <jshulse@outpostcc.com>
> **Subject:** Fwd: A few questions


Sent from my iPhone

4

Begin forwarded message:

> **From:** Melinda Flores <melinda@freespeechsystems.com>
> **Date:** June 30, 2022 at 9:56:46 AM CDT
> **To:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
> **Cc:** Melinda Flores <melinda@freespeechsystems.com>
> **Subject: Re: A few questions**
>
> Jeff,
> Attached is the payroll information you requested as well as the PQPR
> reports.  You can call me at 11....512-497-0948
> Thanks,
>
> Melinda
>
> ----- Original Message -----
> From: "Jeffrey Shulse" <jshulse@chartcapitalmgmt.com>
> To: "Melinda Flores" <melinda@freespeechsystems.com>
> Sent: Wednesday, June 29, 2022 7:25:26 PM
> Subject: Re: A few questions
>
> Yes ... sounds good
>
> Sent from my iPhone
>
>> On Jun 29, 2022, at 6:14 PM, Melinda Flores
>> <melinda@freespeechsystems.com> wrote:
>>
>> This will be fine, Jeff.  Will 11 am work for you?  I can
>> send some reports over to you before then for review if
>> you'd like.
>>
>> Melinda
>>
>> ----- Original Message -----
>> From: "Jeffrey Shulse"
>> <jshulse@chartcapitalmgmt.com>
>> To: "Melinda Flores"
>> <melinda@freespeechsystems.com>
>> Sent: Wednesday, June 29, 2022 9:54:53 AM
>> Subject: Re: A few questions
>>
>> And my first day was 6/21 ... just fyi
>>
>> Sent from my iPhone

5

008873

On Jun 29, 2022, at 9:52 AM, Jeffrey Shulse <jshulse@chartcapitalmgmt.com> wrote:

If you want to talk remotely tomorrow … I don't want you to change everything around for me … and I don't have a need to drive to Austin just to drive to Austin

Remote tomorrow is fine with me if it works for you?

Sent from my iPhone

> On Jun 29, 2022, at 9:44 AM, Melinda Flores <melinda@freespeechsystems.com> wrote:

Hi Jeff,

Sorry I missed you yesterday.  I wasn't aware you were coming in and I had some back to back up appointments in the afternoon.

I received your paperwork and all looks good.  We didn't get the background check in time to include you in this Friday's payday

6

008874

so your first payday will be 07/15/22 and will cover the pay period that started Monday 06/27/22 and ends 07/10/22 in addition to the last couple of days of the period that just ended.  Your first pay will be a live check that will need to be deposited.  Your direct deposit will start on the following pay period.

I spoke to Dr. Jones yesterday and gave me the go ahead and give you financials for 2021.  I can have that ready for you tomorrow and we can actually sit in the conference room and remote in to QuickBooks if need be.

I can also provide the payroll information for you as well.

I usually work remotely on Tuesdays and Thursdays but since you're coming in tomorrow I'll be here in the office.  More likely I will work from home on Friday this week.

Thanks,

Melinda

----- Original Message -----

008875

From: "Jeffrey Shulse"
<jshulse@chartcapitalm
gmt.com>

To: "Melinda Flores"
<melinda@infowars.co
m>

Sent: Tuesday, June 28,
2022 2:23:06 PM

Subject: A few
questions

Melinda,

I believe you are out
this afternoon... so a
few quick items

Did you get my new
hire paperwork I put in
your basket last
week?  Any questions
or issues ?  When is
payroll ?  I assume we
are paid on Friday's ?

I need financial info for
PQPR ... Bob Roe is
going to give you the
"all clear" ... but I need
to sift through the last
12 months of info to
figure out some costs ...
say 1/1/2021 to
12/31/21 and maybe
Q1 of 2022?  Again, I
need to do some cost
analysis to figure out
some fair revenue
sharing percentages

It would also be helpful
to see ADP payroll info
for the last 6-8 months
... how about 10/1/21
to 5/31/22?  I need to
put together an org
chart by company that

8

actually pays the salary, what company they actually do work for … FSS or PQPR and what "department" they work in … if you already have something like that …. It would be a helpful start

I will be back in Austin on Thursday morning… what is your schedule for the next few days ?

Thanks

Jeff Shulse

Sent from my iPhone

9

# EXHIBIT 22

008878

## R.J. Shannon

**From:** R.J. Shannon
**Sent:** Wednesday, May 11, 2022 11:44 AM
**To:** Max Beatty; avi.moshenberg@mhllp.com
**Cc:** Kyung Lee; Adam Rodriguez
**Subject:** InfoW - Proposed Stipulation [Subject to FRE 408]
**Attachments:** IW - Draft Stipulation re Texas Plaintiffs 4867-8066-2303 v.1.docx

[Subject to FRE 408]

Max,

As discussed yesterday, attached is a draft stipulation that we believe would resolve all the disputes between the parties without having to deal separately in each adversary proceeding. Please let us know your thoughts and any comments.

In addition to stating that your clients are relying on the assets disclosed in the Schedules, we made the non-existence of any material undisclosed assets an express requirement for the release. Hopefully, that will alleviate any concern you have that Jones of FSS later try to claim that something was property of one of the Debtors when the stipulation was entered.

Feel free to share with your counterparts for the Connecticut Plaintiffs. We made the language general enough that it should just be a matter of swapping out names.

Thanks,
R. J.

**R. J. Shannon**
Associate
**Parkins Lee & Rubio LLP**
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Direct: (713) 715-1660
Cell: (512) 693-9294
rshannon@parkinslee.com
www.parkinslee.com



EXHIBIT
22
008879

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| In re: | Case No. 22-60020 |
| INFOW, LLC, *et al.*, | Chapter 11 (Subchapter V) |
| Debtors.[1] | Jointly Administered |

### STIPULATION AND ORDER

The above-captioned debtors and debtors in possession (collectively, the "Debtors") and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs" and together with the Debtors, the "Parties") hereby enter into this stipulation (the "Stipulation") and agree as follows:

WHEREAS, on April 18, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under subchapter v of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, prior to the Petition Date, the Texas Plaintiffs commenced state-court actions against one or more of the Debtors styled as: *(a) Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *(b) Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; *(c) Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech*

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

*Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *(d) Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and *(e) Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "State Court Litigation");

WHEREAS, one or more of the Debtors removed or attempted to remove the lawsuits comprising the State Court Litigation to the U.S. Bankruptcy Court for the Western District of Texas (the "Removal Court");

WHEREAS, the Texas Plaintiffs filed *The Texas Litigation Plaintiffs' Supplemental Motion to Dismiss Petition* [ECF No. 42] (the "Motion to Dismiss") with the U.S. Bankruptcy Court for the Southern District of Texas on April 27, 2022 (the "Motion to Dismiss");

WHEREAS, the Debtors filed their respective Schedules of Assets and Liabilities on May 2, 2022 [ECF Nos. 59 through 78] (collectively, the "Schedules") indicating that the Debtors have *de minimis* assets other than (a) domain names, trademarks, copyrights, and intellectual property rights associated with websites; (b) royalty payments related to Youngevity; (c) causes of action for malpractice for their prepetition attorneys; and (d) rights to payments from Alex Jones ("AEJ") and Free Speech Systems, LLC ("FSS") for administrative expenses and satisfaction of claims under the Plan Support Agreement [ECF Nos. 6-3 and 48-2] (the "PSA") and Declaration of Trust for the 2022 Litigation Settlement Trust [ECF Nos. 6-2 and 48-1] (the "Declaration of Trust");

008881

WHEREAS, after investigation by the Debtors' Chief Restructuring Officer and professionals, the Debtors do not believe that the Debtors have any assets other than those reflected in the Schedules, PSA, and/or Declaration of Trust;

WHEREAS, relying on the veracity of the Schedules and disclosure of the PSA and Declaration of Trust, the Texas Plaintiffs no longer wish to be creditors of the Debtors or otherwise participate in the Debtors' bankruptcy cases;

**NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUPTCY COURT, ORDERED THAT:**

1.  *Release of Claims Against the Debtors.*  Subject to Paragraph 2 of this Stipulation, each of the Texas Plaintiffs hereby releases the Debtors and their respective bankruptcy estates from any and all claims, causes of action, equitable remedies, or rights to payment, existing on the date the Parties executed this Stipulation. For the avoidance of doubt, the Texas Plaintiffs each release any and all claims or rights to payment for sanctions against the Debtors or their bankruptcy estates to the fullest extent allowable under applicable nonbankruptcy law and shall not seek the imposition or collection of any sanctions awarded against the Debtors or their bankruptcy estates for acts occuring prior to the date the Parties entered into this Stipulation. The Texas Plaintiffs and the Debtors shall cooperate to provide for the dismissal with prejudice of the Debtors from each of the actions comprising the State Court Litigation.

2.  *Limitations on Release.* The release of the Debtors by the Texas Plaintiffs contained in this Stipulation shall not be effective to the extent that the Debtors hold material undisclosed assets on the date that the Parties entered into this Stipulation that is property of the Debtors' bankruptcy estates under 11 U.S.C. §§ 541 or 1115. The Debtors' disclosed assets comprise: (a) those assets reflected in the Schedules and (b) funds contemplated to be paid under the PSA or

Declaration of Trust, irrespective of whether the PSA or Declaration of Trust contemplated such funds to be paid to the Debtors, their estates, or the 2022 Litigation Settlement Trust. To the extent that the Texas Plaintiffs assert that the Debtors or their estates owned material undisclosed assets on the date of this Stipulation and seek to assert claims against the Debtors that would otherwise be released, the Texas Plaintiffs shall file a motion with the Bankruptcy Court seeking an order determining that the releases contemplated by this Stipulation have no force and effect.

3.     *Withdrawal of the Motion to Dismiss.* The Texas Plaintiffs' hereby withdraw their Motion to Dismiss without prejudice to refiling if the Bankruptcy Court does not approve this Stipulation. Upon approval of the Stipulation the withdrawal shall be with prejudice.

4.     *Withdrawal of Opposition to Remand.* Upon approval of this Stipulation, the Texas Plaintiffs may file a pleading or other document, to be approved by the Debtors, which approval shall not be unreasonably withheld, with the Removal Court notifying the Removal Court of this Stipulation and that the Debtors do not oppose remand. At the Texas Plaintiffs' request, the Debtors shall join in the Texas' Plaintiffs filing or take other reasonable steps to inform the Removal Court that the Debtors do not oppose remand.

5.     *Non-Applicability of Automatic Stay and/or Releases to Non-Debtor Parties.* For the avoidance of doubt, (a) the automatic stay pursuant to section 362 of the Bankruptcy Code does not prohibit the continuation of the State Court Litigation against any person other than the Debtors; (b) the release of the Debtors by the Texas Plaintiffs in this Stipulation shall not release any claims, causes of actions, or other rights against any person other than the Debtors.

6.     *Subject to Bankruptcy Court Approval.* This Stipulation shall be immediately binding on the Parties and subject only to the approval of the Bankruptcy Court. To the extent that

008883

the Bankruptcy Court denies approval of this Stipulation, the Stipulation and the releases and mutual obligations contained herein shall be of no further force and effect.

       7.     *Retention of Jurisdiction.* The Court shall have and retain (a) with respect to any dispute among only the Parties, sole and exclusive jurisdiction over the enforcement of the terms of this Stipulation as well as with respect to all matters arising from or related to the implementation and/or interpretation of this Stipulation and (b) with respect to any dispute involving any other person, including any of the Parties and AEJ and/or FSS, non-exclusive jurisdiction over the enforcement of the terms of this Stipulation as well as with respect to all matters arising from or related to the implementation and/or interpretation of this Stipulation. The Parties hereby consent to such jurisdiction to resolve any disputes or controversies arising from or related to this Stipulation. Any motion or application brought before the Court to resolve a dispute arising from or related to this Stipulation shall be brought on notice as provided by and in accordance with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of Texas.

       8.     *Modification of Stipulation.* This Stipulation shall not be modified, altered, amended, or vacated without written consent of all Parties hereto.

Dated: _____, 2022

                                           _____
                                           UNITED STATES BANKRUPTCY JUDGE

008884

STIPULATED AND AGREED ON MAY ___, 2022 BY AND AMONG:

**NEIL HESLIN, SCARLETT LEWIS, LEONARD POZNER, VERONIQUE DE LA ROSA, and MARCEL FONTAINE**

*/s/ DRAFT*

THE BEATTY LAW FIRM PC
J. Maxwell Beaty
State Bar No. 24051740
max@beattypc.com
1127 Eldridge Pkwy
Suite 300, #383
Houston, Texas 77077
Tel. 832-529-3381

*/s/ DRAFT*

MCDOWELL HETHERINGTON LLP
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
1001 Fannin Street, Suite 77002
Houston, Texas 77002
Tel. 713-337-5580
*Counsel to the Texas Plaintiffs*

-and-

**INFOW, LLC (F/K/A INFOWARS, LLC), IWHEALTH, LLC (F/K/A INFOWARS HEALTH, LLC), AND PRISON PLANET TV, LLC**

*/s/ DRAFT*

PARKINS LEE & RUBIO LLP
Kyung S. Lee
State Bar No. 12128400
klee@parkinslee.com
R. J. Shannon
State Bar No. 24108062
rshannon@parkinslee.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. 713-715-1660
*Proposed Counsel to the Debtors and Debtors in Possession*

008885

# EXHIBIT 23

008886

## R.J. Shannon

| | |
|---|---|
| **From:** | R.J. Shannon |
| **Sent:** | Wednesday, May 11, 2022 12:52 PM |
| **To:** | rchapple@cstrial.com; rww@bymanlaw.com |
| **Cc:** | Kyung Lee; Adam Rodriguez |
| **Subject:** | InfoW, LLC - Proposed Stipulation Resolving Disputes [Subject to FRE 408] |
| **Attachments:** | IW - Draft Stipulation re Conn Plaintiffs 4869-8126-8255 v.1.docx |

[Subject to FRE 408]

Ryan and Randy,

We have discussed the possibility of resolving the Debtors' various disputes with the Texas Plaintiffs through a stipulation confirming that the Texas Plaintiffs will not assert claims against the Debtors and the Debtors will not oppose remand of the state court litigation. We would like to make the same proposal to the Connecticut Plaintiffs. The issue we have with the dismissals in both sets of cases is that they purport to be without prejudice so that the Plaintiffs could potentially still assert claims against the Debtors/their estates.

Attached is a draft stipulation that we believe would resolve all the disputes between the parties without having to deal separately in each adversary proceeding or incur unnecessary expense in the bankruptcy case. It is identical to what we proposed to the Texas Plaintiffs with different names and a couple non-substantive nits. The Texas Plaintiffs have not yet agreed to this, but appeared to be open to the concept.

Our understanding is that the primary concern of both sets of Plaintiffs is that Jones and FSS might later try to claim that something was property of one of the Debtors when the stipulation was entered. To protect your clients against that, the draft stipulation provides that the Connecticut Plaintiffs are relying on the assets disclosed in the schedules and made the non-existence of any material undisclosed assets an express requirement for the release to be effective. Jones/FSS would have nothing to gain from playing that game.

Please let us know your thoughts and any comments on the Stipulation. We sent the draft for the Texas Plaintiffs to Max Beatty (max@beattypc.com) and Avi Moshenberg (avi.moshenberg@mhllp.com) about an hour ago.

Thanks,
R. J.

**R. J. Shannon**
Associate
**Parkins Lee & Rubio LLP**
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Direct: (713) 715-1660
Cell: (512) 693-9294
rshannon@parkinslee.com
www.parkinslee.com

1



EXHIBIT
23

008887

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| In re: | Case No. 22-60020 |
| INFOW, LLC, *et al.*, | Chapter 11 (Subchapter V) |
| Debtors.[1] | Jointly Administered |

**STIPULATION AND ORDER**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs" and together with the Debtors, the "Parties") hereby enter into this stipulation (the "Stipulation") and agree as follows:

WHEREAS, on April 18, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under subchapter v of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, prior to the Petition Date, the Connecticut Plaintiffs commenced state-court actions against one or more of the Debtors styled as: ***(a)*** *Lafferty et al. v Jones et al.*, Docket No. UWY-CV18-6046436-S, in the Connecticut Superior Court; ***(b)*** *Sherlach et al. v. Jones et al.*, Docket No. UWY-CV18-6046437-S, in the Connecticut Superior Court; and ***(c)*** *Sherlach v. Jones*

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

*et al.*, Docket No. UWY-CV18-6046438-S, in the Connecticut Superior Court (collectively, as may have been consolidated, the "State Court Litigation");

WHEREAS, one or more of the Debtors removed or attempted to remove the lawsuits comprising the State Court Litigation to the U.S. Bankruptcy Court for the District of Connecticut (the "Removal Court");

WHEREAS, the Connecticut Plaintiffs filed *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Debtors' Designation as Subchapter V Small Vendors* [ECF No. 36] (the "Motion to Dismiss") with the U.S. Bankruptcy Court for the Southern District of Texas on April 26, 2022 (the "Motion to Dismiss");

WHEREAS, the Debtors filed their respective Schedules of Assets and Liabilities on May 2, 2022 [ECF Nos. 59 through 78] (collectively, the "Schedules") indicating that the Debtors have *de minimis* assets other than (a) domain names, trademarks, copyrights, and intellectual property rights associated with websites; (b) royalty payments related to Youngevity; (c) causes of action for malpractice for their prepetition attorneys; and (d) rights to payments from Alex Jones ("AEJ") and Free Speech Systems, LLC ("FSS") for administrative expenses and satisfaction of claims under the Plan Support Agreement [ECF Nos. 6-3 and 48-2] (the "PSA") and Declaration of Trust for the 2022 Litigation Settlement Trust [ECF Nos. 6-2 and 48-1] (the "Declaration of Trust");

WHEREAS, after investigation by the Debtors' Chief Restructuring Officer and professionals, the Debtors do not believe that the Debtors have any assets other than those reflected in the Schedules, PSA, and/or Declaration of Trust;

WHEREAS, relying on the veracity of the Schedules and disclosure of the PSA and Declaration of Trust, the Connecticut Plaintiffs no longer wish to be creditors of the Debtors or otherwise participate in the Debtors' bankruptcy cases;

008889

**NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUPTCY COURT, ORDERED THAT:**

1.     *Release of Claims Against the Debtors.*  Subject to Paragraph 2 of this Stipulation, each of the Connecticut Plaintiffs hereby releases the Debtors and their respective bankruptcy estates from any and all claims, causes of action, equitable remedies, or rights to payment, existing on the date the Parties executed this Stipulation. For the avoidance of doubt, the Connecticut Plaintiffs each release any and all claims or rights to payment for sanctions against the Debtors or their bankruptcy estates to the fullest extent allowable under applicable nonbankruptcy law and shall not seek the imposition or collection of any sanctions awarded against the Debtors or their bankruptcy estates for acts occuring prior to the date the Parties entered into this Stipulation.  The Connecticut Plaintiffs and the Debtors shall cooperate to provide for the dismissal with prejudice of the Debtors from each of the actions comprising the State Court Litigation.

2.     *Limitations on Release.* The release of the Debtors by the Connecticut Plaintiffs contained in this Stipulation shall not be effective to the extent that the Debtors hold material undisclosed assets on the date that the Parties entered into this Stipulation that is property of the Debtors' bankruptcy estates under 11 U.S.C. §§ 541 or 1115. The Debtors' disclosed assets comprise: (a) those assets reflected in the Schedules and (b) funds contemplated to be paid under the PSA or Declaration of Trust, irrespective of whether the PSA or Declaration of Trust contemplated such funds to be paid to the Debtors, their estates, or the 2022 Litigation Settlement Trust. To the extent that the Connecticut Plaintiffs assert that the Debtors or their estates owned material undisclosed assets on the date of this Stipulation and seek to assert claims against the Debtors that would otherwise be released, the Connecticut Plaintiffs shall file a motion with the

3

Bankruptcy Court seeking an order determining that the releases contemplated by this Stipulation have no force and effect.

3.      *Withdrawal of the Motion to Dismiss*. The Connecticut Plaintiffs' hereby withdraw their Motion to Dismiss without prejudice to refiling if the Bankruptcy Court does not approve this Stipulation. Upon approval of the Stipulation, the withdrawal shall be with prejudice.

4.      *Withdrawal of Opposition to Remand*. Upon approval of this Stipulation, the Connecticut Plaintiffs may file a pleading or other document, to be approved by the Debtors, which approval shall not be unreasonably withheld, with the Removal Court notifying the Removal Court of this Stipulation and that the Debtors do not oppose remand. At the Connecticut Plaintiffs' request, the Debtors shall join in the Connecticut Plaintiffs' filing or take other reasonable steps to inform the Removal Court that the Debtors do not oppose remand.

5.      *Non-Applicability of Automatic Stay and/or Releases to Non-Debtor Parties*. For the avoidance of doubt, (a) the automatic stay pursuant to section 362 of the Bankruptcy Code does not prohibit the continuation of the State Court Litigation against any person other than the Debtors;  and (b) the release of the Debtors by the Connecticut Plaintiffs in this Stipulation shall not release any claims, causes of actions, or other rights against any person other than the Debtors.

6.      *Subject to Bankruptcy Court Approval*. This Stipulation shall be immediately binding on the Parties and subject only to the approval of the Bankruptcy Court. To the extent that the Bankruptcy Court denies approval of this Stipulation, the Stipulation and the releases and mutual obligations contained herein shall be of no further force and effect.

7.      *Retention of Jurisdiction*. The Court shall have and retain (a) with respect to any dispute among only the Parties, sole and exclusive jurisdiction over the enforcement of the terms of this Stipulation as well as with respect to all matters arising from or related to the

008891

implementation and/or interpretation of this Stipulation and (b) with respect to any dispute involving any other person, including any of the Parties and AEJ and/or FSS, non-exclusive jurisdiction over the enforcement of the terms of this Stipulation as well as with respect to all matters arising from or related to the implementation and/or interpretation of this Stipulation. The Parties hereby consent to such jurisdiction to resolve any disputes or controversies arising from or related to this Stipulation. Any motion or application brought before the Court to resolve a dispute arising from or related to this Stipulation shall be brought on notice as provided by and in accordance with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of Texas.

8.   *Modification of Stipulation.* This Stipulation shall not be modified, altered, amended, or vacated without written consent of all Parties hereto.

Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

008892

STIPULATED AND AGREED ON MAY ___, 2022 BY AND AMONG:

**DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO-MARINO, WILLIAM ALDENBERG, WILLIAM SHERLACH, AND ROBERT PARKER**

*/s/ DRAFT*

CAIN & SKARNULIS PLLC
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
303 Colorado Street, Suite 2850
Austin, Texas 78701
Tel. 512-477-5000

*/s/ DRAFT*

BYMAN & ASSOCIATES PLLC
Randy W. Williams
State Bar No. 21566850
rww@bymanlaw.com
7924 Broadway, Suite 104
Pearland, Texas 77581
Tel. 281-884-9262
*Counsel to the Connecticut Plaintiffs*

-and-

**INFOW, LLC (F/K/A INFOWARS, LLC), IWHEALTH, LLC (F/K/A INFOWARS HEALTH, LLC), AND PRISON PLANET TV, LLC**

*/s/ DRAFT*

PARKINS LEE & RUBIO LLP
Kyung S. Lee
State Bar No. 12128400
klee@parkinslee.com
R. J. Shannon
State Bar No. 24108062
rshannon@parkinslee.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. 713-715-1660
*Proposed Counsel to the Debtors and
Debtors in Possession*

008893

# EXHIBIT 24

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

## GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY, AND DISCLAIMER REGARDING DEBTOR'S SCHEDULES AND STATEMENTS

The Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") filed by Free Speech Systems, LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor") are unaudited and were prepared pursuant to section 521 of Title 11 of the United States Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") by the Debtor's chief restructuring officer (the "CRO"). While the CRO has made reasonable efforts to file complete and accurate Schedules and Statements based upon information available at the time of preparation, the Schedules and Statements remain subject to further review and verification by the Debtor. Subsequent information may result in material changes in financial and other data contained in the Schedules and Statements. The Debtor reserves the right to amend its Schedules and Statements from time to time as may be necessary or appropriate. The Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements (the "Global Notes") is incorporated by reference in, and comprises an integral part of, the Schedules and Statements and should be referred to and reviewed in connection with any review of the Schedules and Statements.

1.     Description of the Cases and "As Of" Information Date. On July 29, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor currently operates its business and possess its property as a debtor-in-possession under section 1184 of the Bankruptcy Code. Unless otherwise noted, all asset and liability information is as of the Petition Date.

2.     Basis of Presentation. These Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to fully reconcile to any financial statements otherwise prepared and/or distributed by the Debtor.

3.     Causes of Action. Despite its reasonable efforts, as described above, the Debtor may not have set forth all of its claims, causes of actions and potential recoveries in its Schedules and Statements. The Debtor reserves all rights with respect to any causes of action it may possess, and neither these Global Notes nor the Schedules and Statements shall be deemed a waiver of any such causes of action.

**EXHIBIT**
*24*
008895

4. <u>Insiders</u>. The listing or failure to list a person or other entity as an "insider" in the Schedules and Statements is not intended to be nor should it be construed as a binding admission that such person or entity is or is not an insider. The Debtor reserves the right to dispute or challenge the designation of any individual or entity in connection with any other matter arising in the Debtor's chapter 11 case.

5. <u>Intellectual Property Rights</u>. Any omission of intellectual property from the Schedules and Statements shall not be an admission that such intellectual property rights have been abandoned, have been terminated or otherwise expired by their terms or have been assigned or otherwise transferred pursuant to a sale, acquisition or other transaction. In accordance with the foregoing, the Debtor reserves all of its rights with respect to the legal status of any and all intellectual property rights, regardless of whether such intellectual property rights are or are not listed in the Schedules and Statements.

6. <u>Summary of Significant Reporting Policies</u>. The Schedules and Statements have been signed by W. Marc Schwartz, the CRO to the Debtor. In reviewing and signing the Schedules and Statements, Mr. Schwartz has necessarily relied upon the efforts, statements, and representations of the Debtor's business records and personnel. Mr. Schwartz has not personally verified the accuracy of each such statement and representation, including, but not limited to, statements and representations concerning amounts owed to creditors. The Debtor made reasonable efforts to accurately report asset, liability, disbursement and other information on its Statements and Schedules, and the Debtor adopted the following conventions in the preparation of the Schedules and Statements.

a. <u>Fair Market Value; Book Value</u>. Unless otherwise noted, the value of each asset and liability of the Debtor is shown on the basis of the book value of such asset or liability in the Debtor's accounting books and records. As applicable, assets that have been fully depreciated or were expensed for accounting purposes have no net book value. As a result, the value of the Debtor's assets and liabilities set forth on the Schedules and Statements may not always reflect the current market values of such property and/or liabilities. The Debtor reserves its right to amend or adjust the value of each asset or liability set forth herein.

b. <u>Liabilities</u>. The Debtor reserves the right to dispute any liability indicated in its Schedules notwithstanding the designation in the Schedules and Statements.

c. <u>Claims</u>. The Debtor's Schedules and Statements list creditors and set forth the Debtor's estimate of the claims of creditors as of the Petition Date. The Bankruptcy Court has authorized the Debtor to, among other things make payments to certain critical vendors and utility providers. As a result, the actual unpaid claims of creditors that ultimately may be allowed in this case may differ from the amounts set forth in the Schedules and Statements. The inclusion of any such amounts in the Schedules and Statements shall not be deemed to obligate the Debtor to pay such amounts in and of themselves.

d. <u>Disputed, Contingent and/or Unliquidated Claims</u>. Schedules D and E/F permit the Debtor to designate a claim as disputed, contingent and/or unliquidated. A failure

2

to designate a claim on any of these Schedules as disputed, contingent and/or unliquidated does not constitute an admission that such claim is not subject to objection. The Debtor reserves the right to dispute, or assert offsets or defenses to, any claim reflected on these Schedules as to amount, liability, or status. Moreover, the Debtor reserves the right to amend its Schedules and Statements as necessary and appropriate.

7.  <u>General Conventions Relating to the Schedules of Assets and Liabilities</u>. The

Debtor adopted the following conventions in connection with the preparation of the Schedules:

      a.  <u>Schedule D</u>. Except as otherwise agreed pursuant to a stipulation or agreed order entered by the Bankruptcy Court, the Debtor reserves the right to dispute or challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any specific asset to a secured creditor listed on Schedule D of the Debtor. Moreover, although the Debtor may have scheduled claims of various creditors as secured claims, the Debtor reserve all rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction or any document or instrument related to such creditor's claim. The descriptions provided on Schedule D are intended only to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens. Nothing in the Global Notes or the Schedules and Statements shall be deemed a modification or interpretation of the terms of such agreements.

      b.  <u>Schedule G</u>. While reasonable efforts have been made to ensure the accuracy of the Schedule of Executory Contracts, inadvertent errors or omissions may have occurred. The Debtor hereby reserves all rights to dispute the validity, status or enforceability of any contract, agreement or lease set forth on Schedule G and to amend or supplement such Schedule as necessary. The contracts, agreements and leases listed on Schedule G may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements which may not be listed therein. Certain of the real property leases listed on Schedule G may contain renewal options, guarantees of payments, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties and obligations are not set forth on Schedule G. Certain of the executory agreements may not have been memorialized and could be subject to dispute. Additionally, the Debtor may be parties to various other agreements concerning real property, such as easements, rights of way, subordination, non-disturbance, supplemental agreements, amendments/letter agreements, title documents, consents, site plans, maps and other miscellaneous agreements. Such agreements, if any, are not set forth on Schedule G. Certain of the agreements listed on

3

Schedule G may be in the nature of conditional sales agreements or secured financings. The presence of a contract or agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or unexpired lease. The Debtor reserves all rights, claims and causes of action with respect to the contracts and agreements listed on these Schedules and Statements, including the right to dispute or challenge the characterization or the structure of any transaction, document or instrument.

c.      Schedule H. Codefendants in litigation matters involving the Debtor are not listed in Schedule H unless the trial court has made a ruling that results in an identity of interest between the Debtor and such co-defendant.

*[Remainder of Page Intentionally Left Blank]*

4

**Fill in this information to identify the case:**

Debtor name    Free Speech Systems, LLC

United States Bankruptcy Court for the:   Southern    District of   Texas
                                                          (State)

Case number (If known):   22-60043

☐ Check if this is an amended filing

# Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals

12/15

---

## Part 1:   Summary of Assets

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

     1a. **Real property:**
          Copy line 88 from *Schedule A/B* .......................................................   $ 1,335,971.23

     1b. **Total personal property:**
          Copy line 91A from *Schedule A/B* .....................................................   $ 13,327,463.23

     1c. **Total of all property:**
          Copy line 92 from *Schedule A/B* .......................................................   $ 14,663,434.46

---

## Part 2:   Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
    Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D* .............................   $ 53,646,687.84

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

     3a. **Total claim amounts of priority unsecured claims:**
          Copy the total claims from Part 1 from line 5a of *Schedule E/F* .........................................   $ 

     3b. **Total amount of claims of nonpriority amount of unsecured claims:**
          Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F* .........................   + $ 995,824.64

4. **Total liabilities** ...........................................................................................................   $ 54,642,512.48
    Lines 2 + 3a + 3b

**Fill in this information to identify the case:**

Debtor name __Free Speech Systems, LLC__

United States Bankruptcy Court for the: __Southern__ District of __Texas__
(State)

Case number (if known): __22-60043__

☐ Check if this is an amended filing

Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property
12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

## Part 1:  Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

   All cash or cash equivalents owned or controlled by the debtor

   **Current value of debtor's interest**

2. **Cash on hand**

   Please see attached schedule for additional Bank accounts

   $ 951.31

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

   | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
   |---|---|---|---|
   | 3.1. ▮▮▮▮ | Checking | 8 5 6 3 | $ 118,999.04 |
   | 3.2. ▮▮▮▮ | Checking | 8 5 1 4 | $ 1,163,808.79 |

   *See continuation sheet*

4. **Other cash equivalents** *(Identify all)*

   4.1. ___   $ _____
   4.2. ___   $ _____

5. **Total of Part 1**

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

   $1,284,759.14

## Part 2:  Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

   **Current value of debtor's interest**

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

   7.1. ▮▮▮▮ (Credit card processing)   $ 500,000.00
   7.2. LIT Industrial (Security Deposit)   $ 33,360.00

| Debtor | Free Speech Systems, LLC | Case number (if known) | 22-60043 |
|---|---|---|---|
| | Name | | |

8 **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Please see attached schedule for additional prepayments

Description, including name of holder of prepayment

8.1. The Travelers Companies (Prepaid Insurance) _____ $ 1,224.50

8.2. The Hartford (Prepaid Insurance) _____ $ 1,444.31

\* See continuation sheet\*

9. **Total of Part 2.** $ 687,969.95

Add lines 7 through 8. Copy the total to line 81.

---

## Part 3: Accounts receivable

10. **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.

☑ Yes. Fill in the information below.

Current value of debtor's interest

11 **Accounts receivable**

| 11a. 90 days old or less: | 0.00 | − | 0.00 | = ......→ | $ 0.00 |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |
| 11b. Over 90 days old: | 9,788,413.22 | − | 0.00 | = ......→ | $ 9,788,413.22 |
| | face amount | | doubtful or uncollectible accounts | | |

12 **Total of Part 3** $ 9,788,413.22

Current value on lines 11a + 11b = line 12. Copy the total to line 82.

---

## Part 4: Investments

13. **Does the debtor own any investments?**

☑ No. Go to Part 5.

☐ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

| 14.1. _____ | _____ | $ _____ |
| 14.2. _____ | _____ | $ _____ |

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

| Name of entity: | % of ownership: | | |
|---|---|---|---|
| 15.1. _____ | _____ % | _____ | $ _____ |
| 15.2. _____ | _____ % | _____ | $ _____ |

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

| 16.1. _____ | _____ | $ _____ |
| 16.2. _____ | _____ | $ _____ |

17. **Total of Part 4** $ 0.00

Add lines 14 through 16. Copy the total to line 83.

| Debtor | Free Speech Systems, LLC | Case number (if known) 22-60043 |
|---|---|---|
| | Name | |

## Part 5: Inventory, excluding agriculture assets

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☐ No. Go to Part 6.

☑ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | | | | |
| | MM / DD / YYYY | $ | | $ |
| **20. Work in progress** | | | | |
| | MM / DD / YYYY | $ | | $ |
| **21. Finished goods, including goods held for resale** | | | | |
| Merchandise | 07/29/2022 MM / DD / YYYY | $ 1,327,107.43 | Net Book Value | $ 1,327,107.43 |
| **22. Other inventory or supplies** | | | | |
| | MM / DD / YYYY | $ | | $ |

**23. Total of Part 5**

Add lines 19 through 22. Copy the total to line 84. — $ 1,327,107.43

**24. Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

**25. Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value 89,882.37 Valuation method Net Book Value Current value 89,882.37

**26. Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | | | |
| | $ | | $ |
| **29. Farm animals** Examples: Livestock, poultry, farm-raised fish | | | |
| | $ | | $ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| | $ | | $ |
| **31. Farm and fishing supplies, chemicals, and feed** | | | |
| | $ | | $ |
| **32. Other farming and fishing-related property not already listed in Part 6** | | | |
| | $ | | $ |

| Debtor | Free Speech Systems, LLC | Case number (if known) 22-60043 |
|---|---|---|
| | Name | |

**33. Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85.

$0.00

**34. Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

  ☐ No
  ☐ Yes

**35. Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____ Valuation method _____ Current value $_____

**36. Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No
☐ Yes

**37. Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No
☐ Yes

**Part 7: Office furniture, fixtures, and equipment; and collectibles**

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.
☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **39. Office furniture** | | | |
| Rugs, Chairs, Lamps and other Office Furnitures | $3,285.92 | Net Book Value | $3,285.92 |
| **40. Office fixtures** | | | |
| | $ ___ | | $ |
| **41. Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| Computer Equipments and Software | $44,180.49 | Net Book Value | $44,180.49 |
| **42. Collectibles** Examples: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 Artwork | $73.00 | Net Book Value | $73.00 |
| 42.2 _____ | $ | | $ |
| 42.3 _____ | $ | | $ |

**43. Total of Part 7.**
Add lines 39 through 42. Copy the total to line 86.

$47,539.41

**44. Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No
☑ Yes

**45. Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No
☐ Yes

Debtor     Free Speech Systems, LLC
_____
           Name

Case number (if known) 22-60043
_____

---

## Part 8: Machinery, equipment, and vehicles

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.
☑ Yes. Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1 2021 Winnebago Adventurer Model 35F (VIN:1F66F5DN1LOA03038) | $ 0.00 | Net Book Value | $ 0.00 |
| 47.2 2015 Ford F-450 Model F45 (VIN: 1FDUF4HT0FEC06013) | $ 148,890.74 | Net Book Value | $ 148,890.74 |
| 47.3 | $ | | $ |
| 47.4 | $ | | $ |
| **48. Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| 48.1 | $ | | $ |
| 48.2 | $ | | $ |
| **49. Aircraft and accessories** | | | |
| 49.1 | $ | | $ |
| 49.2 | $ | | $ |
| **50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | | | |
| Production and Other Equipments | $ 40,262.53 | Net Book Value | $ 40,262.53 |

51. **Total of Part 8.**
    Add lines 47 through 50. Copy the total to line 87.

    $ 189,153.27

52. **Is a depreciation schedule available for any of the property listed in Part 8?**
    ☐ No
    ☑ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
    ☑ No
    ☐ Yes

---

Debtor    Free Speech Systems, LLC
          _____          Case number (if known)  22-60043
          Name

## Part 9:    Real property

54. **Does the debtor own or lease any real property?**
    ☐ No. Go to Part 10.
    ☑ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as<br>Assessor Parcel Number (APN), and type of property<br>(for example, acreage, factory, warehouse, apartment<br>or office building), if available. | Nature and extent<br>of debtor's interest<br>in property | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|---|
| 55.1  Warehouse Improvement (3019 Alvin Devane Blvd Austin, TX 78741) | Leasehold Improvement | $ 1,335,971.23 | Net Book Value | $ 1,335,971.23 |
| 55.2 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.3 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.4 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.5 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.6 _____ | _____ | $ _____ | _____ | $ _____ |

56. **Total of Part 9.**                                                                  $ 1,335,971.23
    Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

57. **Is a depreciation schedule available for any of the property listed in Part 9?**
    ☐ No
    ☑ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**
    ☑ No
    ☐ Yes

## Part 10:    Intangibles and intellectual property

59. **Does the debtor have any interests in intangibles or intellectual property?**
    ☐ No. Go to Part 11.
    ☑ Yes. Fill in the information below.

| General description | Net book value of<br>debtor's interest<br>(Where available) | Valuation method<br>used for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets** | $ _____ | _____ | $ _____ |
| 61. **Internet domain names and websites**<br>Domain Names, Websites and Website Developments | $ 2,520.81 | Net Book Value | $ 2,520.81 |
| 62. **Licenses, franchises, and royalties** | $ _____ | _____ | $ _____ |
| 63. **Customer lists, mailing lists, or other compilations** | $ _____ | _____ | $ _____ |
| 64. **Other intangibles, or intellectual property** | $ _____ | _____ | $ _____ |
| 65. **Goodwill** | $ _____ | _____ | $ _____ |

66. **Total of Part 10.**                                                                  $ 2,520.81
    Add lines 60 through 65. Copy the total to line 89.

Debtor  Free Speech Systems, LLC
Name

Case number (if known) 22-60043

67. Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?
- ☑ No
- ☐ Yes

68. Is there an amortization or other similar schedule available for any of the property listed in Part 10?
- ☐ No
- ☑ Yes

69. Has any of the property listed in Part 10 been appraised by a professional within the last year?
- ☑ No
- ☐ Yes

## Part 11: All other assets

70. Does the debtor own any other assets that have not yet been reported on this form?

Include all interests in executory contracts and unexpired leases not previously reported on this form.
- ☑ No. Go to Part 12.
- ☐ Yes. Fill in the information below.

**Current value of debtor's interest**

71. Notes receivable

Description (include name of obligor)

_____  — _____ = ➔ $ _____
Total face amount     doubtful or uncollectible amount

72. Tax refunds and unused net operating losses (NOLs)

Description (for example, federal, state, local)

_____   Tax year _____  $ _____
_____   Tax year _____  $ _____
_____   Tax year _____  $ _____

73. Interests in insurance policies or annuities

_____   $ _____

74. Causes of action against third parties (whether or not a lawsuit has been filed)

_____   $ _____

Nature of claim   _____
Amount requested   $ _____

75. Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims

_____   $ _____

Nature of claim   _____
Amount requested   $ ___   ___

76. Trusts, equitable or future interests in property

_____   $ _____

77. Other property of any kind not already listed  *Examples:* Season tickets, country club membership

_____   $ _____
_____   $ _____

78. Total of Part 11.

Add lines 71 through 77. Copy the total to line 90.   $ 0.00

79. Has any of the property listed in Part 11 been appraised by a professional within the last year?
- ☐ No
- ☐ Yes

Debtor    Free Speech Systems, LLC
          Name                                                    Case number *(if known)* 22-60043

## Part 12:    Su mma ry

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 1,284,759.14 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 687,969.95 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 9,788,413.22 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 1,327,107.43 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 47,539.41 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 189,153.27 | |
| 88. **Real property.** *Copy line 56, Part 9.* ................................................➜ | | $ 1,335,971.23 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 2,520.81 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ...........................91a. | $ 13,327,463.23 | + 91b. $ 1,335,971.23 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ..................................................................    $ 14,663,434.46

Official Form 206A/B                    Schedule A/B: Assets — Real and Personal Property                008907 page 8

Debtor: Free Speech Systems, LLC                    Case Number: 22 - 60043

Part 1.
3. Additional checking, savings, money market, or financial brokerage accounts

| Name of Institution | Account Type | Last 4 digits of Account Number | Current value of debtor's Interest |
|---|---|---|---|
| ███████████ | Checking | 8522 | $1,000.00 |
| ███████████ | Checking | 8621 | $0.00 |
| ███████████ | Checking | 5675 | $0.00 |
| ███████████ | Checking | 8746 | $0.00 |

Part 2.
8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent

| Description, including name of holder of prepayment | Current value of debtor's Interest |
|---|---|
| Frost Insurance Agency | $4,899.14 |
| Stratus | $2,124.27 |
| Shannon & Lee LLP | $100,000.00 |
| ATXHD, Inc | $41,342.00 |
| Protection 1 Alarm | $2,559.73 |
| CubeSmart | $1,016.00 |

[To Supplement: Retainer of The Law Offices of Ray Battaglia, PLLC on the Petition Date - Est. $77,235.00]

008908

**Fill in this information to identify the case:**

Debtor name  Free Speech Systems, LLC

United States Bankruptcy Court for the:  Southern    District of  Texas
                                                      (State)

Case number (If known):  22-60043

☐ Check if this is an
   amended filing

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible.

1. **Do any creditors have claims secured by debtor's property?**
   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   ☐ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |
| --- | --- |

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral. | Column B<br>**Value of collateral**<br>that supports this claim |
| --- | --- | --- | --- |

**2.1** Creditor's name
PQPR Holdings Limited LLC

Creditor's mailing address
3005 S Lamar Blvd Ste D109-317
Austin TX 78704-8864

Creditor's email address, if known

Date debt was incurred  2020/08/13
Last 4 digits of account number  ___ ___ ___ ___

Do multiple creditors have an interest in the same property?
☑ No
☐ Yes. Specify each creditor, including this creditor, and its relative priority.

Describe debtor's property that is subject to a lien
Please see attached

Describe the lien
Uniform Commercial Code Lien

Is the creditor an insider or related party?
☐ No
☑ Yes

Is anyone else liable on this claim?
☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☑ Disputed

$ 53,646,687.84    $ 14,663,434.46

**2.2** Creditor's name

Creditor's mailing address

Creditor's email address, if known

Date debt was incurred
Last 4 digits of account number

Do multiple creditors have an interest in the same property?
☐ No
☐ Yes. Have you already specified the relative priority?
   ☐ No. Specify each creditor, including this creditor, and its relative priority.

   ☐ Yes. The relative priority of creditors is specified on lines

Describe debtor's property that is subject to a lien

Describe the lien

Is the creditor an insider or related party?
☐ No
☐ Yes

Is anyone else liable on this claim?
☐ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____    $ _____

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**    $ _____

| Debtor | Free Speech Systems, LLC | Case number (if known) 22-60043 |
|---|---|---|
| | Name | |

## Part 2: List Others to Be Notified for a Debt Already Listed in Part 1

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |

Free Speech Systems, LLC

## 2.1 Describe debtor's property that is subject to a lien

(1) All fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Haappease, Gut Fution, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Incuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survivial Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and all gross revenue, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with repect to any of the foregoing

**Fill in this information to identify the case:**

Debtor    Free Speech Systems LLC

United States Bankruptcy Court for the:   Southern    District of   Texas
                                                            (State)

Case number   22-60043
(if known)

☐ Check if this is an amended filing

Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims

**12/15**

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

## Part 1:   List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

   ■ No. Go to Part 2.

   ☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  | Total claim | Priority amount |
|---|---|---|---|

**2.1**   Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number**   \_\_\_ \_\_\_ \_\_\_ \_\_\_

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (\_\_\_\_)

**As of the petition filing date, the claim is:** $ _____     $ _____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

**2.2**   Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number**   \_\_\_ \_\_\_ \_\_\_ \_\_\_

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (\_\_\_\_)

**As of the petition filing date, the claim is:** $ _____     $ _____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

**2.3**   Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number**   \_\_\_ \_\_\_ \_\_\_ \_\_\_

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (\_\_\_\_)

**As of the petition filing date, the claim is:** $ _____     $ _____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

Debtor **Free Speech Systems LLC**                                            Case number (if known) 22-60043
     Name

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

                                                           **Amount of claim**

**3.1**
**Nonpriority creditor's name and mailing address**
Addshoppers, Inc

15806 Brookway Dr Ste 200
Huntersville, NC 28078

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 2,989.00

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.2**
**Nonpriority creditor's name and mailing address**
Air Supply of North Texas aka Precision Oxygen

2829 Fort Worth Avenue
Dallas, TX 75211

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 105.48

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.3**
**Nonpriority creditor's name and mailing address**
Airco Mechanical, LTD

PO Box 1598
Round Rock, TX 78680

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 17,268.71

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.4**
**Nonpriority creditor's name and mailing address**
AT&T Mobile

PO Box 5001
Carol Stream, IL 60197-5001

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 5,167.41

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.5**
**Nonpriority creditor's name and mailing address**
Atomial, LLC

1920 E. Riverside Drive Suite A-120 #124
Austin, TX 78741

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 50,400.00

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.6**
**Nonpriority creditor's name and mailing address**
Austin Security & Investigation Solutions

PO Box 2904
Pflugerville, TX 78691

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 5,961.87

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

008913

Official Form 206E/F          **Schedule E/F: Creditors Who Have Unsecured Claims**

Debtor  FreeSpeech Systems LLC
Name

Case number (if known) 22-60043

| Part 2: | Additional Page |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.7** Nonpriority creditor's name and mailing address
Blott, Jacquelyn, Attorney at Law

200 University Boulevard Suite 225 #251

Round Rock, TX 78665

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☒ Disputed
- ☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 58,280.00

---

**3.8** Nonpriority creditor's name and mailing address
City of Austin

PO Box 2267

Austin, TX 78783

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 6,532.68

---

**3.9** Nonpriority creditor's name and mailing address
CTRMA Processing

PO Box 734182

Dallas, TX 75373

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 24.23

---

**3.10** Nonpriority creditor's name and mailing address
eCommerce CDN, LLC

221 E 63rd Street

Savannah, GA 31405

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 27,270.00

---

**3.11** Nonpriority creditor's name and mailing address
Elevated Solutions Group

706 W Ben White Blvd, Bldg B, Ste 188

Austin, TX 78740

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 319,148.16

---

Debtor _____
     Free Speech Systems LLC
Name

Case number (if known) _____

---

**Part 2:**    **Additional Page**

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

                                                                         **Amount of claim**

---

**3.12**   **Nonpriority creditor's name and mailing address**

Getty Images, Inc

PO Box 953604

St. Louis, MO 63195-3604

Date or dates debt was incurred     _____

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 9,201.25

---

**3.13**   **Nonpriority creditor's name and mailing address**

Gibson, Ronald

4012 Pleasant Grove Church Rd

Shelby NC, 28150-2842

Date or dates debt was incurred     _____

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 3,000.00

---

**3.14**   **Nonpriority creditor's name and mailing address**

Gracenote Media Services, LLC

29421 Network Place

Chicago, IL 60673-1294

Date or dates debt was incurred     _____

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 119.98

---

**3.15**   **Nonpriority creditor's name and mailing address**

Greenair, Inc

23569 Center Ridge Road

Westlake, OH 44145

Date or dates debt was incurred     _____

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 12,240.00

---

**3.16**   **Nonpriority creditor's name and mailing address**

Impact Fire Services LLC

PO Box 735063

Dallas, TX 75373-5063

Date or dates debt was incurred     _____

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 165.00

---

Official Form 206E/F         **Schedule E/F: Creditors Who Have Unsecured Claims**

008915

Debtor _____
        Free Spirit Systems LLC
        Name

Case number (if known) _____

## Part 2: Additional Page

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

**3.17** | Nonpriority creditor's name and mailing address
JCE SEO

6101 Broadway
San Antonio, TX 78209

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 5,000.00

**3.18** | Nonpriority creditor's name and mailing address
JW JIB Productions, LLC

2921 Carvelle Drive
Riviera Beach, FL 33404

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 7,000.00

**3.19** | Nonpriority creditor's name and mailing address
Konica Minolta Premier Finance

PO Box 41602
Philadelphia, PA 19101-1602

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 1,847.87

**3.20** | Nonpriority creditor's name and mailing address
Kount An Equifax Company

PO Box 740253
Atlanta, GA 30374

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 11,172.00

**3.21** | Nonpriority creditor's name and mailing address
Lumen/Level 3 Communications

PO Box 910182
Denver, CO 80291-0182

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 7,906.43

| Debtor | Free Speech Systems LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

| **Part 2:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.22** | Nonpriority creditor's name and mailing address

Lyman, Daniel

5832 Elton Road

Venice, FL 34293

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 3,500.00

---

**3.23** | Nonpriority creditor's name and mailing address

PQPR Holdings

3005 S Lamar Blvd Ste D109-317

Austin TX 78704-8864

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.24** | Nonpriority creditor's name and mailing address

MRJR Holdings, LLC

PO Box 27740

Las Vegas, NV 89426

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.25** | Nonpriority creditor's name and mailing address

Sparkletts & Sierra Springs

PO Box 660579

Dallas, TX 75266-0579

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 1,084.14

---

**3.26** | Nonpriority creditor's name and mailing address

Texas Gas Service

PO Box 219913

Kansas City, MO 64121

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number  ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 1,078.28

---

008917

| Debtor | | | |
| --- | --- | --- | --- |
| Name | | | |

FreeSpeech Systems LLC

Case number (if known) 22-60043

| **Part 2:** | **Additional Page** |
| --- | --- |

| | Amount of claim |
| --- | --- |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

---

**3.27** Nonpriority creditor's name and mailing address

Willow Grove Productions

1810 Rockcliff Road

Austin, TX 78746

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,700.00

---

**3.28** Nonpriority creditor's name and mailing address

WMQM-AM 1600

21 Stephen Hill Road

Atoka, TN 38004

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,500.00

---

**3.29** Nonpriority creditor's name and mailing address

American Express

200 Vesey Street

New York, NY 10285

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 54,279.78

---

**3. 30** Nonpriority creditor's name and mailing address

David Jones

3005 S Lamar Blvd Ste D109-317

Austin TX 78704-8864

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 150,000.00

---

**3.31** Nonpriority creditor's name and mailing address

Campco

4625 W. Jefferson Blvd

Los Angeles, CA 90016

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number _ _ _ _

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

008918

| Debtor | FreeSpeech Systems LLC | Case number (if known) 22-60043 |
|---|---|---|
| | Name | |

Case 4:23-cv-00463 Document 16-25 Filed in TXSD on 03/13/09 Page 453 of 480

## Part 2:   Additional Page

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.32** Nonpriority creditor's name and mailing address

CustomTattoNow.com

16107 Kensington Dr #172

Sugar Land, TX 77479

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed
- ☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.33** Nonpriority creditor's name and mailing address

David Icke Books Limited

1a Babbington Lane

Derby, England DE11SU

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.34** Nonpriority creditor's name and mailing address

American Media/Reality Zone

PO Box 4646

Thousand Oaks, CA 91359

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.35** Nonpriority creditor's name and mailing address

Justin Lair

1313 Lookout Ave

Klamath Falls, OR 97601

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.36** Nonpriority creditor's name and mailing address

RatsMedical.com

1211 E Bridle Trail Rd

Draper, UT 84020

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

Debtor _____
       Free Speech Systems LLC
       Name

Case number (if known) _____

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

**3.37** Nonpriority creditor's name and mailing address

███████████████████████

███████████████
███████████████
███████████████

As of the petition filing date, the claim is:
Check all that apply.
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed
- ☐ Liquidated and neither contingent nor disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

**3.38** Nonpriority creditor's name and mailing address
Skousen, Joel

PO Box 565

Spring City, UT 84662

As of the petition filing date, the claim is:
Check all that apply.
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

**3.39** Nonpriority creditor's name and mailing address
Wisconsin Dept. of Revenue

PO Box 3028

Milwaukee, WI 53201-3028

As of the petition filing date, the claim is:
Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

**3.40** Nonpriority creditor's name and mailing address
Watson, Paul

9 Riverdale Road Ranmoor Sheffield

South Yorkshire, United Kingdom S10 3FA

As of the petition filing date, the claim is:
Check all that apply.
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

**3.41** Nonpriority creditor's name and mailing address
Verizon Wireless

PO Box 660108

Dallas, TX 75266

As of the petition filing date, the claim is:
Check all that apply.
- ☐ Contingent
- ☑ Unliquidated
- ☐ Disputed

$ 0.00

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

008920

Debtor **Free Speech Systems LLC** _____  Case number _(if known)_ _____
          Name

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.42** | Nonpriority creditor's name and mailing address
Miller, Sean

PO Box 763

Wyalusing, PA 18853

As of the petition filing date, the claim is:
_Check all that apply._
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed
- ☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

**3.43** | Nonpriority creditor's name and mailing address
Spectrum Enterprise aka Time Warner Cable

PO Box 60074

City of Industry, CA 91716

As of the petition filing date, the claim is:
_Check all that apply._
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

**3.44** | Nonpriority creditor's name and mailing address
Ready Alliance Group, Inc

PO Box 1709

Sandpoint, ID 83864

As of the petition filing date, the claim is:
_Check all that apply._
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

**3.45** | Nonpriority creditor's name and mailing address
One Party America, LLC

6700 Woodlands Parkway Suite 230-309

The Woodlands, TX 77382

As of the petition filing date, the claim is:
_Check all that apply._
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

**3.46** | Nonpriority creditor's name and mailing address
LCJ Pictures LLC

PO Box 19549

Austin, TX 78760

As of the petition filing date, the claim is:
_Check all that apply._
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim: _____

$ 89,882.37

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

---

008921

Debtor _Free Speech Systems LLC_____  Case number _(if known)_____
        Name

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.47** | **Nonpriority creditor's name and mailing address**
Brennan Gilmore

c/o Civil Rights Clinic, 600 New Jersey Ave NW

Washington, DC 20001

Date or dates debt was incurred  _____

Last 4 digits of account number  __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** Litigation Settlement

**Is the claim subject to offset?**
☐ No
☐ Yes

$ $50,000.00

---

**3.48** | **Nonpriority creditor's name and mailing address**
Christopher Sadowski

c/o Copy Cat Legal PLLC, 3111 N. University Drive,

Coral Springs, FL 33065

Date or dates debt was incurred  _____

Last 4 digits of account number  __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Asserted copyright

**Is the claim subject to offset?**
☐ No
☐ Yes

$ $90,000.00

---

**3.49** | **Nonpriority creditor's name and mailing address**
Neil Heslin

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

Date or dates debt was incurred  2018

Last 4 digits of account number  __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** Litigation claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.50** | **Nonpriority creditor's name and mailing address**
Scarlett Lewis

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

Date or dates debt was incurred  2018

Last 4 digits of account number  __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.51** | **Nonpriority creditor's name and mailing address**
Leonard Pozner

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

Date or dates debt was incurred  2018

Last 4 digits of account number  __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

008922

Debtor Free Speech Systems LLC _____ Case number (if known)_____
        Name

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

---

**3.52** Nonpriority creditor's name and mailing address
Veronique De La Rosa

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston, TX 77002

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred    2018
Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.53** Nonpriority creditor's name and mailing address
Marcel Fontaine

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston, TX 77002

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred    2018
Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.54** Nonpriority creditor's name and mailing address
David Wheeler

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred    2018
Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.55** Nonpriority creditor's name and mailing address
Francine Wheeler

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred    2018
Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.56** Nonpriority creditor's name and mailing address
Jacqueline Barden

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred    2018
Last 4 digits of account number    ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

Debtor _____ Free Speech Systems LLC _____ Case number (if known) _____
   Name

| Part 2: | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

                                                                        **Amount of claim**

**3.57** | **Nonpriority creditor's name and mailing address**
Mark Barden

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
*Check all that apply.*
☒ Contingent
☒ Unliquidated
☒ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim:    Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.58** | **Nonpriority creditor's name and mailing address**
Nicole Hockley

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St. STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
*Check all that apply.*
☒ Contingent
☒ Unliquidated
☒ Disputed

Basis for the claim:    Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.59** | **Nonpriority creditor's name and mailing address**
Ian Hockley

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
*Check all that apply.*
☒ Contingent
☒ Unliquidated
☒ Disputed

Basis for the claim:    Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3. 60** | **Nonpriority creditor's name and mailing address**
Jennifer Hensel

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
*Check all that apply.*
☒ Contingent
☒ Unliquidated
☒ Disputed

Basis for the claim:    Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.61** | **Nonpriority creditor's name and mailing address**
Donna Soto

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
*Check all that apply.*
☒ Contingent
☒ Unliquidated
☒ Disputed

Basis for the claim:    Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

008924

Debtor  FreeSpeech Systems LLC
Name

Case number *(if known)* 22-60043

| | | |
|---|---|---|

## Part 2:  Additional Page

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.62** | **Nonpriority creditor's name and mailing address**
Carlee Soto Parisi

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor
   disputed

**Basis for the claim:** Litigation Claim

$ 0.00

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

---

**3.63** | **Nonpriority creditor's name and mailing address**
Carlos M. Soto

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St. STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** Litigation Claim

$ 0.00

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

---

**3.64** | **Nonpriority creditor's name and mailing address**
Jillian Soto-Marino

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** Litigation Claim

$ 0.00

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

---

**3.65** | **Nonpriority creditor's name and mailing address**
William Aldenberg

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** Litigation Claim

$ 0.00

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

---

**3.66** | **Nonpriority creditor's name and mailing address**
William Sherlach

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** Litigation Claim

$ 0.00

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

---

Debtor _____    Case number (if known) _____

FreeSpeech Systems LLC

Name

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.67** Nonpriority creditor's name and mailing address

Robert Parker

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
*Check all that apply.*

☑ Contingent
☑ Unliquidated
☑ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred    2018

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.68** Nonpriority creditor's name and mailing address

Yan Luis

c/o Noor A. Sabb, 280 North Broadway, STE 300

Jericho, New York 11753

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: ADA Claim

$ 0.00

Date or dates debt was incurred    _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.___** Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred    _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.___** Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred    _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.___** Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 0.00

Date or dates debt was incurred    _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

---

008926

| Debtor | Free Speech Systems LLC | Case number (if known) |
|--------|-------------------------|------------------------|
|        | Name                    |                        |

## Part 3: List Others to Be Notified About Unsecured Claims

4. **List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2.** Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| | Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|---|
| 4.1. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.2. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.3. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.4. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 41. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.5. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.6. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.7. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.8. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.9. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.10. | | Line _____  ❏ Not listed. Explain _____ | — — — — |
| 4.11. | | Line _____  ❏ Not listed. Explain _____ | — — — — |

008927

Debtor _____
Name Case number (if known)_____

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---------|---------------------------------------------------------------|

5. Add the amounts of priority and nonpriority unsecured claims.

Total of claim amounts

5a. **Total claims from Part 1**  5a. $ 0.00

5b. **Total claims from Part 2**  5b. **+** $ 995,824.64

5c. **Total of Parts 1 and 2**
Lines 5a + 5b = 5c.  5c. $ 995,824.64

**Fill in this information to identify the case:**

Debtor name   Free Speech Systems, LLC

United States Bankruptcy Court for the: Southern    District of   Texas
                                                      (State)

Case number (If known):   22-60043        Chapter   11

☐ Check if this is an amended filing

Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases    12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

1. **Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

2. **List all contracts and unexpired leases**         State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| | | | |
|---|---|---|---|
| **2.1** | State what the contract or lease is for and the nature of the debtor's interest | Financial services Agreement<br>For Credit Card Processing and Other Financial Service | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>PQPR Holdings Limited LLC: PO Box 19549 Austin TX 78760 - 9549 |
| | State the term remaining | 9 years and 2 months | |
| | List the contract number of any government contract | | |
| **2.2** | State what the contract or lease is for and the nature of the debtor's interest | Employment Agreement<br>For Employment of Alex Jones | Alex Jones: 3019 Alvin Devane Blvd Austin TX 78741 |
| | State the term remaining | "At will" Basis | |
| | List the contract number of any government contract | | |
| **2.3** | State what the contract or lease is for and the nature of the debtor's interest | Lease Agreement<br>Studio Lease | BCC UBC LLC: 901 S. Mopac Expressway Plaza I, Suite 60, Austin , TX 78746 |
| | State the term remaining | 2 years and 5 Months | |
| | List the contract number of any government contract | | |
| **2.4** | State what the contract or lease is for and the nature of the debtor's interest | Service Agreement<br>For Back Ground Checks and Investigative Services | Austin Security and Investigation Solutions LLC: PO Box 2904 Pflugerville, TX 78691 |
| | State the term remaining | 9 Months, Renews Automatically | |
| | List the contract number of any government contract | | |
| **2.5** | State what the contract or lease is for and the nature of the debtor's interest | Building and Land Lease Agreement<br>Warehouse Lease | Expo Glo, LLC: 1717 McKinney Ave, Suite 1900 Dallas, TX 75202-1236 |
| | State the term remaining | Renews Monthly | |
| | List the contract number of any government contract | | |

**Fill in this information to identify the case:**

Debtor name __Free Speech Systems, LLC__

United States Bankruptcy Court for the: __Southern__ District of __Texas__
(State)

Case number (If known): __22-60043__

☐ Check if this is an amended filing

## Official Form 206H

# Schedule H: Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

1. **Does the debtor have any codebtors?**

   ☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

   ☑ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G*. Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.**

| | *Column 1:* **Codebtor** | | *Column 2:* **Creditor** | |
|---|---|---|---|---|
| | **Name** | **Mailing address** | **Name** | Check all schedules that apply: |
| 2.1 | Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin  TX  78741 <br> City  State  ZIP Code | Niel Heslin | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.2 | Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin  TX  78741 <br> City  State  ZIP Code | Scarlett Lewis | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.3 | Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin  TX  78741 <br> City  State  ZIP Code | Leonard Pozner | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.4 | Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin  TX  78741 <br> City  State  ZIP Code | Veronique De La Rosa | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.5 | Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin  TX  78741 <br> City  State  ZIP Code | Marcel Fontaine | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.6 | | Street <br><br> City  State  ZIP Code | | ☐ D <br> ☐ E/F <br> ☐ G |

| Fill in this information to identify the case and this filing: |
|---|

Debtor Name  __Free Speech Systems, LLC__

United States Bankruptcy Court for the:  __Southern__  District of  __Texas__
                                                                    (State)

Case number (*If known*):  __22-60043__

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☒ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☒ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☒ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☒ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☒ *Schedule H: Codebtors* (Official Form 206H)

☒ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

❏ Amended *Schedule* ____

❏ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒ Other document that requires a declaration  __Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements.__

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  __08/29/2022__            **✗** _signature_
                MM / DD / YYYY                    Signature of individual signing on behalf of debtor

                                        __W. Marc Schwartz__
                                        Printed name

                                        __Chief Restructuring Officer__
                                        Position or relationship to debtor

# EXHIBIT 25

008932

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

## DECLARATION OF W. MARC SCHWARTZ

I, W. Marc Schwartz, declare under penalty of perjury as follows:

1.      I am making this declaration in connection with the Motion of W. Marc Schwartz and Schwartz Associates, LLC (collectively "Schwartz"). Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Schwartz [ECF No. 207] (the "Rule 59 Motion").

2.      Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge.

3.      Along with potentially other documentary evidence, Schwartz anticipates introducing into evidence either at a rehearing requested in the Rule 59 Motion and/or the hearing on Schwartz's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 252] (the "Administrative Expense Motion") the documents attached to the Witness and Exhibit List filed with the Court on January 18, 2023, as Exhibits 13 through 26 (the "Demonstrative Exhibits").

4.      Schwartz also anticipates introducing into evidence at a rehearing requested in the Rule 59 Motion and/or the hearing on the Administrative Expense Motion the following documents (the "Non-Demonstrative Exhibits" and together with the Demonstrative Exhibits and



EXHIBIT

9828526 v1 (72053.00005.000)
008933

other exhibits submitted at such rehearing and/or hearing on the Administrative Expense Motion, the "Additional Documentary Evidence"):

    a.   Memorandum dated June 5, 2022, regarding PQPR's asserted lien and note;

    b.   Email dated August 6, 2022, from R. Shannon to K. Lee, R. Battaglia, and M. Schwartz regarding Alex Jones's asserted indemnity; and

    c.   Spreadsheet prepared by Schwartz Associates LLC of the costs that that the Debtor would incur to prevent interruption to the Debtor's business if Alex Jones attended the entire trial in Connecticut.

5.    Schwartz anticipates submitting testimony related to the Additional Documentary Evidence and other matters that it contends will show, among other things demonstrating that Schwartz does not have or represent any interest adverse to the Debtor's estate, that:

    a.   Schwartz's initial reaction to Alex Jones's request for the Debtor to seek extension of the automatic stay to Mr. Jones and take other actions preventing the Connecticut Litigation from continuing was that the Debtor should reject the request;

    b.   Schwartz analyzed and did not find support for Jones' asserted indemnity on its own initiative;

    c.   The Debtor's proposed payment of Mr. Jones's travel expenses to attend the Connecticut Litigation and 100% of state court counsel fees was negotiated to allow the Debtor to reach agreement with the Connecticut Plaintiffs with respect to their motion to modify the automatic stay to allow the Connecticut Litigation to continue;

    d.   The Connecticut Plaintiffs required in order to reach the contemplated deal with the Debtor that Mr. Jones to agree to certain aspects of the agreed order modifying the automatic stay to allow the Connecticut Litigation to continue;

    e.   The Debtor's proposed payment of Jones's travel expenses to attend the Connecticut Litigation and 100% of state court counsel fees was negotiated by the Debtor in the context of Mr. Jones asserting through his counsel that Mr. Jones may cease his involvement with the Debtor;

    f.   Schwartz believed that (i) Mr. Jones's agreement to joint representation by the existing state court counsel was necessary to allow such joint representation and (ii) finding replacement counsel was problematic and would likely cost significantly more than paying 100% of the fees for the existing counsel;

g.  When the Court indicated that it would not approve the Debtor bearing 100% of fees for the existing state court counsel, Schwartz used that as additional leverage to renegotiate the division of costs with Mr. Jones;

h.  The non-existence of a management agreement between FSS and PQPR;

i.  Schwartz did not take direction from Mr. Jones in the Debtor's case or the IW Cases;

j.  Schwartz adopted the recommendations of counsel that PQPR's asserted secured claim was that, at a minimum, the lien was likely avoidable;

k.  In prepetition negotiations with PQPR, Schwartz, in conjunction with S&L, represented that the alternative to a negotiated solution was an immediate action in bankruptcy court to avoid PQPR's asserted lien and/or note;

l.  As the result of the prepetition negotiations with PQPR, the Debtor negotiated the Forbearance Agreement that provided benefits to the Debtor, and subsequently its bankruptcy estate, that could not have been achieved non-consensually through an avoidance action;

m.  The possibility of potential subordination of PQPR's asserted secured claim in postpetition discussions with PQPR;

n.  Schwartz first suggested at the August 3, 2022, hearing the expansion of the Subchapter V Trustee's duties in response to the Sandy Hook Plaintiffs' stated desire for independent review of PQPR's asserted secured claim;

o.  Schwartz worked to secure a replacement for PQPR, Blue Asension, and Aurium that was ultimately finalized by the Debtor under management of Patrick Magill and approved by the Court in connection with the Debtor's motions for approval to enter into the financial services agreement [ECF No. 273] and fulfilment agreement [ECF No. 276];

p.  Schwartz assisted in the preparation of the Third Interim Cash Collateral Order [ECF No. 148] and will discuss adverse positions taken by Alex Jones; and

q.  Schwartz worked to determine a means for the Debtor to be able to agree to modification of the automatic stay with respect to the Connecticut Litigation in a manner that would not cause untenable disruption to the Debtor's operations; and

r.  S&L assisted Mr. Schwartz in locating and providing information and documents in the Connecticut Litigation that allegedly had not been provided to the Connecticut Plaintiffs despite numerous requests.

6.      I did not believe that that the evidence described above was relevant to the U.S.

Trustee's objection to the Schwartz employment application based on (i) the contents of the

objection; (ii) discussions with the attorneys for the U.S. Trustee and Sandy Hook Plaintiffs; (iii) the representations at the September 13, 2022, hearing; and (iv) the joinder by the Sandy Hook Plaintiffs. I therefore did not prepare the Additional Documentary Evidence, the additional testimony that Schwartz seeks to submit at the rehearing and/or hearing on the Administrative Expense Motion, or legal arguments about what constitutes a predisposition under circumstances that renders that predisposition an interest adverse to the estate for the September 20, 2022, hearing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 18, 2023,

By: /s/ *W. Marc Schwartz*
W. Marc Schwartz