**PlnDue, DsclsDue, LEAD, CLOSED, Subchapter_V**

# U.S. Bankruptcy Court
## Southern District of Texas (Victoria)
### Bankruptcy Petition #: 22-60020

|  |  |
|---|---|
| *Date filed:* | 04/17/2022 |
| *Date terminated:* | 06/10/2022 |
| *Debtor dismissed:* | 06/10/2022 |
| *341 meeting:* | 06/16/2022 |
| *Deadline for filing claims:* | 08/24/2022 |
| *Deadline for filing claims (govt.):* | 10/17/2022 |

*Assigned to:* Bankruptcy Judge Christopher M. Lopez
Chapter 11
Voluntary
No asset

*Debtor disposition:* Dismissed for Other Reason

| *Debtor* | represented by **Kyung Shik Lee** |
|---|---|
| **InfoW, LLC** | Kyung S. Lee PLLC |
| 5606 N. Navarro | 4723 Oakshire Drive |
| Ste. 300-W | Apt. B |
| Victoria, TX 77904 | Houston, TX 77027 |
| VICTORIA-TX | 713-301-4751 |
| Tax ID / EIN: 46-4546916 | Email: kslee50@gmail.com |
|  |  |
|  | **Charles Michael Rubio** |
|  | Parkins & Rubio LLP |
|  | 100 Park Avenue |
|  | Suite 1600 |
|  | New York, NY 10017 |
|  | 646-419-0181 |
|  | Fax : 713-715-1699 |
|  | Email: crubio@parkinsrubio.com |
|  |  |
|  | **R. J. Shannon** |
|  | Shannon & Lee LLP |
|  | 700 Milam St., STE 1300 |
|  | Houston, TX 77002 |
|  | 713-714-5770 |
|  | Email: rshannon@shannonpllc.com |

| *Debtor* | represented by **Kyung Shik Lee** |
|---|---|
| **IWHealth, LLC** | (See above for address) |
| 5606 N. Navarro |  |
| Ste. 300-W | **Charles Michael Rubio** |
| Victoria, TX 77904 | (See above for address) |
| VICTORIA-TX |  |
|  | **R. J. Shannon** |
|  | (See above for address) |

| *Debtor* | represented by **Kyung Shik Lee** |
|---|---|
| **Prison Planet TV, LLC** | (See above for address) |
| 5606 N. Navarro |  |
| Ste. 300-W | **Charles Michael Rubio** |

010255

Victoria, TX 77904
VICTORIA-TX
Tax ID / EIN: 26-1510005

**Trustee**
**Melissa A Haselden**
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149

(See above for address)

**R. J. Shannon**
(See above for address)

represented by **Melissa A Haselden**
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149
Fax : 866.405.6038
Email: mhaselden@haseldenfarrow.com

**U.S. Trustee**
**US Trustee**
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002
713-718-4650

represented by **Ha Minh Nguyen**
Office of the United States Trustee
515 Rusk St
Ste 3516
Houston, TX 77002
202-590-7962
Email: ha.nguyen@usdoj.gov

**Jayson B. Ruff**
Office of the United States Trustee
515 Rusk St.
Ste. 3516
Houston, TX 77002
713-718-4650
Fax : 713-718-4670
Email: jayson.b.ruff@usdoj.gov

| Filing Date | # | Docket Text |
|---|---|---|
| 04/17/2022 | 1 (12 pgs) | Chapter 11 Subchapter V Voluntary Petition Non-Individual Fee Amount $1738 Filed by InfoW, LLC. (Lee, Kyung) (Entered: 04/18/2022) |
| 04/18/2022 | | Receipt of Voluntary Petition (Chapter 11)( 22-60020) [misc,volp11] (1738.00) Filing Fee. Receipt number A23653924. Fee amount $1738.00. (U.S. Treasury) (Entered: 04/18/2022) |
| 04/18/2022 | 2 (5 pgs) | Debtors Master Service List (Filed By InfoW, LLC ). (Shannon, Robert) (Entered: 04/18/2022) |
| 04/18/2022 | 3 (1 pg) | Declaration re: *Declaration Under Penalty of Perjury for Non-Individual Debtors* (Filed By InfoW, LLC ). (Shannon, Robert) (Entered: 04/18/2022) |
| 04/18/2022 | 4 (1 pg) | Statement *Corporate Ownership Statement and Report Regarding Value, Operations and Profitability of Entities in which the Estate of the Debtor Holds a Substantial and Controlling Interest* (Filed By InfoW, LLC ). (Shannon, Robert) (Entered: 04/18/2022) |

| | | |
|---|---|---|
| 04/18/2022 | 5<br>(15 pgs; 2 docs) | Emergency Motion *Debtors' Emergency Motion for Joint Administration of Chapter 11 Cases* Filed by Debtor InfoW, LLC (Attachments: # 1 Proposed Order) (Shannon, Robert) (Entered: 04/18/2022) |
| 04/18/2022 | 6<br>(86 pgs; 4 docs) | Emergency Motion *Debtors' Emergency Motion for Order Authorizing Appointment of Russell F. Nelms and Richard S. Schmidt as Trustees of the 2022 Litigation Settlement Trust and Granting Related Relief* Filed by Debtor InfoW, LLC (Attachments: # 1 Proposed Order # 2 Exhibit A # 3 Exhibit B) (Shannon, Robert) (Entered: 04/18/2022) |
| 04/18/2022 | 7<br>(40 pgs; 4 docs) | Emergency Motion *Debtors' Emergency Application for Interim and Final Orders (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* Filed by Debtor InfoW, LLC (Attachments: # 1 Proposed Order # 2 Exhibit A # 3 Exhibit B) (Shannon, Robert) (Entered: 04/18/2022) |
| 04/18/2022 | | Notice of Appearance and Request for Notice Filed by Ha Minh Nguyen (Nguyen, Ha) (Entered: 04/18/2022) |
| 04/18/2022 | | Notice of Appearance and Request for Notice Filed by Jayson B. Ruff (Ruff, Jayson) (Entered: 04/18/2022) |
| 04/18/2022 | 8<br>(2 pgs) | Order for Joint Administration Signed on 4/18/2022 (rsal) (Entered: 04/18/2022) |
| 04/18/2022 | | Certificate of Email Notice. Contacted K. Lee. Movant to notice all interested parties and file a certificate of service with the court (Related document(s): 6 Emergency Motion Debtors' Emergency Motion for Order & 7 Debtors' Emergency Application for Interim and Final Orders). Hearing is scheduled for 4/22/2022 at 09:00 AM by telephone and video conference. (rsal) (Entered: 04/18/2022) |
| 04/18/2022 | 9<br>(4 pgs) | Notice of Appointment of Chapter 11 Subchapter V Trustee. Melissa A Haselden added to case as trustee. (Ruff, Jayson) (Entered: 04/18/2022) |
| 04/18/2022 | 10<br>(2 pgs) | Meeting of Creditors Chapter 11 for Non-Individual Debtor Set 341(a) meeting to be held on 5/26/2022 at 10:00 AM at US Trustee Houston Teleconference. Last day to object to dischargeability under section 523 is 7/25/2022. Proofs of Claims due by 8/24/2022. Government Proof of Claim due by 10/17/2022. (Ruff, Jayson) (Entered: 04/18/2022) |
| 04/18/2022 | 11<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Shelby A Jordan Filed by on behalf of Shelby A Jordan (Jordan, Shelby) (Entered: 04/18/2022) |
| 04/18/2022 | 12<br>(4 pgs) | Corrected Notice *of Appointment of Chapter 11 Subchapter V Trustee.* Filed by US Trustee (Ruff, Jayson) (Entered: 04/18/2022) |
| 04/19/2022 | 13<br>(3 pgs) | Notice *Notice of Hearing.* (Related document(s):6 Emergency Motion, 7 Emergency Motion) Filed by InfoW, LLC (Shannon, R. J.) (Entered: 04/19/2022) |

| | | |
|---|---|---|
| 04/20/2022 | ⊙ 14<br>(4 pgs) | BNC Certificate of Mailing - Meeting of Creditors. (Related document(s):10 Meeting of Creditors Chapter 11 for Non-Individual Debtor Set) No. of Notices: 33. Notice Date 04/20/2022. (Admin.) (Entered: 04/20/2022) |
| 04/20/2022 | ⊙ 15<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):8 Order for Joint Administration) No. of Notices: 28. Notice Date 04/20/2022. (Admin.) (Entered: 04/20/2022) |
| 04/21/2022 | ⊙ 16<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Raymond William Battaglia Filed by on behalf of Ray W. Battaglia (Battaglia, Raymond) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 17<br>(141 pgs; 7 docs) | Witness List, Exhibit List (Filed By IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC ).(Related document(s):6 Emergency Motion, 7 Emergency Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Shannon, R. J.) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 18<br>(11 pgs; 2 docs) | Objection (related document(s):6 Emergency Motion). Filed by US Trustee (Attachments: # 1 Proposed Order) (Ruff, Jayson) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 19<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Ryan E Chapple Filed by on behalf of David Wheeler, et al. (Chapple, Ryan) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 20<br>(3 pgs) | Exhibit List (Filed By US Trustee ).(Related document(s):6 Emergency Motion, 7 Emergency Motion) (Ruff, Jayson) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 21<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Randy W Williams Filed by on behalf of David Wheeler, et al. (Williams, Randy) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 22<br>(113 pgs; 14 docs) | Emergency Motion *to Continue Hearings on Dkts. 6 and 7* Filed by Creditor David Wheeler, et al. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Proposed Order) (Chapple, Ryan) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 23<br>(99 pgs; 13 docs) | Exhibit List (Filed By David Wheeler, et al. ).(Related document(s):6 Emergency Motion, 7 Emergency Motion, 22 Emergency Motion) (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Exhibit K # 12 Exhibit L) (Chapple, Ryan) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 24<br>(2 pgs) | Objection *o Debtors Emergency Motion for Order Authorizing Appointment of Russell F. Nelms and Richard S. Schmidt as Trustees of The 2022 Litigation Settlement Trust and Granting Related Relief* (related document(s):6 Emergency Motion). Filed by Neil Heslin, et al. (Beatty, Jon) (Entered: 04/21/2022) |
| 04/21/2022 | ⊙ 25<br>(39 pgs; 4 docs) | Witness List, Exhibit List (Filed By Neil Heslin, et al. ).(Related document(s):6 Emergency Motion) (Attachments: # 1 Exhibit 1 # 2 |

| | | |
|---|---|---|
| | | Exhibit 2 # 3 Exhibit 3) (Beatty, Jon) (Entered: 04/21/2022) |
| 04/21/2022 | 26 (3 pgs) | Notice of Appearance and Request for Notice Filed by Clifford Hugh Walston Filed by on behalf of Neil Heslin, et al. (Walston, Clifford) (Entered: 04/21/2022) |
| 04/22/2022 | 27 (3 pgs) | Motion to Appear pro hac vice *of Alinor C. Sterling*. Filed by Creditor David Wheeler, et al. (Chapple, Ryan) (Entered: 04/22/2022) |
| 04/22/2022 | 28 (3 pgs) | Motion to Appear pro hac vice *of Christopher M. Mattei*. Filed by Creditor David Wheeler, et al. (Chapple, Ryan) (Entered: 04/22/2022) |
| 04/22/2022 | 29 | Courtroom Minutes. Time Hearing Held: 09:00 AM. Appearances: Kyung Lee, RJ Shannon, Marc Schwartz, Jason Ruff, Ha Nguyen, Matthew Okin, David Curry, Max Beatty, Cliff Walston, Melissa Haselden, Ryan Chapple, Randy Williams, Alinor Sterling, Chris Mattei, Ray Battaglia, Shelby Jordan, and Richard Schmidt. (Related document(s):6 Debtors' Emergency Motion for Order and 7 Debtors' Emergency Application for Interim and Final Orders). Hearings are continued to 4/29/2022 at 03:00 PM by telephone and video conference. (kpico) (Entered: 04/22/2022) |
| 04/22/2022 | 30 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Wheeler, et al./Ryan Chapple. This is to order a transcript of Debtors' Emergency Motions and April 22, 2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By David Wheeler, et al. ). (Chapple, Ryan) Electronically forwarded to Veritext Legal Solutions on 4/26/2022. Estimated completion date: 4/27/2022. Modified on 4/26/2022 (RachelWillborg). (Entered: 04/22/2022) |
| 04/22/2022 | 81 (2 pgs) | Letter from Insert Company Name, LLC (BrittanyBoniface) (Entered: 05/03/2022) |
| 04/25/2022 | 31 (12 pgs) | Brief (Filed By IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC ). (Related document(s): 29 Courtroom Minutes) (Lee, Kyung) (Entered: 04/25/2022) |
| 04/25/2022 | 32 (3 pgs) | Order Granting Motion To Appear pro hac vice as to Alinor C. Sterling (Related Doc # 27). Signed on 4/25/2022. (rsal) (Entered: 04/25/2022) |
| 04/25/2022 | 33 (3 pgs) | Order Granting Motion To Appear pro hac vice as to Christopher M. Mattei (Related Doc # 28). Signed on 4/25/2022. (rsal) (Entered: 04/25/2022) |
| 04/25/2022 | 34 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Nina Khalatova. This is to order a transcript of 4/22/2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Nina Khalatova ). (ckrus) Copy request electronically forwarded to Veritext Legal Solutions on 4/26/2022. Estimated completion date: 4/27/2022. Modified on 4/26/2022 (RachelWillborg). (Entered: 04/26/2022) |
| 04/26/2022 | 35 (32 pgs; 3 docs) | Motion *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claims, (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* Filed by Debtors IWHealth, LLC, |

010259

| | | InfoW, LLC, Prison Planet TV, LLC (Attachments: # 1 Proposed Order # 2 Exhibit 1) (Lee, Kyung) (Entered: 04/26/2022) |
|---|---|---|
| 04/26/2022 | 🌐 36 (59 pgs; 3 docs) | Emergency Motion *to Dismiss Chapter 11 Cases and Objection to Debtors' Designation as Subchapter V Vendors* Filed by Creditor David Wheeler, et al. (Attachments: # 1 Exhibit A # 2 Proposed Order) (Chapple, Ryan) (Entered: 04/26/2022) |
| 04/26/2022 | 🌐 37 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by U.S. Trustee. This is to order a transcript of Hearing Held on 4/22/2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By US Trustee ). (Nguyen, Ha) Copy Request electronically forwarded to Veritext Legal Solutions 4/27/2022. Estimated Transcript Completion Date: 4/28/2022. Modified on 4/27/2022 (JacquelineMata). (Entered: 04/26/2022) |
| 04/27/2022 | 🌐 38 (165 pgs; 10 docs) | Witness List, Exhibit List (Filed By Neil Heslin, et al. ).(Related document(s):6 Emergency Motion, 7 Emergency Motion, 36 Emergency Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9) (Beatty, Jon) (Entered: 04/27/2022) |
| 04/27/2022 | 🌐 39 (75 pgs) | Transcript RE: held on 04/22/2022 before Judge Christopher M. Lopez. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 07/26/2022. (VeritextLegalSolutions) (Entered: 04/27/2022) |
| 04/27/2022 | 🌐 40 (10 pgs; 2 docs) | Objection *Debtors' Preliminary Objection to Connecticut Plaintiff's Emergency Motion to Dismiss Chapter 11 Cases and Objection to Debtors' Designation as Subchapter V Small Vendors* (related document(s):36 Emergency Motion). Filed by IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC (Attachments: # 1 Proposed Order) (Lee, Kyung) (Entered: 04/27/2022) |
| 04/27/2022 | 🌐 41 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Ordinary (30 days)) by Adam Rodriguez. This is to order a transcript of Hearing, 4/22/2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions. (BrendaLacy) Copy request electronically forwarded to Veritext Legal Solutions on 4/28/2022. Estimated completion date: 5/29/2022. Modified on 4/28/2022 (RachelWillborg). (Entered: 04/27/2022) |
| 04/27/2022 | 🌐 42 (144 pgs; 8 docs) | Motion to Dismiss Case for Debtors Abuse . Objections/Request for Hearing Due in 21 days. Filed by Creditor Neil Heslin, et al. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Proposed Order) (Beatty, Jon) (Entered: 04/27/2022) |
| 04/27/2022 | 🌐 43 (5 pgs) | BNC Certificate of Mailing. (Related document(s):32 Order on Motion to Appear pro hac vice) No. of Notices: 6. Notice Date 04/27/2022. (Admin.) (Entered: 04/27/2022) |
| 04/27/2022 | 🌐 44 (5 pgs) | BNC Certificate of Mailing. (Related document(s):33 Order on Motion to Appear pro hac vice) No. of Notices: 6. Notice Date 04/27/2022. (Admin.) (Entered: 04/27/2022) |

| | | |
|---|---|---|
| 04/28/2022 | 45<br>(1 pg) | Notice of Filing of Official Transcript as to 39 Transcript. Parties notified (Related document(s):39 Transcript) (Olin) (Entered: 04/28/2022) |
| 04/29/2022 | 46<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Avishay Moshenberg Filed by on behalf of Neil Heslin, et al. (Moshenberg, Avishay) (Entered: 04/29/2022) |
| 04/29/2022 | 47<br>(4 pgs) | Certificate of Service (Filed By Neil Heslin, et al. ).(Related document(s):42 Motion to Dismiss Case) (Moshenberg, Avishay) (Entered: 04/29/2022) |
| 04/29/2022 | 48<br>(133 pgs; 5 docs) | Notice *Notice of Amended and Restated Declaration of Trust and Plan Support Agreement*. (Related document(s):6 Emergency Motion) Filed by IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D) (Shannon, R. J.) (Entered: 04/29/2022) |
| 04/29/2022 | 49<br>(6 pgs) | Agenda for Hearing on 4/29/2022 (Filed By IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC ). (Lee, Kyung) (Entered: 04/29/2022) |
| 04/29/2022 | 50<br>(108 pgs; 3 docs) | US Trustee's Motion to Dismiss Case Filed by U.S. Trustee US Trustee (Attachments: # 1 Exhibit Exhibit A # 2 Proposed Order) (Ruff, Jayson) (Entered: 04/29/2022) |
| 04/29/2022 | 51<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by R.J. Shannon. This is to order a transcript of Status Conference on 4-29-2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Trinity Transcription Services (Filed By IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC ). (Shannon, R. J.) Electronically forwarded Trinity Transcriptions on April 29, 2022. Estimated completion date: April 30, 2022. to Modified on 5/2/2022 (ShannonHolden). (Entered: 04/29/2022) |
| 04/29/2022 | 52 | Courtroom Minutes. Time Hearing Held: 3:00 p.m. Appearances: Kyung Lee, RJ Shannon, Marc Schwartz, Jason Ruff, Ha Nguyen, Matthew Okin, Max Beatty, Melissa Haselden, Ryan Chapple, Randy Williams, Ray Battaglia, and Shelby Jordan. (Related document(s): Status Conferences: 6 Debtors' Emergency Motion for Order and 7 Emergency Motion Debtors' Emergency Application for Interim and Final Orders). Mr. Lee provides a status report. Comments made by parties. Court issues scheduling deadlines. An evidentiary hearing on all Motions to Dismiss filed at docket entries 36, 42, and 50 is scheduled for 5/27/2022 at 09:00 AM by telephone and video conference. A TENTATIVE hearing is scheduled for 6/3/2022 at 10:00 a.m. by telephone and video conference as to 6 Debtors' Emergency Motion for Order Authorizing Appointment of Russell F. Nelms and Richard S. Schmidt, 7 Debtors' Emergency Application for Interim and Final Orders, and 35 Motion Setting Bar Dates. (kpico) (Entered: 04/29/2022) |
| 04/30/2022 | 53<br>(63 pgs) | Transcript RE: STATUS CONFERENCE held on April 29, 2022 before Judge Christopher M. Lopez. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 07/29/2022. (Battaglia, Cheryl) (Entered: 04/30/2022) |
| 04/30/2022 | 54<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):45 Notice of Filing of Official Transcript (Form)) No. of Notices: 6. Notice Date |

010261

| | | 04/30/2022. (Admin.) (Entered: 04/30/2022) |
|---|---|---|
| 05/01/2022 | 📄 55 (34 pgs) | BNC Certificate of Mailing. (Related document(s):50 US Trustee's Motion to Dismiss Case) No. of Notices: 33. Notice Date 05/01/2022. (Admin.) (Entered: 05/01/2022) |
| 05/02/2022 | 📄 56 (1 pg) | Notice of Filing of Official Transcript as to 53 Transcript. Parties notified (Related document(s):53 Transcript) (Olin) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 57 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by U.S. Trustee. This is to order a transcript of Hearing Held on 4/29/2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Trinity Transcription Services (Filed By US Trustee ). (Ruff, Jayson) Copy request electronically forwarded to Trinity Transcription Services on 5/3/2022. Estimated transcript completion date: 5/4/2022. Modified on 5/3/2022 (ClaudiaGutierrez). (Entered: 05/02/2022) |
| 05/02/2022 | 📄 58 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 4/29/2022 3:00:49 PM ]. File Size [ 34298 KB ]. Run Time [ 01:11:27 ]. (admin). (Entered: 05/02/2022) |
| 05/02/2022 | 📄 59 (8 pgs) | Schedule A/B: Property for Non-Individual (Filed By InfoW, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 60 (1 pg) | Schedule D Non-Individual- Creditors Having Claims Secured by Property (Filed By InfoW, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 61 (8 pgs) | Schedule E/F: Creditors Who Have Unsecured Claims for Non-Individual (Filed By InfoW, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 62 (1 pg) | Schedule G Non-Individual- Executory Contracts and Unexpired Leases (Filed By InfoW, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 63 (1 pg) | Schedule H Non-Individual- Codebtors (Filed By InfoW, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 64 (1 pg) | Summary of Assets and Liabilities Schedules for Non-Individual (Filed By InfoW, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 65 (1 pg) | Declaration re: *Schedules and Summary* (Filed By InfoW, LLC ). (Related document(s):59 Schedule A/B, 60 Schedule D - Creditors Holding Secured Claims, 61 Schedule E/F, 62 Schedule G, 63 Schedule H, 64 Summary of Assets and Liabilities) (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 66 (8 pgs) | Schedule A/B: Property for Non-Individual (Filed By IWHealth, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 📄 67 (1 pg) | Schedule D Non-Individual- Creditors Having Claims Secured by Property (Filed By IWHealth, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |

| 05/02/2022 | 68 (6 pgs) | Schedule E/F: Creditors Who Have Unsecured Claims for Non-Individual (Filed By IWHealth, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 69 (1 pg) | Schedule G Non-Individual- Executory Contracts and Unexpired Leases (Filed By IWHealth, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 70 (1 pg) | Schedule H Non-Individual- Codebtors (Filed By IWHealth, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 71 (1 pg) | Summary of Assets and Liabilities Schedules for Non-Individual (Filed By IWHealth, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 72 (1 pg) | Declaration re: *Schedules and Summary* (Filed By IWHealth, LLC ). (Related document(s):66 Schedule A/B, 67 Schedule D - Creditors Holding Secured Claims, 68 Schedule E/F, 69 Schedule G, 70 Schedule H, 71 Summary of Assets and Liabilities) (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 73 (8 pgs) | Schedule A/B: Property for Non-Individual (Filed By Prison Planet TV, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 74 (6 pgs) | Schedule E/F: Creditors Who Have Unsecured Claims for Non-Individual (Filed By Prison Planet TV, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 75 (1 pg) | Schedule G Non-Individual- Executory Contracts and Unexpired Leases (Filed By Prison Planet TV, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 76 (1 pg) | Schedule H Non-Individual- Codebtors (Filed By Prison Planet TV, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 77 (1 pg) | Summary of Assets and Liabilities Schedules for Non-Individual (Filed By Prison Planet TV, LLC ). (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 78 (1 pg) | Declaration re: *Schedules and Summary* (Filed By Prison Planet TV, LLC ).(Related document(s):73 Schedule A/B, 74 Schedule E/F, 75 Schedule G, 76 Schedule H, 77 Summary of Assets and Liabilities) (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/02/2022 | 79 (7 pgs; 2 docs) | Motion to Extend Time *to File Statement of Financial Affairs* Filed by Debtors IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC (Attachments: # 1 Proposed Order) (Shannon, R. J.) (Entered: 05/02/2022) |
| 05/03/2022 | 80 (3 pgs) | Notice of Appearance and Request for Notice Filed by Clifford Hugh Walston Filed by on behalf of Neil Heslin, et al. (Walston, Clifford) (Entered: 05/03/2022) |
| 05/03/2022 | 82 (1 pg) | Order Granting Motion to Extend Time to File Statement of Financial Affairs. (Related Doc # 79) Signed on 5/3/2022. (kpico) (Entered: 05/03/2022) |

010263

| 05/03/2022 | ● | Deadlines Updated as to Statement of Financial Affairs. (Related document(s):82 Order on Motion to Extend Time). (kpico) (Entered: 05/03/2022) |
|---|---|---|
| 05/04/2022 | ●83<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):56 Notice of Filing of Official Transcript (Form)) No. of Notices: 6. Notice Date 05/04/2022. (Admin.) (Entered: 05/04/2022) |
| 05/05/2022 | ●84<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):82 Order on Motion to Extend Time) No. of Notices: 7. Notice Date 05/05/2022. (Admin.) (Entered: 05/05/2022) |
| 05/06/2022 | ●85<br>(35 pgs; 4 docs) | Request for Hearing (Filed By David Wheeler, et al. ). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (Chapple, Ryan) (Entered: 05/06/2022) |
| 05/06/2022 | ●86<br>(89 pgs; 5 docs) | Request for Hearing (Filed By Neil Heslin, et al. ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Proposed Order) (Moshenberg, Avi) (Entered: 05/06/2022) |
| 05/09/2022 | ●87<br>(16 pgs) | Statement of Financial Affairs for Non-Individual (Filed By InfoW, LLC ). (Shannon, R. J.) (Entered: 05/09/2022) |
| 05/09/2022 | ●88<br>(15 pgs) | Statement of Financial Affairs for Non-Individual (Filed By IWHealth, LLC ). (Shannon, R. J.) (Entered: 05/09/2022) |
| 05/09/2022 | ●89<br>(15 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Prison Planet TV, LLC ). (Shannon, R. J.) (Entered: 05/09/2022) |
| 05/10/2022 | ●90<br>(1 pg) | Order Setting Status Conference. Status Conference to be held on 5/13/2022 at 01:00 PM by telephone and video conference. Signed on 5/10/2022. (rsal) (Entered: 05/10/2022) |
| 05/12/2022 | ●91<br>(118 pgs; 17 docs) | Exhibit List (Filed By IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC ).(Related document(s):85 Request for Hearing, 86 Request for Hearing, 90 Order Setting Hearing) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 Exhibit # 11 Exhibit # 12 Exhibit # 13 Exhibit # 14 Exhibit # 15 Exhibit # 16 Exhibit) (Shannon, R. J.) (Entered: 05/12/2022) |
| 05/12/2022 | ●92<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):90 Order Setting Hearing) No. of Notices: 7. Notice Date 05/12/2022. (Admin.) (Entered: 05/12/2022) |
| 05/13/2022 | ● | Courtroom Minutes. Time Hearing Held: 1:00 PM. Appearances: Kyung Lee, RJ Shannon, Marc Schwartz, Melissa Haselden, Jayson Ruff, Ha Nguyen, Ryan Chapple, Randy Williams, Alinor Sterling, Chris Mattei, Max Beatty, and Avishay Moshenberg. (Related document(s): 90 Status Conference). Mr. Chapple provides a status report. Comments made by parties. Status conference concluded. (kpico) (Entered: 05/13/2022) |
| 05/13/2022 | ●93<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 5/13/2022 1:00:32 PM ]. File Size [ 12345 KB ]. Run Time [ 00:25:43 ]. (admin). |

| | | (Entered: 05/13/2022) |
|---|---|---|
| 05/13/2022 | 🌐 94<br>(36 pgs; 4 docs) | Application to Employ Parkins Lee & Rubio LLP as Bankruptcy Counsel to the Debtors for the Period from April 18 to May 15, 2022. Objections/Request for Hearing Due in 21 days. Filed by Debtors IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC (Attachments: # 1 Exhibit # 2 Exhibit # 3 Proposed Order) (Shannon, R. J.) (Entered: 05/13/2022) |
| 05/18/2022 | 🌐 95<br>(13 pgs) | Emergency Motion *To Continue Hearing Date on Motions to Dismiss* Filed by Debtor InfoW, LLC (Lee, Kyung) (Entered: 05/18/2022) |
| 05/18/2022 | ⚫ | Certificate of Email Notice. Contacted parties. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):95 Emergency Motion To Continue Hearing Date on Motions to Dismiss). Hybrid Hearing is scheduled for 5/19/2022 at 02:00 PM. (rsal) (Entered: 05/18/2022) |
| 05/18/2022 | 🌐 96<br>(8 pgs) | Stipulation By Neil Heslin, et al. and InfoW, LLC; IWHealth, LLC; and Prison Planet TV, LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Neil Heslin, et al. ). (Beatty, Jon) (Entered: 05/18/2022) |
| 05/19/2022 | 🌐 97<br>(30 pgs; 4 docs) | Application to Employ Kyung S. Lee PLLC as Attorneys for Debtors. Objections/Request for Hearing Due in 21 days. Filed by Attorney Kyung Shik Lee (Attachments: # 1 Affidavit Declaration # 2 Exhibit KSLPLLCEngagementAgreement # 3 Proposed Order Proposed Order Approving KSLPLLC Retention) (Lee, Kyung) (Entered: 05/19/2022) |
| 05/19/2022 | 🌐 98<br>(53 pgs; 4 docs) | Notice *of Filing of Certain Pleadings in Connecticut Adversary Proceeding*. Filed by David Wheeler, et al. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C) (Chapple, Ryan) (Entered: 05/19/2022) |
| 05/19/2022 | 🌐 99<br>(7 pgs) | Stipulation and Order (Related document(s): 96 Stipulation). Signed on 5/19/2022. (rsal) (Entered: 05/19/2022) |
| 05/19/2022 | ⚫ | Courtroom Minutes. Time Hearing Held: 2:00 PM. Appearances: Kyung Lee, Marc Schwartz, Melissa Haselden, Jayson Ruff, Ha Nguyen, Ryan Chapple, Randy Williams, Alinor Sterling, Chris Mattei, Max Beatty, and Avishay Moshenberg. Mr. Lee provides a status report. Comments made by parties. Court grants 95 Motion to Continue for the reasons stated on the record. All matters scheduled for 5/27/2022 and 6/3/2022 are continued to 6/10/2022 at 09:00 AM. (kpico) (Entered: 05/19/2022) |
| 05/19/2022 | 🔊 100<br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 5/19/2022 2:01:00 PM ]. File Size [ 13297 KB ]. Run Time [ 00:27:42 ]. (admin). (Entered: 05/19/2022) |
| 05/19/2022 | 🌐 101<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Ryan Chapple. This is to order a transcript of Motion to Continue on May 19, 2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By David Wheeler, et al. ). (Chapple, Ryan) Electronically forwarded to Veritext Legal Solutions on 5/20/2022. Estimated completion date: 5/23/2022. Modified on 5/20/2022 (RebeccaBecknal). (Entered: 05/19/2022) |

| | | |
|---|---|---|
| 05/20/2022 | ⬤ 102<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Michael P Ridulfo Filed by on behalf of W. Marc Schwartz (Ridulfo, Michael) (Entered: 05/20/2022) |
| 05/21/2022 | ⬤ 103<br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):99 Generic Order) No. of Notices: 8. Notice Date 05/21/2022. (Admin.) (Entered: 05/21/2022) |
| 05/23/2022 | ⬤ 104<br>(18 pgs; 5 docs) | Notice *of Remand*. Filed by Neil Heslin, et al. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4) (Beatty, Jon) (Entered: 05/23/2022) |
| 05/23/2022 | ⬤ 105<br>(25 pgs) | Transcript RE: motion held on 5/19/22 before Judge CHRISTOPHER M. LOPEZ. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 08/22/2022. (VeritextLegalSolutions) (Entered: 05/23/2022) |
| 05/24/2022 | ⬤ 106<br>(1 pg) | Notice of Filing of Official Transcript as to 105 Transcript. Parties notified (Related document(s):105 Transcript) (Olin) (Entered: 05/24/2022) |
| 05/26/2022 | ⬤ 107<br>(1 pg) | Notice of Continuance of Meeting of Creditors. 341(a) meeting to be held on 6/2/2022 at 10:00 AM at US Trustee Houston Teleconference. (Ruff, Jayson) (Entered: 05/26/2022) |
| 05/26/2022 | ⬤ 108<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):106 Notice of Filing of Official Transcript (Form)) No. of Notices: 8. Notice Date 05/26/2022. (Admin.) (Entered: 05/26/2022) |
| 05/28/2022 | ⬤ 109<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):107 Notice of Continuance of Meeting of Creditors) No. of Notices: 35. Notice Date 05/28/2022. (Admin.) (Entered: 05/28/2022) |
| 06/01/2022 | ⬤ 110<br>(4 pgs) | Stipulation By US Trustee and InfoW, LLC et al.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes., Proposed Order RE: *US Trustee's Motion to Dismiss Case* (Filed By US Trustee ).(Related document(s):50 US Trustee's Motion to Dismiss Case) (Nguyen, Ha) (Entered: 06/01/2022) |
| 06/02/2022 | ⬤ 111<br>(1 pg) | Notice of Continuance of Meeting of Creditors. 341(a) meeting to be held on 6/16/2022 at 10:00 AM at US Trustee Houston Teleconference. (Ruff, Jayson) (Entered: 06/02/2022) |
| 06/02/2022 | ⬤ 112<br>(68 pgs; 3 docs) | Omnibus Response (related document(s):50 US Trustee's Motion to Dismiss Case). Filed by Kyung Shik Lee (Attachments: # 1 Exhibit Exhibit A # 2 Exhibit Exhibit B) (Lee, Kyung) (Entered: 06/02/2022) |
| 06/04/2022 | ⬤ 113<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):111 Notice of Continuance of Meeting of Creditors) No. of Notices: 35. Notice Date 06/04/2022. (Admin.) (Entered: 06/04/2022) |
| 06/10/2022 | ⬤ | Courtroom Minutes. Time Hearing Held: 09:00 AM. Appearances: Jayson Ruff, RJ Shannon, Marc Schwartz, and Melissa Haselden. (Related document(s):36 Emergency Motion to Dismiss, 42 Motion to Dismiss Case, and 50 US Trustee's Motion to Dismiss Case). Comments made by parties. Court signs Stipulation and Agreed Order Dismissing Chapter 11 Case for the reasons stated on the record. (kpico) (Entered: 06/10/2022) |

| | | |
|---|---|---|
| 06/10/2022 | ● <u>114</u><br>(4 pgs) | Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases. Signed on 6/10/2022 (Related document(s):<u>50</u> US Trustee's Motion to Dismiss Case) (kpico) (Entered: 06/10/2022) |
| 06/10/2022 | ● <u>115</u><br>(51 pgs; 4 docs) | Notice *of Filing of Withdrawals of Removal and Orders Remanding Cases to Superior Court and Closing Adversary Proceedings in Connecticut*. Filed by David Wheeler, et al. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B # <u>3</u> Exhibit C) (Chapple, Ryan) (Entered: 06/10/2022) |
| 06/10/2022 | ● <u>116</u><br>(3 pgs) | Response *to Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases*. Filed by David Wheeler, et al. (Chapple, Ryan) (Entered: 06/10/2022) |
| 06/10/2022 | ● | Bankruptcy Case Closed (rsal) (Entered: 08/15/2022) |
| 06/12/2022 | ● <u>117</u><br>(6 pgs) | BNC Certificate of Mailing. (Related document(s):<u>114</u> Generic Order) No. of Notices: 8. Notice Date 06/12/2022. (Admin.) (Entered: 06/12/2022) |
| 06/13/2022 | ● <u>118</u><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by InfoW, LLC. This is to order a transcript of Hearing on 06/10/2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By IWHealth, LLC, InfoW, LLC, Prison Planet TV, LLC ). (Shannon, R. J.) Electronically forwarded to Veritext Legal Solutions on 6/16/2022. Estimated completion date: 6/19/2022. Modified on 6/16/2022 (RachelWillborg). (Entered: 06/13/2022) |
| 06/14/2022 | ● <u>119</u><br>(41 pgs) | Application for Compensation *FIRST AND FINAL APPLICATION FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PARKINS & RUBIO LLP, AS GENRERAL COUNSEL FOR THE DEBTORS, FOR THE PERIOD APRIL 18, 2022 THROUGH MAY 15, 2022*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Charles Michael Rubio (Rubio, Charles) (Entered: 06/14/2022) |
| 06/15/2022 | ● <u>120</u><br>(13 pgs; 3 docs) | Motion to Amend (related document(s):<u>114</u> Generic Order). Filed by Attorney Parkins & Rubio LLP (Attachments: # <u>1</u> Proposed Order # <u>2</u> Service List) (Rubio, Charles) (Entered: 06/15/2022) |
| 06/15/2022 | ● <u>121</u><br>(1 pg) | Order Setting Status Conference on Parkins & Rubio LLP Motion Filed at Docket No. 120 (Related document(s): <u>120</u> Motion to Amend). Hybrid Status Conference is scheduled for 6/17/2022. Signed on 6/15/2022. (rsal) (Entered: 06/15/2022) |
| 06/16/2022 | ● <u>122</u><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Parkins & Rubio LLC. This is to order a transcript of Hearing 4/29/2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Trinity Transcription Services (Filed By Parkins & Rubio LLP ). (Rubio, Charles) PDF failed to load. Please submit another request. Modified on 6/17/2022 (JacquelineMata). (Entered: 06/16/2022) |
| 06/16/2022 | ● <u>123</u><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Parkins & Rubio LLC. This is to order a transcript of hearing 4/22/2022 and 5/19/2022 before Judge Christopher Lopez. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Parkins & Rubio LLP ). (Rubio, Charles) PDF failed to load. Please submit another request. Modified on 6/17/2022 (JacquelineMata). (Entered: 06/16/2022) |

| 06/17/2022 | 124 (1 pg) | Statement *Letter Regarding Status Conference* (Filed By Parkins & Rubio LLP ).(Related document(s):121 Order Setting Hearing) (Rubio, Charles) (Entered: 06/17/2022) |
|---|---|---|
| 06/17/2022 | 125 | Courtroom Minutes. Time Hearing Held: 09:30 AM. Appearances: Leonard Parkins, Kyung Lee, Marc Schwartz, R.J. Shannon, and Charles Rubio. (Related document(s): Status Conference: 120 Motion to Amend). Mr. Schwartz provides a status report. Comments made by parties. Status conference is continued to 6/23/2022 at 09:00 AM by telephone and video conference. (kpico) (Entered: 06/17/2022) |
| 06/17/2022 | 126 (3 pgs) | Notice *of Receipt of Funds*. (Related document(s):114 Generic Order) Filed by Melissa A Haselden (Haselden, Melissa) (Entered: 06/17/2022) |
| 06/18/2022 | 127 (3 pgs) | BNC Certificate of Mailing. (Related document(s):121 Order Setting Hearing) No. of Notices: 9. Notice Date 06/18/2022. (Admin.) (Entered: 06/18/2022) |
| 06/20/2022 | 128 (20 pgs; 3 docs) | Application for Compensation for Melissa A Haselden, Trustee Chapter 11, Period: 4/18/2022 to 6/10/2022, Fee: $12,375.00, Expenses: $0.00. Objections/Request for Hearing Due in 21 days. Filed by Attorney Melissa A Haselden (Attachments: # 1 Exhibit A # 2 Proposed Order) (Haselden, Melissa) (Entered: 06/20/2022) |
| 06/20/2022 | 129 (4 pgs) | Notice *NOTICE OF FILING OF FIRST AND FINAL FEE APPLICATION FOR COMPENSATION OF SUBCHAPTER V TRUSTEE*. (Related document(s):128 Application for Compensation) Filed by Melissa A Haselden (Haselden, Melissa) (Entered: 06/20/2022) |
| 06/21/2022 | 130 (9 pgs) | Transcript RE: held on 06/08/2022 before Judge Christopher M. Lopez. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 09/19/2022. (VeritextLegalSolutions) (Entered: 06/21/2022) |
| 06/21/2022 | 131 (1 pg) | Notice of Filing of Official Transcript as to 130 Transcript. Parties notified (Related document(s):130 Transcript) (ShannonHolden) (Entered: 06/22/2022) |
| 06/22/2022 | 132 (2 pgs) | Withdraw Document (Filed By InfoW, LLC, Parkins & Rubio LLP ). (Related document(s):94 Application to Employ, 119 Application for Compensation, 120 Motion to Amend) (Rubio, Charles) (Entered: 06/22/2022) |
| 06/22/2022 | | The Status Conference scheduled for 6/23/2022 at 09:00 AM is cancelled. (rsal) (Entered: 06/22/2022) |
| 06/24/2022 | 133 (3 pgs) | BNC Certificate of Mailing. (Related document(s):131 Notice of Filing of Official Transcript (Form)) No. of Notices: 9. Notice Date 06/24/2022. (Admin.) (Entered: 06/24/2022) |
| 07/15/2022 | 134 (1 pg) | Order Approving Application For Compensation (Related Doc # 128). Approving for Melissa A Haselden Signed on 7/15/2022. (clopez) (Entered: 07/15/2022) |
| 07/20/2022 | 135 (3 pgs) | BNC Certificate of Mailing. (Related document(s):134 Order on Application for Compensation) No. of Notices: 9. Notice Date 07/20/2022. |

| | | (Admin.) (Entered: 07/20/2022) |
|---|---|---|
| 08/05/2022 | 136 (1 pg) | Chapter 11 Subchapter V Trustees Report of No Distribution. Funds Collected: $0.00. Key information about this case as reported in schedules filed by the debtor(s) or otherwise found in the case record: This case was pending for 2 months. Assets Abandoned (without deducting any secured claims): Not Applicable, Assets Exempt: Not Applicable, Claims Scheduled: $140000.00, Claims Asserted: Not Available, Claims scheduled to be discharged without payment (without deducting the value of collateral or debts excepted from discharge): Not Applicable. (Haselden, Melissa) (Entered: 08/05/2022) |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60020 |
| | § | |
| INFOW, LLC, *et al.*, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtors[1] | § | Jointly Administered |

### CONNECTICUT PLAINTIFFS' EMERGENCY MOTION TO DISMISS CHAPTER 11 CASES AND OBJECTION TO DEBTORS' DESIGNATION AS SUBCHAPTER V SMALL VENDORS

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**Emergency relief has been requested. If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.**

**Relief is requested no later than Friday, April 29, 2022 at 3:00 p.m.**

David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley,

Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian

Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, Movants or

Connecticut Plaintiffs) hereby file this *Emergency Motion to Dismiss Chapter 11 Cases and*

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC fka Infowars, LLC (6916). IWHealth, LLC fka Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is P. O. Box 1819, Houston, TX 77251-1819.

010270

*Objection to Debtors' Designation as Subchapter V Small Vendors* (the Motion) relating to Case No. 22-60020, *In re InfoW, LLC* (InfoW), Case No. 22-60021, *In re IWHealth, LLC* (IWH), and Case No. 22-60022, *In re Prison Planet TV, LLC* (PPT) (collectively, the Debtors and individually, the Debtor) and respectfully state as follows:

## I.    REQUEST FOR EMERGENCY CONSIDERATION

1.    Emergency consideration of this Motion is sought due to the relief initially requested by the Debtors related to non-debtor insiders and the delay and expense that will be suffered given that one trial date has already been lost, and others may be in jeopardy if the Movants are not allowed to proceed to liquidate their claims by jury trial.  The litigation underlying these bankruptcy filings has been going on for several years, and just as Movants were preparing their cases for trial to liquidate the amounts owed to them, these bankruptcy filings of three non-operating entities seeking relief for Jones and FSS was filed in a locale where none of the Debtors had any connection, other than by case law that allows a legal entity to claim an entire state as its domicile.

2.    The consideration of the emergency relief requested by Debtors should not proceed until the issues raised herein are considered, since if either the cases do not qualify for subchapter V or they are dismissed for bad faith, consideration of the Debtors' requested relief will be mooted. Further to the point, Movants' objections to the relief requested by Debtors in large part dovetails with the arguments and evidence that support the underlying motion.  If the Court does not want to consider the relief herein on an emergency basis, it should at least be considered when and if Debtors proceed with their emergency motions.

## II.    PRELIMINARY STATEMENT

3.      Given the declaration attached to each of the Debtor's voluntary petitions, these three entities are not subchapter V debtors.  The chief restructuring officer's declaration states unequivocally that none of the Debtors engage in business activities; maintain financial records; submit tax returns; generate income; or have any debts or liabilities other than those relating to the litigation discussed below.[2]  They have no employees, limited to no assets, no cash flow, no available source of income to sustain a plan of reorganization, and no creditors other than those relating to the litigation discussed below.

4.      These are not typical chapter 11 bankruptcies.  They were not filed with the goal of reorganizing operating businesses through confirmation of a chapter 11 plan.  These filings were initiated by Alex Jones (Jones) so that he and his wholly owned and controlled entity, Free Speech Systems, LLC (FSS), would obtain the benefit of the automatic stay without filing for bankruptcy.[3]  Jones, FSS, and one of the Debtors were set to go to trial in Texas on Monday, April 25, 2022.  Jones, FSS, and all three Debtors are set to go to trial in Connecticut in August.  These bankruptcy cases were filed to improperly delay these trials, attempt to liquidate plaintiffs' claims in this venue instead of by juries of their peers, and provide Jones and FSS all of the protections of the bankruptcy process (including non-debtor releases when the Debtors' hand-picked trustees deem a claim is "paid in full") without having to disclose relevant financial and business documentation.  They have no valid bankruptcy purpose, and they should be dismissed with prejudice as bad-faith filings so the Movants and the other Sandy Hook plaintiffs can continue with their constitutional rights to have the damages Jones inflicted upon them liquidated by a jury of their peers.

---

[2] Recognizing these issues, the Debtors filed a bench memorandum attempting to recast the statements made in the declaration.  The Movants address this memorandum below.

[3] Jones, FSS, and the Debtors are collectively referred to herein as the Jones Defendants.

### III.   RELEVANT BACKGROUND

5.     As discussed in pleadings filed with the Court last week, the Movants are victims of Jones's intentional tortious conduct and plaintiffs in three consolidated actions currently pending in Connecticut (the Connecticut Litigation).  Movants did not loan the Jones Defendants money or become the victims of a fraudulent scheme designed to take their money.  Instead, they are the immediate family members of children and educators killed in the Sandy Hook Elementary School shooting on December 14, 2012, and one first responder to that shooting.  They are victims of the Jones Defendants' abhorrent behavior.  Liability against the Jones Defendants has been established due to litigation tactics over the last several years so bad that the courts in both Texas and Connecticut entered default judgments on liability against Jones and his entities.

6.     For more than five years, Jones, through his media empire, targeted Movants and labeled the shooting deaths of their loved ones a hoax and lies.  Jones and his Infowars "contributors" told an audience of millions that the Sandy Hook shooting was "a synthetic completely fake with actors," a "hologram," an "illusion" and "the fakest thing since the three-dollar bill," "staged" to take away their guns, and that the Sandy Hook families were "paid . . . totally disingenuous" "crisis actors" who faked their loved ones' deaths.

7.     Jones urged the audience to "investigate," knowing his audience would respond by cyberstalking, harassing, and threatening the families.[4]  These are only a few excerpts from the families' 39-page, 394-paragraph initial complaint that allege a course of conduct sounding in false

---

[4] Attached as **Exhibit A** is a true and correct copy of the Wheeler Plaintiffs' Original Complaint.  The citations to the quotations, in the order they appear, are: **Ex. A**, Complaint ¶ 185 (Jones on his radio show);  ¶ 223 (Jones on his radio show);  ¶¶ 140-41 (non-debtor defendants Wolfgang Halbig and Jones on Jones's radio show);  ¶¶ 117, 273 (Jones on his channel and at a press conference), ¶¶ 138, 149, 223 (Jones on his radio show); ¶ 295 (statement by an Infowars "contributor" on Jones's radio show); ¶¶ 112, 120-21, 185, 197 (Jones on his channel and on his radio show).  Identical allegations appear in the complaints in the consolidated actions brought by Sherlach and Parker.

010273

light, negligent, and intentional infliction of emotion distress, violation of the Connecticut Unfair Trade Practices Act, and defamation.

8.     The Connecticut Litigation proceeded for nearly four years, and, from the beginning, the Jones Defendants resisted the authority of the Connecticut Superior Court by every conceivable means.  The case was removed twice to the United States District Court and was remanded twice.   Jones was sanctioned in June 2019 for repeated violations of the court's discovery orders and threatening conduct toward plaintiffs' counsel, a sanction affirmed by the Connecticut Supreme Court in *Lafferty v. Jones*, 336 Conn. 332, 374, 377 (2020) (describing Jones' course of conduct as "a whole picture of bad faith litigation misconduct").

9.     On remand, Jones continued to flaunt court orders and his discovery obligations by falsely denying the existence of certain financial records, producing fabricated financial records, and simply refusing to produce analytics data concerning revenue and content distribution. In October 2021, knowing a sanction of default was likely imminent as a result of their continued misconduct, the Jones Defendants attempted to avoid it by moving to recuse the Connecticut Superior Court judge who presided over the case since its inception.  The court denied the motion, finding that the Jones Defendants had not shown any "judicial bias, partiality, or impropriety." On November 15, 2021, the Court entered a default against the Jones Defendants, finding that the sanction was necessary "given the scope and extent of the discovery material that the defendants have failed to produce."

10.     And now on April 17 and 18, 2022, in yet another attempt to delay, to avoid adjudication of the claims pending in the Connecticut Litigation, and to avoid an imminent trial on similar claims brought by other Sandy Hook families in Travis County, Texas (the Texas Litigation), the three Debtors—at Jones's direction—filed for relief under chapter 11, subchapter

V, of the Bankruptcy Code.  The Jones Defendants' motives are further evidenced by the removal of both the Texas Litigation and the Connecticut Litigation within hours of the bankruptcy filings. The sole basis for each removal was this bankruptcy.  Moreover, although Jones and FSS are not debtors in this bankruptcy, the Jones Defendants purported to remove the state law claims against those non-debtors, effectively staying the state court cases completely.

11.     These mature cases are ready for jury trial in Connecticut and Texas.  Connecticut and Texas juries are the only proper arbiter of the Movants' and the Texas plaintiffs' claims, and this Court should not allow the Jones Defendants to use these bad-faith bankruptcy filings as a basis to avoid those arenas.

### IV.     JURISDICTION

12.     The United States Bankruptcy Court for the Southern District of Texas (the Court) has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

### V.     PROCEDURAL BACKGROUND

13.     Debtors, Jones, and FSS are defendants in the Connecticut Litigation.  Movants are David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg (collectively, the Wheeler Plaintiffs), William Sherlach (Sherlach), and Robert Parker (Parker, and together with the Wheeler Plaintiffs and Sherlach, the Connecticut Litigation Plaintiffs or Movants).

14.     On May 23, 2018, the Wheeler Plaintiffs filed their Complaint in the Judicial District of Fairfield at Bridgeport, Connecticut (Wheeler Litigation).

15.     On July 2, 2018, Sherlach filed his Complaint in the Judicial District of Fairfield at Bridgeport, Connecticut (Sherlach Litigation).

16.     On November 15, 2018, Sherlach and Parker filed their Complaint in the Judicial District of Fairfield at Bridgeport, Connecticut (Sherlach and Parker Litigation).

17.     Thereafter, on March 8, 2019, the Wheeler Litigation, Sherlach Litigation, and Sherlach and Parker Litigation were ordered to the Complex Litigation Docket of Waterbury under Case Nos. UWY-CV18-6046436S, UWY-CV18-6046437S, and UWY-CV18-6046438S, respectively, and are consolidated and referred to herein as the Connecticut Litigation.

18.     On April 17, 2022, Debtor InfoW, LLC (fka InfoWars, LLC) filed a voluntary petition for relief under chapter 11, subchapter V, of the Bankruptcy Code.  On April 18, 2022, the same day IWHealth, LLC and Prison Planet TV, LLC filed their petitions for relief under the Bankruptcy Code, the Debtors filed their Emergency Motions [Dkt. 6] and [Dkt. 7].  Debtors' chapter 11 cases are being jointly administered pursuant to the Court's Order for Joint Administration [Dkt. 8].

19.     On April 18, the Debtors removed each of the three lawsuits comprising the Connecticut Litigation to the United States Bankruptcy Court for the District of Connecticut.

## VI.     RELIEF REQUESTED AND BASIS FOR RELIEF

20.     Movants seek entry of an order dismissing the chapter 11 cases because the Debtors do not meet the definition of a debtor under 11 U.S.C. section 1182 and are not eligible filers, and such other and further relief as the Court deems just and equitable.  In addition, pursuant to section 707(a), the Court should dismiss these cases as bad faith filings.

010276

## VII.   ARGUMENT & AUTHORITIES

21.     Federal Rule of Bankruptcy Procedure 1020(b) provides that the United States Trustee or any party in interest may object to a debtor's designation as a small business case within 30 days of the conclusion of the first meeting of creditors.  And section 1112(b) provides for the dismissal of a chapter 11 case for cause if it is in the best interest of the creditors and the estate. *See* 11 U.S.C. § 1112(b).  Section 1112(b)(4) sets forth a list of non-exclusive grounds constituting "cause" for dismissal.  *See* 11 U.S.C. § 1112(b)(4) ("cause" includes, but is not limited to, the enumerated factors).  The Fifth Circuit has also held that a finding of lack of good faith constitutes cause for dismissal under section 1112(b).  *See Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068, 1072 (5th Cir. 1986).  The Debtors' cases should be dismissed because they filed these bankruptcies in bad faith.

### A.     *Debtors are not eligible for relief under subchapter V.*

22.     The debtor bears the burden of demonstrating that it is eligible to proceed under subchapter V.  *In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233, 236 (Bankr. S.D. Tex. 2021) (recognizing "[i]f a party-in-interest objects, the debtor bears the burden of proving eligibility under Subchapter V.") (internal citations omitted).  Debtors' bankruptcy filings establish they are not and never have been "engaged in commercial or business activities" as is required to be entitled to relief under subchapter v.  The Small Business Reorganization Act of 2019 (SBRA) was intended to "address reorganization of small businesses." 116 Pub. L. 54, 2019, Enacted H.R. 3311, 1133 Stat. 1079.  Section 1182(1) of subchapter v originally defined "debtor" as a "small business debtor," as defined under section 101(51D) of the Bankruptcy Code.

23.     Effective March 27, 2020, section 1182(1) was temporarily amended to define "debtor" as follows:

010277

> (A) subject to subparagraph (B), [debtor] means a person *engaged in commercial or business activities* (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor . . . .

11 U.S.C. § 1182(1)(A); "Coronavirus Aid, Relief, and Economic Security Act," (CARES Act), Pub. L. 116-136, March 27, 2020, 134-Stat 381, § 1113(a)(3) (emphasis added).   Since section 1182(1) duplicates the definition of "small business debtor" found in section 101(51D), it is relevant to look at how the term "engaged in" is used in other subsections of section 101.  It is presumed that "identical words used in different parts of the same statute carry the same meaning." *See, e.g.*, *Henson v. Santander Consumer USA Inc*., 137 S. Ct. 1718, 1723 (2017); *see also Tula-Rubio v. Lynch*, 787 F.3d 288, 295 (5th Cir. 2015); *Ibrahim v. C.I.R.*, 788 F.3d 834, 836-37 (8th Cir. 2015).

24.    While the amount of outstanding debt has changed, both sections 101(51D) and 1182(1)(A) define "debtor" as a "person engaged in commercial or business activities."  Therefore, a debtor may elect subchapter V only if they are actively carrying out "commercial or business activities" at the time of the filing of the petition.  *See* 11 U.S.C. §§ 101(51D) and 1182(1)(A). Because a debtor must be "engaged in commercial or business activities" on the petition date, the Court must determine whether the Debtor has satisfied that standard.  By way of their own chief restructuring officer's statements, Debtors cannot satisfy that standard.

25.    As this Court has stated in analyzing subchapter V, "'engaged in' commercial or business activities means a debtor was actively participating in one of these activities on the petition date."  *In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233, 236 (Bankr. S.D. Tex. 2021).

Using Merriam-Webster Dictionary to determine the plain meaning of section 1182(1)(A), this Court has further stated:

> Commercial means "of or relating to commerce" and "viewed with regard to profit." Commerce means "the exchange or buying and selling of commodities on a large scale involving transportation from place to place." Business means "a usually commercial or mercantile activity engaged in as a means of livelihood," or "dealings or transactions especially of an economic nature." Finally, "activity" means "the quality or state of being active: behavior or actions of a particular kind."

*In re Port Arthur Steam Energy, L.P.*, 629 B.R. at 236.   Applying the ordinary meaning of "commercial or business activities" to the language of section 101(51D), a person must be engaged in the exchange or buying and selling of economic goods or services for profit.  *See id.*; *see also In re Johnson*, No. 19-42063-ELM, 2021 WL 825156, at *8 (Bankr. N.D. Tex. Mar. 1, 2021).

26.   Here, Debtors admit that none of them are engaged in the exchange or buying and selling of any economic goods or services of their own for profit.   Debtors' appointed Chief Restructuring Officer, W. Marc Schwartz swears that:

> [T]he Debtor[s] have no purpose other than to hold assets which may be used by other entities. They undertake no business activities, they do not sell, rent or lease to others anything. Their assets do not generate any income for them. They have no bank accounts and do not pay money to anyone for any reason. They have no debt or other liabilities other than those related to pending or potential litigation. For these reasons, they have no financial statements or books of account and they do not file income tax returns.

*See* Decl. of W. Marc Schwartz, attached to Debtors' Voluntary Pet. for Bankr. [Dkt. 1].  Thus, Debtors' own bankruptcy filings establish that they "undertake no business activities." *See id*. On the petition date, Debtors were not engaged in any ongoing commercial or business activities, do not meet the definition of a debtor set forth in 11 U.S.C. section 1182(1), and are not qualified to proceed under subchapter V of the Bankruptcy Code.

27.     And Debtors' Bench Memorandum [Dkt. 31] fails to establish that Debtors engaged in business activities as opposed to being hollow shell companies.  Debtors contradict their own chief restructuring officers' sworn declaration when they state they "are engaged in the business of holding the legal assets and the website necessary for the family business to operate." *See* Debtors' Bench Mem. at 3.  But a search on the USPTO's Trademark Electronic Search System shows Free Speech Systems, LLC as the owner of 28 marks including, among many others, Prison Planet, Infowars, The Alex Jones Show, and Infowars Life.[5]  None of the Debtors were listed as owners of any registered marks.

28.     Debtors' reliance upon this Court's holding in *Port Arthur Steam Energy, L.P.* is also misplaced as the facts the Court considered in its 'engaged in business activities' analysis are distinguishable from those here:

| Port Arthur Steam Energy | Debtors |
|---|---|
| PASE was managed by two principals of its limited partner under a management agreement. An independent contractor also worked for PASE. | *Debtors, according to the declaration, conduct no business activities and filed no tax returns, so they had no employees.* |
| PASE was litigating a multi-million-dollar lawsuit to recover money for PASE. | *Debtors are not engaged in lawsuits to recover any money.  The only purpose of the pending litigation is to quantify the amount of damages that they owe to the Movants and the plaintiffs in the Texas litigation.* |
| PASE was pursuing collection remedies on an outstanding account receivable of about $163,000 from Oxbow. | *Debtors have no accounts receivables, or even accounts for that matter, according to the declaration.* |

---

[5] *See* https://www.uspto.gov/trademarks/search.

010280

| | |
|---|---|
| PASE actively maintained its facility and vehicles. Individuals routinely worked on site to preserve the value of PASE's assets. This included running the technical parts of the facility, maintaining utilities like power and water, and making repairs after severe storms that unfortunately occur in that area. | *Debtors have no facilities or vehicles.  Nor do they have any individuals who worked to preserve assets.[6]* |
| Preceding the bankruptcy filing, PASE's managers worked on a plan to sell assets and pay creditors in chapter 11, including bundling certain assets; prepared photographs and specifications information for potential buyers; and hosted plant visits. PASE estimated the value of these assets at around $3 million. | *Debtors took no actions to pay creditors.* |
| PASE sold an asset worth about $35,000 in the months before the bankruptcy filing. | *Debtors had no assets to sell, instead, they are relying upon non-debtor insiders, specifically Alex Jones and Free Speech Systems, LLC to pay for their bankruptcy.* |
| PASE filed reports and tax returns as required by state and federal agencies. | *Debtors have never generated any income, paid any bills, or filed tax returns.* |

See *Port Arthur Steam Energy, L.P.,* 629 B.R. at 236-37 (italicized portions not in original).  These Debtors are not engaged in business or commercial activities under this or any Court's subchapter V analysis.

**B.**    ***Debtors' bankruptcies are bad-faith filings under Fifth Circuit precedent.***

29.    Only bankruptcy petitions filed in good faith merit the protection offered under the Bankruptcy Code.  *See In re McMahan*, 481 B.R. 901, 915 (Bankr. S.D. Tex. 2012) (recognizing "inherent in *any* bankruptcy case is a fundamental prerequisite: a debtor must file his petition in good faith.") (citing *In re Elmwood*, 964 F.2d 508, 510 (5th Cir. 1992); *see also Inv. Grp., LLC v. Pottorff*, 518 B.R. 380, 382 (N.D. Tex. 2014) (recognizing "bad faith is determined based on the

---

[6] Debtors allege in their Bench Memorandum that they recently entered into a lease in Victoria, Texas, just prior to filing bankruptcy.  This was done, most likely, in attempt to legitimize venue in the Southern District Bankruptcy Court.

totality of the circumstances" and that "[f]iling a bankruptcy petition in bad faith, although not explicitly enumerated in 11 U.S.C. § 1112, is an adequate basis to dismiss a bankruptcy petition") (internal citations omitted).  Further, "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068, 1071 (5th Cir. 1986).  The good faith requirement limits the availability of the various protections afforded by the Bankruptcy Code only to those debtors with "clean hands" and "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way." *Id*.  "[A] court may consider the potential for abuse in every case, whether on motion of an interested party, or sua sponte." *In re McMahan*, 481 B.R. at 915.

30.     There is no precise test for determining whether a bankruptcy petition was filed in bad faith.  Instead, courts look to a non-exhaustive list of factors, including those relating to the debtor's financial condition and motives.  *See Little Creek*, 779 F.2d at 1072.  Factors typically considered by the Fifth Circuit include, but are not limited to: (i) whether the debtor has only one asset; (ii) whether the debtor has few employees; (iii) whether the debtor only has a few, if any, unsecured creditors whose claims are relatively small in relation to the claims of the secured creditors; (iv) whether the debtor's financial problems involve essentially a dispute between the debtor and a secured creditor which can be resolved in a pending state court action; and (v) whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.  *See id*. at 1073.  Outside the Fifth Circuit, courts also consider, among other things: (i) whether the debtor's pre-petition conduct has been improper; (ii) whether the petition allows the debtor to evade court orders; (iii) whether the debtor

010282

has ongoing business or employees; (iv) whether the debtor's income is sufficient to operate or sustain a plan of reorganization; (v) whether the debtor filed solely to invoke the automatic stay; (vi) whether the debtor intends to create and organize a new business rather than reorganizing or rehabilitating an existing one; and (vii) whether the debtor is merely a shell corporation.[7]

31.     When considering these factors, the Debtors' bankruptcies were filed in bad-faith and should be dismissed.  Per Debtors' own filings, they have no ongoing business or employees, have limited assets, have no cash flow or sources of income other than voluntary contributions from non-debtor third parties, and have no creditors other than Movants and the plaintiffs in the Texas Litigation, making them shell companies for Jones and FSS.  *See* Decl. of W. Marc Schwartz, attached to Debtors' Voluntary Pet. for Bankr. [Dkt. 1].  Debtors, along with Jones and FSS, are defendants in numerous pending lawsuits concerning the 2012 Sandy Hook shootings, which, if allowed to proceed, would resolve Debtors' financial problems, as Debtors' liability in those cases is clear and damages are the only remaining issue.  Debtors then filed for bankruptcy on the eve of trial in the Texas Litigation and just months before trial in the Connecticut Litigation. *See, e.g., In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 495 (Bankr. S.D. Tex. 2013)

---

[7] *See, e.g., In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 557 (D. Del. 2002) (debtor's pre-petition conduct, ongoing business, income for operations, and intent to invoke automatic stay); *In re AdBrite Corp.*, 290 B.R. 209, 218 (Bankr. S.D.N.Y. 2003) (debtor's pre-petition conduct, ongoing business, income sufficiency for operations, and intent to invoke automatic stay); *In re DCNC N. Carolina I, LLC*, 407 B.R. 651, 662 (Bankr. E.D. Pa. 2009) *aff'd sub nom. DCNC N. Carolina I v. Wachovia Bank, N.A.*, No. CIV.A. 09-3775, 2009 WL 3856498 (E.D. Pa. Nov. 13, 2009) (same); *In re First Assured Warranty Corp.*, 383 B.R. 502, 544 (Bankr. D. Colo. 2008) (debtor's ongoing business); *Matter of Orchard Hills Baptist Church, Inc.*, 608 B.R. 309, 315 (Bankr. N.D. Ga. 2019) (debtor's evasion of court orders, ongoing business, and income); *In re EHT US1, Inc.*, 630 B.R. 41, 429-20 (Bankr. D. Del. 2012) (debtor's ongoing business, income, and intent to invoke automatic stay); *In re Lake Michigan Beach Pottawattamie Resort LLC*, 554 B.R. 899, 906 (Bankr. N.D. Ill. 2016) (debtor's income for operations and intent to invoke automatic stay); *In re Premier Golf Properties, LP*, 564 B.R. 710, 722 (Bankr. S.D. Cal. 2016) (debtor's income sufficient for reorganization); *In re Lezdey*, 332 B.R. 217, 222 (Bankr. M.D. Fla. 2005) (same); *In re Rosenblum*, 608 B.R. 529, 537 (Bankr. D. Nev. 2019) (same); *In re Harmony Holdings, LLC*, 393 B.R. 409, 418 (Bankr. D.S.C. 2008) (same); *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987) (debtor's intent to invoke automatic stay, intent to create new business, and status as shell corporation); *In re 4 C Solutions, Inc.*, 289 B.R. 354, 366 (Bankr. C.D. Ill. 2003) (debtor's ongoing business and intent to create new business); *Singer Furniture Acquisition Corp. v. SSMC, Inc. N.V.*, 254 B.R. 46, 52 (M.D. Fla. 2000) (same).

(bankruptcy filing on "eve of a [state court] foreclosure" was—much like PASE's filing in the face of Oxbow enforcing its judgment—evidence of "an intent to delay or frustrate").  Debtors, Jones, and FSS have already been defaulted in both Texas and Connecticut for repeated, willful violations of court orders and persistent bad faith litigation tactics and are ready for jury trials on damages. This filing is simply their latest attempt to avoid those trials and frustrate the Movants' recovery.

32.     Moreover, a chapter 11 filing undertaken "in bad faith to secure a litigation advantage in another forum is not only case dispositive but also necessitates a dismissal." *Invs. Grp., LLC*, 518 B.R. at 384 (affirming bankruptcy court dismissal of case after it concluded that the "primary purpose" for filing the bankruptcy petition was to gain an advantage in pre-petition litigation); *see also In re Briggs-Cockerham, L.L.C.*, No. 10-34222-BJH-11, 2010 WL 4866874, at *5 (Bankr. N.D. Tex. Nov. 23, 2010) (dismissing bankruptcy of debtor whose filing was a "litigation tactic").  Jones's and FSS's use of the Debtors' bankruptcy to delay final resolution of the pending state trials necessitates dismissal by this Court under this standard. Notably, Debtors—shell corporations with minimal assets—were the only entities to file for bankruptcy.  Jones caused the Debtors' bankruptcies to be filed in an attempt to improperly extend the protections of the automatic stay while simultaneously avoiding the disclosure requirements of section 521 of the Bankruptcy Code and the applicable Bankruptcy Rules.  Jones and FSS could have filed bankruptcy and participated the negotiation and facilitation of a consensual plan. Instead, Jones and FSS, through Debtors, are attempting to carry out a scheme to avoid the requirements of bankruptcy while reaping its benefits.

33.     For the foregoing reasons, the facts weigh overwhelmingly in favor of a "for cause" dismissal of Debtors' bankruptcy case. The Court should not entertain Debtors' effort to subvert

the bankruptcy process for the benefit of Jones and FSS at the expense of legitimate creditors such as Movants.

## VIII.   RESERVATION OF RIGHTS

34.      Movants expressly reserve the right to supplement this Motion, to introduce evidence at any hearing with respect thereto, and to file additional supplemental objections and pleadings.

## CONCLUSION

For the foregoing reasons, Movants respectfully request this Court enter an order (i) dismissing with prejudice Case No. 22-60020, *In re InfoW, LLC*, Case No. 22-60021, *In re IWHealth, LLC*, and Case No. 22-60022, *In re Prison Planet TV, LLC*, and (ii) awarding Movants any further relief the Court deems appropriate.

Respectfully submitted this 26th day of April 2022.

/s/ Ryan E. Chapple
Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262
**ATTORNEYS FOR MOVANTS**

010285

## CERTIFICATE OF CONFERENCE

I hereby certify, as counsel for Movants, my firm has conferred with Debtors' counsel, and as of the filing of this Motion, Debtors' counsel is opposed to the relief requested herein.

*/s/ Ryan E. Chapple*
Ryan E. Chapple

## CERTIFICATE OF ACCURACY

I hereby certify that the foregoing statements are true and accurate to the best of my knowledge and belief.  This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Ryan E. Chapple*
Ryan E. Chapple

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Emergency Motion to Dismiss has been served on counsel for Debtors, Debtors, and all parties receiving or entitled to notice through CM/ECF on this 26th day of April 2022.

*/s/ Ryan E. Chapple*
Ryan E. Chapple

010286

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60020 |
| | § | |
| INFOW, LLC, *et al.*, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtors[1] | § | Jointly Administered |

# EXHIBIT A

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC fka Infowars, LLC (6916). IWHealth, LLC fka Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005).  The address for service to the Debtors is P. O. Box 1819, Houston, TX 77251-1819.

| RETURN DATE: JUNE 26, 2018 | : | JUDICIAL DISTRICT |
| ERICA LAFFERTY, ET AL, | : | OF FAIRFIELD |
| v. | : | AT BRIDGEPORT |
| ALEX JONES, ET AL. | : | MAY 23, 2018 |

## COMPLAINT

## INTRODUCTION

1.    This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.    Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.    In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.    That tragic day left behind 26 families that will never be whole again.

5.    Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.    Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.    Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.    Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.    Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

1

010288

10.     Nevertheless, time and again, Jones has accused Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11.     Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12.     Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13.     As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14.     On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15.     They have confronted strange individuals videotaping them and their children.

16.     Some of them have moved to undisclosed locations to avoid this harassment.

17.     The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18.     Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19.     The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

010289

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiffs are the immediate family of four children and two educators killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012, as well as one first-responder to the scene.

22.     Plaintiffs Jacqueline Barden and Mark Barden are the parents of murdered first-grader Daniel Barden, who was seven years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

23.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of murdered first-grader Dylan Hockley, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

24.     Plaintiffs Francine Wheeler and David Wheeler are the parents of murdered first-grader Benjamin Wheeler, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

25.     Plaintiffs Jennifer Hensel and Jeremy Richman are the parents of murdered first-grader Avielle Richman, who was six years old at her death on December 14, 2012. They reside in Fairfield County, Connecticut.

26.     Plaintiffs Donna Soto is the mother, and Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto are the siblings, of murdered first-grade teacher Victoria Leigh Soto, who was 27 years old when she died shielding her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School on December 14, 2012. They reside in Fairfield County, Connecticut.

27.     Plaintiff Erica Lafferty is the daughter of Dawn Hochsprung, the principal of Sandy Hook Elementary School on December 14, 2012. Dawn died that day trying to save her students from Adam Lanza's murderous rampage. Erica resides in Litchfield County, Connecticut.

28.     Plaintiff William Aldenberg was a first responder to Sandy Hook Elementary School on December 14, 2012, and was depicted in iconic photographs and video footage from those events. He has been antagonized by some of the defendants and their followers, who claim that he is a crisis actor. He resides in Worcester County, Massachusetts.

29.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, and Florida.

30.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com

010290

and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations.

31.     Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

32.     Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

33.     Defendant Infowars Health LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

34.     Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

35.     All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

36.     Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

37.     Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

38.     Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

39.     Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ;  Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010)  https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

4

010291

## THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

40.     Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

41.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

42.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

43.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

44.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

45.     His followers have shown themselves ready to comply.

46.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

47.     "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

48.     Jones's followers came running to his call, as he knew they would.

49.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

50.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

010292

51.     On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

52.     Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

53.     Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

54.     Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

55.     In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

56.     She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

57.     The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

58.     On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

59.     Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

60.     Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

61.     Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[5]

---

[5] https://www.facebook.com/mert.melfa/videos/539807396217619/.

010293

62.     Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

63.     Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

64.     Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

65.     Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

66.     In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

67.     After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

68.     Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

69.     On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

70.     During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

71.     Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

        A.     For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

        B.     Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in

7

reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive."[6]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children.[7]

D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

72.     Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor.[8] His Facebook page continues to display those publications.

73.     Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

74.     In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

75.     In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

---

[6] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[7] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[8] See, e.g., https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252. https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

8

76.     For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[9]

77.     The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

78.     Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

79.     On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[10] traveled to and were located in Hartford, Connecticut, for the creation of this video.

80.     Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[11]

81.     On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[12]

82.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[13]

83.     Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[14]

84.     Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

85.     Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

---

[9] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[10] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[11] https://www.youtube.com/watch?v=4_2FznkfcBU.
[12] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[13] https://www.youtube.com/watch?v=jCOe3qIgyFA.
[14] https://www.youtube.com/watch?v=TGCfi_ot0CU.

010296

86.     Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

87.     Defendant Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

88.     Defendant Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

89.     Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.

## THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL

90.     The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

91.     The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[15]

92.     The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

93.     Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

94.     Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas

---

[15] *See generally* Richard J. Hofstatdler, *The Paranoid Style in American Politics, and Other Essays* (1964).

010297

masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[16]

95.     According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

96.     In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[17]

97.     In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

98.     News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

99.     Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[18]

100.     In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[19]

---

[16] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[17] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[18] Charlie Warzel, Alex Jones Will Never Stop Being Alex Jones, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.vqXeXzdLEZ#.qewdqoN0m2.

[19] Corky Siemaszko, *InfoWars'Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.

010298

## THE CAMPAIGN OF ABUSE

101.   Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

102.   On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[20]

103.   That article alleges that Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

104.   An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

105.   At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

106.   On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[21]

107.   The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

108.   In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

109.   The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

110.   A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[20] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

[21] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

12

010299

## January 27, 2013

111.    On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[22] Just over a month had passed since the shooting at Sandy Hook.

112.    Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

113.    Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying."

114.    Jones then played a video of Robby Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

115.    Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

116.    As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

117.    Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

118.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

119.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## March 2013

---

[22] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

010300

120.    On March 14, 2014, Jones stated, "We've clearly got people where it's actors playing different parts of different people."

121.    He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

122.    The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

## May 27, 2013

123.    On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[23]

124.    During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

125.    In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

126.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

127.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

128.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## May 13, 2014

129.    On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[24]

130.    That day, Jones hosted Wolfgang Halbig.

131.    During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

---

[23] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.

[24] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

010301

132.    Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

133.    Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

134.    Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

135.    Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

136.    Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

137.    He continued, "The whole thing, you've got 'em jumping gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

138.    Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

139.    Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012."

140.    Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

141.    During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake . . . it's fake . . . you've got parents acting . . . it just is the fakest thing since the three-dollar bill."

142.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

143.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

144.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

010302

## September 25, 2014

145. On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[25]

146. This assertion was a complete fabrication: the FBI had made no such statement.

147. During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

148. This was a false statement. FBI crime statistics showed no such thing.

149. Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

150. Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

151. Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

152. Jones asserted that the school was "a cut-out" used as a stage for the event.

153. Jones and Halbig both stated "I wish it was real instead of fake."

154. Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

155. Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

156. Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

157. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

158. On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

---

[25] https://www.youtube.com/watch?v=N1RlzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

010303

159.    The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

160.    The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

161.    The article quoted Halbig as saying that there was "a 'script' followed during the event."

162.    It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

163.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

164.    On information and belief, the article has been viewed by hundreds of thousands of persons.

### December 12, 2014

165.    On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[26]

166.    The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

167.    During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

168.    Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one

---

[26] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

010304

of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

169.   A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

170.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### December 28, 2014

171.   On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[27]

172.   Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

173.   Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

174.   Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

175.   Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

176.   Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

177.   A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

178.   On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[27] https://www.youtube.com/watch?v=TGCfi_ot0CU.

010305

179.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## January 2, 2015

180.    On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

181.    The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

182.    "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

183.    The pictures used were images of Noah Pozner.

184.    Upon information and belief, hundreds of thousands of people have viewed this article.

## January 13, 2015

185.    On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[28]

186.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

187.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

188.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[28] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

010306

## March 4, 2015

189.   On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[29]

190.   Jones hosted Halbig on that episode.

191.   During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

192.   Halbig stated the school was not in operation at the time of the shooting.

193.   Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

194.   Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

195.   Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

196.   Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

197.   Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

198.   Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

199.   Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

200.   A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

201.   On information and belief, this episode was also broadcast through Jones's radio affiliates.

202.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[29] https://www.youtube.com/watch?v=_7ib5WkULBY.

010307

**May 28, 2015**

203.    On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[30]

204.    David Knight hosted Halbig on Infowars Nightly News.

205.    Halbig accused Newtown police chief Mike Kehoe of committing perjury.

206.    Halbig once again appeared, and stated that the school was unsanitary and unsafe.

207.    Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

208.    A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

209.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

210.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

211.    On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[31]

212.    The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

213.    The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

214.    Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

215.    On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

---

[30] https://www.youtube.com/watch?v=Ml3KVj2nVRA.
[31] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

010308

216.     Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[32] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

217.     During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

218.     Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

219.     On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

## July 7, 2015

220.     On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[33]

221.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[34]

222.     "[T]he more we look at Sandy Hook," he said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

223.     He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

224.     Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

---

[32] https://www.youtube.com/watch?v=5cll79t7Mrw.

[33] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[34] https://www.youtube.com/watch?v=jCOe3qIgyFA.

010309

225.    Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

226.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

227.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

228.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 17, 2016

229.    On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

230.    These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

231.    Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

232.    Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[35]

233.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

234.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

235.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 18, 2016

236.    On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[36]

---

[35] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.
[36] https://www.youtube.com/watch?v=MwudDfz1yAk.

010310

237.   During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

238.   He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

239.   He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

240.   Jones rehearsed several of his most commonly employed arguments that the Sandy Hook shooting was staged, including that Anderson Cooper was standing in front of "a blue screen or a green screen," that video was "looped," and that "one of the reported fathers of the victims . . . [was] doing classic acting training."

241.   In closing, Jones said, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

242.   The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

243.   On information and belief, this episode was also broadcast through Jones's radio affiliates.

244.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

010311

**November 28, 2016**

245.    On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[37]

246.    In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[38]

247.    Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

248.    Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

249.    Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

250.    These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

251.    Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

252.    This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

253.    Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

254.    He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

255.    The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

256.    Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

---

[37] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.

[38] https://www.youtube.com/watch?v=9PdrlrSCLu0.

010312

**March 8, 2017**

257.    On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

258.    During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

259.    Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

260.    A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

261.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

262.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**April 22, 2017**

263.    On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[39]

264.    During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

265.    Jones told his audience that they should not "believe any of it."

---

[39] https://www.youtube.com/watch?v=rUn1jKhWTXI.

26

266.    As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' deaths.

267.    During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

268.    In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

269.    The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

270.    Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

271.    The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

272.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

## April 28, 2017

273.    On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[40]

274.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[40] https://www.youtube.com/watch?v=StOyqyt0fkY.

27

010314

**June 13, 2017**

275.     On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[41]

276.     Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

### The Megyn Kelly Interview

#### *The Preview*

277.     On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

278.     NBC released a preview of the interview on the internet on the following day.

279.     In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

280.     Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

281.     In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

282.     Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

283.     Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

284.     The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

285.     These statements were heard by millions of people.

---

[41] https://www.facebook.com/80256732576/videos/10155465593882577/.

28

*June 15, 2017 – Infowars*

286.    During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

287.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

288.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming

289.    The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

290.    Before the interview aired that day, Jones published several pre-show videos on Infowars.

291.    During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

    A.  In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."

    B.  Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."

    C.  He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."

    D.  He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."

    E.  While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the

010316

plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormal and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

292.    Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

293.    As discussed in paragraphs 123 through 128 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

294.    In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

295.    During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

296.    In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

297.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

298.    These statements were heard by hundreds of thousands, if not millions of people.

### The June 18, 2017 NBC Broadcast

299.    During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

300.    At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 171 through 179 of this complaint.

301.    In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

302.    Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

303.    In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

30

304. Later, Kelly stated, "But Alex, the parents—one after the other—devastated. The dead bodies that the coroner autopsied."

305. In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

306. Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

307. Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real. But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

308. Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

309. Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

310. Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

311. Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

312. Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

313. In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

314. It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

315. There is no evidence "on the other side."

316. A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

317. More than three million people saw and heard these statements by Jones.

*Alex Jones's June 18, 2017 Counter-Programming*

318.    Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

319.    The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

320.    As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged event.

321.    This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

322.    Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

323.    This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

324.    On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

325.    Hundreds of thousands, if not millions, of people heard these statements.

### *June 26, 2017*

326.    During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

327.    On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[42]

328.    Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

---

[42] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

32

329. Shroyer's support for this statement was video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

330. Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

331. Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

332. In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

333. A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

334. These statements were heard by at least tens of thousands, if not millions, of people.

335. On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery.

## COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

336. All previous allegations in this complaint are incorporated as if fully set forth herein.

337. The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in their position.

338. The false light in which the defendants' statements placed the plaintiffs would be highly offensive to a reasonable person.

339. The defendants had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs

33

010320

would be placed.

340.     These false publications have caused the plaintiffs actual and substantial damages.

341.     In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

342.     The plaintiffs are private individuals and are neither public officials nor public figures.

343.     The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

344.     The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

345.     The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

346.     These acts of the defendants resulted in damage to the plaintiffs.

### COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

347.     All previous allegations in this complaint are incorporated as if fully set forth herein.

348.     In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' deaths; the defendants published numerous defamatory statements.

349.     These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' deaths and/or are actors lying about the deaths of their loved ones.

350.     The statements contained in the defendants' campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

351.   The defendants' defamatory publications readily identified the plaintiffs to millions of people.

352.   The defendants' defamatory publications were broadcast to millions of people.

353.   The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

354.   In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

355.   The plaintiffs are private individuals and are neither public officials nor public figures.

356.   The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

357.   The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

358.   The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

359.   These acts of the defendants resulted in damage to the plaintiffs.

### COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

360.   All previous allegations in this complaint are incorporated as if fully set forth herein.

361.   In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

362.   The defendants' conduct was extreme and outrageous.

363.   The defendants' conduct was the cause of the plaintiffs' distress.

364.   The emotional distress sustained by the plaintiffs was severe.

35

365.     The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

366.     In light of their prior experience with similar sorts of false and reckless statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

367.     The plaintiffs have suffered actual and substantial damages.

368.     The plaintiffs are private individuals and are neither public officials nor public figures.

369.     The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

370.     The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

371.     The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

372.     These acts of the defendants resulted in damage to the plaintiffs.

### COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

373.     All previous allegations in this complaint are incorporated as if fully set forth herein.

374.     The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

375.     The plaintiffs' distress was foreseeable.

376.     The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

377.     The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

378.     The plaintiffs have suffered actual and substantial damages.

36

379.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

380.    The plaintiffs are private individuals and are neither public officials nor public figures.

381.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

382.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

383.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

384.    These acts of the defendants resulted in damage to the plaintiffs.

## COUNT FIVE: Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* (Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)

385.    All previous allegations in this complaint are incorporated as if fully set forth herein.

386.    The defendants unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

387.    This campaign of lies, abuse, and harassment was a deceptive practice and offended public policy.

388.    The defendants' reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

389.    The defendants' conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

390.    The plaintiffs are private individuals and are neither public officials nor public figures.

391.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether

010324

or not they were true.

392.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

393.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

394.    These acts of the defendants resulted in damage to the plaintiffs.


WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A.     Monetary damages;

B.     Punitive damages;

C.     Attorneys' fees;

D.     Costs;

E.     Declarative relief;

This matter is within the jurisdiction of this court.

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this 23rd day of May, 2018.

THE PLAINTIFFS,

By      _____

WILLIAM M. BLOSS
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT  06604
PHONE: (203) 336-4421
FAX:  (203) 368-3244
wbloss@koskoff.com
mblumenthal@koskoff.com
JURIS #32250

39

010326

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60020 |
| | § | |
| INFOW, LLC, *et al.*, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtors¹ | § | Jointly Administered |

### ORDER GRANTING CONNECTICUT PLAINTIFFS' EMERGENCY MOTION TO DISMISS CHAPTER 11 CASES AND OBJECTION TO DEBTORS' DESIGNATION AS SUBCHAPTER V SMALL VENDORS

Upon the motion (Motion) of David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, Movants) for entry of an order (this Order) dismissing the Chapter 11 cases; and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, its creditors, and other parties in interest; and appropriate notice having been provided under the circumstances of the Motion and the opportunity for a hearing on the Motion, and that no other or further notice is required; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

---

¹ The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC f/k/a Infowars, LLC (6916). IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005).  The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

010327

1.      The Motion is GRANTED as set forth herein.

2.      Case No. 22-60020, *In re InfoW, LLC*, Case No. 22-60021, *In re IWHealth, LLC*, and Case No. 22-60022, *In re Prison Planet TV, LLC* are hereby dismissed with prejudice.


Dated: _____, 2022


_____
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-60020 |
| INFOW, LLC, *et al.*, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtors.[1] | § | |
| | § | Jointly Administered |

---

**THE TEXAS LITIGATION PLAINTIFFS' SUPPLEMENTAL
MOTION TO DISMISS PETITION**

---

THIS MOTION SEEKS AND ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOTIVE PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Creditors Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "**Texas Litigation Plaintiffs**") hereby: (a) join the *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Debtor's Designation as Subchapter V Small Vendors* [DE 36] (the "**Connecticut Motion**"); and (b) file their supplemental *Motion to Dismiss Petition* (the "**Motion**"), and respectfully state as follows.

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

010329

## INTRODUCTION

1.      "The purpose of the bankruptcy code is to afford the honest but unfortunate debtor a fresh start, not to shield those who abuse the bankruptcy process in order to avoid paying their debts." *In re Nassar*, 216 B.R. 606, 608 (S.D. Tex. 1998). There are no honest debtors here, and there are certainly parties that are attempting to abuse the bankruptcy process.

2.      The Texas Litigation Plaintiffs are plaintiffs in various cases that were previously pending in the district courts of Travis County.  They are victims of Alex Jones and his entities' intentional efforts to spread falsehoods and conspiracy theories while earning millions of dollars from the suffering of others.  On the cusp of finally facing a jury trial on April 25, 2022, Jones reached back into his bag of tricks and litigation tactics in a further effort to avoid facing justice.  He put a plan in motion to file bankruptcy petitions for the three entities he owned that earned no revenues and had little-to-no assets of value to force the victims to the settlement table in a disadvantaged position.

3.      Put simply, there is no legitimate or compelling purpose in continuing these bankruptcy proceedings.  During the limited time this case has been on file, the facts here have demonstrated that the Debtors have no intent to truly "reorganize" their business.  In fact, the Debtors' proposed chief restructuring officer admitted as much when the Court asked him to explain the purpose of this bankruptcy. Schwartz did not say it was to reorganize; he said it was to settle the pending litigation.[2] The Debtors have no actual business to restructure, operations to rehabilitate, no customers to serve, and no real employees.  The bankruptcy is nothing more than a transparent attempt to: (a) evade the impending jury trials and resulting judgments in both Texas and Connecticut;

---

[2] Transcript from April 22, 2022 Hearings, 50:13-20:

> **The Court**: . . . What do you believe the purpose of these Chapter 11 cases is?
>
> **Mr. Schwartz**: The purpose? The purpose is to arrange to pay all of the plaintiffs the amount of their—let's say in a bankruptcy sense, their allowed claim in full.  That's the purpose.

010330

and (b) avoid the need for transparency relating to Jones and Free Speech Systems, LLC's ("**FSS**") ability to pay what they rightfully owe to their victims.

4.    This Court should not condone such behavior.  It should reject it by dismissing this case. Courts have long had the authority to dismiss cases that are not filed in good faith.  *E.g., In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970). And utilizing the bankruptcy process as a mere litigation tactic is bad faith on its face.  This Court should therefore exercise its discretion to dismiss these cases and permit the victims to finally complete the jury trial they have diligently pursued for over four years.

## JURSIDICTION

5.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## BACKGROUND

6.    Alex Jones, through his media company FSS became a national figure by peddling wild conspiracy theories. Followers tune in to hear him and his guests ramble about unsubstantiated claims—like how the September 11th attacks were an inside job by the U.S government. In December 2012, Jones aimed his conspiracy theories at Sandy Hook Elementary, where a tragic mass-shooting killed twenty children.

## I.    ALEX JONES CLAIMS SANDY HOOK IS A HOAX

7.    For over five years after the shooting, Alex Jones and his media empire engaged in a horrific campaign of cruelty in which Jones denied these children were real—insisting instead that the parents were actors in a massive hoax staged by shadowy elite forces. Jones published over 50 episodes of his show and countless articles pushing his monstrous lie, all while coordinating and funding harassment by a dangerous collection of fanatics.

010331

8.      Suffice to say, the harassment by Jones and his proxies took a toll on the Sandy Hook families, several of whom comprise the Texas Litigation Plaintiffs. Take, for example, Neil Heslin and Scarlett Lewis—parents of six-year-old Jesse Lewis, one of the twenty children murdered. Consumed with despair and facing death threats, Heslin granted a television interview with NBC's Megyn Kelly on June 19, 2017 in a desperate plea to Jones to stop the harassment. Heslin begged the national audience to believe he was a real parent, as he shared with the world that he held his son in his arms with a bullet hole through his head. A week later, Jones retaliated by airing multiple episodes accusing Heslin of being a liar, claiming it was impossible for Heslin to have held his son's body.

## II.   THE TEXAS LITIGATION PLAINTIFFS FILE SUIT.

9.      In 2018, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa (the "**Sandy Hook Families**") sued Alex Jones and various entities he owns and/or controls, Debtor InfoW, LLC (f/k/a InfoWars, LLC) ("**InfoWars**"), and nondebtor FSS.  The claims included defamation and intentional infliction of emotional distress, among other claims, and stem from the conspiracy theories Jones and his media outlet disseminated that the mass shooting was a hoax.  Marcel Fontaine's claims arose from falsehoods that Jones and his outfit spread alleging that Fontaine was the shooter responsible for murdering seventeen people at a high school in Parkland, Florida.

10.     Throughout the cases, Jones and his companies routinely evaded discovery and otherwise obstructed progress in the case. Jones made a mockery of the litigation while treating the courts with nothing but contempt. In the Texas litigation, ten of his attorneys have come and gone as Jones has consistently defied court orders and refused to participate in these lawsuits in good faith, all while incurring over $1,300,000 in cumulative sanctions in nearly a dozen orders from the trial court. Jones was also sanctioned for frivolous pleadings by the Texas Court of Appeals and repeatedly sanctioned and held in contempt by the Connecticut Superior Court in a lawsuit brought by other Sandy Hook families. During that time, orders of the various courts have found that Jones has refused

to comply with discovery orders on every successive occasion, produced child pornography in discovery, threatened the lives of plaintiffs' counsel, repeatedly refused to cooperate with depositions, provided false discovery responses, tampered with evidence, submitted a fraudulent affidavit, made frivolous legal arguments, and has continuously introduced chaos and insolence into the proceedings.

11.     Jones's repeated discovery abuses culminated in the trial court granting default judgments for the Sandy Hook Families and against Jones, FSS, and InfoWars on liability in September 2021. The first trial on damages was scheduled to begin Monday, April 25, 2022 (Heslin/Lewis). The remaining cases were set for trial on June 27, 2022 (Pozner/De La Rosa) and August 22, 2022 (Fontaine). The filing of the bankruptcy petition and removal to federal court, however, has precluded the timely liquidation of damages in those matters.

### III.   AS THE INEVITABLE JUDGMENTS NEARED, JONES DOOMSDAY PREPPED BY DIVERTING HIS ASSETS AND THRUSTING HIS SHELL COMPANIES INTO BANKRUPTCY.

12.     After the Sandy Hook Families and Fontaine filed their Defamation Cases, Jones started diverting his and FSS's assets. In 2021 alone, FSS transferred tens of millions more than it cost to operate that year. These transfers started just four months after the last appellate-court decision was issued that allowed the defamation cases to proceed. And from 2018 to 2021, Jones personally drew about $18 million from FSS. These draws were in addition to his yearly salary, which exceeded $600,000, and taken while FSS operated at a net loss in the millions each of those years. Jones has since represented that he is insolvent.

13.     And so was FSS, apparently, when Jones drew the $18 million. Just three months after the last appellate-court decision allowing the defamation cases to proceed, a company named PQPR filed a UCC Financing Statement claiming a security interest in essentially everything FSS owns. The claimed security interest covers an alleged $54 million debt FSS owes to PQPR. The supposed debt began accruing years earlier as part of an arrangement where FSS sells PQPR's products on the

InfoWars website. The products include items such as bumper stickers echoing the conspiracy theories on Jones's programming as well as "preparedness" kits like seeds, storable food, survival gear, and nuclear and biological supplies.[3] Under this alleged arrangement, PQPR was to be reimbursed for the costs of the products and receive 70% of the sales revenue while FSS retained the other 30%. In practice, however, FSS supposedly kept 100% of the revenue for about seven years and did not pay for the goods PQPR provided—to the point where a $54 million debt had accumulated. All the while, PQPR not only supplied FSS with more products to sell but also paid FSS millions a year to advertise on the InfoWars website. PQPR still supplies FSS with products to sell and pays for advertising.

14.     As one might expect, this arrangement lasted because PQPR is not actually an independent business. It's an insider of Jones. It is owned and operated directly or indirectly by Jones, his parents, and his children. And the income PQPR receives—including from sources like the Jones Debtors—goes to Alex Jones and these Jones transferees.

15.     And after the defamation cases began, Jones started transferring large sums of money. These sums include money FSS started regularly transferring to PQPR *the same month that the default judgments were rendered*. In fact, the month the default judgments were rendered, FSS started transferring to PQPR between $11,000 per day and $11,000 per week plus 60–80% of FSS's sales revenue— supposedly just to pay the interest on the alleged $54 million debt.

16.     The reality is that these transfers are designed to siphon away Jones's assets to make him and FSS judgment-proof. And on April 6th, 2022, the Texas Litigation Plaintiffs filed an additional suit against Jones, FSS, InfoWars, and other insiders for engaging in fraudulent transfers under the Texas Uniform Fraudulent Transfer Act.

---

[3] *See, e.g.,* InfoWars Store, at "Stickers and Decals", https://www.infowarsstore.com/gear/stickers-and-decals (last visited April 4, 2022); InfoWars Store, at "Preparedness", https://www.infowarsstore.com/preparedness (last visited April 4, 2022).

010334

17.     On April 17, 2022, however, the Debtors filed voluntary petitions for relief under Chapter 11, Subchapter V, of the Bankruptcy Code. The Petitions were signed by W. Marc Schwartz, the Debtors' Chief Restructuring Officer.  The *Declaration of W. March Schwartz Regarding Bankruptcy Code § 1161(1) Requirements* (the "**Schwartz Declaration**", attached as **Exhibit 1**) accompanied each of the Debtors' petitions.  Schwartz met with both (a) a CPA hired to "delve into the books of account of various entities affiliated with the Debtors"; and (b) Alex Jones and his counsel.  Ex. 1, ¶ 7.  After his investigation, Schwartz came to the following conclusions:

> I have learned that the Debtor's [sic] have no purpose other than to hold assets which may be used by other entities. ***They undertake no business activities, they do not sell, rent or lease to others anything. Their assets do not generate any income for them***. They have no bank accounts and do not pay money to anyone for any reason. They have no debt or other liabilities other than those related to pending or potential litigation. For these reasons, they have no financial statements or books of account and they do not file income tax returns.

Ex. 1, ¶ 8 (emphasis added).

18.     The Debtors seek to have insolvent non-debtors Jones and FSS fund the reduced payment of the Debtors' unliquidated debts to the Texas and Connecticut Litigants through a Subchapter V plan that the creditors have no vote in approving or rejecting.

19.     The Sandy Hook Families set for trial on April 25, 2022 nonsuited their claims against InfoWars because discovery revealed InfoWars had no employees, assets, or business activity, and doing so would prevent the trial from being stayed.[4] After having been nonsuited, InfoWars filed its notice of removal even though it was no longer a party in the case.  This improper removal caused the April 25, 2022 trial to determine damages against Jones and FSS to be postponed. On April 26,

---

[4] *E.g., In re Long*, 564 B.R. 750, (S.D. Ala. 2017) ("Just as a bankruptcy court may lift the stay to permit an action to proceed to completion in another tribunal, in this district and many others, so may a plaintiff dismiss a debtor from a lawsuit without violating the automatic stay.") (collecting cases).

010335

2022, Heslin and Lewis each filed their Plaintiff's *Motion for Abstention and Remand* in Adversary No. 22-01023 currently pending in the Western District of Texas.

## ARGUMENT

20.     The Court should dismiss the bankruptcy petitions and allow the Texas Litigation Plaintiffs to proceed to trial against non-debtors Jones and FSS.  The Fifth Circuit has long held that courts have discretion to dismiss cases for cause where the filing was not made in good faith.  *E.g., Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970) ("'Good faith' implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose.").  The requirement of good faith "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes."  *Little Creek Dev. Co.*, 779 F.2d at 1072.  Here, the evidence establishes the lack of good faith needed to continue with these proceedings.

### IV.   THE EVIDENCE ESTABLISHES THE DEBTORS LACK THE INTENT TO REORGANIZE

21.     Any suggestion that the bankruptcy is designed to reorganize the Debtors' business is a charade. Rather, a review of the Schwartz Declaration and the Declaration of Trust establish that the Debtors never conducted any actual prepetition business, and do not intend to in the future:

- After taking a meeting with Jones, Schwartz admits that the Debtors "undertake no business activities" and that they "do not sell, rent or lease to others anything." *Schwartz Declaration*, Ex. 1, ¶ 8. And the Debtors' assets "do not generate any income for them." *Id.*

- The Trustees are not authorized to engage in any trade or business. Declaration of Trust, Art. 3.8.

010336

If the Debtors did not conduct business pre-petition and cannot in the future, there can be no "honest intent and genuine desire . . . to effect a plan of reorganization." *In re Metropolitan Realty Corp.*, 433 F.2d at 678. Clearly, there is another motivation for the bankruptcy.

22. And Schwartz further confirmed that the primary intent of the bankruptcy is not reorganization at the April 22, 2022 hearing. When the Court inquired as to the purpose of the bankruptcy, Mr. Schwartz responded that it was to "arrange to pay all of the plaintiffs the amount of their—let's say in a bankruptcy sense, their allowed claim in full. That's the purpose." *Transcript from April 22, 2022 Hearings*, 50:13-20 (excerpt attached as **Exhibit 2**). Schwartz's statement makes two things clear: (a) there is no real intent to reorganize; and (b) the alleged payment in full will only be "in a bankruptcy sense." The qualification is telling, as it suggests a deeper motivation for the bankruptcy—avoiding large judgments rendered by juries in the state courts through the bankruptcy process.

## V. THE BANKRUPTCY IS NOTHING MORE THAN AN IMPERMISSIBLE LITIGATION TACTIC ESTABLISHING THE DEBTORS' BAD FAITH

23. The petitions represent nothing more than a litigation tactic designed to strip the victims of their right to a jury trial. In the context of determining dismissal for a bad faith filing, "courts regularly consider whether the bankruptcy was intended to obtain tactical advantage in litigation or negotiations." *In re Mirant Corp.*, Case No. 0.-46590, 2005 WL 2148362, at * 8 (Bankr. N.D. Tex. Jan. 26, 2005) (citing *In re Cedar Shore Resort, Inc.*, 235 F.3d 375 (8th Cir. 2000)). An analysis of the timing of events and documents submitted thus far establish that the bankruptcy itself is yet another litigation tactic seeking to eliminate the victims' access to the trial courts.

24. The timing of petitions' filing and subsequent removals show that the filing was a litigation tactic. After approximately four years of litigation, the first Sandy Hook Family trial was set to begin on April 25, 2022. The Debtors filed their petitions on April 18, 2022 and shortly thereafter, InfoW, LLC filed notices of removal in each case. But InfoW, LLC was not a party to the suit at the

010337

time of the removal, having already been nonsuited from the case earlier that day.[5]  Given that InfoW, LLC was no longer a party to the suit, the apparent reason for the removal was necessarily stopping the trial against Alex Jones and FSS.[6]

25.     The language of the Plan Support Agreement ("**PSA**," attached as **Exhibit 3**) establishes that the bankruptcy and undisclosed plan is an unfair litigation tactic.  The PSA requires the Debtors, along with the Trust, Jones, and FSS to "jointly file and prosecute a motion to establish . . . a Litigation Settlement Trust Claims Estimation protocol. . . ."  Ex. 3, pg. 6, § 3(a). This process requires "the estimation of the Litigation Settlement Trust Claims by the Bankruptcy Court in these Bankruptcy Cases pursuant to Sections 502(c) and 105 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules of Procedure." Ex. 3, pg. 5. And the PSA terminates if "[t]he relevant court remands the Litigation Claims and lifts the automatic stay to allow the State Court to proceed to Judgment." Ex. 3, pg. 14, § 8(xiii).  Read together, the clear intent of the bankruptcy is to rob the victims of any ability to have their case resolved by a state court, regardless of the delay that may result.

26.     The requirement that this Court estimate the claims ignores the statutory limitations on claims-estimation procedures for at least three reasons.  First, the plain language of 11 U.S.C. § 502(c) provides that the Court's ability to estimate claims only applies in situations of "undue delay to the administration of the case."  Given that the Heslin/Nelson trial would have already been underway, the cause of any undue delay is the Debtors, Jones, FSS, and this bankruptcy.  The Court should not reward parties with unclean hands by allowing them to benefit from the very delay they caused.  Moreover, had the trial gone forward, it could have served as a test case that would have

---

[5] The filing of a nonsuit extinguishes a case or controversy from the moment it is filed. *Univ. of Tex. Med. Branch at Galveston v. Estate of Blackmon*, 195 S.W.3d 98, 100 (Tex. 2006). The only requirement is the mere filing of the nonsuit with the clerk of the court. *Id.*

[6] In an apparent effort to cure the deficiency, Jones and FSS later joined the removal notice.  *Heslin v. Jones*, AP No. 22-01023, at Docket No. 6.

010338

assisted in either the process of estimating the other victim's claims.  But the Debtors, Jones, and FSS robbed the Court and all of the victims of this important piece of information.  Worse yet, the PSA would handcuff this Court from lifting the stay and remanding the case to determine what a jury would award.[7]  *See* Ex. 3, pg. 14, § 8(xiii).  Second, 28 U.S.C. § 157(b)(2)(B) limits the Court's authority in determining "the liquidation or estimation" of personal-injury tort claims.  This means that, at a minimum, any estimation of claims will require the intervention of the District Court, which will further lead to delay.  Third, § 502(c) only provides for mandatory estimation where the associated delay in liquidation is "undue."  *E.g., In re Dow Corning Corp.*, 211 B.R. 545, 563 (E.D. Mich. 1997).  It is difficult to comprehend how any delay associated with a trial on the merits would be "undue" given: (a) the importance of preserving the victims Seventh Circuit right to a trial by jury, and (b) the fact that the trials were all scheduled to occur by August of 2022.[8]

27.    This Court should not condone such gamesmanship from the Debtors, Jones, and FSS.  Had these parties truly been interested in assuring payment in full of all claims, they could have allowed the state court proceedings to advance to trial, determine the total pool of damages suffered by all of the victims, and then filed bankruptcy petitions if the judgement debtors' assets were insufficient to satisfy the judgments.  Instead, Jones has orchestrated a bankruptcy proceeding designed to evade facing any jury, minimize damages, and limit any transparency into his finances and wherewithal to pay judgments against him and his companies.

---

[7] "Neither the Code nor the Rules prescribe any method for estimating a claim, and it is therefore committed to the reasonable discretion of the court, . . . which should employ whatever method is best suited to the circumstances of the case." *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996); *see also, In re Continental Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993) (holding that a bankruptcy court's estimation of an unliquidated claim "may be disturbed on appellate review only in the event of an abuse of discretion.").  Here, the best and most efficient way to determine the value of the claims to proceed to trial.

[8] Notably, both the Heslin/Lewis and Pozner/De La Rosa (*i.e.,* the Sandyhook Families) trials would have been completed well within the 120-day period following the Petition Date.  The Fontaine trial would have commenced shortly after.

## VI.   THE DEBTORS' BAD FAITH IS FURTHER CONFIRMED BY THEIR SEEKING BANKRUPTCY RELIEF AS SUBCHAPTER V DEBTORS.

28.     That this bankruptcy was filed in bad faith is further settled by the Debtors' own bankruptcy petitions, which prove they do not qualify to proceed under Subchapter V. As the Connecticut Motion establishes, the Debtors are not debtors under Subchapter V because they are not "engaged in commercial or business activities."  Indeed, the Debtors' proposed chief restructuring officer, Marc Schwartz, declared under oath that the Debtors do not engage in such activities based on his investigation.  Ex. 1, ¶ 8. And at the first-day hearing, Schwartz doubled-down on this when questioned by the Court. Ex. 2, 50:13-20.

29.     Schwartz's testimony is consistent with what InfoWars has said all along in the defamation cases. For example, InfoWars represented to the state court in pleadings that it does not do anything: "In fact, there will be no evidence that Infowars LLC does anything. Infowars, LLC has no operations, no employees, and no assets, and Infowars LLC and Free Speech Systems have not integrated their resources to 'achieve common business purpose.'"[9] Even InfoWars's corporate representative and current trustee, Rob Dew, could not identify its business purpose:[10]

---

[9] *Defendants' Response to Plaintiff's Motion to Compel and for Sanctions*, Case No. D-1-GN-18-001605, Ex. 4, ¶8.

[10] *Excerpt from Deposition of Rob Dew as Corporate Representative of InfoWars, LLC*, Case No. D-1-GN-18-006623, Ex. 5, at 15:12–22.

010340

```
12        Q.   I'm not trying to trick you.  If you don't
13   know, you don't know.  I'm just trying to figure out
14   what you do know.  Okay.
15             The business purpose of InfoWars, LLC, what is
16   it?
17        A.   I don't know.
18        Q.   Okay.  Why was it created?  By "it," why was
19   InfoWars, LLC, created?
20        A.   I don't know.
21        Q.   How does InfoWars, LLC, make money?
22        A.   I don't know.
```

InfoWars even clarified in an interrogatory response that it "does not generate revenue."[11] In another interrogatory response, it clarified that "Infowars, LLC has no office."[12] And in response to an interrogatory to describe its business purpose, InfoWars responded, "None, other as described in Texas Secretary of State filings."[13] The reality is that the Debtors, especially InfoWars, do not engage commercial or business activities.

30.    This Court recently analyzed what sort of activities make someone a debtor under Subchapter V in its *Steam Energy* opinion. *See In re Port Arthur Steam Energy*, L.P., 629 B.R. 233, 235–39 (Bankr. S.D. Tex. 2021). In doing so, it cited to several factors that showed the debtor there engaged

---

[11] *Defendant InfoWars, LLC's Responses to Plaintiff's Interrogatories, Requests for Admissions, and Requests for Production of Documents*, Case No. D-1-GN-18-006623, Ex. 6, at pg. 2, Interrogatory No. 3.

[12] Ex. 6, at pg. 3, Interrogatory No. 5.

[13] Ex. 6, pg. 2, Interrogatory No. 2.

in business or commercial activities—none of which are present here.[14]  Given that the Connecticut Motion already spotlighted these differences between the debtor in that case and the Debtors here, the Texas Litigation Plaintiffs will not regurgitate that analysis. That analysis, however, settles that the Debtors do not engage in the types of business or commercial activities that trigger the definition of a debtor under Subchapter V.

31.     Perhaps that's why the Debtors resort to rejected caselaw in their motion to massage themselves into debtor status. Citing *In re Wright*, *In re Bonert*, and *In re Blanchard*, the Debtors argue in their briefing that the "majority" view is that the debtor need not be currently engaged in business or commercial activities to be debtors. ECF No. 31, at 8–9. Based on this "majority" view, the Debtors insist that they can qualify as Subchapter V debtors based on the business and commercial activities they engaged in before the bankruptcy filing. ECF No. 31, at 8–9. But this argument fails for two reasons.

32.     First, the actual majority view is that a Subchapter V debtor must be presently engaged in business or commercial activities on the petition date to qualify as a debtor. What the Debtors failed

---

[14] *Compare In re Port Arthur Steam Energy*, L.P., 629 B.R. at 235–39 (citing facts that the company was managed by two principles under a management agreement, litigating a multi-million-dollar lawsuit as a plaintiff, pursuing collection remedies on outstanding account receivables, actively maintaining its facilities and vehicles, actively working on a plan to sell its assets, and filed tax returns as required by state and federal agencies) (citing *In re Johnson*, 2021 WL 825156 (Bankr. N.D. Tex. 2021)) *with* ECF Nos. 1, at 10–11 (showing Debtors undertake no business activities; do not sell, rent, or lease anything; have no bank accounts and do not pay money to anyone for any reason, have no debt or other liabilities besides the pending litigation, and have no financial statements or books and do not file tax returns).

010342

to mention is that most cases have rejected *Wright*, *Bonert*, and *Blanchard*.[15]   And it was for good reason. The holdings in *Wright*, *Bonert*, and *Blanchard* were based solely on an analysis by the treatise, COLLIER ON BANKRUPTCY.[16]   But as the *In re Ikalowych* court noted, the treatise was later revised to remove the very passage relied upon by the Wright court. *In re Ikalowych*, 629 B.R. at 282–83 ("In other words, the treatise authors changed their minds and no longer argue against a temporal restriction as of the Petition Date."). Even setting that about-face aside, this Court has already sided with the true majority in the *Steam Energy* opinion. "The Court agrees with cases holding that 'engaged in' commercial or business activities means a debtor was actively participating in one of these activities on the petition date." *In re Port Arthur Steam Energy, L.P.*, 629 B.R. at 236. Indeed, the Debtors noted this Court's position in their own bench memo. ECF No. 31, at ¶ 16. The Debtors knew when they filed their petition and bench memo that they had to be engaged in commercial or business activities on the petition date to be Subchapter V debtors. Still, they argued that their past activities qualified. Because such activities do not, the Debtors cannot invoke relief under Subchapter V.

---

[15] *See, e.g.,  In re Blue*, 630 B.R. 179, 189–90 (Bankr. M.D.N.C. 2021) (rejecting the "Wright-Bonert-Blanchard line of cases" and noting that "The majority of recent cases to examine the issue require subchapter V debtors to be presently engaged in business or commercial activities."); *In re McCune*, 635 B.R. 409, 420 (Bankr. D.N.M. 2021) ("While some cases hold that § 1182 does not require a debtor to be engaged in commercial or business activities on the petition date, [t]he majority of recent cases to examine the issue require subchapter V debtors to be presently engaged in business or commercial activities.") (cites and quote omitted); *In re Ikalowych*, 629 B.R. 261, 282 (Bankr. D. Colo. 2021) (rejecting *Wright. Bonert*, and *Blanchard* in part because none engaged in a statutory analysis of the plain language and "more persuasive subsequent case law construes the "engaged in" phrase as applying to the circumstances as of the Petition Date"); *In re Thurmon*, 625 B.R. 417, 421 (Bankr. W.D. Mo. 2020) (rejecting *Wright. Bonert*, and *Blanchard* and holding that the debtor must be engaged in business or commercial on the petition date); *In re Rickerson*, 636 B.R. 416, 424–25 (Bankr. W.D. Pa. 2021) (rejecting *Wright. Bonert*, and *Blanchard* as unpersuasive and agreeing that a Subchapter V debtor must be presently engaged in commercial or business activities).

[16] *See In re Ikalowych*, 629 B.R. 261, 282 (Bankr. D. Colo. 2021) (stating that "the *Wright* court did not actually engage in a statutory interpretation exercise and did not explain its rationale.  Instead, it simply quoted a passage from a bankruptcy treatise . . ." and noting *Bonert* and *Blanchard* "endorsed the *Wright* court's approach without any judicial analysis").

010343

33.     Second, even if past activity sufficed, the Debtors here engaged in no past business or commercial activities. The Debtors flaunt two past activities that, in their view, make them Subchapter V debtors. One of those activities are actions taken to prepare for bankruptcy—like retaining bankruptcy counsel and a CPA firm. Of course, many of these activities only spotlight the Debtors' bad faith. The testimony at the first-day hearing, for example, established that they moved their supposed business from Austin to Victoria in early April—despite swearing that for the past 180 days, they principally operated in Victoria:[17]

> **11. Why is the case filed in *this district*?**
>
> Check all that apply:
>
> ☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

ECF Nos. 1, at 3. Even setting aside this wholly inaccurate statement, these types of activities are not business or commercial activities. After all, virtually all petitioners engage in activities to prepare for bankruptcy. If preparing for bankruptcy alone sufficed, then Subchapter V's requirements that the debtor engage in business or commercial activities would be meaningless.

34.     The other past activity the Debtors cite is obtaining and holding intellectual property. But there is no evidence that the Debtors actually own and hold any intellectual property. As the Connecticut Motion notes, the US Patent Office shows that FSS owns the Infowars name—not InfoW. ECF No. 36, at ¶ 27 (citing See https://www.uspto.gov/trademarks/search). This is consistent with what InfoWars represented in state court before petitioning for bankruptcy: "Plaintiff is trying to paint a picture that Infowars LLC handles intellectual properties on the Infowars.com website. This allegation is inaccurate and misleading." Ex. 4, ¶ 11. But even if that were not true, the admissions by InfoWars, in both the litigation and through Schwartz's declaration and testimony,

---

[17] Although the Court may find that the question of domicile ultimately has no legal effect on where the Debtors could file, the misstatement in the petitions is still relevant to the question of good faith.

010344

establish that they were not using the intellectual property to conduct any business or commercial activities.

35.     As the Debtors rightly acknowledged in their briefing, the purpose of Subchapter V is to help small businesses reorganize their liquidated debts so they can swiftly return to business. See ECF No. 31, at ¶ 10. But the Debtors here have no business to return to. As of the petition date, they conducted no commercial or business activities. And none of their debts comprise of the types of liquidated debts a qualifying small business would incur from engaging in commercial and business activities. Simply put, there's no business here to reorganize. That the Debtors nonetheless sought relief under a Subchapter V reorganization plan only evidences that his bankruptcy was filed in bad faith. The Court should dismiss it.

## CONCLUSION

For these reasons, and the reasons set forth in the Connecticut Motion, the Texas Litigation Plaintiffs respectfully request that this Court (a) dismiss the Debtors' cases with prejudice; and (b) grant such other and further relief as the Court deems appropriate.


Dated: April 27, 2022                           Respectfully submitted,

                                               THE BEATTY LAW FIRM PC

                                               By: /s/ J. Maxwell Beatty
                                               J. Maxwell Beatty
                                               State Bar No. 24051740
                                               max@beattypc.com
                                               1127 Eldridge Pkwy
                                               Suite 300, #383
                                               Houston, Texas 77077
                                               Tel. 832-529-3381
                                               Fax. 832-852-1266

                                               -AND-

010345

**McDowell Hetherington LLP**

By: */s/ Avi Moshenberg*
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
1001 Fannin Street, Suite 2700
Houston, Texas 77002
Tel. 713-337-5580
Fax. 713-337-8850

*Counsel for the Texas Litigation Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that, on April 27, 2022, a copy of the foregoing motion was served on all parties registered to receive such service via the Court's ECF system.

*/s/ J. Maxwell Beatty*
J. Maxwell Beatty

010346

EXHIBIT
1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

In re:　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
INFOW, LLC　　　　　　　　　　　　）　Case No. 22 - _____
　　　　　　　　　　　　　　　　　　）
　　　　　　Debtor.　　　　　　　　）　Chapter 11 (Subchapter V)

**DECLARATION OF W. MARC SCHWARTZ REGARDING**
**BANKRUPTCY CODE § 1116(1) REQUIREMENTS**

I, W. Marc Schwartz, hereby declare as follows:

1.　　　My name is W. Marc Schwartz.

2.　　　I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters.  The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

3.　　　SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services   My firm represents individuals, companies and courts in a variety of assignments including as Chief Restructuring Officers, financial advisers, trustees and examiners in bankruptcy matters; working as testifying or consulting experts on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as court appointed receivers in state and federal courts.

4.      I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

5.      I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state law.

6.      I was retained as of April __, 2022 by the Trustee of the Litigation Settlement Trust formed by InfoW, Inc. ("InfoW"), IWHealth, LLC ("IWH") and Prison Planet TV, LCC ("PTV", and together with the InfoW, IWH, and PTV, the "Debtors") as the Debtors' Chief Restructuring Officer.

7.      Since my retention, I have met with Bob Roe, a CPA retained to delve into the books of account of various entities affiliated with the Debtors and assist those entities to prepare accurate financials statements which could be relied upon by the reader to accurately reflect the financial condition and activities of the entities. I have also met with counsel for the Debtors and Mr. Jones to obtain an understanding of the Debtors' operations. I have also reviewed lists of assets owned by the Debtors.

8.      I have learned that the Debtor's have no purpose other than to hold assets which may be used by other entities. They undertake no business activities, they do not sell, rent or lease to others anything. Their assets do not generate any income for them. They have no bank accounts and do not pay money to anyone for any reason. They have no debt or other liabilities other than those related to pending or potential litigation. For

2

these reasons, they have no financial statements or books of account and they do not file income tax returns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: ___04/18/2022_____    By: _____
                                                       W. Marc Schwartz

010349

EXHIBIT
2

```
 1                   UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        VICTORIA DIVISION

 3                                  )  CASE NO: 22-60020-CML
                                    )
 4   INFOW, LLC,                    )  Victoria, Texas
                                    )
 5            Debtor.               )  Friday, April 22, 2022
                                    )
 6   ------------------------------ )  9:00 a.m. - 10:49 a.m.
                                    )
 7                                  )  CASE NO: 22-60021-CML
                                    )
 8   IWHEALTH, LLC,                 )
                                    )
 9            Debtor.               )
                                    )
10   ------------------------------ )

11                               TRIAL

12        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
13

14   APPEARANCES:

15   For the Debtors:          KYUNG SHIK LEE
                               R.J. SHANNON
16                             Parkins Lee & Rubio LLP
                               Pennzoil Place
17                             700 Milam Street
                               Suite 1300
18                             Houston, TX 77002

19   For the U.S. Trustee:     JAYSON B. RUFF
                               HA MINH NGUYEN
20                             Office of the United States Trustee
                               515 Rusk Street
21                             Suite 3516
                               Houston, TX 77002
22
     For Proposed Litigation   MATTHEW OKIN
23   Settlement Trustees:      DAVID CURRY
                               Okin Adams
24                             1113 Vine Street
                               Suite 240
25                             Houston, TX 77002
```

```
 1   For Neil Heslin et al:    JON MAXWELL BEATTY
                               The Beatty Law Firm PC
 2                             935 Bayou Parkway
                               Houston, TX 77077
 3
                               CLIFFORD HUGH WALSTON
 4                             Walston Bowlin, LLP
                               4299 San Felipe Street
 5                             Suite 300
                               Houston, TX 77027
 6
     Sub Chapter V Trustee:    MELISSA A. HASELDEN
 7                             Haselden Farrow PLLC
                               Pennzoil Place
 8                             700 Milam
                               Suite 1300
 9                             Houston, TX 77002

10   For David Wheeler et al:  RYAN E. CHAPPLE
                               Cain & Skarnulis PLLC
11                             303 Colorado Street
                               Suite 2850
12                             Austin, TX 78701

13                             RANDY W. WILLIAMS
                               Byman & Associates PLLC
14                             7924 Broadway
                               Suite 104
15                             Pearland, TX 77581

16                             ALINOR STERLING
                               CHRISTOPHER M. MATTEI
17                             Koskoff Koskoff & Bieder
                               350 Fairfield Avenue
18                             Suite 501
                               Bridgeport, CT 06604
19
     For the Trustee:          RAYMOND WILLIAM BATTAGLIA
20                             Law Offices of Ray Battaglia, PLLC
                               66 Granburg Circle
21                             San Antonio, TX 78218

22   Interested Party:         Shelby A Jordan
                               Jordan & Ortiz, PC
23                             500 N Shoreline
                               Suite 900 N
24                             Corpus Christi, TX 78401

25
```

010351

```
1   Also Present:            MARC SCHWARTZ, CRO
                             RICHARD SCHMIDT
2
    Court Reporter/Deputy:   Kimberly Picota
3
    Transcribed by:          Veritext Legal Solutions
4                            330 Old Country Road, Suite 300
                             Mineola, NY 11501
5                            Tel: 800-727-6396

6

7
    Proceedings recorded by electronic sound recording;
8   Transcript produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2          <u>VICTORIA, TEXAS; FRIDAY, APRIL 22, 2022 9:00 AM</u>

3                        (Call to Order)

4          THE COURT:  Good morning, everyone.  This is Judge

5   Lopez.  Today is April 22nd.  I'm going to call the nine

6   a.m. case, which is essentially first-day hearings in InfoW

7   LLC, IWL -- it should be IWHealth LLC, and Prison Planet TV

8   LLC.

9          There are a number of folks on the line, and I'm

10  going to try to keep the line unmuted, just see how that

11  goes.  We have a feature where I can mute the entire line,

12  and I'm going to try to avoid that.  But if I end up doing

13  it, I will give everyone plenty of notice and you will have

14  to hit five-star if you wish to be heard.

15         I'm going to just ask everyone to please put your

16  phone on mute right now until your case is called.  And I

17  hear a lot of back noise.  I'm just going to turn the

18  feature on.  So I'm asking everyone just please take a look

19  at your phone and please keep it on mute.  When it is time

20  to speak, I will call on you and you are able to speak.

21  Let's see how this goes.

22         Let me start off by taking appearances.  And why

23  don't I start in the courtroom.  Who is here on behalf of

24  the Debtors?

25         MR. LEE:  Good morning, Your Honor.  Kyung Lee, K-

1    royalty interest before?  Like let's just say with in the 90

2    days before the filing?

3              MR. SCHWARTZ:  Well...

4              THE COURT:  Go ahead.  I'll tell you why I'm

5    asking.  I don't want you to be confused by my question.

6    You mentioned that there was a direct pay at some point, and

7    then you stopped.  Or you stepped in and said no, it's got

8    to go directly to IW health, the royalty payment.  What was

9    the pre-bankruptcy arrangement before you...

10             MR. SCHWARTZ:  Pre-bankruptcy, the royalty was

11   sent to Alex Jones directly, his personal bank account.

12             THE COURT:  Okay, thank you.

13             MR. SCHWARTZ:  And I discovered that

14   (indiscernible) that was a Monday.  Because that's when I

15   went to Austin.  So prior to that date, it was not receiving

16   any royalty..

17             THE COURT:  Okay.  And then there's one more.

18   Prison Planet TV LLC.

19             MR. SCHWARTZ:  Prison Planet owns a number of

20   videos that were produced and developed by Alex Jones'

21   enterprise.  I think eight, 10, 12 or something like that.

22   There's a list of them.

23             THE COURT:  Aside from own them, what does it do?

24   It just owns them?

25             MR. SCHWARTZ:  It's similar to...

010354

1          THE COURT:  InfoW?

2          MR. SCHWARTZ:  InfoW.  It just owns them.

3          THE COURT:  How much cash do you think it held on

4    the petition date?

5          MR. SCHWARTZ:  It held zero.

6          THE COURT:  It held zero.  Within the 90-day

7    period before the petition date, was it generating any

8    income?

9          MR. SCHWARTZ:  The 90 days before -- so just like

10   InfoW, owned by Alex Jones a hundred percent.  And half of

11   its assets were used (indiscernible) FSS.  It was not

12   anything for that use.

13         THE COURT:  Okay.  Okay.  I guess I can ask you

14   and I can ask Mr. Lee.  And I think Mr. Lee has already

15   asked the question.  What do you believe the purpose of

16   these Chapter 11 cases is?

17         MR. SCHWARTZ:  The purpose?  The purpose is to

18   arrange to pay all of the plaintiffs the amount of their --

19   let's say in a bankruptcy sense, their allowed claim in

20   full.  That's the purpose.

21         THE COURT:  So when the pleadings talk about

22   paying it in full, you are referring to a defined term in

23   the trust agreement that basically says whatever the court -

24   - whatever is allowed in the bankruptcy case, the amount of

25   that claim.

```
 1              MR. SCHWARTZ:  Yes.
 2              THE COURT:  Okay.  Does that contemplate payments
 3    -- does the settlement then contemplate just the Debtors or
 4    will it include a global settlement including the non-
 5    debtors that you've described earlier?
 6              MR. SCHWARTZ:  It includes the -- specially Alex
 7    Jones and FSS.
 8              THE COURT:  Okay.
 9              MR. SCHWARTZ:  Because they are the source of the
10    funds to make the payment.
11              THE COURT:  Okay.  Mr. Schwartz, I will tell you,
12    there was a motion set for you for today.  It sounds like
13    it's not going forward.  I think those are all the questions
14    that I have for you.  I think that is what is customary on a
15    first day I think to just ask, get a general understanding.
16    Are you aware of anything else in connection with the
17    bankruptcy case itself that you think I should know at this
18    time in terms of what may be coming?
19              Typically -- and I'm just saying this for folks
20    who are listening.  It's very typical for a bankruptcy judge
21    to ask at the beginning of a case what might I expect in the
22    short-term future.  I've been told by some folks they are
23    going to file a motion, and I'll take them up.  And maybe
24    this is a question for Mr. Lee.  What may I expect in the
25    short near-term.
```

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 27, 2022
```

010357

EXHIBIT
3

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, the "Agreement") is made and entered into as of April 14, 2022 by and among the following parties (each individually a "Party" and collectively referred to as the "Parties"):

(a)     Free Speech Systems, LLC, a Texas limited liability company ("FSS);

(b)     Alex E. Jones, an individual residing in Texas ("AJ");

(c)     InfoW, LLC,[1] a Texas limited liability company ("IW");

(d)     InfoHealth, LLC,[2] a Texas limited liability company ("IWH"); and

(e)     Prison Planet TV, LLC, a Texas limited liability company ("PTV").

## RECITALS

WHEREAS, IW, IWH and PTV (collectively the "Debtors" and each individually a "Debtor") intend to commence voluntary reorganization cases (the "Bankruptcy Cases") under subchapter V of chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court") to affect the resolution and payment of certain claims and litigation claims through one or more chapter 11 plan(s) of reorganization;

WHEREAS, the Debtors have determined that it would be in their best interests and the interest of their creditors to implement a restructuring of their indebtedness and other obligations through the prosecution of the Bankruptcy Cases under the exclusive control of trustees to be approved by the Bankruptcy Court and funded by AJ and FSS (collectively the "Third-Party Funding Contributor[s]") as herein provided;

WHEREAS, the Parties have agreed on the terms of this Agreement and the elements of a proposed chapter 11 plan(s) for the Debtors, each as may be amended, modified, or supplemented from time to time, including any schedules and exhibits attached thereto, in each case, in accordance with the terms hereof (the "Plan");

WHEREAS, subject to the terms hereof and appropriate approvals of the Bankruptcy Court, as may be required, the following sets forth the agreement among the Parties concerning their respective obligations in connection with the Plan(s) and the Bankruptcy Cases.

---

[1]     Formerly known as InfoWars, LLC

[2]     Formerly known as InfoWars Health, LLC

010358

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

### Section 1        CERTAIN DEFINITIONS

Applicable definitions contained in (i) the Bankruptcy Code; and (ii) the Litigation Settlement Trust (and associated documents) are incorporated into this Agreement except as modified in this Section 1 or except as conflicting with the defined the terms herein. The following definitions shall have the meanings as specified herein, and shall be designated, when such special definitions are applicable, with capital letters, and these definitions shall be enforceable as terms of the Agreement in conjunction with the respective matters to which they reference or define.

***"Allowed"*** or ***"Allowed Claim"*** means a Litigation Settlement Trust Claims or Claim that is allowed: (i) in any stipulation executed by the Debtor (or the Litigation Settlement Trustees after the Confirmation Order becomes a Final Order), the Third-Party Funding Contributors and the holder of the Litigation Settlement Trust Claim; (ii) in a Final Order; or (iii) pursuant to the terms of the Plan.

***"Approved Plan Documents"*** means those agreements and documents executed and or submitted in conjunction with the Plan or as a supplement to the Plan which have been approved by the Third-Party Funding Contributors.

***"Bankruptcy Cases"*** means collectively or individually the cases filed by the Debtors pursuant to 11 U.S.C. §1101, *et seq*.

***"Bankruptcy Code"*** means title 11 of the United States Code.

***"Confirmation Order"*** means the order of the Bankruptcy Court confirming the Plan(s) pursuant to section 1191 of the Bankruptcy Code.

***"Debtor"*** or ***"Debtors"*** shall refer individually and collectively to InfoW, LLC (XXXX), InfoHealth, LLC (XXXX), and Prison planet TV, LLC (XXXX), including any and all affiliated, predecessor, successors, assigns, agents, employees, partners, attorneys, representatives, administrators, investigators, consultants and other persons, acting or purporting to act on behalf of any of the above entities.

***"Definitive Documents"*** means, with respect to the Plan(s), all material documents (including any related Bankruptcy Court orders, agreements, schedules, pleadings, motions, filings, or exhibits) that are contemplated by this Agreement and that are otherwise necessary or desirable to implement the Plan(s) and this Agreement, including (as applicable): (i) the Plan(s); (ii) Disclosure Statement(s) if ordered by the Bankruptcy Court; (iii) any other operative documents and/or agreements relating to the Plan(s) (including any documents necessary to implement the distributions contemplated thereunder); (iv) the Confirmation Order.

***"Effective Date"*** means April 8, 2022.

*"Final Order"* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

*"Litigation"* means pending civil lawsuits, including but not limited to the following:

Marcel Fontaine vs. Alex E., Jones, Infowars, LLC, Free Speech Systems, LLC and Kit Daniels, Cause No. D-1-GN-18-001605 in the 459th Judicial District Court of Travis County, Texas;

Neil Heslin vs. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835 in the 261st Judicial District Court of Travis County, Texas;

Veronique de la Rosa and Leonard Pozner vs. Alex E. Jones, Inforwars, LLC, and Free Speech Systems, LLC, Cause No. D-1-GN-18-001842 in the 345th Judicial District Court of Travis County, Texas;

Scarlett Lewis vs. Alex E. Jones, Inforwars, LLC, Free Speech Systems, LLC and Owen Shroyer, Cause No. D-1-GN-18-006623 in the 98th Judicial District Court of Travis County, Texas;

Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046437-S in the Superios Court of Connecticut, Waterbury Division;

010360

William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046438-S in the Superios Court of Connecticut, Waterbury Division; and

Brennan M. Gilmore v. Alexander ("Alex") E. Jones, Infowars, LLC, Free Speech Systems, LLC, Lee Stanahan, Lee Ann McAdoo a/k/a Lee Ann Fleissner, Scott Creighton, James ("Jim") Hoft, Allen B. West, Derrick Wilburn, Michelle Hickford, and Words-n-Ideas, LLC, Cause No. 3:18-cv-00017-GEC in the United States Districrt Court for the Western District of Virginia, Charlottesville Division;

together with any other pending lawsuits against any of the Parties on the Effective Date of this Agreement (collectively, the "Litigation Claims").

***"Initial Trust Funding"*** means $725,000 in cash funded to the Litigation Settlement Trust by AJ from his Exempt property upon the Effective Date of this Agreement to pay the costs of administration of the Debtors' Bankruptcy Cases and the Litigation Settlement Trust, including retention of the Litigation Settlement Trustees and retention by the Trustees of all professionals deemed necessary to accomplish the purpose of this Trust and the commitment of the Third-Party Funding Contributors to maintain for not less than 120 days after the Petition Date a balance of $200,000 after payment of all initial administrative expense retainers to newly appointed Litigation Settlement Trustees and as the only members of the Debtors acting as independent Members, together with the Debtors' professionals from time to time, to be paid directly, or thereafter maintained in the Litigation Settlement Trust for continued payment of the costs of Administration of the Litigation Settlement Trust and the Debtors' Bankruptcy Cases.

***"Litigation Settlement Trust"*** means the 2022 Litigation Settlement Trust dated effective April 1, 2022 for the benefit of the Debtors' as provided therein, including that Third-Party Funding Contributor[s] intended to facilitate and underwrite the "Payment in Full" Plan Class of Allowed Litigation Settlement Trust Claims and the Litigation Settlement Trust Beneficiaries Litigation Settlement Trust Claims, as may exist from time to time and as may be funded by the Third-Party Funding Contributors for this purpose from time to time to achieve Payment in Full.(s).

***"Litigation Settlement Trustees"*** means two individuals approved by the Bankruptcy Court to serve as Trustees of Litigation Settlement Trust who will replace the interim trustee serving in that capacity prior to the filing of the Bankruptcy Cases.

***"Litigation Settlement Trust Claims Bar Date"*** means the bar date for filing Claims or Litigation Claims in the Bankruptcy Cases established by Order of the Bankruptcy Court;

***"Litigation Settlement Trust Claims"*** means the Claims of any party arising out of or related to the Litigation Claims and evidenced by a proof of claim timely filed in the Debtors' Chapter 11 case(s).

010361

"*Litigation Settlement Trust Claims Estimation*" means the estimation of the Litigation Settlement Trust Claims by the Bankruptcy Court in these Bankruptcy Cases pursuant to Sections 502(c) and 105 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules of Procedure.

"*Litigation Settlement Trust Beneficiary*" Means the holder of a Litigation Settlement Trust Claim.

"*Litigation Trust Expenses*" means all costs, expenses and professional fees incurred by the Litigation Settlement Trust and the Litigation Settlement Trustees during the Support Period, specifically including, but not limited to the allowed fees and expenses of the Debtors and their professionals incurred in connection with the prosecution of the Bankruptcy Cases and those incurred after the Plan Effective Date, approved by the Litigation Settlement Trustees.

"*Petition Date*" means the date  upon which the earliest of the Debtors' Bankruptcy Cases was commenced as a voluntary bankruptcy case.

"*Plan(s)*" or "*Plan(s) of Reorganization*" means the chapter 11 plan(s) to be jointly proposed by the Debtors supported by the Third-Party Funding Contributors in each of the Bankruptcy Cases, that contains the same terms set forth in, and is otherwise materially consistent with this Agreement and that is an Approved Plan Document, as the same may be amended, supplemented, or otherwise modified as provided herein.

"*Plan Effective Date*" means the date on which the Plan, as confirmed, becomes effective, as defined therein.

"*Support Period*" means, with respect to any Party, the period commencing on the later of (a) the Agreement Effective Date and (b) the Petition Date and ending on the date on the earlier of (i) 180 days following the commencement date and (ii) termination of  this Agreement, *provided* however that if a Confirmation Order is entered, then on and after the Effective Date the Support Period shall remain in effect for the earlier of not less than 5 years from the Plan Effective Date or until Payment in Full, or full liquidation of all available assets in the Litigation Settlement Trust, which ever first occurs.

> ### Section 2       The Plan(s) and the Litigation Settlement Trust Claims Estimation

The Parties agree that as soon as practical after the Petition Date, and during the Support Period that they will

> (i)       promptly file a Motion to set a Litigation Settlement Trust Claims Bar Date;

> (ii)       promptly file a Motion to Estimate all Litigation Settlement Trust Claims pursuant to Section 502(c) to determine for all purposes, except, allowance of the amount of all Litigation Claims, and shall set an Estimation Protocol to initiate and conduct such estimations.

(iii)    promptly initiate the protocol for settlement negotiations of the allowed amounts of all Litigation Settlement Trust Claims, the Plan treatment, and all related issues and matters toward a Plan Confirmation of a "Payment in Full" Plan; and

(iv)    promptly initiate and negotiate the Definitive Documents in good faith, and such Definitive Documents will be materially consistent in all respects with this Agreement, and otherwise in form and substance reasonably acceptable to the Parties, and that, upon execution, the terms and conditions set forth in this Agreement are not subject to further negotiation or change. Notwithstanding anything to the contrary herein, in no event shall the Plan or the Definitive Documents (x) increase or decrease directly or indirectly the settlement consideration or otherwise require any amount to be payable, directly or indirectly, by the Third-Party Funding Contributors or (y) change the conditions precedent for funding by the Third-Party Funding Contributors. If the Plan and the Definitive Documents satisfy the criteria in this Section 2, they will be considered the "Approved Plan Documents." This provision, however, is not intended in any way to abrogate, abridge or affect in any way the fiduciary duties and obligations of the Debtors.

**Section 3    Joint Agreements**

During the Support Period, the Parties agree to the following:

(a)    The Debtors and the Litigation Settlement Trust along with the Third-Party Funding Contributors shall jointly file and prosecute a motion to establish (x) a Litigation Settlement Trust Claims Bar Date, (y) a Litigation Settlement Trust Claims Estimation protocol, and (z) the Plan(s).

(b)    Each Party agrees to (i) support and take all reasonable actions necessary to facilitate the confirmation, implementation and consummation of, the Plan and (ii) not take any action that is inconsistent with the implementation or consummation of this Agreement or the Plan.

(c)    No Party shall:

(i)    object to, delay, or take any other action to interfere, directly or indirectly, in any respect with acceptance or implementation of the Plan(s), nor encourage any person or entity to do any of the foregoing;

(ii)    directly or indirectly seek, solicit, propose, file, support, encourage, or vote for any plan of reorganization other than the Plan;

(iii) take any other action, including but not limited to, initiating any legal proceeding, that is materially inconsistent with, or that would prevent or delay consummation of, the Plan; and

(iv) impede either in the Bankruptcy Court or any other court reasonable efforts to have the Plan confirmed by the Court as during the Support Period.

**Section 4    Third-Party Funding Contributor Agreements**

(a) During the Plan Support Period the Third-Party Funding Contributors shall:

010363

(i) fund the Initial Trust Funding to the Litigation Settlement Trust;

(ii) subject to execution of confidentiality agreements in a form acceptable to the Third-Party Funding Contributors, (A) deliver or cause to be delivered to the Litigation Settlement Trustees any and all documents (or copies thereof) relating to the Litigation Settlement Trust Claims, held by the Debtors, their employees, agents, advisors, attorneys, accountants, or any other professionals hired by the Debtors, and (B) provide reasonable access to the Litigation Settlement Trustees and their advisors to such employees of the Debtors, their agents, advisors, attorneys, accountants, or any other professionals hired by the Debtors with knowledge of matters relevant to the Litigation Settlement Trust Claims for the purpose of enabling the Litigation Settlement Trustees to fulfill their obligations under this Plan and the Litigation Settlement Trust, including the prosecution of the Litigation Settlement Trust Claims.

(iii) subject to execution of confidentiality agreements in a form acceptable to the Third-Party Funding Contributors or the Bankruptcy Court, upon request from the Litigation Settlement Trustees, the Third-Party Funding Contributors shall deliver current financial information, operating information, assets or account information ("Information") as reasonably needed to determine that each Third-Party Funding Contributor has the financial ability to pay Allowed Litigation Settlement Trust Claims in full, in accordance with the Plan. The Information shall be produced only under this provision, and if there is any disagreement on Information production requested, the Litigation Settlement Trustees may seek orders from any Federal Court.

(b) After the Confirmation Order becomes a Final Order and continuing until the Third-Party Funding Contributors declare that they will not Pay in Full a settlement proffered by the Litigation Settlement Trustees:

(i) From time to time thereafter, transfer to the Litigation Settlement Trust additional funds to the extent required by the Litigation Settlement Trust and the confirmed Plan to pay Litigation Trust Expenses during the Support Period.

(ii) The Plan shall provide that the Litigation Settlement Trustees shall hold a perfected lien and security interest in and to all of FSS's and all non-exempt AJ assets to secure their obligations hereunder, subject to this Section 4(b) hereof. The Litigation Settlement Trustees and the Third-Party Funding Contributors shall determine from time to time an appropriate budget for FSS to be operated properly during the Support Period and an appropriate personal budget for AJ consistent with the anticipated needs of individual contributions during the Support Period and consistent with his usual and ordinary needs. No agreed budget term or provision will waive any right to an exemption in property otherwise available to AJ and his

family.  The Third-Party Funding Contributors covenant that they shall not divert, secret, hide or hinder assets subject to this agreement, other than those available to each under the agreed budgets during the Support Period prior to termination.  In any Litigation relating to allegations of breach of this provision shall be brought exclusively in the bankruptcy court and shall entitle the Litigation Settlement Trustees to injunctive relief and costs.

(iii)    Subject to execution of confidentiality agreements in a form acceptable to the Third-Party Funding Contributors, upon request from the Litigation Settlement Trustees, the Third-Party Funding Contributors shall deliver the current financial information, operating information, assets or account information ("Information") as reasonably needed to determine that each Third-Party Funding Contributor is maintaining operations and business sufficient to not only maintain the minimum balance in the Litigation Settlement Trust, but also to pay Allowed Litigation Settlement Trust Claims in full, in accordance with the Plan.  The Information shall be produced only under this provision, and to the extent that there is any disagreement on Information production requested, the Litigation Settlement Trustees may seek orders from any Federal Court.

(iv)    In accordance with the confirmed Plan, (i) transfer $2 million to the Litigation Settlement Trust, (ii) , contribute $250,000 per quarter for 20 consecutive quarters to the Litigation Settlement Trust, and contribute additional funds to the Litigation Settlement Trust as may be requested by the Litigation Settlement Trustees and agreed to by the Third-Party Funding Contributors in writing, or pursuant to an agreed budget, from time to time in accordance with the Plan to Pay in Full Allowed Litigation Settlement Trust Claims or Allowed Claims.

**Section 5        Duration of the Agreement.**

The Agreement shall become effective on the date it is executed by all Parties, *provided*, however, that if the Agreement is not executed by the Debtors on or before 5:00 p.m. (Central Daylight Time) on April 15, 2022, or such later date as agreed by the Debtors and the Third-Party Funding Contributors (the "Expiration Date"), this Agreement shall no longer be available for acceptance by the Debtors.  The Agreement will remain in effect and be irrevocable by the Parties during the Support Period.  Upon implementation under the Plan, the Agreement shall remain in effect for not less than 5 years from the Plan Effective Date.

**Section 6        Representations and Warranties.**

(a)   The Third-Party Funding Contributors jointly and severally represent and warrant that the following statements are true, correct and complete as of the date hereof:

(viii)       Organization and Good Standing. FSS is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas.

(ix)     Authorization of Agreement.  Each of the Third-Party Funding Contributors has the requisite power and authority to execute this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by the Third-Party Funding Contributors and the consummation by the Plan of the transaction contemplated hereby has been duly authorized by FSS' managers and no other corporate proceedings on the part of the Third-Party Funding Contributors are necessary to authorize this Agreement or to consummate the transaction contemplated hereby.  This Agreement has been duly executed and delivered by the Third-Party Funding Contributors and, assuming due execution and delivery by the Debtors of this Agreement, this Agreement constitutes a valid and binding obligation of the Third-Party Funding Contributors, enforceable against the Third-Party Funding Contributors in accordance with its terms.  The Third-Party Funding Contributors are prepared to consummate this Agreement immediately upon its acceptance by the Debtors.

(x)     Due Diligence.  The Third-Party Funding Contributors have completed their due diligence, and this Agreement is not subject to a due diligence condition, *provided* that the Debtors shall continue to provide information regarding the Bankruptcy Cases and the process surrounding confirmation of the Plan(s).

(xi)     No Securities; No Third-Party Financing.  No securities are being issued and the obligation of the Third-Party Funding Contributors to perform under this Agreement is not conditioned on obtaining third-party financing.

(xii)     Financial Capability.  The Third-Party Funding Contributors have and will have upon Plan Effective Date, sufficient cash and/or cash flow available to consummate the transactions contemplated by this Agreement and the Plan.

(xiii)     No Violation; Consents.  The execution and delivery by the Third-Party Funding Contributors of this Agreement and the consummation of the transactions contemplated hereby do not and will not (1) violate any provision of the organizational documents of FSS, (2) violate any Order of any governmental authority to which the Third-Party Funding Contributors are bound or subject, (3) violate any applicable law, or (4) violate any legal agreements to which a Third-Party Funding Contributor is a party.

(xiv)     No Third-Party Approvals Required.  No regulatory or other third-party approvals, consents or filings are required to be obtained or made by the Third-Party Funding Contributors in order to consummate this Agreement, except for any such requirements, the failure of which to be obtained or made would not reasonably be expected to prevent, impede or materially delay or otherwise affect in any material respect the transactions contemplated by this Agreement.

(xv)     Bankruptcy.  There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by or, to the knowledge of the Third-Party Funding Contributors, threatened against the Third-Party Funding Contributors.

010366

(xvi)     Representation by Counsel.  The Third-Party Funding Contributors acknowledge that they have been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.

(b)   The Debtors represent and warrant that the following statements are true, correct and complete as of the date it executes this Agreement:

(ii)     Organization and Good Standing.  The Debtors are limited liability companies duly formed, validly existing and in good standing under the laws of the State of Texas.

(iii)     Authorization of Agreement.  The Debtors have the requisite limited liability company power and authority to execute this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by the Debtors and the consummation by the Debtors of the transaction contemplated hereby have been duly authorized by the managers of the Debtors and no other limited liability company proceedings on the part of the Debtors are necessary to authorize this Agreement or to consummate the transaction contemplated hereby.  This Agreement has been duly executed and delivered by the Debtors and, assuming due execution and delivery by the Third-Party Funding Contributors, this Agreement constitutes a valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms.

(iv)     No Violation; Consents.  The execution and delivery by the Debtors of this Agreement and the consummation of the transactions contemplated hereby do not and will not (1) violate any provision of the organizational documents of the Debtors, (2) violate any Order of any governmental authority to which the Debtors are bound or subject, or (3) violate any applicable law.

(v)     No Third-Party Approvals Required.  Other than approval of the Bankruptcy Court, no order or permit issued by, or declaration or filing with, or notification to, or waiver from any governmental authority is required on the part of the Debtors in connection with the execution and delivery of this Agreement, or the compliance or performance by the Debtors with any provision contained in this Agreement, except for any such requirements, the failure of which to be obtained or made would not reasonably be expected to prevent, impede or materially delay or otherwise affect in any material respect the transactions contemplated by this Agreement.

(vi)     Representation by Counsel.  The Debtors acknowledge that they have been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.

(vii)     Binding on Debtors in Possession and Reorganized Debtors. This Agreement shall become binding on the Debtors in Possession and the Reorganized Debtors upon the Bankruptcy Court approving the Agreement on a standalone basis or as the terms of the Agreement may be contained and incorporated into a Plan and a confirmation order approving this Agreement.

(viii)     The obligations and rights of the Third-Party Funding Contributors shall be as set out in the Litigation Settlement Trust and this Agreement and in the event of

Plan Support Agreement                        Page 10

a conflict among such terms of either agreements, the Litigation Settlement Trust shall control.

**Section 7        Covenants.**

(a)        Access to Information.  The Debtors covenant and agree that prior to the Plan Effective Date and prior to termination of this Agreement pursuant to Section 8 hereof, the Debtors will permit the Third-Party Funding Contributors and their representatives to have reasonable access, during normal business hours and upon reasonable advance notice, to the books and records and senior management personnel of the Debtors pertaining to the Agreement.  The Parties shall cooperate to resolve issues where such disclosure would result in violation of applicable law or would jeopardize any privilege available to the Debtors or any of their affiliates relating to such information or would cause the Debtors or any of their affiliates to breach a confidentiality obligation to which they are bound.  In connection with such access, the Third-Party Funding Contributors' representatives shall cooperate with Debtors' representatives and shall use their best efforts to minimize any disruption of business.   The Third-Party Funding Contributors shall indemnify, defend and hold harmless the Debtors, the Debtors' officers, directors, employees and agents from and against all liabilities asserted against or suffered by them relating to, resulting from, or arising out of, examinations or inspections made by Third-Party Funding Contributors or its representatives pursuant to this Section 7(a).

(b)        Notice; Settlements.  The Debtors covenant and agree that prior to the Plan Effective Date and prior to termination of this Agreement, pursuant to Section 8 hereof, the Debtors shall (i) keep the Third-Party Funding Contributors apprised of any settlement discussions, negotiations or meetings related to Plan and the Litigation Settlement Trust Claims, and (ii) will be entitled to enter into a settlement of any Litigation Settlement Trust Claim against the Debtor(s) without the prior consent of the Third-Party Funding Contributors, but shall not be entitle to bind such Third-Party Funding Contributors except to the extent of their respective consent and agreement;  provided, further, the absence of any such consent shall not impair or effect the Trustees' binding settlement(s) reached nor shall it prohibit the respective Third-Party Funding Contributors from later consenting and causing the "Payment in Full" event to entitle the Third-Party Funding Contributor to their respective "Resulting Releases."

(c)        Conduct of Business Pending the Consummation of Plan.  The Debtors agree that prior to the Plan Effective Date and termination of this Agreement pursuant to Section 8 hereof, unless otherwise expressly permitted by this Agreement, the Debtors shall conduct their business in the ordinary course.

(d)        Cooperation; Consents and Filings.

(i)        From and after the date hereof and until prior to the Plan Effective Date and termination of this Agreement pursuant to Section 8 hereof, unless otherwise expressly permitted by this Agreement, the Parties shall cooperate with each other and use (and will cause their respective representatives to use) commercially reasonable efforts (1) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on their part under this Agreement, applicable law or otherwise to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable; (2) to obtain promptly from any person or

governmental authority any consent, order or permit required to be obtained by the Parties or any of their respective affiliates in connection with the authorization, execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby and thereby; (3) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the transactions contemplated hereby and thereby required under any applicable law, including, without limitation, the Disclosure Statement (if required), the Plan, all documents, instruments and pleadings necessary for the approval of the Disclosure Statement (if required) and confirmation of the Plan; and (4) to provide prompt notification to the other Party hereto of any actions pursuant to clauses (1) – (3) of this Section 7(d). In addition, no Party shall take any action after the date hereof (other than any action required to be taken under this Agreement or to which the other Parties shall have granted their consent) that could reasonably be expected to materially delay the obtaining of, or result in not obtaining, any consent, order, permit, qualification, exemption or waiver from any governmental authority or other person required to be obtained prior to the effective date of the Plan; including, without limitation, the Disclosure Statement (if required), the Plan, all documents, instruments and pleadings necessary for the approval of the Disclosure Statement (if required)  and confirmation of the Plan.

       (ii)      If permitted by applicable law and subject to any limitations on access to information provided for in Section 4(a), each party shall consult with the other parties with respect to, and provide any information reasonably requested by the other party in connection with, all material filings made with the Bankruptcy Court or any governmental authority in connection with this Agreement and the transactions contemplated hereby.  If any party or any of its affiliates receives a request for information or documentary material from any governmental authority with respect to this Agreement or any of the transactions contemplated hereby, then such party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and, to the extent permitted by applicable law, after consultation with the other parties, an appropriate response in compliance with such request.

      (g)     Bankruptcy Matters.  The Parties shall use commercially reasonable efforts to cooperate, negotiate, assist and consult with each other to secure the entry of an order confirming the Plan following the date hereof, and to consummate the transactions contemplated by this Agreement, including, without limitation, the Plan, all documents, instruments and pleadings necessary for the approval of a disclosure statement (if necessary) regarding the Plan and confirmation of the Plan.  In the event that any order of the Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such order), the Parties will cooperate in taking such steps to diligently defend against such appeal, petition or motion and the Parties shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.  The Parties shall not, without the prior written consent of the other parties, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to a sale or plan of reorganization, other than the Plan, unless the Debtors through the Litigation Settlement Trustees determine in their business judgment their fiduciary obligations require them to do so.

010369

**Section 8**     **Termination.**  This Agreement shall terminate, and the obligations of the Parties shall thereupon terminate and be of no further force and effect, upon the occurrence of the earlier of the following events (each, a "Termination Event"):

       (i)     Upon mutual written consent of the Debtors, on the one hand, and the Third-Party Funding Contributors, on the other hand;

       (ii)     The Bankruptcy Cases are (a) dismissed, (b) converted to a case under chapter 7 of the Bankruptcy Code, or (c) converted into a case under Chapter 11 of Title 11 of the Bankruptcy Code other than under Subchapter V thereof;

       (iii)     The Bankruptcy Court enters an order appointing a trustee or examiner under chapter 11 of the Bankruptcy Code;

       (iv)     The Bankruptcy Court enters an order granting relief from the automatic stay imposed by §362 of the Bankruptcy Code to allow the continued litigation of a Litigation Settlement Trust Claim without the consent of the Third-Party Funding Contributors;

       (v)     The Debtor or the Third-Party Funding Contributors shall (a) fail to comply with any of its obligations under this Agreement (it being understood that only the non-breaching party may invoke the Termination Event), or (b) has breached any representation, warranty, covenant or agreement contained in this Agreement;

       (vi)      the Debtors shall withdraw (or move to withdraw) the Plan;

       (vii)     The Third-Party Funding Contributors have terminated participation under the Agreement, including ¶ 4(b).

       (viii)     The Bankruptcy Court enters an order denying confirmation of the Plan;

       (ix)     The Bankruptcy Court does not enter an order approving the appointment of the Litigation Settlement Trustees on or before April 30, 2022;

       (ix)     The Plan has not been filed with the Court on or before April 30, 2022;

       (x)     The Plan has not been confirmed by the Court on or before the expiration of the Support Period;

       (xi)     The order confirming the Plan fails to become a Final Order on or before 90 days after the expiration of the Support Period; *provided*, that the requirement for finality shall be waived as to any appeal as to which the appellant fails to obtain a stay pending appeal of the confirmation order; or

       (xii)     Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise

010370

restricting, preventing, or prohibiting the Plan in a way that cannot be reasonably remedied or otherwise grants relief to any party that is materially inconsistent with the Plan or this Agreement.

(xiii)   The relevant court remands the Litigation Claims and lifts the automatic stay to allow the State Court to proceed to Judgment.

**Section 9      Amendments.**  This Agreement may not be modified, amended, or supplemented, except in a writing signed by all Parties.

**Section 10      Governing Law; Jurisdiction.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas or the United States, without regard to the applicable principles of conflict of laws.

**Section 11      Notices.**  All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, telecopy, facsimile, or if duly deposited in the mails, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, as follows:

*If to the Debtor, to:*

Marc Schwartz
Chief Restructuring Officer
of the Debtors
Schwartz & Associates
712 Main Street, Ste 1830
Houston, Texas 77002


With a copy to:

Kyung S. Lee
Parkins Lee & Rubio LLP
Pennzoil Place-13th Floor
700 Milam
Houston, Texas 77002
klee@parkinslee.com


*If to the Third-Party Funding Contributors:*

Free Speech Systems, LLC
To:
Law Offices of Ray Battaglia, PLLC
Attn: Ray Battaglia
66 Granburg Circle
San Antonio, Texas 78218

010371

rbattaglialaw@outlook.com

Alex Jones
To:
Shelby A. Jordan
Jordan & Ortiz, P.C.
sjordan@jhwclaw.com

**Section 12      Reservation of Rights.**   This Agreement is part of a proposed settlement of all disputes among the Parties.  Except as expressly provided in this Agreement or the Plan, nothing therein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of the Parties to protect and preserve their respective rights, remedies, and interests, including, without limitation, any claims against any other Party.  If the transactions contemplated herein or in the Plan are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights and remedies.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto, shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**Section 13      Entire Agreement.**   This Agreement, together with the Reorganization Plan, constitute the entire understanding and agreement among the Parties with regard to the subject matter hereof, and supersedes all prior agreements with respect thereto.

**Section 14      Headings.**   The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

**Section 15      Successors and Assigns.**   This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors and assigns.

**Section 16      Specific Performance.**   Each Party hereto recognizes and acknowledges that a breach by it of any covenant or agreement contained in this Agreement may cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law, and therefore each Party hereto agrees that in the event of any such breach the other Parties shall be entitled to seek the remedy of specific performance of such covenant and agreement and injunctive and other equitable relief in addition to any other remedy to which such Parties may be entitled, at law or in equity.

**Section 17      Remedies Cumulative.**   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

**Section 18      No Waiver.**   The failure of any Party to exercise any right, power, or remedy provided under this Agreement or otherwise available to it at law or in equity, or to

010372

insist upon compliance by any other Party with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

        **Section 19**    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by telecopier or facsimile shall be as effective as delivery of a manually executed signature page of this Agreement.

**Section 20**    **Severability.**  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.

        **Section 21**    **No Third-Party Beneficiaries.**  Unless expressly stated herein as to direct or indirect beneficiaries of the Litigation Settlement Trustor the Confirmed Plan, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

        **Section 22**    **Jurisdiction and Venue:**  Notwithstanding any provision herein to the contrary no action or proceeding by any Party or any third-party may be brought to determine, enforce, prohibit, enjoin, or otherwise determine any rights or obligations of any Party to this Agreement except in the United States Bankruptcy Court or the United States District Court, as the case may be, for the Division and District in which the Bankruptcy Cases have been filed.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Declaration or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

Effective Date: April ___, 2022.

**INITIAL LITIGATION SETTLEMENT TRUSTEE**

By:     _____
Name:    Robert Dew
Title:    Initial Trustee, and as sole officer and
         Director of each Debtor entity
         InfoW, LLC, InfoHealth, LLC,
         Prison Planet TV, LLC

**THIRD-PARTY FUNDING CONTRIBUTOR ALEX JONES**

By:     _____
Name:

**THIRD-PARTY FUNDING CONTRIBUTOR FREE SPEECH SYSTEMS, LLC**

By:     _____
Name:
Title:

**SIGNATURES LEFT BLANK PENDNG APPOINTMENT BY BANKRUPTCY COURT ORDER**

_____
Name:
Title: Litigation Settlement Trust Trustee and
Debtors' Independent Board Members

_____
Name:
Title: Litigation Settlement Trust Trustee and
Debtors' Independent Board Members

010374

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Declaration or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

Effective Date: April **15** 2022.

***INITIAL* LITIGATION SETTLEMENT TRUSTEE**

By:

Name: Robert Dew

Title: Initial Trustee, and as sole officer and Director of each Debtor entity InfoW, LLC, InfoHealth, LLC, Prison Planet TV, LLC

**THIRD-PARTY FUNDING CONTRIBUTOR ALEX JONES**

By:

Name:

**THIRD-PARTY FUNDING CONTRIBUTOR FREE SPEECH SYSTEMS, LLC**

By:

Name:

Title:

**SIGNATURES LEFT BLANK PENDNG APPOINTMENT BY BANKRUPTCY COURT ORDER**

_____

Name:

Title: Litigation Settlement Trust Trustee and Debtors' Independent Board Members

_____

Name:

Title: Litigation Settlement Trust Trustee and Debtors' Independent Board Members

010375

EXHIBIT
4

NO. D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| V. | § | TRAVIS COUNTY, T E X A S |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC and | § | |
| KIT DANIELS, | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S
## MOTION TO COMPEL AND MOTION FOR SANCTIONS

Defendants Infowars, LLC, Free Speech Systems, LLC ("Free Speech Systems") and Kit Daniels (collectively, the "Defendants"), hereby file this Response to Plaintiff's Motion to Compel and Motion for Sanctions and would respectfully show the Court the following:

## OVERVIEW

1.       This lawsuit involves allegations of defamation against a reporter, a media company, and a media affiliate ("Defendants") for information reported about an ongoing emergent situation - the Parkland, Florida Douglas High School shooting of 2018. In particular, Defendants are being sued for posting a picture to the Infowars.com website that was believed to be the Florida school shooter.[1] The initiation of this lawsuit began nearly three years ago. Throughout the pendency of this action, discovery has been stayed due to the Defendants' filing and appeals of a Motion to Dismiss under the Texas Anti-SLAPP statute. The termination of those stays took effect on April 22, 2021. On June 2, 2021, Defendants provided responses to Plaintiff's

---

[1] Although the same Defendants are named in defamation actions related to the Sandy Hook school shooting, those cases are readily distinguishable from the Fontaine matter: different plaintiffs, different defense counsel, different facts, different circumstances, and different defendants.

031595-83488/4842-3169-9185.10-83488/4842-3169-9185.9-83488/4842-3169-9185.9-83488/4842-3169-9185.8-83488/4842-3169-9185.8
031595-83488/4842-3169-9185.4-83488/4842-3169-9185.3
-83488/-83488/.

010376

requests for written discovery. Defendants concede that their responses to written discovery requests were untimely, but that the late responses were not made in bad faith.

2.      On June 7, 2021, Defendants filed a motion for withdrawal of deemed admissions, based on an untimely response to requests for admissions. In that motion, Defendants explain, at length, how the failure to respond on time was due to an honest oversight of counsel and a miscalculation of the timeline for when the discovery proceedings were to be stayed. That motion remains pending before the Court.

3.      On July 1, 2021, Plaintiffs filed a motion to compel responses from Infowars, LLC and a motion for sanctions to which the Defendants now respond. As an initial matter, Plaintiff attaches as alleged exhibits to his motion to compel and for sanctions, copies of entire deposition transcripts taken in other cases that are not before this Court. Such testimony is inadmissible and should not be considered by the Court without the proper predicate, which has not even come close to being established. *See* Tex. R. Evid. 804(a) and (b). The attachment of depositions from other cases is a theatrical attempt to bring Alex Jones, who has been dismissed from this case, back in to the case, but it has zero evidentiary value and should not be considered by this Court.

## ARGUMENT AND AUTHORITIES

### I.   LEGAL STANDARDS

4.      A responding party must produce documents within the person's possession, custody or control. Tex. R. Civ. P. 196.3 (Westlaw, effective Jan. 1, 1999). The phrase "possession, custody, or control" of an item means that the person either has physical possession of the item or has a right to possession that is equal or superior to that of the person who has physical possession. Tex. R. Civ. P. 192.7(b) (Westlaw, effective Jan. 1, 2021). A party is not required to produce information that is not reasonably available to the party or its attorney when the response is made.

010377

Tex. R. Civ. P. 193.1 (Westlaw, effective Jan. 1, 2021). Mere speculation that one company has control over another company's documents is insufficient to compel production. *GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993).

5.     For Infowars, LLC to be required to produce documents held by Free Speech Systems, LLC (a separate juridical entity), Plaintiff must allege and show that Infowars, LLC has constructive or actual possession of the documents held by Free Speech Systems. *In re U-Haul Int'l*, 87 S.W.3d 653, 656 (Tex. App.—San Antonio 2002, no pet.). The separate existence  of corporations will be observed by the courts even where one company may dominate or control, or even treat another company as a mere department, instrumentality or agency.  *See Id.* at 657 (trial court abused its discretion in requiring production of documents from sister company despite common ownership by parent company). To require one corporation (even one that is closely related) to produce documents in the constructive possession of another, there must be pleadings and evidence of a "single business enterprise;" namely, that two companies "integrate their resources to achieve a common business purpose."  *Id.*; *In re: Methodist Primary Care Grp.*, 553 S.W.3d 709, 722 (Tex. App.-Houston 2018) ("[t]hat entities are related is not sufficient by itself to establish that an entity has possession of the related entities documents").

6.     The burden is on Plaintiff to show the parent company controls the internal business operations and affairs of the subsidiary to show companies operate as a "single business enterprise." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002); *accord GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993) (because no evidence existed showing GCSC had possession of documents controlled by GTFL, a separate corporate entity, Plaintiff's speculation of a single business enterprise was insufficient to compel production);  *In re U-Haul Intern., Inc.,* 87 S.W.3d 653, 656–57 (Tex. App.—San Antonio 2002,

no pet.)(finding plaintiffs had not met their burden of proving two companies acted as a single business enterprise).  The degree of control the parent company exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *U-Haul*, 87 S.W.3d at 656-57.

7.     Factors commonly considered in determining whether corporations operate as a single business enterprise include, but are not limited to, the following: (1) common employees, (2) common offices, (3) centralized accounting, (4) payment of wages by one corporation to another corporation's employees, (5) common business name, (6) services rendered by the employees of one corporation on behalf of another corporation, (7) undocumented transfers of funds between corporations, and (8) unclear allocation of profits and losses between corporations. *Country Vill. Homes, Inc. v. Patterson*, 236 S.W.3d 413, 427 (Tex. App.—Houston [1st Dist.] 2007, review granted, judgment vacated and remanded by agreement); *But compare  S. Union Co. v. City of Edinburg*, 129 S.W.3d 74, 89 (Tex. 2003) (fact that two corporations had common directors, shared employees, and central accounting and payroll systems did not justify disregarding distinct corporate entities).

## II. INFOWARS, LLC IS A COMPANY ENTIRELY SEPARATE FROM FREE SPEECH SYSTEMS

8.     Infowars, LLC and Free Speech Systems are separate business entities, and they are not part of a single business enterprise (such that Infowars, LLC has constructive possession of Free Speech Systems' responsive documents). In fact, there will be  no evidence that Infowars, LLC does anything. Infowars, LLC has no operations, no employees, and no assets, and Infowars, LLC and Free Speech Systems have not integrated their resources to"achieve a common business purpose."  Without as much as a pleading or a viable theory to go on, Plaintiff's Motion to Compel

4

Production by Infowars, LLC is not only pointless, but also a "fishing expedition" that violates

discovery. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (Discovery requests

must be "reasonably tailored to include only matters relevant to the case" and may not be used as

a "fishing expedition.")

### III. COMMON OWNERSHIP DOES NOT SHOW A "SINGLE BUSINESS ENTERPRISE"

9.      The fact that Alex Jones allegedly owns both companies is insufficient to show that

the companies operate as a single business enterprise. Contrary to Plaintiff's assertions, the

governing case law demonstrates that common ownership or common officers, without anything

else, does not show a "single business enterprise." *Country Vill. Homes*, 236 S.W.3d at 427. On

page 14 of Plaintiff's Motion, Plaintiff cites to *Costa v. Kerzner* and a string of cases[2] to aver that

a corporation owned by a single individual is enough to show joint control, and thereby a single

business enterprise. Plaintiff's reliance on these cases is misplaced however, because those cases

dealt with situations of a corporate "alter ego" of an individual, and involved lawsuits against

owners who have multiple companies, at least one of which is a non-party to the lawsuit. Those

cases examined primarily how under the Federal Rules of Civil Procedure, a party can be

compelled to produce documents held by a non-party to the lawsuit if the party has control over

documents held by a non-party affiliate. These cases did not examine or deal with two or more

companies acting as a "single business enterprise." Unlike in the cases cited by Plaintiff: Alex

Jones, the alleged owner of both companies, is not a party to this lawsuit; and neither company is

an "alter ego" of Alex Jones. Hence, these cases have no application to this case and should be

---

[2] *Costa v. Kerzner Intern. Resorts, Inc.*, 277 F.R.D. 468, 472 (S.D. Fla 2011); *Steele Software Sys., Corp. v. DataQuick Info. Sys., Inc.*, 237 F.R.D. 561, 564 (D. Md. 2006); *Perini Am., Inc. v. Paper Converting Mach. Co.*, 559 F. Supp. 552 (E.D. Wisc. 1983); *Duracore Pty Ltd. v. Applied Concrete Tech., Inc*, 2015 WL 4750936 (W.D. Ky. Aug. 11, 2015).

disregarded by the Court.

## IV. INFOWARS, LLC AND FREE SPEECH SYSTEMS HAVE DIFFERENT PURPOSES

10.     In its motion, Plaintiff uses imprecise and confusing language to boldly mischaracterize Alex Jones' inadmissible and objected-to-testimony from other unrelated proceedings on multiple occasions. This confusion arises from Plaintiff's insistence on referring generally to "InfoWars" to mean Alex Jones, Free Speech Systems, and Infowars LLC collectively. *See* **Exhibit "A"**, page 25, para. 5. This imprecise language has made it challenging and confusing for Defendants and Defense counsels to respond to Plaintiff's requests and questions because these three entities are entirely separate (and one of them, Alex Jones, has already been dismissed by this Court from the lawsuit). Now, Plaintiff's continued, and inaccurate, use of the generic term "InfoWars" is painting a misrepresentation of the facts for the Court. So as to not leave a false impression with the Court as to the true nature of these companies, Defense counsel is compelled to clarify these mischaracterizations below.

### *Mr. Jones testified Infowars LLC handles intellectual properties.*

11.     In its motion Plaintiff avers that "Mr. Jones testified that Infowars, LLC was set up to handle InfoWars' 'intellectual properties'." *Plaintiff's Motion*, p. 6. In addition to the reference to inadmissible testimony not before the Court, the lack of precision in Plaintiff's language makes it difficult to ascertain what Plaintiff is getting at. But, taken in the context of Plaintiff's entire motion, it seems Plaintiff is trying to paint a picture that Infowars LLC handles intellectual properties on the Infowars.com website. This allegation is inaccurate and misleading.

***The mistake in the Terms of Use does not show "single business enterprise."***

12.     Infowars LLC was mistakenly named on the Infowars.com webpage's Terms of Use as being the operator of the website. The website has since updated its Terms of Use to reflect Free Speech Systems LLC. A mistake, at best, creates a disputed fact that does not rise to the level of a dispositive showing of a "single business enterprise."

13.     The reference to the California copyright suit against Infowars, LLC is yet another overstatement of Plaintiff's position. *Plaintiff's Motion,* Page 6. If one continues to read the opinion past the sentence quoted by Plaintiff, it is clear that the Court has doubts as to whether Infowars, LLC was indeed the operator of the website and if it was actually a mistake that Infowars, LLC was listed on the website.

> The websites on which the MAGA posters were advertised—www.infowars.com and www.prisonplanet.com—listed Infowars as the owner and operator. (*Id.*). Defendants point out that "these are mistakes, as the sites are operated by FSS and Infowars has no involvement in the operation of the sites." (Infowars Mot. at 9). At best, this assertion creates a dispute of fact. *See Larin Corp. v. Alltrade, Inc.*, No. 06-EDCV-1394-ODW (OPx), 2008 WL 11338579, at *3 (C.D. Cal. Feb. 13, 2008) (denying summary judgment where the plaintiff "has named both Alltrade, Inc. and Alltrade Tools LLC as defendants because it is difficult to discern which party is in fact the proper defendant responsible for the alleged wrongdoing" and finding that Alltrade, Inc. has not "present[ed] definitive evidence to show that it is not so intertwined with Alltrade Tools LLC").

*Furie v. Infowars, LLC*, 401 F. Supp. 3d 952, 970 (C.D. Cal. 2019). This type of dispute is not enough, in and of itself, to show that companies are operating as a single business enterprise. And unlike the *All Trade* case referenced in the *Furie* opinion, Infowars, LLC can present evidence that it is not intertwined with Free Speech Systems.

14.     Although the mistake in the Infowars.com's Terms of Use did not preclude Infowars, LLC from remaining in this lawsuit, to be clear, the Court of Appeals in this case did not declare Infowars, LLC and Free Speech Systems LLC to be a "single business enterprise."

*Infowars, LLC v. Fontaine*, 03-18-00614-CV, 2019 WL 5444400, at *3 (Tex. App.—Austin Oct. 24, 2019, pet. denied)(emphasis added)("[Fontaine] established the **minimum** quantum of evidence necessary to support a rational inference that Infowars, LLC is a **proper defendant** [based on the Terms of Service].") Nothing more can be inferred from the opinion.

### *Counsel was simply trying to cooperate in its responses to discovery.*

15.     Defense counsel included responses to Plaintiff's Interrogatories that related to Free Speech Systems because Plaintiff's questions were poorly worded and Defense counsel was trying to be cooperative. In his Interrogatories (like in his original petition), Plaintiff referred generally to "InfoWars" throughout. "InfoWars" was defined by Plaintiff as follows:

> 'Info Wars' generically, means the brand name of the media organization founded by Alex Jones, whether operating as Info Wars, LLC, Free Speech Systems, or any other corporate name.

*See* **Exhibit "A"**, page 25, para. 5. This definition by Plaintiff is illustrative of Plaintiff's presumption that the three entities are a "single business enterprise." But as explained above, a single business enterprise is not something that can be presumed, it must be proven. Moreover, this conflating of terms made it very difficult for Defense counsel to respond for each individual Defendant because in effect Plaintiff's chosen language did not address the interrogatories uniquely to Infowars LLC, it addressed the interrogatories to all three defendants.

16.     In an attempt to be cooperative, Defendants responded to Plaintiff's interrogatories. But, Defendants qualified their responses as follows:

## GENERAL RESPONSE

The "Definitions" for the Interrogatories define "InfoWars" generally to mean "the brand name of the media organization founded by Alex Jones, whether operating as InfoWars, LLC, Free Speech Systems, or any other corporate name."  Free Speech Systems, LLC (Kit Daniels' employer) is the owner and operator of the www.infowars.com website (which published the challenged photo of Mr. Fontaine).  InfoWars, LLC does not engage in any business, has no employees and did not publish the challenge photo. With this context in mind, where Plaintiff utilizes its generic definition of "InfoWars" for the interrogatories below (and does not distinguish between Free Speech Systems LLC and InfoWars, LLC), the Respondent shall respond as if "InfoWars" means only Free Speech Systems, LLC.

Plaintiff's characterization of Infowars LLC's responses to the interrogatories in its motion fails to point out the confusing and non-specific language in Plaintiff's own generic definition of "Infowars," and again makes logical leaps and omits language to assert falsely that Infowars LLC has possession of documents held by Free Speech Systems LLC and vice versa. *Plaintiff's Motion*, pages 15-16. Per the explicit text of Defendants' responses to these poorly worded requests, in no way is there a response that shows that Free Speech Systems LLC and Infowars LLC are a "single business enterprise." Quite the opposite, Defendants made every possible attempt to separate the entities in their responses, despite Plaintiff's joint request to all the Defendants collectively.

### CONCLUSION

17.     Infowars, LLC and Free Speech Systems LLC are separate companies. Plaintiff has neither pled nor presented actual evidence that these companies act as a "single business enterprise" or that Infowars LLC has possession of documents held by Free Speech Systems LLC. As such, Infowars LLC has not disobeyed its discovery obligations or failed to comply with the rules of Texas Civil Procedure. *In re U-Haul Intern., Inc.*, 87 S.W.3d 653, 657 (Tex. App.—San Antonio 2002, no pet.) (Plaintiff failed to show that UHaul and Republic were single business enterprise and that UHaul had possession of documents held by Republic, thus U-Haul did not violate discovery order when it failed to produce responsive documents held by Republic).

Without any failure to comply with discovery obligations or the Texas Rules of Civil Procedure, the Court should deny Plaintiff's Motion to Compel further responses from Infowars LLC and deny Plaintiff's request for sanctions. Lastly, as a practical matter, if Plaintiff wants or needs additional document discovery from Free Speech Systems, Plaintiff can simply propound additional requests on that entity.

                              Respectfully submitted,

                              **WALLER LANSDEN DORTCH & DAVIS, LLP**
                              100 Congress Avenue, Suite 1800
                              Austin, Texas 78701
                              Telephone:  (512) 685-6400
                              Telecopier:  (512) 685-6417

                              By:/s/ Eric J. Taube
                                     Eric J. Taube
                                     Texas State Bar No. 19679350
                                     Kevin W. Brown
                                     Texas State Bar No. 24045222
                                     Eric.taube@wallerlaw.com
                                     kevin.brown@wallerlaw.com

                              ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties listed below via email on July 9, 2021:

Mark Bankston
Bill Ogden
Kaster, Lynch, Farrar & Ball, LLP.
1117 Herkimer
Houston, Texas 77008

/s/ Eric J. Taube
Eric J. Taube

# EXHIBIT "A"

010387

4/2/2018 11:57 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001605
Selina Hamilton

CAUSE NO. D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE,<br>    *Plaintiff* | §<br>§<br>§ | .    IN DISTRICT COURT OF |
| VS. | §<br>§ | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC,<br>FREE SPEECH SYSTEMS, LLC, and<br>KIT DANIELS,<br>    *Defendants* | §<br>§<br>§<br>§<br>§ | 459TH    DISTRICT COURT |

---

**PLAINTIFF'S ORIGINAL PETITION, INTERROGATORIES, REQUEST FOR PRODUCTION, REQUST FOR ADMISSIONS, AND REQUEST FOR DISCLOSURE**

---

Plaintiff MARCEL FONTAINE files this original petition against Defendants, ALEX JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and KIT DANIELS, and alleges as follows:

### DISCOVERY CONTROL PLAN

1.      Plaintiff intends to seek a customized discovery control plan under Level 3 of Texas Rule of Civil Procedure 190.4.

### PARTIES

2.      Plaintiff Marcel Fontaine in an individual residing in the Commonwealth of Massachusetts.

3.      Defendant Alex E. Jones is a resident of Austin, Texas. He is the host of radio and web-based news programing, including "The Alex Jones Show," and he

1

owns and operates the website InfoWars.com. Mr. Jones can be served at 100 Congress Avenue, 18th Floor, Austin, TX 78701.

4.      Defendant InfoWars, LLC is a Texas limited liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Elizabeth M. Schurig, at 100 Congress Avenue, 22nd Floor, Austin, TX 78701.

5.      Defendant Free Speech Systems, LLC is a Texas limited liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Avenue, 18th Floor, Austin, TX 78701.

6.      Defendant Kit Daniels is an individual residing in Travis County. At all times relevant to this suit, Mr. Daniels has been a reporter and writer for InfoWars. Mr. Daniels can be served at his last known address, 3501 South First Street, Apt. 261, Austin, TX 78704.

## JURISDICTION & VENUE

7.      The damages sought in this case exceed the minimum jurisdictional limits of Travis County District Courts.

8.      Venue is proper in Travis County, Texas, because a suit for damages for defamation may be brought in the county in which a defendant resided at the time of filing, or the domicile of any corporate defendant, at the election of the plaintiff. *See* Tex. Civ. Prac. & Rem. Code §15.017.

2

010389

## FACTUAL BACKGROUND

I.    **Defendants' Long History of Reckless Defamation Has Resulted in Harassment Against Innocent Parties.**

9.    InfoWars was created in 1999 by Alex Jones, who has controlled its operations since its inception and up to the present day. Wikipedia describes InfoWars as follows:

> InfoWars is an American conspiracy theorist website and media platform owned by Alex Jones's Free Speech Systems LLC. The site has regularly published fake stories which have been linked to harassment of victims.[1]

10.    Mr. Jones' recklessly opportunistic career is littered with the fallout from his willful pattern of malicious defamation, most notably a series of high-profile incidents over the past few years. Mr. Jones garnered significant attention for his slander against the victims of the Sandy Hook massacre, claiming he has seen "evidence" that could lead people to believe "that nobody died there."[2] Jones has also claimed that the 9/11 attacks were "an inside job" involving the U.S. government.[3]

11.    Mr. Jones was also one of the purveyors of the "Pizzagate" story, which is the allegation that elites in the Democratic Party oversaw a pedophile slave

---

[1] *See* https://en.wikipedia.org/wiki/InfoWars, citing numerous published reports.
[2] "Alex Jones Refuses to Apologize for Sandy Hook Conspiracy Theory." *Newsweek.* June 19, 2017. Last available at: http://www.newsweek.com/alex-jones-megyn-kelly-sandy-hook-infowars-627129
[3] *Id.*

3

dungeon in the basement a Washington, D.C. pizzeria.[4] Mr. Jones told his audience, "You have to go investigate it for yourself…Something's going on. Something's being covered up. It needs to be investigated."[5] He also expressed a desire to investigate the pizzeria in person.[6]

12.     The following week, on December 4, 2016, an armed man fired shots inside the pizzeria as part of a plan to uncover the conspiracy.[7] Multiple media outlets confirmed that the perpetrator was a fan of InfoWars internet and radio programing.[8] Under threat of suit from the owner of the establishment, Mr. Jones gave a statement on March 24, 2017 walking back his claims, stating: "To my knowledge today, neither Mr. Alefantis nor his restaurant Comet Ping Pong were involved in any human trafficking as was part of the theories about Pizzagate."[9]

13.     On December 15, 2016, the InfoWars website featured stories making similar accusations against Austin restaurant chain East Side Pies, including ominous "undercover" videos speculating upon imaginary, hideous activities by staff or patrons.[10] These stories generated harassment towards the restaurant and an act

---

[4] "Conspiracy theorist Alex Jones backs off 'Pizzagate' claims." *The Washington Post*. March 24, 2017. Last available at: https://www.washingtonpost.com/lifestyle/style/conspiracy-theorist-alex-jones-backs-off-pizzagate-claims/2017/03/24

[5] "Infowars Denies It Promoted 'Pizzagate' Conspiracy Theory After Deleting Content From Its Website." *Media Matters*. Last available at: https://www.mediamatters.org/blog/2017/02/24/infowars-denies-it-promoted-pizzagate-conspiracy-theory-after-deleting-pizzagate-content-its-website/215465

[6] *Id.*

[7] "Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'" *National Public Radio*. March 26, 2017. Last available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

[8] *Id.*

[9] *Id.*

[10] "Alex Jones Apologizes." *The Austin Chronicle*. March 31, 2017. Last available at: https://www.austinchronicle.com/news/2017-03-31/alex-jones-apologizes/

4

of vandalism on a delivery truck.[11] Mr. Jones acknowledged his role in promoting this conspiracy theory and apologized to the restaurant.[12]

14.     On April 11, 2017, InfoWars published stories claiming that Chobani, an Idaho yogurt manufacturer, was "caught importing migrant rapists."[13] Chobani filed a lawsuit against Jones, which Jones settled in Chobani's favor. Mr. Jones wrote: "On behalf of InfoWars, I regret that we mischaracterized Chobani, its employees and the people of Twin Falls, Idaho, the way we did."[14]

15.     On August 15, 2017, in the wake of the Charlottesville "Unite the Right" rally and the murder of counter-protester Heather Heyer, InfoWars published defamatory statements about Brennan Gilmore, the camera man who caught the fatal attack on film. InfoWars, through its website and video content, alleged that Mr. Gilmore was an agent of CIA and George Soros[15] who assisted in conducting a staged murder. Those statements, which generated malicious harassment towards Mr. Gilmore, are the subject of a pending federal defamation lawsuit in Virginia.[16]

16.     Mr. Jones also published reckless statements about the church shooting in Sutherland Springs, Texas. On November 5, 2017, Mr. Jones first shared his theory

---

[11] *Id.*

[12] *Id.*

[13] "Alex Jones settles Chobani lawsuit and retracts comments about refugees in Twin Falls." *The Los Angeles Times.* May 17, 2017. Last available at: http://www.latimes.com/nation/la-na-chobani-alex-jones-20170517-story.html

[14] *Id.*

[15] George Soros is a venture capitalist and notable donor to left-wing causes and candidates. Mr. Soros is frequently featured in conspiracy theories about "globalist" control of American politics. Though not even in the top 10 of donors in American politics, Mr. Soros is seen in the InfoWars mythology as an insidious puppet master behind all left-wing political action.

[16] *See Brennan M. Gilmore v. Alexander E. Jones, et al.,* in the United States District Court for the Western District of Virginia, Charlottesville Division.

010392

that the event was "part of the Antifa revolution against Christians and conservatives or a Isis op [sic]."[17] On March 5, 2018, two conspiracy enthusiasts showed up at the church and yelled violent threats at the pastor.[18]

17.     On November 27, 2017, InfoWars published false statements about the mass shooting in Las Vegas, claiming that "Vegas is as phony as a three-dollar bill or as Obama's birth certificate."[19] Following InfoWars promoting his conspiracy theory, the survivors were likewise subject to malicious harassment.[20]

## II.     Defendants' Defamatory Statements -- Delivered to a Shockingly Massive Audience -- are Designed to Drive the Sale of 21st Century Snake-Oil.

18.     There was a time when Mr. Jones was a fringe character, little more than a hyper-active carnival barker in the midway of early 2000s conspiracy theory culture. But over the past few years, InfoWars slowly adopted the mantle of "respectable" media outlet and somehow went mainstream. On May 22, 2017, InfoWars' Washington Bureau Chief was given White House press credentials.[21]

19.     Today, InfoWars describes itself as "the frontline of truth journalism" and "the tip of the spear in alternative media - circumventing the dying dinosaur

---

[17] Alex Jones (@RealAlexJones). *Twitter*. (Nov. 5, 2017, 3:14 PM).
[18] "Conspiracy Theorists Arrested Outside Site of 2017 Sutherland Springs Church Shooting." *The Washington Times*. March 6, 2018. Last available at:
 https://www.washingtontimes.com/news/2018/mar/6/conspiracy-theorists-claimingsutherland-springs-s/
[19] "Alex Jones: The Las Vegas Shooting Was as Phony as Obama's Birth Certificate." *Media Matters*. November 27, 2017. Last available at: https://www.mediamatters.org/video/2017/11/27/alex-jones-las-vegas-shooting-was-phony-obama-s-birthcertificate/
[20] "I Hope Someone Truly Shoots You: Online Conspiracy Theorists Harass Vegas Victims." *The Guardian*. October 27, 2017. Last available at: https://www.theguardian.com/us-news/2017/oct/26/las-vegas-shooting-conspiracytheories-social-media
[21] "InfoWars granted temporary White House press credentials." *Business Insider*. May 22, 2017. Last available at: http://www.businessinsider.com/infowars-granted-white-house-press-credentials-2017-5

010393

media systems of information suppression."[22] The InfoWars brand now reaches an astounding audience. The InfoWars website alone receives more than 30 million page-views per month, to say nothing of its social media accounts and third-party video channels.[23] For comparison, MSNBC.com receives 40 million visitors per month.[24]

20.     Mr. Jones feeds his audience a steady diet of false information intended to convince them that a shadowy association of global elites are hatching countless insidious schemes to destroy their way of life or threaten their bodily fluids.[25] The combination of lies and paranoia are designed to drive sales to InfoWars' lucrative online store, where Mr. Jones sells "Brain Force" pills, "Super Male" vitality formulas, "Liver Shield" supplement drops, fluoride-free toothpaste, post-apocalyptic preparedness accessories, and a host of other products tailored to address the imminent threats forecast by InfoWars' defamatory new stories.[26]

21.     Mr. Jones' media operation has also entered the firearms business, promising his audience that "Registration Free Firearms Are A Reality" by selling

---

[22] *See* https://twitter.com/infowars.
[23] *See* https://www.quantcast.com/infowars.com.
[24] *See* https://www.quantcast.com/msnbc.com.
[25] Sadly, this is not an exaggeration. Mr. Jones rails against what he believes is an international communist conspiracy to sap and impurify our bodily fluids, ranting in 2015: "What do you think tap water is? It's a gay bomb, baby. And I'm not saying people didn't naturally have homosexual feelings. I'm not even getting into it, quite frankly. I mean, give me a break. Do you think I'm like, oh, shocked by it, so I'm up here bashing it because I don't like gay people? I don't like them putting chemicals in the water that turn the frigging frogs gay! Do you understand that? I'm sick of being social engineered, it's not funny!"
Last available at: https://www.youtube.com/watch?v=kpiUfb7adPE&feature=youtu.be&t=5m39s
[26] *See* https://www.infowarsstore.com

7

010394

pieces of weaponry to be assembled by the purchaser.[27] InfoWars states that the ATF determined each InfoWars product "IS NOT A FIREARM in its present form. This means we can ship it directly to you to be completed."[28] For example, pictured below is an InfoWars-branded receiver for the AR-15:



22.    In sum, InfoWars is a business built on the idea of generating revenue from the paranoia stoked by its reckless defamation. Defendants' long history of dishonest and irresponsible reporting underscores the malicious nature of the defamatory conduct at issue in this lawsuit.

---

[27] *See* https://www.infowarsstore.com/home-page-best-sellers/tennessee-arms-80-hybrid-receiver.html
[28] *Id.*

8

010395

### III.  The February 14, 2018 Publication

23.     On February 14, 2018, InfoWars published an article concerning the identity of the individual who attacked Marjory Stoneman Douglas High School in Parkland, Florida, an event which garnered massive public attention. An archived copy of the article in question is attached as "Exhibit 1."

24.     The InfoWars article was authored by reporter Kit Daniels, and it underwent several revisions. The article was alternatively titled *"Reported Florida Shooter Dressed as Communist, Supported ISIS," "Florida Shooter Inspired by ISIS - ALLAHU AKBAR,"* and *"Reported Florida Shooter Discussed 'Allahu Akbar' on Instagram Profile."*

25.     The article was featured on the front page on the InfoWars website on February 14, 2018, the day of the Douglas High School shooting. The article, of which every element was factually incorrect, was also featured on social media accounts belonging to InfoWars and Kit Daniels.

26.     Multiple iterations of the article included a photograph of the Plaintiff, Marcel Fontaine, and the articles conveyed the impression that the photograph depicted the suspected Douglas High School shooter. The image as used in the article is shown below:

9

010396



R: 0
Shooter is a commie:

27.    Mr. Fontaine was not involved with the Douglas High School tragedy.
Mr. Fontaine resides in the Commonwealth of Massachusetts and has never traveled
to Florida. He is an ordinary young man with no connection to these events. The
articles were manifestly false and have caused him enormous injury and continuing
personal harassment.

28.    It appears that Mr. Fontaine was targeted by InfoWars due to the t-
shirt he was wearing in his photograph. That novelty t-shirt, sold by online retailer
Threadless.com, makes a visual pun on the phrase "communist party" by depicting

10

010397

communist historical figures in a state of merriment and intoxication, complete with German economist Karl Marx wearing a lampshade on his head.[29]



29.     Mr. Jones and InfoWars have long been consumed with paranoia over the prospect of communist infiltration and indoctrination. Over the past year alone, InfoWars has featured hundreds of sensationalist articles and videos focusing on the of threat of communist agitation and conspiracies. When publishing the Plaintiff's photograph, InfoWars told its audience that it showed the Florida shooter dressed in "communist garb." (*See* Ex. 1).

30.     Following the February 14, 2018 publication and endorsement by InfoWars, Plaintiff's photograph spread across social media platforms with astonishing speed, resulting in its distribution to millions of additional people, typically accompanied by ridicule or malicious threats.

---

[29] *See* https://www.threadless.com/product/383/the_communist_party

010398

31.     The content of the February 14, 2018 InfoWars article was re-published verbatim by numerous ring-wing news websites, further increasing the distribution of the defamatory accusation.[30]

32.     Representative Larry Pittman, a Republican legislator from North Carolina, shared comments about Plaintiff's photograph following its mass distribution by InfoWars. Representative Pittman stated that it was "not surprising" because "many of these shooters turn out to be communist democrats."[31] Representative Pittman claimed, consistent with InfoWars mythology, that a conspiracy of communist democrats "are doing these things to push for gun control so they can more easily take over the country."[32]

33.     So wide was the proliferation of Plaintiff's photograph following InfoWars' publication that it was being discussed by users on Chinese social media. While it is difficult to estimate the total number of people who saw the false accusation as a result of InfoWars' mass dissemination and endorsement, the figure would be measured in the hundreds of millions. Due to Defendants' conduct, Plaintiff's image has been irreparably tainted. InfoWars' story became a lie told round the world.

---

[30] *See, e.g.,* https://michaelsavage.com/?p=1206 ; http://www.libertyonenews.com/florida-hs-shooter-allegedly/ ; http://thedeplorablearmy.com/reported-florida-shooter-dressed-communist-supported-isis/ ; http://www.raptureready.com/2018/02/15/15-feb-2018/ ;
[31] "NC Republican apologizes for 'clumsy' comment about 'communist Democrats.'" *The News & Observer.* February 18, 2018. Last available at: http://www.newsobserver.com/news/politics-government/state-politics/article200807499.html
[32] *Id.*

010399



34.    Further compounding the defamation is the fact the Mr. Jones, Mr. Daniels, and other employees have used InfoWars' various media platforms to cast doubt on the facts surrounding the Florida shooting, just as InfoWars has done with prior national tragedies. The day following the shooting, InfoWars published a video of Mr. Jones stating that the Florida shooting was "a false flag of the deep state to create resentment towards conservatives, gun owners, and sow the seeds of civil war."[33]

35.    A "false flag" is common conspiracy theory lingo for a scenario in which a government orchestrates an attack on its own citizens while making it appear that the attack was actually carried out by an enemy nation or domestic terrorist, thus giving the government a pretext for some desired action. After the Douglas High

---

[33] *See* https://twitter.com/infowars/status/964220278002794496

010400

School shooting in Florida, Mr. Jones told his audience that it was 90% likely the event was a false flag:



36.    According to numerous press accounts, YouTube demonetized Mr. Jones' video content from its website following his claim that the shooting was a "deep state false flag operation," and that the survivors who have emerged as vocal critics of the gun lobby were actors.[34]

37.    Because InfoWars advises its audience to distrust mainstream media sources, the subsequent mainstream news reports showing Nikolas Cruz as the

---

[34] "YouTube Pulls Alex Jones Video Saying Student Anti-Gun Activists Were Actors." *Fortune.* February 24, 2008. Last available at: http://fortune.com/2018/02/24/youtube-pulls-alex-jones-infowars-video/

14

010401

Florida shooter did not remove the threat to Marcel Fontaine. Some InfoWars readers now believe that Mr. Fontaine is part of the supposed "false flag" operation.

38.    In one disturbing example, Twitter user @ExtinctMedia, an InfoWars reader, was confronted by other social media users over the fact that Plaintiff had no involvement in the Douglas High School shooting.[35] Undeterred, @ExtinctMedia posted what purports to be facial analysis between Plaintiff and suspect Nikolas Cruz, while also alleging that the shape of Plaintiff's nose had been altered, consistent with the use of "crisis actors."[36]

 

39.    In other words, Mr. Fontaine continues to suffer harassment and peril even from individuals aware of his identify as a Massachusetts resident, but who nevertheless remain convinced he was part of a horrifying conspiracy. As part of InfoWars' reckless money-making scheme, Mr. Jones is causing his audience to

---

[35] *See* https://twitter.com/huitz_warrior/status/966154367286984704
[36] *Id.* A "crisis actor" is a term used by conspiracy theorists to describe individuals who they believe were paid by the government or global elites to play some role in a fake disinformation event.

010402

disbelieve the basic facts of the incident in favor a labyrinthine conspiracy that calls into question the very nature of reality. These sorts of reckless lies are what caused a disturbed individual to enter pizzeria and begin firing.

40.     Additionally, Plaintiff continues to suffer ridicule, harassment and threats of violence even from those who acknowledge that Plaintiff was not involved in the Florida shooting, such as the examples shown below:





16

41.     Due to these events, it is no exaggeration to say that Plaintiff's life remains in genuine peril.

42.     On February 26, 2018, Mr. Fontaine issued a demand for correction pursuant to Sec. 73.055 of the Texas Civil Practice & Remedies Code. Defendants did not respond.

43.     Due to the reckless and malicious nature of Defendants' conduct, Mr. Fontaine now brings this lawsuit.

## CAUSES OF ACTION

I.     **Defamation and Defamation *Per Se***

44.     All previous allegations are incorporated by reference.

45.     Mr. Fontaine is a private individual and is neither a public official nor a public figure.

46.     The publications by Defendants were false, both in their particular facts and in the main point, essence, or gist in the context in which they were made.

47.     The publications by Defendants directly used Mr. Fontaine's image in connection with a grievous national tragedy.

48.     Defendants' defamatory publications were designed to harm Plaintiff's reputation and subject the Plaintiff to public contempt, disgrace, ridicule, or attack.

49.     Defendants acted with actual malice. Defendants' defamatory statements were knowingly false or made with reckless disregard for the truth or falsity of the statements at the time the statements were made.

17

010404

50.     Defendants' defamatory publications were not privileged.

51.     Defendants' defamatory statements constitute defamation *per se*. The harmful nature of the defamatory publications is self-evident. The defamatory publications implicate the Plaintiff in heinous criminal conduct. False implications of criminal conduct are the classic example of defamation *per se*.

52.     Defendants publicly disseminated the defamatory publications to an enormous audience causing significant damages to the Plaintiff.

53.     Defendants' defamatory publications have injured Mr. Fontaine's reputation and image, and they have exposed Mr. Fontaine to public and private hatred, contempt, ridicule, harassment, and death threats.

54.     In light of their prior experience with these kind of reckless statements, Defendants knew that their publication would cause Plaintiff to suffer harassment and potential violence.

55.     Defendants' defamatory publications have and will continue to cause harm to Mr. Fontaine. Due to Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial damages in an amount to be proven at trial.

II.     **Intentional Infliction of Emotional Distress**

56.     All previous allegations are incorporated by reference.

57.     Defendants knew or should have known that their publication of Mr. Fontaine's photograph connecting him with the Douglas High School shooting would

18

010405

cause him to be the subject of harassment, ridicule, and threats, thereby causing severe emotional distress.

58.    Defendants decision to publish Mr. Fontaine's photograph was outrageous and intolerable, going beyond all possible bounds of decency.

59.    In claiming Mr. Fontaine's image as the Douglas High School shooter, Defendants acted intentionally or recklessly.

## III.    Conspiracy

60.    All previous allegations are incorporated by reference.

61.    Defendants acted together, as a cabal, to accomplish their campaign of defamation. Defendants had a meeting of the minds on the object or course of action underlying their pattern of recklessly defamatory publications.

62.    As a result of this meeting of the minds, Defendants collectively committed the unlawful overt acts detailed above.

63.    Defendants are jointly and severally liable for the injuries Mr. Fontaine suffered due to Defendants' wrongful actions.

## IV.    Respondeat Superior

64.    All previous allegations are incorporated by reference.

65.    When InfoWars employees acted in the manner described in this Petition, they did so as agents of InfoWars and within the scope of their authority from Mr. Jones.

010406

66.     InfoWars and Alex Jones are liable for the damages proximately caused by the conduct of employees and agents, including Kit Daniels, pursuant to the doctrine of *respondeat superior*.

## DAMAGES

67.     Plaintiff has suffered general and special damages, including a severe degree of mental stress and anguish which has disrupted his daily routine.

68.     Plaintiff has also suffered damage to his reputation and image, both up to the present and into the future.

69.     Because Defendants' conduct amounts to defamation *per se*, Plaintiff is also entitled to an award of presumed damages.

70.     Plaintiff is also entitled to an award of nominal damages and a judgment clearing his name.

71.     Plaintiff is also entitled to exemplary damages because the Defendants acted with malice.

72.     Plaintiff is also entitled to pre-judgment and post-judgment interest, costs of court, and attorney's fees.

73.     Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff is seeking relief over $1,000,000.

## JURY DEMAND

74.     Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

010407

## REQUEST FOR DISCLOSURE

75.     Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANTS

76.     Take notice that pursuant to Rules 192 and 197 of the Texas Rules of Civil Procedure, Plaintiff serves the attached interrogatories, Exhibits "B", "D", "F", and "I" to be propounded to Defendants. You are hereby instructed to answer the following interrogatories separately, fully, in writing, and under oath as required by Rule 197.2(d) of the Texas Rules of Civil Procedure and the provisions of Rule 14 shall not apply.

77.     You are further advised that, pursuant to Rule 193.5, the party responding to these Interrogatories is under a duty to supplement his answer if he obtains information upon the basis of which (a) he knows that the answer was incorrect when made, or (b) he knows the answer, though correct when made, is no longer true and the circumstances are such that he failure to amend the answer is in substance a knowing concealment.

78.     If any space left for your answer is insufficient, please attach a separate sheet to complete such answer. The answers shall be served upon the undersigned counsel within 50 days after the service of these interrogatories.

010408

## PLAINTIFF'S REQUESTS FOR PRODUCTION TO DEFENDANTS

79.    Plaintiff propounds the attached Requests for Production as Exhibits "C", "E", "G", and "J" pursuant to Rule 196 of the Texas Rules of Civil Procedure, that Defendants produce or permit the undersigned attorney, to inspect and copy or reproduce the items hereinafter designated on Exhibits "C", "E", "G", and "J" attached hereto.  Within 50 days after service of these Requests for Production, you must serve a written response to the undersigned attorney at 1010 Lamar, Suite 1600, Houston, Texas 77002, including the items requested or stating with respect to each request that an inspection and copying or reproduction will be permitted as requested.  In the event a request is objected to, please specifically state (a) the legal or factual basis for the objection, and (b) the extent to which you refuse to comply with the request.  Pursuant to Rule 193.2(b) of the Texas Rules of Civil Procedure, a party must comply with as much of the request to which the party has made no objection unless it is unreasonable under the circumstances to do so before obtaining a ruling on the objection.   Furthermore, demand is made for the supplementation of your answers to these discovery requests as required by Rule 193.5 of the Texas Rules of Civil Procedure.

## PLAINTIFF'S REQUESTS FOR ADMISSION TO DEFENDANTS

80.    Plaintiff propounds the attached Requests for Admission as Exhibits "H" and "K" under the provisions of Rules 192 and 198 of the Texas Rules of Civil Procedure.  You hereby are requested to admit the truth of the following matters for

22

the purpose of this action only and subject to all proper objections to admissibility which may be made at time of trial.  Each of the matters to which an admission is requested shall be deemed admitted unless the party to whom the request is directed delivers responses, either denying specifically the matters to which an admission is requested or setting forth in detail the reasons why such cannot truthfully be either admitted or denied, to the undersigned counsel for Plaintiff within fifty (50) days after the delivery of this request.

81.    Pursuant to Rule 215.4(b) of the Texas Rules of Civil Procedure, take notice that should Defendant fail to admit the genuineness of any document or the truth of any matter as requested under Rule 198 and which follows hereunder and Plaintiff proves the genuineness of the document or the truth of the matter, Plaintiff shall seek an order from the Court requiring the Defendant to pay reasonable expenses incurred in making that proof, including but not limited to, reasonable expenses and attorney's fees incurred in making that proof.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff Marcel Fontaine asks that the Court issue citation for each Defendant to appear and answer, and that Plaintiff be awarded all the damages set forth above, and to grant whatever further relief to which Plaintiff is justly entitled.

010410

Respectfully submitted,

**KASTER, LYNCH, FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

010411

## DEFINITIONS FOR USE IN RESPONDING
## TO EXHIBITS "B" & "C"

As used herein, the words defined below shall be deemed to have the following meanings:

1. "Communicate" means conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise.

2. "Contract" means any agreement or exchange of promises between two parties.

3. "Deep state" and "false flag" appear to be terms of art used within the mythology of InfoWars. Plaintiff will not attempt to precisely define these inscrutable phrases, but assumes their meaning is understood by those at InfoWars who use them.

4. "Document" means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, runes, ciphers, maps, star charts, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any drafts of the aforesaid upon which have been placed any additional marks or notations.

5. "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars, LLC, Free Speech Systems, LLC, or any other corporate name.

6. "Publication" means disseminating content to the public by any means, whether it be print, internet, video, radio, or otherwise.

7. "The article in question" means the InfoWars article attached as "Exhibit A" to Plaintiff's petition.

010412

## DEFINITIONS FOR USE IN RESPONDING
## TO EXHIBITS "D" & "E"

As used herein, the words defined below shall be deemed to have the following meanings:

1.  "Communications" means conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise.

2.  "Deep state" and "false flag" appear to be terms of art used within the mythology of InfoWars. Plaintiff will not attempt to define these increasingly inscrutable phrases, but assumes their meaning is understood by those at InfoWars who use them.

3.  "Document" means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, runes, ciphers, maps, star charts, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any drafts of the aforesaid upon which have been placed any additional marks or notations.

4.  "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars, LLC, Free Speech Systems, LLC, or any other corporate name.

5.  "Publish" means disseminating content to the public by any means, whether it be print, internet, video, radio, or otherwise.

6.  "Revenue" means income of any kind, whether directly or indirectly.

7.  "The article in question" means the InfoWars article attached as "Exhibit A" to Plaintiff's petition.

010413

## DEFINITIONS FOR USE IN RESPONDING
## TO EXHIBITS "F", "G", & "H"

As used herein, the words defined below shall be deemed to have the following meanings:

1.  "Communications" means conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise.

2.  "Document" means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, runes, ciphers, maps, star charts, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any drafts of the aforesaid upon which have been placed any additional marks or notations.

3.  "InfoWars, LLC" means the named defendant registered with the Texas Secretary of State.

4.  "Free Speech Systems, LLC" means the named defendant registered with the Texas Secretary of State.

5.  "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars, LLC, Free Speech Systems, LLC, or any other corporate name.

6.  "Published" means disseminating content to the public by any means, whether it be print, internet, video, radio, or otherwise.

7.  "The article in question" means the InfoWars article attached as "Exhibit A" to Plaintiff's petition.

27

## DEFINITIONS FOR USE IN RESPONDING
## TO EXHIBITS "I", "J", & "K"

As used herein, the words defined below shall be deemed to have the following meanings:

1. "Communications" means conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise.

2. "Document" means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, runes, ciphers, maps, star charts, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any drafts of the aforesaid upon which have been placed any additional marks or notations.

3. "InfoWars, LLC" means the named defendant registered with the Texas Secretary of State.

4. "Free Speech Systems, LLC" means the named defendant registered with the Texas Secretary of State.

5. "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars, LLC, Free Speech Systems, LLC, or any other corporate name.

6. "Published" means disseminating content to the public by any means, whether it be print, internet, video, radio, or otherwise.

7. "The article in question" means the InfoWars article attached as "Exhibit A" to Plaintiff's petition.

28

# CIVIL CASE INFORMATION SHEET

CAUSE NUMBER *(FOR CLERK USE ONLY):* _____   COURT *(FOR CLERK USE ONLY):* _____

STYLED   MARCEL FONTAINE VS. ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and KIT DANIELS
*(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)*

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

| 1. Contact information for person completing case information sheet: | | Names of parties in case: | Person or entity completing case information sheet is: |
|---|---|---|---|
| Name:<br><br>Mark D. Bankston | Email:<br><br>mark@fbtrial.com | Plaintiff(s)/Petitioner(s):<br><br>MARCEL FONTAINE | [X] Attorney for Plaintiff/Petitioner<br>[ ] *Pro Se* Plaintiff/Petitioner<br>[ ] Title IV-D Agency<br>[ ] Other: |
| Address:<br><br>1010 Lamar, Ste. 1600 | Telephone:<br><br>(713) 221-8300 | | Additional Parties in Child Support Case: |
| City/State/Zip:<br><br>Houston, Texas 77002 | Fax:<br><br>(713) 221-8301 | Defendant(s)/Respondent(s):<br><br>ALEX E. JONES, INFOWARS,<br>LLC, FREE SPEECH<br>SYSTEMS, LLC, and KIT<br>DANIELS | Custodial Parent:<br><br>Non-Custodial Parent: |
| Signature:<br><br>/s/ Mark D. Bankston | State Bar No:<br><br>24034828 | | Presumed Father: |
| | | [Attach additional page as necessary to list all parties] | |

**2. Indicate case type, or identify the most important issue in the case *(select only 1)*:**

| Civil | | | Family Law | |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | **Post-judgment Actions (non-Title IV-D)** |
| *Debt/Contract*<br>[ ] Consumer/DTPA<br>[ ] Debt/Contract<br>[ ] Fraud/Misrepresentation<br>[ ] Other Debt/Contract:<br><br>*Foreclosure*<br>[ ] Home Equity—Expedited<br>[ ] Other Foreclosure<br>[ ] Franchise<br>[ ] Insurance<br>[ ] Landlord/Tenant<br>[ ] Non-Competition<br>[ ] Partnership<br>[ ] Other Contract: | [ ] Assault/Battery<br>[ ] Construction<br>[X] Defamation<br>*Malpractice*<br>  [ ] Accounting<br>  [ ] Legal<br>  [ ] Medical<br>  [ ] Other Professional<br>    Liability:<br><br>[ ] Motor Vehicle Accident<br>[ ] Premises<br>*Product Liability*<br>  [ ] Asbestos/Silica<br>  [ ] Other Product Liability<br>    List Product:<br><br>[ ] Other Injury or Damage: | [ ] Eminent Domain/<br>  Condemnation<br>[ ] Partition<br>[ ] Quiet Title<br>[ ] Trespass to Try Title<br>[ ] Other Property: | [ ] Annulment<br>[ ] Declare Marriage Void<br>*Divorce*<br>  [ ] With Children<br>  [ ] No Children | [ ] Enforcement<br>[ ] Modification—Custody<br>[ ] Modification—Other |
| | | | | **Title IV-D** |
| | | | | [ ] Enforcement/Modification<br>[ ] Paternity<br>[ ] Reciprocals (UIFSA)<br>[ ] Support Order |
| | | **Related to Criminal Matters** | **Other Family Law** | **Parent-Child Relationship** |
| | | [ ] Expunction<br>[ ] Judgment Nisi<br>[ ] Non-Disclosure<br>[ ] Seizure/Forfeiture<br>[ ] Writ of Habeas Corpus—<br>  Pre-indictment<br>[ ] Other: | [ ] Enforce Foreign<br>  Judgment<br>[ ] Habeas Corpus<br>[ ] Name Change<br>[ ] Protective Order<br>[ ] Removal of Disabilities<br>  of Minority<br>[ ] Other: | [ ] Adoption/Adoption with<br>  Termination<br>[ ] Child Protection<br>[ ] Child Support<br>[ ] Custody or Visitation<br>[ ] Gestational Parenting<br>[ ] Grandparent Access<br>[ ] Parentage/Paternity<br>[ ] Termination of Parental<br>  Rights<br>[ ] Other Parent-Child: |
| **Employment** | **Other Civil** | | | |
| [ ] Discrimination<br>[ ] Retaliation<br>[ ] Termination<br>[ ] Workers' Compensation<br>[ ] Other Employment: | [ ] Administrative Appeal<br>[ ] Antitrust/Unfair<br>  Competition<br>[ ] Code Violations<br>[ ] Foreign Judgment<br>[ ] Intellectual Property | [ ] Lawyer Discipline<br>[ ] Perpetuate Testimony<br>[ ] Securities/Stock<br>[ ] Tortious Interference<br>[ ] Other: | | |

| Tax | Probate & Mental Health | |
|---|---|---|
| [ ] Tax Appraisal<br>[ ] Tax Delinquency<br>[ ] Other Tax | *Probate/Wills/Intestate Administration*<br>  [ ] Dependent Administration<br>  [ ] Independent Administration<br>  [ ] Other Estate Proceedings | [ ] Guardianship—Adult<br>[ ] Guardianship—Minor<br>[ ] Mental Health<br>[ ] Other: |

**3. Indicate procedure or remedy, if applicable *(may select more than 1)*:**

| | | |
|---|---|---|
| [ ] Appeal from Municipal or Justice Court<br>[ ] Arbitration-related<br>[ ] Attachment<br>[ ] Bill of Review<br>[ ] Certiorari<br>[ ] Class Action | [ ] Declaratory Judgment<br>[ ] Garnishment<br>[ ] Interpleader<br>[ ] License<br>[ ] Mandamus<br>[ ] Post-judgment | [ ] Prejudgment Remedy<br>[ ] Protective Order<br>[ ] Receiver<br>[ ] Sequestration<br>[ ] Temporary Restraining Order/Injunction<br>[ ] Turnover |

**4. Indicate damages sought *(do not select if it is a family law case)*:**
[ ] Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
[ ] Less than $100,000 and non-monetary relief
[ ] Over $100,000 but not more than $200,000
[ ] Over $200,000 but not more than $1,000,000
[X] Over $1,000,000

010416

EXHIBIT "I"

**Exhibit "I"**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES**
**TO DEFENDANT FREE SPEECH SYSTEMS, LLC**

**INTERROGATORY NO. 1:** Identify all persons answering or supplying information used in answering these Interrogatories and identify their job duties at InfoWars.

**ANSWER:**

**INTERROGATORY NO. 2:** What kind business is Free Speech Systems, LLC, *i.e.*, what does it do?

**ANSWER:**

**INTERROGATORY NO. 3:** Describe the business relationship between InfoWars, LLC and Free Speech Systems, LLC.

**ANSWER:**

**INTERROGATORY NO. 4:** Identify the factual basis for any defense(s) to the causes of actions asserted in Plaintiff's petition.

**ANSWER:**

**INTERROGATORY NO. 5:** Identify any electronically stored information or documents relevant to Plaintiff's petition or your defenses which have been destroyed, deleted, corrupted, damaged, overwritten, or otherwise lost.

**ANSWER:**

# EXHIBIT "J"

**Exhibit "J"**

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
TO DEFENDANT FREE SPEECH SYSTEMS, LLC**

**REQUEST FOR PRODUCTION NO. 1:** A copy of an organizational chart for Free Speech Systems, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** A copy of all legal claims or lawsuits filed against Free Speech Systems, LLC in the past ten years.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** A copy of all insurance policies which may apply to any part of a judgment rendered in this case.

**RESPONSE:**

# EXHIBIT "K"

010421

Exhibit "K"

## PLAINTIFF'S FIRST REQUESTS FOR ADMISSIONS
## TO DEFENDANT FREE SPEECH SYSTEMS, LLC

**REQUEST FOR ADMISSION NO. 1:** Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that the article attached as "Exhibit 1" to Plaintiff's petition accurately reproduces the content of an article published on the InfoWars website on February 14, 2018.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:** Admit that Marcel Fontaine had no involvement in the Douglas High School Shooting.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:** Admit that Marcel Fontaine had no involvement in a false flag operation involving the Douglas High School Shooting.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 5:** Admit that individuals were killed in the Douglas High School Shooting.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 6:** Admit that InfoWars published false statements about the Chobani corporation.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 7:** Admit that InfoWars published false statements about Comet Ping-Pong and James Alefantis.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 8:** Admit that InfoWars published false statements concerning the Sandy Hook school shooting.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 9:** Admit that InfoWars published false statements concerning Brennan Gilmore.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 10:** Admit that InfoWars published false statements about the Sutherland Springs church shooting.

**RESPONSE:**

EXHIBIT "A"

010424

https://www.infowars.com/report-florida-shooter-inspired-by-isis-allahu-akbar/   Go   JAN  FEB  MAR

17 captures
15 Feb 2018 - 16 Feb 2018                                                    2017  2018  2019



THE
THE ALEX JONES SHOW
LISTEN NOW

RADIO SHOWNEWSVIDEOSSTORETOP STORIES

BREAKING NEWSCONTACT

WATCH LIVE                    BREAKING                    STORE

Exhibit A

## MSM already covering it up

**Kit Daniels | Infowars.com - FEBRUARY 14, 2018** 💬 Comments



**Alleged photos of the suspected Florida high school shooter make reference to various ideologies including communism and perhaps ISIS, and voter records suggest 19-year-old Nicolas Cruz was a Democratic voter.**



010426



Additionally, the shooter's garb is very similar to the style worn by ISIS fighters in Syria.

**PolitiDiva™**
@realPolitiDiva

Parkland Killer, Nicolas Cruz, was a known security threat & was
not allowed to carry a backpack to school last year. Also
belonged to Middle East Resistance groups on social media. A)
How did he get in being a known-threat? B) Was this terror-
related?

4:52 PM - Feb 14, 2018

673        556 people are talking about this

The Instagram account was taken down soon after the suspect was arrested.

The shooter was also suspected of having planted bombs, according to the police scanner

Islam slant back in 2015, but interestingly, there's also a 19-year-old Nicolas Cruz who's listed as a Democratic voter in Oakland Park, Florida, which may be the suspect (address blurred out to protect the innocent otherwise):

     

**22 likes**

**cruz_nikolas** Well at least we now know what it means when a sand durka says "allahu Akbar" 😂😂😂

View all 12 comments

DECEMBER 23, 2015

 cruz_nikolas   •••

## Full Name
## Nombre completo : **NICOLAS CRUZ**

## Street Address
## Dirección : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## City
## Ciudad : **OAKLAND PARK**

## Zip Code
## Código postal : **33311**

## County Name
## Condado : **BROWARD**

## Voter Gender
## Género del votante : **Male**

010428

Fecha de inscripción : ░░░░░░░

Party
Partido : **Florida Democratic Party**

Voter Status
Calificación como votante : **Active\***

And another alleged photo of the suspect shows communist garb:



R: **0**
**Shooter is a commie:**
REEEEEEEEEEEEE

This screenshot, found on a Japanese cartoon image board, was apparently taken right after the suspect was apprehended – and right before Instagram nixed the account:



cruz_nikolas • Follow

010429





It's possible the suspect is simply mentally disturbed and latched onto various ideologies to fill a sense of emptiness.

**Facebook:** https://www.facebook.com/RealKitDaniels

**Twitter:**  Follow @KitDaniels1776

## RELATED ARTICLES



### GOWDY: LEAVING CONGRESS TO WORK SOMEWHERE 'WHERE FACTS MATTER'

 U.S. NEWS    Comments



### SHOCK POLL FINDS DEMOCRATS' "BLUE WAVE" HAS TURNED INTO A DROUGHT

🔖 U.S. NEWS    💬 Comments

### REPORT: ROMNEY TO ANNOUNCE SENATE RUN ON SOCIAL MEDIA

🔖 U.S. NEWS    💬 Comments

### SHOOTING OUTSIDE NSA HQ IN FORT MEADE, ONE INJURED

🔖 U.S. NEWS    💬 Comments

### FEINSTEIN FLASHBACK: 'DAY WHEN AMERICA COULD BE THE WELFARE STATE FOR MEXICO IS GONE'

🔖 U.S. NEWS    💬 Comments

## COMMENTS

Disqus seems to be taking longer than usual. Reload?



**Tuesday, Feb. 13th: New Era of News on Horizon** - NYT CEO says print journalism's days are numbered; but in reality, it's the MSM's days that are finished. Also, the U....

READ MORE ⌄



WATCH NOW
Watch The Alex Jones Radio Show

00:00 / 00:00

## TOP STORIES

Why Is Jeff Sessions Violating Donald Trump's Marijuana Position
Pedophile Becomes Fire Chief, Cannabis Activist Gets Life
Reported Florida Shooter Dressed as Communist, Supported ISIS
DACA Insanity: Another Judge Blocks Trump
Shock Footage: Student Films Shots Fired Inside Florida High School
The New Genesis: How To Save Humanity

## MOST POPULAR

Obama's Artist Portrays White Girl Beheaded by Empowered Black Woman

"Fuck Trump" T-Shirt Wearer Says He is Fighting Institutional Racism

Vice Claims Black Women Fleeing America to Escape White People

Germany: Syrian Refugee Throws Dog Out of Window Because He Was Annoyed By It

Liberals Celebrate, Joke About White Powder Letter Sent to Donald Trump Jr.

## GET INFORMED

010432

First Name

Last Name

Email Address

SUBSCRIBE

## FROM OUR STORE VISIT STORE→

**Brain Force Plus**
Your Price: $39.95
On Sale: $29.95
Flip the switch and supercharge your state of mind with the all-new Brain Force PLUS

BUY NOW

### LEARN MORE

## WATCH THE NEWS

 WAR ROOM WITH OWEN SHROYER WITH DAVID KNIGHT - FEBRUARY 13, 2018

 WAR ROOM WITH OWEN SHROYER & ROGER STONE. DEEP STATE PREPARING FOR THE FALL OF HILLARY CLINTON

 THE ALEX JONES SHOW. AI SUPER COMPUTERS WILL DECIDE WHO LIVES AND WHO DIES

 REAL NEWS WITH DAVID KNIGHT. REVEALED: THE "DEEP THROAT" OF RUSSIAGATE

  

## FEATURED VIDEOS

THE  

RADIO SHOWNEWS

VIDEOSSTORE    WATCH LIVE

TOP STORIES    PAGE NOT
               FOUND - BREAKING

**The Fight For Free Speech -** See the rest on the Alex Jones YouTube channel.



RADIO SHOWNEWS

VIDEOSSTORE    WATCH LIVE

TOP STORIES    PAGE NOT
               FOUND - BREAKING

**Does Tucker Carlson Despise Alex Jones? -** See the rest on the Alex Jones YouTube channel.

## ILLUSTRATION





## POLLS

How much money would CNN need to pay you to watch?

○ $1000

○ $10,000

○ $1,000,000

○ My time is too valuable.

Vote    View Results

# INFOWARS

© 2018 Infowars.com is a Free Speech Systems, LLC Company.
All rights reserved. Digital Millennium Copyright Act Notice.

|  |  |  |
|---|---|---|
| Radio | Archive | About Alex Jones Show |
| Video | Watch Alex Jones Show | Subscribe |
| PPTV | Most Recent | Contact |
| Store | D.M.C.A. | |
| Infowars Life | Corrections | |
| T.O.S. | | |

# INFOWARS

© 2018 Infowars.com is a Free Speech Systems, LLC Company.
All rights reserved. Digital Millennium Copyright Act Notice.

010436

EXHIBIT "B"

Exhibit "B"

**PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT KIT DANIELS**

**INTERROGATORY NO. 1:** List all job titles you have held at InfoWars and the dates in which you held them.

**ANSWER:**

**INTERROGATORY NO. 2:** Describe your current job duties.

**ANSWER:**

**INTERROGATORY NO. 3:** List all instances in which you saw the photograph of Mr. Fontaine prior to publishing the article in question.

**ANSWER:**

**INTERROGATORY NO. 4:** Describe all steps you took prior to publication to assure yourself of the accuracy of the article in question.

**ANSWER:**

**INTERROGATORY NO. 5:** List all individuals you communicated with prior to publication regarding the photograph of Mr. Fontaine or the identity of the Douglas High School shooter.

**ANSWER:**

**INTERROGATORY NO. 6:** Do you contend that the members of the "deep state" or other agents of the U.S government or global elite are responsible for orchestrating and/or permitting the Douglas High School Shooting as part of a "false flag" operation, and if so, do you contend that Mr. Fontaine was involved in that "false flag" operation? State all facts supporting such contentions, if made.

**ANSWER:**

**INTERROGATORY NO. 7:** Describe the factual basis for any defense(s) to the causes of actions asserted in Plaintiff's petition.

**ANSWER:**

# EXHIBIT "C"

010439

Exhibit "C"

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
<u>TO DEFENDANT KIT DANIELS</u>**

**<u>REQUEST FOR PRODUCTION NO. 1:</u>** A copy of any contract between you and any other Defendant in this matter.

**<u>RESPONSE:</u>**

**<u>REQUEST FOR PRODUCTION NO. 2:</u>** A copy of any documents in your possession or control prior to publication on February 14, 2018 regarding the identity of the Douglas High School shooter.

**<u>RESPONSE:</u>**

**<u>REQUEST FOR PRODUCTION NO. 3:</u>** All documents in your possession or control relating to the Plaintiff, the article in question, or efforts to ascertain the identity of the Douglas High School shooter.

**<u>RESPONSE:</u>**

EXHIBIT "D"

010441

Exhibit "D"

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT ALEX JONES

**INTERROGATORY NO. 1:** Identify all persons answering or supplying information used in answering these Interrogatories.

**ANSWER:**

**INTERROGATORY NO. 2:** Identify all business entities which derive revenue from the InfoWars website, including the sale of products through the InfoWars online store.

**ANSWER:**

**INTERROGATORY NO. 3:** Did you personally interview and hire Kit Daniels to perform work for InfoWars? If not, who did?

**ANSWER:**

**INTERROGATORY NO. 4:** Are you Kit Daniels' immediate supervisor? If not, who is?

**ANSWER:**

**INTERROGATORY NO. 5:** Describe the steps you require be taken before InfoWars publishes personal information or photographs in connection with a news story.

**ANSWER:**

**INTERROGATORY NO. 6:** Describe the steps you require be taken before InfoWars publishes personal information or photographs in connection with an allegation of serious criminal conduct.

**ANSWER:**

**INTERROGATORY NO. 7:** What is "truth journalism?"

**ANSWER:**

**INTERROGATORY NO. 8:** List every video you have posted to the internet, under any of your personal social media accounts, since January 1, 2016 in which the title or description of the video includes the words "communist(s)," "communism," or "commie."

**ANSWER:**

**INTERROGATORY NO. 9:** Do you contend that the members of the "deep state" or other agents of the U.S government or global elite are responsible for orchestrating and/or permitting the Douglas High School Shooting as part of a "false flag" operation, and if so, do you contend that Marcel Fontaine was involved in that "false flag" operation? State all facts supporting such contentions, if made.

**ANSWER:**

**INTERROGATORY NO. 10:** Identify the factual basis for any defense(s) to the causes of actions asserted in Plaintiff's petition.

**ANSWER:**

EXHIBIT "E"

Exhibit "E"

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION**
**TO DEFENDANT ALEX JONES**

**REQUEST FOR PRODUCTION NO. 1:** A copy of all legal claims or lawsuits filed against you in the past ten years.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** A copy of any documents in your possession or control on February 14, 2018 regarding the identity of the Douglas High School shooter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** All documents in your possession or control relating to the Plaintiff, the article in question, or efforts to ascertain the identity of the Douglas High School shooter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** A copy of all insurance policies which may apply to any part of a judgment rendered in this case.

**RESPONSE:**

EXHIBIT "F"

Exhibit "F"

**PLAINTIFF'S FIRST SET OF INTERROGATORIES**
**TO DEFENDANT INFOWARS, LLC**

**INTERROGATORY NO. 1:** Identify all persons answering or supplying information used in answering these Interrogatories and identify their job duties at InfoWars.

**ANSWER:**

**INTERROGATORY NO. 2:** What kind business is InfoWars, LLC, *i.e.*, what does it do?

**ANSWER:**

**INTERROGATORY NO. 3:** Describe the business relationship between InfoWars, LLC and Free Speech Systems, LLC.

**ANSWER:**

**INTERROGATORY NO. 4:** List every occasion and every medium by which any employee or agent of InfoWars caused Plaintiff's photograph to be published publicly.

**ANSWER:**

**INTERROGATORY NO. 5:** State the number of page views received by the article in question on February 14-15, 2018.

**ANSWER:**

**INTERROGATORY NO. 6:** List every occasion and every medium by which any employee or agent of InfoWars publicly posted a link, shared, or otherwise referenced the article in question.

**ANSWER:**

**INTERROGATORY NO. 7:** Identify every InfoWars employee or agent who was involved in the research, creation, or review of the article in question.

**ANSWER:**

**INTERROGATORY NO. 8:** Identify every source of information upon which InfoWars based its decision to publish Plaintiff's photograph.

**ANSWER:**

**INTERROGATORY NO. 9:** Identify and describe all communications between any employee or agent of InfoWars and any person outside the company relating to the Plaintiff, the article in question, or the identity of the Douglas High School shooter.

**ANSWER:**

**INTERROGATORY NO. 10:** Identify the factual basis for any defense(s) to the causes of actions asserted in Plaintiff's petition.

**ANSWER:**

**INTERROGATORY NO. 11:** Identity any electronically stored information or documents relevant to Plaintiff's petition or your defenses which have been destroyed, deleted, corrupted, damaged, overwritten, or otherwise lost.

**ANSWER:**

**INTERROGATORY NO. 12:** List every article posted to the InfoWars website since January 1, 2016 in which the title of the article includes the words "communist(s)," "communism," or "commie."

**ANSWER:**

**INTERROGATORY NO. 13:** List every video posted to the internet by InfoWars since January 1, 2016 in which the title or description of the video includes the words "communist(s)," "communism," or "commie."

**ANSWER:**

EXHIBIT "G"

Exhibit "G"

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
TO DEFENDANT INFOWARS, LLC**

**REQUEST FOR PRODUCTION NO. 1:** A copy of an organizational chart for InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** A copy of every version of the article in question which was published the InfoWars website.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** A copy, originating from whatever medium, for every occasion in which any employee or agent of InfoWars caused Plaintiff's photograph to be published.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** All communications within InfoWars relating to the Plaintiff, the article in question, or efforts to ascertain the identity of the Douglas High School shooter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All communications between any employee or agent of InfoWars and any third parties relating to the Plaintiff, the article in question, or the identity of the Douglas High School shooter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** All documents in your possession or control relating to the Plaintiff, the article in question, or efforts to ascertain the identity of the Douglas High School shooter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All documents or communications received by InfoWars relating to the Plaintiff, the article in question, or efforts to ascertain the identity of the Douglas High School shooter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:** All documents or electronic databases reflecting page views for InfoWars.com webpages on February 14-15, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:** A copy of all comments posted to the article in question.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:** All written or recorded statements made by any persons having knowledge of any facts concerning the publication of Plaintiff's photograph or the creation of the article in question.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:** All demands for retraction or correction received by InfoWars in the past ten years.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:** All documents relating to disciplinary or corrective actions taken against any employee or agent of InfoWars due to the publication of Plaintiff's photograph.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:** All documents relating to disciplinary or corrective actions taken against any employee or agent of InfoWars due to the publication of false or incorrect information during the past ten years.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:** All documents used to train or instruct InfoWars employees of the vetting of factual information for publication, as in effect on February 14, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:** All documents reflecting policies for the factual vetting of information published by InfoWars, as in effect on February 14, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:** All documents setting forth InfoWars' editorial standards or guidelines, as in effect on February 14, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:** All documents setting forth InfoWars' disciplinary rules or code of conduct for reporters and editorial staff, as in effect on February 14, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:** All documents contained within Kit Daniel's personnel file.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:** A copy of any employment agreements or other contracts between Kit Daniels and any other Defendant in this matter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:** A copy of all legal claims or lawsuits filed against InfoWars, LLC in the past ten years.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 21:** A copy of all insurance policies which may apply to any part of a judgment rendered in this case.

**RESPONSE:**

010452

EXHIBIT "H"

010453

Exhibit "H"

## PLAINTIFF'S FIRST REQUESTS FOR ADMISSIONS
## TO DEFENDANT INFOWARS, LLC

**REQUEST FOR ADMISSION NO. 1:** Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that the article attached as "Exhibit 1" to Plaintiff's petition accurately reproduces the content of an article published on the InfoWars website on February 14, 2018.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:** Admit that Marcel Fontaine had no involvement in the Douglas High School Shooting.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:** Admit that Marcel Fontaine had no involvement in a false flag operation involving the Douglas High School Shooting.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 5:** Admit that individuals were killed in the Douglas High School Shooting.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 6:** Admit that InfoWars published false statements about the Chobani corporation.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 7:** Admit that InfoWars published false statements about Comet Ping-Pong and James Alefantis.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 8:** Admit that InfoWars published false statements concerning the Sandy Hook school shooting.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 9:** Admit that InfoWars published false statements concerning Brennan Gilmore.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 10:** Admit that InfoWars published false statements about the Sutherland Springs church shooting.

**RESPONSE:**

EXHIBIT
5

CAUSE NO. D-1-GN-18-006623

SCARLETT LEWIS,           *   IN THE DISTRICT COURT OF
                            *
          Plaintiff,   *
v.                        *
                            *   TRAVIS COUNTY, TEXAS
ALEX E. JONES; INFOWARS,    *
LLC; and FREE SPEECH        *
SYSTEMS, LLC,            *
                            *   53rd JUDICIAL DISTRICT
          Defendants.  *
*********************************************************

** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER **

VIDEOTAPED/ORAL DEPOSITION OF

ROB DEW

Friday, March 15, 2019

VIDEOTAPED/ORAL DEPOSITION OF ROB DEW, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above styled and numbered cause on Friday, March 15, 2019, from 10:20 a.m. to 11:57 a.m., before KIMBERLEE SCHROEDER, CSR, RPR, CCRR reported via Machine Shorthand at the offices of Waller, Lansden, Dortch & Davis, 100 Congress Avenue, Suite 1800, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and/or any provisions stated on the record or attached hereto.

2

```
 1                    APPEARANCES

 2

 3  COUNSEL FOR PLAINTIFF:

 4          KASTER, LYNCH, FARRAR & BALL, LLP
            1010 Lamar, Suite 1600
 5          Houston, Texas
            (T) 713-221-8300
 6              By:  WILLIAM R. OGDEN, Esq.
                    bill@fbtrial.com
 7                  MARK D. BANKSTON, Esq.
                    mark@fbtrial.com
 8

 9  COUNSEL FOR DEFENDANTS:

10          GLAST, PHILLIPS & MURRAY, P.C.
            14801 Quorom Drive, Suite 500
11          Dallas, Texas
            (T) 972-419-8300
12              By:  MARK C. ENOCH, Esq.
                    mkenoch@gpm-law.com,
13

14          BARNES LAW, LLP   (PRO HAC VICE)
            601 South Figueroa St., Suite 4050
15          Los Angeles, California
            (T) 213.294.3006
16              By:  Robert E. Barnes, Esq.
                    barneslaw@barneslawllp
17

18  VIDEOGRAPHER:

19          JOE BAZAN, Videographer

20

21

22

23

24

25
```

010457

1                    I N D E X

2    DEPOSITION OF ROB DEW

3    EXAMINATION                              PAGE

4   By Mr. Ogden                               4

5   Changes and Signature                     49

6   Reporter's Certification                  51

7   Further Certification                     53

8                       ---oOo---

9                       EXHIBITS

10   PLAINTIFF'S                              PAGE

11  Exhibit 1   Plaintiff's Notice to Take the      4
                Deposition of Free Speech Systems,
12              LLC

13   Exhibit 2   Printout of "InfoWars, LLC, Terms of   21
                 Use & Privacy Policy"
14
     Exhibit 3   Certificate of Correction          47
15
16  Exhibit 4   "Terms of Service"                 46

16                      ---oOo---

17

18

19

20

21

22

23

24

25

4

```
 1                   P R O C E E D I N G S

 2   Friday, March 15, 2019                    10:20 a.m.

 3                       ---oOo---

 4           (Plaintiff's Exhibit No. 1 was marked for

 5      identification.)

 6           THE VIDEOGRAPHER:  We are on the record for the

 7   videotaped deposition of InfoWars, LLC, corporate

 8   representative, Rob Dew, taken on Friday, March 15th,

 9   2019.  The time is approximately 10:20 a.m.

10           Will the Court Reporter please swear in the

11   witness?

12                       ROB DEW,

13   after being first duly sworn, was examined and testified

14   as follows:

15                      EXAMINATION

16   BY MR. OGDEN:

17      Q.   Will you please state your name for me?

18      A.   Rob Dew.

19      Q.   What is your employment status with InfoWars,

20   LLC?

21      A.   As far as I know, there is no employment status

22   with InfoWars, LLC.

23      Q.   What is your understanding as to why you are

24   here today?

25      A.   To give a deposition.
```

1      Q.    Sure.   About what?

2      A.    About -- well, a couple things, I guess.

3      Q.    If you can put your mic on.

4      A.    Sure.

5      Q.    Clip it to your lapel.

6      A.    I don't touch other people's equipment.

7      Q.    Sure.

8            As to what you're here to talk about today,

9   what's your understanding?

10     A.    It's to ask questions that are listed in here

11  -- or answer questions listed in here for InfoWars, LLC,

12  and also for Free Speech Systems.

13     Q.    And right now, it's just InfoWars, LLC.

14           Have you ever been employed by InfoWars, LLC?

15     A.    Not to my knowledge.

16     Q.    Okay.   Have you ever received any sort of

17  payment for InfoWars, LLC?

18     A.    Not to my knowledge.

19     Q.    Exhibit 1 is in front of you.

20     A.    M-hm.

21     Q.    It is the Notice of Deposition.

22           I assume prior to today, you had seen that

23  before?

24     A.    M-hm.

25     Q.    On page 2, there are six topics listed.

14

1  yesterday, and unfortunately, Mr. Bankston is the nice

2  one of us.  So I'm not going to put up with it.  You can

3  leave if you are going to do that.  If you are going to

4  be an obstruction in this deposition, leave now.

5  Otherwise, sit there quietly and don't make gestures and

6  don't share your opinion with anybody but whispering

7  into Mr. Barnes' ear because he is defending this

8  deposition.

9          MR. ENOCH:  I can appreciate your opinion.

10          Please continue the deposition, Mr. Ogden.

11          MR. OGDEN:  Mr. Barnes, did you have something

12  you wanted to share?

13          MR. BARNES:  It was just to instruct him that

14  he had conversations, but not the content of the

15  conversations if it was with attorneys.

16          MR. OGDEN:  Sure.

17      Q.  **Has anyone explained to you -- I'm not asking**

18  **who.  Has anybody explained to you that you are sitting**

19  **here in the corporate capacity today?**

20          **You can answer.**

21      A.  I've had conversations, yes.

22      Q.  **With anybody but your lawyers?**

23      A.  No.

24      Q.  **So when I say has InfoWars ever had an officer**

25  **other than Mr. Jones and you say "not to my knowledge,"**

1  as far as the company is aware, it's never had anyone

2  but Alex Jones; is that true?

3      A.   To my knowledge, yes.  That is true.

4      Q.   And I just want to be clear.  When you say "to

5  my knowledge," that means to InfoWars, LLC's knowledge.

6  Okay?

7      A.   And the question?  Would you repeat it one more

8  time?

9      Q.   Other than Mr. Jones, has InfoWars, LLC, ever

10  had any other officers?

11      A.   Not to my knowledge.

12      Q.   I'm not trying to trick you.  If you don't

13  know, you don't know.  I'm just trying to figure out

14  what you do know.  Okay.

15          The business purpose of InfoWars, LLC, what is

16  it?

17      A.   I don't know.

18      Q.   Okay.  Why was it created?  By "it," why was

19  InfoWars, LLC, created?

20      A.   I don't know.

21      Q.   How does InfoWars, LLC, make money?

22      A.   I don't know.

23      Q.   The InfoWars, LLC, relationship with Alex Jones

24  sitting here today, what is it?

25      A.   To my knowledge, he's the sole officer.

InfoWars, LLC - 3/15/2019

16

1    Q.   What's his title?

2    A.   I don't know.

3    Q.   The company does not know what Mr. Jones' sole

4  title is, and he's the only person that has anything to

5  do with this company; correct?

6    A.   I would not want to give the incorrect title.

7    Q.   So you just don't know?

8    A.   Correct.

9    Q.   Has InfoWars, LLC, ever made a business

10 transaction with Free Speech Systems, LLC?

11   A.   Not to my knowledge.

12   Q.   Okay.  Did you ask Mr. Jones if he's ever made

13 a business transaction between the two companies?

14   A.   No, I did not.

15   Q.   Can you think of anyone else that would have

16 that information?

17   A.   No.

18   Q.   So why didn't you ask Mr. Jones?

19        MR. BARNES:  You can answer to the degree it

20 will not disclose attorney/client communications or

21 conversations.  If you can't answer without disclosing

22 that, then say so.

23        THE WITNESS:  Why did I not --

24        MR. OGDEN:  Q.  Why did you not ask Mr. Jones

25 if there's ever been a business transaction between the

EXHIBIT
**6**

NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 98th JUDICIAL DISTRICT |

### DEFENDANT INFOWARS, LLC'S RESPONSES TO PLAINTIFF'S INTERROGATORIES, REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS

TO:   Mark D. Bankston, Kyle W. Farrar and William R. Ogden, Kaster Lynch Farrar & Ball, LLP, 1010 Lamar, Suite 1600, Houston, Texas 77002

Pursuant to Rules 197.2, 198.2, and 196.2 of the Texas Rules of Civil Procedure,

Defendant InfoWars, LLC provides the following responses to Plaintiff's Interrogatories,

Requests for Admissions and Requests for Production of Documents.

### REQUEST FOR ADMISSION NO. 1:
Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

### RESPONSE:
Because of the volume of documents through which searches were required since this discovery was issued, Infowars and others exerted substantial efforts and resources to search for the requested documents but Infowars was not able to search all documents as requested. Those efforts are continuing. Accordingly this request is presently denied.

### REQUEST FOR ADMISSION NO. 2:
Admit that InfoWars, LLC was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of any of the articles or videos cited in the declaration of Brooke Binkowski, attached to Plaintiff's Motion for Expedited Discovery.

**OBJECTION:**
Defendant objects to this request because of the use of the word "involved" which makes the request vague and ambiguous.

**RESPONSE:**
Subject to these objections, this request is denied. This defendant is not active.

**REQUEST FOR ADMISSION NO. 3:**
Admit that between December 14, 2012 and October 26, 2017, InfoWars, LLC had the authority to remove content from InfoWars.com if InfoWars, LLC determined that the content violated the rights of others or was not appropriate for the website.

**RESPONSE:**
Denied.

**INTERROGATORY NO. 1:**
Identify all persons answering or supplying information used in answering these discovery requests and identify their job duties at InfoWars, LLC.

**ANSWER:**
Rob Drew & Tim Fruge.  These individuals have no job duties at InfoWars, LLC.

**INTERROGATORY NO. 2:**
Describe the business purpose of InfoWars, LLC.

**ANSWER:**
None, other as described in Texas Secretary of State filings. See the attached produced documents.

**INTERROGATORY NO. 3:**
Describe all the ways in which InfoWars, LLC generates revenue.

**ANSWER:**
Infowars, LLC does not generate revenue.

**INTERROGATORY NO. 4:**
Identify every employee or agent of InfoWars, LLC who was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of any of the articles or videos cited in the declaration of Brooke Binkowski, attached to Plaintiff's Motion for Expedited Discovery.

DEFENDANT INFOWARS, LLC'S RESPONSES TO PLAINTIFF'S INTERROGATORIES, REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS - Page 2

010465

**ANSWER:**
None.

**INTERROGATORY NO. 5:**
Does InfoWars, LLC share office space with any other named party?

**ANSWER:**
No. Infowars, LLC has no office.

**INTERROGATORY NO. 6:**
Does InfoWars, LLC share common employees with any other named party?

**ANSWER:**
No.

**INTERROGATORY NO. 7:**
Has an employee or agent of InfoWars, LLC ever rendered services on behalf on any named other party, or has an employee or agent of any named party ever rendered services on behalf on InfoWars, LLC?  Describe.

**ANSWER:**
No.

**INTERROGATORY NO. 8:**
Has InfoWars, LLC ever made an undocumented transfer of funds to any named party, or has any named party ever made an undocumented transfer of funds to InfoWars, LLC? Describe.

**ANSWER:**
No.

**INTERROGATORY NO. 9:**
For each person who had ownership interest in InfoWars, LLC between December 14, 2012 and October 26, 2017, state:

    a)      their full name.

    b)      the date(s) upon which the person acquired their ownership interest.

    c)      the type of consideration paid or promised for the ownership interest and the date(s) on which it was paid or promised.

    d)      the percentage of that individual's ownership interest.

DEFENDANT INFOWARS, LLC'S RESPONSES TO PLAINTIFF'S INTERROGATORIES, REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS - Page 3

010466

e)   whether the person is related by blood or marriage to any other person who is or has been a shareholder, officer, or director of InfoWars, LLC or Free Speech Systems, LLC, and, if so, the identity of the other person and the nature of the relationship.

**ANSWER:**

a)   Alex Jones
b)   November 2007
c)   Money
d)   100%
e)   N/A

**INTERROGATORY NO. 10:**
Identify each person who has served as an officer, director, or management-level employee of InfoWars, LLC at any time during the past six years.

**ANSWER:**
None.

**REQUEST FOR PRODUCTION NO. 1:**
An organizational chart for InfoWars, LLC as of October 26, 2017.

**RESPONSE:**
Responsive documents, if any, will be produced.

**REQUEST FOR PRODUCTION NO. 2:**
All contracts in effect between InfoWars, LLC and any other party.

**RESPONSE:**
None.

**REQUEST FOR PRODUCTION NO. 3:**
All incorporating documents for InfoWars, LLC, including article of incorporation, bylaws, certificate of incorporation, and notice of incorporation.

**RESPONSE:**
Responsive documents, if any, will be produced.

DEFENDANT INFOWARS, LLC'S RESPONSES TO PLAINTIFF'S INTERROGATORIES, REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS - Page 4

010467

Dated: February 25, 2019.

MARK C. ENOCH, P.C.

_/s/ Mark C. Enoch_
Mark C. Enoch
State Bar No. 06630360

14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:    972-419-8366
Facsimile:    972-419-8329
fly63rc@verizon.net

ATTORNEYS FOR DEFENDANTS

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties listed below via efile.txcourts.gov's e-service system on February 25, 2019:

Mark D. Bankston
Kyle W. Farrar
William R. Ogden
Kaster, Lynch, Farrar & Ball, LLP.
1010 Lamar, Suite 1600
Houston, Texas 77002

_/s/ Mark C. Enoch_
Mark C. Enoch

DEFENDANT INFOWARS, LLC'S RESPONSES TO PLAINTIFF'S INTERROGATORIES,
REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS - Page 5

010468

NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 98th JUDICIAL DISTRICT |

## **VERIFICATION**

STATE OF TEXAS           §
                                      §
COUNTY OF _____   §


Before me, the undersigned notary, on this day personally appeared Tim Fruge, as representative of Defendant Infowars, LLC, the affiant, a person whose identity is known to me.  After I administered an oath to affiant, affiant testified as follows:

My name is Tim Fruge.  I am the Free Speech Systems, LLC, Manager of Operations, and for purposes of these interrogatory responses serving as the representative of, Defendant Infowars, LLC.  I am capable of making this verification.  I have reviewed the document entitled Defendant Infowars, LLC's Responses to Plaintiff's Interrogatories, Requests for Admissions and Requests for Production of Documents, in the above-referenced lawsuit.  The answers to the interrogatories stated in the document were derived from documents and to the best of my knowledge, the facts stated in the answers to the interrogatories to which this verification is attached are true and correct.


_____
TIM FRUGE

DEFENDANT INFOWARS, LLC'S RESPONSES TO PLAINTIFF'S INTERROGATORIES,
REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS - Page 6

010469

SUBSCRIBED AND SWORN TO before me on the 25th day of February, 2019, to certify which witness my hand and seal of office.

_____

Notary Public in and for the State of Texas

My Commission Expires:

_____

DEFENDANT INFOWARS, LLC'S RESPONSES TO PLAINTIFF'S INTERROGATORIES,
REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS - Page 7

010470

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-60020 |
| **INFOW, LLC,** *et al.,* | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtors.[1] | § | |
| | § | Jointly Administered |

---

**ORDER GRANTING THE TEXAS LITIGATION PLAINTIFFS'
SUPPLEMENTAL MOTION TO DISMISS PETITION**
(Relates to Docket No. ___)

---

Upon the motion of Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "**Texas Litigation Plaintiffs**") for entry of an order dismissing the Chapter 11 cases (the "**Motion**"); and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, its creditors, and other parties in interest; and appropriate notice having been provided under the circumstances of the Motion and the opportunity for a hearing on the Motion, and that no other or further notice is required; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED**:

1.     The Motion is granted;

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

2.      The Debtors cases, *In re InfoW, LLC* (Case No. 22-60020), *In re IWHealth, LLC* (Case No. 22-60021), and *In re Prison Planet TV, LLC* (Case No. 60022), are all dismissed with prejudice.

3.      The Court shall retain jurisdiction over all matters related to the interpretation and implementation of this Order.

**UNITED STATES DEPARTMENT OF JUSTICE**
**OFFICE OF THE UNITED STATES TRUSTEE**
**KEVIN M. EPSTEIN, UNITED STATES TRUSTEE**
**REGION 7, SOUTHERN and WESTERN DISTRICTS OF TEXAS**
**JAYSON B. RUFF, TRIAL ATTORNEY**
**HA M. NGUYEN, TRIAL ATTORNEY**
**515 Rusk, Suite 3516**
**Houston, TX 77002**
**Telephone: (713) 718-4650 Ext 252**
**Fax: (713) 718-4680**
**E-Mail: jayson.b.ruff@usdoj.gov**
**E-Mail: Ha.Nguyen@usdoj.gov**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **INFOW, LLC** *et al.* | § | **CASE NO. 22-60020** |
| | § | |
| | § | **CHAPTER 11 (Subchapter V)** |
| | § | **Jointly Administered** |
| DEBTORS.[1] | § | |

**MOTION OF THE UNITED STATES TRUSTEE**
**TO DISMISS DEBTORS' CHAPTER 11 CASES**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for Region 7 (the "U.S. Trustee"),

respectfully moves to dismiss the Debtors' chapter 11 cases for cause pursuant to section 1112(b)

of the Bankruptcy Code (the "Motion"), and represents as follows:

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916) ("InfoW"), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN) ("IWHealth"), Prison Planet TV, LLC (0005) ("Prison Planet").  The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

## PRELIMINARY STATEMENT[2]

Debtors' cases should be dismissed for cause under section 1112(b)(1) because these are classic bad faith filings for two primary reasons:  these cases serve no valid bankruptcy purpose and were filed to gain a tactical advantage in the Sandy Hook Lawsuits.  The strategy employed here—filing bankruptcy for three non-operating members of a larger enterprise to channel and cap liability against the other, revenue-generating members of that enterprise and its owner using a bankruptcy subchapter designed to aid small, struggling businesses—is a novel and dangerous tactic that is abusive and undermines the integrity of the bankruptcy system.  Bankruptcy, however, is intended to protect honest but unfortunate debtors who subject themselves and their assets to the supervision of the Court.

The Debtors' cases arise out of a series of lawsuits in Texas and Connecticut brought primarily by relatives of the 2012 Sandy Hook shooting victims (the "Sandy Hook Plaintiffs") seeking redress for harms arising out of statements made by Alex Jones and other employees of FSS asserting that the Sandy Hook shooting was a "false flag" hoax.  According to the Debtors, they filed these cases to resolve the Sandy Hook Lawsuits (in which liability has already been established and all that remains are trials establishing damages) and other litigation claims and to pay such claims "in full."[3]  But despite that these lawsuits arise from Alex Jones's and FSS's allegedly tortious, intentional conduct, neither filed for bankruptcy.  Instead, three days before

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms below or as set forth in *Debtors' Emergency Motion for Order Authorizing Appointment of Russell F. Nelms and Richard S. Schmidt as Trustees of the 2022 Litigation Settlement Trust and Granting Related Relief*, Dkt. No. 6.

[3]     Unfortunately, "payment in full" is inaccurate.  Rather, after removing to federal court the cases that were imminently set for damages trials, Debtors intend to force a claims *estimation* proceeding to value the claims of the Sandy Hook Plaintiffs and cap the distribution they will receive on those claims.  Thus, in an Orwellian use of language, when Debtors say "payment in full," what they actually mean is "payment of estimated damages."  *See* LST ¶ 10(c).

010474

filing these cases, and eight days before jury selection was to begin in Texas, Alex Jones transferred his ownership interests in the Debtor entities into a settlement trust and, without any input from creditors, he entered into a plan support agreement that provides the roadmap for resolution of the Debtors' cases—cases that will be funded solely by Alex Jones and FSS because the Debtors have no ability to do so.

Debtors did not file these cases to reorganize their businesses or to preserve or maximize the value of their assets for the benefit of their creditors.  As their proposed CRO has admitted, these Debtors have *no* businesses and *no* assets from which they earn any income.[4]  Nor were these cases filed to avoid a "race to the courthouse," yet another self-serving pretextual justification offered by Debtors.  Indeed, the Sandy Hook Plaintiffs in both the Texas and Connecticut lawsuits have sought to dismiss these cases.  Instead, this bankruptcy is designed to misuse the subchapter V cases of three non-operating companies to shield the assets of Alex Jones, FSS, and other entities owned or controlled by Alex Jones or Alex Jones's insiders (the "Alex Jones Enterprise") from their primary—and maybe only—creditors, the Sandy Hook Plaintiffs, with "Resulting Releases" for both Jones and FSS as the ultimate end game.[5]  *See, e.g.*, Plan Support Agreement ("PSA"), § 7(b); Litigation Settlement Trust ("LST"), p. 2 (Recitals); ¶¶ 2.2 and 10.1(b).  Although the Debtors have not yet filed a plan, the PSA and LST

---

[4]       Based on statements elicited from Mr. Schwartz at the first hearing in these cases, it appears that he has recently discovered that one debtor, IWHealth, has rights to a royalty payment from which it may begin to earn $38,000 a month.  Tr. April 22, 2022 at 43, 48-9.

[5]       Moreover, this would allow Alex Jones and FSS to retain their assets that they could not otherwise retain had they themselves filed for bankruptcy.  If Alex Jones were a debtor, he would not be able to discharge the claims of the Sandy Hook Plaintiffs because section 523(a)(6) excepts from discharge debts arising from willful and malicious injury.  And both Alex Jones and FSS as debtors would be subject to section 1129(a)(7)'s best interest of creditors' test for plan confirmation, requiring full disclosure of the value of their assets and a showing that impaired, dissenting creditors are receiving at least as much as they would in a chapter 7 liquidation.

3

have set the table for these cases in a very particular way—and it is already apparent what type of meal we're going to get.[6]  Dismissal is in the best interests of all creditors and the estates, and these cases should therefore be dismissed.

## JURISDICTION, VENUE & CONSTITUTIONAL AUTHORITY TO ENTER A FINAL ORDER

1.      The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Debtors assert that venue is proper in this district under 28 U.S.C. § 1408.

2.      This Court has constitutional authority to enter a final order in this matter.  If it is determined that the bankruptcy judge does not have the constitutional authority to enter a final order or judgment in this matter, the U.S. Trustee consents to the entry of a final order or judgment by this Court in this matter.

3.      Kevin M. Epstein is the duly appointed U.S. Trustee for Region 7.  The U.S. Trustee has standing to raise, appear and be heard on any issue in a case or proceeding under the Bankruptcy Code.  11 U.S.C. § 307.

4.      The U.S. Trustee has a statutory duty to monitor the administration of cases commenced under the Bankruptcy Code, including seeking relief under section 1112(b) of the Bankruptcy Code.  28 U.S.C. § 586(a).

5.      No committee has been appointed.  Unless the Court determines there is cause for the appointment of a creditors' committee and orders the appointment of one, the U.S. Trustee is

---

[6]      All references to the provisions of the LST and PSA herein are to the original versions of those documents as filed as exhibits to Dkt. No. 6.  The U.S. Trustee understands that Debtors have filed revised versions of the PSA and LST.  Nevertheless, it is the initial versions that evidence the Debtors' purpose in filing these cases.  While the U.S. Trustee has not had a chance to digest these latest versions, it appears that these versions simply attempt to obfuscate what the earlier versions made clear—that the Debtors are using these cases to benefit Alex Jones and FSS, not the Sandy Hook Plaintiffs.  The U.S. Trustee reserves his rights to supplement this Motion.

010476

prohibited from soliciting and appointing a committee of unsecured creditors in subchapter V

cases such as these. 11 U.S.C. § 1102(a)(3).

## **FACTUAL BACKGROUND**

**General Information**

      6.      On April 17, 2022 (the "Petition Date") and April 18, 2022,[7] the Debtors filed

chapter 11 voluntary petitions and elected to proceed under Subchapter V of chapter 11 on their

respective Petitions.

      7.      On April 18, 2022, the Court entered the Order directing joint administration of

the chapter 11 cases solely for procedural purposes. *See* Dkt. No. 8.

      8.      On April 18, 2022, the U.S. Trustee appointed Melissa Haselden as the Debtors'

Subchapter V Trustee. *See* Dkt. Nos. 9 and 12.

**The Debtors**

      9.      The Debtors are holding companies for certain intellectual property assets. *See*

Dkt. No. 6 at ¶ 7. Specifically, as their proposed Chief Restructuring Officer ("CRO") attests:

> Debtor's [sic] have no purpose other than to hold assets which may be used by
> other entities. They undertake no business activities, they do not sell, rent or lease
> to others anything. Their assets do not generate any income for them. They have
> no bank accounts and do not pay money to anyone for any reason. They have no
> debt or other liabilities other than those related to pending or potential litigation.
> For these reasons, they have no financial statements or books of account and they
> do not file income tax returns.

Dkt. No. 1 pp. 10-11 at ¶ 8. Based on information elicited from the proposed CRO, W. Marc

Schwartz, IWHealth is also entitled to a royalty payment from Youngevity that for many years

---

[7]     InfoW, LLC filed just before midnight on April 17, 2022, while IWHealth, LLC and Prison Planet TV,
LLC's petitions were docketed shortly after midnight on April 18, 2022.

010477

was paid directly to Alex Jones's personal bank account rather than IWHealth.  Tr. April 22, 2022, 48-9.[8]

10.     Each of the Debtors was previously located in Austin, Texas, prior to obtaining leases in Victoria, Texas, in April 2022.  Tr. April 22, 2022, at 52-3.

11.     Prior to April 14, 2022, Alex Jones was the 100% holder of the equity interests in the Debtors.  Dkt. No. 6 at ¶ 9.  The equity in each of the Debtors is now, as of three days before the Petition Date, wholly owned by a recently established Litigation Settlement Trust ("LST").  *Id.* at ¶¶ 9, 16-17.  Alex Jones established the Trust on April 14, 2022, and funded the Trust with his equity interests in the Debtors and an initial funding amount from his "exempt personal assets."  *Id.* at 16-17, Exhibit A (*Declaration of Trust*).

12.     Alex Jones remains the 100% equity holder of FSS, through which Mr. Jones and others operate the so-called InfoWars website and related enterprises.  *Id.*  All the assets of FSS allegedly serve as collateral to repay obligations to PQPR Holdings, LLC ("PQPR"), a vendor to FSS.  *Id.* at ¶ 8, n.1.  PQPR is owned by Alex Jones's insiders.[9]  Dkt. No. 17-6.

---

[8]     Transcript for April 22, 2022, Hearing is attached hereto as Exhibit A.

[9]     In a lawsuit filed in Texas state court on April 6 asserting fraudulent conveyance claims against Jones, FSS, and PQPR, among others, plaintiffs alleged that PQPR filed a UCC Financing Statement claiming a security interest in essentially everything FSS owns only after the Sandy Hook Lawsuits had considerably advanced.  *Heslin v. Jones*, No. D-1-GN-22-001610 (200th Dist. Tex.) Petition, ¶ 33 (filed April 6, 2022). According to plaintiffs, "[t]he [$54 million] supposed debt began accruing years earlier as part of an arrangement where Free Speech Systems sells PQPR's products on the InfoWars website. Under this alleged arrangement, PQPR was to be reimbursed for the costs of the products and receive 70% of the sales revenue while Free Speech Systems retained the other 30%.  In practice, however, Free Speech Systems supposedly kept 100% of the revenue for about seven years and didn't pay for the goods PQPR provided—to the point where a $54 million debt had accumulated.  All the while, PQPR not only supplied Free Speech Systems with more products to sell but also paid Free Speech Systems millions of dollars a year to advertise on the InfoWars website.  PQPR still supplies the Alex Jones Enterprise with products to sell and pays for advertising on the website."  *Id.*  Plaintiffs further allege that within weeks of the default judgments, as part of a scheme to render Jones and FSS "judgment proof," FSS began transferring to PQPR "between $11,000 per day and $11,000 per week plus 60–80% of Free Speech Systems' sales revenue—supposedly just to pay the interest on the alleged $54 million debt."  *Id.* at ¶ 36.

6

13.     Neither Jones, FSS, nor PQPR have filed bankruptcy petitions.

14.     The list of creditors attached to each of the Debtors' petitions contain the names of the relatives of some of the 20 children and six educators killed in the 2012 Sandy Hook school shooting.  *See, e.g.,* Dkt. No. 1 at pp. 6-7.  Their claims are classified as "disputed" and "unliquidated."  *Id.*  No other creditors are listed.  *See Id.*

**The Pending Litigation**

15.     In 2018, the Sandy Hook Plaintiffs filed suits in Texas and Connecticut (collectively, the "Sandy Hook Lawsuits") against Jones, FSS, and certain of the Debtors.[10] Dkt. No. 6 at ¶ 10-11.  As the Debtors admit in their pleadings, "both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones, FSS, and the Debtors failed to comply with discovery requirements such that judgment on *liability* has been entered against them by default."  *Id.* at ¶ 13 (emphasis in original).  The first trial on damages, in Texas, was scheduled to begin jury selection on April 25, 2022. *Id.* at ¶ 14.  In the Connecticut litigation, several weeks before the bankruptcy filings, the court again sanctioned Alex Jones for failing to attend his deposition and advised that trial in that case would nevertheless go forward in August 2022.  Super Ct. DN 788, 3/30/22 Hearing at 25:4-9.

16.     Additionally, prior to filing these chapter 11 cases, the defendants in the Sandy Hook Lawsuits tried multiple times, all unsuccessfully, to remove the litigation to federal courts. *See, e.g.,* No.: 3:18-CV-1156 (JCH), DN 58, 11/5/18 Ruling Re: Mot. for Remand; No. 3:20-cv-1723 (JCH), DN 44, 3/5/21 Ruling Re: Mot. for Remand.  After the first remand in Connecticut failed, the defendants attempted to have the presiding Judge removed for "appearance of judicial

---

[10]     Specifically, the Connecticut cases appear to name all three Debtors, but the Texas cases name only one Debtor, InfoW (which the Sandy Hook Plaintiffs have since nonsuited in the imminent damages trial).  *See* Dkt. No. 6 at ¶ 12.

010479

impropriety," which also failed.  *See* Dkt No. UWYCV186046438S, Order 421277 (Conn. Sup. Ct. November 4, 2021).

17.     Immediately after these filings, the defendants again sought to remove the Sandy Hook Lawsuits.  *See, e.g.,* Dkt. No. 1, Case No. 22-01022 (Bankr. W.D. Tex. April 18, 2022); Dkt. No. 1, Case No. 22-05004 (Bankr. D. Conn. April 18, 2022).  The Sandy Hook Plaintiffs have filed motions seeking a remand of the lawsuits back to the state courts.  *See, e.g.,* Dkt. No. 5 (Motion for Remand), Case No. 22-05004 (Bankr. Conn. April 21, 2022); Dkt. No. 7 (Motion for Abstention and Remand), Case No. 22-01023 (Bankr. W.D. Tex. April 26, 2022).  Debtor InfoW has also filed a motion seeking to transfer the Texas cases out of the bankruptcy court for the Western District of Texas to the bankruptcy court for the Southern District of Texas.  Dkt. No. 7, Case No. 22-01022 (Bankr. W.D. Tex. April 28, 2022).

18.     Certain of the Debtors are also defendants in other pending litigation, some of which was the result of the Sandy Hook Lawsuits.  Dkt. No. 6 at ¶ 12.  As with the Sandy Hook Lawsuits, while only certain of the Debtors are defendants in such litigation, both Alex Jones and FSS are defendants in *every* case.  *Id.*  In one case, plaintiffs sued under the Texas Uniform Fraudulent Transfer Act alleging that Alex Jones diverted his assets to companies owned by insiders such as his parents and children.  *Id.*

**The Litigation Settlement Trust and "Plan Support Agreement"**

19.     As stated above, only three days before the Petition Date, the Debtors, Alex Jones, and FSS entered into the LST.  *Id.* at ¶¶ 9, 16-17 (the LST is annexed to Dkt. No. 6 as Exhibit A).  Although Alex Jones transferred his equity interests in the Debtors into the LST,

8

Alex Jones and FSS remain in charge of the income-producing entities of the Alex Jones Enterprise.  *See id.*  Moreover, the funding in the LST will come from Alex Jones and FSS, who initially funded $725,000 into the trust to pay the administrative expenses of these cases and who propose to limit funding to $10 million.  *Id.* at ¶ 17; LST at § 1.3(b), (c); Dkt. No. 35 at ¶ 11.  The LST prohibits the LST Trustees from causing the Debtors to file an involuntary petition against either Alex Jones or FSS.  LST at § 1.3(a)(iii).

20.     Simultaneously with the creation of the LST, the Debtors also entered into a PSA with Alex Jones and FSS that dictates the roadmap for the Debtors' cases.  *Id.* at ¶ 17, Exhibit B (*Plan Support Agreement*), p. 1.  Under the PSA, the parties agree to take various steps in the bankruptcy cases, including establishing a bar date for claims and a protocol for claims estimation and incorporating the settlement of the claims by the LST Trustee(s) in a subchapter V plan of reorganization.  PSA at pp. 5-8.  Under the PSA, any plan of reorganization in the Debtors' cases and all related documents must be approved by Alex Jones and FSS.  *Id.* at p. 2 (definition of Approved Plan Documents).

21.     The LST appears to contemplate that the Debtors' plan of reorganization will include a channeling injunction and releases for Alex Jones and FSS.  *See* LST at § 10.1(c).  If approved, such a channeling injunction would force the Sandy Hook Plaintiffs to seek payment from the LST for their claims rather than pursue them directly against Alex Jones and FSS, and such a release would bar the claimants from ever pursuing Alex Jones and FSS in the future.

22.     Both the LST and PSA include secrecy provisions designed to limit the information that anyone, including the LST Trustees, can elicit from Alex Jones and FSS, including requirements for parties to agree to confidentiality agreements acceptable to Alex Jones and FSS before obtaining any information.  *See* PSA at §§ 4(a)(iii), (b)(3); *see also* LST at

9

§§ 1.2(d), 2.2(a).  The PSA further limits the financial information Alex Jones or FSS must provide to only that "reasonably needed to determine that [Alex Jones and FSS have] the ability to pay Allowed Litigation Settlement Trust Claims in full, in accordance with the Plan."  PSA at §§4 (a)(iii).

23.     Unlike plan support agreements in other chapter 11 cases, no creditor participated in the drafting or negotiation of the LST or PSA in these cases.  Instead, these are agreements among insiders.

**Subchapter V**

24.     Debtors elected treatment under subchapter V, established by the Small Business Reorganization Act of 2019, Pub. L. No. 116-54 ("SBRA"), which establishes rules and procedures to lower the cost of and simplify the path through chapter 11 for certain small business enterprises.  Subchapter V is wholly elective and its "provisions . . . effectively hybridized chapters 11 and 13. The beneficiaries are the truly 'small' debtors: individuals or mom-and-pop/small businesses."  Robert C. Meyer, *Small Business Reorganization Act Arrives This Month*, XXXIX ABI Journal 2, 8-9, 48-49, at 9, February 2020.

25.     Eligibility for relief under subchapter V is governed by 11 U.S.C. § 1182(1). Under section 1182(1)(A), a debtor is currently eligible for subchapter V if (a) the debtor is engaged in *commercial* or *business* activities; (b) the debtor has aggregate noncontingent liquidated secured and unsecured debts of not more than $3,024,725 (excluding debts owed to insiders or affiliates); and (c) at least 50% of the qualifying indebtedness arose from the commercial or business activities of the debtor.

## LEGAL STANDARD

10

26.     Section 1112(b)(1) of the Bankruptcy Code requires a court to dismiss a chapter 11 case upon finding that "cause" exists for such dismissal, unless the court instead determines that the appointment of a trustee or examiner is in the best interests of creditors.  11 U.S.C. § 1112(b)(1).[11]  Section 1112(b)(1) provides in full:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  Although section 1112(b)(4) of the Code contains a non-exclusive list of what constitutes "cause" for dismissal, the Fifth Circuit Court of Appeals has joined other circuits in holding that "cause" can include a showing that a debtor has not filed its bankruptcy case in good faith.  *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072-73 (5th Cir. 1986); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 816-17 (5th Cir. 1991).  As the Fifth Circuit has stated, this good faith requirement "protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with clean hands." *Little*

---

[11]     A debtor may also avoid dismissal if it proves unusual circumstances satisfying the criteria set forth in section 1112(b)(2).  Section 1112(b)(2) provides, in full,

> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
> (B)the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
> (i) for which there exists a reasonable justification for the act or omission; and
> (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2).

11

*Creek*, 779 F.2d at 1072.  It "prohibits a debtor's misuse of the process where the overriding

motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose

through manipulation of the bankruptcy laws." *Elmwood Dev Co. v. Gen. Elec. Pension Tr. (In*

*re Elmwood Dev. Co.)*, 964 F.2d 508, 510 (5th Cir. 1992).  And in *Humble Place*, 936 F.2d at

818, the Fifth Circuit affirmed dismissal where, among other things, the bankruptcy court found

that the principal purpose of the chapter 11 filing was to "cleanse the partners of their liability,"

reasoning that "[o]f course, the partners are not the Chapter 11 debtor, and their fate is irrelevant

to the propriety of Humble Place's filing. The court was correct to determine that this

impermissible purpose cast doubt on the venture's objective good faith."

27.    In *Little Creek*, the Fifth Circuit addressed how a reviewing court should

approach the good faith inquiry—using an "on-the-spot evaluation of the debtor's financial

condition, motives, and the local financial realities. . . .predicated on certain recurring but non-

exclusive patterns, and [ ] based on a conglomerate of factors rather than on any single datum."

779 F.2d 1068 at 1072.[12]  This is often referred to as a "totality of the circumstances" approach,

and a similar approach is followed by most other circuits.  *See In re 15375 Mem'l Corp. v.*

*Bepco, L.P.*, 589 F.3d 605, 618, n.7 (3d Cir. 2009) (collecting cases); *see also In re Nat'l Rifle*

*Ass'n of Amer.*, 628 B.R. 262, 280 (Bankr. N.D. Tex. 2021) (citation omitted).

28.    The Third Circuit Court of Appeals has highlighted two inquiries that are

particularly relevant to the question of good faith when considering the totality of circumstances

---

[12]    In *Little Creek*, the court also described various factors that tend to be present in a bad faith filing,
including that the debtor has one asset that is encumbered by a secured creditor's liens, no employees, little or no
cash flow or sources of income to fund a plan, few unsecured creditors, and is subject to a foreclosure action or a
state-court litigation that has proceeded to a stand-still, and that there are allegations of wrongdoing by the debtor or
its principals.  *Id.* at 1072-73.  Several of these factors are present in the Debtors' cases.  They have minimal assets,
no employees, no cash flow, little or no income with which to fund a plan, few unsecured creditors beyond the
litigation plaintiffs, are involved in a state court litigation in which they have already been found liable, and there are
allegations of wrongdoing by their former 100% controlling interest holder.

010484

of a debtor's filing: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage. *Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999). Other courts, including those within the Fifth Circuit, have adopted a similar inquiry when considering whether to dismiss a case as a bad faith filing. *See, e.g., Antelope Techs., Inc. v. Janis Lowe (In re Antelope Techs., Inc.)*, 431 Fed. Appx. 272, 275 (5th Cir. 2011) (affirming dismissal of a case for bad faith where the lower court concluded the debtors filed to gain an advantage in shareholder litigation); *Nat'l Rifle Ass'n*, 628 B.R. at 264, 270, 279-80 (finding cause to dismiss case for bad faith "because it was filed to gain an unfair litigation advantage and because it was filed to avoid a state regulatory scheme"); *In re Leslie*, No. 98-35386-H3-11, 1999 Bankr. LEXIS 2113, at *5 (Bankr. S.D. Tex. Feb. 11, 1999) (finding, in the totality of circumstances, that case was commenced for the primary purpose of gaining an unfair advantage in a litigation).

29.     In the Fifth Circuit, the party seeking dismissal is required to make a *prima facie* showing that the debtor lacked good faith in filing its case, after which the burden shifts to the debtor to demonstrate good faith. *In re Mirant Corp.*, 2005 Bankr. LEXIS 1686, *27 n.20 (Bankr. N.D. Tex. Jan. 26, 2005); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 170-71 (Bankr. S.D. Tex. 1989), *judgment entered*, (Bankr. S.D. Tex. Jan. 27, 1989). The moving party need only prove that the filing was objectively in bad faith, rather than showing that a debtor intended to misuse its bankruptcy filing. *See Elmwood Dev.*, 964 F.2d at 512 ("Because the good faith standard is an objective one, the court was not constrained to entertain and give dispositive weight to the subjective state of mind of Elmwood's manager.").

## ARGUMENT

### I.     These Bankruptcy Cases Must be Dismissed for Cause.

13

30.     The totality of facts and circumstances establishes cause for this Court to dismiss the Debtors' cases as a bad faith filing for at least two reasons: (1) the Debtors' cases do not serve a valid bankruptcy purpose; and (2) the Debtors filed these cases to gain a tactical litigation advantage.

31.     Although the facts and indicia of bad faith supporting each of these grounds for cause have already been established in the public filings before this Court, the U.S. Trustee is also prepared to propound discovery, if necessary, to further adduce evidence supporting each ground.

**A.  These Cases Do Not Serve a Valid Bankruptcy Purpose.**

32.     The purpose of bankruptcy is to give "to the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *see* Report of the Committee on the Judiciary, House of Representatives to Accompany H.R. 8200, H.R. Rep. No. 595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6179 ("The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.").  Chapter 11 furthers this purpose in two complementary ways: (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors." *Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 452 (1999).[13]

---

[13]     Other objectives of the Bankruptcy Code include "avoidance of the consequences of economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected." *SGL Carbon*, 200 F.3d at 161 (citing *In re Victory Constr. Co., Inc.*, 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981), *order stayed, Hadley v. Victory Constr. Co., Inc. (In re Victory Constr. Co., Inc.)*, 9 B.R. 570 (Bankr. C.D. Cal. 1981), *order vacated*, 37 B.R. 222 (1984)).

14

33.     In furthering these objectives, chapter 11 vests a debtor with considerable

protections—among them the automatic stay and the discharge of debts.  Subchapter V adds

additional debtor protections—no creditors' committee unless the Court orders one for cause, no

requirement for a disclosure statement, the debtor's exclusive right to file a plan of

reorganization, and the debtor's ability to "cram down" confirmation of a plan without an

impaired accepting creditor class—that "can impose significant hardship on creditors."  *See SGL

Carbon,* 200 F.3d at 165.  Under appropriate circumstances, "the exercise of those powers is

justified.  "But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code."

*Id.* at 166 (emphasis added).  As the Fifth Circuit (affirmed by the Supreme Court) advised in

*Timbers of Inwood Forest*, "when there is no reasonable likelihood that the statutory objective of

reorganization can be realized . . . then the automatic stay and other statutory provisions designed

to accomplish the reorganization objective become destructive of the legitimate rights and

interests of creditors, the intended beneficiaries."  *United Savs. Assoc. of Texas v. Timbers of

Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 373

(5th Cir. 1987) (en banc), *aff'd*, 484 U.S. 365 (1988).

> **i.     *The Debtors have no Reorganizational Purpose.***

34.     These cases are demonstrably not about reorganizing, rehabilitating, or granting a

fresh start to an honest, unfortunate debtor.  The Debtors' bankruptcy filings do not serve any

recognized objective of the Bankruptcy Code.  These Debtors have no businesses and no purpose

to reorganize.

35.     As the Debtors' proposed CRO attests, these Debtors have "no purpose other than

to hold assets which may be used by other entities," but these assets "do not generate any income

010487

for them."[14]   Dkt. No. 1 at 10-11, ¶ 8.   The Debtors do not have bank accounts, financial statements, books of account, or income tax returns.   *Id.*   There is no debt to restructure, no liens being primed, no cash collateral required, and no post-petition financing being granted because these Debtors "undertake no business activities, they do not sell, rent or lease to others anything."   *Id.*   But these Debtors were, until three days before the filings, members of a larger enterprise controlled by Alex Jones.[15]   Dkt. No. 6 at ¶¶ 8-9.   Based on the extremely limited information disclosed about the rest of the Alex Jones Enterprise to date, all the assets and businesses of that enterprise are with Alex Jones, FSS, and other, non-debtor companies, whose finances are not transparent in these cases.   *Id.*; *see also* Tr. April 22, 2022 at 55.

36.       On the contrary, these filings are an attempt to subvert the purpose of the Bankruptcy Code and the subchapter V provisions designed to assist struggling small businesses to reorganize.   Alex Jones and FSS hand-picked these three holding companies for bankruptcy as part of a scheme engineered solely to limit their own legal liability, to deny parties in interest a full accounting of their assets, and to deny individuals their day in court and imminent recovery for established liability.   Neither the Debtors nor their creditors benefit from these bankruptcy cases.   The only ones benefiting are Alex Jones and FSS, who seek to reap the benefits of chapter 11 without any of its burdens.

---

[14]       One debtor, IWHealth, apparently has rights to a royalty payment of $38,000 previously diverted to Alex Jones. The newly hired CRO discovered this debtor asset after some due diligence before this bankruptcy filing and requested that the royalty be paid to the rightful entity.   *See* Tr. April 22, 2022 at 43, 48-9.

[15]       Equitable principles relating to insider transactions support dismissal of these cases given Alex Jones's control of all parties and engineering of the LST and PSA prior to the filing of these cases.   *See Pepper v. Litton*, 308 U.S. 295, 306-07 (1939) ("The essence of the test [for good faith of an insider transaction] is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.").

16

ii.     *The Insider-Negotiated PSA and LST Evidence that Debtors Are Attempting to Abuse the Bankruptcy Code to Shield Non-Debtors from Disclosure and Legal Liability and to Minimize Recovery to Creditors.*

37.     Although the Debtors claim they filed these cases because they were concerned that "efforts to collect on a judgment of the Texas actions would result in leaving nothing for the Connecticut Sandy Hook Plaintiffs or other creditors" and further claim they intend to pay all litigation claims "in full," all evidence suggests that these filings were *not* a benevolent effort by the Debtors to ensure a fair distribution to all creditors.  *See* Dkt. No. 6 at ¶¶ 15, 16.  Because the members of the Alex Jones Enterprise who hold the assets and are themselves defendants and liable to the Sandy Hook Plaintiffs—Alex Jones and FSS—did not file for relief, there is no transparency into their assets or any statutory mechanism for distributing those assets.  Instead, we start this case with the LST and PSA—entered into prior to bankruptcy between affiliated entities, without any creditor support—which cloak Alex Jones's and FSS's books and records in secrecy by imposing confidentiality restrictions on those seeking access and further provide that parties can only obtain access to information reasonably needed to determine whether Alex Jones and FSS can pay estimated, not actual, claim amounts.[16]  *See* PSA at §§4(a)(iii), (b)(3); *see also* LST at §§1.2(d), 2.2(a).

38.     But the PSA sets a course for the Debtors whereby claims will not be paid in full by any ordinary understanding of that term.  Instead, under the PSA, the Debtors must quickly seek approval for a litigation claims bar date and then a claims estimation process, which allows them to cap what can be paid to creditors from whatever assets Alex Jones and FSS choose to

---

[16]     Given this structure, no party in interest can determine whether Alex Jones and FSS actually have the funds to satisfy all of the claims against them (in which case, they have no reason to be concerned about favoring certain creditors over others) or whether they do not have sufficient funds (in which case, it is unclear why they would care how these assets are divided).

010489

contribute in a subchapter V plan of reorganization.  *See* PSA at 5-8.  Based on the information provided to date, even were Debtors to succeed in having the claims estimated, it is not clear how any plan for the Debtors could be feasibly confirmed because the Debtors have no assets to contribute to a plan, and the PSA provides only that Alex Jones and FSS will contribute money until they decide not to.  *See* PSA at §4(b).

39.     Moreover, section 502(c) of the Bankruptcy Code only requires a bankruptcy court to estimate a contingent or unliquidated claim where failure to do so "would unduly delay the administration of the case." *See* 11 U.S.C. § 502(c); *O'Neill v. Continental Airlines, Inc.* (*In re Continental Airlines, Inc.*), 981 F.2d 1450, 1461 (5th Cir.1993) ("In order for the estimation process of § 502(c) to apply, . . . fixing the claim must entail undue delay in the administration of justice."); *In re Dow Corning Corp.*, 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997) ("[E]stimation does not become mandatory merely because liquidation may take longer and thereby delay administration of the case. . . .bankruptcy law's general rule is to liquidate, not to estimate. For estimation to be mandatory, then, the delay associated with liquidation must be 'undue.'").  To determine whether liquidating a claim would unduly delay the case and should instead be estimated, a court should "perform a kind of cost-benefit analysis by considering the time, costs and benefits associated with both estimation and liquidation." *Id.* at 563.

40.     Here, the Debtors have attempted to manufacture exigency by electing subchapter V treatment despite not having any operations or assets.  Thus, they cannot establish that any delay caused by full liquidation of the claims would be "undue." *See Id.* at 563, 566-67 (denying request for estimation where court determined that the strategy behind the request was ultimately to limit the amount the debtor would have to pay and the time delay was "highly speculative" and there was no guarantee estimation would be faster.).  Estimation is a "second-best"

18

procedure in any circumstance, and it is hard to see how there is any benefit to estimating the

Sandy Hook Plaintiffs' claims rather than allowing the imminent trials to proceed to full, actual

judgment.  *See, e.g., Apex Oil Co. v. Stinnes Interoil, Inc. (In re Apex Oil Co)*, 107 B.R. 189, 193

(Bankr. E.D. Mo. 1989) (finding no undue delay where trial in was "imminent"); *see also In re*

*N. Am. Health Care, Inc.,* 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016) (limiting the claims to be

estimated and stating "[b]ecause estimation is a second-best method . . . . a bankruptcy court

ought not to expand the estimation's scope beyond this limited extent absent compelling reasons

to do so.").[17]

      41.    Further, the handwriting is on the wall that Alex Jones and FSS will seek orders

of this Court staying further actions against them in the Sandy Hook Lawsuits (which they have

already sought to remove based on these cases) and that they and the Debtors will ultimately

seek involuntary non-consensual releases, or their functional equivalent, of the plaintiffs' tort

claims against Jones, FSS, and other related, non-debtor parties.  The LST itself suggests that the

Debtors' forthcoming plan of reorganization will involve a channeling injunction and, ultimately,

some type of release for Alex Jones and FSS.  *See* LST at 2; § 10.1(c).  The liabilities facing

Alex Jones arise out of allegations of his intentional tortious conduct that could likely not be

discharged in his own bankruptcy under section 523 of the Code.  11 U.S.C. § 523(a)(6).  Thus,

---

[17]    Moreover, the claims in the Sandy Hook Lawsuits are personal injury claims and thus a trial on the claims is not a core proceeding in the Debtors' cases and cannot be adjudicated by this Court.  *See* 28 U.S.C. § 157(b)(2)(B) and (b)(5).  In addition, bankruptcy courts are constitutionally prohibited from holding jury trials on non-core claims and may not hold jury trials on core claims without the consent of both parties.  *See* 28 U.S.C. § 157(e); *Orion Pictures Corp. v. Showtime Networks Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1101 (2nd Cir. 1993).  Finally, the Debtors' proposal to impose on the plaintiffs an expedited bar date, an estimation process, and a capped distribution via a settlement trust through an artificially staged and orchestrated bankruptcy may also raise concerns about whether they are receiving the due process owed to them under the Constitution.

010491

any such outcome would give him more from the bankruptcy of three non-operating entities in his enterprise than he could obtain in his own personal bankruptcy case.

42.     Finally, the creditors themselves are plainly not asking for this relief.  No creditor was involved in negotiating the LST or the PSA prior to the filings.  And the main creditors in these cases, the Sandy Hook Plaintiffs, have rejected this structure.

### iii.     *The Lawsuits that Allegedly Precipitated these Filings Primarily Concern Non-Debtors.*

43.     To add to the Debtors' lack of an ongoing concern or valuable property that this case might seek to preserve or to maximize, the proposed CRO also admits that the Debtors "have no debt or other liabilities other than those related to pending or potential litigation."   Dkt. No. 1 at 10-11, ¶ 8.   This pending litigation, which the Debtors claim caused a "classic 'race to the courthouse'" precipitating this filing, appears to comprise fewer than ten lawsuits, some of which have been ongoing for many years.  Dkt. No. 6 at ¶¶ 12, 14.   The true catalysts that prompted the filing of these cases are the Sandy Hook Lawsuits pending in Texas and Connecticut, each of which were scheduled for a jury trial on damages before the filings (the first beginning April 25, 2022).[18]  *Id.;* Dkt. No. 5, Case No. 22-05004 (Bankr. D. Conn. April 18, 2022).

44.     But these lawsuits do not arise from Debtors' conduct.  Rather, the lawsuits arise from the allegedly tortious, intentional conduct of Alex Jones and FSS (through its employees),

---

[18]     Counsel for plaintiffs has advised that the other Sandy Hook Lawsuits in Texas are scheduled for trial in June and August 2022.  Tr. April 22, 2022 at 70.  The Connecticut Sandy Hook Lawsuit is scheduled for trial in August 2022.  Dkt. No. 1, Case No. 22-05004 (Bankr. D. Conn. April 18, 2022).

010492

who did not file for bankruptcy in this or any other court.  In fact, the Debtors are not co-defendants in every lawsuit involving the Alex Jones Enterprise.[19]

45.     This all begs the same question—the obvious question since the day these cases were filed—why are these three Debtors in bankruptcy when Alex Jones and FSS are not?  At the first hearing in these cases, the Debtors' CRO suggested that Alex Jones was concerned about reputational damage to himself and the possible loss of vendors to FSS if they filed for bankruptcy.  *See* Tr. April 22, 2022 at 45, 55.  But the main vendor to the Alex Jones Enterprise, PQPR Holdings, is simply another member of that enterprise, controlled by Alex Jones insiders.  Dkt. No. 17-6.  Surely Alex Jones wasn't concerned he would refuse to deal with himself.  In any event, it is clear that by not seeking bankruptcy relief themselves, Alex Jones and FSS do not have to disclose their finances.

### iv.     *The Debtors Are Attempting to Manipulate the Provisions of Subchapter V.*

46.     The Debtors assert that they are precisely the types of enterprises that Congress had in mind when it passed SBRA, enacting subchapter V of chapter 11.  Nothing in the language of subchapter V or in its legislative history validates this position.  The Debtors, who are incapable of funding a plan themselves, attempt to subvert a statutory scheme that was designed to aid well-intentioned small businesses in their efforts to reorganize their financial

---

[19]     While all three debtors appear to be co-defendants in the Connecticut Sandy Hook Lawsuit, only one debtor, InfoW, is a co-defendant in the Texas Sandy Hook Lawsuit that was scheduled for jury selection April 25, 2022.  Nevertheless, when the plaintiffs in one such case filed to nonsuit that debtor and proceed against Alex Jones and FSS, defendants continued their efforts to remove the case to federal court based on the bankruptcy of the non-suited defendant.  *See* Chuck Lindell, *Judge Reluctantly Delays Alex Jones Trial in Sandy Hook Case, Criticizes His Lawyers,* Austin American Stateman (April 20, 2022, updated April 21, 2022, 8:21AM), https://www.statesman.com/story/news/2022/04/20/austin-tx-judge-delays-alex-jones-sandy-hook-trial/7382689001/.

010493

affairs into an obvious scheme to protect Alex Jones and FSS from liability in the Sandy Hook Lawsuits.  The bankruptcy process should not be used to further this abusive scheme.

47.     The elements of this scheme are not difficult to see.  The three non-operating Debtors filed in an attempt to satisfy eligibility for subchapter V to benefit all of the non-debtor defendants.

48.     Even though courts in Texas and Connecticut had entered default judgments against Debtors in favor of Sandy Hook Plaintiffs due to Jones's pattern of misconduct in those cases, the Debtors assert that their indebtedness is all "unliquidated."  Why?  Because unliquidated debts are not counted toward establishing if a debtor and its affiliated debtors have too much debt in the aggregate to avail themselves of subchapter V.  11 U.S.C. § 1182(1).  How?  The Debtors—some of which aren't defendants in every action against Alex Jones and FSS— filed to stay the damages phases of the Sandy Hook Lawsuits that would establish the amounts that the Debtors, Alex Jones, and FSS owe the plaintiffs for their tortious conduct.  Although the Debtors claim that they are trying to avoid a "race to the courthouse," the only race that has occurred here is the Debtors' race to this courthouse, seeking the protection of this Court to avoid the scheduled state court trials on damages.  Little doubt exists that the total damage award against the Debtors, Alex Jones, FSS, and other non-debtor solvent entities of the Alex Jones Enterprise would exceed the debt limit currently in place for subchapter V.

49.     It is also not difficult to see what led the Debtors to choose subchapter V for this scheme.  Subchapter V has features that, when manipulated in the manner proposed by the Debtors, can transform it from a tool to be used by earnest small operating entities to rehabilitate their business and financial affairs to a weapon used against innocent creditors.  For example, a subchapter V debtor must file a plan not later than 90 days after the date of the order for relief.

22

Although at first blush this requirement might seem burdensome to a debtor, in these cases, it appears the Debtors intend to rely on the 90-day plan deadline to argue that the Court must quickly estimate the Sandy Hook Plaintiffs' claims to avoid "undue delay" in the administration of these cases.  *See* 11 U.S.C. § 502(c)(1); *see supra, ¶¶ 38-9*.

50.      As another example, in a subchapter V case, no committee is appointed unless the Court determines there is cause for the appointment of a creditors' committee and orders the appointment of one.  11 U.S.C. § 1102(a)(3).  Relatedly, confirmation of a non-consensual subchapter V plan under section 1191 of the Code does not require that any class of impaired non-insider claims affirmatively vote to accept the plan.  Instead, subchapter V enables a court to confirm a plan over the dissenting votes of unsecured creditor classes so long as the plan provides that three to five years of the debtor's projected disposable income will be paid under the plan.  11 U.S.C. § 1191(c)(2).  Thus, the Debtors can seek to "cram down" their plan without regard to whether a single Sandy Hook Plaintiff votes in favor of that plan.  And because the Debtors have little or no income, this would not be much of a burden for Debtors nor much of a benefit for creditors.  Although Alex Jones and FSS have agreed to advance some amount to the Debtors for plan payments, there is no transparency to how those amounts were determined— and they were not determined by negotiation with creditors.  Further, because Alex Jones and FSS are not themselves debtors, this Court will not have authority to require them to satisfy the best interests of creditors test—showing that the plan yields more value for creditors than a chapter 7 liquidation—or require that all of Alex Jones's and FSS's projected disposable income for three to five years will be paid to Debtors for distribution to their joint creditors.

23

51.     These cases thus represent an imaginative attempt to misuse subchapter V of chapter 11 to protect non-debtors whose conduct hardly shows them to be the honest but unfortunate debtors entitled to bankruptcy relief even had they themselves filed.

**v.     *For the Reasons Set Forth in Subsections i through iv, The Debtors' Bankruptcy Cases Must be Dismissed.***

52.     Given the totality of circumstances supporting the Debtors' petitions, as set forth in subsections *i* through *iv* above, these Debtors do not belong in bankruptcy and their cases must be dismissed.  "According to the Fifth Circuit, '[g]ood faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose.'"  *In re Cedar Short Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000) (quoting *In re Metro. Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970)).  "Congress has never intended that bankruptcy be a refuge for the irresponsible, unscrupulous or cunning individual." *In re Rognstad*, 121 B.R. 45, 50 (Bankr. D. Haw. 1990).  And courts should apply particular scrutiny to cases involving "asset-culled entities where 'debtors have elected not to submit the actual entities in interest to the jurisdiction of the court, thereby isolating the entities in interest from the scrutiny and control of the court during proceedings.'"  *In re Eden Assocs.,* 13 B.R. 578, 58485 (Bankr. S.D.N.Y. 1981) (dismissing case where court determined, among other things, "that this debtor was formed, if at all, and the property purportedly conveyed to it, to shield the assets of Cook's more affluent companies from the jurisdiction of the Bankruptcy Court") (*quoting In re Dutch Flat Inv.,* 6 B.R. 470, 471 (Bankr. N.D. Cal. 1980)) (emphasis added).

53.     Alex Jones and FSS should not be permitted to use chapter 11 as a means to shield their assets from the plaintiffs.  "Chapter 11 was not designed for the purpose of protecting assets and interests of non-debtor parties under the guise of a legitimate plan of

24

reorganization." *In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 462 (Bankr. N.D. Fla. 2011). Because these cases were not filed for a valid bankruptcy purpose, they must be dismissed.

**B. The Debtors Filed these Cases to Gain a Litigation Advantage for Non-Debtors Alex Jones and FSS.**

54. The timing of these filings—only eight days before the commencement of a jury trial against the defendants in one of the Texas Sandy Hook Lawsuits—together with the pattern of behavior exhibited by the defendants before the courts overseeing the Sandy Hook Lawsuits, reveals that the Debtors' bankruptcy petitions were filed as a litigation tactic to obstruct and delay an imminent trial establishing damages against defendants, including non-debtors Alex Jones and FSS, in state court litigation.

55. "[B]ecause filing a Chapter 11 petition merely to obtain tactical litigation advantage is not within the legitimate scope of bankruptcy laws, . . . courts have typically dismissed chapter 11 petitions under these circumstances. . . ." *SGL Carbon*, 200 F.3d at 165 (citations omitted); *see also Antelope Techs.*, 431 Fed. Appx. at 275 (affirming dismissal of a case for bad faith where the lower court concluded the debtors filed to gain an advantage in shareholder litigation); *Leslie*, 1999 Bankr. LEXIS 2113, at *5 (finding, in the totality of circumstances, that case was commenced for the primary purpose of gaining an unfair advantage in a litigation). Further, "[w]here the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being in good faith." *15375 Memorial Corp.*, 589 F.3d at 625-26 (citing *SGL Carbon*, 200 F.3d at 165). For example, in *15375 Memorial Corp.*, the Third Circuit found that given a mix of facts and "the Debtors' sudden decision to file for bankruptcy

25

despite their [sic] having been dormant and without employees or offices for several years," the Court "[could not] escape the conclusion that the filings were a litigation tactic." *Id*. at 625-26. And in *Cedar Shore,* the Eighth Circuit affirmed dismissal of a case where there existed "strong evidence to support the finding that [the debtor] did not file bankruptcy to effectuate a valid reorganization, but rather to prevent the [the plaintiffs] from pursuing their claims in state court." 235 F.3d at 380–81.

56.     Here, the Debtors have all but admitted that they filed these petitions solely to stop the Sandy Hook Lawsuits from proceeding in state court and to resolve them in the way the Alex Jones Enterprise—but not the Sandy Hook Plaintiffs—sees fit.  *See* Dkt. No. 6 at ¶¶ 15, 16; PSA at 5-8.   Based on the information disclosed thus far, the Debtors have no or virtually no creditors beyond the litigation plaintiffs.  *See, e.g.,* Dkt. No. 1 at ps. 6-7.  As discussed above, the main lawsuits the Debtors identify as precipitating these filings are the Sandy Hook Lawsuits pending in Texas and Connecticut.  *See* Dkt. No. 6 at ¶¶ 12, 15.  Although the Sandy Hook Lawsuits are in different venues, they share many similarities, and these cases thus bear the hallmarks of a classic two-party dispute best left to resolution in the state court.  *See Little Creek* at 1072-73; *Sherwood Enters.,* 112 B.R. at 170.  And the history of these lawsuits evidences a pattern of behavior—of repeated obstruction and delay tactics—that is simply being repeated and moved to a different forum by these bankruptcy filings.

57.     As the Debtors admit in their pleadings, the defendants' sanctionable behavior over a period of at least four years led the courts in both Texas and Connecticut to enter default judgments against them.  *See* Dkt. No. 6 at ¶ 13; *see also Lafferty v. Jones,* 336 Conn. 332, 374, (2020)*, cert. denied,* 141 S. Ct. 2467 (2021) (Connecticut Superior Court quoting the trial court stating that "the discovery in this case has been marked with obfuscation and delay on the part of

26

the defendants").  When the defendants appealed one such sanction, the Connecticut Supreme Court affirmed that the defendants had "willfully disregarded the court's discovery orders." *Lafferty,* 336 Conn. at 377, 79 (noting trial court's consideration of this willfulness "along with the defendants' harassing and intimidating speech toward the plaintiffs' counsel, which together created a whole spectrum of bad faith litigation misconduct.").  Defendants have also tried multiple times to remove the Sandy Hook Lawsuits to federal court—even after the first gambit had been rejected and the suit remanded.  *See, e.g.,* No.: 3:18-CV-1156 (JCH), DN 58, 11/5/18 Ruling Re: Mot. for Remand; No. 3:20-cv-1723 (JCH), DN 44, 3/5/21 Ruling Re: Mot. for Remand.  Unsurprisingly, immediately upon the Debtors' bankruptcy filing, the defendants again sought to remove the lawsuits.  *See, e.g.,* Dkt. No. 1, Case No. 22-01022 (Bankr. W.D. Tex. April 18, 2022); Dkt. No. 1, Case No. 22-05004 (Bankr. D. Conn. April 18, 2022). These bankruptcy filings are merely the latest in a long line of efforts by Alex Jones and FSS to obstruct and hinder the courts' ability to liquidate damages in Texas and Connecticut.

58.    In addition, the *timing* of these filings also unquestionably supports a finding that their purpose was as a litigation tactic against the Sandy Hook Plaintiffs.  After all the defendants' delay and obstruction, the first trial on damages was scheduled to begin with jury selection on April 25, 2022.  *Id.* at 14.  These cases were filed *only eight days before*.  The cases were also filed only weeks after Alex Jones repeatedly refused to attend his scheduled deposition in Connecticut, after which the court again sanctioned him and advised that the trial in that case would nevertheless go forward in August 2022.  20  Super Ct. DN 788, 3/30/22 Hearing at 25:4-9.  And while only one debtor, InfoW, is a co-defendant in Texas, when the Sandy Hook Plaintiffs filed to nonsuit InfoW and proceed solely against Alex Jones and FSS, InfoW

---

[20]    After the imposition of escalating sanctions, Jones ultimately appeared for his deposition.

nonetheless continued its efforts to remove the cases to a federal court and has now sought to transfer venue of those cases. *See* Dkt. No. 1, Case No. 22-01022 (Bankr. W.D. Tex. April 18, 2022); Dkt. No. 7, Case No. 22-01022 (Bankr. W.D. Tex. April 28, 2022); Chuck Lindell, *Judge Reluctantly Delays Alex Jones Trial in Sandy Hook Case, Criticizes His Lawyers,* Austin American Stateman (April 20, 2022, updated April 21, 2022, 8:21AM),

https://www.statesman.com/story/news/2022/04/20/austin-tx-judge-delays-alex-jones-sandy-hook-trial/7382689001/.

59.     Perhaps the best evidence that this filing is for a litigation advantage comes from Mr. Jones's lawyer himself as reported by the Wall Street Journal:

> Mr. Jones's lawyer, Norm Pattis, said Wednesday that they have tried to settle the case "on reasonable terms" and that Sandy Hook families "persist in trying to destroy Alex and his companies." **"We're turning to the bankruptcy courts to compel the plaintiffs to estimate the value of their claims in open court by discernible evidentiary standards,"** Mr. Pattis said. "The plaintiffs have turned this litigation into a macabre morality play and have refused to negotiate in good faith. We hope they will show respect to the federal courts."

*Infowars Bankruptcy Delays Upcoming Sandy Hook Trial,* Wall Street Journal (April 20, 2022) (emphasis added) available at https://www.wsj.com/articles/infowars-bankruptcy-delays-upcoming-sandy-hook-trial-11650494400?mode=list

60.     All the evidence suggests that Alex Jones and FSS intended and still intend to use this bankruptcy to accomplish their long-sought goal of having some other court besides those in Texas and Connecticut resolve the Sandy Hook Lawsuits.[21]  But they don't want just any court.

---

[21]     Immediately prior to the filing. the Debtors obtained leases for the Debtor entities in Victoria, Texas, despite their being previously located at all times in Austin, Texas (the site of the rest of the Alex Jones Enterprise as well as the Texas Sandy Hook Lawsuits).  Tr. April 22, 2022 at 52-3.  For purposes of venue under 28 U.S.C. § 1408, at least one bankruptcy court has held that the "domicile" of an entity is its state of incorporation, and venue in any district in the state is proper for that entity. *See In re ERG Intermediate Holdings, LLC,* No. 15-31858-

They now seek to abuse the bankruptcy system not only to resolve these lawsuits against all of the defendants—Debtors and non-debtors alike—but also to minimize the possible recovery the plaintiffs can receive.  *See supra*, ¶¶ 34-51.  Because the Debtors' bankruptcy petitions were filed as a litigation tactic to thwart the Sandy Hook Plaintiffs from pursuing their claims in state court, these cases must be dismissed.

### II.  Dismissal is in the Best Interests of Creditors and the Estates.

61.     Once cause is established, "a bankruptcy court *shall*"—must—convert[22] or dismiss the case unless the court determines that appointing a section 1104(a) trustee or examiner is in the best interests of the creditors and the estate'" or the debtor establishes unusual circumstances to avoid dismissal.  11 U.S.C. § 1112(b)(1), (2) (emphasis added).[23]

62.     Here, dismissal is in the best interests of the Debtors' creditors, all or almost all of whom are plaintiffs in lawsuits against the Alex Jones Enterprise.[24]  These lawsuits are already

---

HDH11, 2015 WL 6521607, at *4 (Bankr. N.D. Tex. Oct. 27, 2015) ("[A]n entity that is formed under the laws of a given state is domiciled in the entire state for purposes of section 1408(1) and may file a case under the Bankruptcy Code in any District in that state).  Nevertheless, the timing of the effort to obtain these leases and obtaining the leases themselves—suggesting that Debtors were seeking a bankruptcy forum outside of Austin, Texas, the site of the Texas Sandy Hook Lawsuits—is evidence of Jones's intention to manipulate every aspect of this case for his benefit and further indicia of the bad faith of the Debtors leading up to these cases.  As the CRO testified at the First Day hearing, the Victoria office is empty and unused by Debtors.

[22]     While the U.S. Trustee seeks dismissal as the appropriate remedy in these cases, the Court may also choose to convert these cases to chapter 7.  If converted, a chapter 7 trustee may be able to find and monetize assets (as the CRO has in discovering the royalty payment) and initiate actions to avoid fraudulent transfers, among other things.

[23]     The Debtors have the burden to prove unusual circumstances.  The U.S. Trustee is not aware of any facts that would support such a finding here but reserves his right to oppose any such showing at an appropriate time.

[24]     Because the Debtors are the only members of the Alex Jones Enterprise who filed for bankruptcy, there is no benefit to be obtained by the appointment of an examiner that would not be better served by dismissing the case.  Moreover, given that these cases can only survive by the funding of Alex Jones and FSS and the pattern of behavior

29

being administered in state court, the presiding courts have already found the defendants liable, and all that remains is a trial on damages.  As of the filings, jury selection in one Texas case was only days away, and jury selection in Connecticut will follow in August.  Dismissal would ensure not only that the families can see these proceedings through in the venue they chose before a jury of their peers, but also that any claimant who secures a judgment against any member of the Alex Jones Enterprise can enforce that judgment on assets held by those companies without being subject to the roadblocks and limitations the Debtors, Alex Jones, and FSS have attempted to place before them with the PSA, LST, and these filings.  And as evidenced by their own pending motions, the Sandy Hook Plaintiffs—as creditors in these cases—believe their interests would be best served by dismissal of these cases.

### RESERVATION OF RIGHTS

63.     The U.S. Trustee reserves his rights to supplement this motion further should it become appropriate at any time in the future.

### CONCLUSION

WHEREFORE the U.S. Trustee respectfully requests that this Court grant this Motion and grant such other and further relief as it may deem just and proper.

Dated:  April 29, 2022                              Respectfully Submitted,

                                                                  KEVIN M. EPSTEIN
                                                                  UNITED STATES TRUSTEE

---

they have displayed in the state court litigations in Texas and Connecticut, it seems unlikely they would agree to continue such funding were an examiner appointed.

Section 1104, which governs the appointment of a trustee in a typical chapter 11 case, does not apply in subchapter V cases.

30

010502

By: /s/Jayson B. Ruff
Jayson B. Ruff
Trial Attorney
United States Department of Justice
Office of the United States Trustee
Michigan Bar No. P69893
Houston, TX 77002
Telephone: (713)718-4650 ext. 252
Facsimile: (713)718-4670

/s/ Ha M Nguyen
Ha Nguyen
Trial Attorney
CA Bar #305411 | FED ID NO. 3623593
United States Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
E-mail: Ha.Nguyen@usdoj.gov
Cell: 202-590-7962

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 29th day of April, 2022.

/s/ Jayson B. Ruff
Jayson B. Ruff

31

010503

# Exhibit A

**Transcript from April 22, 2022 Hearing**

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          VICTORIA DIVISION

 3                                )   CASE NO: 22-60020-CML
                                  )
 4    INFOW, LLC,                 )   Victoria, Texas
                                  )
 5              Debtor.           )   Friday, April 22, 2022
                                  )
 6                                )   9:00 a.m. - 10:49 a.m.
      ------------------------------)
 7                                )   CASE NO: 22-60021-CML
                                  )
 8    IWHEALTH, LLC,              )
                                  )
 9              Debtor.           )
                                  )
10    ------------------------------)

11                               TRIAL

12            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                   UNITED STATES BANKRUPTCY JUDGE
13

14    APPEARANCES:

15    For the Debtors:          KYUNG SHIK LEE
                                R.J. SHANNON
16                              Parkins Lee & Rubio LLP
                                Pennzoil Place
17                              700 Milam Street
                                Suite 1300
18                              Houston, TX 77002

19    For the U.S. Trustee:     JAYSON B. RUFF
                                HA MINH NGUYEN
20                              Office of the United States Trustee
                                515 Rusk Street
21                              Suite 3516
                                Houston, TX 77002
22
      For Proposed Litigation   MATTHEW OKIN
23    Settlement Trustees:      DAVID CURRY
                                Okin Adams
24                              1113 Vine Street
                                Suite 240
25                              Houston, TX 77002
```

```
 1   For Neil Heslin et al:    JON MAXWELL BEATTY
                               The Beatty Law Firm PC
 2                             935 Bayou Parkway
                               Houston, TX 77077
 3
                               CLIFFORD HUGH WALSTON
 4                             Walston Bowlin, LLP
                               4299 San Felipe Street
 5                             Suite 300
                               Houston, TX 77027
 6
     Sub Chapter V Trustee:    MELISSA A. HASELDEN
 7                             Haselden Farrow PLLC
                               Pennzoil Place
 8                             700 Milam
                               Suite 1300
 9                             Houston, TX 77002

10   For David Wheeler et al: RYAN E. CHAPPLE
                               Cain & Skarnulis PLLC
11                             303 Colorado Street
                               Suite 2850
12                             Austin, TX 78701

13                             RANDY W. WILLIAMS
                               Byman & Associates PLLC
14                             7924 Broadway
                               Suite 104
15                             Pearland, TX 77581

16                             ALINOR STERLING
                               CHRISTOPHER M. MATTEI
17                             Koskoff Koskoff & Bieder
                               350 Fairfield Avenue
18                             Suite 501
                               Bridgeport, CT 06604
19
     For the Trustee:          RAYMOND WILLIAM BATTAGLIA
20                             Law Offices of Ray Battaglia, PLLC
                               66 Granburg Circle
21                             San Antonio, TX 78218

22   Interested Party:         Shelby A Jordan
                               Jordan & Ortiz, PC
23                             500 N Shoreline
                               Suite 900 N
24                             Corpus Christi, TX 78401

25
```

010506

```
 1    Also Present:            MARC SCHWARTZ, CRO
                               RICHARD SCHMIDT
 2
      Court Reporter/Deputy:   Kimberly Picota
 3
      Transcribed by:          Veritext Legal Solutions
 4                             330 Old Country Road, Suite 300
                               Mineola, NY 11501
 5                             Tel: 800-727-6396

 6

 7
      Proceedings recorded by electronic sound recording;
 8    Transcript produced by transcription service.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2          <u>VICTORIA, TEXAS; FRIDAY, APRIL 22, 2022 9:00 AM</u>

3                          (Call to Order)

4          THE COURT:  Good morning, everyone.  This is Judge

5  Lopez.  Today is April 22nd.  I'm going to call the nine

6  a.m. case, which is essentially first-day hearings in InfoW

7  LLC, IWL -- it should be IWHealth LLC, and Prison Planet TV

8  LLC.

9          There are a number of folks on the line, and I'm

10  going to try to keep the line unmuted, just see how that

11  goes.  We have a feature where I can mute the entire line,

12  and I'm going to try to avoid that.  But if I end up doing

13  it, I will give everyone plenty of notice and you will have

14  to hit five-star if you wish to be heard.

15          I'm going to just ask everyone to please put your

16  phone on mute right now until your case is called.  And I

17  hear a lot of back noise.  I'm just going to turn the

18  feature on.  So I'm asking everyone just please take a look

19  at your phone and please keep it on mute.  When it is time

20  to speak, I will call on you and you are able to speak.

21  Let's see how this goes.

22          Let me start off by taking appearances.  And why

23  don't I start in the courtroom.  Who is here on behalf of

24  the Debtors?

25          MR. LEE:  Good morning, Your Honor.  Kyung Lee, K-

1    y-u-n-g, L-e-e, on behalf of the three debtors.  And I would

2    like to introduce some of the players on my side that are

3    helping me with this project, the first one being RJ

4    Shannon.

5              Can you stand up, RJ?

6              MR. SHANNON:  Good morning.

7              THE COURT:  Good morning.

8              MR. LEE:  That's my very bright, smart associate.

9    Younger than I am, so he is able to work a lot harder than I

10   am.

11             The second party that's also helping me is Adam

12   Rodriguez, who is my paralegal, who has been working on this

13   case.  As you all know, he (indiscernible) get done by one

14   person (indiscernible) who made a team that worked with me.

15   So those two would be an integral part of the team.

16             And the third party I'd like to introduce today is

17   Mr. Marc Schwartz,.  He's sitting with me at counsel's

18   table.  He is chief restructuring officer of the three

19   debtors, Your Honor.

20             MR. SCHWARTZ:  Good morning.

21             THE COURT:  Okay.  Who wants to go next?

22             MR. RUFF:  Good morning, Your Honor.  Jason Ruff

23   for the U.S. Trustee's office.  And today with me is Ha

24   Nguyen.

25             THE COURT:  Good morning to both of you.  And I

```
 1    think it's the first time I've actually seen you in person

 2    as opposed to on the screen.  Good morning.

 3             MR. OKIN:  Good morning, Your Honor.  Matthew

 4    Okin, O-k-i-n, and David Curry.  We are here on behalf of

 5    the proposed litigation settlement trustees, Russell Nelms

 6    and Richard Schmidt.  I believe that Mr. Schmidt and Mr.

 7    Nelms are on the call.

 8             THE COURT:  I see them on video.  And good morning

 9    to you, sir.  Good morning to you, Mr. Schmidt and Mr.

10    Nelms.

11             MR. BEATTY:  Yes, Your Honor.  Max Beatty and

12    Cliff Walston.  We are here on behalf of creditors, Heslin,

13    Lewis, De La Rosa, Fontaine, and Pozner.

14             THE COURT:  Good morning.

15             MR. BEATTY:  Good morning.

16             MS. HASELDEN:  Good morning, Your Honor.  Melissa

17    Haselden, Subchapter V Trustee.

18             THE COURT:  Good morning.

19             MR. CHAPPLE:  Good morning, Your Honor.  Ryan

20    Chapple and my colleague, Randy Williams, are here on behalf

21    of what we'll probably refer to as the Connecticut

22    plaintiffs, Mr. David Wheeler, Francine Wheeler, Jacqueline

23    Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer

24    Hensel, Donna Soto, Carly Soto-Parisi, Carlos Soto, Jillian

25    Soto-Marino, William Aldenberg, Richard Cohn, Trustee of the
```

1   bankruptcy estate of Erica Lafferty, William Sherlock, and

2   Robert Parker.

3        And, Your Honor, I also have the Connecticut

4   Plaintiff's counsel on Zoom.  I would like to introduce them

5   as well.

6        THE COURT:  Sure.

7        MR. CHAPPLE:  Ms. Alinor Sterling and Chris

8   Mattei.  And they will be filing motions of pro hac.  They

9   just...

10       THE COURT:  Okay.  Good morning to both of you.

11  And, Ms. Sterling, if you wish to speak today, if anyone

12  wishes to speak today who has not filed a pro hac, you are

13  free to do so (indiscernible) of today.  Not a problem at

14  all.

15       MS. STERLING:  Thank you for that courtesy, Your

16  Honor.

17       THE COURT:  Okay.  Does anyone else wish to make

18  an appearance in the courtroom?  Okay.  I am hearing some

19  background noise.  So I am going to mute the line.  I have

20  about 70 folks on the line, and it got a little tricky.  So

21  I'm going to -- if you wish to speak, just hit five-star if

22  you wish to make an appearance.  Let me see if there's

23  anyone who wishes to make an appearance.  If you wish to

24  make an appearance, just hit five-star.

25       Okay.  There's an area code 207-650 number.  Do

1    you wish to make an appearance?

2          UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

3    Peter (indiscernible) from (indiscernible) Group.  Thank

4    you, sir.

5          THE COURT:  Good morning.  Does anyone else wish

6    to make an appearance?

7          I've got one more.  I've got an area code 210-601

8    number.  Area code 210-601, do you wish to make an

9    appearance?

10         MR. BATTAGLIA:  Sorry, Your Honor.  I had it on

11   mute.  Too many buttons to push.  Ray Battaglia for Free

12   Speech Systems.

13         THE COURT:  Good morning, Mr. Battaglia.

14         Okay, I think I have an area code 512-710.  Does

15   someone wish to make an appearance from an area code 512-710

16   number?

17         MR. JORDAN:  Your Honor, Shelby Jordan.  I am

18   making appearance on behalf of Alex Jones.

19         THE COURT:  Okay.  Good morning, Mr. Jordan.

20         MR. JORDAN:  Good morning.

21         THE COURT:  Okay.  Mr. Lee -- for the folks who

22   have made an appearance, I have left your line unmuted.  I'm

23   going to ask that you just keep your phone on mute just

24   during this time.  And if you with to make -- wish to speak,

25   just let me know.  Okay, I believe I have covered everyone

```
1    who wishes to make an appearance.  So, Mr. Lee, let me turn
2    things over to you, sir.
3              MR. LEE:  May it please the Court, Your Honor.
4    Kyung Lee, for the record, for the three debtors.  I want to
5    take out some administrative matters before we head to the
6    substantive matters for the Court.
7              THE COURT:  Okay.
8              MR. LEE:  Number one, Docket 8 had a joint
9    administration motion that was set for today, and I believe
10   Your Honor has already signed that order.  So that is going
11   to be moot for today's hearing.
12             THE COURT:  Yes, I did sign it.
13             MR. LEE:  Thank you, Your Honor.
14             Number two, I believe in the Subchapter 5 cases,
15   that it would be your desire to sign these Subchapter 5
16   deadlines order today.  And we have a form of order which
17   sets the status conference for an 1188 conference as well as
18   the status report under 1188(c) and a deadline to file a
19   Chapter 11 plan under 1188.  So we have a form of order for
20   that if you want to consider that at the end of the hearing,
21   or whenever you think --
22             THE COURT:  I think -- I don't know who can answer
23   that question.  But if we pick a date, I need to know
24   whether we're going to have a case or not.  But I'm not sure
25   that you can answer that question.
```

1             MR. LEE:  That would be a question for --

2             (Break in audio)

3             THE COURT:  Yeah.  It's really a question for the

4    third party contributors because they are the ones who have

5    the right to terminate it.  But one of the concerns that I

6    have -- and maybe this is just something -- again, all I

7    know is we're not going to write on the papers.  Right?  So

8    I'm just raising some concern to something that maybe

9    somebody can answer very quickly for me, is the third-party

10   contributors essentially fund these Chapter 11 cases.  I

11   don't see any sources of revenue.  As I read the trust

12   agreement, the Debtors are not actually allowed to engage in

13   any business activity, so they can't generate funds.  So if

14   the third party contributors decide to pull the plug and not

15   fund this at any point, you know, maybe a ruling that I make

16   or just decide they don't want to go forward with it any

17   more, you know, the lifeblood of these Chapter 11 cases goes

18   away.  And I think I need to understand whether we have

19   cases or not.  Because, you know, sometimes the judge rules

20   in favor of one way, sometimes the judge rules in another

21   way.  And I need to know kind of whether they are really

22   committed to these cases.  You know, any (indiscernible)

23   Subchapter IV trustee doing her work and doing her --

24   fulfilling her statutory duties in a Subchapter V case.

25             And I'm not indicating one way or the other that I

1    believe that the third-party contributors are not serious

2    about funding these cases.  Obviously they took the time and

3    did it.  I'm just raising -- parties really want to go

4    forward with a Chapter 11 case, right?  There has to be some

5    stream of guaranteed source of funds, and it can't be tied

6    to dates that I haven't approved or decisions that I have

7    not yet to even consider based on motions that have yet to

8    be filed.  You know, it's just not -- it's a hypothetical

9    world.  But I just need to understand that.

10            But maybe all that could be answered.  We're not

11   really going forward today.  I'm just -- it's one of the

12   things that makes me think about the trust.  And as I think

13   about the trustees -- if you're here, Mr. Okin.

14            Mr. Nelms and Mr. Schmidt, this is -- they're

15   certainly qualified.  Put that aside.  The question is who

16   is working on behalf of -- I'm just thinking at the 10,000-

17   foot level.  Right?  Who works for the estate, right?  If

18   the settlement trust fees are bound by the settlement trust

19   and must only work within the confines of the trust -- and I

20   know that the trust is still yet to be negotiated.  But

21   whatever it lands on, then who does the work of the estate,

22   right?  If they're trustees of a trust, then by approving

23   the trustees and then approving them to do the work

24   according to the trust.  So it's almost like an implied

25   approval of the work done under the trust.  But then who

1    represents the estate?  That's the question that ultimately

2    somebody is going to have to answer.  Who does the work of

3    the estate?  Who is acting on behalf of solely the interest

4    of the estate?  I get it, Mr. Schwartz is operating as a

5    327, but the proposed order that was -- someone was going to

6    ask me to sign today was going to say that Mr. Schmidt and

7    Mr. Nelms could fire them without my approval.  Maybe

8    somebody should think about that as they think about the

9    10,000-foot level.  There has to be a 327.  327 means that

10   they are fiduciaries of the estate, which means that the

11   court would have some supervision or they would answer on

12   behalf of the estate or be fiduciaries of the estate.  I

13   just want to make sure that there is someone who is going to

14   take a position, and sometimes they're hard positions, on

15   behalf of the estate.

16        And I'm not saying these questions can't be

17   answered, I'm just -- again, (indiscernible) order on

18   papers, and they raised questions.  And I didn't want to

19   blindside anyone with any of these questions that I had.  So

20   I don't want to start making comments on a trust agreement

21   that you're telling me is going to get negotiated.  We'll

22   have to wait and see what's finally there.

23        MR. OKIN:  We are certainly happy to have your

24   comments in advance so we can address them.  But we will --

25   these are issues we are wrestling with, including not making

1   sure the funding is available --

2           THE COURT:  Because the money comes in, but the

3   money is not -- the way the trust is set up, the third party

4   contributors contribute to the trust, but it doesn't become

5   property of the estate because it stays within the trust,

6   and then the trustees fund in accordance with --

7           MR. LEE:  The plan.

8           THE COURT:  Right?  So that becomes interesting.

9   And so if -- yeah, let's just say a payment in full --

10  payment in full is defined under 10.1(c).  Maybe that number

11  is different than what other people may have expected.  Is

12  it property -- it's not property of the estate.  And so I

13  would be allowing a claim that would never be paid.  It's

14  the things that I think about.

15          And again, this has zero to do with Mr. Schmidt or

16  Mr. Nelms.  That's not -- I just think about on behalf of

17  the estate and the Debtors that have to get administered

18  here.  I should probably stay quiet and just allow Mr.

19  Schwartz to just answer.  But I'm saying this for the

20  benefit of Mr. Lee, who is going to put Mr. Schwartz on.

21  Today is a day for information as I understand it.  And so I

22  think I want to kind of express some of the thoughts that I

23  had as I read the papers and give everyone an opportunity to

24  react to it.  Because I'm going to ask Mr. Schwartz these

25  questions.  And so I suspect -- I don't want to surprise Mr.

1   Schwartz by the way I'm reading and understanding the trust

2   agreement.  Because if I've got something wrong, I want

3   somebody to tell me.

4          MR. OKIN:  Your Honor, I don't think you do on the

5   current documents.  And that's part of what we are working

6   on.  I did just want to leave the Court with -- both Mr.

7   Schmidt and Mr. Nelms have raised a lot of these same

8   issues.  They think they can be a help to this process.

9   They come at this completely neutral.  They think that if

10  people give them a chance and give this process a chance.

11         They've spent their whole lives, their

12  professional careers at least, in the bankruptcy system.

13  They believe in it.  They think that more often than not, it

14  is a fair and equitable process for dividing up scarce

15  resources and that if given an opportunity, they can

16  actually give some people some peace and an opportunity to

17  resolve these issues.  And they think that given enough time

18  and the opportunity to do it, that they can help bring that

19  about.

20         THE COURT:  Okay.  Thank you very much.

21         MR. RUFF:  Good morning, Your Honor.

22         THE COURT:  Good morning.

23         MR. RUFF:  Jason Ruff for the U.S. Trustee's

24  Office.

25         Your Honor raises a number of great questions.

1    And quite frankly, this case begs those questions as it has

2    been set forth before the Court.

3              I would like to just say at the outset too, our

4    opposition has nothing to do with the individuals that are

5    proposed to be the trustees, Your Honor.  Our position is

6    threefold.  And first of all, there's no emergency, so

7    that's off today.  I think everybody recognizes there is no

8    emergency.  But to Your Honor's questions that Your Honor

9    was just asking and what has been proposed here today, this

10   form with this litigation settlement trust, it's called a

11   litigation settlement trust.  It seems to operate more than

12   that, thought.  It seems to operate more like an LLC

13   operating agreement and that the trustees, as was proposed,

14   were to be managers of the LLC, have management authority of

15   the LLC, and with Mr. Schwartz reporting to them

16   essentially, that his duties would run to them.  And there

17   is an inherent conflict there.

18             But Your Honor, 105, which is the authority that

19   they cite for seeking that, your Court blessed that, doesn't

20   extend that far.  The bankruptcy code is clear about when a

21   court can enter orders appointing individuals, examiners and

22   trustees under 1104.  And were Congress is provided a power

23   in one place but not another, Section 105 cannot be used to

24   give the court more powers.

25             And one other thing, Your Honor, is that we found

1   very problematic and was set forth of course in our

2   pleading.  But the motion asks for the Court to bless

3   certain liability protections that are wholly unnecessary

4   for the Court to do.  The trust stands on its own.  It's an

5   agreement that the trustees are being asked to sign that was

6   orchestrated and put into place by Alex Jones and Free

7   Speech Systems.  And, Your Honor, it can determine what

8   their -- if they're going to agree to that, they can agree

9   to that.  They don't need the Court to do that.  The

10  agreement was entered before it ever even -- these cases

11  were filed, Your Honor, before they ever came to court.

12          So it is our position that not only does the Court

13  not have authority to do it, but under the Code at least

14  Your Honor -- it is not necessary, either.

15          THE COURT:  Mr. Ruff, in terms of the timing

16  question if we don't go forward on the CRO motion and on the

17  trustee motion, do you have a sense of timing?

18          MR. RUFF:  Your Honor, I think we can use at least

19  21 days from the date that they were originally proposed.  I

20  don't see what emergency there is.  Mr. Schwartz has already

21  exercised authority on behalf of the Debtors by signing

22  these petitions.

23          THE COURT:  The only question that came to my mind

24  on -- you know, and maybe Mr. Schwartz will answer the

25  question -- is somebody needs to work on schedules and, you

1    know, the bread and butter bankruptcy materials and start to

2    answer questions, and Ms. Haselden has questions or the

3    trustee has basic questions.  I doubt that there's any bank

4    accounts or any -- your know, or anything.  I just want to

5    make sure that there's -- but I guess Mr. Lee has given me

6    some comfort that they're there.  It's the only one that

7    makes me think, you know, should we have someone -- but

8    maybe Mr. Schwartz is going to tell me that he can do that

9    work.  And if he can do that work, then I'm okay with the

10   timing on that.

11          MR. RUFF:  Your Honor, my response to that, to

12   your question would be simply this.  Your Honor, these

13   individuals were put into place.  Take a step back.  These

14   companies were -- these entities were 100 percent wholly

15   owned and controlled by Alex Jones prior to the trust being

16   put into place.  And they were given authority pursuant to

17   those documents, pursuant to things that were done in

18   advance of the bankruptcy case.

19          Your Honor, the court wasn't necessary for them to

20   have authority at that point.  I don't see that it's

21   necessary for them to have authority now as a 327

22   professional if that's what they're going to seek for the

23   CRO's employment under.  That has more to do with their

24   ability to be -- not only to act on behalf of the Debtors,

25   but also to be compensated and the duties that they're going

1    to run under the Code.

2         But every professional that comes in prior to a

3    bankruptcy case still has duties and still has an obligation

4    to act.  If it all blows up, Your Honor, if there is no case

5    here, if Mr. Jones decides that he doesn't want to fund,

6    then that's really on Mr. Jones.  These companies don't

7    operate, they don't have employees.  This is not a situation

8    where if, for lack of a better word, these cases crater,

9    that we are going to see employees of these companies suffer

10   and be without a job and without a source of income.

11   There's not trade creditors out there or other parties who

12   are not going to receive goods and services.

13        Your Honor, the only person here who might be

14   harmed is Alex Jones.  And because these cases appear to be

15   -- at least it's questionable to why we're even here.  But

16   they appear to be orchestrated by him to limit his liability

17   and the liability of Free Speech Systems.  So I don't even

18   know that it really even matters.  It's to his benefit.  He

19   wants these cases to go, then he can decide to fund these

20   cases.  If he doesn't want them to go, to try and do

21   whatever it is that he's trying to do, then he can pull the

22   purse strings and back off and these cases can be dismissed,

23   which perhaps they should.

24        THE COURT:  Thank you.

25        MR. BEATTY:  Your Honor, if I may.  I represent a

1   group of creditors who I am going refer to as the Texas

2   Claimants.

3          THE COURT:  Okay.

4          MR. BEATTY:  And these are the cases that

5   ultimately -- one of which was scheduled to start on Monday.

6   This bankruptcy halted that process and slowed down

7   ultimately the liquidation of damages not only against the

8   Debtors -- I think that's relatively minor.  We can see

9   within the context of what's already been filed that these

10  Debtors don't really operate a business.  The bankruptcy

11  itself was filed to protect Alex Jones and to protect Free

12  Speech from having to face trial on Monday.

13         And I think Your Honor has looked at and seen some

14  of the issues that we identified initially.  But I think

15  there's a lot more than that.  And I think that we have

16  gateway and threshold issues that have to be answered before

17  anyone should go forward in deciding who is a trustee of a

18  trust that apparently has holes in the documents and will

19  need to be changed and who is going to be appointed to run

20  these, and so on and so forth.

21         So just as a preliminary issue, I have some

22  problem with saying that we're going to hear that in 20 more

23  days.  Because I think this Court is going to need to decide

24  the propriety of this bankruptcy well in advance of that.

25  There are a lot of attorneys in this room right now.

1    There's a lot of billing that's going on that to me may be

2    wholly unnecessary.  And all it's doing is causing delay.

3           And, Your Honor, I think one of the things we have

4    to decide right off the bat, is this case subject to

5    dismissal, is it subject to conversion, should it be a

6    Subchapter V even?  Those questions have to be answered

7    before we spend that extra money.  And what we've already

8    seen in the PSA, that plan support agreement, is if you did

9    any of those things, that plan support agreement is dead.

10   If this isn't a Subchapter V, dead.  Dismissed, dead.

11   Converted to a seven, dead.  There is no intent on funding

12   unless they can effectively force third-party releases into

13   a bankruptcy plan.  That's not permitted in the Fifth

14   Circuit.  This is a near (indiscernible) opportunity for

15   them.  They are trying to get a release for Alex Jones and

16   for Free Speech.  And they are attempting to do it without

17   the transparency that's inherent to a bankruptcy process.

18   Because when you look at those agreements, certainly the

19   trustees have some opportunity to look at budgets for Free

20   Speech, for Mr. Jones.  But when you look at the agreement,

21   at best, there's a weak, toothless oversight board who

22   doesn't necessarily have any right to look at any of these

23   confidential documents.  So I think the threshold question

24   for this Court before we move forward, before we do anything

25   else, is whether or not this case should be dismissed.

1           The Fifth Circuit says that good faith implies an

2     honest intent and genuine desire on the part of the

3     petitioner to use the statutory process to effect a plan of

4     reorganization and not merely as a device to serve some

5     sinister or unworthy purpose.

6           And let me tell you, I think we've got a sinister

7     and unworthy purpose here.  I don't think -- and even if I

8     am wrong on that, we don't have an actual intent to

9     reorganize here.  And I say that because you can look at the

10    Schwartz declaration which was filed with every single one

11    of the petitions.

12          And I want to read a paragraph.  It's Paragraph 8.

13    "I have learned that the Debtors have no purpose other than

14    to hold assets which may be used by other entities.  They

15    undertake no business activities.  They do not sell, rent,

16    or lease to others anything.  Their assets do not generate

17    any income for them.  They have no bank accounts and cannot

18    pay money to anyone for any reason.  They have no debt other

19    than liabilities, other than those related to pending or

20    potential litigation.  For these reasons, they have no

21    financial statements or books of account, and they do not

22    file income tax returns."

23          I don't know what we are trying to reorganize

24    here.  We're not setting up a business to contain them in

25    the future, we're channeling settlements and forcing it down

1    Plaintiff's throats.  They want to use a claim estimation

2    procedure, and it's transparent why that needs to occur to

3    them, because they want to face the state court.  We can all

4    say we have disagreements about what the value of those

5    claims are worth.  I am certain if you ask the Defense

6    attorneys from the state court litigations, they would tell

7    you none of the claims are worth much.

8          But even without ever talking to any of the

9    plaintiffs, you see an agreement that suggests there is

10   going to be $2 million put in and a stream of income worth

11   another five.  So at a minimum before we can even negotiate

12   with them, they're telling this Court $7 million in

13   liability.  And the claims estimation procedure, I don't

14   think that -- that's not a process where we have a lot of

15   different claims that will take forever to decide.

16         Again, two of my clients' claims would have been

17   decided.  The dollar amount would have been done.  The other

18   claims are all set for trial in state court.  But there's

19   just a series of poison pills in the trust agreement and the

20   PSA.  If you lift a stay, that -- no more payments.  No more

21   payments from Jones.  If there is a remand, no payments.  On

22   and on and on.  Conversion, dismissal, anything.  It's all

23   dead.

24         This is a situation where the first question for

25   this Court is is this proper.  And I don't want to see all

1    the parties here continuing to spend money on what I think

2    is tertiary before that actual question gest answered.

3          And, Your Honor, the simple issue is that you can

4    look at it and see that it will fail just based on the

5    question of whether or not they are a Sub V debtor.  You

6    know?  To be a Sub V debtor, you have to be a person engaged

7    in commercial or business activities.  Mr. Schwartz has

8    already told us neither of those items are true.  They don't

9    accept money, they don't get paid.  They don't pay anything.

10   They don't operate.

11         So if Sub V is inappropriate, the PSA is down.

12   There is no money.  These are the things we need to look at

13   first, Your Honor.  I don't think we need to make any other

14   decisions.

15         MR. WILLIAMS:  Thank you.  Your Honor, Randy

16   Williams for David Wheeler --

17         THE COURT:  Good morning.  Just get to a mic.  I

18   just want to make sure they can hear you on the...

19         MR. WILLIAMS:  Sorry, Your Honor.

20         THE COURT:  No worries.  Good morning.

21         MR. WILLIAMS:  David Wheeler and the other

22   Connecticut plaintiffs.

23         I think Mr. Beatty has very eloquently and

24   concisely laid out the similar concerns that our clients

25   have and that the fundamental issue here is in light of Mr.

1    Schwartz's declaration, what are we doing here?  And, Your

2    Honor, I will for the record object to Mr. Schwartz giving

3    any further testimony beyond what he has already declared in

4    that declaration today.  Because what have we learned so far

5    today?  That we want to get trustees approved for a trust

6    that the trustees don't even agree to what it's going to

7    look like or say.  And we don't know when we're going to get

8    it or when we're going to have it.  And we're talking about

9    setting hearings and how long we can go, but we don't know

10   when they're going to get a trust agreement that they're

11   happy with or when we're going to be able to see it.

12           And no clock should start ticking and no deadline

13   should run on us until they come forward and give notice of

14   what it is that they want to do.  You've got a PSA we've

15   talked about.  It's not a PSA, Your Honor.  It was

16   negotiated between Alex Jones and himself.  Who stood up on

17   the other side for anybody?  Because again, look at Mr.

18   Schwartz's declaration to these petitions.  These entities

19   don't qualify for Subchapter V.  They don't even qualify to

20   be in the Chapter 11.  This has all been done for the

21   benefit of Alex Jones and Free Speech.

22           And let's talk about that for a minute.  Your

23   Honor, these cases that were being litigated in Texas and

24   Connecticut have been going on for years.  And in the course

25   of those cases, these Debtors, Mr. Jones and Free Speech,

1    have all suffered death penalty sanctions because of their

2    conduct before those courts.  They removed the Connecticut

3    cases, they removed the Texas cases back to (indiscernible)

4    court.  That's not the first time that's happened.  In

5    Connecticut I know it's happened at least twice, and twice

6    they've been sent back.  We've already filed an emergency

7    motion in Connecticut to remand that case, and the

8    Connecticut judge has said that the trial date as to Mr.

9    Jones and Free Speech in September of this year that's

10   already been set and was already pending, as soon as she

11   gets the case back is going to stick.  And again, if they

12   wanted to estimate these claims and know what the real

13   liability was and they've really spent $10 million in legal

14   fees that ended up in them having their pleadings struck and

15   death penalty sanctions, then why didn't they go to court on

16   Monday and see what happened in that case?  Because that

17   would have laid a groundwork that would have then led to

18   something in the way of putting together a plan.

19          Your Honor, being on the bench, you have a lot of

20   experience with Chapter 11 cases I know in your practice.

21   And you know that if there's a real desire to put together a

22   plan and bring people together and forge a settlement

23   between Claimants and Debtors, that there's some negotiation

24   that goes on with someone pre-petition.  And here, it's

25   nonexistent.  They came up with all of this on their own.

```
 1              Actually, Mr. Jones did it.  And he's put $750,000

 2      into the trust that's already -- you ask about Mr. Schwartz.

 3      And based on what I read, Your Honor, Mr. Schwartz has

 4      already exhausted over $30,000 of his $50,000 retainer that

 5      he got.  He filed these cases.  And if his declaration,

 6      which I accept as true, then Your Honor, filing schedules

 7      and statements in these cases with no bank accounts, no tax

 8      returns, no income, no expenses, has got to be a pretty easy

 9      process.

10              But mostly I want to get back to we've got to get

11      to the fundamental issue here.  We've had somebody who,

12      because of his behavior and the behavior of the entities

13      that he owned and controlled and ongoing litigations in

14      multiple courts in Texas and Connecticut face death penalty

15      sanctions.  And Connecticut, those death penalty sanctions

16      were appealed and he lost.  And they were upheld.  That's

17      how bad the conduct has been.  And now we're in another

18      court here trying to do a Subchapter V where you don't get a

19      Committee and have a say.  Only the Debtor can file a plan.

20      Your Honor, this just isn't right.

21              One of the colleagues from Connecticut in our

22      initial meeting with us said this process is illegitimate.

23      And at the time, I was thinking that's a really strong word.

24      And then I slept on it.  And I told Mr. Chapple, I said,

25      well, I've got to apologize to her because she's absolutely
```

```
 1   right.  This is illegitimate.  And before this Court begins

 2   taking steps to move things forward or treat things as

 3   first-day hearings, the Court needs to look at whether or

 4   not this is proper and appropriate, and we need to be taking

 5   all those other steps.

 6         Again, we don't even have a trust agreement.

 7   That's the first thing we get told today is when -- and I

 8   didn't hear Mr. Lee say it.  He said he didn't want to go

 9   forward with it.  But it was counsel for these proposed

10   trustees, said, well, we don't have a trust agreement.  So

11   what are we going to have?  And why are we talking about

12   what it might be when -- why aren't we looking at the issue

13   again of why we're here?

14         And another thing, Your Honor, that's troubling to

15   my clients -- and with all due respect to the Court, why are

16   we in Victoria?  We've pulled the records on these three

17   entities from the Secretary of State up through November of

18   last year.  Every information report that's been filed,

19   every document that's been filed on these entities says that

20   they're domiciled, their assets and their principal place of

21   business was a PO box in Austin, Texas.  So why do these

22   cases get filed in Victoria?  And if Mr. Schwartz's

23   declaration is true, then how do we get to Victoria if we

24   don't have any employees, if we don't have any business

25   until the last umpteen years that these companies have been
```

1    in business with always saying we were in Austin -- or not

2    in business, that they were in existence.  I apologize, Your

3    Honor.

4              So again, we do intend to file an emergency motion

5    to dismiss because we want dismissal considered before we

6    move forward with any of this first-day issues or having

7    anyone talk about -- I don't know what information Mr.

8    Schwartz can give us beyond his declaration.  And again, I

9    don't -- we are very concerned that to the extent the Court

10   comments on and takes testimony in this case, it begins to

11   legitimize the process.  But again, I agree with my

12   Connecticut counsel, I will --

13             THE COURT:  Let me just tell you though, today was

14   the first day and there were two motions set.  And I read

15   objections that were filed to them, and no one is going

16   forward today on anything.

17             I'm giving comments based upon things that I

18   thought about when I read the overall case, read the

19   documents.  I don't think anyone should read anything other

20   than that.  I had two m options in front of me, and I found

21   out they're not going forward today.  If someone files

22   another motion, I'll take that up and consider it.

23             So if people want me to consider something, then

24   they'll file something and I will consider it.  And it

25   sounds like you are.  And when that's filed, I'll consider

1    it.  But right now, I have two motions and I'm trying to

2    find out -- the Debtor has filed two motions and then asked

3    for consideration of them.  I've got a duty to think about

4    the timing of those questions, and I'm raising other

5    questions.  And if somebody files something, then we'll take

6    that up.  But somebody has to file something for me to

7    consider it.

8          MR. WILLIAMS:  Both of those motions are premised

9    on a trust document that you've now been told the two

10   trustees that you were asked to appoint, don't approve of

11   them.  So again --

12         THE COURT:  That's why I'm asking the question.

13   I'm telling you --

14         MR. WILLIAMS:  But we don't have notice of what

15   it's going to be or what we're going to do.  (indiscernible)

16   set something --

17         THE COURT:  I agree with you.

18         MR. WILLIAMS:  We don't know what it's going to

19   be.

20         THE COURT:  That's why I'm asking questions about

21   timing and what that looks like.  I don't know.  But I think

22   Mr. Lee is going to have to give me an answer to that

23   question.  And I agree with you.  We can't set a hearing

24   until there's a document that everyone can look at.  Not

25   just me, but other parties and have an opportunity to review

1    and observe, and Subchapter V trustee, your client.  I don't

2    know what that timing looks like.

3            So I don't know whether 20 days, 60 days makes

4    sense.  I think they're going to have to tell us when that

5    document stops moving, and then we can set a date.  And if

6    there are other motions that are filed before then, then

7    I'll consider those motions as well.

8            We just have to run a transparent -- and a process

9    that's based upon -- and I'm not saying you're saying

10   anything different.  But you need to run a process where

11   there's transparency and there's due process afforded to all

12   parties.  And I'm not going to jam anyone on an emergency

13   motion based on a document that someone has seen 24 hours in

14   advance.  I'm not doing that.  So let's just -- I think Mr.

15   Lee is going to have to -- and maybe with the input of Mr.

16   Okin.  And maybe that's not today.  But I don't think -- and

17   maybe it's just continued to a date to be determined.  But I

18   think on the CRO motion, they need to -- someone needs to

19   tell me when they want to come back.  And on the trust

20   document, I think we're going to have to find out.  And if

21   there's another motion or something else that gets filed,

22   we'll take that up in due course.

23           And I don't think I'm -- I'm not disagreeing with

24   anything of what you're saying.  I'm just highlighting for

25   the parties in the room and for those who may be listening

```
 1    that, you know, we're going to run a process based on the

 2    federal rules of bankruptcy procedure.  We're going to

 3    follow the Bankruptcy Code, and we're going to follow due

 4    process to all parties in interest.

 5          So I don't -- you know, I'm commenting on

 6    documents that were in a motion that was before me.  That's

 7    it.  I don't think anybody should read one way -- I'm not

 8    legitimizing or delegitimatizing anything.  I think I've

 9    probably asked more questions than Mr. Lee probably wanted

10    me to ask.

11          I'm just kidding.  I'm just kidding, Mr. Lee.

12          MR. WILLIAMS:  Respectfully, Your Honor, with

13    regard to asking Mr. Lee or Mr. Okin, it's Mr. Battaglia or

14    Mr. Jordan, whom I'm glad announced today whom they were

15    representing, since when they filed their notices of

16    appearance, they chose not to identify their clients in

17    those documents.  I did see in the attachment to the trust

18    document for the budget that they had gotten retainers to

19    represent Mr. Jones.

20          It's interesting that a trust that's supposed to

21    be for the benefit of injured parties -- and again,

22    liability has already been established.  That's not an issue

23    here.  The only issue is the dollar amount of that.  And

24    again, if you really wanted to have that decided, you could

25    have good clues starting next Monday, but Mr. Jones chose
```

1    not to do that.  He created this bizarre system that we see

2    here, which we still don't know what it is.  But it's not

3    the Debtor or the trustees, who are not actually trustees,

4    who can answer your questions.  It's Mr. Jones and Free

5    Speech.  Because as Your Honor has pointed out, they're the

6    ones who are using their money, and they want releases for

7    that, as Mr. Beatty has pointed out.  But they don't want to

8    come into this Court.  They don't even want to have their

9    lawyers file notice of appearance that identify who they are

10   appearing on behalf of.  They want the benefit of bankruptcy

11   without being in bankruptcy.  We'd be having a whole other

12   discussion at be at a whole other position today, Mr. Beatty

13   and I, and Mr. Jones and Free Speech for part of it.  But

14   the truth is, they're not.  They're staying outside of it.

15   And that's not right.  They shouldn't be -- they're getting

16   the advantage of the stay of these debtors to keep that case

17   from going forward on Monday, and they paid $750,000 of all

18   these professionals, plus some folks on the screen there, to

19   get them to make that happen.  And our folks are just

20   waiting to liquidate their claims, claims that need to be

21   liquidated in state court that shouldn't be liquidated as

22   part of a bankruptcy because the Court's jurisdiction, if it

23   did have jurisdiction, would be tenuous at best.

24           But again, Your Honor, I don't have anything else

25   to add at this time.  I appreciate that we are not going

1    forward today.  We had only filed an emergency motion to

2    continue.  We do intend to object -- well, we intended to

3    object to the motions as filed.  Since they're going to

4    change, we don't know what we're going to do to those.  But

5    we will be filing an emergency motion to dismiss these cases

6    on the grounds that Mr. Beatty has raised and I echoed

7    today.

8              THE COURT:  Okay.  Thank you.

9              MR. BATTAGLIA:  Your Honor, may I briefly be

10   heard?  This is Ray Battaglia.

11             THE COURT:  Yes.  You've identified yourself.

12   There's a lot of boxes, so I appreciate you saying that.

13             MR. BATTAGLIA:  I'm not going to address all of

14   the things that are before the Court, but there are a couple

15   questions that were raised, and much has been said about, I

16   don't know, maybe some (indiscernible) responsive how my

17   appearance was entered and how this trust agreement is not a

18   final document.

19             And I think the Court should appreciate that the

20   trust agreement was negotiated somewhat in the blind.

21   That's not to suggest that Mr. Lee did not act on behalf of

22   his clients in reviewing it.  But at the end of the day,

23   parties who need the most input are the trustees.  And the

24   interim trustee has literally no power under this document,

25   as appropriate.  So the appointment of the trustees is a

1   very important step in getting that document to final.

2          I don't think Mr. Okin -- and he can comment on

3   this.  I don't think we're talking about a wholesale rewrite

4   of this document.  I think there are issues that he brought

5   up this week to us that we were expecting, a first turn of

6   the document.  And of course the third-party funders are

7   amenable to reasonable modifications to that document.  But

8   I think that the suggestion that somehow there is something

9   nefarious about this being less than a complete document is

10  absurd.  We negotiated as best we could a document that

11  serves the purpose of trying to pay allowed claims in full.

12  And the other thing I think that's missing here is that

13  should the case have gone to trial in Austin, there's a

14  significant likelihood that there would be no money for

15  anybody.  And that's the intent here, is to try to preserve

16  a means to pay allowed claims.  And that's what this system

17  is set up to do.  I could dispute a lot of other things, but

18  I think those are the most important thing.

19         I think, Judge, your comment about April 30th, of

20  course we're not going to hold an  April 30th deadline, but

21  we do need this to move forward with some speed so that we

22  know that we've got people we can talk to on the other side

23  to get these documents into final shape.

24         THE COURT:  Okay, thank you.  Anyone else wish to

25  address the Court at this time?  Is there anyone on the line

1    who wishes to address the Court?  Hit five-star.  Okay.

2         MR. LEE:  Good morning, Your Honor.  For the

3    record, Kyung Lee.  I want to apologize.  My bladder is not

4    as strong as it used to be when I was younger, and that's

5    the reason I took a little break.

6         I just want to say one thing if you allow me to

7    put Mr. Schwartz on without any objection from this

8    audience.  I just need to tell you, the parties have been

9    working here very hard, in good faith to create a proposal

10   to, one, pay creditors, and two, to pay them in an equal

11   fashion.  I think those are really pretty legitimate

12   purposes of the Bankruptcy Code which I feel very good about

13   saying to you and to this entire group here, that I feel

14   very proud of being able to bring to this Court a process to

15   do that.

16        Yes, it may have some warts on it.  And yes, it's

17   not perfect.  But it's a proper purpose of this Court and to

18   this process in my view, for the 40 years I've been doing

19   this, to bring to this Court a structure that allows for

20   resolution of the bickering that's been going on for the

21   last ten years in which Mr. Schwartz and I have brought to

22   the table on Day 1 of a bankruptcy case $10 million to be

23   made available and for equal sharing of that money among

24   creditors, and yet I hear nothing, nothing but complaining

25   by those who actually want the money or who are entitled to

1    the money.

2            And so I say to you, Your Honor, there must be

3    something else going on for people to complain about that

4    when for ten years they've had nothing to be able to collect

5    on any of their judgments.  And I find that quite upsetting

6    on my part to have worked this hard to bring to the table

7    this kind of a structure and hear nothing but complaints

8    when the effort has been done solely to bring to the table a

9    structure that has fiduciaries watching over this process

10   for the next five years and bringing $10 million to the

11   table as a first offer on the table with the parties that

12   they believe caused all this injury.

13           And so with that said, Your Honor, if I may, I'd

14   like to be able to show this Court what we've done, why

15   we're here, and what we're trying to do.  And again, in a

16   non-adversarial fashion to try to present to you --

17           THE COURT:  I don't know if that's possible today,

18   Mr. Lee.

19           MR. LEE:  Again, I'm going to tone down my

20   rhetoric in my presentation.  But I didn't have a

21   presentation for you --

22           THE COURT:  Yeah.  If it's in the form of a

23   presentation, I have no problem with it.  If we're going to

24   -- the declaration isn't admitted into the record.  So

25   there's no evidence and there's no motion to go forward.  So

```
 1    I don't need to take evidence about anything.  There's

 2    nothing going forward today and there's nothing that Mr.

 3    Schwartz -- I want to make sure he's clear about this --

 4    that will be used in connection with support of any motion

 5    that may or may not go forward today.  We don't have dates

 6    on anything.  So if what Mr. Schwartz wants to do is provide

 7    what typically happens in a Chapter 11 case, someone

 8    provides background information about why we're here and

 9    what you intend to accomplish, I've got no problem with

10    that.  I just want to make sure that everybody is really

11    clear, this is not going to serve as evidentiary in support

12    for any motion because there is no motion before the Court

13    today.

14         I will also tell everyone there is clearly -- and

15    I understand it -- a lot of emotion on both sides.  It's

16    completely justifiable, and I understand it.  My job is to

17    not focus on that.

18         MR. LEE:  Yes, Your Honor.

19         THE COURT:  My job is to rule on matters that are

20    before me, the legal issues that are before me.  There are

21    parties who are being referenced who are not here, but who

22    are certainly parties in interest.  They are party

23    contributors.  And I've got to consider that.  There are due

24    process issues that are being raised, there are motions that

25    sound like they're going to get filed.  And when we take
```

1    them up, I may rule on them based on the evidence that is

2    before me.

3              I think some of the concerns, Mr. Lee, are legit.

4              MR. WILLIAMS:  And I understand,  Your Honor.

5              THE COURT:  And there are legitimate concerns

6    about how we're here based on the papers.  Mr. Schwartz

7    wants to talk today.  Give him an opportunity to talk.

8              MR. RUFF:  Your Honor, I would actually object to

9    -- I don't know -- what is he going to inform the Court

10   about?

11             THE COURT:  Look, what I am anticipating -- and

12   Mr. Lee will have to (indiscernible) -- is kind of a generic

13   Chapter 11 presentation.  I have questions about these --

14             MR. RUFF:  Well, I have a lot of questions too,

15   Your Honor.  I think everybody in this room has a lot of

16   questions. But Mr. Schwartz is being put up as the chief

17   restructuring officer.

18             THE COURT:  No, he's not being put up for that

19   reason.  If he's going to stand -- if Mr. Schwartz wants, he

20   can stand here and tell me about background information

21   about the case.  This is not going to be used as testimony

22   in any way.  Because if that's the case, then Mr. Schwartz

23   better be ready for a lot of folks cross-examining him

24   today.  If this --

25             MR. RUFF:  Will there be an opportunity to ask

1    questions of Mr. Schwartz?

2              THE COURT:  If Mr. Schwartz is going to speak.

3    Mr. Schwartz can answer questions.

4              MR. LEE:  I have no problems with that, Your

5    Honor.  Mr. Schwartz is --

6              THE COURT:  That's what I'm saying.  If Mr.

7    Schwartz is going to -- just like every Chapter 11 case, if

8    there are questions of the person who stands up and provides

9    a presentation, folks get to ask questions.

10             MR. LEE:  We intend to run a transparent process,

11   Your Honor.

12             THE COURT:  I'm just saying this is not going to

13   be where Mr. Schwartz makes a statement and no one gets to

14   ask questions.  If Mr. Schwartz wants to make a statement,

15   people get to ask questions.

16             MR. RUFF:  I guess --

17             THE COURT:  I have questions.  And I'm going to

18   get my questions answered is what I'm saying.  And you may

19   like the questions I ask.

20             MR. RUFF:  I liked the questions that you asked

21   already, Your Honor, as I said at the outset.  And again,

22   this case begs many questions.  I just -- again, you are

23   here today for a specific purpose.

24             THE COURT:  I agree.

25             MR. RUFF:  We don't even know what these cases are

1   about now.  The Debtors admittedly, Mr. Oaken --

2            THE COURT: That's what I'm trying to find out.

3            MR. RUFF:  Well, okay, very well.  But whatever he

4   says today might be without any merit, because it might all

5   change is what I think we heard today.

6            THE COURT:  I guess that's what I'm saying.  Isn't

7   that something you would want to know?

8            MR. WILLIAMS:  No, Your Honor.  Until we have a

9   document that we know is --

10           THE COURT:  I'm not talking about the trust

11   agreement.  I'm talking about general background information

12   about who does IW help.  That's the question I have.  What

13   do they do?  Are they still conducting business activities?

14   He says no, but I'd like to hear it from him.  Are they

15   conducting commercial activities?  I'd like to know the

16   answer to that question.  Folks, I get to ask questions.  I

17   get it, you get a check, but I get to ask questions.

18           MR. WILLIAMS:  I have no problem with you asking

19   questions, Your Honor.  But with respect to the declaration

20   -- and I know it was offered as an exhibit -- it is part of

21   the record in all three of these cases, at least one

22   administered cases.  I would ask that the Court take

23   judicial notice of that declaration and make it part of any

24   record about what he is going to talk about.  Because I

25   think all your questions are actually answered in that

```
 1   declaration.  And if he is going to say something different
 2   today than what's in --
 3           THE COURT:  You don't know that, because you don't
 4   know the questions I'm going to ask, Mr. Williams.
 5           MR. WILLIAMS: Well, he talks about bank accounts
 6   and --
 7           THE COURT:  You don't know what I'm going to ask,
 8   Mr. Williams.
 9           MR. WILLIAMS:  Yes, Your Honor.  I object to there
10   being any testimony today.
11           THE COURT:  There's no testimony.  Mr. Williams,
12   you've been part of a million Chapter 11 cases.  People get
13   to present information at the beginning, at the outset of a
14   case.  That's all -- and if Mr. Lee goes too far, I'm going
15   to shut it down.  It's really simple what's happening here.
16   In every Chapter 11 case, someone gets to make a
17   presentation and the Court gets to ask basic questions about
18   the Debtor.  Why are you here?  How did you get here?  Who
19   are these three entities?  What are they doing?  Why are we
20   in Victoria?  I get to ask a bunch of questions.  It sounds
21   like you would want to know some of the answers to some of
22   these questions.  Maybe there are questions you don't want
23   to know the answer to, but you get to ask questions.
24           MR. WILLIAMS:  Again, Your Honor, respectfully, I
25   have no problem with you asking any questions that you have
```

1    about anything related to this.  I do have a problem with

2    Mr. Schwartz making any presentation because this is not a

3    typical case.  These folks are victims, not creditors.  The

4    liability has been established.  The only issue is how much.

5    Mr. Lee wants to take credit for a document --

6              THE COURT:  I'm not doing any of that.

7              MR. WILLIAMS:  -- that's been (indiscernible) that

8    doesn't exist.

9              THE COURT:  Mr. Williams, I understand.  But you

10   have to -- you said you have no problem with me asking

11   questions.

12             MR. WILLIAMS:  No, Your Honor.

13             THE COURT:  Okay.  So, Mr. Schwartz, can I ask you

14   a few questions?

15             MR. SCHWARTZ:  Yes, Your Honor.  (indiscernible)

16   please?

17             THE COURT:  You can stand right there.  You can

18   take that microphone right there.

19             It sounds like you have a short presentation you'd

20   like to make.  What would you like to tell the Court?

21             MR. SCHWARTZ:  Well, (indiscernible).

22             THE COURT:  If you can just get the microphone a

23   little bit closer to you.

24             MR. SCHWARTZ:  What we're trying to do -- and I

25   got involved (indiscernible) in this process that

1    (indiscernible) the strategic plan, which (indiscernible).

2    But I was involved after that in a lot of the other matters.

3    But essentially to set up in a single location, a single

4    venue the claims -- the claims determination process, the

5    damage determinization process in a manner independent of

6    any influence by Mr. Jones or any of his associates and to

7    negotiate with Mr. Jones, which is what we did, creating the

8    fund, the initial fund is $9.8 million, to pay the claims

9    over a period of five years under the supervision of the

10   trust.  That's my legal description of what we're trying to

11   do.  The goal was to pay off other claims.

12         Mr. Jones also, as everyone has heard, put up

13   $725,000, and we'll continue dialogue with him.  I would

14   call it a negation (indiscernible) more serious money than

15   that, we need to put up $2 million.  And then I discovered a

16   royalty that was being paid to Mr. Jones that will have

17   documentation to support this.  The (indiscernible) that was

18   given to me was at some point in time IWHealth was the party

19   that generated or created that royalty and that Mr. Jones

20   for some reason at some point in time (indiscernible) paid

21   the royalty directly to Mr. Jones.  They got to have that

22   royalty back.  And he agreed to give us that.  And then also

23   we negotiated that $250,000 a quarter over five years to get

24   our total fund up to $9.8 million.

25         This was a negotiated process.  It was not Mr.

1    Jones telling us what he was going to do and us saying okay,

2    fine, we'll take that.  I had no idea who Mr. Jones was.  I

3    didn't even know until April 4th.  And Mr. Lee approached me

4    and I had to go find out who is this guy.  I had never heard

5    of him.  I hadn't heard of Infowars.  I was not very

6    interested in conspiracy theories.  (indiscernible) landing

7    on the moon, and I don't pay much attention to it.  So that

8    was the -- just of how we got here.

9           A little bit about the structure.  There are two

10   entities in the Jones business enterprise, two legal

11   entities that are responsible for all of the money

12   generation.  FSS, which is the marketing arm that reaches

13   out to his audience and sells everything from t-shirts to

14   vitamins and mineral supplements and emergency food

15   supplies, (indiscernible) that you could use.  Everything

16   you would expect, from books and whatever else.  That --

17   most of that inventory is supplied to FSS by a company

18   called PQPR.  And they are --

19           MR. LEE:  Let me interject.  There's an Exhibit 6,

20   if I may approach, Your Honor, that's already in the

21   binders.  It's corporate diagram that might help the

22   audience as well as the Court.

23           THE COURT:  Just refer to a docket.

24           MR. LEE:  It's Exhibit 6 in the witness's binder

25   book, Your Honor.

```
 1              THE COURT:  Okay, thank you.

 2         MR. SCHWARTZ:  And if you look at the PQPR

 3    (indiscernible) supplies most of the product, not all of it.

 4    Third-party vendors also supply the product, too.  But

 5    that's where the money comes from.

 6              As you know, or they know, Jones and his companies

 7    have been severely -- the word is they were cast out

 8    (indiscernible) or they have had problems (indiscernible)

 9    banks.  But any kind of service.  So they are very careful,

10    conscious, of trying to maintain their current vendors.

11              One of the concerns that came up, and we're

12    looking at this, was the question of filing the bankruptcy

13    is that that would probably push FSS over the top and it

14    would lose all of its or most of its vendor connections and

15    it could no longer survive.  In 2018 and 2019 -- I'm working

16    off memory here.  I'm 71 years old, so it doesn't always

17    work.  But there was something like -- FSS generally did

18    something like 76 to 79, almost $80 million of revenues in

19    those two years.  That's a significant amount of money.

20         MR. WILLIAMS:  Your Honor, if I could respectfully

21    -- we are hearing about entities that he is not CRO for and

22    that aren't debtors in this case.  And if we're going to

23    have a presentation about the debtors in this case, I don't

24    need to know what their strategy was about why Mr. Jones

25    elected not to file another --
```

1          THE COURT:  I have a question, Mr. Williams.

2    Thank you.  Please continue.

3          MR. SCHWARTZ:  Continue?  Okay, 76, 78 million

4    dollars of revenue from those two entities.  The -- if you

5    look at the impact of the litigation in 2021, I would

6    estimate (indiscernible) books be closed for 2021.  But

7    based on the merchant receipts from the credit card

8    operations, the revenue 2021 is approximately $56 million.

9    $20 million less than it had been in the past.

10          THE COURT:  So at some point over the last --

11   let's just call it -- you said you (indiscernible) around

12   April 4th.  So let's say sometime early this month.

13          MR. SCHWARTZ:  Yes.

14          THE COURT:  (indiscernible) with respect to the

15   three entities that are in bankruptcy today.

16          MR. SCHWARTZ:  Yes.

17          THE COURT:  So let's talk a little bit about that.

18   Can you just tell me a little bit about each -- your

19   understanding as to each entity that's in bankruptcy.  So

20   I'll start with the first one.  Infowars LLC.  It's InfoW

21   LLC, which was formerly known as Infowars.

22          MR. SCHWARTZ:  Correct.

23          THE COURT:  When did it change its name?

24          MR. SCHWARTZ:  It was changed in April.

25          THE COURT:  In April?  Do you remember when?

010550

1        MR. SCHWARTZ:  No, I don't.

2        THE COURT:  Sometime before the filing?

3        MR. SCHWARTZ:  Oh, before the filing.  It was

4  shortly before the filing as I recall.

5        THE COURT:  Okay.  And --

6        MR. LEE:  And, Your Honor, if I may interject

7  here.  Part of the reason the name was changed --

8        THE COURT:  I don't want to get into the part of

9  the reason the name was -- I just want to understand.

10  Because at this point -- what does InfoW LLC do?

11        MR. SCHWARTZ:  InfoW LLC owns the trade name

12  Infowars.  Infowars is the name that FSS uses to market its

13  products, and that is the name that Alex's podcasts go out

14  under.  So it is the trademark.  It's the Coca-Cola for the

15  (indiscernible).

16        THE COURT:  I won't hold you to these numbers, but

17  just help me understand.  So let's just say within the 40

18  days before the filing, how much cash did -- or maybe on the

19  petition date, how much cash do you think InfoW holds?

20        MR. SCHWARTZ:  InfoW has no cash.  Up until the

21  time it was transferred to the trust, it was owned by Alex

22  as just part of his business operation.  I don't know why.

23        THE COURT:  What sources of revenues in the last

24  90 days?

25        MR. SCHWARTZ:  InfoW (indiscernible) he annualized

1  his revenue (indiscernible) for use of the trade name that

2  it owns.

3           THE COURT:  Okay.  Okay.  so let's turn to

4  IWHealth LLC.  Okay.  Let's just -- what does IWHealth LLC

5  do?

6           MR. SCHWARTZ:  IWHealth holds a royalty interest.

7  And it's referred to a royalty.  And what it is, it's a

8  commission that is paid by Youngevity to the Jones

9  enterprise for the sale of Youngevity products on the FSS.

10  But that royalty started in April, generally before the

11  filing.  It is now paid to IWHealth.  That was the amount I

12  said we discovered and I said has to come back here to --

13           THE COURT:  Do you know how much that amount was?

14           MR. SCHWARTZ:  About $38,000 a month.

15           THE COURT:  $38,000?

16           MR. SCHWARTZ:  A month.

17           THE COURT:  A month?

18           MR. SCHWARTZ:  Yes, sir.

19           THE COURT:  Is it currently receiving?

20           MR. SCHWARTZ:  Yes.

21           THE COURT:  And so I think you mentioned that FSS

22  sells in markets.  It's a non-debtor.  Does IWHealth sell

23  and market anything or does it just receive that royalty?

24           MR. SCHWARTZ:  It just receives that royalty.

25           THE COURT:  Okay, thank you.  Was it receiving any

1   royalty interest before?  Like let's just say with in the 90

2   days before the filing?

3           MR. SCHWARTZ:  Well...

4           THE COURT:  Go ahead.  I'll tell you why I'm

5   asking.  I don't want you to be confused by my question.

6   You mentioned that there was a direct pay at some point, and

7   then you stopped.  Or you stepped in and said no, it's got

8   to go directly to IW health, the royalty payment.  What was

9   the pre-bankruptcy arrangement before you...

10          MR. SCHWARTZ:  Pre-bankruptcy, the royalty was

11  sent to Alex Jones directly, his personal bank account.

12          THE COURT:  Okay, thank you.

13          MR. SCHWARTZ:  And I discovered that

14  (indiscernible) that was a Monday.  Because that's when I

15  went to Austin.  So prior to that date, it was not receiving

16  any royalty..

17          THE COURT:  Okay.  And then there's one more.

18  Prison Planet TV LLC.

19          MR. SCHWARTZ:  Prison Planet owns a number of

20  videos that were produced and developed by Alex Jones'

21  enterprise.  I think eight, 10, 12 or something like that.

22  There's a list of them.

23          THE COURT:  Aside from own them, what does it do?

24  It just owns them?

25          MR. SCHWARTZ:  It's similar to...

```
1              THE COURT:  InfoW?

2              MR. SCHWARTZ:  InfoW.  It just owns them.

3              THE COURT:  How much cash do you think it held on

4     the petition date?

5              MR. SCHWARTZ:  It held zero.

6              THE COURT:  It held zero.  Within the 90-day

7     period before the petition date, was it generating any

8     income?

9              MR. SCHWARTZ:  The 90 days before -- so just like

10    InfoW, owned by Alex Jones a hundred percent.  And half of

11    its assets were used (indiscernible) FSS.  It was not

12    anything for that use.

13             THE COURT:  Okay.  Okay.  I guess I can ask you

14    and I can ask Mr. Lee.  And I think Mr. Lee has already

15    asked the question.  What do you believe the purpose of

16    these Chapter 11 cases is?

17             MR. SCHWARTZ:  The purpose?  The purpose is to

18    arrange to pay all of the plaintiffs the amount of their --

19    let's say in a bankruptcy sense, their allowed claim in

20    full.  That's the purpose.

21             THE COURT:  So when the pleadings talk about

22    paying it in full, you are referring to a defined term in

23    the trust agreement that basically says whatever the court -

24    - whatever is allowed in the bankruptcy case, the amount of

25    that claim.
```

1            MR. SCHWARTZ:  Yes.

2            THE COURT:  Okay.  Does that contemplate payments

3    -- does the settlement then contemplate just the Debtors or

4    will it include a global settlement including the non-

5    debtors that you've described earlier?

6            MR. SCHWARTZ:  It includes the -- specially Alex

7    Jones and FSS.

8            THE COURT:  Okay.

9            MR. SCHWARTZ:  Because they are the source of the

10   funds to make the payment.

11           THE COURT:  Okay.  Mr. Schwartz, I will tell you,

12   there was a motion set for you for today.  It sounds like

13   it's not going forward.  I think those are all the questions

14   that I have for you.  I think that is what is customary on a

15   first day I think to just ask, get a general understanding.

16   Are you aware of anything else in connection with the

17   bankruptcy case itself that you think I should know at this

18   time in terms of what may be coming?

19           Typically -- and I'm just saying this for folks

20   who are listening.  It's very typical for a bankruptcy judge

21   to ask at the beginning of a case what might I expect in the

22   short-term future.  I've been told by some folks they are

23   going to file a motion, and I'll take them up.  And maybe

24   this is a question for Mr. Lee.  What may I expect in the

25   short near-term.

1              MR. SCHWARTZ:  Well, Your Honor, I'm not a lawyer,

2       as you know.

3              THE COURT:  No, no, no.  You're not.

4              MR. SCHWARTZ:  Mr. Lee (indiscernible) remand.

5       And that's coming I guess But I don't know -- I don't think

6       I'm qualified to talk about it.

7              THE COURT:  No, no, no.  I don't want you using

8       those words.  That's completely fine.  Thank you very much,

9       Mr. Schwartz.

10             MR. SCHWARTZ:  Thank you, Your Honor.

11             MR. RUFF:  Your Honor, could I just ask a couple

12      questions?

13             THE COURT:  Yeah, go ahead.  Just stand on the

14      other side.

15             MR. RUFF:  Yeah, I'll just (indiscernible) the

16      microphone is -- there we go.

17             Mr. Schwartz, I just have a question.  And it

18      relates to why we are here in Victoria.  And on the

19      petitions, there was an address listed for the Debtors where

20      they were located, 5606 North Navarro, Victoria, Texas.  Are

21      you familiar with that location?

22             MR. SCHWARTZ:  Yes, I am.

23             MR. RUFF:  Okay.  And do the Debtors have a lease

24      of that space?  Is that what your understanding is?

25             MR. SCHWARTZ:  Well, it's executive suites.  We

1    have two offices there.  I guess that's some form of a

2    lease.

3            MR. RUFF:  Okay.  So who sits in those office?

4            MR. SCHWARTZ:  There's one desk and one chair and

5    one desk and one chair.  So that's...

6            MR. RUFF:  Do you know when those leases were

7    entered into?

8            MR. SCHWARTZ:  Early April I think.

9            MR. RUFF:  So prior to that, prior to early April,

10   they weren't located there?

11           MR. SCHWARTZ:  No.

12           MR. RUFF:  Okay.  Now, the petition that was

13   signed under penalty of perjury I believe says that for the

14   greater part of 180 days, the debtors were located at that –

15   –

16           MR. LEE:  Objection, Your Honor.  This is asking

17   for a legal answer.  And if you want to talk about that, we

18   can talk about that.

19           THE COURT:  Yeah.  I think that's probably --

20   well, it's a question.  I think the trustee -- I think maybe

21   Mr. Schwartz probably -- you know, like with the remand,

22   maybe someone else can answer --

23           MR. RUFF:  I won't ask for a legal conclusion,

24   Your Honor.  I just want to make sure it's clear though that

25   it wasn't the greater part of 180 days that the Debtors were

Page 54

1   located there.

2        MR. LEE:  That's not an accurate question, Your

3   Honor.  (indiscernible) Dallas, Judge Hale, these Debtors

4   had domicile in every location in the state of Texas for 180

5   days.  So we can have an argument about that --

6        THE COURT:  But we're not going to have it today.

7   What we're going to have is argument (indiscernible) motion

8   in front of the Court that the Court will then consider.

9   Today we're just going to ask very --

10       MR. RUFF:  Your Honor, I was just asking the

11   question to figure out -- to get an idea of why we are here

12   in Victoria.

13       THE COURT:  You can ask questions and people can

14   answer or not.

15       MR. RUFF:  Do you have any idea -- so you had

16   mentioned that Mr. Jones is the one who is going to be

17   filing -- excuse me, funding this process.

18       MR. SCHWARTZ:  Mr. Jones and FSS.  Most of the

19   money come from -- of the $9.8, most of it will come from

20   FSS.

21       MR. RUFF:  Okay.  Ans is it your understanding

22   that both of those entities are also liable for the same

23   body of claims that we are here to try and deal with?

24       MR. SCHWARTZ:  Well, I must admit, I've not looked

25   at the petitions and complaints in the underlying cases.  I

1    would be shocked if they were not.  That's where the money

2    is at.

3                 MR. RUFF:  Okay.  Any idea -- and again, only if

4    you actually know or whatever.  But any idea or any

5    discussions as to why Mr. Jones didn't file for bankruptcy?

6                 MR. SCHWARTZ:  Yes.

7                 MR. RUFF:  Okay.  Do you know why?  What was

8    discussed as to why he didn't file for bankruptcy?

9                 MR. SCHWARTZ:  I know the discussions because I

10   was involved in some of them.  The discussions was, you

11   know, Infowars is a prominent trademark in the conspiracy

12   theories community, if you will.  Alex Jones' name is

13   equally as prominent.  And so the concern was

14   (indiscernible) FSS, FSS were concerned about losing

15   lenders.  In Alex Jones' case, that it would somehow ruin --

16   harm this trademark, his name and his ability to generate

17   funds, sell merchandise to these people.

18                 MR. RUFF:  So that's what was expressed to you at

19   least?

20                 MR. SCHWARTZ:  That was what we discussed.

21                 MR. RUFF:  And does that make sense to you, that

22   that would -- I mean, he is funding this.  the claims are

23   against him.  Does it make sense that somehow him being part

24   of a bankruptcy process that is open and transparent -- how

25   does that harm him?

1          MR. SCHWARTZ:  Being put into bankruptcy is what

2     we were concerned about.  By putting him in bankruptcy would

3     harm his trademark value, his value to us and generally

4     cashflow.  That was the reason as I understood it.  And that

5     was the reason I was involved in discussing it.

6          MR. RUFF:  Well, why didn't it harm the debtors

7     that actually filed then?  They own intellectual property,

8     don't they?

9          MR. SCHWARTZ:  They own intellectual property, but

10    they are not in the public eye at all.  I don't think anyone

11    knew who InfoW was or Infowars LLC was.  I would assume, and

12    I think a lot of people did, that that was a significant

13    entity other than the ownership of the trade name, which is

14    significant.  That was all the significance to the business

15    operation (indiscernible).

16         MR. RUFF:  Now, you had mentioned that when you

17    were negotiating -- for example, you had mentioned that you

18    said that when you discovered about those royalties, hey,

19    those have to become and be paid directly to -- I forget who

20    it was.  I think IWHealth?

21         MR. SCHWARTZ:  Yes.

22         MR. RUFF:  Okay.  And when were those negotiations

23    taking place approximately?

24         MR. SCHWARTZ:  Well, they started on the first

25    Monday I was in Austin, right after the April 4th meeting

1    with Mr. Lee.  They probably, you know, went for four or

2    five days (indiscernible) for transferring the

3    (indiscernible) sending money to the trust, we've got to get

4    bank account (indiscernible) for the trust.

5         MR. RUFF:  Okay.

6         MR. SCHWARTZ:  Because the trust was going to own

7    InfoHealth.  That's what -- the decision was made to put it

8    (indiscernible).

9         MR. RUFF:  Okay.  And were you engaged as the

10   chief restructuring officer at that point?

11        MR. SCHWARTZ:  I don't think so.  I think I was

12   engaged on the 8th or 9th of April.  I could have been.  It

13   was very close to that date.

14        MR. RUFF:  Okay.  So the agreement, the trust

15   agreement that you said that you were negotiating, you were

16   not really negotiating on behalf of nay party, were you?

17        MR. SCHWARTZ:  No.  Each party had a lawyer there.

18   I guess the trust didn't.  But I was the CRO.  I guess I was

19   negotiating for the Debtors, because that's who my

20   responsibility was to.

21        MR. RUFF:  Is it more accurate to say you were the

22   proposed CRO at that point?

23        MR. SCHWARTZ:  Correct.  I was proposed CRO.

24        MR. RUFF:  Okay.  So do you think maybe perhaps it

25   was more accurate to say that you were giving advice as to

```
 1    how it would be better set up optically?

 2         MR. SCHWARTZ:  No.  I was not giving advice on

 3    (indiscernible).  They wanted me to be CRO.  I've got a

 4    reputation -- I've been in this business for over 40 years.

 5    And I've done all kinds of stuff.  I worked as a

 6    (indiscernible) receiver.  I've been special

 7    (indiscernible).  I've got a reputation.  They came to me

 8    and they wanted my reputation.  You want my reputation.

 9    That's one of the things (indiscernible) everything to be

10    clear.  If this money does not belong to Alex, shouldn't be

11    going to Alex, (indiscernible) over here.  So I didn't put

12    it in those words, and I didn't have to.

13         MR. RUFF:  Sure.  So it's accurate to say that if

14    you were going to be a part of this, this is how you wanted

15    it to be done.

16         MR. SCHWARTZ:  I wanted it to be clear, clean, as

17    see-through, and I wanted it to be right.  I wanted as much

18    money getting into the pot.  I'm not think that this was

19    being negotiated.  I'm thinking this is going to be hard to

20    do with $725,000 and $40,000 a month royalty.

21         MR. RUFF:  Right.  So I guess my question then is

22    your negotiation was more on behalf of yourself and, hey, if

23    I'm going to be invested in this, this is how I want it to

24    be.

25         MR. SCHWARTZ:  No.  At that point in time, my
```

```
 1    objective was to get as much money on the table you can get
 2    for the benefit of claimants, the claimants.  That was our
 3    job.  Okay?  If they wanted me here, then they had let me do
 4    my job.  And that would continue to be the case.  You know,
 5    can we get more money on the table is the question I have.
 6           MR. RUFF:  Okay.  But again, that was your job
 7    that you were looking perhaps to do.  At that point you had
 8    not been engaged, correct?
 9           MR. SCHWARTZ:  Correct.  I had not been engaged.
10           MR. RUFF:  Okay.  So Mr. Jones and presumably some
11    of his professionals were looking to have you engaged in
12    this process at this time.  Is that correct?
13           MR. SCHWARTZ:  Well, and they were definitely
14    considering engaging me because I went to their office and
15    they held nothing back from me that I asked f
16           MR. RUFF:  And at that time, they were propping to
17    you this structure.  Is that acute?
18           MR. SCHWARTZ:  Yes.  They were working on the
19    structure.  But the framework was...
20           MR. RUFF:  Did they have a draft of trust
21    agreement, for example, for you to look at?
22           MR. SCHWARTZ:  I don't recall when I first saw
23    that.
24           MR. RUFF:  was it discussed do you believe?
25           MR. SCHWARTZ:  In general, the trust agreement.
```

1          MR. RUFF:  Okay.

2          MR. SCHWARTZ:  I knew there was on coming.  I knew

3    who the proposed trustees were.

4          MR. RUFF:  If -- and that a big if -- if these

5    cases are to go forward, do you think the Debtor or you as

6    the chief restructuring officer of the Debtors would have

7    any opposition to a committee being appointed in these

8    cases?

9          MR. SCHWARTZ:  I mean, whatever the Court wants.

10   I want this thing -- my goal when I walk off this thing five

11   years from now that nobody can question what I did.  And if

12   someone wants to have a committee, they'll have a committee.

13   I mean, that's not for me to say.  But I don't have a

14   problem with it.

15         MR. RUFF:  All right.  Thank you, Mr. Schwartz.

16         THE COURT:  Thank you.

17         Mr. Lee, let me just ask you.  We're not going

18   forward today.  Thank you very much, Mr. Schwartz.

19         MR. LEE:  That's correct.

20         THE COURT:  So you agree with Mr. Williams that I

21   think it's premature to set a date on a timing for the

22   motion, call it the trustee motion, until there is some --

23   until the document stops moving.  And then somebody can

24   refile the --

25         MR. LEE:  I disagree -- I apologize.

1          THE COURT:  No, I get it.  But I'm just telling

2    you.  Because you're asking for this (indiscernible) relief,

3    right?  And this is different than -- maybe you refile

4    something and maybe the date gets set.  But as of right now,

5    I don't know what version of that document is going to look

6    like based upon the statements that Mr. Okin made.  So this

7    isn't a DIP that's going to get tweaked or a disclosure

8    statement where additional sentences are going to get added

9    based upon objections and you kind of negotiate it up.  This

10   is a trust agreement that, I don't know, could materially

11   change.  Mr. Battaglia tells me it won't or he doesn't

12   anticipate it, but I don't know.  Maybe we set a status

13   conference in a week and then we'll know more.

14          MR. LEE:  Your Honor, I fully support that.  And

15   let me just add to this that --

16          THE COURT:  Let me get this additional thought

17   out.

18          MR. LEE:  Yes, sir.

19          THE COURT:  At that status conference, you're

20   going to have to help me understand why at a minimum InfoW

21   and Prison Planet are Subchapter V debtors.  We haven't

22   taken any evidence today.  But based upon what I've heard --

23   so I'm not ruling on it.  You're going to have to help  me

24   understand.

25          MR. LEE:  Yes, Your Honor.

```
 1              THE COURT:  And I want to make sure that everybody
 2      understands why I'm asking these questions.  And it's based
 3      entirely on the statutory provisions.  Section 1182 of the
 4      Bankruptcy Code defines a Debtor as a person that engaged in
 5      commercial or business activity.  Person is defined in
 6      Section 101(41) of the Bankruptcy Code and includes
 7      individuals, partnerships, or corporations.  So person
 8      directly is satisfied, but commercial or business activity,
 9      I don't hear any.  (indiscernible) comes to those two.  And
10      today is not the day to take it up.  I just want everybody
11      to give it some thought based on what I heard.  I think
12      IWHealth -- and again, I didn't take any evidence.  But I
13      did hear Mr. Schwartz say that at least there is a royalty
14      of some amount coming in every month, which I think puts
15      that entity in a different bucket than the other two that I
16      heard.  And again, this is just preliminary discussions that
17      I've heard.  And I'm putting this in the what kind of case
18      do we have as I ask the questions about third-party funding,
19      you know, the ability for them to cut off the lifeline of a
20      case at any point, the role of the trustees and who they
21      would serve, the role of a CRO, whether a true fiduciary of
22      the estate or working for a trust that has not -- that may
23      not have the best interest of the estate.  And it may or may
24      not, but I think at a minimum I need to understand from a
25      foundational standpoint what chapter these cases should be
```

1    in.

2           It sounds like other motions are going to get

3    filed, and I'm not here to prejudice or encourage one way or

4    the other what people are going to file.  People will file

5    whatever they file, and we take them up in due course.  But

6    based upon what I heard, I think we've got -- I've got to

7    answer that question pretty quickly, and I think it can be

8    done in short order I suspect.

9           Mr. Lee?

10          MR. LEE:  Yes, Your Honor.

11          THE COURT:  Now I'm going to stay quiet.

12          MR. LEE:  Number one, with respect to the question

13   that you've asked about the two other entities, I can give

14   you the answer today, but I am prepared to answer at the

15   status conference, and we'll present whatever you want that

16   we think satisfies the business rule that you are asking

17   about insofar as these two Debtor entities, and we are happy

18   to do that.

19          THE COURT:  Okay.

20          MR. LEE:  Number two, whatever they want to file,

21   please file.  Number three, in our way of thinking about

22   this issue, Your Honor, there's only so much a Debtor can do

23   pre-petition to negotiate with third parties.  Like in a

24   DIP, as you all know.  We've brought what is best -- what we

25   could do with third parties.  We are asking now for the

1    creditors, the U.S. Trustee, and for you to help us finish

2    those negotiations.  Because we don't have the balance of

3    the leverage of negotiations with FSS and Alex Jones.  And

4    that's why we are here.  And so if the parties want to do

5    that, they should do that.  And we encourage that.  We've

6    told everybody that.  But for people to just nick pick at

7    this thing and to say it's not appropriate, et cetera,

8    they're fine.  They can do that.  But I want the Court and

9    everyone to know that there is a good faith effort being

10   made here to try to do something constructive with the

11   bankruptcy process.  And you're right, it's not perfect.

12   It's not the panacea of all things.  But it is a construct

13   devised to bring together the parties to a resolution of a

14   very sad and complex situation.  And just like the Boy

15   Scouts, just like the Catholic Diocese, just like any other

16   situation where litigation is at hand, the Bankruptcy Code

17   and the courts are the appropriate vehicles to do this.  And

18   we've picked one because we think it's a resolution process

19   that makes sense here.  And because, unlike the Boy Scouts,

20   unlike Catholic Diocese, there are not millions of dollars

21   available here.  There are limited funds, and we are trying

22   to maximize it so that it goes to the Claimants.  And that's

23   part of the reason why we chose Subchapter V, because not

24   only are we qualified to do that, but it's the right vehicle

25   under the Bankruptcy Code to do this.  And that's why we are

1    here.

2            And again, these are arguments, nothing more than

3    arguments.  And we'll come to you at the appropriate time to

4    make these as actual fact and proof.  But we'll be here on

5    the status conference when you want us to.  I'm going to

6    push the parties to get this trust document done.  And I

7    will tell you, I disagree with Mr. Williams and I disagree

8    with the other parties wanting to delay this thing.  Because

9    we only have 120 days to get this case done in my view.  The

10   trust document is what it is.  It will get fixed to the

11   point where I think you will get comfortable with it.  The

12   two jurists aren't going to sit on something were either

13   they have been misled or not appropriate.

14           And for people to suggest that you're going to be

15   snookered by something like this I think is inappropriate.

16   The parties are going to act right on this side of the

17   table, and we're going to do our very best to make sure the

18   process is correct, that it's upright, and that it's in good

19   faith.  And I will be here to present all of that to you

20   next Friday, and I'm going to push the parties to get the

21   trust document done and to fix the PSA as you pointed out

22   and the things that you've said so far.  And we'll proceed

23   as --

24           THE COURT:  Wait a minute.  I'm not approving the

25   PSA.  So (indiscernible).

1          MR. LEE:  I'm a little overly-ambitious today,

2     Your Honor.  And I apologize for that.  But we will be here

3     Friday to take care of whatever you --

4          THE COURT:  I want -- there's a lot of folks here

5     I courtroom and a lot of folks on the phone saying they are

6     going to file things.  And once they're filed, we'll take a

7     look at them and we'll take them up.  I am making no ruling

8     today on the two matters that were set, the CRO motion and

9     the trustee motion.  I very much appreciate all the comments

10    made by the parties.  I very much appreciate the statements

11    made by Mr. Schwartz.  I know more than I did before I got

12    on.  And if parties file things, then we'll take them up.

13    Everybody knows here in Southern District, reach out to my

14    case manager and just let me know something got filed.  You

15    know, I'll set a hearing on it.

16         Why don't we set a status conference?  And status

17    conference, again, I don't know if it's going to be an

18    evidentiary hearing.  It might just -- but everybody is

19    going to get plenty of notice before any witness is filed.

20    I can carry any witness and exhibit list that got filed.  If

21    parties want to supplement it based upon something they may

22    or may not see, they certainly have the right to do so.  But

23    I'm not going to -- you know, if you filed something today

24    and you feel like it's good, it will carry whenever

25    something gets heard, probably should take comfort in that.

1              You know, would Friday the 29th, do you think we

2    could hold it -- would 3:00 work for the parties?

3              MR. LEE:  For the Debtors it does, Your Honor.

4              THE COURT:  Okay.

5              MR. LEE:  I'm sorry, Your Honor.  Did you say the

6    29th?

7              THE COURT:  Yes.  That's next Friday I believe.

8    Yeah.

9              MR. OKIN:  Your Honor, if the goal was to have the

10   trust document done and available to parties with time to

11   read it, could I suggest we push it to Monday?

12             THE COURT:  Well, the reason I am not pushing it

13   until that following Monday is I would like to stop and just

14   see where things are.  And maybe at that point -- I don't --

15   there's going to be a lot of moving pieces over the next

16   week, and I want to just stop there, even if it's just to

17   check in.  It could be a ten-minute hearing.  It could be

18   more.  But I want to check in at that point and I want to

19   put the pressure on the parties, which means that some young

20   associate is going to be working all weekend.  And all I can

21   say is I've been there.

22             MR. LEE:  Your Honor, if I may ask, are there any

23   specific issues you would like for us to be in a position to

24   address for you at that status conference next Friday?

25             THE COURT:  The only things that are before me are

1    the two motions.  And I've got to check in to see where that

2    is and when the parties wish to go forward on that.  And if

3    something else gets filed, then we can talk scheduling on

4    that.  But at least it's a good place, we don't lose much

5    time on this.

6            Does anyone else have anything they wish to say at

7    this time?

8            MR. WALSTON:  Your Honor, Cliff Walston on behalf

9    of the Texas plaintiffs.

10           THE COURT:  Yes, sir.

11           MR. WALSTON:  The only other data point I would

12   like to add is I do believe as to what is coming, the Texas

13   plaintiffs intend to immediately file a motion to lift the

14   stay before Your Honor and a motion to remand the trial

15   court proceedings back to the state court.  In particular,

16   the trial that was supposed to start on Monday.  And I think

17   that it's important to --

18           THE COURT:  But can you just -- something -- I

19   don't know -- I heard the word remand.  I have not heard the

20   word removed.

21           MR. WALSTON:  Yes, Your Honor.

22           THE COURT:  I don't know what the status of that

23   litigation is and where it is.  Maybe you can help me with

24   that.

25           MR. WALSTON:  Sure.  I'll help you.  I'd love to

1    fill you in on the details of that.

2              As we all know, Mr. Lee filed this plan in the wee

3    hours of Monday morning.  At 9:30 Monday morning of this

4    week, the plaintiffs in that lawsuit non-suited Infowars

5    LLC.

6              THE COURT:  Okay.

7              MR. WALSTON:  Infowars LLC was the only debtor

8    that was a defendant in that case.  The other two debtors

9    are not parties to that case.  Then after at 3:30 p.m., even

10   though by operation of law, Infowars LLC was no longer a

11   party to that litigation because the notice of non-suit had

12   been filed and under state law becomes effective upon

13   filing, Infowars nevertheless removed that case to the

14   Western District in Austin because that case was set to

15   proceed in Austin.  And they had a pretrial hearing on

16   Wednesday of this week previously scheduled to handle all

17   pretrial matters in addition.  The court there had requested

18   an especially large jury pool of extra jurors to show up on

19   Monday.

20             And so ultimately after a contested hearing on

21   Wednesday about whether that removal was proper, even though

22   at the time of removal Infowars was not a party to that

23   case, the court ultimately decided there in the trial court

24   that the plaintiffs needed to go to the court of -- to the

25   Austin bankruptcy court, Western District Bankruptcy Court,

1    seek remand of that trial court back to her.  And she

2    informed all of the parties that the very first possible day

3    after that case hits back and she is able to get a hundred

4    jurors in that courtroom, that they were going to start

5    trial.

6            THE COURT:  So that's the question.  You kind of

7    got to it. So it's not before me.

8            MR. WALSTON:  It is not before you.  The motion to

9    lift --

10           THE COURT:  (indiscernible).

11           MR. WALSTON:  You said what is going to be filed.

12           THE COURT:  No, I appreciate it.

13           MR. WALSTON:  None of the cases -- so there were

14   three cases for the Texas plaintiffs set back to back to

15   back.  The first was supposed to start on Monday.  The

16   second one was June, I believe.  And the third one is set

17   for August, I believe.  So all three of those cases were

18   removed to the Western District as a part of this filing.

19           What is before you though is in the second and

20   third of those cases, Infowars LLC is still a defendant in

21   those cases.  So we will be seeking to lift the stay as to

22   those two, to then go to the Western District to seek remand

23   of those two cases, what I'm going to call the June and

24   August trials.

25           THE COURT:  Got it.

1          MR. WALSTON:  But the reason why I raise these

2     issues is because those trials aren't just about liquidating

3     the damages, liquidating these claims.  And I actually

4     applaud Mr. Lee for trying to come up with a creative

5     structure to put some money on the table for the Claimants.

6     But those trials will actually determine the nature of those

7     claims and likelihood.  And here's why.

8          The Austin court had already entered a liability

9     finding against Mr. Jones with three key issues.  The first

10    was that he was liable for defamation.  The second was that

11    he did that with actual malice, which includes an intent to

12    harm element.  And the third was a finding that all of Mr.

13    Jones' entities, including Infowars, Free Speech Systems,

14    and Mr. Jones himself, were all alter egos of each other.

15         And so had that case gone to trial and there had

16    been the liability finding had become final and that claim

17    had been liquidated in terms of an actual dollar amount,

18    there is a very high likelihood that as to Alex Jones

19    individually, that would not have been a dischargeable debt

20    under 523 because it was a damage award against him for an

21    intentional tort in harming these families.

22         THE COURT:  But I guess --

23         MR. WALSTON:  And so it's the nature of the claim

24    as well, not just the amount.

25         THE COURT:  No, I understand that.  I guess but

```
 1   procedurally what's coming our way is a motion to lift stay

 2   to --

 3             MR. WALSTON:  Two of the three.

 4             THE COURT:  Two of the three to allow you to seek

 5   remand.

 6             MR. WALSTON:  Correct.

 7             THE COURT:  In the Western District.

 8             MR. WALSTON:  We don't believe we need to seek

 9   your lifting the stay as to the one case in which

10   (indiscernible).  Correct.

11             THE COURT:  Okay.  I just want to make sure

12   procedurally I understood why you were using the word

13   remand.

14             MR. WALSTON:  Yes.

15             THE COURT:  You weren't asking me to remand

16   anything.  It's in the Western District.  I just wanted to

17   understand where they were.

18             MR. WALSTON:  Correct.

19             THE COURT:  Okay, thank you.

20             MR. WALSTON:  And the other aspect of this too,

21   Your Honor, as we learned from Mr. Schwartz as to the type

22   of money that was generated by Alex Jones and his entities.

23   You know, each year we heard $80 million, we heard it's down

24   to $50 million.  So the practical reality for these

25   creditors isn't just a dollar amount.  Mr. Jones, since 2012
```

1    when this tragedy happened, has apparently generated in

2    excess of half a billion dollars of revenue with his

3    bullhorn.  That's how he makes his money.  He sells these

4    products because he has an audience of millions and millions

5    of people and he has a very, very loud bullhorn with which

6    to do it.

7              These individual families don't have that kind of

8    platform.  They do in the courtroom.  And these cases are

9    every bit as much about having a determination finally made

10   for them, them having their day in court in which Mr. Jones

11   is held accountable for his conduct.  So it's not just about

12   a liquidating claims procedure, it is very emotional.  And

13   that's why there are so many people in this courtroom and

14   stuff.

15             THE COURT:  Yeah.

16             MR. WALSTON:  So those cases are very important to

17   go forward, not just from a claims perspective and what that

18   claim really is, and is that claim even dischargeable, but

19   it's also about them having their day in court and the

20   emotional aspect that comes with that and their right as a

21   plaintiff to have their claims heard by a jury of their

22   peers.

23             THE COURT:  If you file the motion, we'll consider

24   it.

25             MR. WALSTON:  Thank you.

Page  74

```
 1              THE COURT:  Thank you.

 2              MR. LEE:  Your Honor, just one observation to show

 3    the power of the bankruptcy system.  As soon as we filed,

 4    they non-suited us.  So it was (indiscernible) Infowars.  I

 5    just want you to know that.

 6              THE COURT:  Is there anything else procedurally I

 7    should know about before we -- is there anyone on the line

 8    who wishes to address the court?  Hit five-star.  I didn't

 9    mean to neglect anyone who wishes to address the Court.

10    Okay.  All right.

11              I thank everyone today for their participation.  I

12    would let everyone know for those of you who are

13    participating by video and by phone, as you can tell, my

14    dial-in number and the GoToMeeting link is on there.  It is

15    available at any time for me.  So if there is another

16    hearing set, it sounds like Next Friday at 3:00 p.m., it's

17    going to be the same dial-in and the same GoToMeeting link

18    for all cases that are before me.  So it's just not -- it's

19    a feature that I'm very proud of that we have here in the

20    Southern District of Texas.  Feel free to participate, free

21    to listen in.  And I thank you very much for your time and

22    your participation.  I thank each of the parties for their

23    time, and I will see everyone next Friday at 3:00 p.m.

24    Thank you.

25              (Proceedings adjourned at 10:49 a.m.)
```

```
 1                          CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 27, 2022
```

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
|   INFOW, LLC *et al.* | § | CASE NO. 22-60020 |
| | § | |
| | § | CHAPTER 11 (Subchapter V) |
| | § | Jointly Administered |
| DEBTORS.[1] | § | |

### ORDER GRANTING MOTION OF THE UNITED STATES TRUSTEE
### TO DISMISS DEBTORS' CHAPTER 11 CASES
### [Related Dkt. No. ___]

CAME ON for consideration by the *Motion of the United States Trustee to Dismiss Debtors' Chapter 11 Cases* (the "Motion"). For the reasons set forth on the record, it is hereby

**ORDERED** that the Motion is **GRANTED**; it is

**FURTHER ORDERED** that the above-captioned Debtors' chapter 11 cases are hereby dismissed.

The Court shall retain jurisdiction to interpret and enforce the terms of this Order.

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| In re: | Case No. 22 - 60020 |
| INFOW, LLC, *et al.*, | Chapter 11 (Subchapter V) |
| Debtors.[1] | Jointly Administered |

## DEBTORS' OMNIBUS RESPONSE TO MOTIONS TO DISMISS

InfoW, LLC ("InfoW"), IWHealth, LLC ("IWH"), and Prison Planet TV, LLC ("PTV," and together with InfoW and IWH, the "Debtors"), the debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 cases, hereby file this response to (a) *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Designation as Subchapter V Small Business Vendors* (sic) [ECF No. 36] (the "Connecticut Plaintiffs' MTD"); (b) *The Texas Litigation Plaintiffs' Supplemental Motion to Dismiss Petition* [ECF No. 42] (the "Texas Plaintiffs' MTD"); and (c) *Motion to Dismiss Debtors' Chapter 11 Cases*, [ECF No. 50] (the "UST MTD") and together with the Connecticut Plaintiffs' MTD and the Texas Plaintiffs' MTD, the "Motions to Dismiss"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.     The Connecticut Plaintiffs' MTD and Texas Plaintiffs' MTD are moot. The Texas Plaintiffs' claims against the Debtors were released and the Texas Plaintiffs' MTD was withdrawn

---

[1] The Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

[2] The Debtors have made the business decision to dismiss these chapter 11 cases and have filed the *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [ECF No. 110]. This Response is filed to make sure that the allegations in any of the Motions to Dismiss are not in any way construed by any party as an admission by the Debtors for any purpose and to preserve the Debtors' rights if the Court declines to enter an order approving the stipulation.

by the Stipulation and Order entered on May 19, 2022 [ECF No. 99] (the "Texas Plaintiffs' Stipulation"). The U.S. Bankruptcy Court for the District of Connecticut entered an order dismissing the Connecticut Plaintiffs claims against the Debtors with prejudice on May 26, 2022, as reflected in the Order attached hereto as Exhibit A (the "Connecticut Plaintiffs' Dismissal Order"). The Connecticut and Texas Plaintiffs are no longer creditors in or affected by these chapter 11 cases.

2.     The U.S. Trustee still seeks dismissal of the cases.[3] Although the Debtors have at least $140,000 of asserted claims against them that could be satisfied through the chapter 11 case, the ability to pay those claims and administrative expenses, and valuable assets that could be liquidated if funds were not otherwise available.[4] The Debtors' former link to Alex Jones is too great a sin in the U.S. Trustee's eyes for the Debtors to overcome—despite the U.S. Trustee's paradoxical objection to the appointment of independent management for the Debtors.[5]

3.     The U.S. Trustee's assertions in the UST MTD cannot be the *actual* reasons that the U.S. Trustee still wants these cases dismissed. The crux of the argument in the UST MTD is that the chapter 11 cases were just a litigation tactic and thus were filed in bad faith. But the litigation that the U.S. Trustee claims was the sole, bad-faith purpose of these cases is no longer affected. Despite the resolution of the litigation vis-à-vis the Debtors, however, the U.S. Trustee still seeks dismissal.

---

[3] References to the "U.S. Trustee" are to the U.S. Trustee in his official capacity and includes his agents. The Debtors adopt the style of reference used in the UST MTD (e.g., referring to the U.S. Trustee as "he") without asserting that the actions or knowledge attributed to the U.S. Trustee are the actions or knowledge of Kevin M. Epstein personally.

[4] Debtor InfoW owns the domain name "infowars.com." Although it licenses that name to Free Speech Systems, LLC ("FSS"), a condition of that license—negotiated by the Debtors' prepetition—was that $715,000 of initial funding under the PSA would be paid to satisfy the administrative expenses of these chapter 11 cases. FSS's failure to deliver the funds would be a breach of the license agreement and allow InfoW to sell or license the domain name.

[5] *See Objection of United States Trustee to Debtors' Emergency Motion for Order Authorizing Appointment of Russell F. Nelms and Richard S. Schmidt as Trustees of the 2022 Litigation Settlement Trust and Granting Related Relief* [ECF No. 18].

010582

4.      The U.S. Trustee's other arguments in the UST MTD are similarly belied by logic or the U.S. Trustee's inconsistent actions in these cases. The chapter 11 cases put *these three Debtors* in a position to pay more to their creditors than would have been possible absent chapter 11—approximately $10.0 million, even before the proposed litigation settlement trustees (the "Proposed Trustees") were in place to give the Debtors an opportunity for further negotiations with the third-party funding contributors. But apparently the U.S. Trustee does not believe that paying creditors more than they would receive in a liquidation is a valid reorganizational purpose. The U.S. Trustee complains that the PSA and LST were negotiated by insiders but objected when the Debtors sought to put in place independent third-party fiduciaries in the form of the Proposed Trustees to enable further negotiations.[6] The U.S. Trustee argues that the lawsuits that precipitated the chapter 11 cases primarily concerned non-debtors even though the Debtors had been *defendants* in those lawsuits for four years and faced death penalty sanctions when they claimed they did not have financial information to produce in discovery. And finally, the U.S. Trustee asserts that the Debtors are attempting to abuse subchapter v of chapter 11 of the Bankruptcy Code despite not directly claiming that the Debtors fail to meet the requirements for such relief under the Bankruptcy Code.

5.      While the above dubious positions could be attributed to overzealousness, the U.S. Trustee's statements regarding the Debtors' goals in chapter 11 come perilously close to outright deception. On April 17, 2022, the Debtors provided Assistant U.S. Trustee Millie Sall a copy of their contemplated plan of reorganization, as reflected in Exhibit B hereto. The U.S. Trustee was

---

[6] As the Court is aware and the U.S. Trustee indicated, further negotiations with respect to the PSA and LST *did* occur even before the U.S. Trustee filed the UST MTD. *See Notice of Amended and Restated Declaration of Trust and Plan Support Agreement* [ECF No. 48]. The U.S. Trustee asserts that the amended and restated PSA and LST "simply attempt to obfuscate what the earlier version make clear—that the Debtors are using these cases to benefit Alex Jones and FSS, not the Sandy Hook Plaintiffs." UST MTD at p.4 n.6. The evidentiary support the U.S. Trustee has for that representation to the Court, as required by Rule 11, will unfortunately likely remain a mystery.

010583

*aware* that the Debtors (a) were not contemplating any third-party releases, (b) did not intend to deprive the plaintiffs of their jury trial rights, and (c) the contemplated estimation would be voluntary with respect to allowance.[7] To propose that contemplated plan, however, the Debtors needed appointment and buy-in from the Proposed Trustees, as the U.S. Trustee was aware. Conveniently, the U.S. Trustee opposed the appointment of the proposed trustees even though the appointment would have resolved several of the issues raised in the UST MTD.

6.    The facts are that these chapter 11 cases were filed in good faith and would still serve a valid bankruptcy purpose. Nonetheless, the Debtors, under the management of their independent CRO, recognize that the dismissal is in the best interests of the Debtors and their estates because the U.S. Trustee continued opposition to the cases. The U.S. Trustee has decided to run up the administrative expense of these cases even though no party with a remaining pecuniary interest has a problem. That clearly does not square with the U.S. Trustees claimed role in the bankruptcy process, but that is neither here nor there.

7.    The duty of the Debtors and their professionals as estate fiduciaries is clear and unwavering. The Debtors have therefore agreed to the dismissal of the chapter 11 cases pursuant to the *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [ECF No. 110] (the "Stipulation of Dismissal"). The dismissal of the Chapter 11 Cases should be according to the Stipulation and not any of the Motions to Dismiss, which should be denied as moot or on the merits.

---

[7] It should not be a surprise that the Debtors were (prior to the dismissal of claims against them with prejudice ) and Jones and FSS still are likely to appeal any significant judgment. The contemplated plan provided that there would be no appeal or other challenge if the plaintiffs *elected* to determine their claims through an estimation-like claims allowance process. The Debtors submit that kind of voluntary give and take is indisputably appropriate.

010584

## ARGUMENT

**A. The Motions to Dismiss Are or Will Be Moot Upon Entry of the Stipulation of Dismissal.**

8.      "A pleading is moot when a court's decision on a pending motion will be 'hypothetical or academic' or 'without any practical significance.'" *Halton v. Triplett (In re Triplett)*, Nos. 19-42570, 20-04059, 2022 Bankr. LEXIS 64, at *5 (Bankr. E.D. Tex. Jan. 10, 2022) (quoting *Scarborough-St. James Corp. v. 67500 S. Main St., Richmond, LLC (In re Scarborough-St. James Corp.)*, 554 B.R. 714, 720 (D. Del. 2016)) (internal quotation marks omitted).

9.      Each of the Motions to Dismiss are already moot or will be moot upon approval of the Stipulation of Dismissal. The Texas Plaintiffs' MTD was withdrawn pursuant to the Texas Plaintiffs' Stipulation. But if not, it would be moot because the movants are no longer creditors and have stated they want no further involvement in these chapter 11 cases. The movants with respect to the Connecticut Plaintiffs' MTD are also no longer creditors of the Debtors pursuant to the Connecticut Plaintiffs' Dismissal Order and have told this Court that they want nothing more to do with these chapter 11 cases. The UST Motion either is or will be moot pursuant to the Stipulation of Dismissal.

**B. The Debtors Filed their Bankruptcy Petitions in Good Faith.**

10.      To the extent that the Court finds that the Motions to Dismiss are not moot, they should be denied on the merits. The Debtors filed their petitions in good faith and these chapter 11 cases have a valid reorganizational purpose.

   *i.   Standard for dismissal for bad faith dismissal.*

11.      Bankruptcy relief requires good faith in the commencement, prosecution, and confirmation of bankruptcy proceedings. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986). The Fifth Circuit has instructed that courts should look to a debtor's financial condition,

5

motives, and local financial realities. *Id.* at 1072. The "traditional" bankruptcy case is where a debtor is facing financial difficulties that pose an existential threat. *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 280–81 (Bankr. N.D. Tex. 2021); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) ("Courts . . . have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11."). "Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *In re Little Creek Dev. Co.*, 779 F.2d at 1072.

12.     To amount to "bad faith" that precludes bankruptcy relief, the facts must "rise to the level of egregiousness necessary to conclude that the reorganization process is being perverted . . . ." *In re Little Creek Dev. Co.*, 779 F.2d. at 1073; *accord In re StatePark Bldg. Grp., Ltd.*, 316 B.R. 466, 476 (Bankr. N.D. Tex. 2004) ("To find bad faith, the court must find that the facts surrounding the filing of the petition are particularly egregious."); *see also In re Greene Ave. Restoration II Corp.*, 597 B.R. 202, 217 (Bankr. E.D.N.Y. 2019) ("Dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances."); *In re MBM Ent., LLC*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015) "[A] bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution."). The question is not whether bankruptcy could have been avoided with the benefit of hindsight, but rather whether the Debtor's management could properly conclude that chapter 11 was an appropriate way to address existing or potential difficulties. *See In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *8 (Bankr. N.D. Tex. Jan. 26, 2005). The purpose of the analysis is to "prevent[] abuse of the bankruptcy process by debtors whose overriding motive is to delay

010586

creditors without benefitting them in any way or to achieve reprehensible purposes." *In re Little Creek Dev. Co.*, 779 F.2d. at 1072.

      *ii.*   <u>*The chapter 11 cases have valid reorganizational purposes.*</u>

13.     The Debtors were not a financially healthy companies with no need to reorganize. Each of the plaintiffs brought and continued lawsuits against one or more of the Debtors. Those plaintiffs had obtained judgments with respect to liability. Absent restructuring, the Debtors did not have the ability to pay any significant judgment or even the already-imposed sanctions.[8] Chapter 11 relief was necessary for these three Debtors.

14.     The plaintiffs eventually decided that a jury verdict against Alex Jones and FSS was more important to them than maximizing their recovery. That is, of course, their prerogative but it is entirely irrelevant to bad faith. If creditor protestations were indicative of bad faith, virtually every chapter 11 case filed would be subject to dismissal. The Debtors did not try to prevent the plaintiffs from dismissing the cases with prejudice and indeed attempted to *expedite* the process.

15.     The U.S. Trustee's apparent problem is that Alex Jones and FSS would have also received a benefit under the Debtors' contemplated restructuring. Not for nothing, but that is why those parties were willing to pay into a trust to be distributed according to a plan (a) $725,000 initial funding plus any additional costs of the reorganization, (b) $2.0 million in cash on the effective date of a plan of reorganization, and (c) $250,000 per quarter for 60 quarters. If the bankruptcy was just to delay, the money did not need to be on the table.[9] Rather, those funds going to creditors for their claims against the Debtors was the *entire point* of these chapter 11 cases.

---

[8] Sanctions were assessed against InfoW for the failure of *FSS* to present a corporate representative who was properly prepared to testify on the designated topics.

[9] The Debtors had to *negotiate* for these funds prepetition with an eye to using the appointment of the litigation settlement trustees to get even more consideration. That appears to be a foreign concept to the U.S. Trustee.

010587

16.     Reading between the lines, the U.S. Trustee seems to imply that it would have been preferable for the Debtors to have filed for chapter 11 without the $7.7+ million commitment from Jones and FSS. That is completely unreasonable, to put it charitably.

17.     There is no evidence that the funds that the Debtors negotiated for their former creditors was insufficient—it would have adduced in an estimation proceeding for feasibility if it existed—much less that it was so little that it amounts to a "perversion" of the bankruptcy process or egregious conduct. Courts have held under more problematic facts that the concept the Debtors proposed could potentially result in a confirmable plan of reorganization that made dismissal for bad faith appropriate. *See In re LTL Mgmt., LLC*, 637 B.R. 396, 407-09 (Bankr. D.N.J. 2022).[10]

18.     Paying joint claims of FSS and Alex Jones in a chapter 11 plan would have also served the bankruptcy purpose of maximizing the value of the Debtors' assets. The key intellectual property owned by the Debtors is the domain name "infowars.com." That domain name is most valuable while FSS is operating and Alex Jones is on the air. Additionally, the funds from Youngevity received by IWH are related to FSS's operations. While the Plaintiffs—and perhaps the U.S. Trustee—would prefer Alex Jones to not have a platform, that is irrelevant to these chapter 11 cases. Bankruptcy is about putting dollars in the pockets of creditors.

   *iii.    The U.S. Trustee's arguments about the PSA and LST are meritless, disingenuous, or inapposite.*

19.     The U.S. Trustee's arguments about the PSA and LST (paragraphs 37-42) were and remain baseless.  The U.S. Trustee's complaints are essentially as follows:

---

[10] In LTL, a Johnson & Johnson ("J&J") subsidiary was organized in Texas, another J&J subsidiary with tort liabilities merged into that Texas entity, the newly merged entity conducted a divisive merger in which all of the tort liabilities were put into a new non-operating entity, J&J entered into a funding agreement with the liable entity, and the entity was moved to a different district where it filed bankruptcy. The Debtors here have been defendants in the litigation for years and filed for bankruptcy in the district in which they were domiciled. Also, there are no allegations that the Debtors' actions killed anyone or caused them to develop cancer.

010588

a. The PSA and LST provided that financial information of Jones and FSS relevant to the contemplated restructuring are (i) subject to confidentiality provisions by the proposed trustees and the Debtors' professionals and may be provided to other parties only with a protective order and (ii) related to estimated claims rather than actual claims;

b. The PSA requires an estimation procedure;

c. The "handwriting is on the wall" that the Debtors are going to seek extension of the automatic stay to Jones and involuntary non-consensual releases; and

d. The creditors did not participate in the negotiation of the PSA or LST before the Debtors filed their petitions.

The U.S. Trustee wants the Court to rule that those "facts" are evidence that the Debtors' bankruptcy cases are an attempt to "pervert" the bankruptcy process. Despite the U.S. Trustee's presumably faux outrage, they show nothing of the sort.

20.     Companies and individuals typically require confidentiality provisions before providing non-public financial information and would want a protective order before that information is shared. And even if Alex Jones and FSS were Debtors, the only financial information that would be *public* would be their schedules, statements, and monthly operating reports. Any other non-public financial could only be compelled by a Rule 2004 examination or other discovery and would almost certainly be subject to a protective order if requested. The U.S. Trustee's argument on this point has absolutely no merit.

21.     The U.S. Trustee's arguments with respect to the estimation procedures and non-consensual third-party releases gets close to being disingenuous. As reflected in Exhibit B hereto, the Debtors provided the U.S. Trustee's office a copy of the Debtor's contemplated plan of reorganization on April 17, 2022. The U.S. Trustee was or should have been aware that the estimation procedures contemplated by the Debtors were only (a) for purposes of feasibility or (b) upon election by litigation claimholders. Rather than using the information the U.S. Trustee had

9

available, however, the UST MTD decided to engage in flights of fancy because it better suited his position.

22.     Whether "handwriting was on the wall" as to the extension of the stay to FSS and Jones is a matter of opinion. In any event, it certainly did not happen. The Debtors sought central adjudication of the claims against them but that is hardly tantamount to an extension of the automatic stay.[11]

23.     Finally, that the Debtors did not engage the plaintiffs in the formation of the PSA or LST is inapposite. The U.S. Trustee cannot seriously contend that failure to have a prepackaged chapter 11 case is an indication of bad faith. That is especially true here where the Debtors negotiated a mechanism expressly for the purpose of further negotiations in the appointment of the Proposed Trustees. The entire point of the Proposed Trustees was to give creditors someone unquestionably neutral with whom to negotiate.

> iv.     _One or more of the Debtors were defendants in each of the Sandy Hook Lawsuits and liability had already been established prior to resolution during these chapter 11 cases._

24.     The U.S. Trustee makes noise about the fact that Sandy Hook Lawsuits "do not arise from the Debtors' conduct" but rather "from the allegedly tortious, intentional conduct of Alex Jones and FSS (through its employees) . . . ." UST MTD ¶ 44. The Debtors agree with the U.S. Trustee that the Debtors were entitled to judgment as a matter of law based on the pleadings in the Sandy Hook Litigation. But the relevant state courts—whose opinions actually matter—decided differently. These two state courts even entered judgment against the Debtors.

25.     Ironically, the U.S. Trustee's argument directly cuts against the assertion that the Debtors are not "honest but unfortunate debtors." According to the U.S. Trustee, the Debtors did

---

[11] Moreover, centralized adjudication of claims is one of the central features of the U.S. bankruptcy process.

010590

nothing to cause liability but were still found liable. The *plaintiffs* made the decision to sue these Debtors, pursue litigation against them, and obtain judgments even though there was no basis for liability. The Debtors' use of bankruptcy to resolve those claims—by attempting to paying them in full—was appropriate. When the plaintiffs agreed to have their claims against the Debtors resolved through dismissals with prejudice, the Debtors were more than happy to oblige and worked with the plaintiffs to expedite that process.

  *v. The Debtors qualify for subchapter v of chapter 11*

  26. The U.S. Trustee never asserts that the Debtors do not qualify for subchapter v. Rightly so. It is hard to imagine *how* the Debtors could have possibly incurred any liability except through engaging in business activities. They did not run up their credit cards on trips to Cabo.

  27. Instead, the U.S. Trustee takes issue with Bankruptcy Code § 1182 not including unliquidated liabilities in the calculation of maximum debt to qualify as a subchapter v debtor. The U.S. Trustee wants this Court to unabashedly and directly modify the language that Congress enacted in the Small Business Restructuring Act of 2019 because the U.S. Trustee thinks it should be different.[12] The U.S. Trustee may very well know better than Congress, but obviously that is inappropriate.

  *vi. The chapter 11 cases were not merely a litigation tactic*

  28. As indicated above, the Debtors had valid reorganizational purposes that they sought to accomplish through these chapter 11 cases. The Debtors were prepared with a plan that would have provided as much as $10.0 million for the resolution and payment of claims in a way

---

[12] The U.S. Trustee asserts that "[l]ittle doubt exists that the total damage award against the Debtors, Alex Jones, FSS, and other non-debtor solvent entities of the Alex Jones Enterprise would exceed the debt limit currently in place for subchapter V." UST MTD ¶ 48. There are 21 plaintiffs and the debt limit for subchapter v is $3,024,725. The Debtors severely doubt the U.S. Trustee has a factual basis to assert that the damages of *any* of the plaintiffs exceeds $144,035.71 other than sheer speculation.

010591

that had the potential to shortcut months of successive jury trials and years of appeals. And again, the U.S. Trustee was in possession of that contemplated plan when he filed the UST MTD.

29. The U.S. Trustee also points to the statements of Alex Jones's personal lawyer that the goal of the bankruptcy was to force estimation.[13] But Jones has no control over the Debtors. And, if anything, it shows *why* the Debtors locked Jones and FSS in under the PSA and LST. At the end of the day, the desires of Alex Jones matter even less to the Debtors than the U.S. Trustee's desire to re-write Bankruptcy Code § 1182.

30. The Debtors' conduct during the chapter 11 cases confirms that the point of the bankruptcy cases was to resolve the claims against the Debtors. Although the Debtors opposed the plaintiffs' dubious dismissals *without* prejudice, their position was consistently that they would gladly resolve the claims against them through dismissal *with* prejudice rather than money from Jones and FSS.[14] After the issues were resolved, the Debtors took actions to expedite the process.

**C. The Debtors Agree That Dismissal is in the Best Interests of Creditors in Light of the U.S. Trustee's Unreasonable Position.**

31. The U.S. Trustee has made it clear that he will continue to oppose the Debtor's efforts to pay its remaining creditors through these chapter 11 cases even though there is no remaining creditor opposition.

32. Under these circumstances, the Debtors' CRO has determined that dismissal would be in the best interests of the Debtors and their creditors. While the U.S. Trustee is free to ignore the proclaimed mission of the U.S. Trustee Program "to promote the integrity and efficiency of

---

[13] Perhaps the U.S. Trustee believes that Jones should have been willing to contribute $7.7+ million for nothing, but that is not the way the world works outside of government.

[14] The problem with dismissal *without* prejudice would have been that the plaintiffs could have arguably filed proofs of claim, thereby continuing to assert claims while removing the Debtors' ability to pay them in full. Although the statute of limitations would have run absent bankruptcy, the effect of the automatic stay and the claims bar date may have tolled the applicable limitations period.

010592

the bankruptcy system for the benefit of all stakeholders[,]" the Debtors and their professionals are bound by their fiduciary duties. The Debtors have therefore entered into Stipulation of Dismissal, under which the Debtors seek dismissal of these chapter 11 cases.

## **CONCLUSION**

33.    Based on the foregoing, the Debtors do not oppose dismissal of these chapter 11 cases, but such dismissal not under any of the grounds set forth in the Motions to Dismiss. Instead, the Court should enter the Stipulation of Dismissal agreed to by the Debtors, the U.S. Trustee, and the Subchapter V Trustee.

[*Remainder of Page Intentionally Left Blank*]

13

010593

Dated: June 2, 2022          **KYUNG S. LEE PLLC**

         */s/ Kyung S. Lee*
         Kyung S. Lee
         TX Bar No. 12128400
         Pennzoil Place
         700 Milam Street, Suite 1300
         Houston, TX 77002
         Email: klee@kslpllc.com
         Phone: 713-301-4751

         *Proposed Counsel to the Debtors*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing document was served at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service.

         */s/Kyung S. Lee*
         Kyung S. Lee

14

**<u>Exhibit A</u>**

**Connecticut Plaintiff's Dismissal Order**

010595

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| ERICA LAFFERTY; DAVID WHEELER; FRANCINE WHEELER; JACQUELINE BARDEN; MARK BARDEN; NICOLE HOCKLEY; IAN HOCKLEY; JENNIFER HENSEL; JEREMY RICHMAN; DONNA SOTO; CARLEE SOTO-PARISI; CARLOS M. SOTO; JILLIAN SOTO; WILLIAM ALDENBERG; and RICHARD M. COAN, TRUSTEE OF THE BANKRUPTCY ESTATE OF ERICA L. GARBATINI F/K/A ERICA LAFFERTY | ) ) ) ) ) ) ) ) ) ) ) | Adv. Pro. No. 22-05004 (JAM) |
| | ) | RE: ECF No. 24 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| ALEX EMRIC JONES; INFOWARS, LLC; FREE SPEECH SYSTEMS, LLC; INFOWARS HEALTH, LLC; PRISON PLANET TV, LLC; WOLFGANG HALBIG; CORY T. SKLANKA; GENESIS COMMUNICATIONS NETWORK, INC.; and MIDAS RESOURCES, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING UNOPPOSED MOTION TO DISMISS PLAINTIFFS' CLAIMS AGAINST REMOVING DEFENDANTS INFOWARS LLC (aka INFOW, LLC), INFOWARS HEALTH, LLC (aka IWHealth, LLC) AND PRISON PLANET TV, LLC WITH PREJUDICE[1]

Upon the Unopposed Motion to Dismiss Plaintiffs' Claims Against Removing Defendants

Infowars LLC (aka InfoW, LLC), Infowars Health, LLC (aka IWHealth, LLC) and Prison Planet TV,

LLC With Prejudice (ECF No. 24) ("the Motion to Dismiss"), and upon the record made at the May

---

[1] There are three consolidated cases in the Connecticut Superior Court: *Lafferty v. Jones* (UWY- CV18-6046436-S), *Sherlach v. Jones* (UWY-CV18-6046437-S), and *Sherlach v. Jones* (UWY- CV18-6046438-S). These cases were removed to this Court under names and docket numbers *Lafferty v. Jones* (22-05004), *Sherlach v. Jones* (22- 05005), and *Sherlach v. Jones* (22-05006). This Order is filed in all three bankruptcy cases: 22-05004, 22-05005, and 22-05006.

1

24, 2022 status conference held in this case concerning the Motion to Dismiss, the Court GRANTS

the Motion to Dismiss and ORDERS as follows on:

1. The claims of plaintiffs David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan as Chapter 7 Trustee of the bankruptcy estate of Erica L. Garbatini (hereafter "the Plaintiffs") pending in these three removed cases (Connecticut Superior Court title and docket numbers *Lafferty v. Jones* (UWY-CV18-6046436-S), *Sherlach v. Jones* (UWY-CV18-6046437-S), and *Sherlach v. Jones* (UWY- CV18-6046438-S), now docketed in this Court as *Lafferty v. Jones* (22-05004), *Sherlach v. Jones* (22-05005), and *Sherlach v. Jones* (22-05006)) against Infowars, LLC (aka InfoW, LLC); Infowars Health, LLC (aka IWHealth, LLC); and Prison Planet TV, LLC are hereby dismissed with prejudice and without costs to any party.

2. Dismissal is ordered only as to the claims specifically described in Paragraph 1 above. This Order does not concern and is not intended to affect the Plaintiffs' rights or claims against the other defendants in these cases – Alex Emric Jones; Free Speech Systems, LLC; and Genesis Communications Network, Inc. – in any respect.

3. The removing defendants Infowars, LLC (aka InfoW, LLC); Infowars Health, LLC (aka IWHealth, LLC); and Prison Planet TV, LLC shall file a withdrawal of their notice of removal by 5 p.m. on Tuesday, May 31, 2022.

4. This Court shall retain jurisdiction solely to interpret, implement, or otherwise enforce this Order.

Dated at Bridgeport, Connecticut this 26th day of May, 2022.



Julie A. Manning
United States Bankruptcy Judge
District of Connecticut

010597

2

**Exhibit B**

**April 17, 2022, Email to U.S. Trustee's Office**

010598

**Thursday, June 2, 2022 at 06:20:34 Central Daylight Time**

| | |
|---|---|
| **Subject:** | FW: Confidential Potential IFW Filing |
| **Date:** | Tuesday, May 31, 2022 at 5:44:48 PM Central Daylight Time |
| **From:** | R.J. Shannon |
| **To:** | rshannon@shannonpllc.com |
| **Attachments:** | IW - 04.17.22 Joint Plan (PLR Proposed Final).docx |

**R. J. Shannon**
Associate
**Parkins & Rubio LLP**
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Direct: (713) 715-1660
Cell: (512) 693-9294
rshannon@parkinsrubio.com
www.parkinsrubio.com

---

**From:** R.J. Shannon
**Sent:** Sunday, April 17, 2022 1:22 PM
**To:** Kyung Lee <klee@parkinslee.com>; 'Sall, Millie (UST)' <Millie.Sall@usdoj.gov>
**Cc:** Adam Rodriguez <ARodriguez@parkinslee.com>; Marc Schwartz <MSchwartz@schwartzassociates.us>
**Subject:** RE: Confidential Potential IFW Filing

Millie,

Attached is PLR's proposed final version of the Joint Plan of Reorganization. Please let us know if there are any comments or necessary changes prior to 8 p.m. Central Time. We have asked for any comments from the Third-Party Funding Contributors by 8:00 p.m. Central.

We understand that you will not be able to look at this today, but wanted to keep you in the loop either way.

Thanks,
R. J.

**R. J. Shannon**
Associate
**Parkins Lee & Rubio LLP**
Direct: (713) 715-1660
Cell: (512) 693-9294

---

**From:** R.J. Shannon
**Sent:** Sunday, April 17, 2022 9:49 AM
**To:** Kyung Lee <klee@parkinslee.com>; 'Sall, Millie (UST)' <Millie.Sall@usdoj.gov>
**Cc:** Adam Rodriguez <ARodriguez@parkinslee.com>; Marc Schwartz <MSchwartz@schwartzassociates.us>
**Subject:** RE: Confidential Potential IFW Filing

Millie,

Nice to meet you by email. For ease of review, I have attached updated versions of the  filings with the exhibits compiled as well as Word versions of the Proposed Orders for any changes or comments from the UST.

Documents 1-4 (petition including largest 20, equity holders, 1116 declaration, and resolution; verification of creditor matrix; declaration re largest 20; and corporate ownership statement) will be separate for each Debtor.

Documents 5-7 are the motions and will be the same for each debtor.

Thanks,
R. J.

R. J. Shannon
Associate
Parkins Lee & Rubio LLP
Direct: (713) 715-1660
Cell: (512) 693-9294

---

**From:** Kyung Lee <klee@parkinslee.com>
**Sent:** Sunday, April 17, 2022 9:17 AM
**To:** 'Sall, Millie (UST)' <Millie.Sall@usdoj.gov>
**Cc:** R.J. Shannon <rshannon@parkinslee.com>; Adam Rodriguez <ARodriguez@parkinslee.com>; Marc Schwartz <MSchwartz@schwartzassociates.us>
**Subject:** Confidential Potential IFW Filing

Millie: Please meet RJ Shannon. He will be the lead associate and do a lot of the courtroom and negotiation work. Adam is our paralegal and keeps us straight. Please send Millie you personal contact information, so she has access to one of us at all times about this case. Also on this email is Marc Schwartz, Debtors' existing CRO and the proposed CRO during the Bankruptcy Cases. Marc, please also email Millie your contact information.

Except for an appointment between 2 and 4 today, we are generally available to talk in person, Zoom, Teams or call about the Debtors and First Day Pleadings.

The next email from me will attach the Plan Support Agreement and the Declaration of Trust.

The final email will have the Plan attached.

Set out below is our substantive introduction to the three Debtors.

---

**From:** Kyung Lee <klee@parkinslee.com>
**Date:** Sunday, April 17, 2022 at 8:22 AM
**To:** Kyung Lee <klee@parkinslee.com>
**Subject:** Confidential Potential IFW Filing

Good morning, Millie. In confidence and in anticipation of filing tonight, I will be providing you key documents and pleadings about the three *subchapter v debtors*.

InfoW, LLC., IWHealth, LLC and Prison Private Ltd are affiliates and holders of intellectual property associated with Alex Jones, Free Speech Systems LLC ("FSS") and its intellectual property including "INFOWARS". Certain of the Debtors, along with Mr. Jones and FSS, have been sued in both Texas and Connecticut over certain statements Mr. Jones made about the shooting that took place at Sandy Hook elementary school on December 14, 2012, in Newton, Connecticut. https://firstamendmentwatch.org/deep-dive/alex-jones-infowars-and-the-sandy-hook-defamation-suits/


Before filing bankruptcy by the three debtors, Mr. Jones assigned his membership interest to these companies to an interim trustee of the 2022 Litigation Settlement Trust (the "Litigation Settlement Trust"), along with an initial contribution of $750,000. The sole job of the interim trustee is to hold the member interests pending the appointment by the Bankruptcy Court of Richard Schmidt and Russell Nelms as the operating Trustees of the Litigation Settlement Trust. Both have agreed to serve. The Trustees will have sole governance rights over the Debtors, not Alex Jones, FSS nor any of his affiliated entities (although Alex Jones and FSS have agreed to continue funding of the Trust to assure no administrative insolvency). We are asking the Court to authorize the appointment of the two Trustees at the First Day Hearing.

To further bolster the fiduciary duty of these Debtors, W. Marc Schwartz, an independent CPA, well known as a fiduciary, and with no prior connection to the Debtors or affiliates of the Debtors or Mr. Jones, will act as CRO of the Debtors who will be the day-to-day decision maker of the Debtors and supervisor with full access to the operations of FSS and Alex Jones. He will do this while in chapter 11, and is anticipated to do so over the 5 years from the Effective Date of the Plan.

On the Petition Date, we intend to file a Joint Plan of Reorganization, which contemplates an allowance of liquidated damages through the Plan process and "Payment in Full" (a Plan defined term) of those claims over a 5-year period. To make this a real deal, we had negotiations with counsel for the "Third-Party Fund Contributors", Alex Jones and his operational business company FSS. Shelby Jordan, in his firm's Austin office, represents Alex Jones. Ray Battaglia in San Antonio represents FSS.

The Third-Party Fund Contributor Alex Jones has not only contributed $725,000 to get the entire process here, but will put up another $2,000,000 on the Effective Date of the Plan, dedicate a good receivable that expected to net about $2M or more over the next five years and agreed to fund the Trusts to pay the Allowed Claims in full with a minimum $250,000 per quarter payments until all the claimants have been paid in full, but without interest.

The Debtors and the other business enterprise affiliated with the Debtors would be cannibalized returning little to no value if a Texas court issued a judgement at the end of this month, with the bulk of the claims not set for trial until early fall of this year (the Connecticut claimants don't go to trial until much later this year). Besides having spent a boat load of money on attorneys' fees, everyone on this side agrees the result would be inequitable and economically unfair to all the claimants. Therefore, we have developed the Plan and filed the Bankruptcy Cases.

The first batch are the three First Day Motions. 1. Joint Administration, 2. Application to Appoint Trustees, 3. Application to Appoint CRO.

More to follow. Ask any questions of us. Notwithstanding weird and wildly inaccurate press you may

hear about the Debtors and their affiliates, we intend to be perfectly above board. Marc can answer any questions about the financial records and information about the companies and their finances or feasibility of the Plan.

---

**From:** Sall, Millie (UST) <Millie.Sall@usdoj.gov>
**Date:** Saturday, April 16, 2022 at 9:25 PM
**To:** Kyung Lee <klee@parkinslee.com>
**Subject:** Re: [EXTERNAL] First Day Hearings

Checking to make sure you know the SubV debt limit went back to its original small amount.

Millie

Sent from my iPhone

> On Apr 16, 2022, at 7:45 PM, Kyung Lee <klee@parkinslee.com> wrote:

> Victoria.

> Kyung S. Lee
> Parkins Lee & Rubio LLP
> Cell: 713-301-4751
> klee@parkinslee.com

---

**From:** Sall, Millie (UST) <Millie.Sall@usdoj.gov>
**Date:** Saturday, April 16, 2022 at 7:41 PM
**To:** Kyung Lee <klee@parkinslee.com>
**Subject:** Re: [EXTERNAL] First Day Hearings

Will the cases be filed in Hou or Victoria?

Millie

Sent from my iPhone

> On Apr 16, 2022, at 3:59 PM, Kyung Lee <klee@parkinslee.com> wrote:

> 3 subchapter v cases.

> Yes, we can talk in AM. I hope to have pleadings to you by then. RJ is going to be lead, Adam is our paralegal on the file.

Kyung S. Lee
**Parkins Lee & Rubio LLP**
Cell: 713-301-4751
klee@parkinslee.com

---

**From:** Sall, Millie (UST) <Millie.Sall@usdoj.gov>
**Date:** Saturday, April 16, 2022 at 3:42 PM
**To:** Kyung Lee <klee@parkinslee.com>
**Subject:** Re: [EXTERNAL] First Day Hearings

Will this be filed as a complex or regular Ch 11? If complex, have you secured a hearing with Jones and Isgur? please send me tentative hearing date/time.

To assign a team, can we briefly talk tomorrow morning or afternoon? Typically you tell me number of debtors, type of business and industry, anticipated issues and exit strategy- sale, recap, etc.

Millie

Sent from my iPhone

> On Apr 16, 2022, at 2:55 PM, Kyung Lee <klee@parkinslee.com> wrote:
>
> Millie, I will send you First Day Pleadings tomorrow. Those will explain pieces of the puzzle. There is a Plan, a Plan Support Agreement and a Declaration of Trust. I need to finalize those documents for tomorrow. If done, I will send those to you too. Those will fill in the other parts of the puzzle. Not too complicated. Really straight up.
>
> We would like to go in at 12:01 on Monday AM April 18.
>
> Kyung S. Lee
> **Parkins Lee & Rubio LLP**
> Cell: 713-301-4751
> klee@parkinslee.com

---

**From:** Sall, Millie (UST) <Millie.Sall@usdoj.gov>
**Date:** Thursday, April 14, 2022 at 7:00 AM
**To:** Kyung Lee <klee@parkinslee.com>

**Subject:** Re: [EXTERNAL] First Day Hearings

Are you able to send us drafts of first day pleadings? When do you anticipate hearing on FDMs?

Millie

On Apr 14, 2022, at 12:00 AM, Kyung Lee <klee@parkinslee.com> wrote:

I will track you down Friday afternoon. Working on three new cases. Wanted to share and talk about cases and first days. Should be ready by Friday pm. Thanks

Kyung S. Lee
Parkins Lee & Rubio LLP
Cell: 713-301-4751
klee@parkinslee.com

**From:** Sall, Millie (UST) <Millie.Sall@usdoj.gov>
**Date:** Wednesday, April 13, 2022 at 8:40 PM
**To:** Kyung Lee <klee@parkinslee.com>
**Subject:** Re: [EXTERNAL] First Day Hearings

I am headed to DC tomorrow morning until Sat night but we can find a time to talk. LMK.

Millie

On Apr 13, 2022, at 7:11 PM, Kyung Lee <klee@parkinslee.com> wrote:

Millie, are you going to be around next two days? Wanted to see if you had planned to be out for Easter? Kyung

Kyung S. Lee
Kyung S. Lee PLLC
Partner
Parkins Lee & Rubio LLP
Pennzoil Place
700 Milam, Suite 1300
Houston, Texas 77002
Mobile (713) 301-4751
Klee@parkinslee.com
www.parkinslee.com

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.
***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential

attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.
***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.
***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

PLR PROPOSED FINAL DRAFT 4/17/2022 1:10 PM

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - _____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| IWHEALTH, LLC | ) | Case No. 22 - _____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| PRISON PLANET TV, LLC | ) | Case No. 22 - _____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

### JOINT PLAN OF REORGANIZATION UNDER SUBCHAPTER V OF THE BANKRUPTCY CODE

### IMPORTANT DATES

Date by which Ballots must be received: **[_____, 2022].**

Date by which Objections to Confirmation must be filed and served: **[_____, 2022].**

Hearing on confirmation of the Plan: **[_____, 2022 at __:00 __.m.** (Central Time)].

**PARKINS LEE & RUBIO LLP**

*/s/ Kyung S. Lee*
Kyung S. Lee, State Bar No. 12128400
RJ Shannon, State Bar No. 24108062
Pennzoil Place – North Tower
711 Louisiana Street Suite 1300
Houston, Texas 77002
Phone: (713) 715-1660
Email: klee@parkinslee.com
　　　 rshannon@parkinslee.com

**PROPOSED COUNSEL FOR THE DEBTORS**

010608

## INTRODUCTION

To assure the equal distribution of a debtor's assets among its creditors, one of the "bedrock" principles of the Bankruptcy Code[1], InfoW, LLC, debtor and debtor-in-possession, along with its affiliated subchapter v debtors IWHealth, LLC and Prison Planet TV LLC, propose this Joint Plan of Reorganization Under Subchapter V of the United States Bankruptcy Code (the "Plan")[2]. The Plan fairly and efficiently fixes for purposes of distribution unliquidated Litigation Claims, for submission as an offer to Free Speech Systems, Inc, ("FSS") and Alex E. Jones ("AEJ" or "Jones") (collectively, the "Third-Party Funding Contributors"). Pursuant to the Plan Support Agreement (the "PSA"), the Third-Party Funding Contributors then have the option to accept and pay through the Litigation Settlement Trust.

Unlike other bankruptcy plans with channeling injunctions, the Plan does not seek to release any third parties under the Plan upon confirmation of the Plan. The Third-Party Funding Contributors are released only when Allowed Claims have been paid in full.

The Plan has a performance period of five (5) years from the date the first quarterly payment is made after the Effective Date of the Plan (the "Support Period"). During the Support Period, it is contemplated that the parties will be engaged in the process of claims allowance and payment of Allowed Claims. Once approved by the Bankruptcy Court, the 2022 Litigation Settlement Trust shall own and govern the Debtors during the Bankruptcy Cases with two independent trustees approved by the Bankruptcy Court. The Debtors will in turn be managed by W. Marc Schwartz, an independent Chief Restructuring Officer, whose appointment will also be approved by the Bankruptcy Court. The PSA is intended to support and fund the payment in full of Allowed Claims submitted and approved.

To assure the optimal outcome for the Plaintiffs, the Debtors submit that negotiations must continue with parties affiliated with the Third-Party Funding Contributors after the Petition Date. Most of these parties have been identified by Plaintiffs in a recently filed lawsuit styled, *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine, Plaintiffs, v. Alex Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018, Defendants*, Cause No. D-1-GN-22-001610, District Court, Travis County, Texas, 200th District Court (the "TUFTA Suit"). Based on preliminary discussions with counsel for some of the defendants in the TUFTA Suit, the defendants are prepared to engage in good faith negotiations over this Plan.

**AS REQUIRED BY THE BANKRUPTCY CODE, THE PLAN CLASSIFIES CLAIMS AND INTERESTS IN VARIOUS CLASSES ACCORDING TO THEIR RIGHT TO PRIORITY OF PAYMENTS AS PROVIDED IN THE BANKRUPTCY CODE. THE PLAN STATES WHETHER EACH CLASS OF CLAIMS OR INTERESTS IS IMPAIRED**

---

[1] Even under the Bankruptcy Act, the "purpose…is to bring about equality of division among creditors. For the rule that to the diligent creditor belongs the reward, the [Bankruptcy Act] substitutes the rule that equality is equity." *Canwright v. General Finance Corp.*, 35 F. Supp. 841, 844 (E.D. Ill. 1940), aff'd 123 F.2d 98 (7th Cir. 1941).

[2] Terms not otherwise defined herein are defined in two critical documents related to the Plan: the Plan Support Agreement (the "PSA"), attached hereto as Exhibit "A" and incorporated herein as if fully set forth, and the 2022 Litigation Settlement Trust (the "Litigation Trust"), which is also attached hereto as Exhibit "B".

010609

**OR UNIMPAIRED. THE PLAN PROVIDES THE TREATMENT EACH CLASS WILL RECEIVE UNDER THE PLAN.**

ALL INTERESTED PARTIES SHOULD READ THIS DOCUMENT CAREFULLY AND DISCUSS IT WITH THEIR LEGAL AND FINANCIAL ADVISORS.

THE PLAN MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE PLAN, YOU SHOULD IMMEDIATELY CONTACT THE DEBTORS TO RESOLVE THE DISPUTE. IF YOU AND THE DEBTOR CANNOT AGREE, YOU MUST FILE AND SERVE ANY OBJECTION ON OR BEFORE |_____], 2022. IF YOU DO NOT FILE A TIMELY RESPONSE, THE PLAN MAY BE APPROVED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE PLAN AND HAVE NOT REACHED AN AGREEMENT WITH THE DEBTOR, YOU MUST ATTEND THE CONFIRMATION HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE BANKRUPTCY COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY CONFIRM THE PLAN AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

## ARTICLE 1

## DEFINITIONS AND RULES OF CONSTRUCTION

**1.1.** **Definitions.** Applicable definitions contained in the Bankruptcy Code are incorporated into the Plan except as modified in this Article I. The following definitions shall have the meanings as specified herein, and shall be designated, when such special definitions are applicable, with capital letters, and these definitions shall be enforceable as terms of the Plan in conjunction with the respective matters to which they reference or define:

**1.1.1.** "Administrative Expense Claim" or "Administrative Claim" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases Allowed pursuant to Sections 503(b) or 507 of the Bankruptcy Code including, without limitation (a) any fees or charges assessed against the Debtors' Estates under 28 U.S.C. § 1930, and (b) other Administrative Expense Claims as may be ordered and Allowed by the Bankruptcy Court.

**1.1.2.** "AEJ" or "Jones" means Alex E. Jones, an individual residing in the State of Texas.

**1.1.3.** "Allowed" or "Allowed Claim" means: (a) a Claim that: (i) has been listed by the Debtors in their Schedules as other than disputed, contingent or unliquidated; and (ii) is not otherwise a Disputed Claim; (b) a Claim (i) for which a Proof of Claim or request for payment of Administrative Expense Claim has been filed by the applicable Bar Date, or otherwise has been deemed timely filed under applicable law; and (ii) that is not otherwise a Disputed Claim; or (c) a Claim that is allowed: (i) in any stipulation executed by the Debtors and the Claim holder; (ii) in a Final Order; or (iii) pursuant to the terms of the Plan.

010610

**1.1.4.** "Avoidance Actions" means causes of action arising under chapter 5 of the Bankruptcy Code or under related state or federal statutes or common law, including fraudulent conveyance laws, whether litigation has been commenced to prosecute such causes of action which are expressly preserved for the Estate hereunder.

**1.1.5.** "Ballot" means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan.

**1.1.6.** "Bankruptcy Estate" means the estate created pursuant to 11 U.S.C. § 541 with respect to the Debtors

**1.1.7.** "Bankruptcy Code" or "Code" means Title 11, United States Code, Section 101 *et. seq.*, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive.

**1.1.8.** "Bankruptcy Rules" means collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive.

**1.1.9.** "Bar Date" means the applicable bar date by which a Proof of Claim or request for payment of an Administrative Expense Claim must be or must have been filed, as established by an order of the Bankruptcy Court, including the Bar Date Order or the Confirmation Order.

**1.1.10.** "Business Day" means a day other than a Saturday, Sunday, or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

**1.1.11.** "Cash" means legal tender of the United States of America or its equivalent in immediately available funds.

**1.1.12.** "Chapter 11 Case(s)," "Case(s)," or "Bankruptcy Case(s)" means the case under chapter 11 of title 11 jointly administered under *In re InfoW, LLC.*, Case No. 22-[_____], commenced on April 18, 2022, in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division.

**1.1.13.** "Claim(s)" means a "claim" against the Debtors, as defined in Section 101(5) of the Bankruptcy Code.

**1.1.14.** "Claim Objection Deadline" means the later of (a) sixty (60) days after the Effective Date, (b) sixty (60) days after the Bar Date, and (c) such later date as may be ordered by the Bankruptcy Court pursuant to a motion filed prior to the expiration of such sixty (60) day period.

**1.1.15.** "Class" or "Classification" means the class designated in the Plan, pursuant to Sections 1122 and 1129 of the Bankruptcy Code, into which the Claims of all Creditors or Equity Interests have been segregated for purposes of voting and distributions.

**1.1.16.** "Collateral" means any Property or interest in Property of the Estate which is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code, disallowance under Section 506 of the Bankruptcy Code, or is otherwise invalid under the Bankruptcy Code or applicable state law.

**1.1.17.** "Confirmation" or "Confirmation of the Plan" means the approval of this Plan by the Bankruptcy Court at the Confirmation Hearing.

**1.1.18.** "Confirmation Date" means the date on which the clerk dockets a Confirmation Order determining that the Plan meets the requirements of chapter 11 of the Bankruptcy Code, which order has been previously entered by the Court.

**1.1.19.** "Confirmation Hearing" means the hearing(s) which will be held before the Bankruptcy Court in which the Debtors will seek Confirmation of this Plan.

**1.1.20.** "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

**1.1.21.** "Court" or "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Victoria Division, presiding over the Chapter 11 Cases, or, if necessary, the United States District Court for the District and Division having original jurisdiction over the Chapter 11 Cases.

**1.1.22.** "Creditor(s)" means all creditors of the Debtors holding Claims for debts, liabilities, demands or Claims of any character whatsoever, as defined in Section 101(5) of the Bankruptcy Code.

**1.1.23.** "Cure Claim" means any Claim based upon the Debtors' defaults under any Executory Contract to which the Debtor was a party on the Filing Date which has been or will be assumed under Section 365 of the Bankruptcy Code or pursuant to the Plan.

**1.1.24.** "Debtors" or "Debtors in Possession" means IW, IWH, and PTV, each a Texas limited liability company.

**1.1.25.** "Declaration of Trust" means that declaration of trust establishing the Litigation Settlement Trust executed prior to the Petition Date.

**1.1.26.** "Deficiency Claim" means, with respect to a Secured Claim, the amount by which the Allowed Claim exceeds the sum of (i) any set off rights of the holder of such Claim against the Debtors under Sections 506 and 553 of the Bankruptcy Code and (ii) the net proceeds realized from the disposition of the Collateral securing such Claim or, if such Collateral is not liquidated, the value of the interests of the holder of the Claim in the Debtors' interest in the Collateral securing such Claim, as determined by the Bankruptcy Court in accordance with Section 506 of the Bankruptcy Code; provided, however, that if the holder of such Claim makes the election provided for in Section 1111(b)(2) of the Bankruptcy Code, there shall be no Deficiency Claim in respect of such Claim.

**1.1.27.** "Disallowed" means, with respect to a Claim, Interest, Administrative Expense, or portion thereof, that it is determined by a Final Order that the Claim, Interest, Administrative Expense, or portion thereof is not allowed under Sections 502 or 503 of the Bankruptcy Code.

**1.1.28.** "Disbursing Agent" means the Litigation Settlement Trust and the Trustees thereof.

**1.1.29.** "Disposable Income" means the income that is received by the Debtors that is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtors.

**1.1.30.** "Disputed Claim" means (i) a Claim, Interest or Administrative Expense that is subject to a pending objection; or (ii) until the Objection Deadline:

010612

      **1.1.30.1.**     a Claim for which a corresponding Claim has not been listed in the Debtors' Schedules or for which the corresponding Claim is listed in the Debtors' Schedules with a differing amount, with a differing classification, or as a disputed, contingent, or unliquidated Claim;

      **1.1.30.2.**     a Claim which a Debtors in good faith believes is held by a holder either (i) from which property is recoverable by the applicable Debtors under any of Sections 542, 543, 550 or 553 of the Bankruptcy Code or (ii) that is a transferee of a transfer avoidable under Sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code unless the holder has paid the amount, or turned over any such property for which such holder is liable under the terms of Sections 522(i), 542, 543, 550, or 553 of the Bankruptcy Code; and

      **1.1.30.3.**     an Interest for which a corresponding Interest has not been listed in the Debtors' List of Equity Interests or has been listed in a different number (to the extent of such difference).

**1.1.31.**    "Disputed Claim Reserve" means the Cash reserve to be established pursuant to Section 9.1.5 of the Plan, in an amount sufficient to pay Disputed Claims a Pro Rata Share of distributions that were made to Allowed Claims.

**1.1.32.**    "Distributable Debtor Funds" means the funds held by the Debtors' Bankruptcy Estate on the Effective Date that can be paid to Allowed Claims after accounting for the Disputed Claim Reserve.

**1.1.33.**    "Distributable Trust Funds" means the funds held by the Litigation Settlement Trust paid by pursuant to this Plan, the PSA, and the Declaration of Trust that can be paid to Allowed Claims after accounting for the Disputed Claim Reserve.

**1.1.34.**    "Effective Date" means the first Business Day following fourteen (14) days after the Confirmation Date on which all conditions to the effectiveness of this Plan specified in Article 8 have been met or waived.

**1.1.35.**    "Effective Date Third-Party Funding" means the amounts required to be paid by the Third-Party Funding Contributors to the Litigation Settlement Trust under this Plan on the Effective Date, as set out in Section 7.2.4 of this Plan.

**1.1.36.**    "Equity Interest(s)" or "Interest(s)" means all the membership interest.

**1.1.37.**    "Estate" means the estate created pursuant to Section 541 of the Bankruptcy Code by the commencement of the Chapter 11 Cases.

**1.1.38.**    "Estimated Amount" means the amount of any Claim or Class of Claims estimated for the purposes of confirmation of a plan of reorganization in these Chapter 11 Cases.

**1.1.39.**    "Executory Contract" shall have the meaning assigned in Section 365 of the Bankruptcy Code.

**1.1.40.**    "Filing Date" or "Petition Date" means April 18, 2022, the date upon which the Chapter 11 Cases was commenced as a voluntary case under chapter 11 of the Bankruptcy Code.

**1.1.41.**    "Final Decree" means the order of the Court entered after the Plan is substantially consummated which closes the Chapter 11 Cases.

010613

**1.1.42.** "Final Order" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a stay, new trial, reargument or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to Section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

**1.1.43.** "FSS" means Free Speech Systems, LLC, a Texas limited liability company.

**1.1.44.** "General Unsecured Claim" means an unsecured claim that is not an Administrative Claim, Priority Tax Claim, Priority Unsecured Claim, or an Unsecured Litigation Claim.

**1.1.45.** "Impaired Class" and "Unimpaired Class" shall have the meaning described in Section 1124 of the Bankruptcy Code.

**1.1.46.** "Initial Trust Funding*"* means $725,000 in cash funded to the Litigation Settlement Trust by AEJ from his exempt property upon the effective date of the PSA, prior to the Petition Date, to pay the costs of administration of the Debtors' Bankruptcy Cases and the Litigation Settlement Trust, including retention of the Litigation Settlement Trustees and retention by the Trustees of all professionals deemed necessary to accomplish the purpose of this Trust and the commitment of the Third Party Funding Contributors to maintain for not less than 120 days after the Petition Date a balance of $200,000 after payment of all initial administrative expense retainers to newly appointed Litigation Settlement Trustees and as the only members of the Debtors acting as independent Members, together with the Debtors' professionals from time to time, to be paid directly, or thereafter maintained in the Litigation Settlement Trust for continued payment of the costs of Administration of the Litigation Settlement Trust and the Debtors' Bankruptcy Cases.

**1.1.47.** "IW" means InfoW, Inc. (formerly known as InfoWars, LLC, a Texas limited liability company).

**1.1.48.** "IWH" means IWHealth, LLC (formerly known as InfoWars Health LLC, a Texas limited liability company).

**1.1.49.** "Joint Liability Claim(s)" means (a) a claim against one or more of the Debtors with respect to which on or more of the Protected Parties is jointly liable or (b) a claim asserted against a Protected Party in the Litigation.

**1.1.50.** "Lien" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

**1.1.51.** "Litigation" means all pending civil lawsuits against the Debtors, including but not limited to the following:

---

010614

- *Neil Heslin, Scarlet Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine vs. AEJ, Infowars LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-22-001610 in the 200th District Court of Travis County, Texas;

- *Marcel Fontaine vs. Alex E., Jones, Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th Judicial District Court of Travis County, Texas;

- *Neil Heslin vs. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001835 in the 261st Judicial District Court of Travis County, Texas;

- *Veronique de la Rosa and Leonard Pozner vs. Alex E. Jones, InfoWars, LLC, and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842 in the 345th Judicial District Court of Travis County, Texas;

- *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, Free Speech Systems, LLC and Owen Shroyer*, Cause No. D-1-GN-18-006623 in the 98th Judicial District Court of Travis County, Texas;

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division;

- *Larry Klayman v. Infowars, LLC; Free Speech Systems, LLC; Alex E. Jones; David Jones; Owen Shroyer; and Roger Stone*, Cause No. 20-cv-61912-DPG in the United States District Court for the Southern District of Florida, Ft. Lauderdale Division.

**1.1.52.** "Litigation Settlement Trust" means the 2022 Litigation Settlement Trust created on April 14, 2022, for the benefit of the Debtors' as provided therein.

**1.1.53.** "Litigation Settlement Trustees" means two individuals approved by the Bankruptcy Court to serve as Trustees of Litigation Settlement Trust, who will replace the interim trustee of the Litigation Settlement Trust prior to the filing of the Bankruptcy Cases.

**1.1.54.** "Litigation Claims Estimation" means the estimation of the Unsecured Litigation Claims by the Bankruptcy Court in these Bankruptcy Cases pursuant to Sections 502(c) and 105 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules of Procedure for purposes of confirmation of this Plan.

010615

**1.1.55.** "Litigation Settlement Trust Beneficiary" means the holder of a Litigation Settlement Trust Claim.

**1.1.56.** "Litigation Trust Expenses" means all costs, expenses and professional fees incurred by the Litigation Settlement Trust and the Litigation Settlement Trustees during the Support Period, specifically including, but not limited to the allowed fees and expenses of the Debtors and their professionals incurred in connection with the prosecution of the Bankruptcy Cases and those incurred after the Plan Effective Date, approved by the Litigation Settlement Trustees.

**1.1.57.** "Objection Deadline" means the deadline for Reorganized Debtors to file objections to Claims with the Bankruptcy Court established in Article 9 of this Plan.

**1.1.58.** "Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, or entity of whatever nature.

**1.1.59.** "Plan" means the Debtors' Joint Plan of Reorganization in its present form or as it may be amended, modified, or supplemented from time to time, together with all exhibits thereto.

**1.1.60.** "Plan Supplement" means, including without limitation, the forms of the material documents to implement the provisions of the Plan that are to be filed with the Bankruptcy Court as early as is practicable, but in no event later than five (5) Business Days before the Confirmation Hearing, or on such other date as the Bankruptcy Court may determine. The Plan Supplement is incorporated into the Plan as if fully set forth in the Plan and all references to the Plan refer also to the Plan Supplement.

**1.1.61.** "PSA" means that Plan Support Agreement executed by and among the Debtors and the Third-Party Funding Contributors, as may be amended.

**1.1.62.** "PTV" means Prison Planet TV, LLC, a Texas limited liability company.

**1.1.63.** "Priority Claim" means any Claim (or portion of such Claim) entitled to priority under Section 507 of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Tax Claim, or a Secured Claim.

**1.1.64.** "Priority Secured Tax Claim" means a Secured Claim of a governmental entity whose claim would be a Priority Tax Claim under Sections 502(i) or 507(a) of the Bankruptcy Code if it was not a Secured Claim.

**1.1.65.** "Priority Tax Claim" means a Claim that is entitled to priority pursuant to Sections 502(i) or 507(a)(8) of the Bankruptcy Code other than (i) a Secured Tax Claim, or (ii) an ad valorem or other form of state or local authority tax assessed on property which was transferred or foreclosed prior to the Confirmation Date.

**1.1.66.** "Professional" means any professional employed in the Chapter 11 Cases pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code or otherwise, and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Section 503(b) of the Bankruptcy Code.

**1.1.67.** "Professional Fee Claim" means a Claim of a Professional for compensation for services rendered, and/or reimbursement of costs and expenses incurred, after the Filing Date and prior to and including the Effective Date.

9

**1.1.68.**   "Proof of Claim" means any proof of claim filed with the Bankruptcy Court with respect to the Debtors pursuant to Bankruptcy Rules 3001 or 3002.

**1.1.69.**   "Property" or "Property of the Estate" means all assets of the Debtors which are property of the Estate pursuant to Section 541 of the Bankruptcy Code.

**1.1.70.**   "Pro Rata Share" means with respect to Claims, the proportion that the amount of an Allowed Claim in a particular Class bear to the aggregate amount of all Claims in such Class, exclusive of Disallowed Claims, but including Disputed Claims.

**1.1.71.**   "PQPR" means PQPR Holdings Limited LLC.

**1.1.72.**   "PQPR Secured Note" means the note held by PQPR in the face amount of $29,588,000, dated as of August 13, 2020, the repayment of which is secured by substantially all assets of FSS.

**1.1.73.**   "Protected Parties" means the Third-Party Funding Contributors and PQPR with respect to Claim

**1.1.74.**   "Quarterly Third-Party Funding" means the amounts required to be paid by the Third-Party Funding Contributors to the Litigation Settlement Trust under this Plan on a quarterly basis as set out in Section 7.2.4 of this Plan.

**1.1.75.**   "Reorganized Debtors" means the Debtors on and after the Effective Date, surviving after confirmation of the Plan.

**1.1.76.**   "Schedules" and "Statements" means the Schedules, Statements and Lists filed by the Debtors with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been and may be amended or supplemented from time to time.

**1.1.77.**   "Secured Claim" means the Claim of any Creditor which is secured by a valid, duly perfected Lien (whether voluntary or involuntary) on, or a security interest in Collateral, or which is subject to setoff under Bankruptcy Code Section 553, to the extent of the lesser of: (i) the value of the Collateral; or (ii) the amount of such Allowed Claim.

**1.1.78.**   "Subchapter V Trustee" means the subchapter v trustee appointed in the Bankruptcy Cases, or such trustee's successor appointed to serve as trustee pursuant to Section 1183 of the Bankruptcy Code.

**1.1.79.**   "Support Period" means, with respect to any Party, the period commencing on the later of (a) the Agreement Effective Date and (b) the Petition Date and ending on the date on the earlier of (i) 120 days following the commencement date and (ii) termination of   this Agreement, *provided* however that if a Confirmation Order is entered, the Support Period shall remain in effect for not less than five (5) years from the payment of the first Quarterly Third-Party Funding Payment after the Plan Effective Date.

**1.1.80.**   "Third-Party Funding Contributors" means "AEJ" and "FSS", together.

**1.1.81.**   "Timely Filed" with respect to a Claim, Interest or Administrative Expense, means, that a proof of such Claim or Interest or request for payment of such Administrative Expense was filed with the Bankruptcy Court within such applicable period fixed by the Plan, statute, or pursuant to both Bankruptcy rule 3003(c)(3) and a Final Order (e.g., the Bar Date).

**1.1.82.**   "Trustees" mean the Litigation Settlement Trustees.

**1.1.83.**  "Unimpaired Class" shall have the meaning described in Section 1124 of the Bankruptcy Code.

**1.1.84.**  "United States Trustee" means the United States Trustee for the Southern District of Texas.

**1.1.85.**  "Unsecured Claim" means any Claim (regardless of whether such Claim is covered by insurance) that is neither secured nor entitled to priority under the Bankruptcy Code, or by a Final Order of the Bankruptcy Court, including, but not limited to: (a) any claim arising from the rejection of an Executory Contract under Section 365 of the Bankruptcy Code, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code.

**1.1.86.**  "Unsecured Creditor" means all holders of Unsecured Claims other than holders of Allowed Deficiency Claims.

**1.1.87.**  "Unsecured Litigation Claim" means any Unsecured Claim arising from or related to the Litigation.

**1.2.**  __Rules of Construction.__

**1.2.1.**  <u>Interpretation</u>. Unless otherwise specified herein, all section, article and exhibit references in the Plan are to the respective section in, article of, and exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. All headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

**1.2.2.**  <u>Construction and Application of Bankruptcy Code Definitions</u>. Unless otherwise defined herein, words and terms defined in Section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan. Words or terms used but not defined herein shall have the meanings ascribed to such terms or words, if any, in the Bankruptcy Code. The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

**1.2.3.**  <u>Other Terms</u>. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any article, section, subsection, or clause contained in the Plan.

**1.2.4.**  <u>Time</u>. In computing any period prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2

## INFORMATION REGARDING PLAN

**2.1.**  __Background.__

**2.1.1.**  The Debtors are holdings companies for certain intellectual property assets. Debtor InfoW owns copyrights and domain names related to "Infowars.com." Debtor IWHealth owns cash flow from royalties and/or an agreement with Youngevity. Debtor Prison Planet TV owns copyrights and domain names related to prisonplanet.tv.

010618

**2.1.2.**   "Infowars"—a conspiracy-oriented website and media company—is operated by Free Speech Systems, LLC ("<u>FSS</u>"), which does business under a registered trademark for that name.  InfoW and Prison Planet TV license their intellectual property and domain names to FSS for use in its business but the Debtors do not produce or have any control over the content of Infowars. FSS maintains and operates the website https://www.infowars.com/.

**2.1.3.**   AEJ owns one hundred percent (100%) of the equity in FSS. Prior to the Petition Date, AEJ also owned one hundred percent (100%) of the equity of InfoW, IWHealth and Prison Planet TV. He assigned these equity interests to the Litigation Settlement Trust before the Petition Date.

## 2.2.   <u>Debtors' Involvement with the Sandy Hook Litigation</u>.

**2.2.1.**   The Debtors' financial distress stems primarily from statements of AEJ and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Various parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

**2.2.2.**   The relatives of the Sandy Hook victims and certain other parties (the "<u>Sandy Hook Plaintiffs</u>") assert, among other things, that AEJ and other employees of FSS made defamatory statements and inflicted emotional distress. In 2018, the Sandy Hook Plaintiffs brought actions in Texas and Connecticut (collectively, the "<u>Sandy Hook Lawsuits</u>") against AEJ, FSS, and certain of the Debtors. The crux of the allegations in the Sandy Hook Lawsuits is that AEJ and FSS employees damaged the Sandy Hook Plaintiffs by saying or implying that the Sandy Hook shooting did not occur, and that the entire incident was a "false flag" hoax.

**2.2.3.**   InfoW is also a defendant in other pending litigation unrelated to the events at Sandy Hook elementary school:

- *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Kit Daniels*, Cause No. D-1-GN-18-001605, pending before the 459th District Court for Travis County, Texas—This case involves an article authored by an FSS employee about the shooter at Marjory Stoneman Douglas High School in Parkland, Florida. Iterations of the article included a photograph of the plaintiff, even though the plaintiff was not involved with the shooting or even in Florida at the time.

- *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, pending before the 200th District Court for Travis County, Texas—This lawsuit was brought by the plaintiffs in the other Texas lawsuits under the Texas Uniform Fraudulent Transfer Act ("<u>TUFTA</u>"). The allegations are that AEJ diverted his assets to companies owned by insiders like his parents, his children, and himself. The Plaintiffs seek judgment allowing them to take possession and execute on the assets.

- *Larry Klayman v Infowars, LLC, et al.*, Case No. 20-61912, before the U.S. District Court for the Southern District of Florida, Fort Lauderdale Division—The plaintiff in this case brought claims against InfoW, FSS, AEJ, David Jones, and Owen Shroyer for defamation, Florida Deceptive and Unfair Trade Practices Act, tortious interference, and violation of

12

the Lanham Act for publishing disparaging statements about the plaintiff. On April 14, 2022, the District Court entered a take-nothing judgment in favor of the InfoW and the other defendants. The plaintiff has appealed to the Eleventh Circuit Court of Appeals.

**2.2.4.**   AEJ, FSS, and the Debtors have spent more than $10.0 million in legal fees and expenses since commencement of the Sandy Hook Lawsuits. Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that AEJ, FSS, and the Debtors failed to comply with discovery requirements such that judgment on liability has been entered against them by default. No court has yet to quantify the amount of the damages.[3]

**2.2.5.**   The pending litigation presents a classic "race to the courthouse." The Texas court is scheduled to be the first damages case to go to trial and is set to commence with jury selection on April 25, 2022. The damages trial in the Texas actions is scheduled for months before the damages will be determined in the actions pending in Connecticut.

**2.3.**      **2022 Litigation Settlement Trust.**

**2.3.1.**   To address the Sandy Hook Lawsuits and other litigation, and preserve assets for equal distribution to all creditors, the Debtors, AEJ, and FSS have created the Litigation Settlement Trust to provide a mechanism for the payment in full of the Litigation Claims. A copy of the Declaration of Trust is attached as **Exhibit A** hereto (the "Declaration of Trust").

**2.3.2.**   The Litigation Trust removes control of the Debtors and settlement funds from AEJ and ensures that any settlement of or judgment in the Sandy Hook Lawsuits will be paid according to the terms of the Declaration of Trust and any confirmed Plan in these Chapter 11 Cases. The Litigation Trust has been initially funded pursuant to the funding agreement attached to the Declaration of Trust and the Plan Support Agreement attached hereto as **Exhibit B** (the "PSA"). The "Initial Trust Funding" of $725,000 for administration of these Chapter 11 Cases has been paid to the interim trustee or the Debtors' professionals from exempt personal assets of AEJ.

**2.4.**     **Concept of Plan**

**2.4.1.**   The filing of these Bankruptcy Cases, the Plan, and the Plan Support Agreement is to create a centralized mechanism to maximize the economic returns to the Plaintiffs that can be generated from the commercial enterprise of the Third-Party Funding Contributors over the next five (5) years from the Effective Date.

**2.4.2.**   In addition to the supervision of the Bankruptcy Court, the confirmed Plan provides that two former United States Bankruptcy Judges shall serve as trustees (the "Trustees") over the Litigation Settlement Trust established prior to the Petition Date. Pending approval by the Bankruptcy Court, the Debtors have retained W. Marc Schwartz of Schwartz Associates, as their Chief Restructuring Officer. Debtors intend to seek approval to retain Mr. Schwartz and fully disclose the broad scope of his authority, solely subject to the supervision of the Trustees as soon as it enters the Bankruptcy Cases.

**2.4.3.**   The Debtors and the Third-Party Funding Contributors have reached a written agreement, the PSA, setting out the terms and conditions under which the Third-Party Funding Contributors will (a) fund the Bankruptcy Cases, and (b) fund the confirmed Plan during the

---

[3] The orders implementing default determinations of liability remain subject to appeal in the event that the holders of Class 3 Claims elect to continue litigation.

Support Period to provide for payment in full of all Allowed Claims. Subject in all respects to the more detailed description set forth elsewhere herein, the Plan provides:

**2.4.3.1.** Administrative Claims, Priority Tax Claims, Class 1 Claims (Other Priority Claims) and Class 2 (General Unsecured Claims) will be paid in full on or promptly after the Effective Date;

**2.4.3.2.** The Litigation Settlement Trust, created pursuant to the Declaration of Trust, attached hereto as Exhibit B, will continue to hold 100% of the member interests of the Debtors for the benefit of the holders of Class 3 Claims (Unsecured Litigation Claims);

**2.4.3.3.** The Third-Party Funding Contributors will fund to the Litigation Settlement Trust (i) $2,000,000.00 on the Effective Date, and (ii) quarterly payments in the amount of the $250,000 through twenty (20) equal payments to pay the estimated amount of all claims in full;

**2.4.3.4.** Until the Third-Party Funding Contributors declare that they will not pay in full a settlement proffered by the Litigation Settlement Trustees, the Plan shall provide that the Litigation Settlement Trustees shall hold a perfected lien and security interest in and to all of FSS's and all non-exempt AEJ assets to secure their obligations under the Plan;

**2.4.3.5.** Final determination of unliquidated Class 3 Claims shall be determined either pursuant to an estimation procedure or, at the election of the holders of such Claims if the underlying Litigation has been removed, through continuation of the pending Litigation within the federal court system;

**2.4.3.6.** The Litigation Settlement Trust shall pay Allowed Litigation Claims from assets of the Litigation Settlement Trust as they are determined; and

**2.4.3.7.** Holders of Joint Liability Claims shall be enjoined from taking any action to enforce such Joint Liability Claims against the Third-Party Funding Contributors during the Support Period, provided that there is no event of default under the Plan.

**THE CONFIRMATION OF THE PLAN DOES NOT RELEASE ANY THIRD PARTIES. CLAIMS AGAINST THE THIRD-PARTY FUNDING CONTRIBUTORS SHALL REMAIN VALID UNLESS SATISFIED IN FULL PURSUANT TO THIS PLAN.**

**2.4.4.** The Debtors submit that they have developed a construct that (a) permits equal opportunity for each holder of a Litigation Claim to realize a fair economic recovery, (b) protects the business enterprise which generates the cash to maximize the recoveries to the Allowed Claims, and (c) assures the protection for the holders of Litigation Claims that the Third-Party Contributors will not hide, secret, or abscond with assets during the Support Period.

**2.4.5.** If, on the other hand, the recovery sought by the Plaintiffs is not mere economic damages, the Debtors submit that these Bankruptcy Cases and the attendant myriad of dispute resolution procedures should be employed to bring a global settlement in these Bankruptcy Cases. This Court has potentially available two United States Bankruptcy Judges who may agree to mediate the dispute without costs to the parties. The Debtors submit the filing of these Bankruptcy Cases will bring efficiencies to the judicial system and instant value to all parties.

**2.5.** __Description of Assets__.

**2.5.1.** The Debtors will file Schedules prior to the Confirmation Hearing. Complete copies of the Schedules will be submitted as evidence at such Confirmation Hearing and be available from the Clerk of the Court.

**2.5.2.** The primary assets of the Bankruptcy Estates consist of (a) the copyrights and domain names listed below and (b) and the revenue from the Youngevity license or agreement. AEJ is the original creator and owner of the intellectual property below and has assigned them to the Debtors.

**2.5.3.** The Debtors do not have an estimated value of the intellectual property assets but believe them to be significantly less than the $2.0 million in Cash that will be delivered to the Litigation Settlement Trust for satisfaction of Class 3 Claims on the Petition Date.[4] To the best of the Debtors' knowledge, there are no liens or security interests in and to these assets.

IW Assets:

Copyrights

| Title of Work | Description/ Type of Work | If Derivative Work, Title of Original | Author |
|---|---|---|---|
| infowars.com | Website | | Alexander E. Jones |
| infowars.net | Website | | Alexander E. Jones |
| truthnews.us | Website | | Alexander E. Jones |
| whatistheendgame.com | Website | | Alexander E. Jones |

Domain Names

| Domain Name | Country | Domain Registry |
|---|---|---|
| infowars.com | U.S.A. | Epik LLC |
| infowars.net | U.S.A. | Epik LLC |
| truthnews.us | U.S.A. | Epik LLC |
| whatistheendgame.com | U.S.A. | Epik LLC |

PTV Assets:

Copyrights

| Title of Work | Description/ Type of Work | If Derivative Work, Title of Original | Author |
|---|---|---|---|

---

[4] Under this Plan, the equity in IWHealth will remain with the Litigation Settlement Trust and thus the full stream of payments will be made available to the Litigation Settlement Trust.

010622

| Endgame | Film | | Alexander E. Jones |
|---|---|---|---|
| Terrorstorm | Film | | Alexander E. Jones |
| Order of Death/BG | Film | | Alexander E. Jones |
| Martial Law | Film | | Alexander E. Jones |
| 9/11 Road to Tyranny | Film | | Alexander E. Jones |
| PS3 | Film | | Alexander E. Jones |
| PS2 | Film | | Alexander E. Jones |
| PS1 | Film | | Alexander E. Jones |
| ABDB | Film | | Alexander E. Jones |
| Masters of Terror | Film | | Alexander E. Jones |
| Prisonplanet.tv | Website | | Alexander E. Jones |

Domain Names

| Domain Name | Country | Domain Registry |
|---|---|---|
| prisonplanet.tv | U.S.A. | Register.com |

IWHealth Assets:

Rights to payments from Youngevity, which have ranged from $30,000 to $40,000 per month prior to the Petition Date, under an unsigned license/marketing agreement whereby FSS markets Youngevity products. These funds are estimated to total between $1,800,000 and $2,400,000 over the period that payments will be made under the Plan.

## 2.6.   Liabilities

Other than ordinary course taxing authorities and trade vendors, the other creditors of all three Debtors consist of Class 3 holders of Unsecured Litigation Claims, who are holders of unliquidated claims.

## 2.7.   Liquidation Analysis.

**2.7.1.**  Under Sections 1191 and 1129(a)(7) of the Bankruptcy Code a plan can be confirmed without the accepting votes of impaired classes of claims if each such class would receive under the plan "not less than" they would receive "if the debtor were liquidated under chapter 7."

**2.7.2.**  If these Bankruptcy Cases were converted to chapter 7 and the assets of each Debtor were liquidated, the only resulting proceeds would be from (a) the sale of the domain names (which would be subject to the license to FSS), (b) sale of the PTV domain name and intellectual property (subject to the license to FSS), (c) the revenue earned from the Youngevity Agreement, which would continue only so long as FSS marketed Youngevity products, and (d) the recovery on account of any litigation claims against third parties. While a formal evaluation has not been performed, the Debtors submit that each impaired class would receive not less than they would receive if the Debtors were liquidated under chapter 7. Here, the Plan provides for receipt of

16

$2,000,000 to be made available on the Effective Date from the Third-Party Funding Contributor, while no such amounts are available to the creditors upon conversion of the three Debtors to a case under chapter 7 of the Bankruptcy Code.[5]

**2.7.3.**   Because the Plan provides for payment of all creditors' Allowed Claims in full and provides that the member interests in the Debtors will be held by the Litigation Settlement Trust, the Debtors have not retained an outside consultant to appraise the liquidation value of the assets. Based on the information provided about its historical holding company business, the Debtors do not believe that the liquidation of the Debtors would result in unsecured creditors obtaining a return anywhere close to being paid in full as it is provided for under the Plan.

**2.8. <u>Sources of Income</u>.**

**2.8.1.**   During the Support Period, the confirmed Plan provides for the Trustees to have access to funds made available by the Third-Party Fund Contributors to manage the claims process, to coordinate the monitoring of the Third-Party Fund Contributors and report to the Court, if necessary, the monies to be made available under the PSA, which will serve as the Disposable Income for the Litigation Settlement Trust under the supervision of the Trustees.

**2.8.2.**   On the Effective Date of the Plan, the Third-Party Fund Contributors will fund the Litigation Settlement Trust with cash in the amount of the $2,000,000. Commencing at the end of the first quarter, beginning after the Effective Date, the Third-Party Fund Contributors will provide quarterly payments of $250,000 to the Litigation Settlement Trust for twenty (20) quarters or until Class 3 Claims are paid in full.

**2.8.3.**   The Reorganized Debtors will receive funds from the Youngevity Agreement.

**2.9. <u>Feasibility of Plan</u>.**

**2.9.1.**   The Third-Party Funding Contributors have committed to pay the Litigation Claims over five years.  This payment will come from personal exempt funds of AEJ and from the operations of FSS.

**2.9.2.**   Debtors have received the Initial Trust Funding.  In addition, during the Bankruptcy Cases, the Third-Party Funding Contributors will replenish the $200,000 deposit paid to the Litigation Settlement Trust to cover the costs of the administration of the Litigation Settlement Trust.  Also, on the Effective Date of the confirmed Plan, the Third-Party Funding Contributors will contribute $2,000,000 to the Litigation Settlement Trust and will commence making an additional $250,000 contribution per quarter to the Litigation Settlement Trust beginning the first quarter after the Effective Date.  The total consideration to be made available under the Plan is up to $9,432,000.  Attached as **<u>Exhibit C</u>** is a projection showing how the Plan would work upon Confirmation of the Plan.

**2.9.3.**   The Litigation Settlement Trust also owns, through IWH, the right to receive a royalty that is paid by a company on sales of products sold by FSS.  The royalty is approximately

---

[5] The *minimum* amounts that the Litigation Settlement Trust will be funded to pay unsecured creditors under this Plan is estimated to be $8.8 million—(a) $1.8 million from the Youngevity proceeds, (b) $2.0 million from the Effective Date Third-Party Funding, and (c) $5.0 million from the Quarterly Third-Party Funding. Under the Declaration of Trust, executed prior to the Petition Date, the Third-Party Funding Contributors provided an additional $725,000 of Initial Trust Funding to provide for the administrative expenses of these Chapter 11 Cases. The Initial Trust Funding was derived from the sale of AEJ's exempt homestead.

$38,000 per month.

**2.9.4.**   The minimum amount of money expected to be available to pay the Debtors' liabilities, including the Litigation

| | |
|---|---|
| TPF Contribution on Effective Date | $2,000,000 |
| Quarterly Payments | $5,000,000 |
| Royalty Payments (64 months) | $2,432,000 |
| Total | $9,432,000 |

**2.9.5.**   FSS is the principal entity which generates cash for AEJ and the companies he owns and is affiliated with.  In the past, FSS has generated revenues of $70 to $80 million per year.  The cost and the time it took of AEJ and other employees because of the Litigation adversely affected FSS' sales. In 2021 cash receipts from sales dropped to approximately $56,000,000.

**2.9.6.**   With the cessation of the Litigation and the implementation of a cost reduction plan, FSS is projected to be able to generate $1.1 million of positive cash flow per year going forward. If FSS can increase its revenue to the $70 to $80 million experienced in the past, then it will generate more cash.  FSS can make the payments called for by the Plan at the $1.1 million per year in projected positive cash flow.

**ARTICLE 3**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

**3.1.**   **Claims and Equity Interests Classified.**

To make the Plan easier to understand, to aid in the Plan balloting process and for all confirmation matters, all Claims (except Priority Claims and Priority Tax Claims) and Equity Interests shall be classified as set forth in this Article 3 of the Plan and their treatment set out in Articles 4 and 5 of the Plan.

**3.2.**   **Priority Claims and Priority Tax Claims.**

Section 1123(a)(1) of the Bankruptcy Code provides that Priority Claims and Priority Tax Claims shall not be classified for purposes of voting or receiving distributions under the Plan. All such Claims are to be treated separately as unclassified Claims on the terms set forth in Article 3 of the Plan.

**3.3.**   **Classes of Claims and Equity Interests.**

The Plan classifies Claims and Equity Interests of each of the Debtors as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Claims | N/A | No |
| N/A | Priority Tax Claims | N/A | No |
| Class 1 | Priority Claims | Unimpaired | No (deemed to accept) Paid in Full |
| Class 2 | General Unsecured Claims | Impaired | Yes( Paid in Full, but without interest) |

18

| Class 3 | Unsecured Litigation Claims | Impaired | Yes ( Paid in Full, but without interest) |
| Class 4 | Equity | Unimpaired | No (deemed to accept) |

### 3.4. **Impairment Controversies.**

All controversies as to whether a Class of Claims or Equity Interests are impaired under the Plan and whether they are entitled to vote for or against the Subchapter V Plan shall be resolved by the Bankruptcy Court after notice and hearing.

## ARTICLE 4

## TREATMENT OF UNCLASSIFIED CLAIMS

### 4.1. **Administrative Expense Claims**.

**4.1.1.** All Administrative Expense Claims against the Debtors shall be treated as follows:

**4.1.1.1.** Time for Filing. All holders of Administrative Expense Claims, other than Professional Persons holding Professional Fee Claims, shall file with the Bankruptcy Court a request for payment of such Claims within thirty (30) days after the Effective Date. Any such request must be served on the Debtor, its counsel and all parties requesting notice in the Bankruptcy Cases, and must, at a minimum, set forth (i) the name of the holder of the Administrative Expense Claim; (ii) the amount of the Administrative Expense Claim; and (iii) the basis for the Administrative Expense Claim. A failure to file any such request in a timely fashion will result in the Administrative Expense Claim in question being discharged and its holder forever barred from asserting such Administrative Expense Claim against the Debtors or the Reorganized Debtors.

**4.1.1.2.** Allowance. An Administrative Expense Claim for which a request for payment has been properly filed shall become an Allowed Administrative Expense Claim unless an objection is filed by the date that is thirty (30) days after a request for payment of such Administrative Expense Claim is filed. If an objection is timely filed, the Administrative Expense Claim in question shall become an Allowed Administrative Expense Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

**4.1.1.3.** Payment. Except to the extent (i) that a holder of an Allowed Class 1 Claim and the Debtors agree to a different treatment or (ii) existing agreements between the Debtor and the holder of a Class 1 Claim provide for payment of such Allowed Class 1 Claims on different terms, in which case such Claim shall be satisfied in accordance with those pre-existing agreements or policies, each holder of an Allowed Claim in Class 1 shall receive a Cash payment from the Reorganized Debtors in the amount of the Allowed Class 1 Claim on the later of 15th day after the Effective Date or 15 days after such claim becomes an Allowed Claim.

**4.1.1.4.** Professional Fee Claims. Every Professional Person holding a Professional Fee Claim that has not previously been the subject of a final fee application and accompanying Bankruptcy Court order shall file a final application for payment of fees and reimbursement of expenses no later than the date that is thirty (30) days after the Effective Date; provided, however, that a Professional Person may supplement its request up to and including the date of the  hearing

on such request to account for fees and expenses incurred following the Effective Date in connection with, among other things, preparation of the request for allowance of such Professional Fee Claim, attendance at the hearing thereon and any other allowable fees or expenses not previously requested. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. The last date to object to any final fee application shall be the twenty-first (21st) day after such fee application has been filed with the Bankruptcy Court. Allowed Professional Fee Claims shall be paid in full in Cash by the Reorganized Debtors on the later of 15th day after the Effective Date or 15 days after such claim becomes an Allowed Claim.

**4.2.    Priority Tax Claims**.

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtors agree to a different treatment, each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such Claim, Cash payments from Reorganized Debtors over a period not exceeding five (5) years from the Petition Date. Payments by Reorganized Debtors provided for herein shall be made in equal monthly installments with the first payment due on the tenth Business Day of the first month following the Effective Date. Interest shall accrue on the Priority Tax Claim in accordance with Section 511 of the Bankruptcy Code. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. If the holder of an Allowed Priority Tax Claim has a Lien on the Debtors' property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full. As of the Petition Date, the Debtors are not aware of any Priority Tax Claims.

**ARTICLE 5**

**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS UNDER THE PLAN**

**5.1.    Class 1 – Priority Claims**.

Except to the extent that a holder of an Allowed Priority Claim and the Debtors agree to a different treatment, each holder of an Allowed Priority Claim will receive in full satisfaction of such Claim, Cash payments from Reorganized Debtors on the later of 15 days after the Effective Date or 15 days after such claim becomes an Allowed Claim. As of the Petition Date, the Debtors are not aware of any Priority Claims.

**5.2.    Class 2 – General Unsecured Claims**.

Class 2 consists of General Unsecured Claims against the Debtors. Holders of Allowed Class 2 Claims shall be paid in full from Distributable Debtor Funds upon the later of  (a) thirty 30 days from the Effective Date and (b) thirty (30) days after such Claim becomes an Allowed Claim.

**5.3.    Class 3 - Unsecured Litigation Claims**.

Class 3 consists of Unsecured Litigation Claims against the Debtors. Holders of Class 3 Claims shall receive their Pro Rata Share of the Distributable Litigation Settlement Trust Funds until paid in full.

**5.4.    Class 4 – Equity Interests**.

The Litigation Settlement Trust shall retain its Interest in the Debtors.

010627

## ARTICLE 6

## <u>ACCEPTANCE OR REJECTION OF THE PLAN</u>

**6.1.** **<u>Presumed Acceptance of Plan</u>.**

Any Class that is unimpaired under this Plan is conclusively presumed to accept this Plan. Any Class that voted to accept the Plan is presumed to accept this Plan.

**6.2.** **<u>Presumed Rejection of Plan</u>.**

Any Class that voted to reject the Plan or who will receive or retain no property under the Plan is presumed to reject this Plan.

## ARTICLE 7

## <u>IMPLEMENTATION AND EXECUTION OF THE PLAN</u>

**7.1.** **<u>Means</u>.**

This Plan contemplates the distributions to holders of Allowed Claims by the Reorganized Debtors by cash presently held by the Debtors' Estates or paid to the Litigation Settlement Trust under the confirmed Plan and the PSA from the Third-Party Funding Contributors.

**7.2.** **<u>Litigation Settlement Trust</u>.**

**7.2.1.** <u>Continued Existence</u>. The Litigation Settlement Trust shall continue to exist pursuant to the Declaration of Trust. The Terms of the Declaration of Trust shall continue in force, as modified by this Plan and the Confirmation Order.

**7.2.2.** <u>Authority of Trustees</u>. The Trustees shall have authority to perform all actions set out in the Declaration of Trust and to direct the actions of the Reorganized Debtors to fulfill their obligations under this Plan.

**7.2.3.** <u>Funding by the Debtors</u>. On the Effective Date, the Debtors shall deliver all Cash held on the Effective Date to the Litigation Settlement Trust, which funds shall be held in a segregated account for the payment of Class 2 Claims by the Trustees.

**7.2.4.** <u>Funding by the Third-Party Funding Contributors</u>. On the Effective Date, the Third-Party Funding Contributors shall cause to be paid to the Litigation Settlement Trust Cash in the amount of $2,000,000. In addition, starting on the last day of the first calendar quarter beginning after the Effective Date, the Third-Party Fund Contributors will fund to the Litigation Settlement Trust quarterly payments for a period of twenty (20) quarters in the amount of the greater of (a) $250,000 per quarter and (b) the amount necessary to pay the Estimated Amount of the Class 3 Claims through twenty (20) equal quarterly installments.

**7.2.5.** <u>Joint Liability Claims</u>. Payment of the Unsecured Litigation Claims from the Litigation Settlement Trust shall be credited to payment of the Joint Liability Claims for which the Protected Parties are jointly liable.

**7.2.6.** <u>Institution and Maintenance of Legal and Other Proceedings</u>. The Litigation

21

Settlement Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the Litigation Settlement Trust.

    **7.2.7.**  <u>U.S. Federal Income Tax Matters Relating to the Litigation Settlement Trust.</u> The Litigation Settlement Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties shall report consistently with the foregoing. The Trustees may request an expedited determination under Section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Litigation Settlement Trust for all taxable periods through the dissolution of the Litigation Settlement Trust.

    **7.2.8.**  <u>Distributions to and from the Litigation Settlement Trust Free and Clear.</u> All payments to and distributions form the Litigation Settlement Trust pursuant to this Plan shall be free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person.

    **7.2.9.**  <u>Dissolution.</u> The Litigation Settlement Trust shall be dissolved and the Trustees shall be discharged from their respective duties with respect to the Litigation Settlement Trust upon completion of their duties as set forth in this Plan and the Declaration Period, which, for the avoidance of doubt, shall be no earlier than the date on which all payments and other distributions required to be made from the Litigation Settlement Trust under the Plan and the Declaration of Trust have been made, including payment in full in Cash of all Allowed Class 3 Claims and Joint Liability Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Litigation Settlement Trust, any Cash remaining in the Litigation Settlement Trust shall be distributed in accordance with the Declaration of Trust; *provided that*, in the event the Liquidation Settlement Trust is dissolved prior to the payment in full in Cash of all Joint Liability Claims, all outstanding amounts under such Joint Liability Claims shall be deemed due and payable for purposes of the distribution of such remaining Cash.

    **7.2.10.** <u>Exculpation and Indemnification of the Trustees.</u> To the maximum extent permitted by applicable law, each of the Trustees shall not have or incur any liability for actions taken or omitted in his or her capacity as a Trustee or on behalf of the Litigation Settlement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification, advancement and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as a Trustee or on behalf of the Litigation Settlement Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Litigation Settlement Trust, in each case, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustees shall be satisfied from the assets of the Litigation Settlement Trust.

**7.3.**  **<u>Continued Existence</u>.**

    Debtors shall continue to exist as Reorganized Debtors after the Effective Date. The Litigation Settlement Trust shall continue to be the owners of the Reorganized Debtors and the Trustees shall of the Reorganized Debtors during the Support Period.  W. Marc Schwartz shall continue to act as the Debtors' Chief Restructuring Officer at a compensation to be agreed to prior to the Effective Date and disclosed to the Court.

**7.4.**   **Operations of Reorganized Debtors.**

After the Effective Date, the Reorganized Debtors shall continue in business and shall carry on its business affairs, under the supervision of the Trustees and subject to this Plan and the Confirmation Order. The Reorganized Debtors shall be free to use or sell its assets, hire, and compensate the Trustees, CRO and Professionals and otherwise operate free of the restrictions, limitations and constraints existing under the Bankruptcy Code. The Reorganized Debtors shall operate in conformity with the Plan and shall make distributions to Creditors timely and in accordance with the Plan.

**7.5.**   **Vesting of Assets.**

Unless a plan is confirmed under 1191(b), on the Effective Date, all Property of the Estate of the Debtors, including, but not limited to any rights or causes of action, whether under the Bankruptcy Code or any other applicable law, shall vest in Reorganized Debtors. Claims and causes of action shall include, but not be limited to claims against affiliates and insiders. If a plan is confirmed under 1191(b), all Property shall not vest with the Reorganized Debtors until all plan payments have been made. Upon any conversion of the Bankruptcy Cases to Chapter 7, all assets vesting in Reorganized Debtors shall pass to the Chapter 7 trustee as property of the chapter 7 bankruptcy estate. A determination of which provision of the Bankruptcy Code the Debtors will confirm its Plan will be set forth in the Confirmation Order.

**7.6.**   **Preservation of the Debtors' Claims.**

All causes of action which the Debtors may have, including, but not limited to Avoidance Actions, or which may be enforceable under any statute, shall be preserved and shall constitute Property of the Estate and shall be conveyed to Reorganized Debtors on the Effective Date. The Court shall retain jurisdiction to determine all such causes of action. The Debtors do not believe they have any Avoidance Actions, and, even if they did, do not intend to pursue them, because the Plan provides that all holders of Allowed Unsecured Claims, including Litigation Claims, shall be paid in full.

**7.7.**   **Preservation of Insurance.**

Nothing in this Plan, including the discharge or release of the Debtors provided in this Plan, shall diminish, or impair the enforceability of any insurance policies that may cover any Claims against the Debtors, the Reorganized Debtors or any member, officer, director, agent, professional, financial advisor or other Person covered by any insurance policy maintained by the Debtors. The Debtors has not and does not maintain any such policies. The Reorganized Debtors may seek D&O insurance for the Trustees upon request of the Trustees.

**7.8.**   **Release of Liens.**

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with the Plan, all mortgages, deeds of trust, Liens or other security interests against the Property of the Estate shall be released on the Effective Date. The Debtors' assets are not subject to any commercial or judicial liens and the Plan does not seek to release any liens pursuant to the Plan.

**7.9.**   **Exemption from Stamp or Similar Taxes.**

In accordance with Section 1146(c) of the Bankruptcy Code: (a) the issuance, distribution, transfer or exchange of Reorganized Debtors' equity interests or other property of the Debtors'

010630

Estates; (b) the creation, modification, consolidation or recording of any deed of trust or other security interest, the securing of additional indebtedness by such means or by other means in furtherance of, on in connection with, this Plan or the Confirmation Order; (c) the making, assignment, modification or recording of any lease or sublease; or (d) the making, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, the Confirmation Order, or any transaction contemplated by any of the foregoing shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax or stamp act or real estate transfer or mortgage recording tax, or any governmental assessment. The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

**7.10.** **Recordable Order.**

Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form and shall be accepted by any recording officer for filing and recording purposes without further or additional orders when certified by the Clerk of the Bankruptcy Court.

**7.11.** **Effectuating Documents and Further Transactions.**

The Trustees and the Chief Restructuring Officer of the Debtors and/or Reorganized Debtors, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**ARTICLE 8**

**CONDITIONS PRECEDENT**

**8.1.** **Conditions to Confirmation.**

Confirmation of the Plan shall not occur unless the following conditions have been satisfied by the Debtors or waived, in writing, by the Debtors:

    **a.** The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order;

    **b.** The Third-Party Funding Contributors delivered the Initial Trust Funding required of them under the PSA, as may be amended, executed the PSA and delivered the PSA and all associated agreements related thereto, that conforms with the Plan;

    **c.** The Declaration of Trust is executed and delivered such that the Trustees are the rightful owners of the Reorganized Debtors during the Support Period;

    **d.** The Trustees have agreed to serve, the Bankruptcy Court has approved the Trustees, and the Trustees have approved of the Plan;

    **e.** W. Marc Schwartz is designated as the Chief Restructuring Officer of the Debtors and such retention is approved by the Bankruptcy Court;

    **f.** The Confirmation Order provides for an injunction against the continued prosecution of the Litigation against the Third-Party Funding Contributors during the Support Period, as

long as the parties are in compliance with the terms of the Confirmation Order and the Plan; and

**g.** The Bankruptcy Court has estimated for purposes of feasibility the amount of the Allowed Class 3 Claims and the estimated amount of such claims is not greater than the funding dedicated to the Litigation Settlement Trust under this Plan.

**8.2.** <u>**Conditions to the Effective Date**</u>.

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless, and until, each of the following conditions have been satisfied by the Debtors or, if applicable, waived, in writing by the Debtors and the Third-Party Funding Contributors:

**a.** The Confirmation Order, in a form acceptable to the Debtors and the Third-Party Funding Contributors, shall have become a Final Order, provided however, that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Debtors and the Third-Party Funding Contributors, unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case the Effective Date may be, again at the option of the Debtors and Third-Party Funding Contributors, the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order;

**b.** The Third-Party Funding Contributors have provided the Effective Date Third-Party Funding to the Litigation Settlement Trust;

**c.** W. Marc Schwartz is designated as the Chief Restructuring Officer of the Reorganized Debtors under substantially the same scope as with the Debtors with the designated powers like the ones he had as the CRO during the Bankruptcy Cases is approved by the Bankruptcy Court; and

**d.** No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, if made, remains pending.

**8.3.** <u>**Notice to Bankruptcy Court**</u>.

Promptly after the Effective Date, Reorganized Debtors shall file with the clerk of the Bankruptcy Court a Notice that the Plan has become effective; provided, however, that failure to file such notice shall not affect the effectiveness of the Plan or the rights and substantive obligations of any entity hereunder.

## ARTICLE 9

## <u>PROCEDURES FOR DISPUTED CLAIMS</u>

**9.1.** <u>**Generally**</u>.

**9.1.1.** Except as otherwise provided in the Plan, all claims against the Debtors that are disputed as of the Effective Date shall be subject to the Claims Resolution procedures set forth in the Plan. The following procedures will be applicable to all disputed Claims:

010632

**9.1.1.1.**   Objections to Claim. Except as is otherwise provided for with respect to Professional Fees or Class 3, or as otherwise ordered by the Bankruptcy Court, objections to Claims and Equity Interests shall be prosecuted as follows:

**9.1.1.2.**   Pre-Effective Date Objections. Prior to the Effective Date, any party entitled to do so under the Bankruptcy Code or order of the Court may file and prosecute objections to Claims. The failure of the Debtors prior to Confirmation to object to a Claim for purposes of voting on the Plan shall in no way be deemed to be a waiver of the right of Reorganized Debtors to object to such Claim in whole or in part.

**9.1.1.3.**   Post Effective Date Objections. After the Effective Date, objections to Claims may be made exclusively by the Reorganized Debtors. It is contemplated that majority of Proofs of Claims will be filed by holders of Litigation Claims. None of the Litigation Claims are liquidated, non-contingent or undisputed. Therefore, the Debtors anticipate the initial Proofs of Claims shall be filed in an unliquidated in amount, potentially contingent, and could be subject to dispute.

**9.1.1.4.**   Time to File Objections to Claim. The Reorganized Debtors shall file an Objection to Claim as soon as practicable, but in no event later than sixty (60) days after the later of (a) the Effective Date, (b) the Bar Date, or (c) other date set by the Court. The filing, prosecution, settlement, or withdrawal of all objections to Claims after the Effective Date are reserved to the sound discretion of Reorganized Debtors under the supervision of the Trustees.

**9.1.1.5.**   Disputed Claim Reserve. From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by a Final Order of the Bankruptcy Court or continuation of the Litigation pursuant to this Plan, the Litigation Settlement Trustees shall, consistent with and subject to Section 1123(a)(4) of the Bankruptcy Code, with respect to each applicable class of Claims against the Debtors, retain in the applicable Disputed Claims Reserve for such Class an aggregate amount equal to the Distributions that would have been made to Holders of Disputed Claims of such Class as if such Disputed Claims were Allowed Claims against the Debtors, in each case in an amount equal to the least of (i) the filed amount of such Disputed Claims, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claims and (iii) such other amounts as may be agreed upon by the Holders of such Disputed Claims and the Trustees.

**9.1.1.5.1.**   Interest on Claims. Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

## 9.2.   **Class 1 (Priority) and Class 2 (General Unsecured) Claims.**

**9.2.1.**   Claim Determined by Contested Matter. Except as is otherwise provided for with respect to Professional Fees or Class 3 Claims, or as otherwise ordered by the Bankruptcy Court, disputed claims shall be resolved by an Objection to Claim or estimation of an unliquidated claim.

**9.2.2.**   Disallowance of Penalties and Fines. No distribution shall be made under this Plan on account of, and no Allowed Class 1 or Class 2 Claim shall include, any fine, penalty or exemplary

or punitive damages relating to or arising from any default or breach by the Debtors, and any Claim on account of such fine, penalty, or exemplary or punitive damages shall be deemed disallowed, whether an objection is filed to such Claim.

**9.3.    Class 3 (Litigation) and Joint Liability Claims**.

**9.3.1.**    Estimation of Claims. Absent election to continue the Litigation pursuant to this Plan, unliquidated Class 3 Claims shall be liquidated pursuant to a motion to estimate such claims for purposes of allowance pursuant to Bankruptcy Code § 502(c). The liquidation of such Class 3 Claims shall also determine the amount of any related Joint Liability Claim. The Debtors shall file a motion to estimate such claims and establish procedures for such estimation within sixty (60) days after the Effective Date.

**9.3.2.**    Optional Election to Continue Pending Lawsuits. To the extent that the relevant action underlying a Class 3 Claim was originally initiated in federal court or has been and remains removed pursuant to 28 U.S. Code § 1452 and transferred to this Court, holders of Class 3 Claims shall have the option to elect to liquidate Class 3 Claim through the pending litigation. In the event of such election, the injunctions contained set forth in Article 12 of this Plan shall be modified to allow the continuation of the action solely for purposes of liquidating the relevant Class 3 Claims and any related Joint Liability Claims.

**9.3.3.**    Limited Scope of Estimation. Under the estimation procedures to be established pursuant to Section 9.3.1 above, liability shall be deemed established with respect to the Debtors and the Third-Party Funding Contributors to the extent liability was established against such parties prior to the Petition Date, without recourse to appeal or reconsideration by the Bankruptcy Court with respect to such established liability. For the avoidance of doubt, to the extent that the holder of a Class 3 Claim elects to continue the pending Litigation to liquidate the Class 3 and/or Joint Liability Claims, the Debtors and the Third-Party Funding Contributors shall retain all rights with respect to any established liability, including the right to appeal or seek reconsideration of liability.

**9.3.4.**    Time for Election. Holders of Class 3 Claims electing to liquidate their claim through continuation of the pending Litigation, shall file with the Court and serve on counsel for the Reorganized Debtors notice of such election not later than thirty (30) days after the Effective Date. For the avoidance of doubt, absent such election, all unliquidated Class 3 Claims shall be determined by estimation pursuant to § 502(c).

**ARTICLE 10**

**PROVISIONS GOVERNING DISTRIBUTIONS**

**10.1.    Distributions for Claims Allowed as of the Effective Date**.

No distributions shall be made upon any Claim or Equity Interest except to Allowed Claims and Equity Interests, whether allowance results from: (i) the provisions of the Code; (ii) the entry of a Final Order on an objection to a Claim or Equity Interest; (iii) the determination of an objection to Claim or Equity Interest contained in an adversary proceeding or other pending litigation which the Court has directed to liquidate the Claim of a Creditor Equity Interest holder; (iv) through stipulation entered into between Reorganized Debtors and a Creditor or holder of an Equity Interest; (v) through estimation pursuant to Bankruptcy Code § 502(c), or (vi) under the

express terms of the Plan. Nothing herein shall preclude the payment of the Debtors' operating expenses without Court order.

**10.2.** **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**10.2.1.** <u>Delivery of Distributions in General</u>. Distributions to holders of Allowed Claims shall be made at the addresses set forth in the Proofs of Claim; (ii) the Debtors' Schedules; or (iii) other records of Reorganized Debtors at the time of the distribution.

**10.2.2.** <u>Undeliverable and Unclaimed Distributions</u>.

**10.2.2.1.** Holding and Investment of Undeliverable and Unclaimed Distributions—If the distribution to any holder of an Allowed Claim is returned to Reorganized Debtors or the Litigation Settlement Trust as undeliverable or is otherwise unclaimed, no further distributions shall be made to such holder unless and until the Reorganized Debtors or Trustees are notified in writing of such holder's then-current address. Undeliverable and unclaimed distributions shall be set aside or, in the case of a Cash distribution, deposited in a segregated, interest-bearing account, designated as an "unclaimed distribution reserve" (the "<u>Unclaimed Distribution Reserve</u>"), for the benefit of all such similarly situated Persons until such time as a distribution becomes deliverable or is claimed.

**10.2.2.2.** After Distributions Become Deliverable—Reorganized Debtors shall make all distributions that have become deliverable or have been claimed after a distribution without interest.

**10.2.2.3.** Failure to Claim Undeliverable Distributions—Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the Confirmation Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors and the Estate, Reorganized Debtors, or their property. In such cases, any Cash or other property held in the Unclaimed Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require anyone to attempt to locate any holder of an Allowed Claim.

**10.3.** **Withholding and Reporting Requirements**.

In connection with the Plan and all distributions thereunder, Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**10.4.** **IRS Form W-9**.

Within ninety (90) days of the Effective Date, an Internal Revenue Service Form W-9 will be mailed to each Creditor to whom a Cash distribution is to be made. No distribution hereunder shall be made to a Creditor until that Creditor prepares, executes, and returns to Reorganized Debtors the Internal Revenue Service Form W-9.

010635

**10.5.** __Setoffs__.

Reorganized Debtors may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtors may have against the holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Debtors of any such Claim that the Debtors may have against such holder.

**10.6.** __Payments and Distributions with Respect to Disputed Claims__.

No payment or distribution under the Plan shall be made on account of any Claim unless and until such Claim becomes an Allowed Claim by Final Order of the Court.

## ARTICLE 11

## EXECUTORY CONTRACTS

**11.1.** __No Effect__.

All Executory Contracts and unexpired leases as of the Petition Date that have not been assumed or rejected by separate order shall not be affected by this Plan or the Confirmation Order. The Executory Contracts and unexpired leases shall "ride through" unaffected to the fullest extent permitted by applicable law.

## ARTICLE 12

## EFFECT OF CONFIRMATION

**12.1.** __Binding Effect__.

Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtors and inure to the benefit of, and be binding on, any such holder's respective successors and assigns, regardless of whether any Claim or Interest of such holder is Impaired under this Plan or whether such Holder has accepted this Plan.

**12.2.** __Discharge of Claims against and Interests in the Debtors__.

Subject to Section 12.3 of this Plan, upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Holder (as well as any trustee or agent on behalf of such Holder) of a Claim or Interest and any successor, assign and affiliate of such Holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by Section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, upon the Effective Date, all such Holders of Claims against or Interests in the Debtors, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to Sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, any Debtor.

**12.3.    Limitation on Discharge**.

If the Plan is confirmed under Section 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first three (3) years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code. The Debtors will not be discharged from any debt:

**a.**    On which the last payment is due after the first 3 years of the plan, or as otherwise provided in Section 1192 of the Bankruptcy Code; or

**b.**    Excepted from discharge under § 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

**12.4.    Pre-Confirmation Injunctions, Stays, Stipulations, and Discovery Orders**.

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under Sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**12.5.    Injunction against Interference with Plan**.

Subject to Section 15.4 of the Plan regarding withdrawal and revocation of the Plan, upon entry of the Confirmation Order, all Holders of Claims against or Interests in the Debtors, holders of Joint Liability Claims, and other parties in interests shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan and the Plan Documents.

**12.6.    Plan Injunction**.

Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of this Plan; *provided, however,* that nothing contained herein shall preclude such Persons who have held, hold or may hold Claims

30

against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of this Plan.

**12.7.    Temporary Injunction Regarding Joint Liability Claims**.

In order to supplement the injunction effect of the Plan, the following injunction shall be incorporated in the Confirmation Order and take effect as of the Effective Date:

**12.7.1.** Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan, and in consideration of the commitments of the Third-Party Funding Contributors despite not obtaining any release under this Plan, and pursuant to the exercise of the equitable jurisdiction of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Joint Liability Claim shall for the duration of the Support Period be stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Joint Liability Claims, including:

**12.7.1.1.**   commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Litigation Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Joint Liability Claims;

**12.7.1.2.**   Enforcing, levying, attaching collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Joint Liability Claims;

**12.7.1.3.**   creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Joint Liability Claims;

**12.7.1.4.**   asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Joint Liability Claims; and

**12.7.1.5.**   taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Joint Liability Claims.

**12.7.2.** Reservations. Notwithstanding anything to the contrary in this Section 12.7, the Channeling Injunction shall not stay, restrain, bar, or enjoin:

**12.7.2.1.**   The rights of Holders of Litigation Claims to the treatment afforded to them under the Plan;

**12.7.2.2.**   The right to pursue any claim against any Protected Parties in the event that any Allowed Litigation Claim is not paid in full pursuant to this Plan at the conclusion of the Support Period; or

010638

**12.7.2.3.**   The right to assert any claim against any Protected Parties in the event that there is a default under this Plan that is not remedied or disputed timely under the procedure set out in Section 15.2 or Section 15.3 of this Plan.

**12.7.3.** <u>Tolling of Joint Liability Claims</u>. If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Joint Liability Claim and such action or proceeding is enjoined by the Temporary Injunction, then such period shall be tolled with respect to claims against the Protected Parties from the Effective Date of this Plan until the termination of the Support Period. For the avoidance of doubt, if a period to commence or continue an action had expired prior to the Effective Date, nothing in this Plan shall revive the period for commencing or continuing the action.

**12.7.4.** <u>Violation of Temporary Injunction</u>. In the event that any Person takes any action that a Protected Person believes violates the Channeling Injunction as it applies to any Protected Party, the Protected Party shall be entitled to make an emergency application to the Bankruptcy Court for relief and may proceed by contested matter rather than by adversary proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Channeling Injunction. Upon determining that a violation of Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan; (ii) the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (iv) a fine or penalty paid into the Bankruptcy Court; (v) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vi) an appropriate sanction on any attorney or law firm responsible for the violation; (vii) injunctive relief to prevent future violations by the Person or its counsel; and (viii) attorney and other professional fees incurred by any Protected Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

**12.7.5.** <u>No Modification</u>. Upon the occurrence of the Effective Date, the Channeling Injunction shall be a permanent injunction and there shall be no modification, dissolution, or termination of the Channeling Injunction.

## 12.8. **Exculpation**.

To the maximum extent permitted by applicable law, neither the Debtors, Reorganized Debtors, Trustees nor any of their respective partners, general partners, members, officers, directors, employees, agents, advisors or Professionals have or may incur any liability to any holder of a Claim or Equity Interest, or any other party in interest, or any of their respective members or former members, agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan (the "<u>Chapter 11 Activities</u>"), except for their acts or omissions constituting willful misconduct or gross negligence, as finally determined by a court of competent jurisdiction, and in all respects are entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in connection with the Chapter 11 Activities. No holder of a Claim, Equity Interest or any other party in interest,

including their respective agents, employees, representatives, financial advisors, attorneys or affiliates, have any right of action against the Debtors, Reorganized Debtors, or any of their respective partners, general partners, officers, directors, members, employees, agents, advisors or Professionals for any act or omission in connection with the Chapter 11 Activities, except for their acts or omissions constituting willful misconduct or gross negligence as finally determined by a court of competent jurisdiction.

**12.9.**   **Injunction Related to Exculpation**.

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action exculpated pursuant to this Plan.

## ARTICLE 13

## JURISDICTION

**13.1.**   **Retention of Jurisdiction**.

The Bankruptcy Court shall retain and have all the jurisdiction conferred upon it by the Bankruptcy Reform Act of 1978, including all amendments thereof now existing or hereafter arising, and all amendments made to Title 28 of the United States Code after October 1, 1979. Without limiting the foregoing in any way, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Cases after the Confirmation Date in respect to the following matters to the fullest extent under applicable law:

**a.**   To enable any party in interest (including the Reorganized Debtors) to consummate all proceedings that it may bring prior to the Confirmation Date to set aside Liens, or to recover any preferences, transfers, assets, Claims or damages to which said party may be entitled, or to reject any contracts and recover any property under the provisions of the Bankruptcy Code or other federal or state law;

**b.**   To hear and determine all Claims, estimation of claims, and objections to Claims, including Claims arising from the rejection of any Executory Contract and any objections which may be made thereto;

**c.**   To liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

**d.**   To adjudicate all Claims to any Lien on any Property of the Estate or any proceeds thereof;

**e.**   To recover all assets and Property of the Estate, wherever located, to the extent necessary for the consummation of the Plan;

**f.**   To Allow or disallow any Claim;

**g.**   To resolve any disputes pertaining to the terms and conditions of the sale of any Property of the Estate;

**h.**   To resolve any disputes pertaining to the business operations of the Debtors during the pendency of the Chapter 11 Cases;

**i.** To enter any orders which may be necessary or appropriate to modify, carry out or enforce the provisions of the Plan;

**j.** To determine any defaults under the Plan, and the consequences of such default;

**k.** To resolve any disputes over the meaning of any provision of the Plan;

**l.** To make such determinations as are specifically provided in the Plan;

**m.** To hear and determine all requests for compensation and/or reimbursement of expenses which may be required under the Code, and not otherwise dispensed with under the Plan; and

**n.** To enter a final decree pursuant to Section 350 of the Bankruptcy Code and Bankruptcy Rule 3022.

**13.2.** **Failure of Bankruptcy Court to Exercise Jurisdiction**.

If the Bankruptcy Court abstains or exercises discretion not to hear any matter within the scope of its jurisdiction, nothing herein shall prohibit or limit the exercise of jurisdiction by any other tribunal having competent jurisdiction over such matter.

## ARTICLE 14

## MODIFICATION OF PLAN

**14.1.** **Pre-Confirmation Modifications**.

The Debtors may propose amendments or modifications to the Plan at any time prior to the Confirmation Date, with leave of the Court and upon notice pursuant to Section 1127(a) of the Bankruptcy Code and Bankruptcy Rules 3019.

**14.2.** **Post-Confirmation Modifications**.

After the Confirmation Date, Modification of the Plan is permitted only upon Court order and only as authorized under Section 1193 of the Bankruptcy Code.

## ARTICLE 15

## GENERAL PROVISIONS

**15.1.** **The Subchapter V Trustee**.

The trustee appointed under Section 1183(a) of the Bankruptcy Code will have appropriate access to the management, books and records and professionals of the Debtors to evaluate the Plan. The Trustee's term is anticipated to end upon substantial consummation of the Plan. As permitted by Section 1194(b) of the Bankruptcy Code, the Plan provides that the Debtors, and not the Trustee, will make all required payments under the Plan, thus resulting in administrative cost savings. The Trustee shall make its required filings to discharge its duties.

**15.2.** **Default in Plan Payments**.

**15.2.1.** Cure Period. In the event of a non-monetary or monetary default by the Debtors, Reorganized Debtors, or Trustees under this Plan, the affected creditor shall provide written notice

34

of such default as provided herein. The Debtors, Reorganized Debtors, or Trustees shall have sixty (60) days to cure the default from the earlier to occur of: (i) the date of receipt of the written notice sent by certified mail or overnight delivery service, or (ii) the date of receipt of the written notice sent by first class mail to cure the default. (For the purposes of the written notice by United States first class mail, postage prepaid, such notice will be deemed received five (5) days after depositing the same in the United States mail).

**15.2.2.** Effect of Uncured Default. In the event the Debtors, Reorganized Debtors, or Trustees do not cure the default within the sixty (60) day period provided herein, the affected Creditor or Interest Holder shall be entitled to pursue its state and/or federal law remedies—as limited by the Plan—without further notice or hearing before the Court. In the event the Plan is confirmed pursuant to 11 U.S.C. §1191(b), the following default provisions shall apply: Pursuant to 11 U.S.C. §1191(c)(3), if payments are not made by the Debtors, Reorganized Debtors, Trustee, or Third-Party Funding Contributors as required by the Plan and Confirmation Order, Creditors shall have the right to seek dismissal or conversion of the Bankruptcy Cases. The Bankruptcy Court shall retain jurisdiction to determine all matters related to enforcement of the Plan and Confirmation Order in connection with such default.

## 15.3.   **Default in Third-Party Funding**.

**15.3.1.** Cure Period. In the event of a non-monetary or monetary default by the Third-Party Funding Contributors under this Plan, the PSA, or the Declaration of Trust, the Trustees shall provide written notice of such default to the Third-Party Funding Contributors. The Third-Party Funding Contributors shall have sixty (60) days to cure the default from the earlier to occur of: (i) the date of receipt of the written notice sent by certified mail or overnight delivery service, or (ii) the date of receipt of the written notice sent by first class mail to cure the default. (For the purposes of the written notice by United States first class mail, postage prepaid, such notice will be deemed received five (5) days after depositing the same in the United States mail).

**15.3.2.** Effect of Uncured Default. In the event the Third-Party Funding Contributors do not cure the default within the sixty (60) day period provided herein, (a) the Trustees shall be entitled to retain all funds received from the Third-Party Funding Contributors as liquidated damages and (b) the temporary channeling injunction imposed by Section 12.7 of this Plan shall expire and Creditors may pursue all remedies under applicable law against the Protected Parties, without further order from the Bankruptcy Court. The Bankruptcy Court shall retain jurisdiction to determine all matters related to enforcement of the Plan and Confirmation Order in connection with such default.

## 15.4.   **Revocation, Withdrawal or Non-Consummation**.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file  subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if confirmation or consummation does not occur, then: (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

010642

**15.5.** **Severability of Plan Provisions**.

If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**15.6.** **Successors and Assigns**.

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

**15.7.** **Final Decree**.

The Debtors shall file an application for entry of a final decree within one (1) year after the Effective Date.

**15.8.** **Notices**.

Unless otherwise provided herein or in any Plan Supplement document, all notices or demands required or permitted hereunder shall be deemed to have been duly given and served when made in writing and deposited in the United States Mail, certified mail (return receipt requested), in an envelope addressed to the last known address of the noticed party, with postage prepaid. Any notices to be provided to the Reorganized Debtors shall be addressed as follows:

To the Reorganized Debtors:

> W. Marc Schwartz
> Chief Restructuring Officer
> Reorganized InfoW, Inc.
> 712 Main Street, Suite 1830
> Houston, Texas, 77002

With a copy to the attorneys for the Debtors:

> Kyung S. Lee/R. J. Shannon
> Parkins Lee & Rubio LLP
> Pennzoil Place
> 700 Milam-13th Floor
> Houston, Texas 77002

**15.9.   <u>Governing Laws</u>**.

The Plan shall be governed by the laws of the State of Texas and the laws of the United States, as may be applicable.

**15.10.   <u>Cramdown</u>**.

**15.10.1.**      The Debtors may request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

**15.10.2.**      Subchapter V modifies the rules under which particular classes of claims can be crammed down. Subchapter V permits a court to disregard Section 1129(a)(10) of the Bankruptcy Code and cram down a plan even if no impaired class of claims accepts the plan. Specifically, Section 1191(b) of the Bankruptcy Code provides that if all the applicable requirements of Section 1129(a) of the Bankruptcy Code are met other than Sections 1129(a)(8), (10), and (15), the bankruptcy court can confirm the plan if:

15.10.2.1. The plan does not discriminate unfairly against any impaired, non-consenting class.

15.10.2.2. Is fair and equitable regarding each class of impaired claims or interests that has rejected the plan.

*[Signature Page Follows]*

The Debtors, InfoW, LLC, IWHealth, LLC, and Prison Planet TV, LLC, as debtors in possession in the above-captioned Chapter 11 Cases, submit the Plan in good faith pursuant to all requirements of the Bankruptcy Code, and submits that within its knowledge, information and belief, the Plan is fair and equitable, and is not proposed in violation of Section 1129 of the Bankruptcy Code or by any means forbidden by law, and should be confirmed.

Dated: April __, 2022

Respectfully submitted,

INFOW, LLC

By:_____

Its:_____

-and-

IWHEALTH, LLC

By:_____

Its:_____

-and-

PRISON PLANET TV, LLC

By:_____

Its:_____

-and-

PARKINS LEE & RUBIO LLP

By:_____

Its:_____

010645

PLR PROPOSED FINAL DRAFT 4/17/2022 1:10 PM

# Exhibit A

# Declaration of Trust



PLR PROPOSED FINAL DRAFT 4/17/2022 1:10 PM

# Exhibit B

# Plan Support Agreement



010647

# Exhibit C

# Plan Feasibility Projection



010648

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
June 10, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **INFOW, LLC** *et al.* | § | **CASE NO. 22-60020** |
| | § | |
| **DEBTORS.** | § | **CHAPTER 11 (Subchapter V)** |
| | § | **Jointly Administered** |
| | § | |

**STIPULATION AND AGREED ORDER
DISMISSING DEBTORS' CHAPTER 11 CASES
[Related to ECF. No.  50]**

This *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* is entered into by and among the above-captioned debtors (the "Debtors"), Melissa Haselden as the duly appointed Subchapter V Trustee (the "Sub V Trustee") and the United States Trustee ("UST" and together with the Debtors and the Sub V Trustee, the "Parties").

WHEREAS, on April 17, 2022 and April 18, 2022, the Debtors filed their bankruptcy cases which are jointly administered under Case No. 22-60020 (collectively, the "Chapter 11 Cases").

WHEREAS, the Connecticut Plaintiffs filed their *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Designation as Subchapter V Small Business Vendors* (sic) [ECF No. 36] on April 26, 2022 (the "Connecticut Plaintiffs MTD").

WHEREAS, the Texas Plaintiffs filed *The Texas Litigation Plaintiffs' Supplemental Motion to Dismiss Petition* [ECF No. 42] on April 27, 2022 (the "Texas Plaintiffs MTD").

WHEREAS, on April 29, 2022, the UST filed its *Motion to Dismiss Debtors' Chapter 11 Cases* [ECF No. 50] (the "UST MTD").

WHEREAS, the Texas and Connecticut Plaintiffs have dismissed the Debtors with prejudice from the state court litigation and stipulated that they are no longer creditors and claim holders against the Debtors.

010649

WHEREAS, Marc Schwartz, the Chief Restructuring Officer of the Debtors, has determined that it is in the best interest of the Debtors' estates and their creditors not to continue the Chapter 11 Cases in light of the dismissal with prejudice of the Debtors from the lawsuits against them by the Texas and Connecticut Plaintiffs.

WHEREAS, Debtors and the UST wish to stipulate to the disposition of the Chapter 11 Cases.

**Accordingly, it is hereby AGREED and, upon approval of the Court, ORDERED that:**

1. The Chapter 11 Cases are hereby dismissed pursuant to 11 U.S.C. § 1112(b) upon entry of this Order.

2. The Sub V Trustee is hereby discharged from her duties upon entry of this Order.

3. Within three (3) business days from the entry of this Order, the Debtors shall advance $25,000 to the Sub V Trustee to hold in her IOLTA trust account for application against any fees and expenses approved for payment by this Court.

4. Within ten (10) days from the entry of this Order, the Sub V Trustee shall file a final application seeking approval of her fees and expenses related to these Chapter 11 Cases. All parties shall have the right to object to and contest the allowance of all fees and expenses sought by the Sub V Trustee.

5. Upon the order approving the Sub V Trustee's fees and expenses becoming a final order, the Sub V Trustee shall take into income the allowed fees and expenses from the IOLTA trust fund account.  Any amount remaining after taking the allowed amount into income by the Sub V Trustee shall be returned to the Debtors.

010650

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Stipulation and Agreed Order.

Signed:  June 10, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

**AGREED TO AND ENTRY REQUESTED:**

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

By: /s/Jayson B. Ruff
Jayson B. Ruff
Trial Attorney
Michigan Bar No. P69893
515 Rusk, Ste. 3516
Houston, TX  77002
Telephone:  (713)718-4650 ext. 252
Facsimile:  (713)718-4670

– and –

INFOW, LLC (F/K/A INFOWARS, LLC),
IWHEALTH, LLC (F/K/A INFOWARS
HEALTH, LLC), AND PRISON PLANET TV, LLC

/s/ Kyung S. Lee
KYUNG S. LEE PLLC
Kyung S. Lee
State Bar No. 12128400
klee@kslpllc.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. 713-301-4751

Proposed Counsel to the Debtors

– and –

3

SUBCHAPTER  V TRUSTEE

By: /s/Mellissa Haselden
Melissa Haselden
700 Milam, Suite 1300
Houston, TX 77002
Tel. 832-819-1149

010652